James P. Walsh, CSB. No. 184620
Gwen Fanger, CSB No. 191161
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
Telephone: (415) 276-6500
Facsimile:    (415) 276-6599
budwalsh@dwt.com

Attorneys for Defendants and Claimant
BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and Claimant, F/V POINT LOMA Fishing Company, Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and, F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8 foot long fishing vessel, her engines, tackle, furniture apparel, etc., *in rem*, and Does 1-10, <br><br> Defendants. | No. C-07-2952-WHA <br><br> **DECLARATION OF BARRY A. COHEN IN SUPPORT OF DEFENDANTS' MOTION TO VACATE ORDER OF ARREST** <br><br> **Date: August 16, 2007** <br> **Time: 8:00 a.m.** <br> **Place: Courtroom 9, 19th Floor** |

I, Barry A. Cohen, declare as follows:

1.  I am a resident of the State of California and currently reside in Santa Maria, California. I am a named Defendant in this lawsuit. I make this declaration in support of Defendant's Motion to Vacate Order of Arrest. The facts set forth in this declaration are personally known to me to be true and, if called as a witness, I could and would testify to the following:

2.  For most of my adult life, I have been engaged in various aspects of the fishing

1

1   industry in California, including in the processing sector and in owning and operating fishing
2   vessels. I have been engaged in the fisheries business in California for over 40 years.

3       3.    For at least 10 years, I have done business with the Plaintiff in this case, Del Mar
4   Seafoods, Inc. ("Del Mar"). In fact, from 2004 until 2006, I was employed by Del Mar in its
5   processing plant at Watsonville, California and was paid $2,000 a week. The company also
6   asked me to help deal with issues at its processing plant in Astoria, Oregon in 2006, which I did.
7   Upon my return from Oregon, I was let go in October 2006 because I was told by Joe Cappuccio
8   that the company no longer wished to be in the groundfish business. I had been told by Joe
9   Roggio, prior to moving from Cambria, California to Aptos, California in 2004, that I could have
10  a job with Del Mar as long as I wanted if I moved up there to work for them.

11      4.    In February 1999, Del Mar and I formed a joint venture, the purpose of which was
12  to buy, process, and sell fish from a site I leased at the Port San Luis Pier in Avila Beach,
13  California. Del Mar agreed to fund the joint venture and I supplied a processing crew, access to
14  fishing vessel production, and sales relationships. In 2001, or thereabouts, Del Mar and I began
15  planning for a new joint venture in Mexico, using the F/V POINT LOMA. In this context, I was
16  dealing with Joe Cappuccio, the President of Del Mar. Del Mar had advanced funds to me to
17  upgrade the F/V POINT LOMA as part of an anticipated 50/50 partnership in the Vessel. The
18  agreement for this 50/50 partnership was oral. Later that year, because Del Mar did not want to
19  continue the 50/50 partnership, but had provided funds to upgrade the vessel, we agreed to turn
20  Del Mar's contributed funds into a loan.

21      5.    About two years later, in 2003, Del Mar requested that we provide security for this
22  prior loan. We then entered into a Promissory Note with Del Mar to make arrangements to repay
23  the company over an extended period of time. We also entered into a Ship Mortgage with Del
24  Mar as security for repayment of the loan amount of $215,000. In the transaction, we were not
25  represented by counsel. Del Mar's attorneys drafted the Promissory Note and Ship Mortgage.
26  The entire purpose of the financing arrangement was to provide security for repayment of the
27  funds used to upgrade the vessel, and no other.

28

DAVIS WRIGHT TREMAINE LLP

2

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

6. Chris Cohen and I are still married and I am acting in this case as agent for the interests of the marital community. My wife currently resides in Arizona.

7. In 2004, we transferred, the ownership of the F/V POINT LOMA to a Subchapter S corporation, the F/V Point Loma Fishing Company, Inc., of which I am the President and manager and in which my wife and I own the stock 50/50. The F/V POINT LOMA remains subject to Del Mar's Ship Mortgage. Attached as Exhibit A to this declaration is a true copy of the vessel's current documentation certificate issued by the U.S. Coast Guard. I am acting in this case as the agent for the owner of the vessel, the F/V Point Loma Fishing Company, Inc.

8. The F/V POINT LOMA engages in the groundfish fisheries located outside the State of California and in the U.S. Exclusive Economic Zone ("EEZ")(from three to 200 nautical miles) and is licensed to land its catch only in the State of California. The vessel's home port is Port San Luis, California. I have never used the vessel to fish anywhere except in the EEZ off California. At no time have I ever threatened to move the vessel to another state or another part of California, nor could I do so very easily without obtaining new licenses and new markets.

