James P. Walsh, CSB. No. 184620
Gwen Fanger, CSB No. 191161
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
Telephone: (415) 276-6500
Facsimile:   (415) 276-6599
budwalsh@dwt.com

Attorneys for Defendants and Claimant
BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and Claimant, F/V POINT LOMA Fishing Company, Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and, F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8 foot long fishing vessel, her engines, tackle, furniture apparel, etc., *in rem*, and Does 1-10, <br><br> Defendants. | No. C-07-2952-WHA <br><br> **DECLARATION OF BARRY COHEN IN SUPPORT OF DEFENDANTS' MOTION FOR A PROTECTIVE ORDER LIMITING THE DEPOSITION OF CHRISTENE COHEN PURSUANT TO FRCP 26(c)** <br><br> Date: January 24, 2008 <br> Time: 8:00 a.m. <br> Place: Courtroom 9, 19th Floor |

I, Barry A. Cohen, declare as follows:

1. I am a resident of the State of California and currently reside in Santa Maria, California. I am a named Defendant in this lawsuit. I make this declaration in support of Defendants' Motion for a Protective Order Limiting the Deposition of Christene Cohen Pursuant to FRCP 26(c). The facts set forth in this declaration are personally known to me to be true and, if called as a witness, I could and would testify to the following:

2. I married Chris Cohen on August 24, 1994. We are still married although we are separated and in the midst of divorce proceedings.

3. I will not waive any of my privileges with respect to any information sought from Christene Cohen by Plaintiff in this case, including, but not limited to, the marital communications privilege and attorney-client privilege. If questions are posed to her at deposition, I will instruct counsel to assert my privileges with respect to her testimony.

4. Both Joe Roggio and Joe Cappuccio admitted in their depositions I attended, that they have had no business dealings with Christene Cohen of any kind related to the issues in this lawsuit. Attached as Exhibits A and B, respectively, to my declaration are true and correct copies of excerpts of the draft transcripts from the depositions of Joe Roggio and Joe Cappuccio that were taken in this case.

5. I do not consider any issues relating to our divorce proceedings as relevant to the issues in this lawsuit. The POINT LOMA is owned by the F/V Point Loma Fishing Company, Inc., which has assumed the obligation to pay back any amounts that might be owed under the Promissory Note and has assumed the obligations under the First Preferred Mortgage. I understand and believe the fact that the vessel is owned by a separate corporation, and not by Chris and me personally, provides greater security to Del Mar Seafoods, Inc., not less. Moreover, I understand and believe it makes Chris and my personal finances completely irrelevant to this case and no basis whatever to foreclose the First Preferred Mortgage.

6. I therefore strongly support the Motion for A Protective Order.

DATED this 18th day of December, 2007.

Barry A. Cohen

DECLARATION OF BARRY COHEN IN SUPPORT OF
MOTION FOR PROTECTIVE ORDER
Case No. C-07-02952 WHA

SFO 400577v1 0084259-000001

# Exhibit A

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1           DISCLAIMER
2      The following is an unedited, uncertified draft
3  transcript which may contain untranslated stenographic
4  symbols, an occasional reporter's note, misspelled
5  proper names, nonsensical word combinations, missing
6  or partial words, and/or words in reversed word order.
7  All such entries will be corrected on the final,
8  certified transcript, which will be delivered to you in
9  accordance with our standard delivery terms.
10      Because of the need to correct entries prior to
11  certification, this draft is ONLY for the purpose of
12  augmenting counsel's notes and not for use in any court,
13  arbitration, or other formal proceeding or for
14  distribution to any other party.
15           ---oOo---
16  MORNING SESSION                          10:50 A.M.
17           JOSEPH ROGGIO,
18      having been sworn as a witness by the
19          Certified Shorthand Reporter,
20            testified as follows:
21
22        EXAMINATION BY MR. WALSH
23
24      MR. WALSH:  Q.  Would you state your full name
25  for the record, please, spelling it?

Page 1

1

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1   A.   Joseph Roggio, J-o-s-e-p-h R-o-g-g-i-o.
2        (Deposition Exhibit 1 was marked for
3        identification.)
4        MR. WALSH:  Q.  Mr. Roggio, I'm going to show
5   you what we have marked as Deposition Exhibit 1, which
6   is the notice of your deposition.
7        Have you seen this before?
8   A.   Yes, I have.
9   Q.   Okay.  Did you bring any documents with you?
10       MR. POULOS:  Go ahead.
11       THE WITNESS:  I did not.
12       MR. POULOS:  I'll break in here.
13       The documents that are responsive to that
14  request for production that are in the possession,
15  custody, and control of Del Mar have already been
16  produced in the initial disclosures and in the
17  additional production pursuant to the request for
18  production of documents.
19       We believe that there are substantial
20  additional documents that are in the possession,
21  custody, and control of Mr. Cohen and his companies.
22       We have located a few additional documents
23  through depositions that Mr. Cohen gave in the Point
24  Avila Beach case that may be responsive and that have
25  not been produced by Mr. Cohen, but could potentially

