1   **COX, WOOTTON, GRIFFIN,**
    **HANSEN & POULOS LLP**
2   Gregory W. Poulos  (SBN 131428)
    Max L. Kelley (SBN 205943)
3   190 The Embarcadero
    San Francisco, CA  94105
4   Telephone No.: 415-438-4600
    Facsimile No.: 415-438-4601
5
    **LAW OFFICES OF RICHARD P. WAGNER**
6   Richard P. Wagner (SBN 166792)
    700 Oceangate, Suite 700
7   Long Beach, CA 90802
    Telephone: (562) 216-2946
8   Facsimile:  (562) 216-2960
9
    Attorneys for Plaintiff
10  DEL MAR SEAFOODS, INC.

11                      UNITED STATES DISTRICT COURT
12
                        NORTHERN DISTRICT OF CALIFORNIA
13                         SAN FRANCISCO DIVISION

14

15  DEL MAR SEAFOODS, INC.          )   Case No.: CV 07-02952 WHA
                                    )
16              Plaintiff,          )   **DECLARATION OF MAX L.**
                                    )   **KELLEY IN SUPPORT OF**
17      vs.                         )   **PLAINTIFF'S MOTION FOR**
                                    )   **SUMMARY JUDGMENT OR,**
18  BARRY COHEN, CHRIS COHEN (aka   )   **ALTERNATIVELY, PARTIAL**
    CHRISTENE COHEN), *in personam* and )   **SUMMARY JUDGMENT**
19  F/V POINT LOMA, Official Number )
    515298, a 1968 steel-hulled, 126-gross ton, )
20  70.8- foot long fishing vessel, her engines, )
    tackle, furniture, apparel, etc., *in rem*, and )
21  Does 1-10,                      )
                                    )
22              Defendants.         )
                                    )
                                    )
23  _____ )   Date:  April 3, 2008
                                    )   Time:  8:00 a.m.
24  And Related Counterclaims       )   Place: Courtroom 9, 19th Floor
    _____ )   Hon. William H. Alsup
25

26  I, Max L. Kelley, hereby declare:

27      1.      I am an associate in the firm of Cox, Wootton, Griffin, Hansen & Poulos,

28  LLP, attorneys of record for Plaintiff Del Mar Seafoods, Inc. ("Del Mar"). I submit this

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2591

1   declaration in support of Plaintiff Del Mar's Motion for Summary Judgment or, Alternatively,

2   for Partial Summary Judgment. I have personal knowledge of the facts stated below and if

3   called to testify regarding those facts, I would and could competently testify thereto.

4      2.      Attached to this declaration as **Exhibit 1** are true and correct copies of the

5   relevant excerpts from the transcript of the deposition testimony of Barry Cohen given in this

6   case.

7      3.      Attached to this declaration as **Exhibit 2** is a true and correct copy of the

8   accounting spreadsheet generated by Del Mar to document the loan/repayment history of the

9   debt owed by Barry Cohen under the Note and Mortgage and which has been produced

10  during discovery to defendants as "DMSI 0269."

11     4.      Attached to this declaration as **Exhibit 3** are true and correct copies of the

12  relevant excerpts from the transcript of the deposition testimony of Joe Roggio given in this

13  case.

14     5.      Attached to this declaration as **Exhibit 4** is a true and correct copy an

15  accounting spreadsheet generated by Del Mar, that was attached as Exhibit 1 to the transcript

16  of the deposition testimony of Barry Cohen given in this case.

17     6.      Attached to this declaration as **Exhibit 5** is a true and correct copy of a

18  Memorandum written by Barry Cohen's accountant David Cantrell, and that was attached as

19  Exhibit 2 to Barry Cohen's deposition.

20     7.      Attached to this declaration as **Exhibit 6** is a true and correct copy of the

21  Promissory Note at issue in this case.

22     8.      Attached to this declaration as **Exhibit 7** is a true and correct copy of the

23  Preferred Ship Mortgage at issue in this case.

24     9.      Attached to this declaration as **Exhibit 8** is a true and correct copy of the

25  defendants' Responses to Plaintiff's Requests for Admissions.

26     10.     Attached as **Exhibit 9** to this declaration are true and copies of cancelled

27  checks written by Barry Cohen to Del Mar for payments on the Promissory Note and that

28  were also attached as Exhibit 10 to Barry Cohen's deposition transcript.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar\Seafood\2504

11. Attached as Exhibit **10** to this declaration is a true and correct copy of the letter written by Barry Cohen and sent to Del Mar, and that was produced to defendants during discovery and identified as "DMSI 0078."

12. Attached to this declaration as **Exhibit 11** are true and correct copies of the relevant excerpts of the deposition testimony of Joe Cappuccio taken in this matter.

13. Attached to this declaration as **Exhibit 12** are true and correct copies of the relevant excerpts of the deposition testimony of Christene Cohen taken in this matter.

14. On June 8, 2007, the verified complaint was filed alleging that the Cohens were in default as of May 1, 2007. The Vessel was subsequently arrested at the Hyde Street Pier in San Francisco by the U.S. Marshal. The Marshal turned custody of the Vessel over to the court-appointed substitute custodian, National Maritime Services ("NMS"). On or about June 21, 2007, NMS moved the Vessel to Point Richmond and turned custody over to Sugar Dock, LLC.

15. Attached to this declaration as **Exhibit 13** is a true and correct copy of the defendants' Answer and Counterclaim in this matter.

16. Attached to this declaration as **Exhibit 14** is a true and correct copy of Defendants' Responses to Plaintiff's Interrogatories, Set One, and a true and correct copy of their Supplemental FRCP Rule 26 Disclosures.

17. Attached to this declaration as **Exhibit 15** are true and correct copies of the relevant excerpts of the deposition testimony of Captain David Kobak taken in this matter.

18. Attached to this declaration as **Exhibit 16**, is a true and correct copy of the report of the Condition and Value Survey taken of the F/V POINT LOMA on January 7, 2008.

19. Attached to this declaration as **Exhibit 17**, are true and correct copies of the insurance policies regarding the Vessel, and which have been produced by defendants as COHEN 752 – 763.

20. Attached as **Exhibit 18** to this declaration is a true and correct copy of Barry Cohen's declaration filed in this action in support of defendants' motion to vacate the arrest.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods92504

21.    Attached as **Exhibit 19** to this declaration is a true and correct copy of Barry Cohen's declaration filed in this action in reply to plaintiff's opposition to defendants' motion to vacate the arrest

22.    Attached as **Exhibit 20** to this declaration is a true and correct copy of Barry Cohen's declaration filed in this action in support of defendants' motion to vacate the arrest Exhibit 19 Spreadsheet DMSI 0001

23.    Attached to this declaration as **Exhibit 21** is a true and correct copy of the police report filed by Captain Kobak regarding the missing net.

24.    The Cohens' counterclaim does not allege that they had any contractual relationship with any third party. Similarly, they failed to disclose any such third parties in their initial disclosures or in any discovery responses, nor have the Cohens ever produced a copy of any contract with any third party that they contend was interrupted or interfered with.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct. Dated February 28, 2008, at San Francisco, California.

_____
Max L. Kelley

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DclMaxSeafoods\2504

DECLARATION OF MAX L. KELLEY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 1

BARRY ALLEN COHEN     January 9, 2008

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

DEL MAR SEAFOODS, INC.,                )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )    NO. C-07-2952-WHA
                                       )
BARRY COHEN, CHRIS COHEN (aka          )
CHRISTENE COHEN), in personam          )
and, F/V POINT LOMA, Official          )
Number 515298, a 1968                  )
steel-hulled, 126-gross ton,           )
70.8 foot long fishing vessel,         )
her engines, tackle, furniture         )
apparel, etc., in rem, and             )
Does 1-10,                             )
                                       )
          Defendants.                  )
_____)

DEPOSITION OF

BARRY ALLEN COHEN

_____

January 9, 2008

REPORTED BY: RITA R. LERNER, CSR #3179     (2001-404170)

BARRY ALLEN COHEN    January 9, 2008

14

1    A.   Ever.
2    Q.   How about Olde Port Fisheries, Inc.?
3    A.   Yes.
4    Q.   And what time period were you an owner of Olde
5    Port Fisheries, Inc.?
6    A.   From its inception until today.
7    Q.   When was Olde Port Fisheries, Inc., started?
8    A.   In 2003 or 2004, to my best recollection.
9    Q.   And you're an owner of the Point Loma Fishing
10   Company, Inc., correct?
11   A.   Today?
12   Q.   Yes.
13   A.   Yes.
14   Q.   And you have been since that company was
15   started; is that correct?
16   A.   Correct.  But that company is and has been part
17   of my fishing with that boat.  I just had it
18   incorporated.
19   Q.   How many corporations have you been -- well,
20   have you actually started and been a major shareholder
21   of?
22   A.   One.
23   Q.   The Point Loma Fishing Company, Inc.?
24   A.   No.
25   Q.   Well, then, that would be two.  Did you start

15

1    the Point Loma Fishing Company, Inc.?
2    A.   Yes, but I was not a major stockholder.
3    Q.   Don't you own 50 percent of that?
4    A.   50 percent.  I'm an equal.
5    Q.   Okay.  What other California corporations,
6    besides Point Loma Fishing Company, Inc., and Olde Port
7    Fisheries, Inc., have you started?
8    A.   Olde Port Fish Company, Inc.
9    Q.   Any others?
10   A.   Not that I can think of as of this moment.
11   Q.   So we've got -- I just want to make sure the
12   record is clear here.  You started three corporations:
13   Olde Port Fisheries, Inc., Olde Port Fish Company, Inc.,
14   and Point Loma Fishing Company, Inc.  Is that right?
15   A.   Correct.
16   Q.   Are all of those California corporations?
17   A.   Yes.
18   Q.   And have all of them been Subchapter S
19   corporations?
20   A.   First of all, I don't know.  I would have to
21   guess.  I don't think that Olde Port Fish Company, Inc.,
22   was an S corporation, but I didn't know at the time an
23   "S" from any other kind of corporation.  I still don't
24   know the difference.
25   Q.   When was Olde Port Fish Company, Inc., started?

16

1    A.   A long time ago.  I would have to guess, if you
2    want me to guess.
3    Q.   Well, I'm fairly certain you know that
4    guessing, from having attended all these depositions, is
5    a word we don't like to use.
6        Let me give you the general instruction.  I do
7    not want you to guess about anything.  I am entitled to
8    and I want you to give me your best estimate, if you
9    have one, but don't just pull numbers out of thin air.
10   If you have an estimate, whether it be by year, month,
11   day or decade, even, I'm entitled to the best narrowing
12   down that you can give me.  But if you're just picking
13   something out of thin air, that's guessing.  Do you
14   understand that?
15   A.   Yes.
16   Q.   What's your best estimate of when Olde Port
17   Fish Company, Inc., was started?
18   A.   In the 19 -- end of the 1960s or the 1970s
19   or the early part of the 1980s.  That's my best
20   recollection.  I can't remember what year I went to a
21   corporation from just being the sole owner.
22   Q.   What was the business of Olde Port Fish
23   Company, Inc.?
24   A.   It started out as buying and selling fish from
25   the boats; then it included retail sales; then it

17

1    included a restaurant.
2    Q.   And what was the restaurant?
3    A.   The restaurant was called the "Olde Port Inn."
4    Q.   So the Olde Port Inn -- you owned that
5    restaurant, but you ran it under the Olde Port Fish
6    Company, Inc., corporation?
7    A.   Correct.
8    Q.   Okay.  Is the Olde Port Fish Company, Inc.
9    corporation still in existence?
10   A.   No.
11   Q.   When did that corporation cease to exist?
12   A.   I believe, at the end of the 1980s.
13   Q.   And were the assets of that corporation
14   transferred to some other corporation?
15   A.   I don't know how to answer that.
16   Q.   What happened to the business -- well, for
17   example, the restaurant?
18   A.   Well, I'll explain why I can't answer that.  I
19   transferred it to Leonard Cohen, who put the tables and
20   chairs and stuff in a corporation that he developed.  So
21   it's that transfer to another corporation, another
22   person.  That's why I don't know how to answer that, but
23   that happened with the assets.
24   Q.   You sold the restaurant to Leonard; is that
25   right?

5 (Pages 14 to 17)

18

1    A. Yes.
2    Q. And when you sold that restaurant to Leonard,
3    he took that and put it into a new corporation; is that
4    your understanding?
5    A. He had started a corporation first.
6    Q. Right.
7    A. And he had an operating corporation, and he
8    operated the restaurant for me first. And then he
9    bought the restaurant assets from me.
10    Q. And was that corporation Olde Port Inn, Inc.?
11    A. Yes.
12    Q. So Olde Port Inn, Inc., started operating the
13    restaurant for Olde Port Fish Company, Inc., and then
14    you sold the restaurant to Leonard, and he began not
15    only managing, but actually running and owning the
16    restaurant under the Olde Port Inn, Inc.?
17    A. After a certain amount of time.
18    Q. Are you a shareholder in Olde Port Inn, Inc.?
19    A. No.
20    Q. Do you have any ownership interest or derive
21    income from Olde Port Inn, Inc.?
22    A. No.
23    Q. You don't get any lease income from them?
24    A. No. I have to clarify that. We share rent, so
25    however you want to look at that, but I don't actually

19

1    get any income. Olde Port Inn and Olde Port Fisheries,
2    Inc., share a lease site and we both pay the rent.
3    Q. And the lease site is the property in Avila
4    Beach; correct?
5    A. On the pier at Port San Luis; correct.
6    Q. Okay. When was the Point Loma Fishing Company,
7    Inc., started?
8    A. I don't remember the year.
9    Q. Can you give me your best estimate?
10    A. My best estimate would be in the early 2000s --
11    or late. I would say the early 2000s.
12    Q. So the Point Loma Fishing Company, Inc., was
13    founded prior to execution of the promissory note and
14    mortgage that is the subject of this litigation?
15    A. I believe it was after.
16    Q. When was the promissory note and mortgage that
17    is the subject of this litigation signed?
18    A. I don't remember.
19    Q. But you believe the Fishing Company, Inc. --
20    Port Loma Fishing Company, Inc. -- was established after
21    that?
22    A. I believe so.
23    Q. In addition to your California corporations,
24    you have also been a party, either individually or
25    through your different corporations, in a number of

20

1    joint ventures; is that correct?
2    A. If I understand your question, it's either/or.
3    Yes, I have. I have.
4    Q. You have personally?
5    A. I have.
6    Q. Can you tell us what joint ventures you have
7    been a party to?
8    A. I was a party to a joint venture with Del Mar
9    Seafoods. I was a party to a joint venture of Artemis,
10    Inc., with Joe Cappuccio, and I was a party to a Mexican
11    corporation with Joe Cappuccio and Victor Segura.
12    Q. Were you also a party to a joint venture with
13    Fisherman Johnny?
14    A. Yes.
15    Q. So that's at least four joint ventures that
16    you've been a party to; correct?
17    A. Correct.
18    Q. Are there any more than that?
19    A. Not that I recall.
20    Q. Are there any that your corporations have been
21    a party to that are in addition to those four?
22    A. Not that I can recall.
23    Q. What was the joint venture you had with
24    Del Mar?
25    A. We bought, processed and sold fish at my lease

21

1    site at Port San Luis.
2    Q. What were the terms of that joint venture?
3    A. By "terms," you mean what?
4    Q. What were the basic terms under which the
5    parties entered into a joint venture?
6    A. That Del Mar Seafoods would finance it; I would
7    manage it, be the manager of it and be -- and manage the
8    property of it; and we would split the profits 50-50.
9    Q. When you were the manager, how were you paid?
10    Were you paid only on that 50-50 profit split?
11    A. No. I was also an employee.
12    Q. So you had an employment relationship with
13    Del Mar in this joint venture?
14    A. Actually, we considered that I had an
15    employment with the joint venture and shared in the
16    profit of the joint venture. Had it not been for the
17    joint venture at that time, I would not have been an
18    employee.
19    Q. So, was the income that you received from that
20    joint venture -- you said you were an employee. You got
21    a paycheck; is that right?
22    A. Correct.
23    Q. But you also shared 50-50 in the profits;
24    right?
25    A. Correct.

6 (Pages 18 to 21)

22

1    Q. Were the payments you received as an employee
2  deducted from the 50-50, or was it in addition to your
3  50 percent profit share?
4    A. In addition to.
5    Q. Okay. As the manager of that joint venture,
6  what were your responsibilities?
7    MR. WALSH: Asked and answered.
8    THE WITNESS: Normal management
9  responsibilities: That I would manage it; I would
10 oversee the operation.
11   MR. POULOS: Q. On a day-to-day basis?
12   A. On a day-to-day basis.
13   Q. Were you responsible for approving transfers of
14 inventory to customers of the joint venture?
15   A. You mean, selling them?
16   Q. Yes.
17   A. Yes.
18   Q. Did you sell -- when you were the manager of
19 that joint venture, did you sell product to Michael
20 Cohen, your son?
21   A. I believe -- well, I don't know if I sold it to
22 him personally, but I was aware that he bought some
23 product from the joint venture.
24   Q. And he did so on an account; correct?
25   A. Yes.

23

1    Q. And that's often termed "on account"; correct?
2    A. Well, it was termed a "receivable."
3    Q. But it was on a running account balance that he
4  kept with the joint venture, an open book account, if
5  you will?
6    A. Well, those are your terms, but I would say it
7  seems to be the same as what I'm saying.
8    Q. Well, why don't you describe -- was he allowed
9  to take inventory and have the balance owed on that
10 inventory added to a running account balance?
11   A. He was not allowed to take inventory -- no more
12 than anybody else was allowed to take inventory. If he
13 wanted anything, he was invoiced and the invoice was
14 applied to his receivable.
15   Q. Was the same true for Leonard Cohen and the
16 Olde Port Inn?
17   A. Yes.
18   Q. So Leonard and Olde Port Inn were also
19 customers who obtained fish product from the joint
20 venture?
21   A. Correct.
22   Q. And that joint venture was called "Del Mar
23 Seafoods, Inc., Olde Port Fisheries Division," is that
24 right?
25   A. By some. It was not an official name.

24

1    Q. You understood that Olde Port Fisheries,
2  then -- that JV was basically operating as a division of
3  Del Mar; is that correct?
4    A. No, it was not a division of Del Mar.
5    Q. But it was termed that by some?
6    A. Only by one, that I know.
7    Q. And who was that?
8    A. The bookkeeper put it on the top of the
9  statement on her own volition.
10   Q. Was Michael Cohen an employee of that joint
11 venture?
12   A. Yes.
13   Q. And in what capacity was he employed by the JV?
14   A. He was an employee, a worker.
15   Q. Doing what?
16   A. He worked on the dock and inside the market.
17   Q. At some point did he also become not just an
18 employee, but also a customer?
19   A. Correct.
20   Q. And can you tell me in what capacity he became
21 a customer? What was he doing?
22   A. In a very small capacity he was trying to sell
23 fish to a couple local restaurants.
24   Q. Did he also try to start a web-based fish sales
25 business?

25

1    A. Yes, he did.
2    Q. And did the joint venture allow him to purchase
3  fish on account for both of those businesses?
4    A. We sold fish to Michael at a profit, at a
5  profit margin. What he did with those fish or what the
6  split was -- some went to restaurants, some went to the
7  web thing. I don't know if he got orders on the web
8  deal; I don't know.
9      So all I know is, yes, he did buy fish, and
10 whatever he did with that was up to him. I know he did
11 start a website and put our location and everything on
12 the pier. And that's what I know about it.
13   Q. The joint venture with Del Mar eventually
14 ended; is that correct? You stopped being in a joint
15 venture with Del Mar in Avila Beach?
16   A. To be exact, Del Mar ended the joint venture.
17 Joe Cappuccio ended the joint venture.
18   Q. Do you recall when that was done?
19   A. Sometime in 2004.
20   Q. When that joint venture ended, did Michael owe
21 a balance on his account with the joint venture?
22   A. Yes, he did.
23   Q. Do you recall how much that was?
24   A. I do not.
25   Q. Do you know, since you were the manager,

7  (Pages 22 to 25)

BARRY ALLEN COHEN    January 9, 2008

26

1    whether he ever paid that balance?
2        A.  The balance from when we closed?
3        Q.  Yes.
4        A.  I know he made a payment and I know there was
5    credit given for another payment.  But did he pay it
6    off?  The answer is no.
7        Q.  Did you ever agree to be responsible for that
8    debt of Michael Cohen?
9            MR. WALSH:  Objection.  Vague.  If you
10   understood the word "responsible," you can try and
11   answer it.
12           THE WITNESS:  Well, I said I would be
13   responsible for it.
14           MR. POULOS:  Q.  Who did you say that to?
15       A.  Joe Roggio, for one.
16       Q.  When did you tell Joe Roggio that you would be
17   responsible for Michael Cohen's debt?
18       A.  Sometime after we closed the joint venture.
19       Q.  So sometime after 2004?
20       A.  Sometime in 2004.
21       Q.  Okay.  Who else did you tell that you would be
22   responsible for Michael's debt?
23       A.  Probably Michael.
24       Q.  Have you paid that debt?
25       A.  Not intentionally.

