# EXHIBIT 13

James P. Walsh, CSB. No. 184620
Gwen Fanger, CSB No. 191161
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
Telephone: (415) 276-6500
Facsimile:  (415) 276-6599
budwalsh@dwt.com

Attorneys for Defendants and Claimant
BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
Claimant, F/V POINT LOMA Fishing Company, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC., | ) |
|  | ) |
| Plaintiff, | ) No. C-07-2952-WHA |
|  | ) |
| v. | ) **ANSWER TO VERIFIED** |
|  | ) **ADMIRALTY AND MARITIME** |
| BARRY COHEN, CHRIS COHEN (aka | ) **COMPLAINT (In Personam and In** |
| CHRISTENE COHEN), *in personam* and, | ) **Rem); VERIFIED COUNTERCLAIM** |
| F/V POINT LOMA, Official Number | ) |
| 515298, a 1968 steel-hulled, 126-gross ton, | ) |
| 70.8 foot long fishing vessel, her engines, | ) |
| tackle, furniture apparel, etc., *in rem*, and | ) |
| Does 1-10, | ) |
|  | ) |
| Defendants. | ) |

BARRY COHEN and CHRIS COHEN (aka CHRISTENE COHEN), sued *in personam*, the F/V

POINT LOMA, sued *in rem*, and the F/V POINT LOMA FISHING COMPANY, INC., as Claimant

(hereinafter "Defendants"), hereby Answer the Verified Admiralty and Maritime Complaint of DEL

MAR SEAFOODS, INC. (hereinafter "Plaintiff") and allege their Verified Counterclaim, as follows:

### ANSWER TO COMPLAINT

1.     Paragraph 1 of the Complaint describes the action and contains legal conclusions to

which no response is required.

2.     Paragraph 2 of the Complaint contains legal conclusions to which no response is

1   required.

2       3.      Defendants aver that CHRIS COHEN resides in Scotsdale, Arizona. Defendants admit

3   the remaining allegations in Paragraph 3 of the Complaint.

4       4.      Defendants lack sufficient information to form a belief as to the allegations in Paragraph

5   4 of the Complaint, and therefore deny them.

6       5.      Defendants admit the allegations in Paragraph 5 of the Complaint.

7       6.      Defendants deny the allegations in Paragraph 6 of the Complaint.

8       7.      Defendants admit that, at the time the Promissory Note and Ship Mortgage were signed

9   in 2003, Defendants BARRY COHEN and CHRIS COHEN were the owners of the F/V POINT

10  LOMA. The ownership of the F/V POINT LOMA has since been transferred to the F/V POINT

11  LOMA FISHING COMPANY, INC., subject to the Ship Mortgage. Defendants deny all other

12  allegations in Paragraph 7 of the Complaint.

13      8.      No response to Paragraph 8 of the Complaint is required.

14      9.      Defendants admit the allegations in Paragraph 9 of the Complaint.

15      10.     Defendants aver that the terms of the Promissory Note speak for themselves. Defendants

16  deny all other allegations in Paragraph 10 of the Complaint.

17      11.     Defendants admit the allegations in Paragraph 11 of the Complaint.

18      12.     Defendants aver that the terms of the Promissory Note speak for themselves. Defendants

19  deny all other allegations in Paragraph 12 of the Complaint.

20      13.     Defendants aver that the terms of the Promissory Note speak for themselves. Defendants

21  deny all other allegations in Paragraph 13 of the Complaint.

22      14.     Defendants aver that the terms of the Promissory Note speak for themselves. Defendants

23  deny all other allegations in Paragraph 14 of the Complaint.

24      15.     Defendants deny the allegations in Paragraph 15 of the Complaint. Defendants aver that

25  they have paid $188,000 on the note, including an advance payment of $175,000 made at the request of

26  Plaintiff on November 10, 2005.

27      16.     Defendants deny the allegations in Paragraph 16 of the Complaint. Defendants aver that

28  there is no default on the terms of the Promissory Note because of the advance payment of $175,000 in

Case 3:07-cv-02952-WHA    Document 26    Filed 06/25/2007    Page 3 of 6

2005 and additional payments of $13,000, which covers the required $3,000 monthly payments under the Promissory Note through at least February 2009.

17. Defendants admit the allegations in Paragraph 17 of the Complaint.

18. No response to Paragraph 18 of the Complaint is required.

19. Defendants admit the allegations in Paragraph 19 of the Complaint.

20. Defendants deny the allegations in Paragraph 20 of the Complaint.

21. Defendants deny the allegations in Paragraph 21 of the Complaint.

22. Defendants deny the allegations in Paragraph 22 of the Complaint.

23. Defendants admit that Plaintiff has a maritime lien on the F/V POINT LOMA but deny that Plaintiff has any right to foreclose that lien because Defendants are not in default under the Promissory Note due to the advance payment of $188,000. Defendants deny that any fishing permit or fishing history is subject to such lien because fishing permits and fishing history are intangibles and must be specifically listed in the Promissory Note and Ship Mortgage in order to be subject to a maritime lien. Defendants deny all other allegations in Paragraph 23 of the Complaint.

24. Defendants deny that Plaintiff is entitled to attorneys fees and costs because Defendants are not in default under the Promissory Note. Defendants aver that Plaintiff owes Defendants attorneys fees and costs under the Promissory Note for seizing the F/V POINT LOMA without legal cause.

25. No response to Paragraph 25 of the Complaint is required.

26. Defendants admit that Plaintiff has a maritime lien on the F/V POINT LOMA but deny that Plaintiff has any right to foreclose that lien because Defendants are not in default under the Promissory Note due to the advance payment of $188,000. Defendants deny that any fishing permit or fishing history is subject to such lien because fishing permits and fishing history are intangibles and must be specifically listed in the Promissory Note and Ship Mortgage in order to be subject to a maritime lien. Defendants deny all other allegations in Paragraph 26 of the Complaint.

27. Defendants deny the allegations in Paragraph 27 of the Complaint.

28. The remainder of the Complaint contains a prayer for relief. Defendants deny that Plaintiff is entitled to any relief.

29. Defendants deny each and every allegation in the Complaint, whether express or implied,

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

1  that Defendants have not previously or expressly admitted in this Answer.

2                            **AFFIRMATIVE DEFENSES**

3    30.    Plaintiff has failed to state a claim for which relief may be granted.

4    31.    The Court lacks subject matter jurisdiction over Plaintiff's claim.

5    32.    Plaintiff lacks standing to bring its claim.

6    33.    Plaintiff's claims are barred by estoppel.

7    34.    Plaintiff's claims are barred by accord and satisfaction.

8    35.    Plaintiff has consented to the acts of Defendants complained of in the Complaint.

9    36.    Plaintiff does not come into Court with clean hands.

10    37.    Plaintiff has failed to obtain affirmative consent to make any alleged advances under the Promissory Note for debts completely unrelated to the operation and use of the F/V POINT LOMA.

12    38.    Plaintiff has failed to document in writing any alleged advances under the Promissory Note.

14                            **COUNTERCLAIM**

15    For their Counterclaim against Plaintiff, Defendants allege as follows:

16    39.    The arrest of the F/V POINT LOMA by Plaintiff was wrongful in that (a) Plaintiff has refused, without cause, to admit that Defendants have paid $188,000 on the Promissory Note, including an advance payment of $175,000; (b) Defendants were therefore not in default under the Promissory Note; (c) Plaintiff improperly alleges that the total amount of the loan was greater than $215,000 because of advances under the Promissory Note that Defendants never agreed were subject to the Promissory Note and Ship Mortgage; and (d) none of these relevant, material facts were disclosed to the Court when Plaintiff sought the arrest warrant in this case.

23    40.    Because Defendants paid in November 2005 an amount equivalent to 37 monthly payments in advance, Defendants are not in default and the arrest of the vessel is in breach of the Promissory Note and the Ship Mortgage.

26    41.    The wrongful arrest of the F/V POINT LOMA has disrupted the fishing activities of the Vessel and prevents it from earning income for the benefit of Defendants, including as a source of income to pay off the remaining amount due to Plaintiff under the Promissory Note. Plaintiff has

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

therefore intentionally and/or negligently interfered with Defendants prospective economic advantage.

42.    In taking the action it did, Plaintiff has breached the implied Covenant of Good Faith and Fair Dealing incorporated into the Promissory Note and Ship Mortgage.

## REQUEST FOR RELIEF

WHEREFORE, Defendants respectfully request that the Court:

a.    Enter an order quashing the arrest of the F/V POINT LOMA as wrongful and not authorized under the terms of the Promissory Note and Ship Mortgage;

b.    Enter an order finding Plaintiff in breach of the Promissory Note and the Ship Mortgage;

c.    Enter an order finding that Plaintiff has intentionally and/or negligently interfered with the prospective economic advantage of Defendants;

d.    Enter an order awarding Defendants damages for wrongful or improper arrest, for breach of the Promissory Note and Ship Mortgage, and for intentional and/or negligent interference with Defendants' prospective economic advantage;

e.    Enter an order awarding Defendants their attorney's fees and costs; and

f.    Grant Defendants such further relief as may be appropriate and fair.

DATED this 25th day of June, 2007.

Respectfully submitted,

/s/ James P. Walsh
James P. Walsh (CSB No. 184620)
Gwen Fanger (CSB No. 191161)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-3834
Telephone: (415) 276-6556
Facsimile:   (415) 276-6599

Attorneys for Defendants

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

## VERIFICATION

I, Barry Cohen, hereby state the follows:

1.  I am a resident of the State of California and a defendant in this case and an officer in F/V POINT LOMA Fishing Company, Inc., a company organized under the laws of the State of California.

2.  I have read the above Answer to Admiralty and Maritime Complaint and Verified Counterclaim and hereby verify the facts set forth therein to the best of my knowledge and belief.

3.  I am authorized on behalf of all Defendants to verify the Counterclaim to Plaintiff's Complaint.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this verification was entered into at Avila Beach, California.

Dated this 25 day of June, 2007.

BY: _____
Barry Cohen

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax (415) 276-6599

# EXHIBIT 14

James P. Walsh, CSB. No. 184620
Gwen Fanger, CSB No. 191161
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
budwalsh@dwt.com

Attorneys for Defendants and Claimant
BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
Claimant, F/V POINT LOMA Fishing Company, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC., | ) |
| Plaintiff, | ) No. C-07-2952-WHA |
| v. | ) **DEFENDANTS BARRY COHEN,** |
| | ) **CHRIS COHEN'S (aka CHRISTENE** |
| BARRY COHEN, CHRIS COHEN (aka | ) **COHEN) RESPONSE TO** |
| CHRISTENE COHEN), *in personam* and, | ) **PLAINTIFF'S FIRST SET OF** |
| F/V POINT LOMA, Official Number | ) **INTERROGATORIES** |
| 515298, a 1968 steel-hulled, 126-gross ton, | ) |
| 70.8 foot long fishing vessel, her engines, | ) |
| tackle, furniture apparel, etc., *in rem*, and | ) |
| Does 1-10, | ) |
| Defendants. | ) |
| | ) |

PROPOUNDING PARTY:    PLAINTIFF DEL MAR SEAFOODS, INC.

RESPONDING PARTY:    DEFENDANTS BARRY and CHRISTENE COHEN

SET NO.:    ONE

Barry and Christene Cohen ("Responding Parties") hereby answer, object, or otherwise

respond as follows to Plaintiff's First Set of Interrogatories (the "Interrogatories"), propounded by

Plaintiff, Del Mar Seafoods, Inc. ("Del Mar").

12/21/07

SFO 400218v1 0084289-000001

## GENERAL LIMITATIONS AND OBJECTIONS

1.    Responding Parties have not completed their investigation of the facts relating to the case and have not completed its discovery. The following responses, therefore, are provided without prejudice to the production or use of additional information not set forth in the responses. Furthermore, Responding Parties do not waive their right to object to the use at trial of any information identified by the responses.

2.    Responding Parties object to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, constitutional or statutory rights of privacy, the trade secrets privilege or any other applicable privilege, or documents containing commercially sensitive information.

3.    Responding Parties further object to the Interrogatories to the extent they seek to impose obligations on Responding Parties beyond those established by the Federal Rules of Civil Procedure.

4.    Specific objections to each Interrogatory are made on an individual basis in the responses below.  The General Responses and Objections are hereby incorporated into the response to each separate interrogatory as though set forth in full therein.

5.    Responding Parties object to Interrogatories numbers 26-30 as they exceed 25, the maximum number of interrogatories allowed under Fed. R. Civ. P. 33.  Although Interrogatories 1-25 include numerous subparts to which Responding Parties object, without waiving this objection, Responding Parties respond below to Interrogatories 1-25 only.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Responding Parties object to the instructions, definitions, and Interrogatories to the extent that they purport to require Responding Parties to locate or produce information not known to them or not in their possession, custody or control.  Responding Parties also object to the extent that they purport to impose on Responding Parties any obligations greater than those provided by the Federal Rules of Civil Procedure, case law and other law governing the proper scope and extent of discovery.  Responding Parties further object on the grounds that the definitions of

DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES     SFO 400218v1 0084289-000001
Case No. C-07-2952-WHA

DAVIS WRIGHT TREMAINE LLP

"YOU," "YOUR," "defendants," and "YOURSELF" are overbroad, unduly burdensome and oppressive.

Responding Parties adopt the terms defined by the Plaintiff solely for convenience in responding to the requests herein. Responding Parties do not accept or concede that any of the terms or definitions are appropriate, descriptive or accurate. The above general objections are incorporated into each response below.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY by name, last known address, phone number, employment position, and dates of employment, each person that was employed as a crew member on the M/V [sic] POINT LOMA (the "Vessel") between January 1, 2001 and the present.

**RESPONSE TO INTERROGATORY NO. 1:**

Responding Parties object to this interrogatory on the grounds that it is compound containing at least five distinct subparts requesting 1) the name; 2) the last known address; 3) the phone number, 4) the employment position, and 5) dates of employment for each crew member of the F/V Point Loma between January 1, 2001 and the present. Responding Parties also object to this interrogatory on the grounds that the identity and personal contact information of the crew members is not relevant to the issues in this action, the information is unlikely to lead to admissible evidence, and the time period for which the information is requested is overly broad and irrelevant in that it covers a period of time well before the Note and Mortgage were signed, which are the basis of this lawsuit. Without waiving these objections, Responding Parties responds as follows:

Responding Parties do not possess the knowledge of all of the information requested by this interrogatory but are providing the information that they do have below. As a matter of course, Barry Cohen deals directly with the captain of the F/V Point Loma and has little contact with the crew. The captain of the F/V Point Loma is responsible for hiring the crew. The present three member crew of the F/V Point Loma includes:

1.  Dave Kobak (captain), PO Box 314, Bodega Bay, CA 94923, (707) 592-3931

DAVIS WRIGHT TREMAINE LLP

3

2.  Pete Kellogg (crew member), San Francisco, California

3.  Gene Harding (crew member), San Francisco, California

There have been three captains of the F/V Point Loma since January 1, 2001:  Dave Kobak, Jim Dunaway, and Al Ryan.  Jim Dunaway is deceased and Responding Parties believe that Al Ryan lives in Tacoma, Washington.

## INTERROGATORY NO. 2:

IDENTIFY by name, last known address, phone number, and type of service provided, each person and company that performed maintenance or repair services on the Vessel or provided equipment used aboard the vessel between January 1, 2001 and the present.

## RESPONSE TO INTERROGATORY NO. 2:

Responding Parties object to this interrogatory on the grounds that it is compound containing at least nine distinct subparts requesting 1) the name; 2) the last known address; 3) the phone number, and 4) the type of service provided by 5) each person and 6) each company that performed 7) maintenance or 8) repair or 9) equipment to the F/V Point Loma between January 1, 2001 and the present.  Responding Parties also object to this interrogatory on the grounds that the identity and contact information of the persons and companies providing maintenance, repair, and equipment to the vessel is not relevant to the issues in this action, the information is unlikely to lead to admissible evidence, and the time period for which the information is requested is overly broad and irrelevant in that it covers a period of time well before the Note and Mortgage, the basis of this lawsuit, were even signed.  Without waiving these objections, Responding Parties responds as follows:

Responding Parties do not have knowledge of all of the information requested.  Generally, the captain of the ship engages the services of repair, maintenance, and equipment providers as needed.  Glen Albright in Morro Bay, California has performed repair work on the vessel in the past.

DAVIS WRIGHT TREMAINE LLP

1  **INTERROGATORY NO. 3:**

2       IDENTIFY the fishing net that YOU have alleged was lost during the arrest of the Vessel

3  by providing the size and type of net, the date of purchase and purchase price, the location from

4  where the net was purchased, and the documents that support this information.

5  **RESPONSE TO INTERROGATORY NO. 3:**

6       Responding Parties object to this interrogatory on the grounds that it is compound

7  containing at least six subparts requesting 1) the size of the net 2) the type of the net, 3) the date of

8  purchase of the net, 4) the purchase price, 5) the location from where the net was purchased, and

9  6) documents that support this information.  Responding Parties will construe this interrogatory as

10  two requests to the extent the information in subparts 1-5 seek information to substantiate

11  Responding Parties' claim for damages for the lost net.  Without waiving this objection,

12  Responding Parties respond as follows:

13       1)  The size of the net is described fully and accurately in the diagram provided as

14            Exhibit 1 to these Interrogatories and labeled COHEN 00671.

15       2)  The type of the net is described fully and accurately in the diagram provided as

16            Exhibit 1 to these Interrogatories and labeled COHEN 00671.

17       3)  The net was purchased on or about October 7-8, 2006.