9. A special limited entry permit is required to engage in the Pacific Groundfish Fisheries off California regulated by the National Oceanic and Atmospheric Administration ("NOAA") in the U.S. EEZ. However, unlike most other such permits, the NOAA permit is issued not to the vessel but to a person qualifying as the owner of the permit. The NOAA permit has been issued to, and is owned by, the F/V Point Loma Fishing Company, Inc. Attached as Exhibit B is a copy of the NOAA permit held by the company. The permit may be used on the F/V POINT LOMA or it may be transferred to another vessel of similar length.

10. The Promissory Note and Ship Mortgage do not cover the NOAA permit for at least two reasons. First, neither the Promissory Note nor the Ship Mortgage contains language that includes the NOAA permit as security. Second, and more importantly, NOAA does not recognize the existence of liens against such permits. Attached as Exhibit C is a copy of a letter from NOAA confirming this position. Thus, I have never agreed to provide Del Mar a security interest in this NOAA permit.

3

11.     In December of 2004, while I was working for Del Mar, I made a $5,000 payment on the Promissory Note.  Attached as Exhibit D is the check representing this payment.  At the end of 2005, Joe Cappuccio and Joe Roggio, in a meeting, told me that Del Mar's bank, which provided a credit line to the company, had expressed concern about the size of the loan for the F/V POINT LOMA.  Joe Cappuccio asked me to make a large advance payment on the loan.  Later, Joe Roggio told me at another meeting that, if I made the advance payment, he would see to it that the vessel loan with Del Mar would be interest free.  Because of this promise and understanding, we took out a home equity loan on our house and paid Del Mar $175,000, with the expectation that no interest would be due on the Promissory Note and that the payment comprised advance monthly payments into the future. The payment date was November 10, 2005.  Attached as Exhibit E is the check for this advance payment on the Promissory Note.  It was my understanding that this payment (and the earlier one) reduced the total amount of the debt from $215,000 to $35,000; that monthly payments were covered well into the future; and that no interest would be due on payment of the remaining amount.  When I delivered the check to Joe Cappuccio, I told him I would pay the rest as soon as I can.  In response, he said it was now such a small amount that he was not concerned about it any more, which reinforced by understanding that I had made advance payments on the Note.

12.     Within a month or so after this advance payment, I recall receiving a piece of paper which purported to be a Schedule of Payments from Joe Roggio.  Attached as Exhibit F is the copy of the document I received from Joe Roggio.  The Schedule contains references to various debts not related to the Promissory Note.  I looked it over and told him this does not look right to me.  He said he was just "cleaning up the books." I didn't want to tell him how to keep his books but I did not tell him that the $175,000 payment could be applied to anything other than the Promissory Note, nor did I agree with any of the amounts listed in his Schedule of Payments.  For certain, he did not expressly ask if I was agreeable to applying the $175,000 to these other debts or to treating the other debts as "advances" under the Promissory Note, which would then be secured by the Ship Mortgage.

DAVIS WRIGHT TREMAINE LLP

4

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

13. After I was let go by the company in October 2006, I asked Joe Roggio to let me know where I stood with the company. He then gave me a newer revised version of the Schedule of Payments, probably in December 2006. That new Schedule showed new debts called "Olde Port Balance, Point Loma Balance, and Fees for Olde Port Case." I, again, never agreed that these amounts would be treated as "advances" under the Promissory Note, to be secured by the Ship Mortgage, nor did I ever agree that they were correct in any way.

14. I made additional payments on the Promissory Note in January ($2,000), February ($3,000) and March ($3,000), 2007. Attached as Exhibit G are the checks that represent those payments. I did so after being asked by Joe Roggio to make payments on what I owed, but did not specify any amount or for what.

15. The seizure of the F/V POINT LOMA on June 7, 2007 came as a complete shock to me. I never received any prior notice, orally or written, from Del Mar that I had to make any monthly payments or owed any interest after the advance payment was made in November 2005 or the vessel would be seized. It has always been my understanding that the advance payments made me current on the Note through February 2009.

16. The seizure of the vessel has completely disrupted its operations. At present, I am losing at least $20,000 a month in gross sales for the vessel. I have been trying to keep the captain, Dave Kobak, and the two crew members available so that I can take the vessel fishing as soon as possible, paying about $2,000 a week to date. The vessel is my only source of income at present, other than my Social Security payments.

17. I believe that the seizure of the Vessel is unfair and unnecessary and not consistent at all with my agreements with Del Mar.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED this 9th day of July, 2007.

/s/ *Barry A. Cohen*
Barry A. Cohen

5

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001