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

```
 1      Q.  Did you ever have any kind of conversation
 2  about these transactions with Chris Cohen?
 3      A.  Well, the joint venture agreement was between
 4  Barry and Joe, not Chris.
 5          This had to do with what was left over after
 6  when we set down the joint venture operation.
 7          MR. WALSH:  Move to strike as nonresponsive.
 8      Q.  The question is, Did you ever have any
 9  conversation with Chris Cohen about any of these
10  business dealings?
11      A.  We weren't in a joint venture with
12  Chris Cohen.
13      Q.  So, the answer is no?
14          MR. POULOS:  Just he's looking for a "yes" or
15  "no."
16          THE WITNESS:  No, I never talked to Chris
17  about it.
18          MR. WALSH:  Q.  Do you know if Mr. Cappuccio
19  ever talked to Chris about it?
20      A.  You'll have to ask Mr. Cappuccio.
21      Q.  The answer is, no, you don't know?
22      A.  If you're asking me to assume if he talked to
23  Chris, I would say no.
24      Q.  Do you have any personal knowledge?
25      A.  My personal knowledge would be no, but...
```

ROUGH DFT 2007-12-13 Roggio.txt

0

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1    Q.    You have nothing further to add?

2    A.    Except for these amounts, again, were included
3    in the profits and losses of the joint venture.

4    Q.    As of October 2004; correct?

5    A.    Correct.

6    Q.    Okay. Did you ever send, in October or after
7    October 2004, a notice in writing to Mr. Cohen that he
8    owed these items and explain why he owed them?

9    A.    I discussed them with Barry. And he said to
10   add them to his balance.

11        Otherwise, I would have gone after the
12   individuals who owed that money.

13        MR. WALSH: Move to strike as nonresponsive.

14   Q.    Did you ever write a letter to Mr. Cohen
15   outlining that these are the amounts that are owed to
16   the joint venture?

17   A.    No.

18   Q.    Did you ever write a letter to Chris Cohen
19   outlining that these were the amounts owed to the joint
20   venture?

21   A.    No.

22        MR. POULOS: I object that the question
23   mischaracterizes the testimony.

24        He didn't testify that they were amounts owed
25   to the JV.

Page 37

37

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1  Q. Did you have any conversation with Chris Cohen
2  as to whether she was willing to have the note amended
3  and have that amount added to the note?
4  A. No.
5  Q. The next item, "Point Loma Balance," what's
6  that?
7  A. When Barry's boat started fishing for just
8  Del Mar Seafoods, he was taking fuel, ice, and other
9  advances. And when he was delivering fish, we were
10 deducting those to his charges that he put on our
11 accounts. And when he stopped fishing for us, that was
12 the leftover balance.
13 Q. How about the "Fees for Olde Port Case"?
14         MR. POULOS: What about them?
15         MR. WALSH: Can you wait until I --
16         MR. POULOS: Sure.
17         MR. WALSH: Q. Why do they get added to this
18 schedule?
19 A. Because they were discussed with Barry.
20         And, again, he was taking responsibility for
21 those fees that were incurred for his -- you'll have to
22 ask him -- for his case with the Avila Beach Port --
23 with the Port of Avila Beach.
24 Q. Who had the discussion with him about these
25 fees?

Page 115

115

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1   Did you give this to Barry?
2   A. Well, I know Barry -- at what point of this
3   spreadsheet was it given to Barry? I don't know.
4   But Barry has definitely got this spreadsheet.
5   I mean, was it at, you know, this part of the
6   spreadsheet? Was it at this part of the spreadsheet? I
7   don't know.
8   Q. This particular document, do you recall ever
9   giving it to Barry Cohen?
10  A. Yeah.
11  Q. When?
12  A. Oh, you're talking about with all of these
13  items on it (indicating)?
14  Q. Yes, this particular one on it (indicating).
15  MR. POULOS: This one with the handwriting?
16  MR. WALSH: Q. Yes, the one with the
17  handwriting on it.
18  A. Oh, no, not with the handwriting on it.
19  Q. Did you mail it to him with a cover letter?
20  A. No.
21  Q. Did you mail a copy of this to Chris Cohen
22  with a cover letter?
23  A. No.
24  Q. Did you ever write a letter demanding that he
25  make this payment?