27

1        Q.  Have you paid it, in your own estimation?
2        A.  In my mind?
3        Q.  Yes.
4        A.  No.
5        Q.  When fisherman -- well, withdrawn.
6            How much do you understand that you are
7    responsible to pay for Michael's debt?
8        A.  Today?
9        Q.  Yes.
10       A.  Nothing.
11       Q.  How much do you believe the debt was at the
12   time that you agreed to be responsible for it?
13       A.  I don't know.
14       Q.  And why do you contend -- you've said in your
15   own mind, you haven't paid that debt; correct?
16       A.  In my own mind, I have not paid it.
17       Q.  And in your -- and you agree that you had
18   agreed to be responsible for it?
19       A.  I agreed to be responsible for it.  At the time
20   I said that I will be responsible for it.
21       Q.  And you're a man of your word, aren't you?
22       A.  Yes.
23       Q.  You're not trying to back out of being
24   responsible for it, are you?
25       A.  I said at the time I said that, I was

28

1    responsible for it.  So to ask me after many things have
2    changed am I still responsible for it is not a valid
3    conclusion.  A lot of things have changed that changed
4    that agreement.
5        Q.  What has changed that -- well, do you believe
6    the debt has been forgiven?
7        A.  I don't think that's the right terminology.
8        Q.  What is it that you think has changed that
9    means you no longer -- or that allows you to revoke your
10   responsibility for that debt?
11       A.  I am not revoking my responsibility for that
12   debt.  That's your word.  That's not what I said.  But
13   if you want me to answer, I will, but then I will answer
14   with the whole truth, and if that's what you would like
15   me to do, I will.
16       Q.  Of course, I want you to tell me the whole
17   truth.  Why do you feel you are no longer responsible
18   for that debt?
19       A.  Okay.  For several reasons.  Number one is when
20   I said I would be responsible for it, I was thinking
21   that I would, as an employee of Del Mar, collect that
22   money over time, and I didn't worry about it because I
23   was an employee of Del Mar.  And why I had confidence to
24   be an employee of Del Mar is because when Joe Cappuccio
25   asked me if I would come work at the Watsonville

29

1    plant -- he offered me that job -- I talked to Joe
2    Roggio, we went out to lunch, and Joe said, "You know,
3    we want you to come here."
4            And I said, "You know what, Joe.  For me to
5    sell my house and to buy a different house up here is a
6    huge commitment, and what security do I have that I
7    would have this job?"  And Joe Roggio told me that day
8    that if you come up here, if you sell your house in
9    Cambria and you move up here, you can work for this
10   company as long as you'd like to; that will be your
11   security.
12           And the day that Joe Cappuccio called me in his
13   office and he said, "Barry, we no longer need your
14   services," I asked Joe Roggio, "Joe, what about the
15   promise you made me if I moved and bought a house up
16   here and sold my house in Cambria?"
17           And Joe Roggio said, "Things change, you know."
18   That's a quote.  "Things change, you know."  That's the
19   God's honest truth.  That was one reason.
20           The second reason is because when Del Mar left,
21   they didn't want anything to do with that joint venture.
22   They did not want to be involved with the harbor; they
23   did not want to be a party to the lawsuit; they didn't
24   want to be involved in any way.  And Joe Cappuccio
25   walked away from the joint venture.  And Joe Roggio

8 (Pages 26 to 29)

BARRY ALLEN COHEN    January 9, 2008

30

1  signed an assignment giving me all the rights and
2  everything of that joint venture to me, and excluded
3  them from any involvement in the joint venture at all.
4  And when he signed that, he was well aware that there
5  were receivables on that joint venture receivable,
6  including Michael and Leonard Cohen. And he assigned it
7  all to me; he didn't -- there was no revoking anything.
8  Those are the reasons.
9       And there was one more reason. And because
10 when I made a boat payment to -- I made it to Del Mar
11 Seafoods, but I handed it to Joe Cappuccio -- then Joe
12 Roggio, on his own volition, applied it to outstanding
13 balances that are on that piece of paper he gave me,
14 which included Michael and Leonard's thing, and he
15 showed them as paid off with that $175,000 payment.
16      So, on the left hand, Del Mar is saying that it
17 was okay that they took the money and applied it there,
18 and then today they're saying I still owe it. Well, it
19 can't be both ways. So that's why, in my mind, this
20 whole thing doesn't make any sense.
21      I gave that money as a payment against that
22 boat loan because Joe Cappuccio asked me if I would help
23 him because the bank was giving him a problem about
24 having such a big loan on his books. He asked me as a
25 favor to do something, to make a big loan. I said I

31

1  would see what I could do. I went, talked to my wife,
2  we got a second on our house, and I gave Joe Cappuccio
3  that check as a payment against the loan that I had on
4  the boat. That's the essence of how the whole thing
5  worked.
6   Q.  Okay. Let's look at -- the first one, for the
7  Michael Cohen debt -- we're talking about the Michael
8  Cohen debt -- you agreed to be responsible for it;
9  correct? Is that right?
10  A.  That's what I said.
11  Q.  You didn't say -- and it was you personally
12 assuming that responsibility; is that right?
13      MR. WALSH: I believe you've answered that
14 question.
15      MR. POULOS: You can answer it again.
16      THE WITNESS: I said I would be responsible.
17      MR. POULOS: Q.  Okay. With respect to the
18 boat payment, you're talking about the payment of the
19 $175,000; right?
20  A.  That's the one I was referring to.
21  Q.  Okay. You understand that Del Mar believed --
22 as you said, Joe Roggio, applied a portion of that
23 payment to pay off the Michael Cohen debt that you said
24 you would be responsible for; correct? You understand
25 that's what Joe Roggio did?

32

1   A.  I understand that's what it said on that paper
2  that I told him didn't look right to me.
3   Q.  Okay. You understand that Del Mar believed
4  that that payment, that $175,000 payment, if properly
5  applied, in Del Mar's mind, paid off that balance you
6  owed on the Michael debt. You understand that?
7   A.  Absolutely not.
8   Q.  That's Del Mar's position?
9   A.  No, not true. They did not think that for one
10 second, because Joe Cappuccio asked me to get that money
11 for him to apply to the note that showed on their books
12 for the boat.
13      And Greg, I want to say something between you
14 and I. Please don't say inflammatory things to me.
15 Don't say I revoke on my word and things. That's not
16 necessary. We're going to be nice to each other; okay,
17 please? I won't be inflammatory to you.
18  Q.  I'm not trying to be inflammatory.
19  A.  I know, but with your choice of words, be
20 careful. Okay?
21  Q.  I am.
22  A.  Okay. Good.
23  Q.  You've given me three reasons why you think
24 that the debt you personally assumed for Michael Cohen
25 you no longer owe. And I just want to make sure that

33

1  those are the three reasons, the only three reasons,
2  that you're relying on for saying that you no longer owe
3  that debt.
4   A.  I'm going to say --
5       MR. WALSH: Wait, Barry. Let me put an
6  objection on the record.
7       I'll put an objection on the record that you
8  cannot ask him for a legal conclusion; that there are
9  legal positions why he is not obligated to pay in
10 addition to whatever he may believe. With that, you can
11 answer.
12      THE WITNESS: Okay. I need -- do me a favor.
13 Read that back, what he asked me.
14      MR. POULOS: I'll rephrase it. I just want to
15 make sure I'm getting everything on the record today.
16  Q.  We've established that you told Joe Roggio and
17 Michael, at least those two people, that you would be
18 responsible for Michael's debt.
19  A.  That's true, but I think you said that I
20 assumed Michael's debt.
21  Q.  By being responsible for it, I consider that
22 assuming that debt.
23  A.  But that's not what I said. I said I would be
24 responsible for it.
25  Q.  What did that mean to you?

9 (Pages 30 to 33)

BARRY ALLEN COHEN    January 9, 2008

34

1    A.  That I would see that Del Mar got paid that
2    money.  And that's a huge difference, in my mind, to
3    assuming something for myself.  I said I will be
4    responsible for it.  Exact words.
5        And I can't say that's the only three reasons.
6    I don't know if that is.  I wasn't even thinking what
7    Bud was thinking, but those are the three that are on
8    the top of my mind of -- where I think I did not go back
9    on my word.  I felt like, one, they were all assigned to
10   me, anyhow.  It was given -- all the receivables were
11   given to me, so I could pay myself, if I want.  And the
12   second -- or I could forgive them; I could do whatever I
13   want with them.
14       And the other one is when Joe Roggio made that
15   paper and I said to him, "This does not look right to
16   me," and he said, "Barry, I'm just cleaning up the
17   books; it's okay," meaning that what I understood what
18   he said when he was just cleaning up the books is that
19   it meant exactly that:  He was justing up the books.
20   I still -- when I was going to pay off the amount of
21   money against that loan for the boat, that I would then
22   say I want that note signed back to me; that we're done.
23   And that's what I thought he meant:  That he was just
24   cleaning up his books.  It had nothing to do with what
25   was going on with me, because I gave that payment 100

35

1    percent for that note amount, that note loan, because
2    that was the one that I was asked to do and it made
3    sense to me because that's the one I had collateral on.
4        Q.  We're going to come back to what that note was
5    for in a few minutes.
6        A.  Okay.
7        Q.  Let's talk about --
8        A.  Can we take a quick break right now.  I just
9    need to run to the restroom.
10       MR. POULOS:  Absolutely.
11       (Recess from 11:06 to 11:17)
12       MR. POULOS:  Okay.  Let's go back on.
13       Q.  We've talked about Michael Cohen's debt.  There
14   were some debts that Leonard Cohen also owed to Del Mar
15   Seafoods; is that right?
16       A.  No.
17       Q.  Who did he owe the debts to?
18       A.  The joint venture.
19       Q.  And what you're contending is owed to the Avila
20   Beach joint venture?
21       A.  Correct.
22       Q.  What were those debts for?
23       A.  For fish that he purchased from the joint
24   venture.
25       Q.  For use at Olde Port Inn, presumably?

36

1    A.  Presumably.  I would think so, but I didn't
2    follow the fish.
3        Q.  Do you have an idea of how much those debts
4    were?
5        A.  I don't.
6        Q.  By the time the joint venture was wound up, had
7    those debts been paid?
8        A.  His receivables had not been paid.
9        Q.  Did you also agree to be responsible for those
10   debts?
11       A.  Yes.
12       Q.  And did you tell that to Joe Roggio?
13       A.  Yes.
14       Q.  Did you tell that to Joe Cappuccio?
15       A.  I don't believe so.
16       Q.  Did you tell it to Leonard?
17       A.  Yes.
18       Q.  Do you have any idea as you sit here today how
19   much of Leonard's debt you agreed to be responsible for?
20       A.  Whatever his debt was on the receivables to the
21   joint venture.
22       Q.  You were given a payment schedule by Joe Roggio
23   after you made the $175,000 payment that showed debts
24   for Michael, debts for Leonard, debts for inventory.  Do
25   you remember that?

37

1        MR. WALSH:  Objection.  Vague as to time.
2        MR. POULOS:  Q.  You know the schedule I'm
3    talking about?
4        A.  What was termed, I believe, written on there,
5    was "Statement of Payments."  Is that --
6        Q.  Yes.
7        A.  Okay.  And -- say your question again.
8        Q.  With respect to that, that showed balances due
9    from Michael, balances due from Leonard, and how those
10   were paid off by that $175,000 payment; right?
11       A.  And inventory.
12       Q.  And inventory.
13       A.  And that showed what Joe Roggio put on there.
14   That's what it showed to me.  Not -- you have to
15   remember, I said it doesn't look right to me for a lot
16   of reasons.
17       Q.  My question is:  In terms of the numbers that
18   were on there for the debts of Michael and the debts of
19   Leonard and the debts for inventory, did you disagree
20   with those figures?  Not whether they were still owed or
21   whether the payment was applied, but in terms of the
22   number of what that debt was that you agreed to be
23   responsible for, did you have any disagreement as to
24   that number?
25       MR. WALSH:  Objection.  Assumes facts not in

10  (Pages 34 to 37)

BARRY ALLEN COHEN    January 9, 2008

38

1  evidence.
2      THE WITNESS: I did not say I agreed with the
3  numbers. I disagree with the inventory number. I
4  disagree with some additional ones on me, but I just
5  broadly said that it doesn't look right to me.
6      MR. POULOS: Q. I understand that, but that's
7  not my question. My question isn't what you said. My
8  question is, for Michael I believe it showed $13,920.48.
9  That's off the top of my head and I may be wrong a
10  little bit. Did you disagree with that number?
11      A. I didn't go that far.
12      Q. As you sit here today, do you have any reason
13  to disagree with the number that was shown for Michael's
14  debts?
15      MR. WALSH: Again, to clarify, shown on that
16  piece of paper?
17      MR. POULOS: Right.
18      MR. WALSH: If you have the document, it might
19  be easier. We're talking about that piece of paper
20  authored by Joe Roggio. Do you understand, Barry?
21      THE WITNESS: Yes.
22      Greg, I don't disagree or agree with the
23  numbers. I don't know.
24      MR. POULOS: Q. I have the big copy -- I don't
25  want to mark this one; I want to mark a better copy of

39

1  it.
2      Well, I was close. It looks like $13,920.40.
3  I guess I was off by eight cents. You don't know
4  whether that -- that showed us the beginning balance for
5  Michael. Do you know if that was accurate or not? Do
6  you have a reason to dispute that number?
7      A. When I looked at this, I looked at it in total.
8  I did not question is that exactly the right number. I
9  don't know.
10      Q. Okay. And today you don't know?
11      A. And today I don't know.
12      Q. Okay. And you don't know -- when you said to
13  Joe Roggio, "I'll be responsible for Michael's debts,"
14  did you have some number in your mind that you would be
15  responsible for?
16      A. No.
17      Q. Under the Olde Port Inn -- that's the one
18  applicable to Leonard; right?
19      A. Correct.
20      Q. That shows 16 --
21      A. Looked like 18.
22      Q. Or 18,089.10. Again, I want to mark a better
23  copy. I apologize for it.
24      A. There are good ones.
25      Q. We'll put out a better copy. Do you have any

40

1  reason to dispute that number?
2      A. Right now I don't have a reason to dispute it
3  but I don't have a reason to say that's accurate,
4  either.
5      Q. Okay. When you said you would be -- said to
6  Joe Roggio that you would be responsible for Leonard's
7  debts, did you have a specific number in mind?
8      A. No. Whatever he owed.
9      Q. Okay. For the inventory figure, what was it on
10  the inventory figure that you did dispute?
11      A. At that time, I didn't dispute anything other
12  than the whole thing.
13      Q. "That time" being when this was first presented
14  to you?
15      A. When he showed that to me, the only thing said
16  was that it doesn't look right to me. And Joe said,
17  "I'm just cleaning up the books." And that was pretty
18  much the whole -- our conversation.
19      MR. POULOS: Max, could you bring in a clean
20  copy of this, a small one? Make three copies.
21      Q. As you sit here today, do you have a reason to
22  dispute the figures shown under "Inventory"?
23      A. That I should be paying for? Is that what you
24  mean?
25      Q. The numbers shown here -- do you believe any of

41

1  these numbers are wrong under "Inventory"?
2      A. I don't think this belongs in here.
3      MR. WALSH: Let me note for the record that
4  he's pointing to the top number in the inventory column.
5      MR. POULOS: Actually, I think he's pointing to
6  the whole column.
7      MR. WALSH: Some of those are minuses.
8      MR. POULOS: I understand.
9      MR. WALSH: I think he means that's the total
10  number you're talking about.
11      MR. POULOS: Let's find out from the witness
12  what he means.
13      THE WITNESS: Okay.
14      MR. POULOS: Q. What was your understanding of
15  what the category of inventory related to on this sheet?
16      A. When I look at that, I think that he's saying
17  that's the ending inventory of the joint venture and
18  that since -- now I'm going to speculate a little bit
19  about it -- that since that's the ending inventory for
20  the joint venture, that I should be responsible to pay
21  that, also, since we kept it for -- the inventory stayed
22  there. And he's saying that -- in this piece of paper,
23  what it's implying is that I should pay for it.
24      Q. Was the inventory that was left over at the end
25  of the joint venture sold to Olde Port Inn for use in

11 (Pages 38 to 41)

BARRY ALLEN COHEN    January 9, 2008

42

1  their retail fish market?
2     A.  Olde Port Inn is a restaurant.
3     Q.  Right.
4     A.  The retail market is separate from the
5  restaurant.  A different company.
6     Q.  What company is that?
7     A.  Olde Port Fisheries, Inc.
8     Q.  Okay.  That's your company?
9     A.  Right.
10    Q.  All right.  Was the inventory left over
11 transferred to the retail market for Olde Port
12 Fisheries, Inc.?
13    A.  Yes.
14    Q.  And how much was the inventory worth that was
15 transferred to Olde Port Fisheries, Inc.?
16    A.  I don't know exactly.
17    Q.  Okay.  Just so the record is clear, when the
18 joint venture ended, the inventory, fish inventory that
19 was on hand, you used in your fish market, Olde Port
20 Fisheries, Inc.?
21    A.  Correct.
22    Q.  And you can't tell us how much inventory you
23 took at the end of that or that you used in your fish
24 market at the end of that joint venture?
25    A.  Sitting here today, I do not know what the

43

1  accuracy of that number is.  I don't.  I couldn't be
2  expected to remember exactly how much the inventory was.
3     Q.  If that is what this figure represents, do you
4  dispute these numbers?
5     A.  That I owe it?
6     Q.  No.  That this is the value of that fish, that
7  it was valued at 10,300 and whatever that figure is.
8  I'm reading it upside down.
9     A.  Okay.  You're saying if that's accurate?
10    Q.  Yes.
11    A.  If that's accurate, which I'm not --
12    MR. WALSH:  Calls for an opinion, first of all.
13    MR. POULOS:  Q.  I'm asking, do you have any
14 reason to dispute that that is an accurate figure for
15 the value of the fish that was taken by Olde Port
16 Fisheries, Inc., for sale in its retail shop at the
17 close of the joint venture?
18    A.  That was very compound, and to be exactly
19 truthful, I cannot say it was used all in the retail
20 market, because we could have sold some wholesale.  But
21 I will say, to clarify this, that at the end of the
22 joint venture, there was product and supplies left on
23 the premise.  The value -- I don't know the exact
24 amount.  Could it be close to that?  Yes.  And so I'll
25 say that, if that's what you're driving at.

44

1     Q.  You think it could have been close to that
2  figure for the inventory?  That's all I'm trying to get
3  here.
4     A.  It could be close.
5     Q.  Okay.  What did you understand the debt listed
6  under the column "Point Loma" referred to?
7     A.  I'm going to have to say I don't know exactly.
8     Q.  What was your understanding?
9     A.  That there were some debts that the Point Loma
10 owed.  I don't want to guess, so I have to be careful
11 how I say this.  I believe that that represented fishing
12 operational debts that the Point Loma owed the joint
13 venture.
14    Q.  How did the Point Loma owe the joint venture, Point
15 Loma being your fishing boat?
16    A.  Right, because the Point Loma fished for the
17 joint venture.  I would have to look at all the stuff,
18 but I would say how it could be is that Point Loma
19 purchased fuel and ice from the joint venture and that,
20 usually, the fuel and ice is deducted from the check
21 that they receive for the fish they deliver.  And maybe
22 that was the difference of fuel and ice, that much or
23 thereabouts or something like that, more than the fish
24 they delivered.
25    Q.  And what about the column -- well, first of

45

1  all, do you have any -- you're the owner of the Point
2  Loma; right?
3     A.  Correct.  Well --
4     Q.  You and your wife own 50 percent each of the
5  shares of the Point Loma Fishing Company, Inc.?
6     A.  You've got it.
7     Q.  At the time these debts were incurred, though,
8  the fishing boat Point Loma was owned just by you and
9  your wife, not by the corporation; right?
10    A.  I believe that's true.
11    Q.  Okay.  And can you tell me, as the then-owner
12 of the Point Loma, whether the Point Loma owed this
13 16,000 and some odd dollars?  Looks like 16 or 18,021.
14 I can't read that.
15    A.  What's the question?
16    Q.  Did you owe that amount?
17    A.  I don't know if that's exactly what I owed.
18    Q.  Could it be close?
19    A.  I think that I could have owed the joint
20 venture that.  Close.
21    Q.  Okay.  And what about the debts under "Barry"?
22 What did you understand those debts to be?
23    A.  I would say a combination of the note to the
24 boat plus some additional charges someplace, some
25 additional monies owed.