18       4)  The total price for the net was approximately $13,000-$15,000.

19       5)  The net was purchased from Astoria, Oregon.

20       6)  Documents supporting this information include:

21            a.  Diagram of net, attached as Exhibit 1 (COHEN 00671) to these

22                 Interrogatories

23            b.  Purchase order from Englund Marine and Industrial Supply Co., dated 10-

24                 07-06

25            c.  Bill for net, dated 10-08-06 from Kevin Dunn (net maker)

26

27

28

DAVIS WRIGHT TREMAINE LLP

**INTERROGATORY NO. 4:**

IDENTIFY each person and entity that was a member of the Avila Beach Joint Venture including, for each, their position and interest in the joint venture.

**RESPONSE TO INTERROGATORY NO. 4:**

Barry Cohen and Del Mar Seafoods, Inc. were the only members of the Avila Beach Joint Venture. They each held a 50% interest in the Avila Beach Joint Venture. Barry Cohen held the position of manager for the Avila Beach Joint Venture.

**INTERROGATORY NO. 5:**

For each member of the Avila Beach Joint Venture state all contributions (both financial and in-kind) made to the joint venture including the date(s) of each contribution.

**RESPONSE TO INTERROGATORY NO. 5:**

Responding Parties object to this interrogatory to the extent they cannot answer on behalf of Del Mar Seafoods, Inc. as to what it specifically contributed to the Avila Beach Joint Venture. Without waiving this objection, Responding Parties respond that Del Mar Seafoods, Inc. generally contributed the overall financing for the Joint Venture and Barry Cohen contributed the location, building, approximately $15,000 in inventory (including fish, boxes, and supplies), trained employees, fish suppliers, customers, a de-icer, hoists, miscellaneous equipment and his expertise upon formation of the Joint Venture in 1999.

**INTERROGATORY NO. 6:**

State the relationship, if any, that existed between the Avila Beach Joint Venture and Olde Port Inn, Inc. at any time during the existence of the joint venture.

**RESPONSE TO INTERROGATORY NO. 6:**

Olde Port Inn, Inc. was a customer of the Avila Beach Joint Venture.

**INTERROGATORY NO. 7:**

State the relationship, if any, that existed between the Avila Beach Joint Venture and Olde Port Fisheries, Inc. at any time during the existence of the joint venture.

**RESPONSE TO INTERROGATORY NO. 7:**

Olde Porte Fisheries, Inc. was a customer of the Avila Beach Joint Venture.

DAVIS WRIGHT TREMAINE LLP

**INTERROGATORY NO. 8:**

State what YOUR relationship is, or has been, to Olde Port Inn, Inc. for all times that YOU have had any relationship to that entity, including for each time period a description of what YOUR relationship has been.

**RESPONSE TO INTERROGATORY NO. 8:**

Responding Parties object to this interrogatory on the grounds that the use of the term "relationship" is vague and ambiguous in the this context and that the relationship to a company that is not a party to this lawsuit is irrelevant to the issues in this case. Without waiving this objection, Responding Parties respond that Barry Cohen built Olde Port Inn, Inc. in 1971 and owned it from 1971 until he sold it in or around 1995.

**INTERROGATORY NO. 9:**

State what YOUR relationship is or has been to Olde Port Fisheries, Inc. for all times that YOU have had any relationship to that entity, including for each time period a description of what YOUR relationship has been.

**RESPONSE TO INTERROGATORY NO. 9:**

Responding Parties object to this interrogatory on the grounds that the use of the term "relationship" is vague and ambiguous in the this context and that the relationship to a company that is not a party to this lawsuit is irrelevant to the issues in this case. Without waiving this objection, Responding Parties respond that Barry and Chris Cohen have owned and continue to own 50% each of Old Port Fisheries, Inc. during its entire existence.

**INTERROGATORY NO. 10:**

State what relationship, if any, each of YOUR sons (Leonard and Michael) has had, or currently has, in any of the businesses in which YOU have held any interest, including, but not limited to, the Avila Beach Joint Venture, Olde Port Fisheries, Inc., Olde Port Inn., Inc., and F/V POINT LOMA Fishing Company, Inc.

**RESPONSE TO INTERROGATORY NO. 10:**

Responding Parties object to this interrogatory on the grounds that the use of the term "relationship" is vague and ambiguous in the this context and that the relationships of Barry

DAVIS WRIGHT TREMAINE LLP

7

Cohen's sons, who are not parties to this lawsuit, to the Avila Beach Joint Venture, Olde Port

Fisheries, Inc., and Olde Port Inn., Inc. companies that are not parties to this lawsuit are irrelevant

to the issues in this case. Responding Parties also object to this interrogatory on the grounds that it

is compound requesting information for two different people as to four different companies.

Without waiving these objections, Responding Parties respond as follows:

      1) <u>Avila Beach Joint Venture</u>: Michael Cohen was an employee of the Joint Venture.

          Leonard Cohen had no relationship to the Joint Venture.

      2) <u>Olde Port Fisheries, Inc.</u>: Michael Cohen was an employee of Olde Port Fisheries,

          Inc. Leonard Cohen had no relationship with this company.

      3) <u>Olde Port Inn, Inc.</u>: Leonard Cohen is the current owner of Olde Porte Inn, Inc.

          Michael Cohen had no relationship with this company.

      4) <u>F/V Point Loma Fishing Company, Inc.</u>: Neither Michael Cohen nor Leonard

          Cohen have any relationship with this company.

**INTERROGATORY NO. 11:**

State the amount of attorneys' fees, if any, that YOU owed to the law firm of Miller, Starr

& Regalia as of August 1, 2007.

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Parties object to this interrogatory on the grounds that is irrelevant to the

issues in this case; namely the amount of the debt remaining under the Note and the unlawful

arrest of the Vessel. Notwithstanding this objection and without waiving it, Responding Parties

respond that this information is not within their control and they do not have the bills prepared by

the law firm of Miller, Starr, & Regalia.

**INTERROGATORY NO. 12:**

State what YOUR gross earnings were for each voyage of the Vessel between October 31,

2001 and the present.

**RESPONSE TO INTERROGATORY NO. 12:**

Responding Parties object to this interrogatory on the grounds that it is overly broad and

unduly burdensome as it requests gross earnings for *each* voyage of the Vessel back to 2001, well

DAVIS WRIGHT TREMAINE LLP

8

before the timing of the underlying issues in this case. Responding Parties further object on the grounds that it requests confidential, competitive information and is irrelevant to the underlying issues in this case, namely the amount of the debt remaining under the Note (signed in 2003) and the wrongful arrest of the Vessel.

**INTERROGATORY NO. 13:**

State what YOUR net earnings (gross earnings less expenses) were for each voyage of the Vessel between October 31, 2001 and the present.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Parties object to this interrogatory on the grounds that it is overly broad and unduly burdensome as it requests gross earnings for *each* voyage of the Vessel back to 2001, well before the timing of the underlying issues in this case. Responding Parties further object on the grounds that it requests confidential, competitive information and is irrelevant to the underlying issues in this case, namely the amount of the debt remaining under the Note (signed in 2003) and the wrongful arrest of the Vessel.

**INTERROGATORY NO. 14:**

List every item of personal property that YOU allege was removed from the Vessel during the period it was under arrest and which YOU further allege has not been returned to the lawful owner or to the Vessel.

**RESPONSE TO INTERROGATORY NO. 14:**

Responding Parties object to this interrogatory as compound and consists of at least two subparts requesting 1) a list of items of personal property removed from the Vessel during the period it was under arrest and 2) a list of items that have not been returned to the lawful owner of the vessel. Without waiving this objection, Responding Parties respond as follows:

1) The only item that was removed from the Vessel at the time of the arrest was the net to the extent it was located on the dock and the captain of the Vessel was not allowed to put it on the Vessel at the time of the arrest.

2) The net is still missing and has not been returned to the Vessel.

1    **INTERROGATORY NO. 15:**

2        In paragraph 3 of YOUR declaration dated August 1, 2007 YOU swore under penalty of

3    perjury that $215,000 was a "low estimate of the amount actually contributed by Del Mar" to the

4    Mexico joint venture. What is YOUR best estimate as to the actual amount contributed by Del

5    Mar?

6    **RESPONSE TO INTERROGATORY NO. 15:**

7        At the time Barry Cohen signed the declaration dated August 1, 2007, he believed that

8    $215,000 was "a low estimate" of the amount contributed by Del Mar to the Mexico Joint Venture

9    because Joe Roggio, Del Mar's controller who had access to the books and accounts of the Joint

10   Venture, had told him it was a "low estimate." Barry Cohen and Joe Roggio had agreed that the

11   Note would cover this amount based on information from Joe Roggio. Barry Cohen has since

12   come to believe that the amounts used by Joe Roggio to calculate the $215,000 figure in the Note

13   in fact add up to less than $215,000.

14   **INTERROGATORY NO. 16:**

15       In paragraph 2 of YOUR declaration dated August 1, 2007 YOU state that the contributions

16   from Del Mar were to be used for "upgrades, maintenance and new nets" for the Vessel. State

17   whether all of the funds contributed by Del Mar were used for these purposes.

18   **RESPONSE TO INTERROGATORY NO. 16:**

19       Responding Parties lack sufficient knowledge to state whether all of the funds contributed

20   by Del Mar were used for "upgrades, maintenance and new nets." Since the Joint Venture's

21   accounts were included in Del Mar's books, Responding Parties respond that the information as to

22   what the funds were used for is therefore within the control of Del Mar. In particular, the Joint

23   Venture sent copies of its accounts to Del Mar and Joe Roggio every month for Del Mar's review.

24   **INTERROGATORY NO. 17:**

25       List all of the work done to the F/V PONT LOMA (the "Vessel") either as "upgrades" or

26   "maintenance" with the funds that were contributed by Del Mar including for each item the date,

27   cost, and the identity of the person(s) who performed the work. The identity of the person(s)

28   should include their business name, address, and phone number.

DAVIS WRIGHT TREMAINE LLP

1  **RESPONSE TO INTERROGATORY NO. 17:**

2      Responding Parties object to this interrogatory on the grounds that is compound and

3  consists of at least six subparts requesting the 1) date, 2) cost, 3) identity of persons who

4  performed the work including their 4) business name, 5) address, and 6) phone number for all

5  upgrades and maintenance performed on the Vessel. Responding Parties further object to this

6  interrogatory on the grounds that the phrase "funds that were contributed by Del Mar" is vague

7  and ambiguous as to what context the funds are referring; and the performance of any upgrades or

8  maintenance performed on the Vessel are irrelevant to the issues in this case relating to the amount

9  of the debt remaining under the Note and the wrongful arrest of the Vessel. Without waiving these

10  objections, Responding Parties respond that they no longer have this information as these

11  upgrades and maintenance work were likely performed in or around 2001 and such work is

12  primarily overseen by the captain of the Vessel.

13  **INTERROGATORY NO. 18:**

14      Who was the person that had overall responsibility for determining the use of, and

15  accounting for, the funds contributed by Del Mar for upgrades and maintenance of the Vessel?

16  **RESPONSE TO INTERROGATORY NO. 18:**

17      Responding Parties object to this interrogatory on the grounds that it is vague and

18  ambiguous as to which funds Plaintiff is referring. Without waiving this objection, to the extent

19  the interrogatory is asking who had overall responsibility for determining the use of, and

20  accounting for, the funds contributed by Del Mar for upgrades and maintenance of the Vessel

21  related to the Mexico Joint Venture, Responding Parties respond that Joe Cappuccio and Joe

22  Roggio had this overall responsibility.

23  **INTERROGATORY NO. 19:**

24      Who was the person that had overall responsibility for determining the use of and

25  accounting for the funds contributed by Del Mar to the Mexico joint venture?

26  **RESPONSE TO INTERROGATORY NO. 19:**

27      Joe Cappuccio and Joe Roggio had overall responsibility for determining the use of and

28  accounting for the funds contributed by Del Mar to the Mexico Joint Venture.

DAVIS WRIGHT TREMAINE LLP

**INTERROGATORY NO. 20:**

In YOUR declaration dated August 1, 2007 YOU stated in paragraph 10 that at the time of the arrest of the Vessel, the Vessel was "making at least $20,000 per month." State whether this figure was a gross or net figure and how it was calculated.

**RESPONSE TO INTERROGATORY NO. 20:**

Responding Parties object to this interrogatory on the grounds that it is compound and contains at least two subparts requesting 1) whether the $20,000 figure per month was gross or net and 2) how this number was calculated. Without waiving this objection, Responding Parties respond that this number was a conservative estimate of the gross intake of the Vessel calculated based on the average amount of fish sold by the Vessel per month.

**INTERROGATORY NO. 21:**

For each check that YOU wrote drawn on Wells Fargo bank, Salinas branch, account number 443-5703640 (The Avila Beach Checking Account), in which YOU listed YOURSELF as the payee, please state what the check number was, the date, amount and what the funds were used for.

**RESPONSE TO INTERROGATORY NO. 21:**

Responding Parties object to the use of "YOU" and "YOURSELF" in this context as vague and ambiguous as to which Defendant the interrogatory is directed at and object on the grounds that the request is compound consisting of at least four subparts requesting 1) the payee, 2) the check number, 3) the date, 4) the amount, and 5) what the funds were used for. Responding Parties further object that the request is irrelevant to the limited issues in this case; namely the amount of the debt remaining under the Note and the unlawful arrest of the Vessel. Notwithstanding this objection and without waiving it, to extent this interrogatory is directed at Barry Cohen, he responds that he does not have the information to answer this question within his possession, including the knowledge of what account number this interrogatory refers to. To the extent this interrogatory refers to a Del Mar checking account, this information is most likely within the control of Plaintiff itself.

DAVIS WRIGHT TREMAINE LLP

**INTERROGATORY NO. 22:**

Provide a list of each survey YOU have had performed on the F/V POINT LOMA since YOU purchased the Vessel including for each survey the date of the survey, identify of the surveyor, and the location of the survey report.

**RESPONSE TO INTERROGATORY NO. 22:**

Responding Parties object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence where information related to surveys of the Vessel are irrelevant to the issues in this case that include the amount of an alleged debt between Responding Parties and Plaintiff. Responding Parties also object on the grounds that it is unduly burdensome and harassing where it seeks irrelevant information for an overly broad period of time extending beyond the scope of the time period at issue in this litigation. The issues in this case are limited to the amount of the debt under the Note and wrongful arrest of the Vessel; neither of which relate to survey reports for the Vessel during the period of ownership by Defendants. To the extent Plaintiff alleges that the condition of the Vessel formed a basis for having the Vessel arrested, Plaintiff made no attempt to determine the condition of the Vessel prior to the arrest and can not now attempt to support its decision to have the Vessel arrested after the fact and after failing to establish probable cause at the time of the arrest.

**INTERROGATORY NO. 23:**

IDENTIFY the bank from whom YOU obtained the loan to make the lump sum payment of $175,000.00 against the Note and Mortgage, including the name of the bank, the branch, the person at the bank that YOU dealt with, YOUR loan number, and the loan amount.

**RESPONSE TO INTERROGATORY NO. 23:**

Responding Parties object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence and that it is unduly burdensome, harassing, violates their right to privacy. Without waiving this objection, Responding Parties respond that Barry and Chris Cohen took out a loan on their home in order to make the lump sum payment in the amount of $175,000 towards the Note. The fact that they made this payment is uncontested and where they got the money from and under what circumstances is irrelevant to the

DAVIS WRIGHT TREMAINE LLP

fact that they paid Plaintiff $175,000 towards the Note making them current through at least February 2009 under the Note.

**INTERROGATORY NO. 24:**

If YOU contend that YOU had the financial resources in June, 2007 to make payments on the note and Mortgage of at least $3,000 per month or 15% of the gross catch, whichever was greater, state what financial resources YOU had at that time including the source of the income, the amount of income (whether weekly, monthly, or annually), savings or checking account balances, and / or other assets that were sufficiently liquid to he used to meet the monthly payment obligations. In responding with the list of assets including checking account balances, YOU are specifically requested to provide the balances as of June 1, 2007 in Coast National Bank account no. 102509277 and Coast National Bank account no. 102000579.

**RESPONSE TO INTERROGATORY NO. 24:**

Responding Parties object to this interrogatory on the grounds that the term "financial resources" is vague and ambiguous. If the question is asking whether Responding Parties had the ability to make payments on the Note and Mortgage of at least $3,000 per month or 15% of the gross catch, whichever was greater, Responding Parties respond that up until the time when Plaintiff arrested the Vessel, they had the ability to go fishing and make payments towards the Note from the income earned from the Vessel's fishing operations.

**INTERROGATORY NO. 25:**

List all personal computers that YOU owned or used in January 2007 including for each whether it is still owned or used by YOU, the email program used on it, whether YOU have deleted any programs or documents from it (them) and the current location of the computer(s).

**RESPONSE TO INTERROGATORY NO. 25:**

Responding Parties object to this interrogatory on the grounds that it is compound and contains at least five subparts requesting: 1) a list of all computers, 2) current status of ownership, 3) the email program used, 4) the deletion of any programs or documents, and 5) the current location of the computer. Without waiving this objection, Responding Parties respond that Barry Cohen owns one computer that he has owned since January 2007. America Online is the email

1  program used on it.  Programs or documents may have been deleted as a matter of course when

2  they are no longer needed.  The computer is currently located at Michael Cohen's house in Santa

3  Maria, California.

4  **INTERROGATORY NO. 26:**

5      List YOUR locations and activities on January 30, 2007.

6  **RESPONSE TO INTERROGATORY NO. 26:**

7      Responding Parties object Interrogatory number 26 on the grounds that it exceeds the 25

8  interrogatory limit under FRCP 33(a).