Page 120

120

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

```
 1     A.   Or 15 percent of the landing receipts,
 2  whichever one is greater.
 3     Q.   Right.  And did you, at any time after the
 4  note was entered into, send Mr. Cohen a notification as
 5  to what might be due under the landing receipt
 6  provision?
 7     A.   No.
 8     Q.   But you could calculate that, couldn't you?
 9     A.   If he provided me with the proper records,
10  yeah, I could.
11     Q.   Correct.  And when he delivered it to Del Mar,
12  you knew what his landing receipts were, did you not?
13     A.   Yes.
14     Q.   But at no time did you ever send a letter
15  saying, "We want you to pay a percentage of the landing
16  receipts," did you?
17     A.   No.
18     Q.   Did you ever send a notice to him that he was
19  late on a payment under the note?
20     A.   No.
21     Q.   Did you ever send him a notice that told him
22  that interest was due?  Did you send him a letter or a
23  writing that interest was due?
24     A.   No.
25     Q.   I assume the answer would be the same with
```

Page 133

ROUGH DFT 2007-12-13 Roggio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1  respect to Christene Cohen as well.
2       A.  Yes.
3       Q.  So, tell me again the circumstances under
4  which this $175,000 payment was made.
5           Did you talk to Barry about why he made this
6  payment?  That's the first question:  Did you talk to
7  Barry about why he made this payment?
8       A.  Did I talk to Barry?
9       Q.  Yes.
10      A.  I know we had talked about him making a
11 payment or that a payment was coming.
12      Q.  Tell me about those conversations.
13      A.  He told me that he was going to get an equity
14 line against his home and that he was going to pay off
15 some bills and make a payment to -- and make a payment
16 to Del Mar Seafoods.
17          MR. POULOS:  Can we take a break?  I need to
18 use the restroom.
19          MR. WALSH:  Sure.
20          (Recess taken:  2:36 p.m. until 2:47 p.m.)
21             (Deposition Exhibits 27 and 28 were
22              marked for identification.)
23          MR. WALSH:  Q.  I'm going to show you two
24 exhibits at once.
25          MR. POULOS:  This is 27 and 28?

134

Page 134

# Exhibit B

ROUGH DFT 2007-12-14 Cappuccio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1                DISCLAIMER
2      The following is an unedited, uncertified draft
3 transcript which may contain untranslated stenographic
4 symbols, an occasional reporter's note, misspelled
5 proper names, nonsensical word combinations, missing
6 or partial words, and/or words in reversed word order.
7 All such entries will be corrected on the final,
8 certified transcript, which will be delivered to you in
9 accordance with our standard delivery terms.
10      Because of the need to correct entries prior to
11 certification, this draft is ONLY for the purpose of
12 augmenting counsel's notes and not for use in any court,
13 arbitration, or other formal proceeding or for
14 distribution to any other party.
15                ---oOo---
16 FRIDAY, DECEMBER 14, 2007            11:02 A.M.
17            P R O C E E D I N G S
18       (Deposition Exhibits 29 and 30 were marked
19         for identification.)
20                ---oOo---
21        JOSEPH FRANK CAPPUCCIO,
22    having been sworn as a witness by the
23       Certified Shorthand Reporter,
24         testified as follows:
25                ---oOo---

ROUGH DFT 2007-12-14 Cappuccio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

```
 1
 2              EXAMINATION BY MR. WALSH
 3
 4       MR. WALSH:  Q.  Could you state your full name
 5  for the record, please?
 6       A.   Joseph Frank Cappuccio.
 7       Q.   Would you spell "Cappuccio," please?
 8       A.   C-a-p-p-u-c-c-i-o.
 9       Q.   Mr. Cappuccio, my name is James Walsh, and
10  I'm an attorney with the law firm of Davis Wright
11  Tremaine.  I represent the defendants in the lawsuit of
12  Del Mar Seafoods versus Barry Cohen, et al.
13            This morning we're going to have a deposition
14  of you with respect to the issues in that case.
15            What I would like to do at the outset is to
16  simply go over some instructions about the conduct of
17  the deposition so that you and I both have the same
18  understanding of how we're going to do this.
19            First of all, I assume that you understand
20  that the testimony -- because you have been sworn, the
21  testimony you're giving here today is under oath and
22  subject to penalties of perjury.
23       A.   Yes.
24       Q.   Okay.  The next instruction is that it's good
25  to answer "yes" or "no."
```

ROUGH DFT 2007-12-14 Cappuccio.txt

UNCERTIFIED, ROUGH-DRAFT TRANSCRIPT

1  into bankruptcy.
2      Then his wife called the office. They were
3  going through a real nasty divorce. And she accused him
4  of beating her.
5      So, I went at, "Uh-oh. This is getting ugly."
6      And that made me say, "We better secure the
7  asset."
8      And at that point, we advised their (sic)
9  attorney what our options were.
10     We never advised him what to do. We asked him
11 what to do.
12     Q.  So, it was the call from your attorney and you
13 said you got a call from Chris Cohen.
14     A.  The office did. I didn't personally receive
15 the call from Chris Cohen.
16     Q.  Who received the call from Chris Cohen?
17     A.  I'm not exactly sure.
18     Q.  During the period of time that we're talking
19 about from 1999 to 2006, did you ever have any business
20 dealings with Chris Cohen yourself?
21     A.  No, uh-uh.
22     Q.  So, it was the lawsuit having to do with legal
23 fees; correct?
24     A.  It was Barry's admission that he might be
25 forced to declare bankruptcy if the Court were not to

Page 24

24