BARRY ALLEN COHEN    January 9, 2008

46

1    Q.  By you personally?
2    A.  Well, I don't know what you're referring to.
3  What personally?  The difference, or the whole thing,
4  or --
5    Q.  What did you understand that column to
6  represent?
7    A.  That column represents, in part -- the note
8  secured by the boat, I believe, is in that number.  And
9  I believe that in addition to the boat, some other
10  monies owed were just put in the same column.  I think
11  it should have been different.  I didn't understand the
12  whole thing, but it should have been -- in my opinion,
13  should have been the boat note separate from everything
14  else, and that's what should have gotten paid.
15    Q.  The beginning balance that's shown on this
16  sheet says the beginning balance is 237,035.48.
17    (Inaudible comment by Mr. Walsh)
18    MR. POULOS:  Let's have this marked as
19  Exhibit 1.
20    (Whereupon, Exhibit 1 was
21      marked for identification.)
22    THE WITNESS:  It's not the same document, not
23  the same document at all.  It's a different document.
24    MR. ROGGIO:  This is a more current one.
25    THE WITNESS:  This is the one that was done

47

1  after I got laid off, when I asked for it.  No, it was
2  not even that.  That was the most recent one.
3    MR. POULOS:  Let me take a break and grab the
4  right one.
5    (Recess from 11:36 to 11:40)
6    MR. POULOS:  Q.  You want to compare that,
7  because I think this is the one.  I think that's the
8  same, except, you know, it doesn't have the handwriting
9  on it.
10    A.  It might be even clearer.  But anyway --
11    Q.  I think it's a little better than this one.
12    A.  I know there's a good copy of, you know, kind
13  of the original of this that didn't get all blurred in
14  faxing and stuff.
15    MR. POULOS:  Let's re-mark Exhibit 1 so that
16  we've got a proper Exhibit 1.
17    (Whereupon, Exhibit 1 was
18      marked for identification.)
19    MR. POULOS:  Q.  Why don't you take a look at
20  Exhibit 1, which I think is a slightly better copy than
21  the one we've been looking at.
22    All right.  So we've been talking about the
23  figures under -- we've gotten to look at the figure
24  under the column called "Barry"; correct?
25    A.  Correct.

48

1    Q.  And what did you think that that figure
2  represented?
3    A.  I think this represents the major part of that
4  number I believe was the note for the boat, the
5  $215,000, plus I believe that the rest was some other
6  monies owed.
7    Q.  By you?
8    A.  That's what I think this shows.
9    Q.  Okay.  What other monies owed do you think were
10  included in that?
11    A.  Greg, I have no idea.
12    Q.  The beginning balance -- let's talk about the
13  note for a minute.  You just mentioned a note for
14  $215,000; correct?
15    A.  Correct.
16    Q.  That's a promissory note that you understand is
17  part of what's at issue in this litigation; right?
18    A.  Correct.
19    Q.  And what was the $215,000 note for?  Where did
20  that debt come from?
21    A.  That's two different questions.
22    Q.  Where did it come from?
23    A.  It came from when Joe Cappuccio was going to
24  buy a 50 percent interest in the Point Loma so we could
25  go a 50-50 joint venture in Mexico.  Initially, he

49

1  wanted to buy a 50 percent interest in the Point Loma.
2  I had to get the Point Loma ready to go to Mexico, and
3  had a lot of upgrades to do on it.  Going to -- Mexico
4  is like a third world country -- no infrastructure -- so
5  there was a lot of things we had to do to make the boat
6  self-sufficient.  So a lot of the money that I used was
7  to upgrade the boat.  While the boat was being upgraded,
8  then there were expenses on the boat.  And all of the
9  money that was on that note, at the time we did it, was
10  to be applied to the purchase price of one half interest
11  in the boat.  That's where the amounts of money came
12  from.
13    Q.  That added up to what you say was the original
14  215 balance?
15    A.  I think I always said that was an approximate
16  number.  But that's not why the note was made.  That's a
17  different answer -- different question.
18    Q.  You know who Dave Cantrell is; right?
19    A.  Yes.
20    Q.  He's your CPA?
21    A.  Yes.
22    Q.  And he was involved in trying to help you and
23  Joe Cappuccio set up the joint venture for Mexico;
24  correct?
25    A.  He was somewhat involved.

13  (Pages 46 to 49)

BARRY ALLEN COHEN     January 9, 2008

50

1    Q.  You consulted with him on that process?
2    A.  I don't know if I did or if Gene Glaser did or
3  if we did together. I don't remember how it came about,
4  but he did get involved.
5    Q.  Just so we've got it on the record, you and Joe
6  Cappuccio had the idea of creating a joint venture to
7  fish using the Point Loma in Mexican waters; correct?
8    A.  That's pretty correct.
9    Q.  And that became what ultimately is sort of
10 short-handed to be known as the "Mexico joint venture,"
11 right?
12   A.  Correct.
13   Q.  And as part of that joint venture, Joe
14 Cappuccio was going to contribute certain things to the
15 joint venture; correct?
16   A.  Correct.
17   Q.  And one of those was the cost of a fishing
18 permit for the Point Loma to fish in Mexican waters;
19 correct?
20   A.  Well, that's what happened.
21   Q.  Okay. And in addition, he was going to
22 purchase -- originally, the plan was that he would
23 purchase a half interest in the Point Loma?
24   A.  Correct.
25   Q.  And he would do that by paying for certain

51

1  upgrades on the Point Loma; is that right?
2    A.  No.
3    Q.  How was he funding that purchase? I'll
4  withdraw that. Let me ask it this way.
5        In addition to purchasing the Mexico fishing
6  permit, Joe Cappuccio was also going to pay for certain
7  improvements or upgrades, however you want to phrase it
8  to the Point Loma; is that right?
9    A.  Well, he was -- he would advance the money to
10 get that done. He actually didn't do any upgrading or
11 anything like that; his whole contribution was money.
12 And it was used mostly for upgrade of the vessel and
13 maintaining the vessel and paying the bills for the
14 vessel. And whatever the total amount would be would be
15 applied to his purchasing a 50 percent interest in the
16 Point Loma. And I believe -- well, I don't know. I
17 can't remember anything other than, really, that's the
18 basic thing that happened. I don't want to say anything
19 that's wrong, because I don't know.
20   Q.  Eventually, Joe ended up not purchasing part of
21 the Point Loma; is that right?
22   A.  Correct.
23   Q.  And instead, the amounts advanced were
24 converted to a promissory note and mortgage against the
25 Point Loma; is that correct?

52

1    A.  That's the end result.
2    Q.  Right. But the amounts that were included in
3  that promissory note were not just amounts for the
4  improvements on the Point Loma, were they?
5    A.  I don't think so.
6    Q.  You don't think I'm right?
7    A.  No. I don't think that they were all just for
8  improvements on the Point Loma. There were a lot of
9  maintenance issues; there was insurance to be paid. The
10 boat got tied up for a long time, too, trying to get all
11 this done. So there were expenses that were really not
12 upgrades, but they were maintenance of it.
13   Q.  Also included when you converted all this into
14 the promissory note were debts that you owed for
15 personal advances; is that correct?
16   A.  Well, I don't know.
17   Q.  Well, isn't it true that you previously have --
18 well, withdrawn.
19        Why don't you take a look at -- we'll mark this
20 as Exhibit 2.
21        (Whereupon, Exhibit 2 was
22         marked for identification.)
23        MR. WALSH: I'm going to generally object to
24 this line of questioning on the basis of the parol
25 evidence rule.

53

1        THE WITNESS: Okay.
2        MR. POULOS: Q. Have you seen this document
3  before?
4    A.  Yes, I have.
5    Q.  And you know that this is a document, also,
6  that Mr. Cantrell testified about a couple of weeks ago
7  when we took his deposition; right?
8    A.  Right.
9    Q.  And you were present for that deposition?
10   A.  Correct.
11   Q.  And you remember, if you turn to page 2 of this
12 memo from Mr. Cantrell, that it lists, in bullet points,
13 Mexico fishing permit $97,000; boat improvements,
14 $84,000; personal loans to Barry Cohen, $62,004; and
15 fishing loans prior to the JV of 53,411. Do you see
16 that?
17   A.  Yes.
18   Q.  Isn't it true that the last three bullet points
19 there -- boat improvements, personal loans and fishing
20 loans, or some portions of all of those -- were what
21 were converted to the debt --
22   A.  Yes.
23   Q.  -- in the promissory note?
24   A.  That's what I believe.
25   Q.  So the promissory note wasn't a promissory note

14  (Pages 50 to 53)

BARRY ALLEN COHEN    January 9, 2008

58

1       Do you see that?
2    A. Yes.
3    Q. Do you agree with all of that?
4    A. Yes.
5    Q. Then it said, "The amount owed as of December
6    2001 for these advances was $16,394.75."
7       Do you see that?
8    A. Yes.
9    Q. Do you agree with that?
10   A. I don't disagree with it.
11   Q. "Therefore the total owed to Cappuccio was
12   $78,398.75," which is "($62,004, plus $16,394.75)."
13      Do you see that?
14   A. Yes.
15   Q. Do you agree with that?
16   A. Sitting here today, I do not disagree with it.
17   Q. "According to Barry's" -- it continues,
18   "According to Barry's records, Joe advanced
19   $111,715.78 cents for boat improvements."
20      Do you see that?
21   A. I see that.
22   Q. Do you disagree with it or agree with it?
23   A. I don't disagree with it. I don't understand
24   it at this moment.
25   Q. Okay. Does that refresh your recollection that

59

1    you actually had and maintained records showing the
2    expenditures for boat improvements?
3    A. Oh, I never said I didn't.
4    Q. Do you have them still?
5    A. I'm sure we do. I did not dispose of any.
6    Q. Do you know if you have produced them in this
7    case?
8    A. I have.
9       MR. WALSH: Yes, we made them available to you.
10   They're sitting waiting for you to investigate. They're
11   part of the records that were available that we tried to
12   arrange for Max to see last week. They're all there for
13   you to see.
14      MR. POULOS: Q. How are those arranged down in
15   Avila Beach?
16   A. On two pallets and one full file cabinet four
17   drawers high.
18   Q. Do you have a file for boat improvements that
19   were made and paid for?
20   A. I doubt it.
21   Q. So in order to get those records, we've got to
22   go through two pallets and a file cabinet worth of
23   documents?
24   A. Well, I think if you go through two pallets and
25   the file cabinet, you're going to get all the things you

60

1    asked for. It's in there. I didn't take anything out.
2    Q. Is it true, then, that the amount secured by
3    the preferred mortgage -- or the amount under the
4    promissory note and secured by the preferred mortgage
5    relates not just to boat improvements, but to personal
6    loans and fishermen advances that you owed to Del Mar?
7    A. Without saying the amounts of anything, I would
8    say that's probably true. However, I don't think we
9    need to go exactly by these titles, because there's
10   going to be some mixed up things in there.
11      MR. POULOS: It's noon. Let's take, say, a
12   40-minute lunch break.
13      (Lunch recess from 12:02 to 12:48;
14       Present: Mr. Poulos, Mr. Walsh, and the
15       witness)
16      MR. POULOS: Q. When we took a break for
17   lunch, we were talking about the source of the $215,000
18   in debt that is under the promissory note. Do you
19   remember that?
20   A. Mm-hmm, yes.
21   Q. And if you take a look at Mr. Cantrell's
22   memorandum, Exhibit 2, on page 2 we were looking at the
23   bullet points there; correct? On page 2 there's bullet
24   points "Mexican fishing permit," "boat improvements,"
25   "personal loans"?

61

1    A. Yes.
2    Q. And "fishing loans."
3       In terms of the boat improvements, it then says
4    in the memo that your records showed that you had --
5    that Joe Cappuccio had advanced $111,715.78 for boat
6    improvements; correct?
7    A. That's what this says.
8    Q. And you don't have any reason to dispute that,
9    do you?
10   A. I don't have a reason to dispute it.
11   Q. Now, in terms of the personal loans to Barry
12   Cohen, is it your testimony that any portion of those
13   personal loans were in fact paid to -- used for
14   improvements of the Point Loma?
15   A. I don't think so.
16   Q. What were those personal loans used for?
17   A. I can't tell you today. I don't know.
18   Q. You had signing authority on a bank account for
19   the Olde Port Fisheries Division of Del Mar; right?
20   A. For the joint venture?
21   Q. Yes.
22   A. Yes.
23   Q. On a Wells Fargo account; right?
24   A. Yes.
25   Q. And you wrote checks for the funds used to

16  (Pages 58 to 61)

BARRY ALLEN COHEN    January 9, 2008

98

1    A.  Yes.  And before.
2         MR. WALSH:  We will provide an insurance
3    certificate, if that's the case.  The insurance company
4    will give us the information.
5         MR. POULOS:  Q.  Who was the insurance company?
6    A.  They change.  Who is it today?
7    Q.  No, I know who it is today.
8    A.  Who is it today?
9    Q.  I've got a certificate.
10   A.  They just changed it again.  It's Chase now.
11   Q.  Who was it in the last two years; do you
12   recall?
13   A.  No.  Let's go before two years and I'll tell
14   you who.
15   Q.  Tell me when the last time you know.
16   A.  Pettit & Morey (phonetically) at Newport Beach.
17   Now I think they're Chase Insurance Company.  Same
18   place, same people, just a buyout thing.
19        MR. POULOS:  Q.  Has Del Mar Seafoods, Inc.,
20   been listed as an additional insured under all the
21   insurance policies since the promissory note and
22   preferred mortgage were entered into?
23   A.  I don't think so.
24   Q.  When was the last time the vessel was
25   drydocked, if ever?

99

1    A.  If ever?  You want to add that, really?
2    Q.  I'm adding that because I don't want to get an
3    objection that I'm assuming something.  It's not meant
4    to be derogatory.  It's if it's ever been done.
5    A.  It's been done several times.  More than
6    several times.
7    Q.  Do you recall when?
8    A.  No, I don't.
9    Q.  Do you recall when the last time was?
10   A.  No.
11   Q.  Do you recall whether it was in the last five
12   years?
13   A.  I think it was more than five years.
14   Q.  Do you recall where it was done?
15   A.  It was either done in Channel Islands or in
16   San Pedro, but I think Channel Islands.
17   Q.  I don't recall the exact words from Captain
18   Kobak's deposition yesterday, but he described the
19   vessel generally as being in an advanced state of
20   disrepair or deterioration.  Do you agree with that?
21   A.  Well, I wouldn't know what he means by that, so
22   how would I agree or disagree with it?
23   Q.  How would you characterize the overall
24   condition of the vessel's hull presently?
25   A.  It needs a paint job.

100

1    Q.  That's it?
2    A.  I think so.
3    Q.  What type of maintenance have you done on the
4    vessel in the last year?
5    A.  I have not done any maintenance on it.
6    Q.  Have you hired somebody other than Captain
7    Kobak and the crew to do any maintenance on the vessel
8    in the last year?
9    A.  If there was any maintenance done -- I'm sure
10   there was maintenance done -- but if there's any
11   maintenance done, that would be Captain Kobak's
12   responsibility and he would take care of it.  If
13   something doesn't work on the boat, he fixes it or gets
14   a new one, whatever he needs to do.  He knows that.  And
15   he just decides what he needs to keep it working right.
16   Q.  How much income did you receive from the
17   fishing operations on the Point Loma in the last fiscal
18   year, so in 2007?
19   A.  I thought I sent you all of the money.
20   Q.  Do you remember how much you've actually
21   earned?  Because, actually, it doesn't give us that.
22   What it gives -- what you gave me, so the record is
23   clear, you gave me at Mr. Cantrell's deposition a stack
24   of documents, and I'll put it on the record here in a
25   minute.

101

1    A.  Which is the gross receipts for that.
2    Q.  What I'm asking is the net.
3    A.  I have no idea.
4    Q.  You have -- as the vessel owner, you receive 50
5    percent of the net income from the vessel after the
6    deduction of fuel and ice expenses; is that right?
7    A.  That's correct.
8    Q.  The other 50 percent goes to the crew; correct?
9    A.  Correct.  And the captain.
10   Q.  Right.  The captain.  From the 50 percent that
11   you receive, you have to pay for the dockage of the
12   vessel; right?
13   A.  Yes.
14   Q.  How much is that?
15   A.  It's $1200.  I don't know if that's monthly or
16   once every two months.  I'm not sure.  But it has a
17   place in San Francisco.  So whatever the dockage charge
18   is, I forget, but I send them a check when I get the
19   bill.
20   Q.  You pay for insurance from that 50 percent?
21   A.  Sure.
22   Q.  How much is the insurance?
23   A.  In the neighborhood of $25,000 a year.
24   Q.  From that 50 percent, you pay for maintenance
25   of the vessel; correct?

26 (Pages 98 to 101)

BARRY ALLEN COHEN    January 9, 2008

### 114

1    MR. WALSH: That's correct.
2    MR. POULOS: So we've got a stipulation on the
3  record that attorneys who were retained by Mr. Cohen
4  have possession of the Miller Starr Regalia invoices?
5    MR. WALSH: That's correct.
6    MR. POULOS: All right.
7    Q. Did you read the responses to requests for
8  production before you verified them, Mr. Cohen?
9    A. I did.
10    Q. Did you read your responses to interrogatories
11  before you verified them?
12    A. I read them. I read them twice.
13    Q. Did you understand in verifying them that you
14  were swearing that they were true under penalty of
15  perjury?
16    A. I understand that.
17    Q. You are making a claim in this case for damages
18  arising from the arrest of the vessel; is that correct?
19    A. That is correct.
20    Q. And what damages are you claiming that you
21  incurred as a result of the arrest of the vessel?
22    A. I thought you had that.
23    Q. I'm asking you to tell me what you believe to
24  be the damages.
25    A. My attorney fees, the loss of revenue from the

### 115

1  boat not being able to go fishing, my costs and
2  expenses. That's all I can think of this minute, as of
3  this moment.
4    Q. Are you making a claim for damages for the loss
5  of a fishing net?
6    A. Yes.
7    Q. Did you authorize your attorneys to present a
8  claim to the United States Marshal for the Northern
9  District of California for the value of the loss of the
10  fishing net?
11    MR. WALSH: Objection. Don't answer that
12  question. It implicates attorney-client privilege.
13    MR. POULOS: Q. Are you aware that a claim was
14  made to the United States Marshal Service for the
15  Northern District of California for the loss of the net?
16    A. I don't think I should answer that.
17    MR. WALSH: Yes or no, are you aware?
18    THE WITNESS: No. At this moment I'm not
19  aware.
20    MR. POULOS: Q. What was the date that the
21  fishing net was last -- withdrawn.
22    The fishing net that you're claiming was lost
23  as a result of the arrest of the vessel was not on the
24  vessel at the time of the arrest; is that true?
25    A. To my understanding, that's true.

### 116

1    Q. The fishing net that you're claiming was lost
2  as a result of the arrest was not on the same pier as
3  the Fishing Boat Point Loma at the time of the arrest,
4  was it?
5    A. Say that again.
6    Q. The fishing net was actually at a different
7  pier than the Point Loma was at, at the time of the
8  arrest?
9    A. I don't know.
10    Q. Have you spoken with Captain Kobak about the
11  circumstances of the loss of the fishing net?
12    A. Yes.
13    Q. Did Captain Kobak tell you that the fishing net
14  went missing sometime around July 20th of 2007?
15    A. To answer that question, I don't know; I don't
16  know the dates. But I know, in reference to the boat
17  being arrested, it was missing after the boat was
18  arrested.
19    Q. Do you recall Captain Kobak telling you that he
20  thought the fishing net had been stolen by the crew on a
21  vessel called the "Karen"?
22    A. He mentioned that was one of his ideas. It was
23  a speculation, though. It was not from anything other
24  than speculation. That's my understanding of what he
25  said.