9  **INTERROGATORY NO. 27:**

10      State whether YOU had any health problems, including sickness of any kind, in January

11  2007.

12  **RESPONSE TO INTERROGATORY NO. 27:**

13      Responding Parties object Interrogatory number 27 on the grounds that it exceeds the 25

14  interrogatory limit under FRCP 33(a).

15  **INTERROGATORY NO. 28:**

16      State whether YOU had any sources of income other than social security payments in

17  January 2007 and, if YOU did, identify what the other sources of income were.

18  **RESPONSE TO INTERROGATORY NO. 28:**

19      Responding Parties object Interrogatory number 28 on the grounds that it exceeds the 25

20  interrogatory limit under FRCP 33(a).

21  **INTERROGATORY NO. 29:**

22      State all efforts, if any, YOU made to recover the fishing net that YOU contend was lost

23  from the Vessel or dock during the arrest of the Vessel.

24  **RESPONSE TO INTERROGATORY NO. 29:**

25      Responding Parties object Interrogatory number 29 on the grounds that it exceeds the 25

26  interrogatory limit under FRCP 33(a).

27

28

DAVIS WRIGHT TREMAINE LLP

**INTERROGATORY NO. 30:**

State what YOUR net earnings have been from the operation of the Vessel since it was released from arrest, including how the net earnings are calculated.

**RESPONSE TO INTERROGATORY NO. 30:**

Responding Parties object Interrogatory number 30 on the grounds that it exceeds the 25 interrogatory limit under FRCP 33(a).

Dated:  December 21, 2007

DAVIS WRIGHT TREMAINE LLP

By: _____
James P. Walsh
Gwen Danger
Attorneys for DEFENDANTS and
CLAIMANT BARRY COHEN, CHRIS
COHEN (aka CHRISTENE COHEN), the F/V
POINT LOMA and Claimant, F/V POINT
LOMA FISHING COMPANY, INC.

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES    SFO 400218v1 0084289-000001
Case No. C-07-2952-WHA

Dec-21-07   02:19pm   From-Davis Wright Tremaine     +4152788598     T-862   P.018/038   F-281

**VERIFICATION**

I, Barry A. Cohen, declare:

I am authorized to sign this Verification on behalf of Responding Parties. I have read the foregoing Responses to Plaintiffs First Set of Interrogatories to Defendants Barry and Christene Cohen and know the contents thereof, and based on information and belief, I believe the responses to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _21_ day of December, 2007 at _LAGUNA BEACH_, California.

_____
Barry A. Cohen

**PROOF OF SERVICE**

1

2      I, the undersigned, declare under penalty of perjury under the laws of the United States of

3   America that the following is true and correct:

4      I am employed in the City and County of San Francisco, State of California, in the office

5   of a member of the bar of this court, at whose direction the service was made. I am over the age of

6   eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee

7   of DAVIS WRIGHT TREMAINE LLP, and my business address is 505 Montgomery Street, Suite

8   800, San Francisco, California 94111.

9

10   I caused to be served the foregoing **DEFENDANTS BARRY COHEN, CHRIS COHEN'S (aka CHRISTENE COHEN) RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** on the parties indicated below by the following means:

11

12     **I enclosed a true and correct copy of said document in an envelope and placed it for collection and mailing with the United States Post Office on December 21, 2007, following the ordinary business practice to the following:**

13

14     Gregory W. Poulos
       Max L. Kelley
15     Cox, Wootton, Griffin,
       Hansen & Poulos LLP
16     190 The Embarcardero
       San Francisco, CA 94105
17

18     Richard P. Wagner
       The Law Offices of Richard P. Wagner
19     400 Oceangate, Suite 700
       Long Beach, CA 90802
20

21     I am readily familiar with my firm's practice for collection and processing of
22   correspondence for delivery in the manner indicated above, to wit, that correspondence will be
     deposited for collection in the above-described manner this same day in the ordinary course of
23   business.

24     Executed on December 21, 2007, at San Francisco, California.

25

26                                    Robin D. Huey

27

28

DAVIS WRIGHT TREMAINE LLP

# EXHIBIT 1

FY POINT LOMA

Bottom
60 feet   Footrope
3 feet   Breastline
Bosom hung 2½" per mesh
Guard mesh   4⅞" DBL 4mm
Single        5" stretch 4mm

60
85
25
55
170
60
55
45
85
38½
ALL BAR
2.B1P
AP

Top
78 feet   headrope
3 feet   Breastlines
Bosom hung 2½" per mesh
Single   5" stretch 4mm

60
5
11
12
42
35
57½
32
57½
42
35
64
45
85
38½
A3
A9
WRAP
2.B1P
AP

1  James P. Walsh, CSB. No. 184620
2  Gwen Fanger, CSB No. 191161
   DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone:  (415) 276-6500
   Facsimile:  (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8

9              UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12  DEL MAR SEAFOODS, INC.,                      )
                                                 )
13              Plaintiff,                       )   No. C-07-2952-WHA
                                                 )
14      v.                                       )   **DEFENDANTS' SUPPLEMENTAL**
                                                 )   **DISCLOSURES PURSUANT TO**
15  BARRY COHEN, CHRIS COHEN (aka                )   **F.R.C.P. 26(a)(1), 26(e)**
    CHRISTENE COHEN), *in personam* and,         )
16  F/V POINT LOMA, Official Number              )
    515298, a 1968 steel-hulled, 126-gross ton,  )
17  70.8 foot long fishing vessel, her engines,  )
    tackle, furniture apparel, etc., *in rem*, and )
18  Does 1-10,                                   )
                                                 )
19              Defendants.                      )
                                                 )
20  _____  )

21          Defendants Barry Cohen, Chris Cohen (aka Christene Cohen), the vessel F/V POINT

22  LOMA (the "Vessel"), and Claimant F/V Point Loma Fishing Company, Inc., (collectively,

23  "Defendants"), hereby submit their Supplemental Disclosures pursuant to Federal Rules of Civil

24  Procedure 26(a)(1) and 26(e).  These disclosures are preliminary and discovery is ongoing.

25  Defendants reserve the right to correct, amend, supplement or otherwise modify these disclosures

26  based on new information as discovery and litigation proceed.

27

28

                                               1

<u>Computation of Category of Damages.</u>

Defendants submit the following computation of damages. These computations reflect the approximate amount of damages incurred by Defendants and Defendants reserve the right to amend them. Defendants have incurred damages in the following amounts for the wrongful arrest of the Vessel:

a.    Lost fishing income, including compensation for all fixed costs for the vessel and lost net income, not including any variable costs that did not have to be paid while the vessel was tied up: $127,750.78.

b.    Attorney's fees and costs under the promissory note for foreclosing without cause: fees: $59,565.50; costs: $1,446.44[1].

c.    Lost net: estimated replacement cost $16,000.

d.    Barry Cohen's estimated costs relating to the litigation: $2,500.

Copies of documents in the Defendants' possession, custody or control that Defendants may use to support these computations are attached hereto and labeled Cohen00016-00057.


DATED:  October 12, 2007.




/s/ James P. Walsh
James P. Walsh (CSB No. 184620)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery St., Suite 800
San Francisco, CA 94111-3727
Telephone:  (415) 276-6500
Facsimile:  (415) 276-6599

Attorneys for Defendants BARRY COHEN,
CHRIS COHEN, F/V POINT LOMA and the
F/V POINT LOMA FISHING COMPANY,
INC.

---

[1] Estimated current amount.

DEFENDANTS' SUPPLEMENTAL DISCLOSURES FRCP 26(a)(1). (e)
Case No. C-07-2952-WHA

SFO 374949v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

## PROOF OF SERVICE

1

2    I, the undersigned, declare under penalty of perjury under the laws of the United States Of

3    America that the following is true and correct:

4    I am employed in the City and County of San Francisco, State of California, in the office

5    of a member of the bar of this court, at whose direction the service was made.  I am over the age

6    of eighteen (18) years, and not a party to or interested in the within-entitled action.  I am an

7    employee of DAVIS WRIGHT TREMAINE, LLP, and my business address is 505 Montgomery

8    Street, Suite 800, San Francisco, California 94111.

9    I caused to be served the foregoing **DEFENDANTS' SUPPLEMENTAL DISCLOSURES**
**UNDER FRCP 26(a)(1), 26(e)** on the parties indicated below by the following means:

10

11   **I enclosed a true and correct copy of said document in an envelope and placed it for**
**collection and mailing with the United States Post Office on October 12, 2007, following  the**
12   **ordinary business practice to the following:**

13       Gregory W. Poulos
         Max L. Kelley
14       Cox, Wootton, Griffin,
         Hansen & Poulos LLP
15       190 The Embarcadero
         San Francisco, CA 94105
16
         Mark D. Holmes
17       McKasson Klein & Holmes LLP
         600 Anton Boulevard, Suite 650
18       Costa Mesa, CA  92626

19       I am readily familiar with my firm's practice for collection and processing of
     correspondence for delivery in the manner indicated above, to wit, that correspondence will be
20   deposited for collection in the above-described manner this same day in the ordinary course of
     business.

21
         Executed on October 12, 2007, at San Francisco, California.
22

23

24                                                    Robin D. Huey

25

26

27

28

3

DAVIS WRIGHT TREMAINE LLP

# EXHIBIT 15

DAVID ALAN KOBAK     January 8, 2008

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

| | |
|---|---|
| DEL MAR SEAFOODS, INC., | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|    vs. | )   NO. C-07-2952-WHA |
| | ) |
| BARRY COHEN, CHRIS COHEN (aka | ) |
| CHRISTENE COHEN), in personam | ) |
| and, F/V POINT LOMA, Official | ) |
| Number 515298, a 1968 | ) |
| steel-hulled, 126-gross ton, | ) |
| 70.8 foot long fishing vessel, | ) |
| her engines, tackle, furniture | ) |
| apparel, etc., in rem, and | ) |
| Does 1-10, | ) |
| | ) |
|       Defendants. | ) |
| | ) |

DEPOSITION OF

DAVID ALAN KOBAK

January 8, 2008

REPORTED BY: RITA R. LERNER, CSR #3179     (2001-404169)

1

DAVID ALAN KOBAK    January 8, 2008

30

1  three miles, but I was getting ready to when the vessel
2  was arrested. The net was tied up on the deck, stacked
3  up so I could pick it up and get it off the boat and put
4  the other net back on. We were going to go make a trip
5  the next day or two after the vessel was arrested,
6  whenever the weather was good.
7      Q. So in the time period of the arrest, the big
8  net was on the deck of the vessel, ready to be
9  off-loaded?
10     A. Yes, sir.
11     Q. So it was off the spool?
12     A. Yes.
13     Q. There was another, smaller net that you would
14  use for fishing inside of three miles or in the
15  shallower water?
16     A. Well, that other net is what they call a
17  "selective flatfish trawl," and if you fish inside of
18  100 fathoms, it has to have an 8-inch roller thing on
19  the footrope. You have to have that net to fish inside
20  of 100 fathoms. 150, actually, but the RCA covers from
21  150 in to 100, so you can't fish there anyway. But I
22  can fish from the three-mile line to the 100-fathom
23  curve with that small net. I can use that small net
24  outside when I know I'm fishing for petrale. That's one
25  of the reasons we got the net. I got 70,000 pounds of

31

1  petrale with that new net when we first got it.
2      Q. When did you get that net?
3      A. That's a date I don't know, either. We got it
4  October, probably, of 2007, I would guess.
5      Q. So the net that was --
6      A. No. Actually, it was 2006; wasn't it?
7      Q. Okay.
8      A. Yeah.
9      Q. So how many times had you fished with this
10  smaller net before the vessel was arrested?
11     A. I used it for most of November and most of
12  December, and I took it off somewhere in there, but I'm
13  not real sure what dates. I have all that stuff on the
14  boat. I didn't realize I needed it; otherwise, I would
15  have brought it. So I don't know. Sorry.
16     Q. Where was -- the smaller net is the one that
17  has been alleged went missing at some time around the
18  time of the arrest?
19     A. Yes.
20     Q. So if we refer to that as the smaller net,
21  you'll understand what I'm referring to?
22     A. Yes, sir.
23     Q. So that smaller net you think was purchased or
24  obtained sometime in around October of '06?
25     A. Somewhere in that area. I'd have to look it up

32

1  to get you the exact dates, if you need them.
2      Q. Okay. Where was the smaller net when the
3  vessel was arrested?
4      A. It was on Pier 45, and there's a reason for
5  this. I'll have to tell you it's going to be a little
6  long.
7          The boat's big, as you notice, and the net that
8  I have on the boat is huge. To get that net off, I have
9  to lift it with a hook line, a hook line where the rope
10  is. I have to lift it up into the air, put the rope
11  under that, and take my truck there and pull it off on
12  Pier 45. And there's only one spot I can do that. The
13  hoist on Pier 45 will not lift that net, and it's too
14  big to put in my truck; it's huge. So I put one on
15  there and take the other one off in that same area like
16  that between the two buildings on that side of Pier 45
17  there.
18     Q. Okay. Pier 45 is not where the Point Loma was
19  berthed at the time of the arrest?
20     A. No, it's just right across from it, though.
21     Q. It's across the water?
22     A. That's right. Across the bay there, the water.
23     Q. Right. So the smaller fishing net was on a
24  dock across the water from where the Point Loma was
25  berthed?

33

1      A. Yes, sir.
2      Q. The Hyde Street Pier is essentially -- is that
3  like Pier 49, then?
4      A. I don't know. Hyde Street Pier -- that's where
5  the old boats are there. But the fish dock -- I don't
6  know. The Hyde Street Pier is where the commercial
7  fishing vessels dock down.
8          MR. POULOS: Let me have marked as Exhibit 2
9  this photograph.
10         (Whereupon, Exhibit 2 was
11         marked for identification.)
12         MR. POULOS: Q. Exhibit 2 has Bates number
13  DMSI 00066. That's the number in the lower right-hand
14  corner, for your reference. This photograph shows the
15  Point Loma; correct?
16     A. Yes, sir.
17     Q. And it shows it tied up at the Hyde Street
18  Pier; is that correct?
19     A. Yes, sir.
20     Q. And in the distance, behind the vessel, across
21  the water there is Pier 45; is that right?
22     A. Yes, sir.
23     Q. So the net, the smaller net, was not even at
24  the same pier structure as the Point Loma?
25     A. No.

9 (Pages 30 to 33)

34

1    Q.  When did the smaller net get put on Pier 45?
2    A.  I don't remember the exact date.
3    Q.  Can you tell me approximately?  Was it a month
4  before the vessel was arrested; two months?
5    A.  Several months.  Two months, at least, yeah.
6    Q.  When was the last time you had been over and
7  inspected that net over at Pier 45?
8    A.  I can see the net from the boat all the time.
9  I've got another net parked there right now at the same
10  exact spot.
11    Q.  So when was the last time before the vessel was
12  arrested that you saw that net?
13    A.  Oh, I saw that net after the vessel was
14  arrested for a while, because I went down there a few
15  times.
16    Q.  For how many days?
17    A.  It was there until whatever it was, the 21st or
18  17th of August, whenever it was when it was stolen.  Or
19  Maybe July.  I'd have to bring all the papers.  I don't
20  have it written down anywhere here.  Maybe I do.  Let me
21  look.
22        The net went missing about between 7-16 and
23  7-17.  My crew man called me up on one of those dates
24  and said they had walked down the dock there, walked by
25  the net and the net was gone, but the ground was still

35

1  wet where the net had been.  So they figured it
2  disappeared right in that area at that time.
3    Q.  So, July 16th or July 17th?
4    A.  Or July 17th.  One of those.
5    Q.  What had you done to secure the net after the
6  vessel was arrested on June 7th?
7    A.  I had done nothing to it.  It was just sitting
8  there.  It's big; it's pretty much secure on its own.
9    Q.  Are you looking at the declaration or at notes
10  of yours?
11    A.  Just some stuff I have written down, I guess.
12    Q.  Can I see that, please?
13    A.  If you can make heads or tails of it.  Barely
14  descriptive, handwritten.  Excuse me.
15    Q.  You filed a police report regarding the loss of
16  the fishing net?
17    A.  I did, yes.
18    Q.  Who did you file that report with?
19    A.  I filed it at the dock there on 7-20-07 with --
20  I can't really pronounce the guy's name.  It was one of
21  the harbor policemen down there.  Their office is right
22  there by the fuel dock, where you walk down to the boat.
23    Q.  You're looking at something there?
24    A.  I'm looking at the report thing from him, and
25  the number.  I don't know why it's written down as

36

1  "fencing" there.  I don't know what that means.
2  I explained to him what it was, and he knows.  I see him
3  all the time.
4    Q.  So this is -- what you've handed me -- and
5  we'll make a copy of this -- is a Reportee Follow-up on
6  case No. 070731796, and it's got an officer's name at
7  the bottom.  I'm not sure I can read it properly.  And
8  it's got handwritten on the side, "7-20-07."
9        It's your recollection, then, that this was the
10  date that you filed the police report?
11    A.  That's when I talked to him, yes.
12    Q.  Okay.  Do you recall when you filled out that
13  report?  Did you actually fill out a report?
14    A.  I didn't fill out anything.  This guy took
15  notes and wrote it all down.  He said on something like
16  this, you don't follow up on it or anything; you just
17  stick it in the file.
18        I told him I was looking for it.  I've been all
19  over looking for it, and I've talked to everybody around
20  there, looking for that net.  I went to a lot of trouble
21  and pissed a lot of people off.  One Italian tells me
22  that the other Italian could very well have stolen it.
23        He just took the report; that's all he did.
24  And he wrote some stuff down and said, "If you find it,
25  call me," and he'll take care of it for us.  But --