### 117

1    Q. Are you aware that Captain Kobak filed a police
2  report for the theft of the fishing net?
3    A. He told me he did.
4    Q. Have you seen a copy of that?
5    A. Like that (snapping fingers), today. I didn't
6  even read it. Just saw it slide on the table.
7    Q. You're talking about that little piece of
8  paper?
9    A. No. Before we got here.
10    Q. The main police report?
11    A. Yes. I didn't get to look at it or anything.
12  It just went by. So I can say I saw it, but I didn't
13  get the chance to look at it. He told me that he
14  notified the harbor, the police. I told him every place
15  to try to find the net. And I think he did the best he
16  could to try to find the net. I don't know.
17    Q. Do you recall how long after the vessel was
18  arrested that the fishing net was found to be missing?
19    A. A short time after.
20    Q. I will represent to you that Captain Kobak
21  testified yesterday that it wasn't missing until July --
22  or went missing, I think is his term, until on or around
23  July 20th of 2007. Does that refresh your recollection?
24    A. No. When was the boat arrested?
25    Q. June 7th of 2007.

30 (Pages 114 to 117)

134

```
 1       MR. WALSH: Objection. I don't think it's been
 2   established it's an e-mail. Whatever you want to call
 3   it, piece of paper, I'm not sure it's an e-mail.
 4       MR. POULOS: On Exhibit 7 -- it's the same as
 5   what's on the Exhibit 7, right?
 6       THE WITNESS: It's the same date on both of
 7   them.
 8       MR. POULOS: Q. Okay. Does tying those two
 9   things together -- the fact that the check is dated
10   January 30th and the Exhibit 7 is dated January 30th --
11   does that help refresh your recollection as to whether
12   you are the author of Exhibit 7?
13   A. No.
14   Q. The next page is a check dated February 15th,
15   2007, for $3,000. Is that right?
16   A. Correct.
17   Q. Okay. And is that also a check that you wrote
18   on the Point Loma checking account to Del Mar Seafoods
19   for payment?
20   A. Correct.
21   Q. And when you wrote "on account," what account
22   were you referring to?
23   A. This was on the note account.
24   Q. And the same goes for the first page, where it
25   says "on account"?
```

135

```
 1   A. Correct.
 2       (Discussion off the record)
 3       MR. POULOS: Q. You have the other $3000
 4   check?
 5   A. Yes. 4-23 is the date on it.
 6   Q. So the next page is the check dated 4-23 for
 7   $3,000?
 8   A. That's what I have.
 9   Q. Yes. Okay. That also is a check written on
10   your F/V Point Loma account signed by you; correct?
11   A. Correct.
12   Q. Do you believe that those are the three checks,
13   then, that are reflected on Exhibit 8 as payments on
14   account?
15   A. Say that again.
16   Q. Do you believe that those, then, are the three
17   checks that are reflected on Exhibit 8?
18   A. On this?
19   Q. Yes, as payments on account.
20   A. I believe they are.
21   Q. Now, you had made -- at the heart of this case
22   is your payment of $175,000; correct?
23   A. Correct.
24       MR. POULOS: Let's have that marked as Exhibit
25   11.
```

136

```
 1       (Whereupon, Exhibit 11 was
 2        marked for identification.)
 3       MR. POULOS: Q. That is the check for $175,000
 4   that you've testified about making; is that right?
 5   A. Correct.
 6   Q. And that was a check that you believe should
 7   have been applied to the balance under the promissory
 8   note; correct?
 9   A. Correct. And this is a copy of the check; not
10   the check.
11   Q. Right. You delivered that check in person;
12   correct?
13   A. Correct.
14   Q. And you first took it to Joe Cappuccio when he
15   was in his office; is that right?
16   A. That's the only place I took it.
17   Q. Didn't he tell you to take that over to Joe
18   Roggio?
19   A. No.
20   Q. So he accepted the check -- is your testimony?
21   A. That's my testimony.
22   Q. Can you tell me when that occurred, when you
23   actually handed that to him, that check?
24   A. I can't say exactly, but it had to be very
25   close to that date. I don't think that I held onto it.
```

137

```
 1   I think I made it the day I gave it to him.
 2   Q. So you think you gave it to him on November 9th
 3   of 2005?
 4   A. I believe so. But I want to correct one thing
 5   because I just want this understood. I know for sure
 6   that I handed this check to Joe Cappuccio, because when
 7   I saw Joe Roggio I told him I want to give this to Joe
 8   myself.
 9       I gave it to Joe Cappuccio. He looked at it
10   and said -- I said, "Here's the check that I said I
11   would give." He said, "Thank you very much." And I
12   said, "I'll pay you the rest as soon as I can." And he
13   said, "Well, I'm not worried about" -- "I'm not
14   concerned" or "not worried about it; it's such a small
15   amount now."
16       After that point, I don't know; I don't
17   remember if he gave me back the check and I took it. I
18   don't remember that at all. So if somebody is saying
19   that's what happened, that may have been, because all I
20   remember very clearly in my mind is I handed him the
21   check because I knew it was important to him, and I know
22   he thanked me and said he wasn't worried about the rest
23   I told him I would pay as soon as I can. He
24   said, "Whatever you can do, I'm not worried about it
25   anymore; it's such a small amount." After that point I
```

BARRY ALLEN COHEN    January 9, 2008

138

1  don't remember really. So if I took it or they're
2  saying I took it to Joe Roggio, it's possible, but I
3  don't remember that. That's for clarification.
4       Q. Fine. What else do you recall, if anything,
5  about the conversation that you had with Joe Cappuccio?
6  Was there more to it than that, or is that all that you
7  remember?
8       A. I think that was the whole conversation.
9       Q. So I take it this whole exchange probably
10  lasted less than a minute?
11      A. Maybe two. Yes, very short.
12      Q. And you don't remember, then, any conversation
13  with Joe Roggio about this check because you don't
14  remember whether you took it to him or not, so I'm
15  assuming you don't remember a conversation?
16      A. I didn't think I took it to him, but I just got
17  the feeling, because you asked that question, that maybe
18  somebody said I did. And maybe somebody will remember
19  something I don't. All I'm going to tell you is this is
20  what I remember; that's what I don't remember. I
21  thought I just left. If I took the check, if he said,
22  "Take it to Joe Roggio," I don't remember that at all.
23      Q. Okay. And do you remember whether you had any
24  subsequent -- on that day or others -- conversations
25  with Joe Roggio about this payment?

139

1       A. I don't know. I don't know in what context
2  you're talking about. I gave the check to Joe. Is that
3  what you mean?
4       Q. No. I just want to know what other
5  conversations, if any -- and I'm not saying there were;
6  I'm not saying there weren't. I'm asking you, did you
7  have any other conversations or any conversations with
8  Joe Roggio about this check that you remember? I don't
9  want to hear at trial, "Oh, I remember I had a
10  conversation with Joe." Tell me if you do or you don't.
11  It's that simple.
12      A. I'm not going to do that. I don't remember any
13  after. I don't know for how long a period of time
14  you're talking. A week later, did I? I don't know. A
15  week before? Yeah, I'm sure I did. I know I told Joe
16  Roggio I was coming. He knew I was coming because I
17  went to him first and said, "I made the check out and I
18  want to give it to Joe myself," because I thought it was
19  my place to do that. And pretty much, that's what I
20  remember about the actual giving of the check.
21      Q. How did the giving of this check come about?
22  Why did you give them -- let me rephrase.
23         Why did you give them a check for 175?
24         MR. WALSH: Objection. Asked and answered.
25  You can answer it again.

140

1         THE WITNESS: Want me to answer it again? Not
2  the whole big dissertation I made; right?
3         Joe Cappuccio asked me to do something like
4  this.
5         MR. POULOS: Q. Did he specify the amount?
6       A. No, he told me what the problem was, that he
7  needed my help, and I said I would see what I could do.
8  And this is what I could do.
9       Q. When was that conversation? I'm sorry. Did
10  you say Roggio or Cappuccio?
11      A. Cappuccio.
12      Q. When did you have that conversation with Joe
13  Cappuccio?
14      A. Of him asking me if I could help him do this?
15      Q. Yes.
16      A. I would guess -- my best estimate -- a couple
17  of months before this check, because after he asked, I
18  went home, talked to my wife about it and went about
19  trying to get a second on the house. So, however long
20  that took, that's when I did it. I didn't wait a month
21  or two; I tried to do it when he asked me. And I told
22  you why he said he needed it: Because the bank that he
23  gets his credit line with was unhappy with that type of
24  loan on his books.
25         And Joe Cappuccio -- what he said to me was the

141

1  bank said: We're the bank and you're the fish company;
2  we don't want to see those loans on your books when you
3  borrow money from us. That's what he told me and it
4  made sense. So I said, "I'll do what I can," and that's
5  how this came about. And that's why I was so emphatic
6  that it was for the note on the boat, because that was
7  the whole purpose of doing this. They didn't ever say
8  anything about receivables or this. That's why he had a
9  line of credit -- to fund his receivables. What he told
10  me is they just didn't like seeing that note that I had
11  with them that Chris and I signed. And this was to pay
12  down that note that much.
13      Q. Do you remember anything else about the
14  conversation, besides what you've told me so far?
15      A. With Joe Cappuccio?
16      Q. Right.
17      A. That's the essence of it. I don't remember
18  words verbatim, but he told me that the bank
19  dah-dah-dah -- the things I just said, and this is the
20  result of what he asked me to do.
21      Q. Okay. Do you recall -- you've mentioned a
22  conversation you had with Joe Roggio before this payment
23  was made in which you told Joe that you wanted to give
24  Joe Cappuccio the check personally.
25      A. Yeah.

36 (Pages 138 to 141)

# EXHIBIT 2

1/10/2008

## Olde Port Fisheries Balances (Avila Beach JV)

| Date | Activity | Loan Activity Amount | M. Cohen | OP Fishery | OP Inn | Inventory | Port San Luis Case | Barry Note Principal Balance | Principal Balance For Interest Calc. | Days | 7% Interest Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/03 | Beginning Balances | 215,000.00 | | | | | | 215,000.00 | 215,000.00 | | |
| 01/01/04 | Barry/Point Loma Advances | 11,767.38 | | | | | | 226,767.38 | 226,767.38 | 61 | 2,650.07 |
| 03/01/04 | Barry/Point Loma Advances | 1,768.00 | | | | | | 228,535.38 | 228,535.38 | 60 | 2,945.55 |
| 05/01/04 | Barry/Point Loma Advances | 3,500.00 | | | | | | 232,035.38 | 232,035.38 | 60 | 2,666.17 |
| 09/30/04 | Point Loma AP Balance | 16,021.31 | | | | | | 248,056.69 | 248,056.69 | 149 | 6,722.39 |
| 09/30/04 | Advance to Chase Avila Debts | 42,372.74 | | 13,920.40 | 18,069.10 | 10,383.24 | | 290,429.43 | 248,056.69 | | |
| 12/22/04 | Barry Paymt | (5,000.00) | | | | | | 285,429.43 | 243,056.69 | 82 | 3,955.02 |
| 09/24/05 | American Payment | (1,474.75) | | | | (1,474.75) | | 283,954.68 | | | |
| 09/14/05 | Olde Port PYMT | (1,000.00) | | | | (1,000.00) | | 282,954.68 | | | |
| 11/10/05 | Inventory Adjustment | (1,300.00) | | | | (1,300.00) | | 281,654.68 | | | |
| 11/10/05 | Barry Paymt (175,000) | (175,000.00) | | (13,920.40) | (18,069.10) | (6,608.49) | | 106,654.68 | 106,654.68 | 318 | 15,028.58 |
| 12/05/06 | Olde Port AR Balance | 7,417.67 | | 7,417.67 | | | | 114,072.35 | | | |
| | Point Loma AP Balance | 1,368.82 | | | | | | 115,441.17 | 108,023.50 | 385 | 7,984.06 |
| | Fees for Port San Luis Case | 21,308.52 | | | | | 21,308.52 | 136,749.69 | | | |
| 02/05/07 | Barry Paymt | (2,000.00) | | | | | | 134,749.69 | 106,023.50 | 60 | 1,250.24 |
| 02/20/07 | Barry Paymt | (3,000.00) | | | | | | 131,749.69 | 103,023.50 | 15 | 303.23 |
| 04/25/07 | Barry Paymt | (3,000.00) | | | | | | 128,749.69 | 103,023.50 | 65 | 1,302.07 |
| 12/31/07 | Balance of Interest Calc. | | | | | | | 128,749.69 | 103,023.50 | 246 | 4,784.32 |
| | Totals | | - | 7,417.67 | - | - | 21,308.52 | 128,749.69 | | | 49,207.70 |

Balance with Interest     177,957.39

Damages spreadsheet.xls

DMSI 0269

# EXHIBIT 3



1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4                 ---oOo---

**CERTIFIED COPY**

JG  Jane GROSSMAN
RS  REPORTING Services

5   DEL MAR SEAFOODS, INC.,         )
                                    )
6          Plaintiff,               )
                                    )
7   vs.                             )        No. C-07-2952-WHA
                                    )
8   BARRY COHEN, CHRIS COHEN        )
    (aka CHRISTENE COHEN), *in*     )
9   *personam*, and F/V POINT LOMA,)
    Official Number 515298, a       )
10  1968 steel-hulled, 126-gross    )
    ton, 70.8 foot long fishing     )
11  vessel, her engines, tackle,    )
    furniture apparel, etc., *in*   )
12  *rem*, and Does 1-10,           )
                                    )
13         Defendants.              )
    _____)

14

15

16          DEPOSITION OF JOSEPH ROGGIO

17             December 13, 2007

18

19

20          Taken before JANE GROSSMAN

21              CSR No. 5225

22

23       JANE GROSSMAN REPORTING SERVICES
            Certified Shorthand Reporters
24        1939 Harrison Street, Suite 460
            Oakland, California 94612
25              (510) 444-4500

DEPOSITION OF JOSEPH ROGGIO

1

1          MR. WALSH:  Q.  Did you yourself check with

2    regard to the Vessel Documentation Center, U.S. Coast

3    Guard -- did you ask for an abstract of title?

4          A.    No.

5          Q.    Did you ever send any letter to either

6    Mr. Cohen or Mrs. Cohen with regard to these issues to

7    seek clarification?

8          A.    Well, clarification of what?

9          Q.    The debt that was owed.

10         A.    Well, I just know that when we recorded the

11   note with the National Vessel Documentation Center, they

12   sent us the document back with a stamp.  And since then

13   it has been placed in the file.

14         Q.    The question is this:  Did you or

15   Joe Cappuccio draft a letter to Mr. or Mrs. Cohen that

16   said, "We're concerned about you paying back your note.

17   What are your circumstances?"

18         A.    Did we write a letter?  No.

19         Q.    You did not.  Okay.

20               Let's go back to Exhibit 2, if you would.  I

21   would like you to go to page 6.

22               Are we on the same page?

23         A.    Page 6.

24         Q.    Good.  Thank you.

25               Now, I believe it's correct that you have

DEPOSITION OF JOSEPH ROGGIO

1   asserted that, in addition to the note amount of 215,000,

2   there were advances made under the note; is that correct?

3       A.   Well, there were additional charges that Barry

4   made that I considered fell under the note.

5       Q.   You considered?

6       A.   Yeah.  Well, I'm talking about the charges for

7   the *Point Loma*.

8       Q.   Well, we'll get to that.

9            So, the position is that in addition to the

10  215,000 original amount of the note, Barry and his wife

11  both agreed to add certain advances to the note and the

12  mortgage; is that correct?

13      A.   Well, what amounts are you talking to?

14           I just know that these amounts here

15  (indicating) that you have highlighted on your page that

16  I can see were discussed by me and Barry about adding

17  those to his balances.  And I took that as being part of

18  the funds that Barry owed Del Mar Seafoods.

19      Q.   Under the note?

20      A.   I assumed under the note.

21      Q.   You assumed?

22      A.   Well, I think we both assumed that he was

23  talking about -- when he said to add to his balance, his

24  balance is the note.

25      Q.   So, the operative words that triggered your

DEPOSITION OF JOSEPH ROGGIO

1    assumption were "his account"?  Is that what he said,

2    "Add these to my account"?

3         A.   He said -- I remember "add to his balances."

4              Now, if he used the word "account" -- you're

5    going to have to ask him.

6         Q.   I'm just asking --

7         A.   I recall him saying "balances."

8         Q.   Balances.  Okay.

9         A.   "Balances" to me means add it to his account

10   balance.

11        Q.   Did you ever have any kind of conversation

12   about these transactions with Chris Cohen?

13        A.   Well, the joint venture agreement was between

14   Barry and Joe, not Chris.

15             This had to do with what was left over after

16   when we set down the joint venture operation.

17             MR. WALSH:  Move to strike as nonresponsive.

18        Q.   The question is, Did you ever have any

19   conversation with Chris Cohen about any of these

20   business dealings?

21        A.   We weren't in a joint venture with

22   Chris Cohen.

23        Q.   So, the answer is no?

24             MR. POULOS:  Just he's looking for a "yes" or

25   "no."

# EXHIBIT 4

11/15/2008  12:01 FAX 925 933 4126    MILLER STARR    @004

11-15-2005  08:55AM  FROM-DEL MAR SEAFOODS INC Om    T-131  P.002/006  F-239

**Del Mar Seafoods, Inc.**
**Schedule of Payments**

| | Michael Cohen | Olde Perkins | Inventory | Point Loma | Barry | Total |
|---|---|---|---|---|---|---|
| Beginning Balance | 15,820.40 | 16,069.10 | 16,383.24 | 16,021.91 | 237,035.48 | 205,420.93 |
| 12/22/2004 Barry Paymt | | | | | (5,000.00) | (5,000.00) |
| 8/24/2005 American Payment | | | (1,474.75) | | | (1,474.75) |
| 9/14/2005 Olde Perk PYMT | | | (1,000.00) | | | (1,000.00) |
| 11/10/2005 Inv. Adj | | | (1,900.00) | | | (1,900.00) |
| 11/10/2005 Payment from Barry | (15,820.40) | (16,069.10) | (11,008.49) | (16,021.91) | (120,180.70) | (175,000.00) |
| Ending Balance | | | | | 111,854.78 | 111,854.78 |





# EXHIBIT 5

# Memorandum

To:         Barry Cohen, Joe Roggio & Gene Glaser
From:       David Cantrell, CPA
Regarding:  Cappuccio/Cohen Joint Venture
Date:       August 30, 2002
Page 1 of 4



## Background

The following is a summary of my understanding of the events that have occurred in connection with the formation of the Cappuccio/Cohen joint venture. Please take note, that I am not familiar with Mexican corporate or tax laws and can not address any related issues.

In October of 2001 Barry Cohen & Joe Cappuccio agreed to form a joint venture to operate the Point Loma fishing vessel in Mexico. To accomplish their goal, they formed a Mexican corporation. The Mexican corporation is owned 51% by a Mexican national and 49% by Cohen & Cappuccio as equals. The value or cost of the stock is not known by me at this time, but it is my understanding that it is low.

The Mexican corporation was formed to operate the Point Loma in Mexican waters, but not to own it. A Mexican fishing licenses was obtained by the Mexican corporation and the Point Loma was registered as a Mexican vessel. The cost to complete these tasks was $97,000 which was loaned to the Mexican corporation by Joe Cappuccio. Various improvements have been made to the Point Loma to make it ready for operating the joint venture. These improvements have been funded by Cohen and Cappuccio. In addition, Cappuccio has loaned funds to the Mexican corporation to fund its initial operations. Starting in December of 2001, the Mexican corporation paid rent to Cohen for the use of the boat at the rate of $3,500 per month. The rent was used by Cohen to pay the loans on the boat.

The Point Loma is currently owned by Barry & Chris Cohen. The boat was subject to a loan from the SBA in the original amount of $219,000. The lender that held the SBA loan would not allow the registration to be transferred to Mexico. As a result, the Cohen's obtained a loan secured by their personal residence in the approximate amount of $139,000. They also obtained a 2nd loan on their home and a vehicle in the amount of $80,000. The proceeds were used to pay off the SBA loan. In addition, the Cohen's borrowed $35,000 from Coast National Bank to help fund the improvements made by them. The Coast National loan is unsecured.

Barry Cohen provided schedules of the funds he has expended related to the refurbishment of the boat and to carry the Point Loma operation since the joint venture was formed.