37

1    Q.  Okay.  When the vessel was arrested, you've
2  mentioned some of the personal effects that were on the
3  vessel.  After the vessel was returned, were there any
4  other things missing?
5    A.  Just what's in that report, more or less.  One
6  of the guys lost a hat, which I forgot to mention.  I
7  had a nice little pencil sharpener thing.  It's a little
8  thing; it didn't mean nothing, but it disappeared.
9        Plus the guy that was on there had a dog on
10  there.  It was kind of filthy.  The boat was really a
11  pigsty, more so than it is.  Cigar ashes all over the
12  place; the toilet was plugged up.  They had unplugged
13  the boat, unplugged into 220 there for the water heater
14  and 110 for the rest of the boat.  Had the refrigerator
15  going and a water cooler with a storage refrigerator
16  part in it.  Food was in both of those.  And they
17  unplugged it when they towed it away.  The Park
18  (inaudible word) Service towed it over to the Sugar
19  Dock.  It never got plugged back in good and all the
20  stuff was rotten.  And a guy ate our groceries and said
21  he left us $40 with a note.  I have it somewhere here,
22  but I didn't see the $40 dollars.  You know, he rifled
23  through everything on the boat and made a mess.
24    Q.  So it was a mess.  You mentioned a hat and then
25  you mentioned a report.  Can you recall what, if

DAVID ALAN KOBAK    January 8, 2008

38

1  anything, actually ultimately was not returned to you?
2      A.  I had guns on the boat, but those came back to
3  me.  But there was a pair of binoculars upstairs, pretty
4  nice binoculars, which we never did find.  I had to buy
5  a new pair, because we had to have binoculars.
6      Q.  How much were the binoculars?
7      A.  It's in there, right there.
8      Q.  In the declaration?
9      A.  Yes.  I wrote the price down there somewhere.
10      Q.  You handed me a declaration, and then on this
11  declaration -- looks like it's original with your
12  signature?
13      A.  It was, yes.
14      Q.  And then you have a bunch of handwritten notes
15  on it.
16      A.  I just wrote down some stuff that came to mine
17  as I'm reading it and thinking about coming here.
18      Q.  When did you make these notes?
19      A.  I made some today, in fact, on the back there.
20      Q.  The ones in red on the back?
21      A.  Uh-huh.
22      Q.  What about the interlineations on the
23  declaration itself?
24      A.  That's something I put on it immediately when I
25  got back, because whoever wrote it out there -- it says

39

1  8-foot or 8-inch or something -- didn't get it quite
2  straight.  I added little comments where it's in writing
3  of what it should be.
4      Q.  Who owns the area where you were storing the
5  smaller net?
6      A.  The harbor.
7      Q.  And who had given you permission to store it
8  over there?
9      A.  Hedley Prince, the harbormaster there, which I
10  found out later he shouldn't have, I guess.  But I tried
11  to talk to a lady called "Claudia Davison," and she got
12  mad at me, wasn't very nice at all; wasn't receptive to
13  the fact that it is a working fishing dock and that's a
14  fishing vessel.  And like I said, you can't take the net
15  off anywhere else unless you hire a crane and put it on
16  a flatbed truck.  I'm not equipped to do all that stuff.
17  I don't want to go that far.  But he said it was all
18  right if I set it there.
19      Q.  You don't have any reason to believe that
20  Del Mar took the smaller fishing net, do you?
21      A.  It could have been just anybody, couldn't it?
22      Q.  You don't know?
23      A.  Do you believe that Joe Cappuccio would come up
24  and take his net that he thought was his?  What do you
25  think?

40

1          I went down many trails trying to find that net
2  and I spent a lot of time doing it.  I've been to part
3  of Bodega Bay and wandered around other places, looking
4  and right up here, Pier 26, looking around in places,
5  and I've never seen hide nor hair of it.  Nobody knows
6  anything about it.  I've talked to everybody out on the
7  dock out there at one time or the other.  I got little
8  leads here and there and I pulled them out, but none of
9  them helped me.
10      Q.  How would you describe the condition of the
11  Point Loma now?
12      A.  What do you think?  It's a mess.  It's been
13  that way since I've been on it.  It's too much for me to
14  want to fix up.  If it was my boat, I might have
15  attacked it, but you can't expect me to get my crew to
16  do that kind of work on that boat five or six days a
17  week just to get it cleaned up.  It would take a long
18  time.  It's sad that it's gotten in that shape.
19      Q.  Would you agree with me that it is in an
20  advanced state of deterioration?
21      A.  Pretty much so, yes, sir.  It still works -- is
22  what my comment would be.  It still works and everything
23  works on it, and it's productive when we go fishing.
24      Q.  Is it true that there is no routine
25  maintenance, but if something breaks, you fix it?

41

1      A.  We do a certain amount of routine maintenance
2  to keep stuff from falling apart, to a point.  Like the
3  rust you see and the damage that has already been done,
4  and there's not much you can do about a lot of it.  You
5  work around it, and if stuff breaks, you have to fix it.
6      Q.  I noticed on the port's railing near the stern,
7  there's a major chunk of metal missing from the railing
8  area there.
9      A.  Yeah.
10      Q.  Is that pretty symptomatic of the condition of
11  the vessel overall?
12      A.  I hope it's not that way everywhere, like the
13  part under the water.
14      Q.  Right.  It floats?
15      A.  It floats, yes.  Haven't had any problems
16  anywhere, but we keep our survival suits or life jackets
17  available.
18      Q.  Let's take a break for just a few seconds so I
19  can go ahead and make copies of these and attach them to
20  the record.
21          MS. FANGER:  I haven't seen those yet.  Can I
22  take a look at these?
23          MR. POULOS:  Sure.  While we're doing that,
24  let's just jump ahead a minute.  We'll mark that, then,
25  as Exhibit 3.

11  (Pages 38 to 41)

# EXHIBIT 16



**MARINE SURVEYORS**
Crew & Passenger Injuries
Hull Damage & Machinery Claims
Cargo Surveys
NAMS Cert. #105204

*K.D. MOORE ASSOCIATES*

**CASUALTY INVESTIGATORS**
Construction Liability Losses
Machinery & Equipment Failures
Energy Casualties
CA Pvt. Invest. Lic. AQ007623

## SURVEY OF CONDITION AND VALUE
### OUR CASE: 16616-I
**SURVEY HELD AT THE REQUEST OF GREG POULOS, ATTORNEY, ON BEHALF OF INTERESTED PARTIES
AT THE HYDE STREET HARBOR, SAN FRANCISCO, CA; ON THE 7TH DAY OF JANUARY, 2008.**

---

### GENERAL INFORMATION

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **OWNER** | : | Barry Cohen<br>Point Loma Fishing Company, Inc. | **ADDRESS** | : | 874 W. Grand Ave.<br>Grover Beach, CA 93433 | | |
| **VESSEL NAME** | : | "POINT LOMA" | **REG. / DOC. #**<br>**IMO NUMBER** | :<br>: | 515298<br>7049354 | | |
| **MOORAGE** | : | Hyde Street Harbor, San<br>Francisco, CA | **TONS – GROSS** | : | 126 | **NET** : | 86 |
| **TYPE VESSEL** | : | Commercial Fishing Vesel | **INSPECTION ASHORE /AFLOAT** | | | : | Afloat |
| **BUILDER** | : | SIRACUSA SHIPYARD, INC.<br>Siracusaville, LA | **YEAR BUILT** | : | 1968 | | |
| **INTENDED SERVICE** | : | Bottom Trawling | | | | | |
| **EST. PRESENT VALUE** | : | $140,000 | **EST. REPLACEMENT VALUE** | : | $950,000 | | |

---

### HULL

**LENGTH - LOA** : 76'  **REG** : 70.8'  **BEAM** : 21.5'  **DRAFT** : 10'  **DEPTH** : 11.7'

| | | | |
|---|---|---|---|
| **PLANTING** | : 3/8" Welded Steel | **TRANSVERSE/LONGITUDINAL<br>FRAMING** | : 5/16-3/8 x 4" Welded Steel bar; on 2'<br>Centers |
| **DATE LAST HAULED** | : Unknown | **CONVERTED /<br>REBUILT** | : Converted from Shrimper to Trawler; Year<br>unknown |

---

### PROPULSION MACHINERY

| | | | | | | |
|---|---|---|---|---|---|---|
| **# OF ENGINES** | : | 1 | **MAKE** | : Caterpillar | **SPEED – AVG** | : 7 Knots |
| **HP (TOTAL)** | : | 670 | **MODEL** | : 3412 | **MAX** | : 9 ½ Knots |
| **SERIAL NOS** | : | 60M04036 | **FUEL** | : Diesel | **TEMP. GAUGES** | : Yes |
| **ENGINE HRS** | : | Unknown | | | **TYPE EXHAUST** | : Dry Stack |
| **OVHL DATE** | : | Unknown | | | | |
| **TURBOCHARGED** | : | Yes | | | **KEEL COOLER** | : Yes |
| **BILGE PUMPS** | : | 3 hp Electric | | | | |

---

## UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
### PAGE 2 of 5 / JANUARY 11, 2008

### ELECTRICAL SYSTEM

| | | | | | | |
|---|---|---|---|---|---|---|
| GENERATOR MAKE | : CT 3304 | HOURS | : Unknown | RATING | : | 65 KW |
| BATTERIES | : 4 HD | CHOCKED | : Yes | COVERED | : | Yes |
| WIRING | : Adequate | FUSED/BKR | : Circuit Breakers | WIRED FOR | : | 220 / 110 v |
| RUNNING LIGHTS USCG APPROVED | | | : Yes | | | |

### TANKS AND FUEL LINES

| | | | | | |
|---|---|---|---|---|---|
| NO. OF FUEL TANKS | : 2 | SHUT-OFF VALVES ACCESSIBLE | : | Yes | |
| TOTAL FUEL CAPACITY | : Est.10,000 gallons | EQUIPPED WITH VENT LINES | : | Yes | |
| SHAPE | : Integral with hull | LOCATION OF FUEL LINES | : | Under deck; protected | |
| CONDITION | : No Leaks Noted | | | | |
| NO. OF WATER TANKS | : 1 | VENTS OVERBOARD | : | Yes | |
| TOTAL WATER CAPACITY | : 7,000gallons | | | | |

### ALARM SYSTEMS

**Alarm Panel on Bridge with the following Audio/visual Alarms:**

Main Water Level
Main Oil Pressure
Main Water Temperature
Auxiliary Water Level
Auxiliary Oil Pressure
Auxiliary Water Temperature
Hydraulic Tank Level
Engine room Bilge Alarm
Fish Hold Bilge Alarm
Lazarette Bilge Alarm
Fire
Gear Pressure

### GALLEY

| | | | | | | |
|---|---|---|---|---|---|---|
| TYPE OF STOVE | : AC Electric | MAKE | : Admiral | SECURED | : | Yes |
| VENTILATION | : Adequate | | | OTHER | : | GE Microwave |
| | | | | | | Toaster |
| | | | | | | Coffee maker |
| | | | | | | Hot plate |
| | | | | | | Magic Chef Refrigerator |
| | | | | | | Stainless Steel Double Sink |
| | | | | | | Orion CCD-TV |

UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
PAGE 3 of 5 / JANUARY 11, 2008

## FIRE AND SAFETY

| | | | | |
|---|---|---|---|---|
| NO. OF EXTINGUISHERS | : 5 | TYPE / SIZE | : | 5lb & 10lb ABC Dry Chemical |
| DATE LAST INSP. | : 27 September 2007 | LOCATION | : | Throughout vessel; Bridge, Main Passage, Engine room |

| | | | |
|---|---|---|---|
| LIFE PRESERVERS | : 4 Adult | LOCATION : Staterooms | |
| OTHER RAFTS | : 1 "Zodiac" | TYPE : 4 person, inflatable | LOCATION : Top of Pilot House |

| | | | |
|---|---|---|---|
| SURVIVAL SUITS | : 4 | LOCATION : Staterooms | FIRST AID KIT : yes |
| EPIRB | : Yes | LOCATION : Top of Pilot House | FLARES : Yes |
| RING BUOYS | : 2 | NO. WITH LIGHT : 0 | NO. WITH LINE : 2 |

## DOCK AND GROUND TACKLE

NO. OF ANCHORS  :  1                              TYPE/SIZE  :  Stockless; estimated 300lb

WINDLASS  :  See comments

## VESSEL LAYOUT

**MAIN DECK:**
A. Fore Deck
B. Pilot house
C. Galley
D. Starboard Forward Stateroom
E. Portside Head and Shower
F. Starboard Amidships Stateroom
G. Starboard Aft Stateroom
H. Aft Fish Deck

**LOWER DECK:**
A. Forepeak
B. Forward Storage and Shop
C. Engine Room
D. Fish holds
E. Lazarette

## FISHING EQUIPTMENT

Masts- (2) 8" Diameter Steel Pipes
Boom- (1) 6" Diameter Steel Pipe
(1) Hydraulic Boom Hook Winch
(2) Hydraulic Drag Winches with 5/8" Wire Rope Drag Lines
(2) Steel Drag Doors
(2) Hydraulic Net Reels
(1) Large Drag Net on Aft Reel
(No Net on Forward Reel)

UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
PAGE 4 of 5 / JANUARY 11, 2008

## NAVIGATION / ELECTRONIC EQUIPMENT

**PILOT HOUSE:**

FURUNO Multi-scale Partition LP-1000
FURUNO XBX Radio Beacon Receiver
RDI Bridgewatch timer device
FURUNO GPS Navigator GP 50 mk 2
COMNAV Marine 2001 Auto Pilot
FURUNO GaAs Radar display
Standard horizon hailer
FURUNO SSB Transceiver FS-1503
West Marine VHF 600 DSC Radio
FURUNO Color Video Sounder FCV-1000
FURUNO Color Sonar
Desktop PC
NEWMAR 115-24-15R Radar
(2) Orion CCD for cameras 2& 3 on deck
Barometer / clock/ hydrometer
DIRIGO gimbaled Compass
Auxiliary Autohelm Compass
Gages; oil pressure, oil temperature, Engine RPM, Water temperature, Rudder RPM
COMNAV Rudder Angle Indicator

*Note: Some obsolete Electronic Equipment observed in pilot house; fastened to bulkheads but not in use.*

## SURVEYORS COMMENTS

- In general, the vessel was found to be functional. However, the maintenance condition was very poor. The Captain advised this Surveyor at attendance that if something failed he would fix it to function. But, there was no preventive maintenance authorized. Most significantly he did not know when the vessel was last hauled nor hours of when the engines were last overhauled.

- The interior below deck surface are in exceptionally poor condition with heavy rust.

- The exterior coatings are rusting and do not appear to have been painted for some years.

- The bulwark rails are rusted through.

- The hydraulic hoses on all equipment are leaking and in need of replacement.

- The anchor windlass does not function and the wire rope rode is heavily rusted.

- This surveyor observed no evidence of preventive maintenance for several years.

Enclosure: Photographs (5 pages)

UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-1
PAGE 5 of 5 / JANUARY 11, 2008

### THIS SURVEY IS IS NOT A CONDITION
### OF SALE OR TITLE TRANSFER
--------------------------------------------------

This survey sets forth the apparent condition of the vessel, including hull, machinery, equipment and fittings and gear to the best of the surveyor's ability without borings, removal of bulkheads, panelings, ceilings or other portions of her structure without climbing masts or inspections of spars above that normally visible from the deck and without the operation or opening of her machinery, electronics or auxiliaries for internal examination of their operation for performance study; nor was any evaluation made of the vessel's stability. It represents the surveyor's honest and unbiased opinion, but in submitting this survey, it is understood by all parties concerned that this is survey is not to be considered a guarantee of its accuracy, nor does it create any liability on the part of the surveyor or his employers arising out of the reliance on information in this survey.



DATE: 01/11/08

Ken Moore, Marine Surveyor

/frc
/16616C&V

KENNETH D. MOORE
No.
105-204

VESSEL    : F/V "POINT LOMA"                    OUR CASE: 16616-I
**The following photographs were taken by Surveyor Ken Moore, while in attendance at Hyde Street Harbor, San Francisco, CA on 01/07/08.**

1.  View of Port Bow;



2.  View Starboard Bow;



3. View Fore deck; note advanced corrosion on pipe rail.



4. View of forward anchor windlass; non-functioning.



5.  View of mooring cleat; note advanced corrosion, typical of all fittings and fixtures aboard vessel.



6.  Typical view of hydraulic apparatus, fittings, and manifolds; note advanced corrosion.



7. View of overhead in engine room; note advanced corrosion through deck plating.



8. View of Generator; condition typical of all internal machinery.



9.  View Fish Hold;



10. Typical view of overhead in fish hold; note advanced corrosion to all ferrous components.



/Bc
/16616pho01.07.08

# EXHIBIT 17

**Acordia of Oregon, Inc.**

P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

**POLICY NO. YA-03253**

# POLICY OF INSURANCE
### (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

| | |
|---|---|
| Assured: | BARRY COHEN<br>C/O OLD POINT FISHERIES<br>P.O. BOX 40, AVILA BEACH, CA. 93424 |
| For account of: | HIMSELF |
| Loss, if any, payable to: | ASSUREDS OR ORDER |
| Total amount insured: (100%) | $250,000.00 H&M/$1,000,000.00 P&I |
| Interest: | HULL & MACHINERY/PROTECTION & INDEMNITY |
| Vessel(s): | F/V "POINT LOMA" |
| At and From: | NOVEMBER 23, 2003,  Noon, Pacific Standard Time to<br>NOVEMBER 23, 2004  Noon, Pacific Standard Time. |

Conditions: (as per form and endorsement attached)
   TRADING/LAY UP WARRANTY, INSTITUTE SERVICE OF SUIT;/BROKERS AND/OR AGENTS CANCELLATION CLAUSE/LIEN CLAUSE; FISHING VESSEL CLAUSES;P&I FISHING VESSEL CLAUSES; INSTITUTE EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION END.,TRIA END;INSTITUTE CHEMICAL, BIOLOGICAL, BIO-CHEMICAL,ELECTROMGNETIC WEAPONS & CYBER ATTACH EXCLUSION CLAUSE;  AMERICAN INSTITUTE HULL CLAUSES;POLLUTION EXCLUSION;SP-38 P&I CLAUSES;PREMIUM FINANCE END;TRIA EXCLUSION;

| | | | |
|---|---|---|---|
| Amount Insured Hereunder: | $250,000.00 H&M<br>$1,000,000.00 P&I | RATE: | 3.45%<br>AGREED |
| PREMIUM | $ 8,625.00 H&M<br>$14,700.00 P&I | DEDUCTIBLE | $10,000<br>$5,000 |

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at **Newport, Oregon** this **23RD** day of NOVEMBER, 2003.