Gene Glaser provided a schedule of the funds expended by Joe Cappuccio related to the joint venture and amounts loaned to Barry Cohen as fishermen advances. His schedule showed the following items:



EXHIBIT 2
Cohen
1-9-08 RL

# Memorandum

To:         Barry Cohen, Joe Roggio & Gene Glaser
From:       David Cantrell, CPA
Regarding:  Cappuccio/Cohen Joint Venture
Date:       August 30, 2002
Page 2 of 4

- Mexican fishing permit ..................  $97,000
- Boat improvements ...................   84,000
- Personal loans to Barry Cohen           62,004
- "Fishing loans" prior to J.V.            53,411

I asked Barry Cohen to review the data provided by Gene Glaser. He agreed that $97,000 was expended for the permit and that his personal loans were $62,004. He also agreed that Joe advanced funds that were used for the Point Loma refurbishment. However, according to Barry, the funds labeled as "Fishing loans" prior to J.V., do not agree with his records. Olde Port Fisheries maintained a receivable account for funds advanced to fishermen. These funds are ordinarily repaid by the fisherman when they sell their catch to the company. Barry had such an account for the Point Loma for the period prior to the formation of the joint venture. The amount owed as of December 2001 for these advances was $16,394.75. Therefore the total owed to Cappuccio was $78,398.75 ($62,004 + $16,394.75) According to Barry's records; Joe advanced $111,715.78 for boat improvements. Schedule 1 gives the detail according to Barry's records and a reconciliation to Gene's data. In summary, Gene's data indicates that Joe advanced $9,300 more than Barry's records show. This difference is explained on Schedule 1.

The joint venture has been operating without a formal structure since the October of 2001.

Joint Venture Structural Goals     **NO JOINT VENTURE**

  Based on discussions with Gene Glaser and Barry Cohen the Joint Venture should be structured to meet the following goals:
- Cappuccio and Cohen are to be equal owners of the joint venture operation.
- Any profit or loss sustained by the joint venture should be borne equally by Cohen and Cappuccio.
- The Point Loma should be owned by the joint venture.
- The ownership of the Mexican corporation should be held by the joint venture.
- Loans to the Mexican corporation for the fishing license should be an asset of the joint venture.
- The debts related to the Point Loma should be assumed by the joint venture.
- The rights to operate the vessel in Mexican and US waters should be held by the joint venture.
- Each owner wants to limit their liability to their invested capital.
- Each owner wants the ability to continue the operation of the joint venture in the event of the death, disability or insolvency of the other owner.
- Each owner wants to provide for the orderly liquidation of their ownership for the benefit of their heirs.

DMSI 0130

# Memorandum

To:          Barry Cohen, Joe Roggio & Gene Glaser
From:        David Cantrell, CPA
Regarding:   Cappuccio/Cohen Joint Venture
Date:        August 30, 2002
Page 3 of 4

- Any fish acquired by the Point Loma will be sold to Olde Port Fisheries at normal market prices.
- The terms and structure of the existing arrangement between Olde Port Fisheries and Del Mar Seafoods should not be incorporated into the joint venture structure. If it is necessary to formalize this arrangement it should be done separately.
- The Mexican corporation should not have significant profits or cash flow beyond what is necessary to carry its operations and pay its debts to the joint venture.
- Any funds loaned by Del Mar to the Mexican corporation for operations will be owed to Del Mar and not recorded on the joint venture books.

Suggested Structure

- Form a California based Sub-S Corporation owned equally by Cohen and Cappuccio. Report the activity for 2002 prior to the formation of the Sub-S Corporation as a general partnership owned by Cohen & Cappuccio.
- Each party will contribute the assets and debts they currently hold to the Corporation under IRC Section 351. Since the debts on the Point Loma is currently secured by Cohen's home and personal assets, the corporation will have to enter into some type of contract or note with the Cohen's to assume the debts. It is expected that Coast National Bank will transfer its note to the corporation. Schedule 2 listed the assets and debts to be contributed.
- The Mexican corporation should enter into a rental agreement for the use of the Point Loma. The monthly rental should be sufficient to provide a reasonable return to the joint venture on its investment of $400,000 and to cover the related debt service. Presumably the rents will be an expense for the Mexican corporation. Joe and Barry should establish the fair rental amount.
- The price paid for fish acquired from the Mexican corporation should be as low as possible. However, the Mexican corporation will need sufficient profits to retire its debts to the Sub-S Corporation.
- Cohen and Cappuccio will presumably be the only officers and employees of the Sub-S Corporation. They should, if operations allow, receive a reasonable salary for their services. It is my expectation that the services will be minimal and therefore the salaries will be low.
- If the Sub-S Corporation has profits after paying its expenses, they should be distributed to the shareholders as dividends.
- The Sub-S Corporation will record the purchase of fish from the Mexican Corporation and sell it to Olde Port Fisheries at current market prices. Accordingly, it may need a license of some type to operate in this manner.
- The shareholders should consider a buy-sell agreement to deal with the possibility of something happening to one of the shareholders.

DMSI 0131

# Memorandum

To:         Barry Cohen, Joe Roggio & Gene Glaser
From:       David Cantrell, CPA
Regarding:  Cappuccio/Cohen Joint Venture
Date:       August 30, 2002
Page 4 of 4

**Alternate Structure**

The above structure contemplates that each partner will contribute their assets to a general partnership as of 1/1/02. As a result, the joint venture would have to use each partner's basis in the various assets for tax purposes. Cohen's basis in the boat is about $228,000 while the agreed value is $400,000. The partners would only be able to depreciate the $228,000 basis. This structure is in compliance with tax law and benefits Cohen because he gets credit for the value of the boat without having to pay tax on the difference between his basis and its actual value. However, the structure is not necessarily good for Cappuccio because he is in effect paying $200,000 for one-half of the boat but can only depreciate about $114,000. One of the assets being contributed by Cappuccio is his receivable from Cohen for $78,398.75. This asset can not be depreciated and therefore would not generate any tax deductions to the partners. Collecting the receivable would not generate taxable income either. I think we should consider the alternative of Cohen selling a partial interest in the boat to Cappuccio prior to the formation of the partnership. Cappuccio would use the debt from Cohen as the payment for the partial interest and would assume a proportionate amount of the existing boat loans. This would give Cappuccio basis in the boat of about $173,000. Cohen would not have to repay the receivable, but would have to recognize taxable income on the sale to Cappuccio. I estimated the tax to Cohen at about $15,000. Schedule 3 shows how the sale might work. If this alternative sounds interesting to both partners we can work out the details later. . . .

DMSI 0132

From: 8316478465    Page: 6/14    Date: 12/12/2007 4:06:14 PM

Schedule 1
Schedule of Point Loma Advance Account per Olde Port Fisheries Books

| Date | Check # | Advance to Fisherman | Repayment by Fisherman | Due for Fisherman Advances | Advance for Boat Refurb. | Total for Boat Refurb. |
|---|---|---|---|---|---|---|
| Balance at | | | | | | |
| 12/31/00 | | 14,094.75 | | 14,094.75 | | - |
| 01/29/2001 | 2804 | 2,000.00 | | 16,094.75 | | - |
| 02/04/2001 | 2821 | 6,000.00 | | 22,094.75 | | - |
| 02/09/2001 | | | (6,000.00) | 16,094.75 | | - |
| 03/02/2001 | 2892 | 4,000.00 | | 20,094.75 | | - |
| 03/08/2001 | 2911 | 6,000.00 | | 26,094.75 | | - |
| 03/16/2001 | 2941 | 2,000.00 | | 28,094.75 | | - |
| 03/22/2001 | 2968 | 2,500.00 | | 30,594.75 | | - |
| 03/23/2001 | | | (2,500.00) | 28,094.75 | | - |
| 03/28/2001 | | | (1,000.00) | 27,094.75 | | - |
| 04/03/2001 | | | (2,000.00) | 25,094.75 | | - |
| 04/24/2001 | 3040 | 2,000.00 | | 27,094.75 | | - |
| 04/30/2001 | | | (15,000.00) | 12,094.75 | | - |
| 08/27/2001 | 3381 | 4,000.00 | | 16,094.75 | | - |
| 09/03/2001 | 3393 | 5,000.00 | | 21,094.75 | | - |
| 10/23/2001 | 3609 | | | 21,094.75 | 4,000.00 | 4,000.00 |
| 11/02/2001 | 3626 | | | 21,094.75 | 7,000.00 | 11,000.00 |
| 11/05/2001 | 3650 | | | 21,094.75 | 4,000.00 | 15,000.00 |
| 11/08/2001 | 3667 | | | 21,094.75 | 10,000.00 | 25,000.00 |
| 11/14/2001 | 3690 | | | 21,094.75 | 10,000.00 | 35,000.00 |
| 11/23/2001 | 3715 | | | 21,094.75 | 4,000.00 | 39,000.00 |
| 11/27/2001 | 3734 | | | 21,094.75 | 6,000.00 | 45,000.00 |
| 11/30/2001 | 3736 | | | 21,094.75 | 1,000.00 | 46,000.00 |
| 12/03/2001 | 3742 | | | 21,094.75 | 2,000.00 | 48,000.00 |
| 12/??/2001 | Credit for fish | | (9,400.00) | 11,694.75 | | 48,000.00 |
| ( 001 | 3755 | | | 11,694.75 | 2,000.00 | 50,000.00 |
| 2001 | 3760 | | | 11,694.75 | 2,000.00 | 52,000.00 |
| 12/09/2001 | 3764 | | | 11,694.75 | 5,000.00 | 57,000.00 |
| 12/12/2001 | 3772 | | | 11,694.75 | | 57,000.00 |
| 12/19/2001 | 3787 | | | 11,694.75 | 8,000.00 | 65,000.00 |
| 12/28/2001 | 3804 | | | 11,694.75 | 5,000.00 | 70,000.00 |
| Sub-total of 2001 items | | 47,594.75 | (35,900.00) | | 70,000.00 | 70,000.00 |
| Correct credit for fish | | 4,700.00 | | 16,394.75 | | |
| Revised totals for 2001 | | 52,294.75 | (35,900.00) | 16,394.75 | | |
| 01/14/2002 | 3840 | | | | 5,000.00 | 75,000.00 |
| 01/17/2002 | 3855 | | | | 5,000.00 | 80,000.00 |
| 01/24/2002 | 3876 | | | | 7,000.00 | 87,000.00 |
| 01/31/2002 | 3890 | | | | 8,000.00 | 95,000.00 |
| 02/06/2002 | 3,910.00 | | | | 1,000.00 | 96,000.00 |
| 02/07/2002 | 3,914.00 | | | | 2,500.00 | 98,500.00 |
| 02/11/2002 | 3,918.00 | | | | 2,000.00 | 100,500.00 |
| 02/14/2002 | 3,938.00 | | | | 2,000.00 | 102,500.00 |
| 02/20/2002 | 3,961.00 | | | | 2,500.00 | 105,000.00 |
| 02/26/2002 | 3,985.00 | | | | 2,790.00 | 107,790.00 |
| Oct thru. Feb fuel bills paid by Del Mar for Point Loma | | | | | 3,925.78 | 111,715.78 |
| Sub-total of 2002 items | | | | | 41,715.78 | |
| Total funds advanced by Joe for boat improvements | | | | | | 111,715.78 |

Reconciliation to Data provided by Gene Glaser in Olde Port Fisheries Records
Gene's data after correction

| | | |
|---|---|---|
| Boat improvement funds as of 12/31/01 | $ 84,000.00 | |
| Less correction to 12/31/01 balance | (14,000.00) | |
| Plus correction of credit for fish | 4,700.00 | |
| Fishing loans per Gene's data | 53,411.00 | |
| Gene's data after corrections | $ 128,111.00 | |
| Olde Port Fisheries Records | | |
| Boat improvement funds | $111,715.78 | |
| Fishing loans | 16,394.75 | |
| Total per Barry's data | $ 128,110.53 | |
| ( nce due to rounding | 0.47 | |

DMSI 0133

Schedule 2
Joe Cappuccio/Barry Cohen Joint Venture

|  |  | Value per Agreement of Joint Venturer's |
|---|---|---|
| Summary of Assets & Liabilities Contributed to JV |  |  |
| Contributions by Barry Cohen |  |  |
| Point Loma Fishing Vessel |  |  |
| Agreed Value before recent improvements |  | 400,000.00 |
| Less: |  |  |
| Boat loan, due to Barry & Chris Cohen to off-set loan on their home |  | (139,000.00) |
| Boat loan, due to Barry & Chris Cohen to off-set the 2nd loan on their home and vehicle |  | (80,000.00) |
| Equity in Point Loma |  | 181,000.00 |
|  |  |  |
| Capitalized loan fees | 5,425.00 |  |
| Less accumulated amortization | (513.00) |  |
|  | 4,912.00 | 4,912.00 |
|  |  |  |
| Improvements & capitalized costs |  |  |
| 2001 Improvements |  |  |
| October | 8,809.00 |  |
| November | 22,906.00 |  |
| December | 20,535.00 |  |
|  | 52,250.00 |  |
| Less accumulated depreciation | (653.00) |  |
|  | 51,597.00 | 51,597.00 |
|  |  |  |
| 2002 Improvements, Labor & other costs |  |  |
| January | 36,369.92 |  |
| February | 13,628.40 |  |
| March | 16,792.80 |  |
| April | 22,754.78 |  |
| Fuel bills paid by Olde Port Fisheries | 3,925.78 |  |
|  | 93,469.68 | 93,469.68 |
|  |  |  |
| Total Improvements |  | 145,066.68 |
| Less: improvements funded by Coast National Bank loan assumed by new entity | (32,557.00) | (32,557.00) |
|  |  |  |
| Less improvements funded by Cappuccio |  | (111,715.78) |
| Equity in improvements funded by Cohen |  | 793.90 |
|  |  |  |
| Value of California/USA fishing licenses 0 |  | 100,000.00 |
| Equity in assets contributed by Barry Cohen |  | 286,709.90 |
|  |  |  |
| Contributions by Joe Cappuccio |  |  |
| Loan to Mexican corporation related to Mexican license | 97,000.00 | 97,000.00 |
| Boat improvements |  | 111,715.78 |
| Funds owed to Joe Cappuccio by Cohen |  |  |
| "Fishing loans" prior to J.V. | 16,394.75 |  |
| Assignment of debt from Barry Cohen, held by Joe Cappuccio | 62,004.00 |  |
| Total due from Cohen | 78,398.75 | 78,398.75 |
| Equity in assets contributed by Joe Cappuccio |  | 287,114.53 |
|  |  |  |
| Difference in equities- Cohen over(under) Cappuccio |  | (408.63) |

*Does Joe Agree*

DMSL 0134

Schedule 3
Gain on Sale of Partial Interest in Point Loma

|  | Cohen | Cappuccio | Total |
|---|---|---|---|
| Point Loma Boat | 226,743.09 | 173,256.91 | 400,000.00 |
| Less debts | (124,141.84) | (94,858.16) | (219,000.00) |
| Equity | 102,601.25 | 78,398.75 | 181,000.00 |

| Percent sold |  | 43.31% |  |
|---|---|---|---|

| Basis to Barry | Basis before Sale | Sold Basis | Remaining Basis |
|---|---|---|---|
| Boat | 200,607.00 | 86,848.06 | 113,658.94 |
| 2001 Improvements | 52,250.00 | 22,631.68 | 29,618.32 |
| Capitalized fees | 5,425.00 | 2,349.80 | 3,075.20 |
| Less depre | (30,076.00) | (13,027.19) | (17,048.81) |
|  | 228,106.00 | 98,802.35 | 129,303.65 |

| Gain on sale |  | 74,454.56 |  |
|---|---|---|---|

| Ordinary income gain |  | 13,027.19 |
|---|---|---|
| Long-term cap gain |  | 61,427.37 |
| Less cap gain loss C/F |  | (22,536.00) |
| Net Cap Gain |  | 38,891.37 |

Estimated tax Fed
| Ordinary gain |  | 3,647.61 |
|---|---|---|
| L-T Gain |  | 7,778.27 |
|  |  | 11,425.89 |
| State |  | 3,500.22 |

| Total estimated tax |  | 14,926.11 |
|---|---|---|

DMSI 0135

# EXHIBIT 6

From · 44361471       Page: 15/15 ___ Date: 6/5/2007 6 · 18 PM
05/15/2007  11:55    5622162960                    RICHARD P WAGNER                              PAGE  18/28

COPY

**PROMISSORY NOTE**

NATIONAL VESSEL DOCUMENTATION CE
USGS
RECEIVED / FILED

20 APR '04          10 : 08 /

RECORDED: BOOK _____ PAGE ____
DOCUMENTATION OFFICER

For the value received, BARRY COHEN and CHRIS COHEN, an individual of 2028 Draydon Avenue, Cambria, California 93428, hereinafter referred to as maker, promises to pay to the order of DEL MAR SEAFOODS, INC., 331 Ford Street, Watsonville, California 95076, its successors and assigns, hereinafter referred to as holder, the sum of two hundred fifteen thousand ($215,000.00) dollars at the rate of seven (7) percent per annum, as follows:

Monthly payments of $3,000.00 or fifteen (15) percent of the gross landing receipts of each and every landing of seafood product made by the fishing vessel POINT LOMA, whichever is greater, commencing on _January '04_ and on the 15th day of each succeeding month until principal and interest are fully paid. Payments are to be applied to interest first.

1. This promissory note is secured by a First Preferred Ship Mortgage on the vessel POINT LOMA, Official No. _C.L.G. 575 298 Are a._ dated _10/31/03_.

2. Incorporation of Terms of First Preferred Mortgage.

This note is secured by a continuing security interest in the vessel described in a Preferred Mortgage, dated _10/31/03_, executed by maker in favor of holder. The terms of that Preferred Mortgage are incorporated into this note by reference to the same effect as if set forth in this note in their entirety. On default, under Preferred Mortgage or under this note, holder may exercise any of the remedies granted by the Preferred Mortgage. Maker acknowledges that holder rights are cumulative.

3. Acceleration of Maturity.

In the event of default, in the payment of any of the installments or interest due as provided in this

note, time being of the essence, holder may, without notice or demand, declare the entire principal sum then unpaid immediately due and payable. Further, if maker should at any time fail in business or become insolvent, or commit an act of bankruptcy, or if any writ of execution, garnishment, attachment, or other legal process is issued against any deposit account or other property of maker, or if any assessment for taxes against maker, other than taxes on real property, is made by the federal or state government, or any department or agency of the federal or state government, or if maker fails to notify holder of any material change in their financial condition, all of the obligations of maker shall, at option of holder, become due and payable immediately without demand or notice.

### 4.  Modification of Terms.

Holder may, with or without notice to maker, cause additional parties to be added to this note, or release any party, or revise, extend, or renew the note, or extend the time for making any installment provided for in this note, or accept any installment in advance, all without affecting the liability of maker.

### 5.  Attorney's Fees.

If suit is commenced on this note, maker shall pay to holder a reasonable attorney's fee and all costs.

### 6.  Waiver of Rights by Maker.

Maker hereby waivers (a) presentment, demand, protest, notice of dishonor and/or protest, and notice of non-payment; (b) the right, if any, to the benefit of, or to direct the application of, any security hypothecated to holder until all indebtedness of maker to holder, however arising, shall have been paid; and (c) the right to require holder to proceed against any party to this note, or to pursue any other remedy in holder power. Holder may proceed against maker directly and independently of any other party to this note, and the cessation of the liability of any other party or

any reason other than full payment, or any revision, renewal, extension, forbearance, change of rate of interest, or acceptance, release, or substitution of security, or any impairment or suspension of holder's remedies or rights against any other party, shall not in any way affect the liability of . maker.

DATED: _____

_____
Barry Cohen

_____
Chris Cohen

# EXHIBIT 7

 COPY

## FIRST PREFERRED MORTGAGE

NATIONAL VESSEL DOCUMENTATION CENTER
USGG
RECEIVED / FILED

Official No: _575 298_

20 APR '04        ' 10 : 08 AM

On the vessel:
POINT LOMA

RECORDED: BOOK _04 70_ PAGE _497_

Dated: _10/31/03_

DOCUMENTATION OFFICER

Amount of Mortgage $215,000.000

and made by BARRY COHEN And CHRIS COHEN a married couple

(Hereinafter called "Owner")

### WITNESSETH

Whereas, the maker, Mortgagor herein, is the sole owner of the whole of the vessel

(if more than one vessel is mortgaged hereunder, the term vessel means each such vessel)

hereinafter named and described, and is justly indebted to the Mortgagee, as evidenced by the

promissory note dated _10/31/03_ in the principal amount of $215,000.00, payable to the order

of Mortgagee as follows:

Per the Attached Promissory Note which shall become a part of this mortgage.

THE TOTAL AMOUNT OF THIS MORTGAGE IS TWO HUNDRED FIFTEEN THOUSAND

DOLLARS AND PERFORMANCE OF MORTGAGE COVENANTS.

And has agreed to give this Mortgage as security, and has authorized and directed the

execution and delivery hereof.