POLICY          YA-03253

INSURED         BARRY COHEN

VESSEL          "POINT LOMA"

ENDORSEMENT     12

EFFECTIVE       DECEMBER 23, 2003

IN CONSIDERATION OF PREMIUMS CHARGED, IT IS HEREBY UNDERSTOOD
AND AGREED THAT THE EFFECTIVE DATES ON THE "DEC PAGE",
ENDORSEMENT 10 AND LINES 21 AND 22 CF THE AMERICAN INSTITUTE
HULL CLAUSES ARE CORRECTED TO READ FROM:  "DECEMBER 23, 2003,
NOON, PACIFIC STANDARD TIME TO DECEMBER 23, 2004, NOON, PACIFIC
STANDARD TIME".

BY: _____    #PP1893/03
    SUNDERLAND MARINE THRU A.E.S.


BY: _____    #03-0269A
    SUNDERLAND MARINE THRU H.M.U.




ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
SK 1/20/04

Acordia of Oregon, Inc.

1231-A SE Bay Boulevard
P.O. Box 1610
Newport, OR 97365
(541) 265-4500 • Fax: (541) 265-4262
Toll Free Call (800) 451-9850





# CERTIFICATE OF INSURANCE
## American E & S Insurance Brokers
### Seattle

**OP03 2117**

RENEWAL OF:
NEW

**THIS IS TO CERTIFY THAT** American E & S Insurance Brokers in accordance with authorization granted them have procured insurance as hereinafter from: **Underwriters at Lloyd's, London - 100%**

| | |
|---|---|
| PREMIUM: | $589.00 |
| POLICY FEE: | $125.00 |
| TOTAL: | $714.00 |

**ASSURED:** Barry Cohen
C/o Old Point Fisheries

**ADDRESS:** P O Box 40 ,
Avila Beach, CA 93424

**POLICY PERIOD:** From: <u>December 23, 2003</u>   To: <u>December 23, 2004</u>
Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED: AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that American E & S Insurance Brokers is not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

   If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to American E & S Insurance Brokers. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by American E & S Insurance Brokers in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of American E & S Insurance Brokers endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by American E & S Insurance Brokers

Dated at Seattle, WA this  23rd  day of  December 2003

By _____
*American E & S Insurance Brokers*

AES-CERT 5/02

COHEN
754

# ACORDIA OF OREGON, INC.

P.O. Box 1610  *  Newport, Oregon  97365   1-800-451-9850 * Fax: (541) 265-4262
1231-A S.E. Bay Boulevard, Newport, Oregon, 97365

**POLICY NO: YA-04242**

# POLICY OF INSURANCE

### (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names.  All subject to the terms and conditions of the forms and endorsements attached herein:

Assured:

~~BARRY COHEN~~  *F/U Point Loma Fishing Co, Inc*
C/O OLD POINT FISHERIES            *end #15*
P.O. BOX 40
AVILA BEACH, CA.  93242

For account of:               HIMSELF

Loss, if any, payable to:      ASSURED OR ORDER

Total amount insured: (100%)   $250,000 H&M/$1,000,000 P&I

Interest:                      HULL & MACHINERY / PROTECTION & INDEMNITY

Vessel(s):                     F/V "POINT LOMA"

At and From:                   DECEMBER 23, 2004, NOON, LOCAL TIME to
                               DECEMBER 23, 2005 NOON, LOCAL TIME

Conditions: (as per form and endorsement attached) SP-38 P&I CLAUSES;P&I FISHING VESSEL CLAUSES;TRIA EXCLUSION;CL 370;CL380;ASBESTOS EXCLUSION;POLLUTION EXCLUSION;EXCESS COLL. END;SERVICE OF SUIT CLAUSE;FISHING VESSEL CLAUSES;AMERICAN INSTITUTE HULL CLAUSES; CANCELLATION/LIEN CLAUSES;PREMIUM FINANCE END;TRADING WARRANTY/LAY UP WARRANTY; UNITED STATES ECONOMIC AND TRADE SANCTIONS CLAUSE;

Amount Insured Hereunder:      $250,000.00 H&M
                               $1,000,000.00 P&I          RATE:  3.45%
                                                                 AGREED

           Premium:            $8,625.00H&M
                               $14,700.00 P&I             Deductible: $10,000.00
                                                                      $5,000.00

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein.  It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at *Newport, Oregon* this 23RD day of *DECEMBER 2004.*

tample' 'HC

Page 20

**CERTIFICATE OF INSURANCE**

RENEWAL OF:
OP03 2117

*American E & S Insurance Brokers*
*Seattle*

CERTIFICATE NO.
**OP04 3127**

**THIS IS TO CERTIFY THAT American E & S Insurance Brokers in accordance with authorization granted them**
**have procured insurance as hereinafter from:    Underwriters at Lloyd's, London - 100%**

ASSURED:  Barry Cohen
C/o Old Point Fisheries

ADDRESS:
P O Box 40 ,
Avila Beach, CA 93424

| | |
|---|---|
| PREMIUM: | $648.00 |
| POLICY FEE: | $125.00 |
| TOTAL: | $773.00 |

**POLICY PERIOD:**      From:  December 23, 2004      To:  December 23, 2005
Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED:  AS PER ATTACHED FORMS**

1.
It is expressly understood and agreed by the Assured by accepting this instrument that American E &S Insurance Brokers is not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2.
If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to American E &S Insurance Brokers. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by American E &S Insurance Brokers in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of American E &S Insurance Brokers endorsed hereon.

4.
This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions

5. stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by American E &S Insurance Brokers

Dated at Seattle, WA this  December 8, 2004

AES-CERT 5/02

By _____

*American E & S Insurance Brokers*

COHEN
756




# Acordia of Oregon, Inc.

P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO. YA-**05252**

# POLICY OF INSURANCE
### (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein,
severally but not jointly, do hereby insure the assured named herein, for the amounts and
proportions, set opposite their respective names. All subject to the terms and conditions of the forms
and endorsements attached herein:

Assured:        **F/V POINT LOMA FISHING CO., INC.**
             **C/O OLD POINT FISHERIES**
             **P.O. BOX 40**
             **AVILA BEACH, CA. 93242**

For account of:      **THEMSELVES**

Loss, if any, payable to:    ASSURED OR ORDER

Total amount insured: (100%)     $250,000 H&M/$1,000,000 P&I

Interest:         HULL & MACHINERY AND PROTECTION & INDEMNITY

Vessel(s):          **"POINT LOMA"**

At and From:       **DECEMBER 23, 2005   Noon, Local Time to**
               **DECEMBER 23, 2006, Noon, Local Time**

Conditions: (as per form and endorsement attached) TRADING & LAY UP
WARRANTY; FISHING VESSEL CLAUSES; BROKERS &/OR AGENTS CANCELLATION
CLAUSE; SERVICE OF SUIT CLAUSE; LIEN CLAUSE; CL380; CL370; ASBESTOS
EXCLUSION; TRIA EXCLUSION; POLLUTION EXCLUSION CLAUSE; AMERICAN
INSTITUTE HULL CLAUSES; P&I FISHING VESSEL CLAUSES; SP-38 P&I CLAUSES;
EXCESS COLLISION END; PREMIUM FINANCE END; U.S. ECONOMIC & TRADE
SANCTIONS CLAUSE.

Amount Insured Hereunder:     **$250,000.00 H&M**       **RATE:**   3.45 %
                            **$1,000,000.00 P&I**        **AGREED**

PREMIUM            **$8,625.00 H&M**      **DEDUCTIBLE: $10,000**
                    **$14,700.00 P&I**                       **$5,000**

Any provisions required by law to be stated in policies issued by any company subscribing hereto,
shall be deemed to have been stated herein. It is further agreed that each of the companies will
issue their individual policies in accord with the terms described herein, upon demand by the
Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed
by a duly authorized officer, attorney, or agent at **Newport, Oregon** this 23RD day of
DECEMBER, **2005**.

Seattle                                                    **OP05 4146**

**IS IS TO CERTIFY THAT Salvus Bain Management (USA) LLC** in accordance with authorization granted
m have procured insurance as hereinafter from:        **Underwriters at Lloyd's, London - 100%**

SURED:   F/v Point Loma Fishing Company, Inc.

| | |
|---|---|
| **PREMIUM:** | $648.00 |
| **POLICY FEE:** | $125.00 |

DRESS:   P O Box 40 ,
Avila Beach, Ca, 93424

| | |
|---|---|
| **TOTAL:** | **$773.00** |

LICY PERIOD:        From:  December 23, 2005      To:  December 23, 2006
Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

TEREST COVERED:  **AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that Salvus Bain Management (USA) LLC in not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to Salvus Bain Management (USA) LLC. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by Salvus Bain Management (USA) LLC in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of Salvus Bain Management (USA) LLC endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

is Certificate shall not be valid unless signed by Salvus Bain Managment (USA) LLC

ated at Seattle, WA this  December 8, 2005

By  _[signature]_

S-Ch___ 5/02                                                Salvus Bain Management (USA) LLC