NOW, THEREFORE, in consideration of the premises and for other good and

valuable considerations, receipt of all of which is hereby acknowledged and to secure payment of

said indebtedness and interest and other sums that hereafter may become due pursuant hereto and

the performance of all covenants hereof. Owner by these presents mortgages and conveys unto

Mortgagee, its successors and assigns, the whole of the Vessel named below and further

described in her (their) last marine document(s) issued and identified as follows:

Name:    POINT LOMA

Home Port: Avila Beach, California. ............

Official Number: 575298

Together, with all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, tackle, apparel, furniture, fittings, tools, pumps, equipment and supplies, and fishing and all other appurtenances and accessories and additions, improvements and replacements now or hereafter belonging thereto, whether or not removed there from, all of which shall be deemed to be included in the term "vessel" herein, and said document(s) being deemed included herein by reference;

TO HAVE AND TO HOLD all singular the above described vessel unto Mortgagee, it's successors and assigns, forever;

PROVIDED, HOWEVER, that if Owner, his heirs, executors, administrators or its successors or assigns shall perform and observe all and singular the terms, covenants and agreements herein, then this Mortgage shall cease, otherwise to remain in full force and effect.

Nothing herein shall be deemed or construed to subject the lien hereof any property other than a vessel as the term issued in Title 46, Chapter 313, and Section 31322 of the United States Code. Owner agrees to pay said indebtedness with interest thereon as herein and in said note provided, and to perform and observe the further terms, covenants and agreements herein, and to hold the vessel subject thereto.

## ARTICLE I - PARTICULAR COVENANTS OF OWNER

Owner Covenants as follows:

1.    Owner is and shall continue to be a citizen of the United States entitled to own and operate said vessel under her marine document, which Owner shall maintain in full force and effect; and all action necessary for the execution, delivery and validity hereof and of the

good faith affidavit filed herewith and of said note has been taken. If a corporation, Owner is
duly organized and is and shall continue in good standing under the laws of the State of NOT
APPLICABLE and authorized to do business and in good standing in any other State wherein
Owner regularly does business.

2.       Owner lawfully owns and possesses the vessel free from all liens and encumbrances
whatsoever except as may herein below be specified and shall warrant and defend title to and
possession of all and every part thereof for the benefit of Mortgagee against all persons
whomsoever. Owner shall not set up against Mortgagee of this mortgage any claim of Owner
against Mortgagee and/or assignee under any past or future transaction.

3.       Owner shall at his (its) own expense, keep the vessel fully and adequately insured under
usual full marine insurance with policy valuation not exceeding the amount insured and, in the
aggregate as to all vessels mortgaged herein, in at least the amount of the unpaid principal
balance of this Mortgage, and shall maintain insurance to cover protection and indemnity risks,
towers liability risks if the vessel performs towage, employees compensation and other risks and
liabilities from time to time specified by Mortgagee. All insurance shall be taken out in the name
of Owner and shall by its terms be payable to Mortgage for account of Mortgage and Owner as
their respective interests may appear, and all policy forms, underwriters and amounts shall be
subject to Mortgagee's approval. Owner shall notify, and shall request underwriters to agree
reasonably in advance to notify Mortgagee of any cancellation of or material change in any
insurance coverage. All policies, binders and cover notes shall be delivered to Mortgagee with
evidence satisfactory to it that all premiums and other charges therefore have been fully paid.
Owner shall maintain all such insurance unimpaired by any act, breach or warranty or otherwise.

4.       Owner shall comply with and not permit the vessel to be operated contrary to any
provision of the law, treaties, conventions, rules, regulations or orders of the United States, any
State and/or any other jurisdiction wherein operated, and/or of any department or agency thereof,

nor remove the vessel from the limits of the United States save on voyages with the intent of returning, nor abandon the vessel in any foreign port. Owner shall do everything necessary to, establish and maintain this Mortgage as First Preferred Mortgage on said vessel.

5..    Neither the Owner, Agent nor Master of the vessel has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the vessel or any part thereof any lien whatsoever other than to the Mortgagee or for crew's wages or salvage.

6.    Owner shall place and keep prominently in the pilot house (if any), chart room or Master's cabin or elsewhere on the vessel as specified by Mortgagee any notice of this Mortgage required by Mortgagee, and shall keep proper copy hereof with the ship's papers and exhibit the same to all persons having business with the vessel, and to Mortgagee on demand.

7.    Owner shall pay when due all taxes, assessments, government charges, fines and penalties lawfully imposed and promptly discharge any and all liens whatsoever upon vessel. Owner shall at his (its) own expense at all times maintain the vessel in thorough repair and working order and shall make all proper renewals and replacements.

8.    If the vessel shall be libeled, attached, detained, seized or levied upon or taken into custody under process or under color of any authority, Owner shall forthwith notify Mortgagee by telegram, confirmed by letter, and forthwith discharge or release the vessel there from and in any event within fifteen (15) days after such attachment, detention, seizure, levy or taking into custody.

9.    Owner shall at all times afford Mortgagee complete opportunity to inspect the vessel and cargoes and papers thereof, and to examine Owners related accounts and records; and shall certify quarterly and, if Mortgagee requests, monthly, that all wages and all other claims whatsoever which might have given rise to a lien upon the vessel have been paid.

10.    Owner shall not, without prior written consent of Mortgagee, sell or mortgage the vessel or any interest therein nor charter her except to persons and for uses lawful for American vessels and then only provided said insurance be unaffected thereby or adequately replaced; nor,

if a corporation, to merge or consolidate with any other person, firm or corporation, or dissolve.

11.    From time to time Owner shall execute and deliver such other and further instruments and assurance as in the opinion of Mortgagee's counsel may be required to subject to vessel more effectual to the lien hereof and to the payment of said indebtedness and for operation of the vessel as herein provided, and to effectuate sales as provided in paragraph (C) of Section 1 of Article 11.

ARTICLE II - DEFAULT

1.    In any one or more of the following events, herein termed events of default:

(a) Default in the punctual payment of the principal of the note secured hereby or any installment thereof, or in the due and punctual performance of any provision of Sections 3, 4, 5, 6, 8 and 10 or Article I hereof, or attempt to violate Sections 4 or 10 of Article I hereof, or default continuing for fifteen (15) days in performance of any other covenant herein; or

(b) Commission of any act of bankruptcy by Owner or approval by any court of a petition or answer asking for reorganization, arrangement, extension or other relief under any bankruptcy law; or to appointment of a receiver for Owner or any of Owner's property or the taking by any court of any action comparable thereto; or rendition of a final judgment against Owner for the payment of money and failure of Owner to discharge the same within ninety (90) days or stay the execution thereof pending appeal; or Mortgagee's conclusion in good faith at any time that, through actual or prospective impairment of Owner's net current asset position, net worth, asset-liability ratio, or earning, or through prospective violation of any provision of this Mortgage, Mortgagee is in danger of losing said debt, or any part thereof, by delaying collecting thereof until the time above limited for the payment thereof, then, and in every such case, Mortgagee may:

*ACCELERATION*

(a)     Declare the principal of said note and all accrued interest thereon to be and they shall then become and be due and payable forthwith, after which they shall bear interest at the rate of 10% per annum;

(b)     Recover judgment for, and collect out of any property of Owner, any amount thereby or otherwise due hereunder; and/or collect all earned charter hire and freight monies relating to services performed by the vessel, Owner hereby assigning to Mortgagee such earned charter hire and freight monies then owing; and/or

(c)     Retake the vessel without legal process at any time wherever the same may be, and, without being responsible for loss or damage, hold and in Mortgagee's or in Owner's name lease, charter, operate or otherwise use the vessel for such time and on such terms as Mortgagee may deem advisable, being accountable for net profits, if any, and with the right to dock the vessel free of charge at the Owner's premises or elsewhere at Owner's expense; and/or sell the vessel, free from any claim by Owner of any nature whatsoever, in the manner provided by the law; to the extent permitted by law, such sale may be public or private, without notice, without having the vessel present, and/or Mortgagee may become the purchaser.

For such purpose Mortgagee and its agents are hereby irrevocably appointed the true and lawful attorneys of Owner in his (its) name and stead to make all necessary transfers of the vessel thus sold.

2.     In the event that the vessel shall be arrested or detained by any officer of any court or by any other authority, Owner hereby authorizes Mortgagee, its officers, representatives and appointees, in the name of the Owner or of Mortgagee, to receive or to take possession thereof, and to defend any action and/or discharge any lien.

3.      Each and every power or remedy herein given to Mortgagee shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often as may be deemed expedient by Mortgagee. No delay or omission by Mortgagee shall impair any right, power, or remedy, and no waiver of any default shall waive any other default. In any suit Mortgagee shall be entitled to obtain appointment of a receiver of the vessel and the earnings thereof, who shall have full rights and powers to use and operate the vessel, and to obtain a decree ordering and directing the sale and disposition thereof.

4.      The net proceeds of any judicial or other sale, and any charter, management, operation or other use of the vessel by Mortgagee, of any claim for damages, of any judgment, and any insurance received by Mortgagee (except to the extent paid to Owner or applied in payment of repairs or otherwise for Owner's benefit) shall be applied as follows:

          FIRST:   To the payment of all attorneys fees, court costs, and any other expenses, losses, charges, damages incurred or advances made by Mortgagee in the protection of its rights or caused by Owner's default hereunder or under the note secured hereby, with interest on all such amounts at the rate of 10% per annum; and to provide adequate indemnity against any liens for which priority over this Mortgage is claimed;

          SECOND:   To the payment of all interest, to date of payment, on the note and any or all other sums secured hereby, and as to any balance of such proceeds, to the payment of next of any or all matured installments of principal and then of any or all un-matured installments of principal in the inverse order of this maturity.

          Mortgagee shall be entitled to collect any deficiency from Owner. Owner shall be entitled to any surplus, subject to set-off in favor of Mortgagee for any other indebtedness of Owner.

5.      All advances and expenditures which Mortgagee in its discretion may make any repairs, insurance, payment of liens or other claims, defense of suit, or for any other purpose whatsoever related hereto or said note and all damages sustained by Mortgagee because of defaults, shall be repaid by Owner on demand with interest at 10% per annum, and until so paid shall be a debt due from Owner to Mortgagee secured by the lien thereof. Mortgagee shall not be obligated to make any such advances or expenditures, nor shall the making thereof relieve Owner of any obligation or default with respect thereto.

### ARTICLE III - POSSESSION UNTIL DEFAULT

Until one or more of the events of default hereinbefore described, Owner shall be permitted to obtain actual possession and use of the vessel.

### ARTICLE IV - SUNDRY PROVISIONS

All covenants and agreements of Owner herein contained shall bind Owner, his heirs, executors, administrators and assigns, or its successors and assigns, shall inure to the benefit of Mortgagee and its successors and assigns. Following any assignments hereof, any reference herein of "Mortgagee" shall be deemed to refer to the assignee. If one or more person is the Owner herein, "his" shall mean "their".

FUTURE ADVANCES. This mortgage is executed for the purpose of securing not only the payment of the above described note but also to secure all future advances made by the holder of said note to the mortgagor; and said mortgage shall remain in full force and effect to secure all future advances and all renewals or extensions of the above described note.

IN WITNESS WHEREOF, on the day and year above written, Owner has executed this Mortgage, or if a corporation, has caused this Mortgage to be executed in its name and its corporate seal to be affixed hereto by its proper officers thereunto duly authorized or as required by State law.



### CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of San Luis Obispo

On 10-31-03 before me, Nancy E. Martin, Notary Public, personally appeared Christene Layne Cohen and Barry A. Cohen,

☐ personally known to me - OR - ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

NANCY E. MARTIN
COMM. #1428438
NOTARY PUBLIC-CALIFORNIA
SAN LUIS OBISPO COUNTY
My Comm. Expires August 8, 2007

*Nancy E. Martin*

*Signature of Notary*

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**

☐ Individual
☐ Corporate Officer

Title

☐ Partner(s)     ☐ Limited
                 ☐ General

☐ Attorney-in-Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other:

Absent Signer (Principal) is Representing:

**DESCRIPTION OF ATTACHED DOCUMENT**

First Preferred Mortgage

*Title or Type of Document*

11 plus attached acknowledgment

*Number of Pages*

10-31-03

*Date of Document*

None

*Signer(s) Other Than Name(s) Above*

ADM-005 (07/01)

# EXHIBIT 8

1  James P. Walsh, CSB. No. 184620
2  Gwen Fanger, CSB No. 191161
   DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone: (415) 276-6500
   Facsimile: (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN) and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  DEL MAR SEAFOODS, INC.,                    )
                                               )
12                    Plaintiff,               )   No. C-07-2952-WHA
                                               )
13         v.                                  )   **DEFENDANTS BARRY COHEN,**
                                               )   **CHRIS COHEN'S (aka CHRISTENE**
14  BARRY COHEN, CHRIS COHEN (aka              )   **COHEN) RESPONSE TO**
    CHRISTENE COHEN), *in personam* and,       )   **PLAINTIFF'S FIRST SET OF**
15  F/V POINT LOMA, Official Number            )   **REQUESTS FOR ADMISSIONS**
    515298, a 1968 steel-hulled, 126-gross ton,)
16  70.8 foot long fishing vessel, her engines,)
    tackle, furniture apparel, etc., *in rem*, and)
17  Does 1-10,                                 )
                                               )
18                    Defendants.              )
                                               )
19  _____ )

20  PROPOUNDING PARTY:    PLAINTIFF DEL MAR SEAFOODS, INC.

21  RESPONDING PARTY:     DEFENDANTS BARRY and CHRISTINE COHEN

22  SET NO.:              ONE

23         Defendants and Responding Parties, BARRY and CHRISTENE COHEN ("Responding

24  Parties"), respond and object to Plaintiff's First Set of Requests for Admissions as follows.

25                        **PRELIMINARY STATEMENT**

26         These responses are made solely for the purposes of this action and are subject to all

27  objections as to competence, relevance, materiality, propriety, and admissibility and any other

28  objections or grounds that would require the exclusion of any statement made herein if such

DAVIS WRIGHT TREMAINE LLP

statement were made by a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

No incidental or implied admissions are intended by these responses. The fact that Responding Parties respond or object to any of the request for admissions should not be taken as an admission that Responding Parties accept or admit the existence of any facts assumed by such request for admissions, or that such response or objection constitutes admissible evidence as to any such assumed facts. The fact that Responding Parties respond to part or all of any request for admission is not intended to and shall not be construed to be a waiver by Responding Parties of any objection to any request for admission. Furthermore, Responding Parties' responses herein are made without waiving, and expressly reserving, the right: (a) to object to any effort to use any responses in any step or proceeding in this action or any other action, and (b) to object on any ground to other discovery requests regarding the subject matter of any request herein.

This action is still in the discovery phase and Responding Parties have not yet completed investigation of the facts related to the action; have not yet completed discovery in this action; and have not yet completed preparation for trial. Responding Parties' responses herein are based on, and reflect the current state of their knowledge. Responding Parties expressly reserve the right to supplement these responses at a later time should they deem such supplementation necessary or appropriate, but assume no obligation to do so.

## RESPONSE TO REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that you are acting in this case as the agent for the interests of your marital community.

### RESPONSE TO REQUEST NO 1:

Responding Parties object to the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the terms "acting" and "agent" as vague and ambiguous. Without waiving these

objections, admit that Barry and Christene Cohen are each the agent of each other in their marital community.

**REQUEST FOR ADMISSION NO. 2:**

Admit that in 2004 you transferred the ownership of the F/V POINT LOMA (the "Vessel") to the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO 2:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, admit that Barry and Christene Cohen jointly transferred the ownership of the F/V Point Loma to the F/V Point Loma Fishing Company, Inc.

**REQUEST FOR ADMISSION NO. 3:**

Admit that you are the manager of the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO 3:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, admit that Barry Cohen is the manager of the F/V Point Loma Fishing Company, Inc.

**REQUEST FOR ADMISSION NO. 4:**

Admit that you and your wife each own 50% of the shares of the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO 4:**

Responding Parties object to the use of the term "you" and "your" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, admit that Barry and Christene Cohen each own 50% of the shares of the F/V Point Loma Fishing Company, Inc.

DAVIS WRIGHT TREMAINE LLP

1  **REQUEST FOR ADMISSION NO. 5:**

2       Admit that in this case you are acting as the agent for the owner of the Vessel, the F/V

3  Point Loma Fishing Company, Inc.

4  **RESPONSE TO REQUEST NO 5:**

5       Responding Parties object to the use of the term "you" as vague and ambiguous as to

6  which responding party, Barry or Christene Cohen, the request is directed at.  Responding Parties

7  also object to the use of the term "agent" as vague and ambiguous.  Without waiving these

8  objections, admit that Barry Cohen is acting as the agent to the extent he is acting as manager of

9  the F/V Point Fishing Company, Inc.

10  **REQUEST FOR ADMISSION NO. 6:**

11       Admit that you have never used the Vessel to fish anywhere other than in the Exclusive

12  Economic Zone off of California.

13  **RESPONSE TO REQUEST NO 6:**

14       Responding Parties object to the use of the term "you" as vague and ambiguous as to

15  which responding party, Barry or Christene Cohen, the request is directed at.  Responding Parties

16  also object to the use of the term "fish" as vague and ambiguous to the extent Responding Parties

17  make a distinction between "fishing" (catching fish) and "shrimping" (catching shrimp) activities.

18  Without waiving these objections, admit that Barry Cohen has never used the Vessel to fish

19  anywhere other than in the Exclusive Economic Zone off of California although he used the

20  Vessel only one time off the coast of Oregon approximately 8-10 years ago for shrimping

21  activities and not for fishing.

22  **REQUEST FOR ADMISSION NO. 7:**

23       Admit that at the end of 2005, in a meeting with both Joe Cappuccio and Joe Roggio, they

24  told you that Del Mar's bank that provided credit to Del Mar, had expressed its concern to Del

25  Mar about the size of Del Mar's loan to you for the Vessel.

26  **RESPONSE TO REQUEST NO 7:**

27       Responding Parties object to the use of the term "you" as vague and ambiguous as to

28  which responding party, Barry or Christene Cohen, the request is directed at.  Notwithstanding this

DAVIS WRIGHT TREMAINE LLP

4

objection and without waiving it, deny that there was such a meeting with both Joe Cappuccio and Joe Roggio to the extent Barry Cohen can not recollect for certainty that Joe Roggio was also at the meeting.

**REQUEST FOR ADMISSION NO. 8:**

Admit that at the meeting with Joe Roggio and Joe Cappuccio at the end of 2005 Joe Cappuccio asked you to make a large payment on the loan evidenced by the Note and Mortgage.

**RESPONSE TO REQUEST NO 8:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, Barry Cohen responds that he can not recollect with certainty that both Joe Roggio and Joe Cappuccio were at the meeting; but admit that at a meeting with at least Joe Cappuccio at the end of 2005, Joe Cappuccio asked Barry Cohen to make a large payment on the loan evidenced by the Note and Mortgage.

**REQUEST FOR ADMISSION NO. 9:**

Admit that you agreed with Del Mar that you would be responsible for the debts of your sons, Michael and Leonard, to Del Mar arising from amounts they owed the Avila Beach joint venture.

**RESPONSE TO REQUEST NO 9:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies this request.

**REQUEST FOR ADMISSION NO. 10:**

Admit that when you made the $175,000 payment to Del Mar, you told Joe Cappuccio you would pay Del Mar the remaining balance owed to Del Mar.

**RESPONSE TO REQUEST NO 10:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving

this objection, admit that when Barry Cohen gave the check for $175,000 to Joe Cappuccio, Joe Cappuccio said "thank you" and that when Barry Cohen said that he would pay the balance of the Note as soon as he could, Joe Cappuccio said that "it is such a small amount, I'm not even worried about it."

**REQUEST FOR ADMISSION NO. 11:**

Admit that you asked Del Mar to inform you of the amounts of your sons, Michael and Leonard's, debts to the Avila Beach joint venture in November, 2005.

**RESPONSE TO REQUEST NO 11:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies he asked Del Mar to inform him of the amounts his sons, Michael and Leonard's, debts to the Avila Beach joint venture in November, 2005.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the reason you requested the amount of your son's debts to Del Mar was so that you would know how much debt you were assuming on their behalf and how much you would be entitled to be reimbursed by them.