COHEN 758

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              4617
CONNECTION TEL                    14152786599
CONNECTION ID
ST. TIME              08/21 08:40
USAGE T               02'04
PGS. SENT                3
RESULT                OK
```



**Wells Fargo Insurance Services of Oregon, Inc.**

# Fax Transmittal Sheet

1231-A SE Bay Boulevard
P.O. Box 1610
Newport, OR 97365
541.265.4500 / 800.451.9850
541.265.4262 Fax

| To: | BUD WALSH | From: | SUE KEESEE |
|---|---|---|---|
| Date: | August 21, 2007 | Time: | 8:31 AM |
| Location: | | RE: | F/V POINT LOMA FISHING |
| | | | CO. INC F/V "POINT LOMA" |
| Fax Number: | 415 276 6599 | Number of Pages: | 3 (Including Cover Page) |

**Comments:** DEAR MR. WALSH:

TO FOLLOW ARE COPIES OF THE DEC SHEETS FOR THE INSURANCE ON THE F/V "POINT LOMA". THE ACCOUNT IS PAID IN FULL.

PLEASE LET ME KNOW IF YOU NEED ANYTHING MORE.

SINCERELY,

SUE KEESEE

# *A*cordia of Oregon, Inc.

P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO. YA-06260

# POLICY OF INSURANCE

(Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

**Assured:**

> **F/V POINT LOMA FISHING CO., INC.**
> **C/O OLD POINT FISHERIES**
> P.O. BOX 40
> AVILA BEACH, CA. 93242

For account of:          **THEMSELVES**

Loss, if any, payable to:      ASSURED OR ORDER

Total amount insured: (100%)      $250,000 H&M/$1,000,000 P&I

Interest: .          HULL & MACHINERY AND PROTECTION & INDEMNITY

Vessel(s):          "POINT LOMA"

At and From:          **DECEMBER 23, 2006   Noon, Local Time to**
                     **DECEMBER 23, 2007, Noon, Local Time**

Conditions: (as per form and endorsement attached)TRADING & LAY UP WARRANTY;FISHING VESSEL CLAUSES; BROKERS &/OR AGENTS CANCELLATION CLAUSE;SERVICE OF SUIT CLAUSE; LIEN CLAUSE;CL 380;CL 370;ASBESTOS EXCLUSION; TRIA EXCLUSION;POLLUTION EXCLUSION CLAUSE;AMERICAN INSTITUTE HULL CLAUSES;P&I FISHING VESSEL CLAUSES;SP-38 P&I CLAUSES;U.S. ECONOMIC & TRADE SANCTIONS CLAUSE;EXCESS COLLISION END;PREMIUM FINANCE END.

| Amount Insured Hereunder: | $250,000.00 H&M<br>$1,000,000.00 P&I | **RATE:**   3.45%<br>AGREED |
|---|---|---|
| PREMIUM | $8,625.00 H&M<br>$15,900.00   P&I | DEDUCTIBLE: $10,000 H&M<br>$5,000 P&I |

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at **Newport, Oregon** this 23RD day of DECEMBER, 2006.

COHEN
760.

# CERTIFICATE OF INSURANCE

**Salvus Bain Management (USA) LLC**

*Seattle*

RENEWAL OF:
OP05 4146

CERTIFICATE NO.
**OP06 5158**

THIS IS TO CERTIFY THAT **Salvus Bain Management (USA) LLC** in accordance with authorization granted them have procured insurance as hereinafter from: **Underwriters at Lloyd's, London - 100%**

**ASSURED:**   F/V Point Loma Fishing Company, Inc.
c/o Old Point Fisheries

**ADDRESS:**   P O Box 40 ,
Avila Beach, CA 93424

| | |
|---|---|
| PREMIUM: | $646.00 |
| POLICY FEE: | $125.00 |
| **TOTAL:** | **$771.00** |

**POLICY PERIOD:**   From: December 23, 2006   To: December 23, 2007
Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED:   AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that Salvus Bain Management (USA) LLC is not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to Salvus Bain Management (USA) LLC. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by Salvus Bain Management (USA) LLC in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of Salvus Bain Management (USA) LLC endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by Salvus Bain Managment (USA) LLC

Dated at Seattle, WA this   December 13, 2006

AES-CERT 5/02

By _____

Salvus Bain Management (USA) LLC

©COPY

COHEN
761

*Wells Fargo Insurance Services of Oregon, Inc.*
P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO. YA-07264

# POLICY OF INSURANCE
## (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

**Assured:**

F/V POINT LOMA FISHING CO., INC.
C/O OLD POINT FISHERIES
P.O. BOX 40
AVILA BEACH, CA. 93242

For account of: **THEMSELVES**

Loss, if any, payable to: ASSURED OR ORDER

Total amount insured: (100%)     $250,000 H&M/$1,000,000 P&I

Interest: HULL & MACHINERY AND PROTECTION & INDEMNITY

Vessel(s): "POINT LOMA"

.t and From:
DECEMBER 23, 2007  Noon, Local Time to
DECEMBER 23, 2008, Noon, Local Time

Conditions: (as per form and endorsement attached) TRADING & LAY UP WARRANTY;FISHING VESSEL CLAUSES; BROKERS &/OR AGENTS CANCELLATION CLAUSE;SERVICE OF SUIT CLAUSE; LIEN CLAUSE;CL 380;CL 370;ASBESTOS EXCLUSION; TRIA EXCLUSION;POLLUTION EXCLUSION CLAUSE;AMERICAN INSTITUTE HULL CLAUSES;P&I FISHING VESSEL CLAUSES;SP-38 P&I CLAUSES;U.S. ECONOMIC & TRADE SANCTIONS CLAUSE;EXCESS COLLISION END;PREMIUM FINANCE END.

Amount Insured Hereunder:
$250,000.00 H&M
$1,000,000.00 P&I                    **RATE:**  3.45%
                                               **AGREED**

PREMIUM
$8,625.00 H&M
$15,900.00  P&I          DEDUCTIBLE:  $10,000 H&M
                                               $5,000 P&I

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at Newport, Oregon this 23RD  day of DECEMBER, 2007.

# CERTIFICATE OF INSURANCE

### Salvus Bain Management (USA) LLC

*Seattle*

RENEWAL OF:
OP06 5158

OP07 6159

**THIS IS TO CERTIFY THAT** Salvus Bain Management (USA) LLC in accordance with authorization granted them have procured insurance as hereinafter from: **Underwriters at Lloyd's, London – 100%**

| | |
|---|---|
| PREMIUM: | $775.00 |
| POLICY FEE: | $125.00 |
| **TOTAL:** | **$900.00** |

**ASSURED:** F/V Point Loma Fishing Company, Inc.
c/o Old Point Fisheries

**ADDRESS:** Po Box 40
Avila Beach, CA 93242

**POLICY PERIOD:** From: <u>December 23, 2007</u>   To: <u>December 23, 2008</u>
Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED: AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that Salvus Bain Management (USA) LLC in not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to Salvus Bain Management (USA) LLC. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by Salvus Bain Management (USA) LLC in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of Salvus Bain Management (USA) LLC endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by Salvus Bain Managment (USA) LLC

Dated at Seattle, WA this  December 10, 2007

By _____

Salvus Bain Management (USA) LLC

AES-CERT 5/02



# EXHIBIT 18

1    James P. Walsh, CSB. No. 184620
2    Gwen Fanger, CSB No. 191161
    DAVIS WRIGHT TREMAINE LLP
3    505 Montgomery Street, Suite 800
    San Francisco, California 94111-3611
4    Telephone: (415) 276-6500
    Facsimile:  (415) 276-6599
5    budwalsh@dwt.com

6    Attorneys for Defendants and Claimant
    BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7    Claimant, F/V POINT LOMA Fishing Company, Inc.

8

9                 UNITED STATES DISTRICT COURT

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

| | |
|---|---|
| 12   DEL MAR SEAFOODS, INC.,         ) | |
| 13              Plaintiff,   ) | No. C-07-2952-WHA |
| 14       v.                 ) | **DECLARATION OF BARRY A. COHEN IN SUPPORT OF DEFENDANTS' MOTION TO VACATE ORDER OF ARREST** |
| 15   BARRY COHEN, CHRIS COHEN (aka   ) | |
|     CHRISTENE COHEN), *in personam* and,   ) | |
| 16   F/V POINT LOMA, Official Number   ) | **Date: August 16, 2007** |
|     515298, a 1968 steel-hulled, 126-gross ton,  ) | **Time: 8:00 a.m.** |
| 17   70.8 foot long fishing vessel, her engines,  ) | **Place: Courtroom 9, 19th Floor** |
|     tackle, furniture apparel, etc., *in rem*, and  ) | |
| 18   Does 1-10,                  ) | |
| 19            Defendants.   ) | |

20

21       I, Barry A. Cohen, declare as follows:

22       1.      I am a resident of the State of California and currently reside in Santa Maria,

23   California. I am a named Defendant in this lawsuit. I make this declaration in support of

24   Defendant's Motion to Vacate Order of Arrest. The facts set forth in this declaration are

25   personally known to me to be true and, if called as a witness, I could and would testify to the

26   following:

27       2.      For most of my adult life, I have been engaged in various aspects of the fishing

28

                           1

*(vertical left margin)* DAVIS WRIGHT TREMAINE LLP

1  industry in California, including in the processing sector and in owning and operating fishing

2  vessels. I have been engaged in the fisheries business in California for over 40 years.

3      3.      For at least 10 years, I have done business with the Plaintiff in this case, Del Mar

4  Seafoods, Inc. ("Del Mar"). In fact, from 2004 until 2006, I was employed by Del Mar in its

5  processing plant at Watsonville, California and was paid $2,000 a week. The company also

6  asked me to help deal with issues at its processing plant in Astoria, Oregon in 2006, which I did.

7  Upon my return from Oregon, I was let go in October 2006 because I was told by Joe Cappuccio

8  that the company no longer wished to be in the groundfish business. I had been told by Joe

9  Roggio, prior to moving from Cambria, California to Aptos, California in 2004, that I could have

10  a job with Del Mar as long as I wanted if I moved up there to work for them.

11      4.      In February 1999, Del Mar and I formed a joint venture, the purpose of which was

12  to buy, process, and sell fish from a site I leased at the Port San Luis Pier in Avila Beach,

13  California. Del Mar agreed to fund the joint venture and I supplied a processing crew, access to

14  fishing vessel production, and sales relationships. In 2001, or thereabouts, Del Mar and I began

15  planning for a new joint venture in Mexico, using the F/V POINT LOMA. In this context, I was

16  dealing with Joe Cappuccio, the President of Del Mar. Del Mar had advanced funds to me to

17  upgrade the F/V POINT LOMA as part of an anticipated 50/50 partnership in the Vessel. The

18  agreement for this 50/50 partnership was oral. Later that year, because Del Mar did not want to

19  continue the 50/50 partnership, but had provided funds to upgrade the vessel, we agreed to turn

20  Del Mar's contributed funds into a loan.

21      5.      About two years later, in 2003, Del Mar requested that we provide security for this

22  prior loan. We then entered into a Promissory Note with Del Mar to make arrangements to repay

23  the company over an extended period of time. We also entered into a Ship Mortgage with Del

24  Mar as security for repayment of the loan amount of $215,000. In the transaction, we were not

25  represented by counsel. Del Mar's attorneys drafted the Promissory Note and Ship Mortgage.

26  The entire purpose of the financing arrangement was to provide security for repayment of the

27  funds used to upgrade the vessel, and no other.

28

DAVIS WRIGHT TREMAINE LLP

2

6.    Chris Cohen and I are still married and I am acting in this case as agent for the interests of the marital community. My wife currently resides in Arizona.

7.    In 2004, we transferred, the ownership of the F/V POINT LOMA to a Subchapter S corporation, the F/V Point Loma Fishing Company, Inc., of which I am the President and manager and in which my wife and I own the stock 50/50. The F/V POINT LOMA remains subject to Del Mar's Ship Mortgage. Attached as Exhibit A to this declaration is a true copy of the vessel's current documentation certificate issued by the U.S. Coast Guard. I am acting in this case as the agent for the owner of the vessel, the F/V Point Loma Fishing Company, Inc.

8.    The F/V POINT LOMA engages in the groundfish fisheries located outside the State of California and in the U.S. Exclusive Economic Zone ("EEZ")(from three to 200 nautical miles) and is licensed to land its catch only in the State of California. The vessel's home port is Port San Luis, California. I have never used the vessel to fish anywhere except in the EEZ off California. At no time have I ever threatened to move the vessel to another state or another part of California, nor could I do so very easily without obtaining new licenses and new markets.

9.    A special limited entry permit is required to engage in the Pacific Groundfish Fisheries off California regulated by the National Oceanic and Atmospheric Administration ("NOAA") in the U.S. EEZ. However, unlike most other such permits, the NOAA permit is issued not to the vessel but to a person qualifying as the owner of the permit. The NOAA permit has been issued to, and is owned by, the F/V Point Loma Fishing Company, Inc. Attached as Exhibit B is a copy of the NOAA permit held by the company. The permit may be used on the F/V POINT LOMA or it may be transferred to another vessel of similar length.

10.    The Promissory Note and Ship Mortgage do not cover the NOAA permit for at least two reasons. First, neither the Promissory Note nor the Ship Mortgage contains language that includes the NOAA permit as security. Second, and more importantly, NOAA does not recognize the existence of liens against such permits. Attached as Exhibit C is a copy of a letter from NOAA confirming this position. Thus, I have never agreed to provide Del Mar a security interest in this NOAA permit.

3

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

*(handwritten marginal note: "notes from meeting")*

*(handwritten marginal note: "docs evid reflecting memorializing understanding")*

DAVIS WRIGHT TREMAINE LLP

11.     In December of 2004, while I was working for Del Mar, I made a $5,000 payment on the Promissory Note. Attached as Exhibit D is the check representing this payment. At the end of 2005, Joe Cappuccio and Joe Roggio, in a meeting, told me that Del Mar's bank, which provided a credit line to the company, had expressed concern about the size of the loan for the F/V POINT LOMA. Joe Cappuccio asked me to make a large advance payment on the loan. Later, Joe Roggio told me at another meeting that, if I made the advance payment, he would see to it that the vessel loan with Del Mar would be interest free. Because of this promise and understanding, we took out a home equity loan on our house and paid Del Mar $175,000, with the expectation that no interest would be due on the Promissory Note and that the payment comprised advance monthly payments into the future. The payment date was November 10, 2005. Attached as Exhibit E is the check for this advance payment on the Promissory Note. It was my understanding that this payment (and the earlier one) reduced the total amount of the debt from $215,000 to $35,000; that monthly payments were covered well into the future; and that no interest would be due on payment of the remaining amount. When I delivered the check to Joe Cappuccio, I told him I would pay the rest as soon as I can. In response, he said it was now such a small amount that he was not concerned about it any more, which reinforced by understanding that I had made advance payments on the Note.

12.     Within a month or so after this advance payment, I recall receiving a piece of paper which purported to be a Schedule of Payments from Joe Roggio. Attached as Exhibit F is the copy of the document I received from Joe Roggio. The Schedule contains references to various debts not related to the Promissory Note. I looked it over and told him this does not look right to me. He said he was just "cleaning up the books." I didn't want to tell him how to keep his books but I did not tell him that the $175,000 payment could be applied to anything other than the Promissory Note, nor did I agree with any of the amounts listed in his Schedule of Payments. For certain, he did not expressly ask if I was agreeable to applying the $175,000 to these other debts or to treating the other debts as "advances" under the Promissory Note, which would then be secured by the Ship Mortgage.

4

13.    After I was let go by the company in October 2006, I asked Joe Roggio to let me know where I stood with the company. He then gave me a newer revised version of the Schedule of Payments, probably in December 2006. That new Schedule showed new debts called "Olde Port Balance, Point Loma Balance, and Fees for Olde Port Case." I, again, never agreed that these amounts would be treated as "advances" under the Promissory Note, to be secured by the Ship Mortgage, nor did I ever agree that they were correct in any way.

14.    I made additional payments on the Promissory Note in January ($2,000), February ($3,000) and March ($3,000), 2007. Attached as Exhibit G are the checks that represent those payments. I did so after being asked by Joe Roggio to make payments on what I owed, but did not specify any amount or for what.

15.    The seizure of the F/V POINT LOMA on June 7, 2007 came as a complete shock to me. I never received any prior notice, orally or written, from Del Mar that I had to make any monthly payments or owed any interest after the advance payment was made in November 2005 or the vessel would be seized. It has always been my understanding that the advance payments made me current on the Note through February 2009.

16.    The seizure of the vessel has completely disrupted its operations. At present, I am losing at least $20,000 a month in gross sales for the vessel. I have been trying to keep the captain, Dave Kobak, and the two crew members available so that I can take the vessel fishing as soon as possible, paying about $2,000 a week to date. The vessel is my only source of income at present, other than my Social Security payments.

17.    I believe that the seizure of the Vessel is unfair and unnecessary and not consistent at all with my agreements with Del Mar.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED this 9th day of July, 2007.

/s/ *Barry A. Cohen*
Barry A. Cohen

DAVIS WRIGHT TREMAINE LLP

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

# Exhibit A

DHS, USCG, CG-1270 (REV. 06-03)

OMB APPROVED
2115-0110

# UNITED STATES OF AMERICA

## DEPARTMENT OF HOMELAND SECURITY
### UNITED STATES COAST GUARD

### NATIONAL VESSEL DOCUMENTATION CENTER

# *CERTIFICATE OF DOCUMENTATION*

| VESSEL NAME | OFFICIAL NUMBER | IMO OR OTHER NUMBER | YEAR COMPLETED |
|---|---|---|---|
| POINT LOMA | 615298 | 7049354 | 1968 |

| HAILING PORT | HULL MATERIAL | | MECHANICAL PROPULSION |
|---|---|---|---|
| PORT SAN LUIS, CA | STEEL | | YES |

| GROSS TONNAGE | NET TONNAGE | LENGTH | BREADTH | DEPTH |
|---|---|---|---|---|
| 126 GRT | 86 NRT | 70.8 | 21.5 | 11.7 |

PLACE BUILT
SIRACUSAVILLE, LA

| OWNERS | OPERATIONAL ENDORSEMENTS |
|---|---|
| F/V POINT LOMA FISHING COMPANY INC | FISHERY |

MANAGING OWNER
F/V POINT LOMA FISHING COMPANY INC
7121 FERN FLAT ROAD
APTOS, CA 95003

RESTRICTIONS
NONE

ENTITLEMENTS
NONE

REMARKS
NONE

| ISSUE DATE | |
|---|---|
| DECEMBER 15, 2006 | *Thomas L. Willis* |
| THIS CERTIFICATE EXPIRES | DIRECTOR, NATIONAL VESSEL DOCUMENTATION CENTER |
| JANUARY 31, 2008 | |

VDS:
0450834

PREVIOUS EDITION OBSOLETE. THIS CERTIFICATE MAY NOT BE ALTERED.

# Exhibit B

NOAA #88-156a (Sept. 2003)



**U.S. DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
National Marine Fisheries Service
7600 Sand Point Way NE Building #1
Seattle, WA 98116-0070
Telephone: (206) 526-4353



## 2007 FEDERAL PACIFIC COAST GROUNDFISH PERMIT

Issued Pursuant to: 50 CFR Part 320 Subpart G 16 U.S.C. 1801

| Vessel No. | 515298 | Name | POINT LOMA | Actual Length | 70.66 feet |
|---|---|---|---|---|---|

| Permit No. | Valid From/Through | Permit Holder and Address |
|---|---|---|

GF0023    01-Jan-07    31-Dec-07

ENDORSEMENTS:
 TRAWL GEAR
 ENDORSED LENGTH: 70.80 FEET

**PERMIT OWNER**

F/V POINT LOMA FISHING COMPANY, INC

7121 FERN FLAT ROAD
APTOS, CA 95003

**PERMIT HOLDER (vessel owner)**

**F/V POINT LOMA FISHING COMPANY, INC**
7121 FERN FLAT ROAD
APTOS, CA 95003

### PERMIT CONDITIONS AND INFORMATION

Groundfish permits and associated endorsements confer a privilege to participate in the groundfish fishery off the coasts of Washington, Oregon and California with limited entry gear, in accordance with the limited entry system established under the Groundfish Fishery Management Plan (FMP) as amended. Future amendments to the FMP or implementing regulations may modify privileges associated with this permit, or may abolish the limited entry system.

1. This permit is for the vessel as named and described above and such vessel owner(s) as named. This permit must be kept on each vessel at all times. 2. This permit authorizes fishing operations to be conducted by the vessel registered as noted above.

3. This permit is effective on the date indicated above. It continues in effect until the expiration date printed above. Any change in ownership information (including address, vessel name, or vessel length) must be reported to the Regional Administrator. Application permit must be made if the permit expires or if ownership changes.

4. This permit may be cancelled (including suspension or revocation) if the vessel is not operated in accordance with the laws and for a new regulations pertaining to fisheries for which the vessel is permitted.

5. Loss or theft of this permit should be reported to the Special Agent in Charge, NMFS Law Enforcement (206-526-6133) or the Fisheries Permit Office (206-526-4353).

6. This permit may not be registered for use with a different vessel more than once every calendar year except in the case of death of permit holder, or if the permitted vessel is totally lost.

7. Annual renewal of the permit is required by November 30 of each year.

{Euogkbgkdiib}

# Exhibit C

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Sustainable Fisheries Division F/NWR2
7600 Sand Point Way N.E., Bldg. 1
Seattle, WA 98115-0070

July 3, 2007

Mr. Barry Cohen
P.O. Box 40
Avila Beach, CA  93424

Dear Mr. Cohen

As we discussed today, the National Marine Fisheries Service (NMFS), Northwest Region does not accept requests to place liens on Pacific Coast Groundfish Limited Entry Permits ("A" endorsed). As I noted, the Sustainable Fisheries Act (Public Law 104-297) contained a provision that directed NMFS to implement a central lien registry system for all NMFS fishing permits. However, NMFS has not implemented a central lien registry system. The Northwest Region policy has been not to implement a regional lien registry system and feels it best that such a system should be national in scope.

We have advised other permit owners that a financial entity may become an owner or co-owner of a trawl permit to insure their interests.

If you have any further questions regarding this matter, please call me at 206-526-4353.

Sincerely,

Kevin Ford
Fisheries Permit Office



# Exhibit D

Nov 16 05 Case 3:07-cv-02952-WHA   Document 116   Filed 02/28/2008   Page 74 of 109
Case 3:07-cv-02952-A   Document 32-2   Filed 07/03   07   Page 8 of 109
805 541 5758;
Jun-27-07 11...3AM;   Page 2/2

Sent By: Point NATIONAL BANK;

Account:          102500290
Check:            9146
Amount:           5000.00
Date Cleared:     12/33/04



F/V POINT LOMA
LIC M0349596
PH 805-474-8719
899 N 2ND STREET
GROVER BEACH, CA  93433

90-4252/1222
102500296

9146

DATE 12/22/04

PAY TO THE
ORDER OF  Del Mar Seafoods            $ 5000 00/100

Five Thousand &                    00/100  DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420

MEMO  On Account

⑈1222425252649146 102 500303⑈  ⑈0000500000⑈

PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
FOR DEPOSIT ONLY
DEL MAR SEAFOODS, INC.
4427067053

WFB NA FRESN 12302004
3877  0371011700
?1221-8527-8<
14111  14 ESU 47

Exhibit E

Web Client-Redwage Coast National Bank

Find
Clear
Print
Log Off

| | |
|---|---|
| Account Number | 102000579 |
| Amount | 175,000.00 |
| Posting Date | 11/14/2005 |
| Check Number | 7689 |
| TranCode | 7689 |
| Routing Number | |

Tracer Number  R:1 B:7 S:15

View Query Results   View Front   View Back   View Front AND Back



# Exhibit F

T-131   P.002/009   F-230

11-15-2005   09:55AM   FROM-DEL MAR SEAFOODS INC   On

Del Mar Seafoods, Inc.
Schedule of Payments

| | Michael Cutugno | Chris Martino | Inventory | Frank Lopes | Larry | Total |
|---|---|---|---|---|---|---|
| Beginning Balance | 18,921.00 | 18,683.40 | 16,502.31 | 16,021.51 | 237,183.48 | 295,423.23 |
| | | | | | (1,474.75) | (1,474.75) |
| 12/22/2005 Daily Payout | | | | | | |
| 02/01/2005 Amazon Payment | | | (1,474.75) | | | (1,474.75) |
| 01/03/2006 Crew Pay'T/X'T | | | (1,000.00) | | | (1,000.00) |
| 11/10/2005 Inv. Adj | | | (1,000.00) | | | (1,000.00) |
| 11/10/2005 Payment from Larry | (18,921.00) | (18,683.40) | (16,027.48) | (16,021.51) | (173,239.70) | (175,000.00) |
| Ending Balance | 0 | | | | 111,054.75 | 111,054.75 |

Exhibit G

Nov 16 05 Case 3:07-cv-02952-WHA    Document 116    Filed 02/28/2008    Page 80 of 109
          Case 3:07-cv-02952-W    )    Document 32-2    Filed 07/09/  07    Page 14 of 16
Item Viewer-Details                                                           Page 1 of 1

Web Client-NetImage Coast National Bank

| Find |
| Clear |
| Print |
| Log Off |

| | | | |
|---|---|---|---|
| **Account Number** | 102509277 | **Tracer Number** | R:1 B:6 S:1370 |
| **Amount** | 3,000.00 | | |
| **Posting Date** | 02/23/2007 | | |
| **Check Number** | 4020 | | |
| **TranCode** | 4020 | | |
| **Routing Number** | | | |

○ View Query Results  ○ View Front  ○ View Back  ◉ View Front AND Back

F/V POINT LOMA                                                        4020
PO BOX 40
AVILA BEACH CA 93424                                      90-4252/1222

                                                    DATE  2/15/07

PAY TO THE ORDER OF   DEL MAR SEAFOODS                    $ 3000 00/100

Three Thousand 0/100 ---------------------- DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-716-2530
NATIONAL BANK

MEMO  ON ACCOUNT                                         Barry L. Cohen        MP

⑈122425260⑈4020 102 509277⑈    ⑈0000300000⑈

WFB NA FREN 0221200
3025  03610658090 4
>1221-0527-8<
664:   14 ESU 53

Received    06-27-07   10:31am     From-              To-DWT SF            Page 004

Nov 16 05 02:52p
Case 3:07-cv-02952-WHA    Document 116    Filed 02/28/2008    Page 81 of 109
Item Viewer Details    Case 3:07-cv-02952-W    λ    Document 32-2    Filed 07/09/    07    Page 15 of 16    Page 1 of 1

Web Client NetImage Coast National Bank

| Find | | Account Number | 102509277 | Tracer Number | R:1 B:4 S:330 |
| Clear | | Amount | 2,000.00 | | |
| Print | | Posting Date | 02/12/2007 | | |
| Log Off | | Check Number | 4008 | | |
| | | TranCode | 4008 | | |
| | | Routing Number | | | |

○ View Query Results   ○ View Front   ○ View Back   ◉ View Front AND Back

F/V POINT LOMA
PO BOX 40
AVILA BEACH CA 93424

4008

90-4252/1222

DATE 1/30/07

PAY TO THE ORDER OF   Del Mar Seafoods   $ 2,000 00/100

Two Thousand 00/100 DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-746-2330

MEMO  On Account                     Benny A Cole

⑆122425264008 102 509777⑈  0000200000

ENDORSE HERE
X
PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
FOR DEPOSIT ONLY
DEL MAR SEAFOODS, INC.
442706705

WFB NA FREM 02032007
3720  04010287695   4
>1221-8533-84
3412:   14 ESU 52

Web Client-NetImage Coast National Bank

| | |
|---|---|
| **Account Number** | 102509277 |
| **Amount** | 3,000.00 |
| **Posting Date** | 04/27/2007 |
| **Check Number** | 4063 |
| **TranCode** | 4063 |
| **Routing Number** | |

**Tracer Number** R:1 B:5 S:1290

○ View Query Results  ○ View Front  ○ View Back  ◉ View Front AND Back

F/V POINT LOMA
PO BOX 40
AVILA BEACH CA 93424

4063
90-4252/1222

DATE 4/23/07

PAY TO THE ORDER OF _Del Mar Seafoods_ $ 3000 00/

_Three Thousand_ DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-746-2530
NATIONAL BANK

MEMO _Bait on Account_

⑆122242526⑆4063 102 509274⑈ ⑈0000300000⑈

ENDORSE HERE
X
CREDITED TO THE ACCOUNT OF
WITHIN NAMED PAYEE
LACK OF ENDORSEMENT GUARANTEED
WELLS FARGO BANK, N.A.
AU 00592
AU 00592

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

WFB NA FRESH 04252007
3500  0371B076252
Y1201-8527-8<
2865:   14 ESO 46

FEDERAL RESERVE BOARD

# EXHIBIT 19

1  James P. Walsh, CSB. No. 184620
2  Gwen Fanger, CSB No. 191161
   DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone: (415) 276-6500
   Facsimile:  (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8

9                    UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12  DEL MAR SEAFOODS, INC.,              )
                                         )
13                     Plaintiff,        )  No. C-07-2952-WHA
                                         )
14         v.                            )  DECLARATION OF BARRY A.
                                         )  COHEN IN SUPPORT OF
15  BARRY COHEN, CHRIS COHEN (aka        )  DEFENDANTS' REPLY TO
    CHRISTENE COHEN), in personam and,   )  PLAINTIFF'S OPPOSITION TO
16  F/V POINT LOMA, Official Number       )  MOTION TO VACATE ORDER OF
    515298, a 1968 steel-hulled, 126-gross ton, )  ARREST
17  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., in rem, and )  Date: August 16, 2007
18  Does 1-10,                           )  Time: 8:00 a.m.
                                         )  Place: Courtroom 9, 19th Floor
19                     Defendants.       )

20         I, Barry A. Cohen, declare as follows:

21         1.      I am a resident of the State of California and currently reside in Santa Maria,

22  California. I am a named Defendant in this lawsuit. I make this declaration in support of

23  Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Vacate Order of Arrest.

24  The facts set forth in this declaration are personally known to me to be true and, if called as a

25  witness, I could and would testify to the following:

26         2.      Although the Promissory Note (the "Note") I have with Del Mar may be

27  characterized as a "loan," I never directly borrowed these funds from Del Mar. Rather, Del Mar,

28                                            1

DAVIS WRIGHT TREMAINE LLP

1   my wife and I entered into the Note following a decision by Del Mar's president, Joe Cappuccio,

2   not to purchase a one-half interest in the F/V POINT LOMA (the "Vessel") for use in a fishing

3   operations joint venture in Mexico (the "Mexico Joint Venture"). Initially, Joe Cappuccio and I

4   discussed forming the Mexico Joint Venture to use the Vessel to fish off the coast of Mexico and

5   transport the catch by truck to California for processing. Attached as Exhibit 1 is a true and

6   correct copy of an excerpt of the deposition transcript of Joe Cappuccio, taken February 16, 2006,

7   in the case *Cohen et al. v. Port San Luis Harbor District*, Case No. CV 040897 (Superior Court of

8   California, County of San Luis Obispo) addressing this issue. In anticipation of the investment in

9   the Vessel, Del Mar financed some upgrades, maintenance, and new nets for the Vessel. After

10  these upgrades were done, Joe Cappuccio informed me that he changed his mind about investing

11  in the F/V POINT LOMA for the Mexico Joint Venture. At his request, I agreed to convert the

12  funds provided by Del Mar for upgrades to the Vessel into a loan. Del Mar had no accurate

13  accounting for the amount of funds spent for the upgrades, so Del Mar's bookkeeper, corporate

14  officer, and controller, Joe Roggio, and I agreed that amount covered by the Note and subject to

15  the First Preferred Ships Mortgage (the "Mortgage") would be $215,000.

16      3.      The $215,000 was a low estimate of the amount actually contributed by Del Mar.

17  However, since Del Mar could produce no accurate accounting of the amount spent on the

18  upgrades to the Vessel, I did not want to agree to owe more than Del Mar had actually spent.

19  Thus, Joe Roggio and I agreed on $215,000 which is set forth expressly in the Note. In fact, the

20  purpose of the Note was simply to formalize our agreement. Attached as Exhibit 2 is a true and

21  correct copy of an excerpt of the deposition transcript of Joe Roggio, taken November, 29, 2005,

22  in the case *Cohen et al. v. Port San Luis Harbor District*, Case No. CV 040897 (Superior Court of

23  California, County of San Luis Obispo) addressing this issue.

24      4.      At all times, the only amount secured by the Mortgage has been $215,000.

25  Although Del Mar now asserts, after negotiation and signing of the Note, that the cost of the

26  upgrades to the Vessel was actually $237,035, it did not raise this at the time we entered into the

27  Note and Mortgage. The Note expressly states that the amount owed is fixed at $215,000. At no

28

2

DAVIS WRIGHT TREMAINE LLP

1   time did I agree to amend the Note to cover the additional amount that Del Mar claimed it paid to

2   upgrade the Vessel. In fact, Joe Roggio himself, a certified public accountant and Del Mar's

3   corporate officer and controller, prepared the Note and committed to the $215,000. If Del Mar

4   had reason to believe that the amount to be covered by the Note was greater than $215,000 it

5   should have raised it prior to signing the Note and agreeing that the amount of the Note would be

6   set at $215,000.

7       5.    The Note also does not cover any "advances" or other "debts" that Del Mar alleges

8   that I owe. Contrary to Del Mar's assertions, the Note does not cover a total of $295,439.53 that it

9   alleges includes the amount of money provided to upgrade the Vessel plus other amounts owed

10  from the Avila Fish Processing Joint Venture, amounts I allegedly agreed to pay Del Mar on

11  behalf of my sons, and nearly $21,000 in Del Mar's attorney's fees incurred in representing Del

12  Mar in the litigation against the Port San Luis Harbor District. I never agreed to amend the Note

13  to include any of these amounts. It would make no sense to secure these "advances" or "debts" to

14  the Vessel where they are completely unrelated to the operation of the Vessel.

15      6.    I never stated that the supposed statement of account ("Statement"), attached as

16  Exhibit 2 to Plaintiff's Request for Judicial, provided by Del Mar of my alleged debts was correct.

17  When asked about the Statement during my testimony, I simply described what appeared to be

18  listed on the Statement. The Statement included references to the amounts owed by my sons.

19  When asked about whether the Statement related to the Note, I answered "yes" because the

20  Statement did include a reference to the $215,000 and therefore "related to" the Note. At no time

21  did I say in my testimony, or ever agree with Del Mar, that the Note covered all of the "debts"

22  listed on the Statement. Nor did my wife ever agree to include any of the other "debts" listed on

23  the Statement under the Note.

24      7.    Other than the $215,000, none of the debts listed on the Statement related to the

25  F/V POINT LOMA. My testimony, attached as Exhibit 1 to Plaintiff's Request for Judicial

26  Notice, does not confirm that I agreed that the debts in the Statement were all covered by the Note.

27  I simply identified what each debt listed on the Statement related to. In fact, the only things that

28

---

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S REPLY TO P'S OPP. TO DEF'S MOTION TO VACATE ORDER OF ARREST          SFO 371033v1 0084289-000001
Case No. C-05-3927-CW

3

1    the Statement show conclusively was that we made a substantial payment of $175,000 on the Note

2    and that no interest was listed as due and owing.

3        8.    The only modification to the Note related to a change in the timing of the monthly

4    payments. The original terms of the Note required me to make monthly payments in the amount

5    of $3,000 or fifteen percent of the gross landing receipts of the F/V POINT LOMA seafood

6    production. However, the Note was subsequently modified when Joe Cappuccio asked me to

7    make a large advance payment on the loan. Later Joe Roggio told me at another meeting that, if I

8    made the advance payment, he would see to it that the vessel loan with Del Mar would be interest

9    free. Because of this promise and understanding, my wife, Chris Cohen and I took out a home

10   equity loan on our house and paid Del Mar $175,000, with the expectation that no interest would

11   be due on the Note and that the payment comprised advance monthly payments into the future.

12       9.    For nearly two years after we paid the lump sum advance payment, we never

13   received any inquiries or demands for monthly payments from Del Mar. The lack of demand for

14   any monthly payments in addition to representations made by Del Mar, supported our expectation

15   that the lump sum payment made us current under the Note well into the future. In 2007, we made

16   payments on the Note in January ($2,000), February ($3,000), and March ($3,000) after an oral

17   request from Joe Roggio to make some payments on what we owed. Other than these three

18   payments, Del Mar never requested payment under the Note since we paid them $175,000 in

19   advance. I believe that $27,000 remains on the Note since I have paid $188,000 on the Note to

20   date.

21       10.   Del Mar never inquired of me, either orally or in writing, as to the financial status

22   of our fishing vessel business or expressed a perceived risk of loss of value to the Vessel. I have

23   known Joe Cappuccio for a long time, at least ten years, and yet he made no effort to contact me

24   before having the Vessel arrested without any notice. Attached as Exhibit 3 is a true and correct

25   copy of an excerpt of the deposition transcript of Joe Cappuccio, taken February 16, 2006, in the

26   case *Cohen et al. v. Port San Luis Harbor District*, Case No. CV 040897 (Superior Court of

27   California, County of San Luis Obispo) addressing this issue. Had Del Mar contacted me, I would

28

DAVIS WRIGHT TREMAINE LLP

1  have showed them that the Vessel was not at risk and that the Vessel was fully operational and

2  making at least $20,000 per month. Del Mar was aware that we transferred ownership of the

3  Vessel to Subchapter S corporation and never expressed any concern.

4      11.    At no point has PLFC been non-operational. I recently applied for and received a

5  Certificate of Revivor for PLFC's corporate status with the state of California after its status had

6  been suspended on a technicality for failure to complete the Statement of Information Form SI 200

7  required by the Secretary of State. PLFC's corporate status has been revived and it is currently in

8  good standing with the state of California. Attached as Exhibit 4 is a true and correct copy of the

9  Certificate of Revivor from the California Franchise Tax Board showing that PLFC is in good

10  standing.

11      12.    Instead of undertaking a reasonable inquiry into the financial condition of PLFC

12  and the Vessel, Del Mar based its Complaint for Arrest of the Vessel on irrelevant and incorrect

13  conclusions about my own financial status. It does not follow that the Vessel itself was in danger

14  of losing its value or ability to operate successfully from the fact that I am in the midst of divorce

15  proceedings as well as other litigation. The fact that I consulted a bankruptcy attorney *after* the

16  Vessel was arrested does not support Del Mar's argument that it had reason to believe at the time

17  of the arrest that the Vessel was at risk. Lastly, my inability to post a bond to secure the release of

18  the Vessel for $150,000 on a Note on which we have already paid nearly $188,000, does not

19  support Del Mar's argument that it had reason to believe that the Vessel was at risk at the time of

20  the arrest.

21      13.    The Vessel was never at risk of leaving the district. I have been engaged in the

22  fisheries business in California for over 40 years. In addition, the fishing licenses I have would

23  not allow me to fish anywhere other than California. Del Mar's assertions that the Vessel would

24  leave the district, let alone the United States in a matter of hours, is completely unfounded.

25  DATED this 1st day of August, 2007.

26                                              /s/ Barry A. Cohen
                                                Barry A. Cohen
27

28

DAVIS WRIGHT TREMAINE LLP

5

# Exhibit 1

00001

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2             COUNTY OF SAN LUIS OBISPO
 3                 --o0o--
 4  BARRY A. COHEN; LEONARD A. COHEN; )
 5  OLDE PORT INN, INC. And OLDE PORT )
 6  FISHERIES, INC.,                  )
 7         Plaintiffs,      )
 8    vs.              ) Case No. CV 040897
 9  PORT SAN LUIS HARBOR DISTRICT;  )
10  and DOES 1 to 50, inclusive,    )
11         Defendants.     )
12  _____)
13  AND RELATED CROSS-ACTION      )
14
15        DEPOSITION OF JOSEPH CAPPUCCIO
16
17    DATE:    THURSDAY, FEBRUARY 16, 2006
18    TIME:         10:00 A.M.
19    LOCATION:        OFFICES OF:
20      MONTEREY PENINSULA COURT REPORTERS
21        2801 MONTEREY-PENINSULA HIGHWAY
22             MONTEREY, CALIFORNIA
23
24
25    REPORTER:  KATHERINE E. LAUSTER, CSR 1894
```