**RESPONSE TO REQUEST NO 12:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the phrase "requested the amount" as vague and ambiguous. Notwithstanding these objections and without waiving them, Barry Cohen denies this request.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Joe Roggio provided you with a spreadsheet (DMSI 0001) detailing the debts and payments regarding your and your son's debts to Del Mar in November 2005 in response to your request for such information.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

**RESPONSE TO REQUEST NO 13:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that Joe Roggio gave him the spreadsheet labeled DMSI 0001 and therefore denies the remainder of this request in full. Barry Cohen admits that in or around November 2005, Joe Roggio gave him a spreadsheet titled Schedule of Payments, attached as Exhibit F to Declaration of Barry Cohen in Support of Responding Parties' Motion to Vacate Order of Arrest, dated July 9, 2007, which is different than DMSI 0001.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after receiving the spreadsheet (DMSI 0001) you never told Joe Roggio or Joe Cappuccio that you disagreed with any of the amounts noted thereon.

**RESPONSE TO REQUEST NO 14:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that he ever received the spreadsheet labeled DMSI 0001 from Joe Roggio and therefore denies the remainder of the request in full. Barry Cohen admits that in or around November 2005, Joe Roggio gave him a different spreadsheet titled Schedule of Payments, attached as Exhibit F to Declaration of Barry Cohen in Support of Responding Parties' Motion to Vacate Order of Arrest, dated July 9, 2007, and after looking at the spreadsheet, Barry Cohen told Joe Roggio that the information in the spreadsheet "didn't look right to me."

**REQUEST FOR ADMISSION NO. 15:**

Admit that after receiving the spreadsheet (DMSI 0001) you never told Joe Roggio or Joe Cappuccio that you disagreed with how your payments had been applied as evidenced thereon.

**RESPONSE TO REQUEST NO 15:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that he ever received the spreadsheet labeled

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DMSI 0001 from Joe Roggio and therefore denies the remainder of the request in full. Barry Cohen admits that in or around November 2005, Joe Roggio gave him a different spreadsheet titled Schedule of Payments, attached as Exhibit F to Declaration of Barry Cohen in Support of Responding Parties' Motion to Vacate Order of Arrest, dated July 9, 2007, and after looking at the spreadsheet, Barry Cohen told Joe Roggio that the information in the spreadsheet "didn't look right to me."

## REQUEST FOR ADMISSION NO. 16:

Admit that after receiving the spreadsheet (DMSI 0001) you never told Joe Roggio or Joe Cappuccio that you disagreed with treating the debts listed thereon under "Michael Cohen," "Olde Port Inn," "Inventory," and "Point Loma" as advances under the Note and Mortgage.

## RESPONSE TO REQUEST NO 16:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that he ever received the spreadsheet labeled DMSI 0001 and therefore denies the remainder of the request in full.

## REQUEST FOR ADMISSION NO. 17:

Admit that after receiving the newer revised spreadsheet from Joe Roggio in approximately December 2006, as you have stated in your Declaration dated July 9, 2007 on pg. 3, lines 2-4, you never told Joe Roggio or Joe Cappuccio that you disagreed with treating the debts listed thereon under "Olde Port Balance," "Point Loma Balance," and "Fees for Olde Port Case" as advances under the Note and Mortgage.

## RESPONSE TO REQUEST NO 17:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to this request to the extent the statement in Barry Cohen's Declaration referred to in this request appears at page 5 of the Declaration and not page 3. Notwithstanding these objections and without waiving them, Barry Cohen denies this request.

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

1   **REQUEST FOR ADMISSION NO. 18:**

2       Admit that on or about January 30, 2007 that you authored the document DMSI 0078.

3   **RESPONSE TO REQUEST NO 18:**

4       Responding Parties object to the use of the term "you" as vague and ambiguous as to

5   which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this

6   objection and without waiving it, Barry Cohen responds that after a diligent search of his records

7   he has no recollection of whether he authored the document DMSI 0078 and therefore denies this

8   request.

9   **REQUEST FOR ADMISSION NO. 19:**

10      Admit that in approximately January 2007 Joe Roggio asked you to make payments on the

11  amounts you owed Del Mar.

12  **RESPONSE TO REQUEST NO 19:**

13      Responding Parties object to the use of the term "you" as vague and ambiguous as to

14  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

15  also object to the use of the phrase "the amounts you owe Del Mar" as vague and ambiguous as to

16  what specific amounts are being referred to. Without waiving this objection, Barry Cohen admits

17  that Joe Roggio asked him to make payments but Joe Roggio did not say what the payments would

18  be for or state the amount that the payments should be.

19  **REQUEST FOR ADMISSION NO. 20:**

20      Admit that Del Mar has a valid maritime lien on the Vessel.

21  **RESPONSE TO REQUEST NO 20:**

22      Responding Parties object to this request on the grounds that it calls for a legal conclusion

23  as to what constitutes a valid maritime lien. Without waiving this objection, admit that if Del Mar

24  has a valid Preferred Ship Mortgage, then it has a security interest in the Vessel in the form of a

25  maritime lien.

26  **REQUEST FOR ADMISSION NO. 21:**

27      Admit that under the terms of the Mortgage that you signed (DMSI 0101 – DMSI 0110)

28  Del Mar is not, and was not, required to give you notice before foreclosing on the Mortgage.

DAVIS WRIGHT TREMAINE LLP

9

**RESPONSE TO REQUEST NO 21:**

Responding Parties object to this request on the grounds that it calls for a legal conclusion as to the notice requirements under the terms of the Mortgage. Responding Parties also object that the use of the phrase "terms of the Mortgage" is vague and ambiguous as the "terms" of the Mortgage also include covenants of good faith and fair dealing, which in light of the extensive prior dealings among the parties and the lump-sum payment by the Cohens at the request of Plaintiff, required at minimum, an inquiry into the ability of the Cohens to make payments on the Note and notice prior to foreclosure. Notwithstanding these objections and without waiving them, deny.

**REQUEST FOR ADMISSION NO. 22:**

Admit that under the terms of the Mortgage that you signed (DMSI 0101 – DMSI 0110) there is no provision relieving you, the mortgagor, from your obligation to continue to make monthly payments even if you make a large payment in excess of your monthly obligation under the Note and Mortgage.

**RESPONSE TO REQUEST NO 22:**

Responding Parties object to this request on the grounds that it calls for a legal conclusion as to the mortgagor's obligations under the terms of the Mortgage. Notwithstanding this objection and without waiving it, deny.

**REQUEST FOR ADMISSION NO. 23:**

Admit that under the terms of the Note and Mortgage you, the mortgagor, were, and are, required to make monthly payments of $3,000 or 15% of the Vessel's monthly gross landing receipts starting on January 1, 2004 and continuing until paid in full.

**RESPONSE TO REQUEST NO 23:**

Responding parties deny this request. The parties amended the Note and payment obligations by their mutual performance in two ways: 1) the Cohens' lump-sum payment in the amount of $175,000, that was not required under the terms of the Note, includes advance payments under the Note making them current to-date, and 2) Del Mar has never demanded interest on the Note at any time nor have the Cohens paid any interest on the Note.

DAVIS WRIGHT TREMAINE LLP

10

**DAVIS WRIGHT TREMAINE LLP**

1  **REQUEST FOR ADMISSION NO. 24:**

2      Admit that from January 1, 2004 until December 22, 2004 you failed to make a single

3  payment to Del Mar towards your obligations under the Note and Mortgage.

4  **RESPONSE TO REQUEST NO 24:**

5      Responding Parties object to the use of the term "you" as vague and ambiguous as to

6  which responding party, Barry or Christene Cohen, the request is directed at. Without waiving

7  this objection, Barry Cohen admits this request.

8  **REQUEST FOR ADMISSION NO. 25:**

9      Admit that after your $5,000 payment dated December 22, 2004 you did not make another

10  payment until November 9, 2005.

11  **RESPONSE TO REQUEST NO 25:**

12      Responding Parties object to the use of the term "you" as vague and ambiguous as to

13  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

14  also object to the use of the term "payment" as to what type of payments this request is referring.

15  Without waiving these objections, Barry Cohen admits that he did not make another payment by

16  check until November 9, 2005, when the Cohens made a lump sum payment on the Note in the

17  amount of $175,000, although plaintiff's spreadsheet labeled DMSI 0001 shows other "payments"

18  credited against the amount Barry Cohen allegedly owes them during the time period from

19  December 22, 2004 to November 9, 2005.

20  **REQUEST FOR ADMISSION NO. 26:**

21      Admit that your last payment to Del Mar was on April 23, 2007.

22  **RESPONSE TO REQUEST NO 26:**

23      Responding Parties object to the use of the term "you" as vague and ambiguous as to

24  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

25  also object to the use of the term "payment" as to what type of payments this request is referring.

26  Without waiving these objections, Barry Cohen admits that his last direct payment by check was

27  April 23, 2007, although by virtue of his lump sum advance payment in the amount of $175,000,

28

he continues to make payments and is current under the Note and Mortgage through at least February 2009.

**REQUEST FOR ADMISSION NO. 27:**

If your response to the previous Request was to admit it, also admit that after your last payment on April 23, 2007 there was an outstanding balance due under the Note and Mortgage.

**RESPONSE TO REQUEST NO 27:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the term "payment" as to what type of payments this request is referring. Without waiving these objections, Barry Cohen admits that there is an outstanding balance remaining under the Note and Mortgage in the amount of $27,000 although no payments are currently due until at least February 2009.

**REQUEST FOR ADMISSION NO. 28:**

If your response to Request No. 26 was anything other than an unqualified "admit," admit that you currently owe money to Del Mar under the Note and Mortgage.

**RESPONSE TO REQUEST NO 28:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the term "payment" as to what type of payments this request is referring. Without waiving these objections, Barry Cohen admits that there is an outstanding balance remaining under the Note and Mortgage in the amount of $27,000 although no payments are currently due until at least February 2009.

**REQUEST FOR ADMISSION NO. 29:**

Admit that the Vessel is your only source of income, other than Social Security.

**RESPONSE TO REQUEST NO 29:**

Responding Parties object to the use of the term "your" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

DAVIS WRIGHT TREMAINE LLP

12

also object as to the use of the phrase "source of income" as vague and ambiguous. Without

waiving these objections, Barry Cohen admits that the Vessel is his only source of income, other

than Social Security.

### REQUEST FOR ADMISSION NO. 30:

Admit that you wrote checks made out to yourself as payee on Del Mar's Wells Fargo

account no. 4435703640.

### RESPONSE TO REQUEST NO 30:

Responding Parties object to the use of the terms "you" and "yourself" as vague and

ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at.

Notwithstanding this objection and without waiving it, Barry Cohen cannot admit or deny this

request because he lacks sufficient information to identify the account number of one of plaintiff's

own checking accounts.

### REQUEST FOR ADMISSION NO. 31:

If your response to the previous Request was to admit it, admit also that the checks your

wrote on that account made payable to yourself as payee were not authorized by Del Mar.

### RESPONSE TO REQUEST NO 31:

Responding Parties object to the use of the term "your" as vague and ambiguous as to

which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

also object to the use of the term "authorized" as vague and ambiguous. Notwithstanding these

objections and without waiving them, Barry Cohen denies this request. Barry Cohen admits that,

as manager and equal partner of the Avila Beach Joint Venture, he had the authority to write

checks on behalf of the Avila Beach Joint Venture.

### REQUEST FOR ADMISSION NO. 32:

Admit that you spent some of the money you obtained from Del Mar's Wells Fargo

account no. 4435703640 on items that were not related to the Olde Port Fisheries joint venture.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

1  **RESPONSE TO REQUEST NO 32:**

2      Responding Parties object to the use of the term "you" as vague and ambiguous as to

3  which responding party, Barry or Christene Cohen, the request is directed at.  Notwithstanding this

4  objection and without waiving it, Barry Cohen cannot admit or deny this request because he lacks

5  sufficient information to identify the account number of one of plaintiff's own checking accounts.

6  Barry Cohen further denies that there was a joint venture involving Old Port Fisheries.

7  **REQUEST FOR ADMISSION NO. 33:**

8      Admit that you agreed to pay Del Mar for its attorneys fees it incurred in the Avila Beach

9  litigation you instituted against the Port of Avila Beach.

10  **RESPONSE TO REQUEST NO 33:**

11      Responding Parties object to the use of the term "you" as vague and ambiguous as to

12  which responding party, Barry or Christene Cohen, the request is directed at.  Notwithstanding this

13  objection and without waiving it, Barry Cohen admits that in a meeting with Joe Roggio, he

14  tentatively and orally agreed to pay the legal fees; however, he received no consideration, felt

15  pressure to make such an agreement as he was an employee of Del Mar at the time, never received

16  an accounting as to the amount of the fees, and never agreed, orally or otherwise, to add these fees

17  to the Note.

18

19      DATED this 21st day of December, 2007.

20

21                                          Respectfully submitted,

22                                          DAVIS WRIGHT TREMAINE LLP

23

24                                  By

25                                          James P. Walsh
                                           Gwen Fanger
26                                          Attorneys for DEFENDANTS and
                                           CLAIMANT BARRY COHEN, CHRIS
27                                          COHEN (aka CHRISTENE COHEN), the F/V
                                           POINT LOMA and Claimant, F/V POINT
28                                          LOMA FISHING COMPANY, INC.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS                                   SFO 400232v1 0084289-000001

*(left margin)* DAVIS WRIGHT TREMAINE LLP

**PROOF OF SERVICE**

I, the undersigned, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

I am employed in the City and County of San Francisco, State of California, in the office of a member of the bar of this court, at whose direction the service was made. I am over the age of eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee of DAVIS WRIGHT TREMAINE LLP, and my business address is 505 Montgomery Street, Suite 800, San Francisco, California 94111.

I caused to be served the foregoing **DEFENDANTS BARRY COHEN, CHRIS COHEN'S (aka CHRISTENE COHEN) RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS** on the parties indicated below by the following means:

**I enclosed a true and correct copy of said document in an envelope and placed it for collection and mailing with the United States Post Office on December 21, 2007, following the ordinary business practice to the following:**

Gregory W. Poulos
Max L. Kelley
Cox, Wootton, Griffin,
Hansen & Poulos LLP
190 The Embarcardero
San Francisco, CA 94105

Richard P. Wagner
The Law Offices of Richard P. Wagner
400 Oceangate, Suite 700
Long Beach, CA 90802

I am readily familiar with my firm's practice for collection and processing of correspondence for delivery in the manner indicated above, to wit, that correspondence will be deposited for collection in the above-described manner this same day in the ordinary course of business.

Executed on December 21, 2007, at San Francisco, California.

_Robin D. Huey_
Robin D. Huey

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

# EXHIBIT 9

Web Client-Netlmage Coast National Bank

| | Find | |
| Clear |
| Print |
| Log Off |

| Account Number | 102509277 | Tracer Number | R:1 B:4 S:330 |
| Amount | 2,000.00 | | |
| Posting Date | 02/12/2007 | | |
| Check Number | 4008 | | |
| TranCode | 4008 | | |
| Routing Number | | | |

○ View Query Results ○ View Front ○ View Back ⦿ View Front AND Back

F/V POINT LOMA                                                    4008
PO BOX 40
AVILA BEACH CA 93424                                        90-4252/1222

                                                    DATE  1/30/07

PAY TO THE
ORDER OF  Del Mar Seafoods                    $ 2,000 00/100

Two Thousand +                             00/100 DOLLARS

NATIONAL BANK    1199 Grand Avenue
                 Arroyo Grande, CA 93420
                 898-746-2530

MEMO  On Account                    Barry A Cohen

⑈122452526⑈4008  102  509277⑈    ⑆0000200000⑆

ENDORSE HERE
X
PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
FOR DEPOSIT ONLY
DEL MAR SEAFOODS, INC.
4427067053

WEB MA FREM 02092007
3720   04010287695  4
               >1221-0527-8<
3412:   14 ESU 52

FEDERAL RESERVE BOARD OF GOVERNORS REG. CC



EXHIBIT 10
Cohen
1-9-08  RI

ov 16 05 01:53p                                                     p. 4
Case 3:07-cv-02952-WHA     Document 32-2     Filed 07/09/2007     Page 14 of 16
Item Viewer-Details                                        Page 1 of 1

Web Client-NetImage Coast National Bank

| Account Number | 102509277 | Tracer Number | R:1 B:6 S:1370 |
|---|---|---|---|
| Amount | 3,000.00 | | |
| Posting Date | 02/23/2007 | | |
| Check Number | 4020 | | |
| TranCode | 4020 | | |
| Routing Number | | | |

Find
Clear
Print
Log Off

⌒ View Query Results   ⌒ View Front   ⌒ View Back   ⊙ View Front AND Back

F/V POINT LOMA                                              4020
PO BOX 40
AVILA BEACH CA 93424                          90-4252/1222
                                    DATE  2/15/07

PAY TO THE
ORDER OF  Del Mar Seafoods              $ 3,000 00/100

Three Thousand                         00/100 DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-746-2530

MEMO  On Account                        Barry L. Cohen

⑈122242526⑈4020  102 509277⑈  ⑈0000300000⑈

WFB NA FREN 02212007
3825   03610658040   4
         >1221-0527-8<
664:      14 ESU 53

Received  06-27-07  10:31am   From-        To-DWT SF        Page  004

Web Client-NetImage Coast National Bank

| | |
|---|---|
| Find | |
| Clear | |
| Print | |
| Log Off | |

| | | | |
|---|---|---|---|
| Account Number | 102509277 | Tracer Number | R:1 B:5 S:1290 |
| Amount | 3,000.00 | | |
| Posting Date | 04/27/2007 | | |
| Check Number | 4063 | | |
| TranCode | 4063 | | |
| Routing Number | | | |

C View Query Results  C View Front  C View Back  ⊙ View Front AND Back



F/V POINT LOMA
PO BOX 40
AVILA BEACH CA 93424
4063
90-4252/1232
DATE 4/23/07

PAY TO THE ORDER OF  Del Mar Seafoods  $ 3000 00

Three Thousand  00/100 DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-746-2530

MEMO Bait on Account  Gary A. Cohn

⑆122242526⑆4063 102 509274⑈  ⑆0000300000⑈

ENDORSE HERE
X
CREDITED TO THE ACCOUNT OF
WITHIN NAMED PAYEE
LACK OF ENDORSEMENT GUARANTEED
WELLS FARGO BANK, N.A.
AU 00592

WFB NA PREM 04272007
3500 037100762*58 -4
>1221-0527-8<
2865: 14 ESD 48

# EXHIBIT 10

Joe,

Please credit my account. With this payment, if your analysis was correct, the new balance should be $139,749.79.

I will try to send you at least $2,000/month, sometimes $3,000.

I'm sick right now and if I try to talk I start coughing, so instead, you get this note.

I'm still unemployed, but this gives me a chance to help Michael make Olde Port better.

I hope things are going good for you and your family. Please give Yvonne my regards. Too bad our families never got the chance to become better friends. Oh, well, things usually happen for a reason. Well, take care of yourself.

Barry

Tuesday, January 30, 2007 America Online: FishmanCohen

DMSI 0078

# EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

**Condensed Transcript**

J|G  Jane GROSSMAN
R|S  REPORTING Services

DEL MAR SEAFOODS, INC.,           )
                                  )
          Plaintiff,              )
                                  )
vs.                               )   No. C-07-2952-WHA
                                  )
BARRY COHEN, CHRIS COHEN          )
(aka CHRISTENE COHEN), in         )
personam, and F/V POINT LOMA,)
Official Number 515298, a         )
1968 steel-hulled, 126-gross )
ton, 70.8 foot long fishing  )
vessel, her engines, tackle, )
furniture apparel, etc., in  )
rem, and Does 1-10,               )
                                  )
          Defendants.             )
_____)


DEPOSITION OF JOSEPH FRANK CAPPUCCIO

December 14, 2007



Taken before JANE GROSSMAN

CSR No. 5225


JANE GROSSMAN REPORTING SERVICES
Certified Shorthand Reporters
1939 Harrison Street, Suite 460
Oakland, California 94612
(510) 444-4500

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

1

1 it's $215,000?

2   A.  That's Joe Roggio's job.  He'll know exactly

3 to the penny what the mortgage would be.

4   Q.  I see.  Do you know if Del Mar Seafoods had

5 any other written promissory note with Mr. Cohen other

6 than the one that we've just discussed?

7   A.  That would be Joe Roggio's job.

8   Q.  Did there come a time in 2005 that you met

9 with Mr. Cohen to talk about concerns that had been

10 raised with this note by your bank?

11   A.  I don't remember.

12   Q.  So, you don't remember that you met with

13 Mr. Cohen and said, "The bank is concerned about the

14 size of the note, and I need some -- I need some help"?

15   A.  I don't have any specific recollection.

16   Q.  Do you recall in 2005 that there was an audit

17 of your company that raised a question about the size of

18 this note?