CAPPUCCIO, Joe 02-16-06                    Page 1

00067
1    A.   The disposition?

2    Q.   Yeah.

3    A.   How it ended up?

4    Q.   Yeah.

5    A.   We won.  They dropped the case.

6    Q.   That's your understanding?

7    A.   Yeah, uh-huh.  Uh-huh.

8    Q.   Productos Pesceros (phonetic) Punta Loma,

9  Inc., what do you recall about that venture?

10        MR. COON:  Overbroad.  Calls for a narrative.

11        THE WITNESS:  It was our -- it was a drag

12  boat.  It was our trawling venture in Mexico, where we

13  had a permit for trawlers to work in Mexican waters.

14    Q.   And what is your recollection as to when it

15  was that this venture was first --

16    A.   I'm awful at this.

17    Q.   -- conceived?

18    A.   When it was first conceived?

19    Q.   Uh-huh.

20    A.   When did we have that breakfast at Golden

21  West pancakes one morning?

22    Q.   Well, actually, you know, if you can --

23    A.   I'm sorry.

24    Q.   I know that Mr. Cohen's helping you out a

25  little bit here, but --

CAPPUCCIO, Joe 02-16-06                    Page 67

00068
1   A.  I'm sorry.

2   Q.  I'm just looking for your recollection.

3   A.  I don't remember the exact date, I'm sorry,

4  but we thought, wouldn't it be cool if we could have

5  our trawlers working in Mexican waters where there

6  were no individual fishing quotas, there were no other

7  trawlers, so it would be like uncharted territory; and

8  we could explore and create a new fishery, and we

9  thought that would be kind of fun and unique.

10   Q.  The "we" you're referring to is who?

11   A.  Barry Cohen and myself.

12   Q.  So the idea was arrived at as -- as a result

13  of a collaborative effort, you and Mr. Cohen?