19   A.  The bank audits loans of our size annually.

20 It's standard procedure.

21   Q.  But do you recall the audit in 2005?

22   A.  The bank audits every company of a company our

23 size annually.

24       But I don't remember or have any detailed

25 knowledge of the 2005 audit, no.  I only assume there

                                                    19

1   A.  I don't remember.

2   Q.  You don't remember what month?

3   A.  No.

4   Q.  You don't remember what year?

5   A.  No.

6   Q.  Did you accept the $175,000 check?

7   A.  I was surprised he gave it to me.  I kept

8 telling him, "Why are you giving it to me?  Give it to

9 Joe Roggio."

10   Q.  Did you have -- did you have any conversation

11 with Mr. Cohen after he handed you the check?

12   A.  I don't really remember.

13   Q.  Let's go back to the time just before you

14 asked lawyers to arrest the vessel, which would be

15 April/May of this year.

16   A.  Okay.

17   Q.  Okay.  Did you have a conversation with

18 Joe Cappuccio -- I mean with Joe Roggio about

19 Barry Cohen and his loan?

20   A.  Yes.

21   Q.  When was this conversation?

22   A.  I don't remember.

23   Q.  What did you discuss in that conversation?

24   A.  I don't remember.

25   Q.  Well, didn't you discuss that you wanted to

                                                    21

1 was one.

2   Q.  So, you didn't -- you never did talk to a bank

3 at any time?

4   A.  That would have been Joe Roggio's department.

5   Q.  So, you didn't discuss the note with the bank

6 at all?

7   A.  That's Joe Roggio's job.

8   Q.  That's Joe Roggio's job.  Okay.

9       In this case, with respect to the note, do you

10 recall any of the terms of the note?

11   A.  No.

12   Q.  You don't recall if Mr. Cohen had to make

13 payments of $3,000 a month, for example?

14   A.  Joe Roggio would have worked that out with

15 Mr. Cohen.

16   Q.  I see.  Do you recall a time when

17 Mr. Barry Cohen came into your office and handed you a

18 check for $175,000?

19   A.  Yes, I remember that actually.

20   Q.  Do you recall the date?

21   A.  No.  I told him, "That's great.  Thank you.

22 Go give it to Joe Roggio."

23   Q.  Was it in your office?

24   A.  Yes, it was.

25   Q.  Was it in the morning or in the afternoon?

                                                    20

1 consider a way to possibly arrest the vessel?

2   A.  No.

3   Q.  Do you remember whether you discussed

4 Mr. Cohen's divorce at that time with Mr. Roggio?

5   A.  We discussed the security of the asset or the

6 money because his situation looked bad.

7   Q.  Now, you said you discussed "the asset."

8       What asset would that be?

9   A.  We wanted to make sure that our interest was

10 protected.  Our asset was the fishing boat.  We wanted

11 to make sure it was secure from possible financial

12 situations that could have got us -- to put Del Mar

13 Seafoods in a position that it would lose its security

14 of the loan.

15   Q.  So, it's your testimony here today that you

16 and Mr. Roggio talked in detail about the vessel and its

17 security?

18   A.  Not in detail.  We just wanted to make sure

19 that the assets were protected, that our security was

20 enhanced with Barry's position.

21   Q.  "Enhanced," did you say?

22   A.  We wanted to make sure that the -- that our

23 collectibility of the debt was in a more safe and secure

24 position.

25       And I told him to do that.

                                                    22

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

1    Q.   So, in order to make sure, what did you tell
2 Mr. Roggio to do?
3    A.   Talk to our attorney.
4    Q.   Did you have any discussion about whether
5 Mr. Roggio would investigate whether the vessel was, in
6 fact, working at that time?
7    A.   Whether the boat was fishing?
8    Q.   Right.
9    A.   Yes, it was fishing.
10   Q.   Did you talk about it with Mr. Roggio?
11   A.   I don't remember.
12   Q.   Did you suggest to Mr. Roggio that he ought to
13 call Barry on the phone and find out what's going on?
14   A.   I don't remember.
15   Q.   Did you suggest to Mr. Roggio that he ought to
16 write a letter to Barry and to Chris Cohen and say,
17 "What's your status?  Can you pay the loan?"
18   A.   I don't remember.
19   Q.   Did you discuss with Mr. Roggio the amount of
20 money that Barry might be owing?
21   A.   I don't specifically remember.
22   Q.   Do you recall if you asked Mr. Roggio to check
23 the Coast Guard records to see who owned the boat?
24   A.   I don't remember.
25   Q.   I'm going to show you what is -- we're not

                                                    23

1          MR. WALSH:  No.
2    Q.   So, you don't recall any such conversation?
3    A.   Not specifically, no.
4    Q.   Did you and Joe Roggio have any discussion
5 about the ownership of the vessel relative to your
6 security?
7    A.   Yeah.  He's not -- we were surprised that the
8 Coast Guard would allow the transfer without making us
9 whole or at least notifying us.
10   Q.   Well, did somebody talk to the Coast Guard?
11   A.   No.
12        We were just surprised that this could even
13 happen without us being advised as lenders on this boat.
14 He owed money based on this asset.
15        I mean, you (sic) shouldn't be able to change
16 title without making us whole or being notified.  We'd
17 have to sign off on that.
18   Q.   Now, did you have a discussion with Mr. Roggio
19 before the vessel seizure?
20   A.   I don't specifically remember.
21   Q.   But you did have that conversation at some
22 point?
23   A.   At some point, yes.
24   Q.   Okay.
25   A.   We were just kind of surprised that it was

                                                    25

1 going to mark this as an exhibit -- a bill of sale.
2        What I'll tell you, Mr. Cappuccio, is that is
3 a bill of sale that sells a vessel to a corporation.
4        MR. POULOS:  Do you have a copy for me?
5        MR. WALSH:  I think I gave one to you
6 yesterday.
7        MR. POULOS:  You also said we weren't going to
8 use the same exhibits.
9        Fortunately, I think I brought my copies.
10       MR. WALSH:  Good.  Good job.
11   Q.  My question is, Do you recall a time talking
12 to Mr. Cohen about -- where he asked you a question
13 about possibly putting his vessel into a corporation?
14   A.  I don't specifically remember.
15       MR. POULOS:  Do you want to wait a minute,
16 Counsel, while I locate the document?
17       MR. WALSH:  That's all I've got.
18       THE WITNESS:  Keep that one (tendering).
19       MR. WALSH:  Keep that one.
20       MR. POULOS:  You marked it as an exhibit.
21       MR. WALSH:  It's not marked as an exhibit.
22       I just wanted to refresh his recollection.
23       It may be from yesterday.
24       MR. POULOS:  I thought you said you were
25 marking it as Exhibit No. 1.

                                                    24

1 allowed to happen.
2    Q.   Now, you said you were concerned about
3 Mr. Cohen's financial position.
4        What was the basis of those concerns prior to
5 the time that you asked the vessel to be seized?
6    A.   Well, my attorney in January, Richard Wagner,
7 advised -- well, we saw the transcripts of some
8 deposition where Barry admitted and said that if he
9 were to lose the Avila case legal reimbursement that he
10 was going to go bankrupt -- he was going to be forced
11 into bankruptcy.
12        Then his wife called the office.  They were
13 going through a real nasty divorce.  And she accused him
14 of beating her.
15        So, I went, "Uh-oh.  This is getting ugly."
16        And that made me say, "We better secure the
17 asset."
18        And at that point, we advised their (sic)
19 attorney what our options were.
20        We never advised him what to do.  We asked him
21 what to do.
22   Q.   So, it was the call from your attorney and you
23 said you got a call from Chris Cohen.
24   A.   The office did.  I didn't personally receive
25 the call from Chris Cohen.

                                                    26

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

8 (Pages 23 to 26)

**Page 27**

1   Q.   Who received the call from Chris Cohen?
2   A.   I'm not exactly sure.
3   .Q.   During the period of time that we're talking
4 about, from 1999 to 2006, did you ever have any business
5 dealings with Chris Cohen yourself?
6   A.   No, uh-uh.
7   Q.   So, it was the lawsuit having to do with legal
8 fees; correct?
9   A.   It was Barry's admission that he might be
10 forced to declare bankruptcy if the Court were not to
11 reimburse his legal fees in the Avila case. It was his
12 testimony that prompted me to believe that he might be
13 going bankrupt. It was his words verbatim.
14   Q.   You believed that he was going to go bankrupt?
15   A.   He did, and it was in writing. And I read it.
16 And it was under oath and perjury and whatever (sic).
17 He said he was going to go broke if he was not
18 reimbursed his legal bills. In January I came to that
19 knowledge.
20   Q.   Mr. Cappuccio, as you sit here today, now that
21 you know that the vessel, the asset you were concerned
22 about, is in a separate corporation, that it is not
23 personally owned by Barry, do you feel more secure or
24 less secure?
25   A.   I would --

**Page 28**

1      MR. POULOS: I would just say I'm going to
2 interpose an objection that that mischaracterizes the
3 evidence, since the testimony is that Mr. Cohen is the
4 sole owner of the corporation that he transferred the
5 title to. So, it still is the corporation and his
6 asset.
7      MR. WALSH: Q. You can answer the question.
8   A.   I'm not an attorney. I'm a fish salesman. I
9 don't know.
10   Q.   I know you're a fish salesman.
11      But you, Mr. Cappuccio, just talked about
12 concern about security of the asset.
13   A.   That's why I asked my attorney.
14   Q.   But you said you had conversations with
15 Mr. Roggio about the security of the asset and the
16 ownership issue having to do with the corporate owner.
17      Didn't you just say that?
18   A.   We were -- we were commenting how the Coast
19 Guard -- why would the Coast Guard let that transfer
20 without notifying us.
21      On mortgages for property, which I knew
22 something about, the lender would be advised of any
23 transfer of property and be made whole on any note
24 against such said (sic) property.
25      Now, maybe ships are different. I don't know.

**Page 29**

1 I'm not an attorney.
2   Q.   But you have owned some fishing vessels;
3 right?
4   A.   But that doesn't make me an attorney.
5   Q.   No, I'm sure it doesn't.
6      But you didn't get any information out of that
7 ownership about --
8   A.   I -- I'm a fish salesman.
9      I'm really not an attorney. And that's why
10 when I have issues like this, I call my attorney. And
11 that's what I always do when I get stuff like this. And
12 I say, "What's this?" And he explains it to me. And I
13 pay him. That's how it usually works.
14      I'm not a play attorney. I'm not an amateur
15 attorney.
16   Q.   But you --
17   A.   I'm a fish salesman.
18   Q.   In terms of security, you are telling me you
19 don't understand the difference in your security
20 situation when the vessel is owned by a separate
21 corporation, and Barry, you said, stated on the record
22 that he personally was going to go into bankruptcy --
23 so, you don't understand the difference?
24   A.   I understand enough to call my attorney. And
25 if he doesn't understand that, I call my accountant.

**Page 30**

1      Joe Roggio is a CPA.
2      He's an attorney (indicating Mr. Poulos).
3      I'm a fish salesman.
4      I appreciate the credit you're giving me, but
5 I'm not that -- I'm not that gifted. This is very
6 confusing, meticulous, very specific knowledge that I
7 just don't possess.
8   Q.   Then you don't understand that with a
9 preferred ship mortgage, your debt is prior to any debt
10 that would be personal to Barry?
11   A.   I don't know that. I am not an attorney.
12   Q.   Did you find that out before you seized the
13 vessel or had the government arrest the vessel?
14   A.   I asked my attorney to collect the money and
15 secure -- make sure that money was secure. And he did
16 what he is supposed to do.
17   Q.   So, did you yourself personally go over with
18 Joe Roggio all the debts that Mr. Cohen might owe before
19 the arrest?
20   A.   You know, I'm sure I did, but I really don't
21 specifically remember.
22   Q.   Yesterday we had a document called an
23 "Assignment of Joint Venture."
24      Have you ever heard of such a thing?
25   A.   Yes.

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

# EXHIBIT 12

Deposition of CHRISTENE COHEN January 11, 2008

## DEL MAR SEAFOODS v COHEN

Page 1 to Page 67

FOR:
GREGORY W. POULOS, ESQUIRE

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# NICHOLS CERTIFIED COURT REPORTERS
2607 N. Hayden Road, Scottsdale, AZ 85257
110 West "C" Street, Suite 1300, San Diego, CA 92101

Phone:   1-800-227-0577
FAX:    1-480-990-7955

DISK
ENCLOSED

BSA XMAX(12/12)

## Page 45

1   A.   No.

2   Q.   This is a bad copy, but it was the one that was

3  attached to the Initial Disclosures. I'm showing you

4  Exhibit-4, and a document with Bates numbers Cohen00009.

5        Have you ever seen that document before?

6   A.   No.

7   Q.   Have you ever discussed with Barry a schedule of

8  payments that he was given by Joe Roggio?

9   A.   No.

10   Q.   How well do you know Joe Roggio? You worked --

11   A.   Pretty well. I like him a lot.

12   Q.   Do you think -- do you have any reason to believe

13  that Joe Roggio has any malice or ill-will towards you?

14   A.   No.

15   Q.   Do you have any reason to believe that he has any

16  malice or ill-will towards Barry?

17   A.   I don't know.

18   Q.   Do you think he -- from your knowledge and

19  experience working with him, do you think he's an honest

20  guy?

21   A.   Pretty much.

22   Q.   That's a little equivocal.

23        Do you have any reason to believe he would be

24  dishonest in any of his representations in this case?

25   A.   I don't know.

## Page 46

1   Q.   Do you have any reason to believe that?

2   A.   I don't know.

3   Q.   As you sit here today, can you think of any

4  occasion where he's been dishonest with you?

5   A.   No.

6   Q.   Let me show you a better copy of that schedule of

7  payments. I found one. The one I'm going to show you was

8  marked as an exhibit to Barry's deposition in the Avila

9  Beach litigation.

10        (Exhibit-6 was marked.)

11        That's, I believe, just a better copy of that

12  schedule of payments.

13        Does that help you in terms of whether you've

14  ever seen that before?

15   A.   No.

16   Q.   You still have never seen it?

17   A.   I have never seen it.

18   Q.   In your employment with Old Port Fisheries/Del

19  Mar, you were not the person responsible for keeping track

20  of the debts of Michael or Leonard to that entity; were you?

21   A.   No.

22   Q.   Who was?

23   A.   I don't know.

24   Q.   Does the name -- I think it's Harriett Shields?

25   A.   The bookkeeper was Harriett Shields and Dean

## Page 47

1  Smith.

2   Q.   Okay. Do you know if they were the people who

3  would track those?

4   A.   Yes.

5        (Exhibit-7 was marked.)

6   Q.   Have you ever seen Exhibit-7 before?

7   A.   No.

8   Q.   How well do you know Joe Cappuccio?

9   A.   Pretty well.

10   Q.   All right. Do you have any reason to believe

11  that Joe Cappuccio has any malice or ill-will toward you or

12  Barry?

13   A.   Not towards me, but I'm sure with Barry.

14   Q.   And why are you sure with Barry?

15   A.   They're in a lawsuit.

16   Q.   Okay. Other than the fact that they're in a

17  lawsuit. I mean, he never made any statements to you --

18   A.   No.

19   Q.   -- that he was angry at Barry or --

20   A.   Never.

21   Q.   Okay. And he had never done anything to you that

22  made you think that he was not -- that he had some personal

23  reason to try to cause any harm to you or Barry?

24   A.   Not to me.

25   Q.   Anything with respect to Barry other than this

## Page 48

1  lawsuit?

2   A.   Nothing comes to mind.

3   Q.   Did you feel you were treated fairly as an

4  employee?

5   A.   Yes.

6   Q.   Are you aware of any claim being filed on your

7  behalf with the United States Marshal Service arising from

8  the loss of that fishing net?

9   A.   No.

10   Q.   How much was the net worth?

11   A.   They're usually around $30,000.00 a net.

12   Q.   Do you know what size net this was?

13   A.   No.

14   Q.   Do you know when it had been purchased?

15   A.   No.

16   Q.   Looking at Exhibit-6 or 7, did Barry ever discuss

17  with you the addition of amounts beyond the $215,000.00 to

18  the promissory note?

19   A.   No.

20   Q.   Where did you get the $175,000.00 that was used

21  to make the payment on the note?

22   A.   A second mortgage on our house.

23   Q.   Was that mortgage taken out solely for that

24  purpose, or was it for some other purposes?

25   A.   It was taken out for that purpose, and also -- I

## Page 57

1 BY MR. POULOS:

2     Q.   We were just starting to talk about that

3 conversation you had with Joe Roggio, and I had just a few

4 questions about that.

5        Is that the only conversation you had with anyone

6 from Del Mar about your divorce?

7     A.   Yes.

8     Q.   Okay. Did you tell Joe Roggio in that

9 conversation that Barry had beat you, or words to that

10 effect?

11     A.   Yes.

12     Q.   Do you recall anything else that you told him

13 about the underlying circumstances that were causing you to

14 get a divorce?

15     A.   No.

16     Q.   Did you tell him that you thought it would be a

17 difficult divorce, one that was going to be expensive and

18 messy, for lack of a better term?

19     A.   I don't recall.

20     Q.   You mentioned that you had been told that the

21 Point Loma Fishing Company and vessel operates at a loss;

22 yes?

23     A.   Yes.

24     Q.   Have you heard that also at other times from

25 Barry?

## Page 58

1     A.   Yes.

2     Q.   It was your understanding that the vessel, even

3 when it's fishing, is not making a profit?

4     A.   I don't know.

5     Q.   But that's what Barry told you?

6     A.   No. There were some months where the weather was

7 bad; the boat couldn't go out, so it wouldn't make as much

8 as other months.

9     Q.   Right. But overall in the course of a year, it

10 operated at a loss?

11     A.   What year are you talking about?

12     Q.   Say 2005.

13     A.   I don't know.

14     Q.   2006?

15     A.   I don't know.

16     Q.   2007?

17     A.   I don't know.

18     Q.   All right. What did Barry tell you?

19     A.   He doesn't tell me.

20     Q.   But he has told you before that the vessel

21 operated at a loss?

22     A.   If it was windy and the boat couldn't go out,

23 yes. He would -- yes. It was bad.

24     Q.   In the divorce, you've been told the position is

25 that the vessel operates at a loss?

## Page 59

1     A.   Yes.

2     Q.   And it's your understanding that that's on an

3 annual basis; isn't it?

4     A.   I don't know.

5     Q.   Have you ever seen the Requests for Production

6 that were served in this case?

7     A.   Yes.

8     Q.   And Request for Production No. 44 was "All

9 documents prepared in furtherance of your divorce

10 proceedings that evidence and/or relate to your assets and

11 liabilities."

12        Have you compiled those documents?

13     A.   I don't have those documents.

14     Q.   You don't have any of the documents in your

15 divorce proceedings?

16     A.   No.

17     Q.   Does your lawyer have those?

18     A.   Some.

19     Q.   Okay. And what documents does your lawyer have?

20     A.   I do not know.

21     Q.   Have you asked your lawyer to provide you with

22 those, so you can provide them in this case?

23     A.   I know he would if -- If asked.

24     Q.   If you asked him?

25     A.   Yes.

## Page 60

1     Q.   And you haven't asked him?

2     A.   No.

3     Q.   Okay.

4     A.   I don't know what to ask him for.

5     Q.   Did you send him this Request for Production for

6 all documents prepared in furtherance of your divorce

7 proceedings?

8     A.   No.

9        MR. POULOS:   I'll have this marked as

10 Exhibit-8.

11        (Exhibit-8 was marked.)

12 BY MR. POULOS:

13     Q.   Have you ever authorized Barry to act as your

14 agent --

15     A.   No.

16     Q.   -- in this case?

17     A.   No.

18     Q.   Have you ever authorized Barry to act on behalf

19 of the marital community in this case?

20     A.   No.

21     Q.   No?

22     A.   No.

23     Q.   When did you review the Request for Production of

24 Documents?

25     A.   A few days ago.

## DEPONENT'S CHANGES OR CORRECTIONS

NOTE:   If you are adding to your testimony, print the exact words you want to add.
If you are deleting from your testimony, print the exact words you want
to delete.  Specify with "ADD" or "DELETE" then sign and date this form.

| PAGE | LINE | CHANGE / ADD / DELETE |
|------|------|------------------------|
| 57 | 8 | I did not tell Joe Raggio that Barry beat me. (delete). (Add) I said that Barry and I had fought and he had pushed me around. |
| 57 | 11 | delete |
| 57 | 19 | (Add) - Yes |
| 59 | 1 | No |

Signature: _Christine Cohen_    Date: _2-27-08_