14   A.  Yeah.

15   Q.  Yeah?

16   A.  Just kind of having a conversation one day,

17  wouldn't that be cool, and we made it work, made it

18  happen.

19   Q.  And generally what was the concept?

20   A.  We would get fishing permits for our trawling

21  boats, our trawlers, and have them fish in Mexican

22  waters, and take the fish, put them in trucks, and

23  truck them up to the plants, and process them.

24   Q.  I'm showing you now a document that was

25  marked as Exhibit 257 to Mr. Roggio's deposition.

CAPPUCCIO, Joe 02-16-06                    Page 68

# Exhibit 2

Case 3:07-cv-02952-WHA    Document 50-2    Filed 08/01/2007    Page 6 of 15

00168
1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF SAN LUIS OBISPO

3

4

5   BARRY A. COHEN; LEONARD A. COHEN,

6   OLDE PORT INN, INC. and OLDE PORT

7   FISHERIES, INC.,

8               Plaintiffs,

9       vs.              Case No. CV 040897

10   PORT SAN LUIS HARBOR DISTRICT; and

11   DOES 1 to 50, inclusive,

12               Defendants.

13   _____

14

15          DEPOSITION OF JOSEPH ROGGIO

16            VOLUME 2/PAGE 168 - 364

17        Tuesday, November 29, 2005, 10:10 a.m.

18

19

20                LOCATION:
21   OFFICES OF MONTEREY PENINSULA COURT REPORTERS
            2801 Monterey-Salinas Highway, Suite E
22                Monterey, California

23

24
     REPORTED BY:
25   LISA A. YORK MEESKE, CSR 10617


            ROGGIO, Joseph (vol. 2) 11-29-05           Page 168

00197

1    A.  Just -- just curious.

2    Q.  Why was it you were curious?

3    A.  I mean, I don't know if there was a

4  specific reason.  But sometimes I -- you know, one thing

5  that I always liked the bookkeeper down there to provide

6  were the -- you know, I wasn't involved in the day-to-day

7  operations.  So the only thing that, obviously, made Joe

8  comfortable was being able to provide backups to the

9  balance sheet numbers.

10    Q.  Was Joe Cappuccio getting concerned during

11  the last quarter of 2003 about the amount of money he was

12  losing through the operation in Avila?

13    MR. SPEIR:  Objection; calls for speculation.

14    THE WITNESS:  Yeah.  I don't know that.  These

15  advances have nothing to do with that, though.

16  BY MR. MOROSKI:

17    Q.  But they were reflected in the books of

18  Olde Port Fisheries Division of Del Mar Seafoods, Inc.;

19  correct?

20    A.  Yeah.  That operation is the one who did

21  the advances.

22    Q.  To Barry Cohen, Point Loma?

23    A.  To both.

24    Q.  Why was it that Barry Cohen was asked to

25  sign a promissory note in favor of Del Mar Seafoods, Inc.

ROGGIO, Joseph (vol. 2) 11-29-05            Page 197

00198

1  in October of 2003?

2      A.  Well, just to formalize it.

3      Q.  Why?

4      A.  I don't think any particular reason except

5  for just to formalize it.

6      Q.  Did you receive instructions from Joe

7  Cappuccio to formalize the amount of money that Barry

8  Cohen owed Del Mar Seafoods, Inc.?

9      A.  My guess it's probably something Joe and

10  Barry talked about, but you'd have to ask him to be sure.

11      Q.  I'm just asking -- I'm taking your

12  deposition today.

13      A.  Okay.  Yeah, no, I don't know.

14      Q.  You don't recall --

15      A.  Joe was, obviously, aware of us preparing

16  the promissory note, but I can't recall if it's something

17  he had instructed me to do.  It's something Barry had

18  instructed me to do, but it's something that we did.  And

19  the only thing behind it is just to formalize it.  There's

20  no -- we're not out to get him.  He's not out to get us.

21      Q.  My question is whether you have any

22  recollection of receiving an instruction from Joe

23  Cappuccio some time in or around the last quarter of 2003

24  to figure out how much money Barry Cohen owes Del Mar

25  Seafoods, Inc. and reduce it to a promissory note.

ROGGIO, Joseph (vol. 2) 11-29-05                 Page 198

00199

1    A.  I don't know that.

2    Q.  You don't have that recollection?

3       Again, what I'm looking for is, either --

4  whether you have a recollection or whether you're saying

5  categorically, no, that did not happen?

6    A.  I mean, Joe -- this -- Joe would be well

7  aware of this from the start.  Now, how it started, you'd

8  have to ask him.

9    Q.  What I'm trying to get --

10    A.  I mean, you're asking me if I -- you know,

11  if he instructed me to do it.  I mean, he is aware of it.

12  It's probably something we had talked about.  I mean, I

13  don't know exactly how it came about, but there's no

14  substance behind it except for just to formalize it.

15    Q.  Was Barry Cohen, to your knowledge,

16  assessed interest under the terms of the promissory note

17  he signed in favor of Del Mar Seafoods, Inc.?

18    A.  The promissory note does state an interest

19  rate.

20    Q.  Was he ever asked to pay it?

21    A.  No.

22    Q.  Was he ever invoiced?

23    A.  No.

24    Q.  Why?

25    A.  We just didn't do that.  It was just,

ROGGIO, Joseph (vol. 2) 11-29-05          Page 199

00200

1  basically, just to have something on paper just in case.

2  You never know. You know, something may happen to poor

3  little Barry, but it's just to formalize it.

4      Q.  Okay. And was Barry Cohen ever asked to

5  sign any other promissory note in favor of Del Mar

6  Seafoods, Inc.?

7      A.  No. They -- the purpose of the promissory

8  note was just to formalize it, and that was it.

9      Q.  Can I see the Chris Cohen W-2s.

10      When did Chris Cohen cease being an employee of

11  Del Mar Seafoods, Inc.?

12      A.  Well, when Barry had completed the -- I

13  don't know the exact dates. But, obviously, when Barry

14  chose it was time to let her go.

15      Q.  When Barry chose to let her go?

16      A.  Correct. Barry -- you know, who laid off

17  the people when he felt it was appropriate.

18      Q.  Are you talking about the people who were

19  employed by Del Mar in Avila?

20      A.  The people he employed in the Avila Beach

21  operation; correct.

22      Q.  Who were on Del Mar Seafoods Inc.'s

23  payroll?

24      A.  Well, we just prepare the checks for him.

25      Q.  Okay. They were, technically, Del Mar

ROGGIO, Joseph (vol. 2) 11-29-05              Page 200

# Exhibit 3

00001
1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              COUNTY OF SAN LUIS OBISPO

3              --oOo--

4  BARRY A. COHEN; LEONARD A. COHEN; )

5  OLDE PORT INN, INC. And OLDE PORT )

6  FISHERIES, INC.,              )

7          Plaintiffs,    )

8    vs.          ) Case No. CV 040897

9  PORT SAN LUIS HARBOR DISTRICT;   )

10 and DOES 1 to 50, inclusive,    )

11        Defendants.   )

12 _____)

13 AND RELATED CROSS-ACTION      )

14

15      DEPOSITION OF JOSEPH CAPPUCCIO

16

17    DATE:    THURSDAY, FEBRUARY 16, 2006

18    TIME:       10:00 A.M.

19    LOCATION:        OFFICES OF:

20      MONTEREY PENINSULA COURT REPORTERS

21      2801 MONTEREY-PENINSULA HIGHWAY

22          MONTEREY, CALIFORNIA

23

24

25    REPORTER: KATHERINE E. LAUSTER, CSR 1894


CAPPUCCIO, Joe 02-16-06                    Page 1

00151

1       How long have you known Barry Cohen?

2    A.   Many years, I couldn't even tell you exactly

3   how long, but it's been quite a while.  At least ten

4   years.

5    Q.   Do you have any opinion as to his integrity,

6   honesty, and truthfulness?

7    A.   He's always proved to me to be a very

8   trustworthy and honest guy.

9    Q.   Have I met you at any time or talked to you

10   before today, sir?

11   A.   No.  Met you this morning.

12   Q.   Earlier you testified a little about your

13   relationship with a Cheryl Pruitt.  Do you recall that

14   testimony?

15   A.   Uh-huh.

16   Q.   Okay.  Do you know whether Cheryl Pruitt had

17   any interest in a lease site on the Hartford pier?

18   A.   Huh-uh, no, I have no idea what her lease

19   situation was.

20   Q.   Do you know how she operated whatever

21   business she operated, through a corporate form, or

22   sole proprietorship, or the details of that?

23   A.   No.

24   Q.   Do you know whether there was any assignment

25   of any lease by Barry Cohen to Cheryl Pruitt?

CAPPUCCIO, Joe 02-16-06                    Page 151

# Exhibit 4



STATE OF CALIFORNIA
FRANCHISE TAX BOARD
PO BOX 942857
SACRAMENTO CA 94257

Notice Date: 07/20/07

## CERTIFICATE OF REVIVOR

F/V POINT LOMA FISHING COMPANY, INC
BARRY A COHEN
874 W GRAND AVE
GROVER BEACH CA  93433-2134
USA

Corporation Name  : F/V POINT LOMA FISHING COMPANY

Corporation Number: 2713874000

Effective Date      : 07/19/2007

his corporation has been relieved of suspension or forfeiture and is now in good standing with the
/anchise Tax Board.

Business Entity and Field Collection Bureau

---

### ASSISTANCE

Telephone assistance is available year round from 7 a.m. until 8 p.m. Monday through Friday.  From January through June, assistance is also available
from 8 a.m. until 5 p.m. on Saturdays. We may modify these hours without notice to meet operational needs.

From within the United States, call ................................................................(800) 852-5711
From outside the United States, call (not toll-free)........................................(916) 845-6500

Website at: www.ftb.ca.gov

Assistance for persons with disabilities: We comply with the Americans with Disabilities Act. Persons with hearing or speech impairments please
call TTY/TDD (800) 822-6268.

FTB 2557 BC ARCS (REV 12-2002)

# EXHIBIT 20

**Del Mar Seafoods, Inc.**
**Schedule of Payments**

8/27/2007

| | Michael Cohen | Olde Port Fisheries | Olde Port Inn | Inventory | Point Loma | Barry | Total |
|---|---|---|---|---|---|---|---|
| Beginning Balance | 13,920.46 | | 18,069.10 | 10,383.24 | 16,021.31 | 237,035.48 | 295,429.53 |
| 12/22/2004 Barry Paymt | | | | | | (5,000.00) | (5,000.00) |
| 6/24/2005 American Payment | | | | (1,474.75) | | | (1,474.75) |
| 9/14/2005 Olde Port PYMT | | | | (1,000.00) | | | (1,000.00) |
| 11/1/2005 Inv. Adj | | | | (1,300.00) | | | (1,300.00) |
| 11/10/2005 Payment from Barry | (13,920.40) | | (18,069.10) | (6,508.49) | (16,021.31) | (120,360.70) | (175,000.00) |
| 12/25/2006 Olde Port Balance (see attached) | | 7,417.67 | | | | | 7,417.67 |
| 12/25/2006 Point Loma Balance (see attached) | | | | | 1,368.82 | | 1,368.82 |
| Fees for Olde Port Case | | | | | | 21,308.52 | 21,308.52 |
| 2/5/2007 Payment | | | | | | (2,000.00) | (2,000.00) |
| 2/20/2007 Payment | | | | | | (3,000.00) | (3,000.00) |
| 4/25/2007 Payment | | | | | | (3,000.00) | (3,000.00) |
| Ending Balance | - | 7,417.67 | - | - | 1,368.82 | 124,963.30 | 133,749.79 |

Barry Balance.xls

DMSI 0001

# EXHIBIT 21

# San Francisco Police Department
## INCIDENT REPORT

**Report Type:** Initial

**070731796**

070731796

| Incident Number | Occurrence from Date/Time | Occurrence to Date/Time | Reported Date/Time | CAD Number |
|---|---|---|---|---|
| 070-731-796 | 7/4/07   09:00 | 7/17/07   10:00 | 7/20/07   10:00 | 072011125 |

**INCIDENT**

**Type of Incident**
Theft, Lost Property, Grand -26145

**Location of Occurrence**
SF Pier #45 Shed B

At Intersection with/Premise type
Waterfront Area

| Confidential Report? | Arrest Made? | Suspect Known? | Suspect Unknown? | Non-Suspect Incident? ✓ | Domestic Violence? | (Type of Weapon Used) | Reporting Unit Mar#3 |
|---|---|---|---|---|---|---|---|

**Location Sent**
Counter Report Marine Unit Office

| How Cleared? | Reported to Bureau | Name | Star | Date/ | Time | Elder Victim | Gang Related? | Juvenile Subject? | Prejudice Based? |
|---|---|---|---|---|---|---|---|---|---|

**OFFICER DECLARATION**

I declare under penalty of perjury, this report of __3__ pages is true and correct, based on my personal knowledge, or is based on information and belief following an investigation of the events and parties involved.

PROP 115 CERTIFIED    5 YEAR/POST    Signature: _Stan BC_

| Reporting Officer | Star | Station | Watch | Date |
|---|---|---|---|---|
| Broucaret | 405 | Marine Unit | 0500-1600 | 7-22-07 |
| Reviewing Officer | STAR | Station | Watch | Date |
| OIC   Sgt. Danny Lopez #40 O.I.C. Marine Unit | STAR | Station | Watch | Date JUL 2 3 2007 |

| Related Case | Related Case | Re-Assigned to | Assigned to 5D200 | Assigned by Broucaret/405 |
|---|---|---|---|---|
| | | Copies to   5D200 | Add'l Copies H&R/1 | |

**VICTIM**

R/V 1

| Code | Name (Last, First Middle) | | Alias |
|---|---|---|---|
| R/V 1 | Kobak, Dave | | |

| Day Phone (707) 592-3931 | Type Work | Home Address PO Box #314 | City Bodega Bay | State CA | Zip Code 94923- |
|---|---|---|---|---|---|
| Night Phone None | Type | Work Address Hyde Street Commercial Harbor | City San Francisco | State CA | Zip Code 94133- |

| DOB / 7/13/42 | Age 65 | DOB Unk. | or age between and | Race W | Sex M | Height | Weight | Hair Color | Eye Color | ID Type | Jurisd. | ID No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Confidential Person | Violent Crime Notification | 293 PC Notification | Star 405 | Follow-up Form YES ✓ | Statement YES | Relationship to Subject Stranger/None |
|---|---|---|---|---|---|---|

| School (if Juvenile) | Injury/Treatment None | Other Information/If Interpreter Needed Specify Language Ex-Owner of the vessel Point Loma |
|---|---|---|

| Code | Name (Last, First Middle) | | ALIAS |
|---|---|---|---|

| Day Phone | Type | Home Address | City | State | Zip Code |
|---|---|---|---|---|---|
| Night Phone | Type | Work Address | City | State | Zip Code |

| DOB Unknown | Date of Birth | Age | or age between and | Race | Sex | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|

| SFNO | J/D# (if Juvi.) | ID Type/Jurisdiction/Number | ID Type/Jurisdiction/Number | ID Type/Jurisdiction/Number |
|---|---|---|---|---|

| Book Section #1 | Book Section #2 | Book Section #3 | Book Section #4 | Book Section #5 | Booking Location |
|---|---|---|---|---|---|

| Warrant # | Court # | Action # | Dept | Enroute to | CWB Check | Star |
|---|---|---|---|---|---|---|

| Warrant Violation(s) | | Bail | Mirandized | Star | Date | Time | Statement |
|---|---|---|---|---|---|---|---|

| Citation # | Violation(s) | | Appear Date/Time | Location of Appearance |
|---|---|---|---|---|

| Book/Cite Approval | Star | Mass Arrest Code | M X-Rays | School (if Juvenile) | CA Form Booked Copy Attached |
|---|---|---|---|---|---|

Other Information: Citation/Warrant/Booking Charge(s)/Missing Person-Subject Description; Scars, Marks

**EXHIBIT 8**
Kobak

**070731796**

## San Francisco Police Department
### PROPERTY LISTINGS

| S. | Code/No<br>STN 1 | Item Description<br>Fishing drag net | | | | Brand<br>Eastern | Model<br>60'x78' |
|---|---|---|---|---|---|---|---|

| 1 | Serial No. | | Gun Make | Caliber | Color<br>GRN | Narcotics Lab No. | Quantity<br>1 | Value<br>$12000.00 |
|---|---|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers
One 370 mesh 60'x78' green drag net with a 30' bridel

| Code/No. | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|

| Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers

| Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|

| Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers

| Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|

| Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers

| Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|

| Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers

| Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|

| Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers

| Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|

| Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
|---|---|---|---|---|---|---|

| Seized by (Star) | From Where |
|---|---|

Additional Description/Identifying Numbers

**070731796**

San Francisco Police Department
**NARRATIVE**

On 07/20/07 at 1000 hours, (R/V) Kobak entered the SFPD Marine Unit office which is located at the Hyde Street Commercial Harbor to report that his (S) fishing net was stolen. Kobak stated that his net was stored with the permission of the Port of San Francisco, outside on the ground of Pier 45 Shed "B". Kobak stated that he last saw the net on 7/4/07 and noticed that it was gone on 7/16/07 at 1030 hours. Kobak told me that the net weighs several hundred pounds and that it would take a forklift or several strong men to move. Kobak added that recently the vessel "Karen" was evicted from the harbor. Kobak added that he believes that is possible that the crew of the Karen stole his net due to the fact that the Karen is a large enough vessel to carry the net. I provided Kobak with all follow-up information and forms.