# Exhibit 1

COX, WOOTTON, GRIFFIN,
HANSEN & POULOS LLP
Gregory W. Poulos (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

E-filing

ORIGINAL
FILED

JUN - 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

DEL MAR SEAFOODS, INC.

Plaintiff,

vs.

BARRY COHEN, CHRIS COHEN (aka
CHRISTENE COHEN), *in personam* and
F/V POINT LOMA, Official Number
515298, a 1968 steel-hulled, 126-gross ton,
70.8- foot long fishing vessel, her engines,
tackle, furniture, apparel, etc., *in rem*, and
Does 1-10,

Defendants.

Case No.: C 07 2952 WHA

VERIFIED ADMIRALTY AND
MARITIME COMPLAINT (*In
Personam* and *In Rem*)

1) Breach of Promissory Note and
Preferred Ship's Mortgage
2) Foreclosure Of Preferred Ship's
Mortgage (46 U.S.C. Section
31325)

Plaintiff, DEL MAR SEAFOODS, INC. ("DEL MAR"), alleges as follows:

I.    **PARTIES AND JURISDICTION**

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure and the Supplemental Rules for Certain Admiralty and

Maritime Claims.

2.    The admiralty jurisdiction of this Court over the instant action is properly

exercised – both *in personam* and *in rem* -- under 28 U.S.C. section 1333; federal question

jurisdiction under 28 U.S.C. section 1331; and the Ship Mortgage Act, 46 U.S.C. sections

30101, and 31301-31343.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2594

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)

Case No.:

3.     Venue is proper in this Court because the Defendant Vessel is physically located within the Northern District of California, the *in personam* Defendants, the COHENS, currently reside within the state of California, and both the Promissory Note and the Ship Mortgage which are the subject of this action were entered into by Defendants in the state of California.

4.     Plaintiff DEL MAR is a California corporation, duly organized and existing according to law and doing business within this District.

5.     Defendant BARRY COHEN is an individual and, upon information and belief, was at all relevant times a resident within this District.

6.     Defendant CHRIS COHEN (aka CHRISTENE COHEN, referred to hereinafter as "CHRIS COHEN") is an individual and, upon information and belief, was at all relevant times a resident within this District.

7.     At all relevant times, Defendants represented that they were the owners of the Defendant Vessel, the F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8- foot long fishing vessel, her engines, masts, anchors, cables, chains, rigging, tackle, apparel, furniture and all appurtenances and necessaries thereto appertaining (the "Vessel").

8.     Does 1 through 10 inclusive, are unknown to DEL MAR, which therefore sues said defendants by such fictitious names. DEL MAR will request leave of Court to amend this complaint to allege their true names and capacities when ascertained. DEL MAR is informed and believes that some or all of Defendants are the agents, servants, employees, partners, alter egos, or representatives of other Defendants and performed the acts mentioned in this Complaint during the course and scope of their agency, servitude, employment, partnership, alter ego, or representative relationship or under the direction or with knowledge and approval of their principals, masters, employers and partners.

9.     On or about October 31, 2003, Defendants, BARRY COHEN and CHRIS COHEN (hereinafter collectively referred to as "the COHENS") agreed to and executed a Promissory Note in favor of DEL MAR (which Promissory Note is hereinafter referred to as

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2304

Case No.:

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)

1    "the Note"). A copy of the Note is attached hereto as **Exhibit A** and is hereby fully

2    incorporated herein by this reference.

3         10.    Under the terms of the Note, the COHENS initially owed DEL MAR the

4    sum of TWO HUNDRED AND FIFTEEN THOUSAND DOLLARS ($215,000.00). The

5    COHENS also agreed that the amount they owed DEL MAR would accrue interest on the

6    unpaid balance at seven (7) percent. The COHENS also agreed to make monthly payments

7    on the Note to DEL MAR in the amount of THREE THOUSAND DOLLARS ($3,000.00)

8    or fifteen (15) percent of the gross landing receipts of each and every seafood product

9    caught by the Vessel, whichever is greater. The COHENS also agreed that all such

10    payments made would be applied to interest first, then to principal. *See* Exhibit A, page 1

11         11.    On or about October 31, 2003, in order to secure payment of the

12    indebtedness of the Note, the COHENS executed and delivered to Plaintiff, in accordance

13    with and pursuant to the laws of the United States, a Preferred Ship Mortgage covering the

14    Vessel (the "Mortgage"), and by the terms of the Mortgage, assigned and mortgaged the

15    Vessel to Plaintiff DEL MAR to secure payment of the indebtedness of the Note. A true

16    and correct copy of the Mortgage is attached to this Complaint as **Exhibit B** and by

17    reference is incorporated herein as though fully set forth.

18         12.    The Note specifically referred to and incorporated by reference the terms of

19    the Mortgage. *See* Exhibit A, page 1.

20         13.    The Note also provided that "If suit is commenced on this note, maker shall

21    pay to holder a reasonable attorney's fee and all costs." *See* Exhibit A, page 2.

22         14.    The Mortgage provides for recovery of attorney's fees and costs upon

23    default, as well as interest of ten (10) percent upon default. *See* Exhibit B, page 6.

24         15.    As of May 1, 2007, the total amount due and owing under the Agreement

25    was $180,653.98, no portion of which has been paid.

26         16.    Interest continues to accrue under the Note and the Mortgage at the rate of

27    $49.49 per day, at the rate of ten (10) per cent interest since default.

28         17.    The Vessel is afloat upon the navigable waters of these United States, and

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/Seafoods/2504

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)

Case No.:

1    within this Judicial District and the Court's Jurisdiction.

## FIRST CLAIM FOR RELIEF – BREACH OF PROMISSORY NOTE AND PREFERRED SHIP'S MORTGAGE IN *PERSONAM* AGAINST DEFENDANTS BARRY COHEN, CHRIS COHEN, AND DOES 1-10

5    18.    Plaintiff DEL MAR hereby realleges and incorporates by this reference

6    paragraphs 1-17 of this Complaint.

7    19.    On or about April 20, 2004, Plaintiff DEL MAR caused the Mortgage to be

8    duly recorded with the National Vessel Documentation Center, U.S. Coast Guard.  Plaintiff

9    DEL MAR has not waived its status as a mortgagee under the Mortgage.  All other

10   requirements of the laws of the United States relating to preferred ship mortgages were duly

11   met or were caused to be met by DEL MAR.  The indebtedness of the Note, as secured by

12   the Mortgage on the Vessel, is a valid preferred ship mortgage lien on the Vessel.

13   20.    Prior to, and as of, May 1, 2007, the COHENS repeatedly failed to make the

14   proper monthly payments as required under the Note and Mortgage.  As of the last payment

15   on April 25, 2007, the COHENS were still in arrears on the required payments. Since April

16   25, 2007, the COHENS have not made any subsequent payments, as required under the

17   Note and Mortgage. Consequently, under the terms of the Note and the Mortgage, the

18   COHENS are in default under the terms of the Note and the Mortgage, and have been since

19   at least May 1, 2007.

20   21.    Under the terms of the Note and the Mortgage, the total principal balance is

21   $180,653.98 as of May 1, 2007.

22   22.    Interest continues to accrue on the amounts presently owed to DEL MAR

23   under the Note and the Mortgage at the rate of ten (10) percent per annum from the date of

24   default at the rate of $49.49 per day.

25   23.    Plaintiff DEL MAR has a maritime lien upon and against the Vessel,

26   pursuant to 46 U.S.C. Section 31341, for the full amount it is owed under the Note and

27   Mortgage, plus interest thereon at the rate of $49.49 per day from the date of default

28   through the date of judgment.

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL 415-438-4600 FAX 415-438-4601

DelMar/Seafoods/2504

-4-

Case No.:

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)

1    24.    Plaintiff DEL MAR is also entitled to attorney's fees and costs based on the

2  Note.

3              **SECOND CLAIM FOR RELIEF – FORECLOSURE OF PREFERRRED**

4       **SHIP'S MORTGAGE PURSUANT TO 46 U.S.C. SECTION 31325 AGAINST**

5           **ALL DEFENDANTS, *IN PERSONAM*, AND THE VESSEL *IN REM***

6    25.    Plaintiff DEL MAR hereby realleges and incorporates by this reference

7  paragraphs 1-24 of this Complaint

8    26.    Plaintiff DEL MAR has a maritime lien against the Vessel, *in rem*, for any

9  and all amounts that are or will be due and owing under the Note and Mortgage, including

10  prejudgment interest at the agreed rate in the Mortgage of ten (10) percent (see Exhibit B at

11  pages 5 and 6); and Plaintiff DEL MAR is entitled to foreclose its maritime lien and satisfy

12  any and all obligations arising under the Note and Mortgage and during the course of the

13  instant action, including the attorney's fees and costs based on the Note and Mortgage,

14  including the costs of bringing this action, and arresting, preserving and selling the Vessel,

15  against the Vessel *in rem*.

16    27.    In view of the foregoing, Plaintiff DEL MAR is entitled to foreclose its

17  maritime lien and the Mortgage satisfy any and all obligations arising under the maritime

18  lien and Mortgage during the course of the instant action; and the costs of bringing this

19  action, and arresting, preserving and selling the Vessel, against the Vessel *in rem*.

20    **WHEREFORE, Plaintiff DEL MAR prays as To All Claims For Relief Against**

21  **All Defendants:**

22    1.    That process in due form of law pursuant to this Court's Admiralty and

23  Maritime Jurisdiction, *i.e.* a Warrant of Arrest, issue against the F/V POINT LOMA

24  (Official No. 515298), her rigging, tackle apparel, furniture, engines, bunkers, and all other

25  necessaries thereunto appertaining and belonging (the "Vessel"), that all persons claiming

26  any interest in the Vessel be cited to appear and answer this Verified *in rem* Complaint; and

27  that Defendants, the COHENS, be cited to appear and answer this Verified Complaint *in*

28  *personam;*

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

199 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeaford/v2504

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)

Case No.:

1        2.    That the Vessel be arrested and preserved pursuant to the practice of this

2    Court in cases involving maritime liens and Preferred Ships Mortgages against vessels in

3    navigation, as provided by the Supplemental Admiralty Rules of the Federal Rules of Civil

4    Procedure and the Rules of this Court;

5        3.    That the Court direct and prescribe the manner in which actual notice of the

6    commencement of this suit shall be given by Plaintiff DEL MAR pursuant to 46 U.S.C.

7    Section 31301 *et seq.* and the Rules of this Court;

8        4.    That the Mortgage and the statutory lien arising therefrom be declared valid

9    against the Vessel in the sum of $180,653.98 in principal, plus all unpaid accrued interest

10   and late charges owing on the Promissory Note, together with all other amounts which have

11   been or are required to be disbursed by or on behalf of Plaintiff for the care, insuring,

12   preservation, movement, and storage of the Vessel while in *custodia legis* herein, plus all

13   other advances, expenses, attorneys' fees, costs and disbursements by Plaintiff, together

14   with post-judgment interest at the maximum statutory rate, with such liens to be prior and

15   superior to the interest, of maritime and non-maritime liens or claims of any and all persons,

16   firms or corporations whatsoever;

17       5.    That the Court enter judgment in Plaintiff's favor for the full amount of

18   Defendant's breach of Note and Preferred Ship Mortgage claims and maritime lien claims,

19   in the amount of $180,653.98, plus interest accrued since May 1, 2007 of $1,831.13 for a

20   total of $182,485.11, plus other interest as allowed by law, attorney's fees, and costs against

21   Defendants BARRY COHEN, CHRIS COHEN and all other defendants who may appear,

22   and the Vessel;

23       6.    That the Vessel be condemned and sold pursuant to the practices of this

24   Court sitting in admiralty and that Plaintiff DEL MAR's claims be paid from the funds

25   realized at such sale;

26       7.    That all attorney's fees and costs based on the Note and Mortgage for

27   arresting, preserving, and selling the Vessel be included in the funds to be paid Plaintiff

28   DEL MAR realized at the sale of the Vessel;

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/SeaSonds/2504

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)     Case No.:

8.      That a judgment against BARRY COHEN, CHRIS COHEN and DOES 1-10, *in personam* be entered for any deficiency resulting after the judicial sale of the vessel;

9.      That it be decreed that any and all persons, firms or corporations claiming any interest in the Vessel are forever barred and foreclosed of and from all right or equity of redemption or claim of, in, or to the mortgaged Vessel and every part thereof;

10.      That the Court provide such other and further relief in Plaintiff DEL MAR's favor as the Court deems just and proper.

**As To Plaintiff DEL MAR's Claims For Relief Against All *Defendants in personam* and *in rem*:**

1.      That the Court award Plaintiff DEL MAR its reasonable attorney's fees and costs pursuant to the Note and Mortgage.

Dated: June 7, 2007

                                      COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.


By:      _____
              Max L. Kelley

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

-7-

Case No.:

VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *In Rem*)

## VERIFICATION

1    I, JOE ROGGIO, hereby state:

2    1. I am an officer of DEL MAR SEAFOODS, INC., Plaintiff in the instant action.

3

4    2. I have read the contents of the above Complaint and hereby verify the facts

5 contained therein are true and correct to the best of my knowledge, information and

6 belief.

7    4. I am authorized on behalf of DEL MAR SEAFOODS, INC. to verify this

8 Complaint.

9    I declare under penalty of perjury under the laws of the State of California and

10 the United States that the forgoing is true and correct and that this verification was

11 executed at Watsonville, California on May 16, 2007.

12

13

14    JOE ROGGIO

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



COPY

NATIONAL VESSEL DOCUMENTATION CE USCG
RECEIVED / FILED

PROMISSORY NOTE

20 APR '04     10 : 08

RECORDED: BOOK _____ PAGE _____

DOCUMENTATION OFFICER

For the value received, BARRY COHEN and CHRIS COHEN, an individual of 2028

Draydon Avenue, Cambria, California 93428, hereinafter referred to as maker, promises to pay to

the order of DEL MAR SEAFOODS, INC., 331 Ford Street, Watsonville, California 95076, its

successors and assigns, hereinafter referred to as holder, the sum of two hundred fifteen thousand

($215,000.00) dollars at the rate of seven (7) percent per annum, as follows:

Monthly payments of $3,000.00 or fifteen (15) percent of the gross landing receipts of each and

every landing of seafood product made by the fishing vessel POINT LOMA, whichever is greater,

commencing on _January '05_ and on the 15th day of each succeeding month until principal

and interest are fully paid. Payments are to be applied to interest first.

   1.   This promissory note is secured by a First Preferred Ship Mortgage on the vessel

POINT LOMA, Official No. _C.L.C. 515298 Brd._ ; dated _10/31/03_

   2.   <u>Incorporation of Terms of First Preferred Mortgage.</u>

   This note is secured by a continuing security interest in the vessel described in a

Preferred Mortgage, dated _10/31/03_ , executed by maker in favor of holder. The terms

of that Preferred Mortgage are incorporated into this note by reference to the same effect as if set

forth in this note in their entirety. On default, under Preferred Mortgage or under

this note, holder may exercise any of the remedies granted by the Preferred Mortgage. Maker

acknowledges that holder rights are cumulative.

   3.   <u>Acceleration of Maturity.</u>

In the event of default, in the payment of any of the installments or interest due as provided in this

From: 44361471     Page: 2/14     Date: 6/5/2007 6:50:07 PM
05/15/2007  11:55     562210x60               RICHARD P WAGNER              PAGE  13/28

note, time being of the essence, holder may, without notice or demand, declare the entire principal sum then unpaid immediately due and payable. Further, if maker should at any time fail in business or become insolvent, or commit an act of bankruptcy, or if any writ of execution, garnishment, attachment, or other legal process is issued against any deposit account or other property of maker, or if any assessment for taxes against maker, other than taxes on real property, is made by the federal or state government, or any department or agency of the federal or state government, or if maker fails to notify holder of any material change in their financial condition, all of the obligations of maker shall, at option of holder, become due and payable immediately without demand or notice.

### 4.   Modification of Terms.

Holder may, with or without notice to maker, cause additional parties to be added to this note, or release any party, or revise, extend, or renew the note, or extend the time for making any installment provided for in this note, or accept any installment in advance, all without affecting the liability of maker.

### 5.   Attorney's Fees.

If suit is commenced on this note, maker shall pay to holder a reasonable attorney's fee and all costs.

### 6.   Waiver of Rights by Maker.

Maker hereby waivers (a) presentment, demand, protest, notice of dishonor and/or protest, and notice of non-payment; (b) the right, if any, to the benefit of, or to direct the application of, any security hypothecated to holder until all indebtedness of maker to holder, however arising, shall have been paid; and (c) the right to require holder to proceed against any party to this note, or to pursue any other remedy in holder power. Holder may proceed against maker directly and independently of any other party to this note, and the cessation of the liability of any other party or

any reason other than full payment, or any revision, renewal, extension, forbearance, change of rate of interest, or acceptance, release, or substitution of security, or any impairment or suspension of holder's remedies or rights against any other party, shall not in any way affect the liability of maker.

DATED: _10/31/02_

_____
Barry Cohen

_____
Chris Cohen

# EXHIBIT B

From: 361471    Page: 4/14    Date: 6/5/2007 6:53  PM
05/15/2007  11:55    5522162960    RICHARD P WAGNER    PAGE  08/28



### FIRST PREFERRED MORTGAGE

NATIONAL VESSEL DOCUMENTATION CENTER
USCG
RECEIVED / FILED

Official No: *575 298*

On the vessel:
POINT LOMA

Dated: *10/31/03*

20 APR '04        10 : 08 AM

RECORDED: BOOK *04 70*  PAGE *497*

DOCUMENTATION OFFICER

Amount of Mortgage $215,000,000

and made by BARRY COHEN And CHRIS COHEN a married couple

(Hereinafter called "Owner")

### WITNESSETH

Whereas, the maker, Mortgagor herein, is the sole owner of the whole of the vessel
(if more than one vessel is mortgaged hereunder, the term vessel means each such vessel)
hereinafter named and described, and is justly indebted to the Mortgagee, as evidenced by the
promissory note dated *10/31/03* in the principal amount of $215,000.00, payable to the order
of Mortgagee as follows:

Per the Attached Promissory Note which shall become a part of this mortgage.
THE TOTAL AMOUNT OF THIS MORTGAGE IS TWO HUNDRED FIFTEEN THOUSAND
DOLLARS AND PERFORMANCE OF MORTGAGE COVENANTS.

And has agreed to give this Mortgage as security, and has authorized and directed the
execution and delivery hereof.

NOW, THEREFORE, in consideration of the premises and for other good and
valuable considerations, receipt of all of which is hereby acknowledged and to secure payment of
said indebtedness and interest and other sums that hereafter may become due pursuant hereto and
the performance of all covenants hereof. Owner by these presents mortgages and conveys unto
Mortgagee, its successors and assigns, the whole of the Vessel named below and further
described in her (their) last marine document(s) issued and identified as follows:

Name:   POINT LOMA

Home Port: Avila Beach, California. ––––––––––

Official Number: _5/5 2 9 8_

Together, with all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, tackle, apparel, furniture, fittings, tools, pumps, equipment and supplies, and fishing and all other appurtenances and accessories and additions, improvements and replacements now or hereafter belonging thereto, whether or not removed there from, all of which shall be deemed to be included in the term "vessel" herein, and said document(s) being deemed included herein by reference;

TO HAVE AND TO HOLD all singular the above described vessel unto Mortgagee, it's successors and assigns, forever;

PROVIDED, HOWEVER, that if Owner, his heirs, executors, administrators or its successors or assigns shall perform and observe all and singular the terms, covenants and agreements herein, then this Mortgage shall cease, otherwise to remain in full force and effect.

Nothing herein shall be deemed or construed to subject the lien hereof any property other than a vessel as the term issued in Title 46, Chapter 313, and Section 31322 of the United States Code. Owner agrees to pay said indebtedness with interest thereon as herein and in said note provided, and to perform and observe the further terms, covenants and agreements herein, and to hold the vessel subject thereto.

## ARTICLE I - PARTICULAR COVENANTS OF OWNER

Owner Covenants as follows:

1.       Owner is and shall continue to be a citizen of the United States entitled to own and operate said vessel under her marine document, which Owner shall maintain in full force and effect; and all action necessary for the execution, delivery and validity hereof and of the

From: 7  361471    Page: 6/14    Date: 6/5/2007 6:53.  PM
05/15/2007  11:55    5522152950    RICHARD P WAGNER    PAGE  10/20

good faith affidavit filed herewith and of said note has been taken. If a corporation, Owner is duly organized and is and shall continue in good standing under the laws of the State of NOT APPLICABLE and authorized to do business and in good standing in any other State wherein Owner regularly does business.

2.    Owner lawfully owns and possesses the vessel free from all liens and encumbrances whatsoever except as may herein below be specified and shall warrant and defend title to and possession of all and every part thereof for the benefit of Mortgagee against all persons whomsoever. Owner shall not set up against Mortgagee of this mortgage any claim of Owner against Mortgagee and/or assignee under any past or future transaction.

3.    Owner shall at his (its) own expense, keep the vessel fully and adequately insured under usual full marine insurance with policy valuation not exceeding the amount insured and, in the aggregate as to all vessels mortgaged herein, in at least the amount of the unpaid principal balance of this Mortgage, and shall maintain insurance to cover protection and indemnity risks, towers liability risks if the vessel performs towage, employees compensation and other risks and liabilities from time to time specified by Mortgagee. All insurance shall be taken out in the name of Owner and shall by its terms be payable to Mortgage for account of Mortgage and Owner as their respective interests may appear, and all policy forms, underwriters and amounts shall be subject to Mortgagee's approval. Owner shall notify, and shall request underwriters to agree reasonably in advance to notify Mortgagee of any cancellation of or material change in any insurance coverage. All policies, binders and cover notes shall be delivered to Mortgagee with evidence satisfactory to it that all premiums and other charges therefore have been fully paid. Owner shall maintain all such insurance unimpaired by any act, breach or warranty or otherwise.

4.    Owner shall comply with and not permit the vessel to be operated contrary to any provision of the law, treaties, conventions, rules, regulations or orders of the United States, any State and/or any other jurisdiction wherein operated, and/or of any department or agency thereof,

nor remove the vessel from the limits of the United States save on voyages with the intent of returning, nor abandon the vessel in any foreign port. Owner shall do everything necessary to, establish and maintain this Mortgage as First Preferred Mortgage on said vessel.

5.. Neither the Owner, Agent nor Master of the vessel has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the vessel or any part thereof any lien whatsoever other than to the Mortgagee or for crew's wages or salvage.

6. Owner shall place and keep prominently in the pilot house (if any), chart room or Master's cabin or elsewhere on the vessel as specified by Mortgagee any notice of this Mortgage required by Mortgagee, and shall keep proper copy hereof with the ship's papers and exhibit the same to all persons having business with the vessel, and to Mortgagee on demand.

7. Owner shall pay when due all taxes, assessments, government charges, fines and penalties lawfully imposed and promptly discharge any and all liens whatsoever upon vessel. Owner shall at his (its) own expense at all times maintain the vessel in thorough repair and working order and shall make all proper renewals and replacements.

8. If the vessel shall be libeled, attached, detained, seized or levied upon or taken into custody under process or under color of any authority, Owner shall forthwith notify Mortgagee by telegram, confirmed by letter, and forthwith discharge or release the vessel there from and in any event within fifteen (15) days after such attachment, detention, seizure, levy or taking into custody.

9. Owner shall at all times afford Mortgagee complete opportunity to inspect the vessel and cargoes and papers thereof, and to examine Owners related accounts and records; and shall certify quarterly and, if Mortgagee requests, monthly, that all wages and all other claims whatsoever which might have given rise to a lien upon the vessel have been paid.

10. Owner shall not, without prior written consent of Mortgagee, sell or mortgage the vessel or any interest therein nor charter her except to persons and for uses lawful for American vessels and then only provided said insurance be unaffected thereby or adequately replaced; nor,

if a corporation, to merge or consolidate with any other person, firm or corporation, or dissolve.

11.     From time to time Owner shall execute and deliver such other and further instruments and assurance as in the opinion of Mortgagee's counsel may be required to subject to vessel more effectual to the lien hereof and to the payment of said indebtedness and for operation of the vessel as herein provided, and to effectuate sales as provided in paragraph (C) of Section 1 of Article 11.

### ARTICLE II - DEFAULT

1.     In any one or more of the following events, herein termed events of default:

(a) Default in the punctual payment of the principal of the note secured hereby or any installment thereof, or in the due and punctual performance of any provision of Sections 3, 4, 5, 6, 8 and 10 of Article I hereof, or attempt to violate Sections 4 or 10 of Article I hereof, or default continuing for fifteen (15) days in performance of any other covenant herein; or

(b) Commission of any act of bankruptcy by Owner or approval by any court of a petition or answer asking for reorganization, arrangement, extension or other relief under any bankruptcy law; or to appointment of a receiver for Owner or any of Owner's property or the taking by any court of any action comparable thereto; or rendition of a final judgment against Owner for the payment of money and failure of Owner to discharge the same within ninety (90) days or stay the execution thereof pending appeal; or Mortgagee's conclusion in good faith at any time that, through actual or prospective impairment of Owner's net current asset position, net worth, asset-liability ratio, or earning, or through prospective violation of any provision of this Mortgage, Mortgagee is in danger of losing said debt, or any part thereof, by delaying collecting thereof until the time above limited for the payment thereof, then, and in every such case, Mortgagee may:

(a)     Declare the principal of said note and all accrued interest thereon to be and they shall then become and be due and payable forthwith, after which they shall bear interest at the rate of 10% per annum;

(b)     Recover judgment for, and collect out of any property of Owner, any amount thereby or otherwise due hereunder; and/or collect all earned charter hire and freight monies relating to services performed by the vessel, Owner hereby assigning to Mortgagee such earned charter hire and freight monies then owing; and/or

(c)     Retake the vessel without legal process at any time wherever the same may be, and, without being responsible for loss or damage, hold and in Mortgagee's or in Owner's name lease, charter, operate or otherwise use the vessel for such time and on such terms as Mortgagee may deem advisable, being accountable for net profits, if any, and with the right to dock the vessel free of charge at the Owner's premises or elsewhere at Owner's expense; and/or sell the vessel, free from any claim by Owner of any nature whatsoever, in the manner provided by the law; to the extent permitted by law, such sale may be public or private, without notice, without having the vessel present, and/or Mortgagee may become the purchaser.

For such purpose Mortgagee and its agents are hereby irrevocably appointed the true and lawful attorneys of Owner in his (its) name and stead to make all necessary transfers of the vessel thus sold.

2.     In the event that the vessel shall be arrested or detained by any officer of any court or by any other authority, Owner hereby authorizes Mortgagee, its officers, representatives and appointees, in the name of the Owner or of Mortgagee, to receive or to take possession thereof, and to defend any action and/or discharge any lien.

3.      Each and every power or remedy herein given to Mortgagee shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often as may be deemed expedient by Mortgagee. No delay or omission by Mortgagee shall impair any right, power, or remedy, and no waiver of any default shall waive any other default. In any suit Mortgagee shall be entitled to obtain appointment of a receiver of the vessel and the earnings thereof, who shall have full rights and powers to use and operate the vessel, and to obtain a decree ordering and directing the sale and disposition thereof.

4.      The net proceeds of any judicial or other sale, and any charter, management, operation or other use of the vessel by Mortgagee, of any claim for damages, of any judgment, and any insurance received by Mortgagee (except to the extent paid to Owner or applied in payment of repairs or otherwise for Owner's benefit) shall be applied as follows:

        FIRST:      To the payment of all attorneys fees, court costs, and any other expenses, losses, charges, damages incurred or advances made by Mortgagee in the protection of its rights or caused by Owner's default hereunder or under the note secured hereby, with interest on all such amounts at the rate of 10% per annum; and to provide adequate indemnity against any liens for which priority over this Mortgage is claimed;

        SECOND:    To the payment of all interest, to date of payment, on the note and any or all other sums secured hereby, and as to any balance of such proceeds, to the payment of next of any or all matured installments of principal and then of any or all un-matured installments of principal in the inverse order of this maturity.

            Mortgagee shall be entitled to collect any deficiency from Owner. Owner shall be entitled to any surplus, subject to set-off in favor of Mortgagee for any other indebtedness of Owner.

05/15/2007 11:55    From: 71 361471    Page: 11/14    Date: 6/5/2007 6:53 PM
                    5622162    RICHARD P. WAGNER        PAGE 15/20

S.        All advances and expenditures which Mortgagee in its discretion may make any repairs, insurance, payment of liens or other claims, defense of suit, or for any other purpose whatsoever related hereto or said note and all damages sustained by Mortgagee because of defaults, shall be repaid by Owner on demand with interest at 10% per annum, and until so paid shall be a debt due from Owner to Mortgagee secured by the lien thereof. Mortgagee shall not be obligated to make any such advances or expenditures, nor shall the making thereof relieve Owner of any obligation or default with respect thereto.

## ARTICLE III – POSSESSION UNTIL DEFAULT

Until one or more of the events of default hereinbefore described, Owner shall be permitted to obtain actual possession and use of the vessel.

## ARTICLE IV – SUNDRY PROVISIONS

All covenants and agreements of Owner herein contained shall bind Owner, his heirs, executors, administrators and assigns, or its successors and assigns, shall inure to the benefit of Mortgagee and its successors and assigns. Following any assignments hereof, any reference herein of "Mortgagee" shall be deemed to refer to the assignee. If one or more person is the Owner herein, "his" shall mean "their".

FUTURE ADVANCES. This mortgage is executed for the purpose of securing not only the payment of the above described note but also to secure all future advances made by the holder of said note to the mortgagor; and said mortgage shall remain in full force and effect to secure all future advances and all renewals or extensions of the above described note.

IN WITHNESS WHEREOF, on the day and year above written, Owner has executed this Mortgage, or if a corporation, has caused this Mortgage to be executed in its name and its corporate seal to be affixed hereto by its proper officers thereunto duly authorized or as required by State law.



### CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of San Luis Obispo

On 10-31-03 before me, Nancy E. Martin, Notary Public, personally appeared Christene Layne Cohen and Barry A. Cohen,

☐ personally known to me - OR - ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Nancy E. Martin*
_____
Signature of Notary

NANCY E. MARTIN
COMM. #1429420
NOTARY PUBLIC-CALIFORNIA
SAN LUIS OBISPO COUNTY
My Comm. Expires August 8, 2007

---

OPTIONAL

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**

☐ Individual
☐ Corporate Officer

Title

☐ Partner(s)    ☐ Limited
              ☐ General

☐ Attorney-in-Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other:

Absent Signer (Principal) is Representing:

**DESCRIPTION OF ATTACHED DOCUMENT**

First Preferred Mortgage

*Title or Type of Document*

11 plus attached acknowledgment

*Number of Pages*

10-31-03

*Date of Document*

None

*Signer(s) Other Than Name(s) Above*

ADM-005 (07/01)

# Exhibit 2

COX, WOOTTON, GRIFFIN,
HANSEN & POULOS LLP
Gregory W. Poulos (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

*FILED*

*RECEIVED*

JUN - 7 2007

E-filing

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

DEL MAR SEAFOODS, INC.                )   Case No.: *C 07 WHA 2952 WHA*
                                      )
                Plaintiff,            )   *Amended*
                                      )   [PROPOSED] ORDER ON
        vs.                           )   PLAINTIFF DEL MAR SEAFOODS,
                                      )   INC.'S EX PARTE APPLICATION
BARRY COHEN, CHRIS COHEN (aka         )   FOR APPOINTMENT OF
CHRISTENE COHEN), *in personam* and   )   SUBSTITUTE CUSTODIAN IN LIEU
F/V POINT LOMA, Official Number       )   OF U.S. MARSHAL
515298, a 1968 steel-hulled, 126-gross ton, )
70.8- foot long fishing vessel, her engines, )
tackle, furniture, apparel, etc., *in rem*, and )
Does 1-10,                            )
                                      )
                Defendants.           )
_____ )

Under the application by Plaintiff, DEL MAR SEAFOODS INC., for an Order

appointing a substitute custodian in lieu of the U.S. Marshal in this case, and good cause

appearing therefore, it is hereby:

ORDERED that Plaintiff's Application is granted;

IT IS FURTHER ORDERED that the U.S. Marshal for this District transfer custody

of the defendant vessel F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled,

126-gross ton, 70.8- foot long fishing vessel, her engines, tackle, furniture, apparel, (the

"Vessel") in or near the navigable waters of San Francisco, or wherever said vessel may be

///

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

-9 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/1504

ORDER FOR SUBSTITUTE CUSTODIAN

*ORIGINAL*

Case No.:

WPA National Maritime Services, Inc.

1    found in this District, to the custody of substitute custodian, by and through its authorized

2    representatives, immediately following its arrest;

3         IT IS FURTHER ORDERED that upon the transfer of said defendant Vessel to the

4    substitute custodian, such substitute custodian is hereby appointed to act as substitute

5    custodian of the vessel during *custodia legis* on behalf of this Court, in place and instead of

6    the U.S. Marshal, until further Order of this Court;

7         IT IS FURTHER ORDERED that upon transfer of custody of the defendant Vessel

8    to the substitute custodian by the U.S. Marshal, the U.S. Marshal shall not be liable for any

9    loss occurring while it remains in the custody of the substitute custodian;

10        IT IS FURTHER ORDERED that upon transfer of the vessel to the substitute

11   custodian, the substitute custodian may place a keeper on board the vessel at all times; and

12   that the substitute custodian will maintain sufficient insurance to protect the Vessel during

13   its custodianship.

14        IT IS FURTHER ORDERED that the fees and costs of the substitute custodian in

15   storing, maintaining, safekeeping, and insuring the vessel while in *custodia legis* shall be

16   taxed as costs of this action; and

17        IT IS FINALLY ORDERED that the U.S. Marshal will place a copy of this order on

18   board the defendant vessel.

19   DATED: June ___7___, 2007

20                                        _____
                                          UNITED STATES DISTRICT JUDGE

21

22

23

24

25

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/SeaSouls/2594

26

27

28

ORDER FOR SUBSTITUTE CUSTODIAN                                    Case No.:

# Exhibit 3

**United States District Court**
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   DEL MAR SEAFOODS INC.,                     No. C 07-02952 WHA

11              Plaintiff,

12        v.                                    **ORDER GRANTING MOTION TO
                                                VACATE ORDER OF ARREST**
13   BARRY COHEN, CHRIS COHEN (aka
     CHRISTINE COHEN), *in personam* and, F/V
14   POINT LOMA, Official Number 515298, a
     1968 steel-hulled, 126-gross ton, 70.8 foot long
15   fishing vessel, her engines, tackle, furniture
     apparel, etc., *in rem*, and Does 1-10,
16
17              Defendants.
                                              /
18

19                              **INTRODUCTION**

20        In this maritime action for breach of a promissory note, defendants move to vacate an

21   order of arrest pursuant to Rule E(4)(f) of the Supplementary Admiralty Rules.  Plaintiff has

22   failed to establish probable cause for the order of arrest.  Accordingly, defendants' motion to

23   vacate the order of arrest is GRANTED.

24                                **STATEMENT**

25        Plaintiff Del Mar Seafoods is a California corporation that owns fishing vessels and runs

26   fish processing plants.  Defendants Barry Cohen and Chris Cohen are individuals, married to

27   one another, who reside in this district.  At all relevant times, the Cohens represented that they

28

1    were the owners of defendant Vessel, the F/V POINT LOMA (Compl. ¶¶ 4–7; Cappuccio Decl.

2    ¶ 4).

3          In 1999, plaintiff and defendant Barry Cohen formed a joint venture for the purpose of

4    buying, processing, and selling fish from a site that Barry Cohen leased in Avila Beach,

5    California. Plaintiff advanced funds to Cohen as part of this venture. In 2003, following

6    plaintiff's decision not to continue with the partnership, plaintiff and defendants entered into a

7    promissory note secured by a ship mortgage. In the note, the parties agreed on a schedule for

8    defendants' repayment of the amount that had been advanced by plaintiff. Specifically,

9    defendants agreed to pay the following:

10          [T]he sum of two hundred fifteen thousand ($215,000) dollars at
      the rate of seven (7) percent per annum as follows:

11

12          Monthly payments of $3,000.00 or fifteen (15) percent of the
      gross landing receipts of each and every landing of seafood

13          product made by the fishing vessel POINT LOMA, whichever is
      greater, commencing on January '04 and on the 15th day of each

14          succeeding month until principal and interest are fully paid.
      Payments are to be applied to interest first.

15    (Cappuccio Decl. ¶¶ 8–11, Exh. A at 1; Cohen Decl. ¶¶ 4–5).

16          Plaintiff maintains that the total principal amount owed under the note increased to

17    $295,429.53 by November 2004. The principal amount allegedly increased from $215,000 due

18    to additional amounts owed by Cohen's sons, fuel advances, and additional information on the

19    original amount owed pursuant to an audit. Plaintiff contends that Barry Cohen agreed to

20    include these additional amounts with the amount owed under the note and mortgage.

21    Defendants deny such an agreement (Cappuccio Decl. ¶¶ 18–22; Cohen Decl. ¶ 12).

22          Between November 2004 and November 2005, plaintiff alleges that defendants paid a

23    total of $7,474.75 on the note, all of which was applied to the accrued interest rather than to the

24    principal. During this period, defendants point to only one payment of $5000, paid in

25    December 2004 (Cappuccio Decl. ¶¶ 22–23; Cohen Decl. ¶ 11). Defendants then paid $175,000

26    in November 2005. Defendants made additional payments in January, February, and March of

27    2007 for a total of $8000.

28

United States District Court
For the Northern District of California

2

**United States District Court**
For the Northern District of California

1    There is significant dispute between the parties as to the effect of the $175,000 payment

2    in November 2005.  Plaintiff maintains that this amount was credited first against the accrued

3    interest of $30,359.83 and then $145,940.17 was applied against the principal amount following

4    an inventory credit of $1300.  Plaintiff alleges that the principal balance was then $149,489.36.

5    Defendants allege that the $175,000 settled payments that were overdue at that point and

6    constituted a prepayment of monthly payments due under the note.  In exchange for the advance

7    payment, defendants contend that plaintiff agreed to make the loan interest-free.  Plaintiff

8    disputes agreeing to an interest-free loan (Cappuccio Decl. ¶¶ 26– 28; Cohen Decl. ¶¶ 11–13).

9    The parties also disagree whether the value of the principal ever changed.  Following the

10   $175,000 payment, plaintiff maintains that $30,095.01 was added to the principal on the note

11   due to advances to defendants as well as to cover attorney's fees in separate litigation.

12   Defendants maintain that the principal owed under the loan did not increase above the original

13   $215,000.

14   The parties also dispute the effect of the $8000 paid during January, February, and

15   March of 2007.  Plaintiff maintains that these payments were applied to interest only.  After

16   these payments, plaintiff contends that the total amount owed on the note as of June 14, 2007,

17   was $189,374.54, including $9,790.17 in accrued interest.  Plaintiff thus alleges that defendants

18   continued to owe monthly payments and were in default for failure to make those payments.

19   Defendants maintain that because there was no interest on the loan, and the principal amount

20   never increased above $215,000, the amount owed as of June 14 was $27,000, which meant

21   they were current on the note through February 2009 (Cappuccio Decl. ¶¶ 36–38; Cohen Decl.

22   ¶¶ 14–15).

23   Plaintiff believes that defendants are in default.  As a result of the alleged default,

24   plaintiff filed an *ex parte* application for arrest of the vessel on June 6, 2007.  A warrant of

25   arrest was issued for the vessel on June 7, 2007, and the vessel was arrested by a United States

26   Marshal.  This motion to vacate the order of arrest due to lack of subject-matter jurisdiction and

27   lack of probable cause for the order of arrest was filed on July 9, 2007.

28                                    3

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ANALYSIS

1.   LACK OF SUBJECT-MATTER JURISDICTION.

Defendants allege that this Court does not have subject-matter jurisdiction over the case under maritime law.  Defendants maintain that because, in their view, there was no breach of the promissory note, plaintiff has no maritime cause of action and thus no basis for the order of arrest.  Defendants' contention is without merit.  "Article III, § 2, cl.3 of the United States Constitution extends the judicial power of the federal sovereign to 'all cases of admiralty and maritime jurisdiction.'"  *World Tanker Carriers Corp. v. M/V Ya Mawlayav*, 99 F.3d 717, 722 (5th Cir. 1997).  Under 28 U.S.C. 1333, federal courts have authority over civil admiralty disputes, "regardless of the existence of a federal statute creating the maritime right, diversity of citizenship, or the minimum amount in controversy."  *Id.* at 723.  At issue here is the ship's mortgage, which is a maritime contract over which the district courts of the United States have original jurisdiction.  Accordingly, this Court does have subject-matter jurisdiction.

2.   PROBABLE CAUSE FOR ARREST.

Defendants contend that the order of arrest was improperly issued pursuant to Rule E(4)(f), which states as follows:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

The purpose of this hearing is not "to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant." *Lion de Mer v. M/V Loretta V*, 1998 WL 307077 at *2 (D. Md. Apr. 3, 1998) (Legg, J.).  "At this stage in the proceedings, plaintiff merely needs to show 'probable cause' for the issuance of the warrant and writ." *Continental v. Adriatic Tankers Shipping Co.*, 1995 WL 649942 (E.D. La. 1995) (McNamara, J.); *see also Greger Leasing Corp. v. Barge PT. Potrero*, 2006 WL 889537, at *1 (N.D. Cal. Apr. 5, 2006) (Conti, J.).  This "probable cause"

4

**United States District Court**
For the Northern District of California

1   requirement "translates roughly to requiring that plaintiff show entitlement to a maritime lien."

2   *Newport News Shipbuilding and Dry Dock Co. v. S.S. Independence*, 872 F. Supp. 262, 265

3   (E.D.Va.1994) (Doumar, J.).

4       A number of factual disputes exist, such as whether the principal amount owed pursuant

5   to the note increased above the original $215,000 and whether plaintiff agreed to an interest-

6   free loan as a result of the $175,000 payment in November 2005. The purpose of a Rule E(4)(f)

7   hearing, however, is not to resolve these factual disputes, but rather to assess whether plaintiff's

8   showing rises to the level of probable cause.

9       Plaintiff has failed to meet its burden of establishing probable cause because there is not

10  sufficient evidence that defendants were in default at the time the order of arrest was issued.

11  Under the note, defendants were to make monthly payments of the greater of "$3,000.00 or

12  fifteen (15) percent of the gross landing receipts" (Cappuccio Decl. Exh. A). From January

13  2004 through May 15, 2007, the last payment date prior to the order of arrest, 41 monthly

14  payments should have been made on the note. At a rate of $3000 per month, defendants should

15  have paid a total of $123,000. From the time the promissory note went into effect in January

16  2004 until the time the boat was seized in June 2007, it is undisputed that defendants paid at

17  least $188,000 to plaintiff. It is true that most of this amount — $175,000 — was paid in a

18  lump sum in November 2005. But paying via lump sum prepayment rather than by monthly

19  payments does not mean defendants are in default.

20      Plaintiff fails to demonstrate that defendant at any point owed *more* than $3000 per

21  month. Plaintiff makes no assertion that more is owed, for example, due to fifteen percent of

22  gross landing receipts being greater than the $3000 for any month. Even if additional amounts

23  were due because of other advances or interest, the promissory note has no provision indicating

24  that payments would ever exceed the $3000 or fifteen percent. Rather, the note indicates that

25  the payments are to continue according to the payment schedule "until principal and interest are

26  fully paid" (*ibid.*).

27

28                                              5

**United States District Court**
For the Northern District of California

1    Plaintiff also fails to show that defendants were behind on the payment schedule at the

2   time of the arrest or that they were obligated to make monthly payments when defendants'

3   payments were actually *ahead* of schedule.  Plaintiff asserts that the $175,000 payment was

4   applied first to interest and then $145,940.17 of it was applied to reduce the principal balance

5   on the note (Cappuccio Decl. ¶ 28).  Even if only this $145,940.17 had been paid toward the

6   note at the time of the order of arrest, this is more than would have been due at that time under a

7   $3000 per month payment schedule.  Plaintiff's mere assertion that monthly payments were still

8   owed at that point is not sufficient to establish probable cause.  Defendants allege that they

9   understood the payment to be an advance on future payments.  Common sense also suggests

10  that if a debtor pays more than is owed on a payment schedule, monthly payments should not be

11  required until there is no longer an excess.

12    Plaintiff has not presented any evidence that defendants owed more than $3000 per

13  month pursuant to the note.  They have also failed to establish that defendants were behind on

14  that $3000 per month schedule or that they were obligated to make payments ahead of schedule.

15  Accordingly, while factual disputes remain, this order finds that plaintiff has not met its burden

16  of showing probable cause for the order of arrest.  This order is without prejudice to plaintiff

17  proving its case at trial or on summary judgment.

18                                **CONCLUSION**

19
20    For all of the above-stated reasons, defendants' motion to vacate the order of arrest is

21  GRANTED.  Defendants are ORDERED not to sell, pledge, hypothecate, diminish the value of, or

22  take the vessel outside the jurisdiction.  Defendants must also keep the vessel fully insured.

23

24

25

26

27

28                                      6

1    Defendants' counsel agreed to these conditions at the hearing.  Mr. Cohen was also present at

2    the hearing and agreed to these conditions.

3        **IT IS SO ORDERED.**

4

5

6    Dated:  August 16, 2007.

7                              WILLIAM ALSUP
                              UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

7

# Exhibit 4

From · 44361471       Page: 15/15    Date: 6/5/2007 6 · 18 PM
05/15/2007  11:55    5622162960                      RICHARD P WAGNER                          PAGE  18/28

COPY

NATIONAL VESSEL DOCUMENTATION OF
USCG
RECEIVED / FILED

PROMISSORY NOTE       20 APR '04        10 : 08 /

RECORDED: BOOK _____ PAGE ____

DOCUMENTATION OFFICER

For the value received, BARRY COHEN and CHRIS COHEN, an individual of 2028
Draydon Avenue, Cambria, California 93428, hereinafter referred to as maker, promises to pay to
the order of DEL MAR SEAFOODS, INC., 331 Ford Street, Watsonville, California 95076, its
successors and assigns, hereinafter referred to as holder, the sum of two hundred fifteen thousand
($215,000.00) dollars at the rate of seven (7) percent per annum, as follows:

Monthly payments of $3,000.00 or fifteen (15) percent of the gross landing receipts of each and
every landing of seafood product made by the fishing vessel POINT LOMA, whichever is greater,
commencing on _Tanuary '04_ and on the 15th day of each succeeding month until principal
and interest are fully paid. Payments are to be applied to interest first.

1.    This promissory note is secured by a First Preferred Ship Mortgage on the vessel
POINT LOMA, Official No. _CLA 515293 that_, dated _10/31/03_.

2.    _Incorporation of Terms of First Preferred Mortgage._

This note is secured by a continuing security interest in the vessel described in a
Preferred Mortgage, dated _10/31/03_, executed by maker in favor of holder. The terms
of that Preferred Mortgage are incorporated into this note by reference to the same effect as if set
forth in this note in their entirety. On default, under Preferred Mortgage or under
this note, holder may exercise any of the remedies granted by the Preferred Mortgage. Maker
acknowledges that holder rights are cumulative.

3.    _Acceleration of Maturity._

In the event of default, in the payment of any of the installments or interest due as provided in this

DMSI 0098

From ?44361471    Page: 2/14    Date: 6/5/2007 6:5?:07 PM

05/15/2007  11:55   5522100060    RICHARD P WAGNER    PAGE  19/20

note, time being of the essence, holder may, without notice or demand, declare the entire principal sum then unpaid immediately due and payable. Further, if maker should at any time fail in business or become insolvent, or commit an act of bankruptcy, or if any writ of execution, garnishment, attachment, or other legal process is issued against any deposit account or other property of maker, or if any assessment for taxes against maker, other than taxes on real property, is made by the federal or state government, or any department or agency of the federal or state government, or if maker fails to notify holder of any material change in their financial condition, all of the obligations of maker shall, at option of holder, become due and payable immediately without demand or notice.

### 4. Modification of Terms.

Holder may, with or without notice to maker, cause additional parties to be added to this note, or release any party, or revise, extend, or renew the note, or extend the time for making any installment provided for in this note, or accept any installment in advance, all without affecting the liability of maker.

### 5. Attorney's Fees.

If suit is commenced on this note, maker shall pay to holder a reasonable attorney's fee and all costs.

### 6. Waiver of Rights by Maker.

Maker hereby waivers (a) presentment, demand, protest, notice of dishonor and/or protest, and notice of non-payment; (b) the right, if any, to the benefit of, or to direct the application of, any security hypothecated to holder until all indebtedness of maker to holder, however arising, shall have been paid; and (c) the right to require holder to proceed against any party to this note, or to pursue any other remedy in holder power. Holder may proceed against maker directly and independently of any other party to this note, and the cessation of the liability of any other party or

DMSI 0099

any reason other than full payment, or any revision, renewal, extension, forbearance, change of rate of interest, or acceptance, release, or substitution of security, or any impairment or suspension of holder's remedies or rights against any other party, shall not in any way affect the liability of maker.

DATED: 10/31/03

_Barry Cohen_
Barry Cohen

_Chris Cohen_
Chris Cohen

DMSI 0100

# Exhibit 5

From: 361471    Page: 4/14    Date: 6/5/2007 6:53    PM
05/15/2007  11:55    5522162966    RICHARD P WAGNER    PAGE  08/29



## FIRST PREFERRED MORTGAGE

NATIONAL VESSEL DOCUMENTATION CENTER
USCG
RECEIVED / FILED

Official No: _515 298_

20 APR '04    10 : 08 AM

On the vessel:
POINT LOMA

RECORDED: BOOK _04.70_ PAGE _497_

Dated: _10/31/03_

DOCUMENTATION OFFICER

Amount of Mortgage $215,000.000

and made by BARRY COHEN And CHRIS COHEN a married couple

(Hereinafter called "Owner")

### WITNESSETH

Whereas, the maker, Mortgagor herein, is the sole owner of the whole of the vessel
(if more than one vessel is mortgaged hereunder, the term vessel means each such vessel)
hereinafter named and described, and is justly indebted to the Mortgagee, as evidenced by the
promissory note dated _10/31/03_ in the principal amount of $215,000.00, payable to the order
of Mortgagee as follows:

Per the Attached Promissory Note which shall become a part of this mortgage.

THE TOTAL AMOUNT OF THIS MORTGAGE IS TWO HUNDRED FIFTEEN THOUSAND
DOLLARS AND PERFORMANCE OF MORTGAGE COVENANTS.

And has agreed to give this Mortgage as security, and has authorized and directed the
execution and delivery hereof.

NOW, THEREFORE, in consideration of the premises and for other good and
valuable considerations, receipt of all of which is hereby acknowledged and to secure payment of
said indebtedness and interest and other sums that hereafter may become due pursuant hereto and
the performance of all covenants hereof. Owner by these presents mortgages and conveys unto
Mortgagee, its successors and assigns, the whole of the Vessel named below and further
described in her (their) last marine document(s) issued and identified as follows:

DMSI 0101

Name:    POINT LOMA

Home Port: Avila Beach, California. _____

Official Number: *515 298*

Together, with all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, tackle, apparel, furniture, fittings, tools, pumps, equipment and supplies, and fishing and all other appurtenances and accessories and additions, improvements and replacements now or hereafter belonging thereto, whether or not removed there from, all of which shall be deemed to be included in the term "vessel" herein, and said document(s) being deemed included herein by reference;

TO HAVE AND TO HOLD all singular the above described vessel unto Mortgagee, it's successors and assigns, forever;

PROVIDED, HOWEVER, that if Owner, his heirs, executors, administrators or its successors or assigns shall perform and observe all and singular the terms, covenants and agreements herein, then this Mortgage shall cease, otherwise to remain in full force and effect.

Nothing herein shall be deemed or construed to subject the lien hereof any property other than a vessel as the term issued in Title 46, Chapter 313, and Section 31322 of the United States Code. Owner agrees to pay said indebtedness with interest thereon as herein and in said note provided, and to perform and observe the further terms, covenants and agreements herein, and to hold the vessel subject thereto.

## ARTICLE I - PARTICULAR COVENANTS OF OWNER

Owner Covenants as follows:

1.        Owner is and shall continue to be a citizen of the United States entitled to own and operate said vessel under her marine document, which Owner shall maintain in full force and effect; and all action necessary for the execution, delivery and validity hereof and of the

DMSI 0102

good faith affidavit filed herewith and of said note has been taken. If a corporation, Owner is duly organized and is and shall continue in good standing under the laws of the State of NOT APPLICABLE and authorized to do business and in good standing in any other State wherein Owner regularly does business.

2.     Owner lawfully owns and possesses the vessel free from all liens and encumbrances whatsoever except as may herein below be specified and shall warrant and defend title to and possession of all and every part thereof for the benefit of Mortgagee against all persons whomsoever. Owner shall not set up against Mortgagee of this mortgage any claim of Owner against Mortgagee and/or assignee under any past or future transaction.

3.     Owner shall at his (its) own expense, keep the vessel fully and adequately insured under usual full marine insurance with policy valuation not exceeding the amount insured and, in the aggregate as to all vessels mortgaged herein, in at least the amount of the unpaid principal balance of this Mortgage, and shall maintain insurance to cover protection and indemnity risks, towers liability risks if the vessel performs towage, employees compensation and other risks and liabilities from time to time specified by Mortgagee. All insurance shall be taken out in the name of Owner and shall by its terms be payable to Mortgage for account of Mortgage and Owner as their respective interests may appear, and all policy forms, underwriters and amounts shall be subject to Mortgagee's approval. Owner shall notify, and shall request underwriters to agree reasonably in advance to notify Mortgagee of any cancellation of or material change in any insurance coverage. All policies, binders and cover notes shall be delivered to Mortgagee with evidence satisfactory to it that all premiums and other charges therefore have been fully paid. Owner shall maintain all such insurance unimpaired by any act, breach or warranty or otherwise.

4.     Owner shall comply with and not permit the vessel to be operated contrary to any provision of the law, treaties, conventions, rules, regulations or orders of the United States, any State and/or any other jurisdiction wherein operated, and/or of any department or agency thereof,

DMSI 0103

nor remove the vessel from the limits of the United States save on voyages with the intent of returning, nor abandon the vessel in any foreign port. Owner shall do everything necessary to establish and maintain this Mortgage as First Preferred Mortgage on said vessel.

5. Neither the Owner, Agent nor Master of the vessel has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the vessel or any part thereof any lien whatsoever other than to the Mortgagee or for crew's wages or salvage.

6. Owner shall place and keep prominently in the pilot house (if any), chart room or Master's cabin or elsewhere on the vessel as specified by Mortgagee any notice of this Mortgage required by Mortgagee, and shall keep proper copy hereof with the ship's papers and exhibit the same to all persons having business with the vessel, and to Mortgagee on demand.

7. Owner shall pay when due all taxes, assessments, government charges, fines and penalties lawfully imposed and promptly discharge any and all liens whatsoever upon vessel. Owner shall at his (its) own expense at all times maintain the vessel in thorough repair and working order and shall make all proper renewals and replacements.

8. If the vessel shall be libeled, attached, detained, seized or levied upon or taken into custody under process or under color of any authority, Owner shall forthwith notify Mortgagee by telegram, confirmed by letter, and forthwith discharge or release the vessel there from and in any event within fifteen (15) days after such attachment, detention, seizure, levy or taking into custody.

9. Owner shall at all times afford Mortgagee complete opportunity to inspect the vessel and cargoes and papers thereof, and to examine Owners related accounts and records; and shall certify quarterly and, if Mortgagee requests, monthly, that all wages and all other claims whatsoever which might have given rise to a lien upon the vessel have been paid.

10. Owner shall not, without prior written consent of Mortgagee, sell or mortgage the vessel or any interest therein nor charter her except to persons and for uses lawful for American vessels and then only provided said insurance be unaffected thereby or adequately replaced; nor,

DMSI 0104

if a corporation, to merge or consolidate with any other person, firm or corporation, or dissolve.

11.      From time to time Owner shall execute and deliver such other and further instruments and assurance as in the opinion of Mortgagee's counsel may be required to subject to vessel more effectual to the lien hereof and to the payment of said indebtedness and for operation of the vessel as herein provided, and to effectuate sales as provided in paragraph (C) of Section 1 of Article 11.

## ARTICLE II - DEFAULT

1.      In any one or more of the following events, herein termed events of default:

(a) Default in the punctual payment of the principal of the note secured hereby or any installment thereof, or in the due and punctual performance of any provision of Sections 3, 4, 5, 6, 8 and 10 or Article I hereof, or attempt to violate Sections 4 or 10 of Article I hereof, or default continuing for fifteen (15) days in performance of any other covenant herein; or

(b) Commission of any act of bankruptcy by Owner or approval by any court of a petition or answer asking for reorganization, arrangement, extension or other relief under any bankruptcy law; or to appointment of a receiver for Owner or any of Owner's property or the taking by any court of any action comparable thereto; or rendition of a final judgment against Owner for the payment of money and failure of Owner to discharge the same within ninety (90) days or stay the execution thereof pending appeal; or Mortgagee's conclusion in good faith at any time that, through actual or prospective impairment of Owner's net current asset position, net worth, asset-liability ratio, or earning, or through prospective violation of any provision of this Mortgage, Mortgagee is in danger of losing said debt, or any part thereof, by delaying collecting thereof until the time above limited for the payment thereof, then, and in every such case, Mortgagee may:

DMSI 0105

From: 7 · 361471    Page: 9/14    Date: 6/5/2007 6:53  'M
08/15/2007  11:55    5622162550    RICHARD P. WAGNER    PAGE  13/20

(a)    Declare the principal of said note and all accrued interest thereon to be and they shall then become and be due and payable forthwith, after which they shall bear interest at the rate of 10% per annum;

(b)    Recover judgment for, and collect out of any property of Owner, any amount thereby or otherwise due hereunder; and/or collect all earned charter hire and freight monies relating to services performed by the vessel, Owner hereby assigning to Mortgagee such earned charter hire and freight monies then owing; and/or

(c)    Retake the vessel without legal process at any time wherever the same may be, and, without being responsible for loss or damage, hold and in Mortgagee's or in Owner's name lease, charter, operate or otherwise use the vessel for such time and on such terms as Mortgagee may deem advisable, being accountable for net profits, if any, and with the right to dock the vessel free of charge at the Owner's premises or elsewhere at Owner's expense; and/or sell the vessel, free from any claim by Owner of any nature whatsoever, in the manner provided by the law; to the extent permitted by law, such sale may be public or private, without notice, without having the vessel present, and/or Mortgagee may become the purchaser.

For such purpose Mortgagee and its agents are hereby irrevocably appointed the true and lawful attorneys of Owner in his (its) name and stead to make all necessary transfers of the vessel thus sold.

2,    In the event that the vessel shall be arrested or detained by any officer of any court or by any other authority, Owner hereby authorizes Mortgagee, its officers, representatives and appointees, in the name of the Owner or of Mortgagee, to receive or to take possession thereof, and to defend any action and/or discharge any lien.

DMSI 0106

3.    Each and every power or remedy herein given to Mortgagee shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often as may be deemed expedient by Mortgagee. No delay or omission by Mortgagee shall impair any right, power, or remedy, and no waiver of any default shall waive any other default. In any suit Mortgagee shall be entitled to obtain appointment of a receiver of the vessel and the earnings thereof, who shall have full rights and powers to use and operate the vessel, and to obtain a decree ordering and directing the sale and disposition thereof.

4.    The net proceeds of any judicial or other sale, and any charter, management, operation or other use of the vessel by Mortgagee, of any claim for damages, of any judgment, and any insurance received by Mortgagee (except to the extent paid to Owner or applied in payment of repairs or otherwise for Owner's benefit) shall be applied as follows:

FIRST:    To the payment of all attorneys fees, court costs, and any other expenses, losses, charges, damages incurred or advances made by Mortgagee in the protection of its rights or caused by Owner's default hereunder or under the note secured hereby, with interest on all such amounts at the rate of 10% per annum; and to provide adequate indemnity against any liens for which priority over this Mortgage is claimed;

SECOND:    To the payment of all interest, to date of payment, on the note and any or all other sums secured hereby, and as to any balance of such proceeds, to the payment of next of any or all matured installments of principal and then of any or all un-matured installments of principal in the inverse order of this maturity.

Mortgagee shall be entitled to collect any deficiency from Owner. Owner shall be entitled to any surplus, subject to set-off in favor of Mortgagee for any other indebtedness of Owner.

DMSI 0107

5.      All advances and expenditures which Mortgagee in its discretion may make any
repairs, insurance, payment of liens or other claims, defense of suit, or for any other purpose
whatsoever related hereto or said note and all damages sustained by Mortgagee because of
defaults, shall be repaid by Owner on demand with interest at 10% per annum, and until so
paid shall be a debt due from Owner to Mortgagee secured by the lien thereof. Mortgagee
shall not be obligated to make any such advances or expenditures, nor shall the making
thereof relieve Owner of any obligation or default with respect thereto.

## ARTICLE III - POSSESSION UNTIL DEFAULT

Until one or more of the events of default hereinbefore described, Owner shall be permitted to
obtain actual possession and use of the vessel.

## ARTICLE IV - SUNDRY PROVISIONS

All covenants and agreements of Owner herein contained shall bind Owner, his heirs, executors,
administrators and assigns, or its successors and assigns, shall inure to the benefit of Mortgagee
and its successors and assigns. Following any assignments hereof, any reference herein of
"Mortgagee" shall be deemed to refer to the assignee. If one or more person is the Owner herein,
"his" shall mean "their".

FUTURE ADVANCES. This mortgage is executed for the purpose of securing not
only the payment of the above described note but also to secure all future advances made by
the holder of said note to the mortgagor; and said mortgage shall remain in full force and effect
to secure all future advances and all renewals or extensions of the above described note.

DMSI 0108

From:    361471     Page: 12/14     Date: 6/5/2007 6:5    PM
05/15/2007  11:55     5622152360          RICHARD P WAGNER                    PAGE   15/28

IN WITNESS WHEREOF, on the day and year above written, Owner has executed this Mortgage, or if a corporation, has caused this Mortgage to be executed in its name and its corporate seal to be affixed hereto by its proper officers thereunto duly authorized or as required by State law.

DMSI 0109

 **CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California

County of San Luis Obispo

On 10-31-03 before me, Nancy E. Martin, Notary Public, personally appeared Christene Layne Cohen and Barry A. Cohen.

☐ personally known to me - **OR** - ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Nancy E. Martin*
_____
Signature of Notary

> NANCY E. MARTIN
> COMM. #1422420
> NOTARY PUBLIC-CALIFORNIA
> SAN LUIS OBISPO COUNTY
> My Comm. Expires August 8, 2007

**OPTIONAL**

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

CAPACITY CLAIMED BY SIGNER (PRINCIPAL)

☐ Individual
☐ Corporate Officer

Title

☐ Partner(s)    ☐ Limited
                ☐ General

☐ Attorney-in-Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other:

Absent Signer (Principal) is Representing:

DESCRIPTION OF ATTACHED DOCUMENT

First Preferred Mortgage

*Title or Type of Document*

11 plus attached acknowledgment

*Number of Pages*

10-31-03

*Date of Document*

None

*Signer(s) Other Than Name(s) Above*

ADM-005 (07/01)

DMSI 0110

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

DEL MAR SEAFOODS, INC.,              )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )    NO. C-07-2952-WHA
                                     )
BARRY COHEN, CHRIS COHEN (aka        )
CHRISTENE COHEN), in personam        )
and, F/V POINT LOMA, Official        )
Number 515298, a 1968               )
steel-hulled, 126-gross ton,         )
70.8 foot long fishing vessel,       )
her engines, tackle, furniture       )
apparel, etc., in rem, and           )
Does 1-10,                           )
                                     )
            Defendants.              )
_____)


DEPOSITION OF

BARRY ALLEN COHEN

_____

January 9, 2008


REPORTED BY: RITA R. LERNER, CSR #3179      (2001-404170)

1

14

1    A.  Ever.
2    Q.  How about Olde Port Fisheries, Inc.?
3    A.  Yes.
4    Q.  And what time period were you an owner of Olde
5  Port Fisheries, Inc.?
6    A.  From its inception until today.
7    Q.  When was Olde Port Fisheries, Inc., started?
8    A.  In 2003 or 2004, to my best recollection.
9    Q.  And you're an owner of the Point Loma Fishing
10  Company, Inc., correct?
11    A.  Today?
12    Q.  Yes.
13    A.  Yes.
14    Q.  And you have been since that company was
15  started; is that correct?
16    A.  Correct.  But that company is and has been part
17  of my fishing with that boat.  I just had it
18  incorporated.
19    Q.  How many corporations have you been -- well,
20  have you actually started and been a major shareholder
21  of?
22    A.  One.
23    Q.  The Point Loma Fishing Company, Inc.?
24    A.  No.
25    Q.  Well, then, that would be two.  Did you start

15

1  the Point Loma Fishing Company, Inc.?
2    A.  Yes, but I was not a major stockholder.
3    Q.  Don't you own 50 percent of that?
4    A.  50 percent.  I'm an equal.
5    Q.  Okay.  What other California corporations,
6  besides Point Loma Fishing Company, Inc., and Olde Port
7  Fisheries, Inc., have you started?
8    A.  Olde Port Fish Company, Inc.
9    Q.  Any others?
10    A.  Not that I can think of as of this moment.
11    Q.  So we've got -- I just want to make sure the
12  record is clear here.  You started three corporations:
13  Olde Port Fisheries, Inc., Olde Port Fish Company, Inc.,
14  and Point Loma Fishing Company, Inc.  Is that right?
15    A.  Correct.
16    Q.  Are all of those California corporations?
17    A.  Yes.
18    Q.  And have all of them been Subchapter S
19  corporations?
20    A.  First of all, I don't know.  I would have to
21  guess.  I don't think that Olde Port Fish Company, Inc.,
22  was an S corporation, but I didn't know at the time an
23  "S" from any other kind of corporation.  I still don't
24  know the difference.
25    Q.  When was Olde Port Fish Company, Inc., started?

16

1    A.  A long time ago.  I would have to guess, if you
2  want me to guess.
3    Q.  Well, I'm fairly certain you know that
4  guessing, from having attended all these depositions, is
5  a word we don't like to use.
6      Let me give you the general instruction.  I do
7  not want you to guess about anything.  I am entitled to
8  and I want you to give me your best estimate, if you
9  have one, but don't just pull numbers out of thin air.
10  If you have an estimate, whether it be by year, month,
11  day or decade, even, I'm entitled to the best narrowing
12  down that you can give me.  But if you're just picking
13  something out of thin air, that's guessing.  Do you
14  understand that?
15    A.  Yes.
16    Q.  What's your best estimate of when Olde Port
17  Fish Company, Inc., was started?
18    A.  In the 19 -- the end of the 1960s or the 1970s
19  or the early part of the 1980s.  That's my best
20  recollection.  I can't remember what year I went to a
21  corporation from just being the sole owner.
22    Q.  What was the business of Olde Port Fish
23  Company, Inc.?
24    A.  It started out as buying and selling fish from
25  the boats; then it included retail sales; then it

17

1  included a restaurant.
2    Q.  And what was the restaurant?
3    A.  The restaurant was called the "Olde Port Inn."
4    Q.  So the Olde Port Inn -- you owned that
5  restaurant, but you ran it under the Olde Port Fish
6  Company, Inc., corporation?
7    A.  Correct.
8    Q.  Okay.  Is the Olde Port Fish Company, Inc.
9  corporation still in existence?
10    A.  No.
11    Q.  When did that corporation cease to exist?
12    A.  I believe, at the end of the 1980s.
13    Q.  And were the assets of that corporation
14  transferred to some other corporation?
15    A.  I don't know how to answer that.
16    Q.  What happened to the business -- well, for
17  example, the restaurant?
18    A.  Well, I'll explain why I can't answer that.  I
19  transferred it to Leonard Cohen, who put the tables and
20  chairs and stuff in a corporation that he developed.  So
21  it's that transfer to another corporation, another
22  person.  That's why I don't know how to answer that, but
23  that happened with the assets.
24    Q.  You sold the restaurant to Leonard; is that
25  right?

Merrill Legal Solutions
(800) 869-9132

BARRY ALLEN COHEN    January 9, 2008

18

1    A.  Yes.
2    Q.  And when you sold that restaurant to Leonard,
3   he took that and put it into a new corporation; is that
4   your understanding?
5    A.  He had started a corporation first.
6    Q.  Right.
7    A.  And he had an operating corporation, and he
8   operated the restaurant for me first.  And then he
9   bought the restaurant assets from me.
10    Q.  And was that corporation Olde Port Inn, Inc.?
11    A.  Yes.
12    Q.  So Olde Port Inn, Inc., started operating the
13   restaurant for Olde Port Fish Company, Inc., and then
14   you sold the restaurant to Leonard, and he began not
15   only managing, but actually running and owning the
16   restaurant under the Olde Port Inn, Inc.?
17    A.  After a certain amount of time.
18    Q.  Are you a shareholder in Olde Port Inn, Inc.?
19    A.  No.
20    Q.  Do you have any ownership interest or derive
21   income from Olde Port Inn, Inc.?
22    A.  No.
23    Q.  You don't get any lease income from them?
24    A.  No.  I have to clarify that.  We share rent, so
25   however you want to look at that, but I don't actually

19

1   get any income.  Olde Port Inn and Olde Port Fisheries,
2   Inc., share a lease site and we both pay the rent.
3    Q.  And the lease site is the property in Avila
4   Beach; correct?
5    A.  On the pier at Port San Luis; correct.
6    Q.  Okay.  When was the Point Loma Fishing Company,
7   Inc., started?
8    A.  I don't remember the year.
9    Q.  Can you give me your best estimate?
10    A.  My best estimate would be in the early 2000s --
11   or late.  I would say the early 2000s.
12    Q.  So the Point Loma Fishing Company, Inc., was
13   founded prior to execution of the promissory note and
14   mortgage that is the subject of this litigation?
15    A.  I believe it was after.
16    Q.  When was the promissory note and mortgage that
17   is the subject of this litigation signed?
18    A.  I don't remember.
19    Q.  But you believe the Fishing Company, Inc. --
20   Port Loma Fishing Company, Inc. -- was established after
21   that?
22    A.  I believe so.
23    Q.  In addition to your California corporations,
24   you have also been a party, either individually or
25   through your different corporations, in a number of

20

1   joint ventures; is that correct?
2    A.  If I understand your question, it's either/or.
3   Yes, I have.  I have.
4    Q.  You have personally?
5    A.  I have.
6    Q.  Can you tell us what joint ventures you have
7   been a party to?
8    A.  I was a party to a joint venture with Del Mar
9   Seafoods.  I was a party to a joint venture of Artemis,
10   Inc., with Joe Cappuccio, and I was a party to a Mexican
11   corporation with Joe Cappuccio and Victor Segura.
12    Q.  Were you also a party to a joint venture with
13   Fisherman Johnny?
14    A.  Yes.
15    Q.  So that's at least four joint ventures that
16   you've been a party to; correct?
17    A.  Correct.
18    Q.  Are there any more than that?
19    A.  Not that I recall.
20    Q.  Are there any that your corporations have been
21   a party to that are in addition to those four?
22    A.  Not that I can recall.
23    Q.  What was the joint venture you had with
24   Del Mar?
25    A.  We bought, processed and sold fish at my lease

21

1   site at Port San Luis.
2    Q.  What were the terms of that joint venture?
3    A.  By "terms," you mean what?
4    Q.  What were the basic terms under which the
5   parties entered into a joint venture?
6    A.  That Del Mar Seafoods would finance it; I would
7   manage it, be the manager of it and be -- and manage the
8   property of it; and we would split the profits 50-50.
9    Q.  When you were the manager, how were you paid?
10   Were you paid only on that 50-50 profit split?
11    A.  No.  I was also an employee.
12    Q.  So you had an employment relationship with
13   Del Mar in this joint venture?
14    A.  Actually, we considered that I had an
15   employment with the joint venture and shared in the
16   profit of the joint venture.  Had it not been for the
17   joint venture at that time, I would not have been an
18   employee.
19    Q.  So, was the income that you received from that
20   joint venture -- you said you were an employee.  You got
21   a paycheck; is that right?
22    A.  Correct.
23    Q.  But you also shared 50-50 in the profits;
24   right?
25    A.  Correct.

6 (Pages 18 to 21)

BARRY ALLEN COHEN   January 9, 2008

22

1    Q.   Were the payments you received as an employee
2   deducted from the 50-50, or was it in addition to your
3   50 percent profit share?
4    A.   In addition to.
5    Q.   Okay.  As the manager of that joint venture,
6   what were your responsibilities?
7        MR. WALSH:  Asked and answered.
8        THE WITNESS:  Normal management
9   responsibilities:  That I would manage it; I would
10  oversee the operation.
11       MR. POULOS:  Q.  On a day-to-day basis?
12   A.   On a day-to-day basis.
13   Q.   Were you responsible for approving transfers of
14  inventory to customers of the joint venture?
15   A.   You mean, selling them?
16   Q.   Yes.
17   A.   Yes.
18   Q.   Did you sell -- when you were the manager of
19  that joint venture, did you sell product to Michael
20  Cohen, your son?
21   A.   I believe -- well, I don't know if I sold it to
22  him personally, but I was aware that he bought some
23  product from the joint venture.
24   Q.   And he did so on an account; correct?
25   A.   Yes.

23

1    Q.   And that's often termed "on account"; correct?
2    A.   Well, it was termed a "receivable."
3    Q.   But it was on a running account balance that he
4   kept with the joint venture, an open book account, if
5   you will?
6    A.   Well, those are your terms, but I would say it
7   seems to be the same as what I'm saying.
8    Q.   Well, why don't you describe -- was he allowed
9   to take inventory and have the balance owed on that
10  inventory added to a running account balance?
11   A.   He was not allowed to take inventory -- no more
12  than anybody else was allowed to take inventory.  If he
13  wanted anything, he was invoiced and the invoice was
14  applied to his receivable.
15   Q.   Was the same true for Leonard Cohen and the
16  Olde Port Inn?
17   A.   Yes.
18   Q.   So Leonard and Olde Port Inn were also
19  customers who obtained fish product from the joint
20  venture?
21   A.   Correct.
22   Q.   And that joint venture was called "Del Mar
23  Seafoods, Inc., Olde Port Fisheries Division," is that
24  right?
25   A.   By some.  It was not an official name.

24

1    Q.   You understood that Olde Port Fisheries,
2   then -- that JV was basically operating as a division of
3   Del Mar; is that correct?
4    A.   No, it was not a division of Del Mar.
5    Q.   But it was termed that by some?
6    A.   Only by one, that I know.
7    Q.   And who was that?
8    A.   The bookkeeper put it on the top of the
9   statement on her own volition.
10   Q.   Was Michael Cohen an employee of that joint
11  venture?
12   A.   Yes.
13   Q.   And in what capacity was he employed by the JV?
14   A.   He was an employee, a worker.
15   Q.   Doing what?
16   A.   He worked on the dock and inside the market.
17   Q.   At some point did he also become not just an
18  employee, but also a customer?
19   A.   Correct.
20   Q.   And can you tell me in what capacity he became
21  a customer?  What was he doing?
22   A.   In a very small capacity he was trying to sell
23  fish to a couple local restaurants.
24   Q.   Did he also try to start a web-based fish sales
25  business?

25

1    A.   Yes, he did.
2    Q.   And did the joint venture allow him to purchase
3   fish on account for both of those businesses?
4    A.   We sold fish to Michael at a profit, at a
5   profit margin.  What he did with those fish or what the
6   split was -- some went to restaurants, some went to the
7   web thing.  I don't know if he got orders on the web
8   deal; I don't know.
9        So all I know is, yes, he did buy fish, and
10  whatever he did with that was up to him.  I know he did
11  start a website and put our location and everything on
12  the pier.  And that's what I know about it.
13   Q.   The joint venture with Del Mar eventually
14  ended; is that correct?  You stopped being in a joint
15  venture with Del Mar in Avila Beach?
16   A.   To be exact, Del Mar ended the joint venture.
17  Joe Cappuccio ended the joint venture.
18   Q.   Do you recall when that was done?
19   A.   Sometime in 2004.
20   Q.   When that joint venture ended, did Michael owe
21  a balance on his account with the joint venture?
22   A.   Yes, he did.
23   Q.   Do you recall how much that was?
24   A.   I do not.
25   Q.   Do you know, since you were the manager,

BARRY ALLEN COHEN    January 9, 2008

26

1  whether he ever paid that balance?
2    A.  The balance from when we closed?
3    Q.  Yes.
4    A.  I know he made a payment and I know there was
5  credit given for another payment.  But did he pay it
6  off?  The answer is no.
7    Q.  Did you ever agree to be responsible for that
8  debt of Michael Cohen?
9      MR. WALSH:  Objection.  Vague.  If you
10  understood the word "responsible," you can try and
11  answer it.
12      THE WITNESS:  Well, I said I would be
13  responsible for it.
14      MR. POULOS:  Q.  Who did you say that to?
15    A.  Joe Roggio, for one.
16    Q.  When did you tell Joe Roggio that you would be
17  responsible for Michael Cohen's debt?
18    A.  Sometime after we closed the joint venture.
19    Q.  So sometime after 2004?
20    A.  Sometime in 2004.
21    Q.  Okay.  Who else did you tell that you would be
22  responsible for Michael's debt?
23    A.  Probably Michael.
24    Q.  Have you paid that debt?
25    A.  Not intentionally.

27

1    Q.  Have you paid it, in your own estimation?
2    A.  In my mind?
3    Q.  Yes.
4    A.  No.
5    Q.  When fisherman -- well, withdrawn.
6      How much do you understand that you are
7  responsible to pay for Michael's debt?
8    A.  Today?
9    Q.  Yes.
10    A.  Nothing.
11    Q.  How much do you believe the debt was at the
12  time that you agreed to be responsible for it?
13    A.  I don't know.
14    Q.  And why do you contend -- you've said in your
15  own mind, you haven't paid that debt; correct?
16    A.  In my own mind, I have not paid it.
17    Q.  And in your -- and you agree that you had
18  agreed to be responsible for it?
19    A.  I agreed to be responsible for it.  At the time
20  I said that I will be responsible for it.
21    Q.  And you're a man of your word, aren't you?
22    A.  Yes.
23    Q.  You're not trying to back out of being
24  responsible for it, are you?
25    A.  I said at the time I said that, I was

28

1  responsible for it.  So to ask me after many things have
2  changed am I still responsible for it is not a valid
3  conclusion.  A lot of things have changed that changed
4  that agreement.
5    Q.  What has changed that -- well, do you believe
6  the debt has been forgiven?
7    A.  I don't think that's the right terminology.
8    Q.  What is it that you think has changed that
9  makes you no longer -- or that allows you to revoke your
10  responsibility for that debt?
11    A.  I am not revoking my responsibility for that
12  debt.  That's your word.  That's not what I said.  But
13  if you want me to answer, I will, but then I will answer
14  with the whole truth, and if that's what you would like
15  me to do, I will.
16    Q.  Of course, I want you to tell me the whole
17  truth.  Why do you feel you are no longer responsible
18  for that debt?
19    A.  Okay.  For several reasons.  Number one is when
20  I said I would be responsible for it, I was thinking
21  that I would, as an employee of Del Mar, collect that
22  money over time, and I didn't worry about it because I
23  was an employee of Del Mar.  And why I had confidence to
24  be an employee of Del Mar is because when Joe Cappuccio
25  asked me if I would come work at the Watsonville

29

1  plant -- he offered me that job -- I talked to Joe
2  Roggio, we went out to lunch, and Joe said, "You know,
3  we want you to come here."
4      And I said, "You know what, Joe.  For me to
5  sell my house and to buy a different house up here is a
6  huge commitment, and what security do I have that I
7  would have this job?"  And Joe Roggio told me that day
8  that if you come up here, if you sell your house in
9  Cambria and you move up here, you can work for this
10  company as long as you'd like to; that will be your
11  security.
12      And the day that Joe Cappuccio called me in his
13  office and he said, "Barry, we no longer need your
14  services," I asked Joe Roggio, "Joe, what about the
15  promise you made me if I moved and bought a house up
16  here and sold my house in Cambria?"
17      And Joe Roggio said, "Things change, you know."
18  That's a quote.  "Things change, you know."  That's the
19  God's honest truth.  That was one reason.
20      The second reason is because when Del Mar left,
21  they didn't want anything to do with that joint venture.
22  They did not want to be involved with the harbor; they
23  did not want to be a party to the lawsuit; they didn't
24  want to be involved in any way.  And Joe Cappuccio
25  walked away from the joint venture.  And Joe Roggio

8  (Pages 26 to 29)

30

1  signed an assignment giving me all the rights and
2  everything of that joint venture to me, and excluded
3  them from any involvement in the joint venture at all.
4  And when he signed that, he was well aware that there
5  were receivables on that joint venture receivable,
6  including Michael and Leonard Cohen. And he assigned it
7  all to me; he didn't -- there was no revoking anything.
8  Those are the reasons.
9      And there was one more reason. And because
10 when I made a boat payment to -- I made it to Del Mar
11 Seafoods, but I handed it to Joe Cappuccio -- then Joe
12 Roggio, on his own volition, applied it to outstanding
13 balances that are on that piece of paper he gave me,
14 which included Michael and Leonard's thing, and he
15 showed them as paid off with that $175,000 payment.
16     So, on the left hand, Del Mar is saying that it
17 was okay that they took the money and applied it there,
18 and then today they're saying I still owe it. Well, it
19 can't be both ways. So that's why, in my mind, this
20 whole thing doesn't make any sense.
21     I gave that money as a payment against that
22 boat loan because Joe Cappuccio asked me if I would help
23 him because the bank was giving him a problem about
24 having such a big loan on his books. He asked me as a
25 favor to do something, to make a big loan. I said I

31

1  would see what I could do. I went, talked to my wife,
2  we got a second on our house, and I gave Joe Cappuccio
3  that check as a payment against the loan that I had on
4  the boat. That's the essence of how the whole thing
5  worked.
6  Q. Okay. Let's look at -- the first one, for the
7  Michael Cohen debt -- we're talking about the Michael
8  Cohen debt -- you agreed to be responsible for it;
9  correct? Is that right?
10 A. That's what I said.
11 Q. You didn't say -- and it was you personally
12 assuming that responsibility; is that right?
13     MR. WALSH: I believe you've answered that
14 question.
15     MR. POULOS: You can answer it again.
16     THE WITNESS: I said I would be responsible.
17     MR. POULOS: Q. Okay. With respect to the
18 boat payment, you're talking about the payment of the
19 $175,000; right?
20 A. That's the one I was referring to.
21 Q. Okay. You understand that Del Mar believed --
22 as you said, Joe Roggio, applied a portion of that
23 payment to pay off the Michael Cohen debt that you said
24 you would be responsible for; correct? You understand
25 that's what Joe Roggio did?

32

1  A. I understand that's what it said on that paper
2  that I told him didn't look right to me.
3  Q. Okay. You understand that Del Mar believed
4  that that payment, that $175,000 payment, if properly
5  applied, in Del Mar's mind, paid off that balance you
6  owed on the Michael debt. You understand that?
7  A. Absolutely not.
8  Q. That's Del Mar's position?
9  A. No, not true. They did not think that for one
10 second, because Joe Cappuccio asked me to let that money
11 for him to apply to the note that showed on their books
12 for the boat.
13     And Greg, I want to say something between you
14 and I. Please don't say inflammatory things to me.
15 Don't say I revoke on my word and things. That's not
16 necessary. We're going to be nice to each other; okay,
17 please? I won't be inflammatory to you.
18 Q. I'm not trying to be inflammatory.
19 A. I know, but with your choice of words, be
20 careful. Okay?
21 Q. I am.
22 A. Okay. Good.
23 Q. You've given me three reasons why you think
24 that the debt you personally assumed for Michael Cohen
25 you no longer owe. And I just want to make sure that

33

1  those are the three reasons, the only three reasons,
2  that you're relying on for saying that you no longer owe
3  that debt.
4  A. I'm going to say --
5      MR. WALSH: Wait, Barry. Let me put an
6  objection on the record.
7      I'll put an objection on the record that you
8  cannot ask him for a legal conclusion; that there are
9  legal positions why he is not obligated to pay in
10 addition to whatever he may believe. With that, you can
11 answer.
12     THE WITNESS: Okay. I need -- do me a favor.
13 Read that back, what he asked me.
14     MR. POULOS: I'll rephrase it. I just want to
15 make sure I'm getting everything on the record today.
16 Q. We've established that you told Joe Roggio and
17 Michael, at least those two people, that you would be
18 responsible for Michael's debt.
19 A. That's true, but I think you said that I
20 assumed Michael's debt.
21 Q. By being responsible for it, I consider that
22 assuming that debt.
23 A. But that's not what I said. I said I would be
24 responsible for it.
25 Q. What did that mean to you?

BARRY ALLEN COHEN      January 9, 2008

34

1    A.  That I would see that Del Mar got paid that
2  money.  And that's a huge difference, in my mind, to
3  assuming something for myself.  I said I will be
4  responsible for it.  Exact words.
5        And I can't say that's the only three reasons.
6  I don't know if that is.  I wasn't even thinking what
7  Bud was thinking, but those are the three that are on
8  the top of my mind of -- where I think I did not go back
9  on my word.  I felt like, one, they were all assigned to
10  me, anyhow.  It was given -- all the receivables were
11  given to me, so I could pay myself, if I want.  And the
12  second -- or I could forgive them; I could do whatever I
13  want with them.
14        And the other one is when Joe Roggio made that
15  paper and I said to him, "This does not look right to
16  me," and he said, "Barry, I'm just cleaning up the
17  books; it's okay," meaning that what I understood what
18  he said when he was just cleaning up the books is that
19  it meant exactly that:  He was justing up the books.
20  I still -- when I was going to pay off the amount of
21  money against that loan for the boat, that I would then
22  say I want that note signed back to me; that we're done.
23  And that's what I thought he meant:  That he was just
24  cleaning up his books.  It had nothing to do with what
25  was going on with me, because I gave that payment 100

35

1  percent for that note amount, that note loan, because
2  that was the one that I was asked to do and it made
3  sense to me because that's the one I had collateral on.
4    Q.  We're going to come back to what that note was
5  for in a few minutes.
6    A.  Okay.
7    Q.  Let's talk about --
8    A.  Can we take a quick break right now.  I just
9  need to run to the restroom.
10    MR. POULOS:  Absolutely.
11    (Recess 11:06 to 11:17)
12    MR. POULOS:  Okay.  Let's go back on.
13    Q.  We've talked about Michael Cohen's debt.  There
14  were some debts that Leonard Cohen also owed to Del Mar
15  Seafoods; is that right?
16    A.  No.
17    Q.  Who did he owe the debts to?
18    A.  The joint venture.
19    Q.  And what you're contending is owed to the Avila
20  Beach joint venture?
21    A.  Correct.
22    Q.  What were those debts for?
23    A.  For fish that he purchased from the joint
24  venture.
25    Q.  For use at Olde Port Inn, presumably?

36

1    A.  Presumably.  I would think so, but I didn't
2  follow the fish.
3    Q.  Do you have an idea of how much those debts
4  were?
5    A.  I don't.
6    Q.  By the time the joint venture was wound up, had
7  those debts been paid?
8    A.  His receivables had not been paid.
9    Q.  Did you also agree to be responsible for those
10  debts?
11    A.  Yes.
12    Q.  And did you tell that to Joe Roggio?
13    A.  Yes.
14    Q.  Did you tell that to Joe Cappuccio?
15    A.  I don't believe so.
16    Q.  Did you tell it to Leonard?
17    A.  Yes.
18    Q.  Do you have any idea as you sit here today how
19  much of Leonard's debt you agreed to be responsible for?
20    A.  Whatever his debt was on the receivables to the
21  joint venture.
22    Q.  You were given a payment schedule by Joe Roggio
23  after you made the $175,000 payment that showed debts
24  for Michael, debts for Leonard, debts for inventory.  Do
25  you remember that?

37

1    MR. WALSH:  Objection.  Vague as to time.
2    MR. POULOS:  Q.  You know the schedule I'm
3  talking about?
4    A.  What was termed, I believe, written on there,
5  was "Statement of Payments."  Is that --
6    Q.  Yes.
7    A.  Okay.  And -- say your question again.
8    Q.  With respect to that, that showed balances due
9  from Michael, balances due from Leonard, and how those
10  were paid off by that $175,000 payment; right?
11    A.  And inventory.
12    Q.  And inventory.
13    A.  And that showed what Joe Roggio put on there.
14  That's what it showed to me.  Not -- you have to
15  remember, I said it doesn't look right to me for a lot
16  of reasons.
17    Q.  My question is:  In terms of the numbers that
18  were on there for the debts of Michael and the debts of
19  Leonard and the debts for inventory, did you disagree
20  with those figures?  Not whether they were still owed or
21  whether the payment was applied, but in terms of the
22  number of what that debt was that you agreed to be
23  responsible for, did you have any disagreement as to
24  that number?
25    MR. WALSH:  Objection.  Assumes facts not in

10  (Pages 34 to 37)

BARRY ALLEN COHEN   January 9, 2008

46

1    Q.  By you personally?

2    A.  Well, I don't know what you're referring to.

3  What personally?  The difference, or the whole thing,

4  or --

5    Q.  What did you understand that column to

6  represent?

7    A.  That column represents, in part -- the note

8  secured by the boat, I believe, is in that number.  And

9  I believe that in addition to the boat, some other

10  monies owed were just put in the same column.  I think

11  it should have been different.  I didn't understand the

12  whole thing, but it should have been -- in my opinion,

13  should have been the boat note separate from everything

14  else, and that's what should have gotten paid.

15    Q.  The beginning balance that's shown on this

16  sheet says the beginning balance is 237,035.48.

17    (Inaudible comment by Mr. Walsh)

18    MR. POULOS:  Let's have this marked as

19  Exhibit 1.

20    (Whereupon, Exhibit 1 was

21    marked for identification.)

22    THE WITNESS:  It's not the same document, not

23  the same document at all.  It's a different document.

24    MR. ROGGIO:  This is a more current one.

25    THE WITNESS:  This is the one that was done

47

1  after I got laid off, when I asked for it.  No, it was

2  not even that.  That was the most recent one.

3    MR. POULOS:  Let me take a break and grab the

4  right one.

5    (Recess from 11:36 to 11:40)

6    MR. POULOS:  Q.  You want to compare that,

7  because I think this is the one.  I think that's the

8  same, except, you know, it doesn't have the handwriting

9  on it.

10    A.  It might be even clearer.  But anyway --

11    Q.  I think it's a little better than this one.

12    A.  I know there's a good copy of, you know, kind

13  of the original of this that didn't get all blurred in

14  faxing and stuff.

15    MR. POULOS:  Let's re-mark Exhibit 1 so that

16  we've got a proper Exhibit 1.

17    (Whereupon, Exhibit 1 was

18    marked for identification.)

19    MR. POULOS:  Q.  Why don't you take a look at

20  Exhibit 1, which I think is a slightly better copy than

21  the one we've been looking at.

22    All right.  So we've been talking about the

23  figures under -- we've gotten to look at the figure

24  under the column called "Barry"; correct?

25    A.  Correct.

48

1    Q.  And what did you think that that figure

2  represented?

3    A.  I think this represents the major part of that

4  number I believe was the note for the boat, the

5  $215,000, plus I believe that the rest was some other

6  monies owed.

7    Q.  By you?

8    A.  That's what I think this shows.

9    Q.  Okay.  What other monies owed do you think were

10  included in that?

11    A.  Greg, I have no idea.

12    Q.  The beginning balance -- let's talk about the

13  note for a minute.  You just mentioned a note for

14  $215,000; correct?

15    A.  Correct.

16    Q.  That's a promissory note that you understand is

17  part of what's at issue in this litigation; right?

18    A.  Correct.

19    Q.  And what was the $215,000 note for?  Where did

20  that debt come from?

21    A.  That's two different questions.

22    Q.  Where did it come from?

23    A.  It came from when Joe Cappuccio was going to

24  buy a 50 percent interest in the Point Loma so we could

25  go a 50-50 joint venture in Mexico.  Initially, he

49

1  wanted to buy a 50 percent interest in the Point Loma.

2  I had to get the Point Loma ready to go to Mexico, and

3  had a lot of upgrades to do on it.  Going to -- Mexico

4  is like a third world country -- no infrastructure -- so

5  there was a lot of things we had to do to make the boat

6  self-sufficient.  So a lot of the money that I used was

7  to upgrade the boat.  While the boat was being upgraded,

8  then there were expenses on the boat.  And all of the

9  money that was on that note, at the time we did it, was

10  to be applied to the purchase price of one half interest

11  in the boat.  That's where the amounts of money came

12  from.

13    Q.  That added up to what you say was the original

14  215 balance?

15    A.  I think I always said that was an approximate

16  number.  But that's not why the note was made.  That's a

17  different answer -- different question.

18    Q.  You know who Dave Cantrell is; right?

19    A.  Yes.

20    Q.  He's your CPA?

21    A.  Yes.

22    Q.  And he was involved in trying to help you and

23  Joe Cappuccio set up the joint venture for Mexico;

24  correct?

25    A.  He was somewhat involved.

13 (Pages 46 to 49)

BARRY ALLEN COHEN    January 9, 2008

50

1    Q.  You consulted with him on that process?
2    A.  I don't know if I did or if Gene Glaser did or
3  if we did together.  I don't remember how it came about,
4  but he did get involved.
5    Q.  Just so we've got it on the record, you and Joe
6  Cappuccio had the idea of creating a joint venture to
7  fish using the Point Loma in Mexican waters; correct?
8    A.  That's pretty correct.
9    Q.  And that became what ultimately is sort of
10  short-handed to be known as the "Mexico joint venture,"
11  right?
12    A.  Correct.
13    Q.  And as part of that joint venture, Joe
14  Cappuccio was going to contribute certain things to the
15  joint venture; correct?
16    A.  Correct.
17    Q.  And one of those was the cost of a fishing
18  permit for the Point Loma to fish in Mexican waters;
19  correct?
20    A.  Well, that's what happened.
21    Q.  Okay.  And in addition, he was going to
22  purchase -- originally, the plan was that he would
23  purchase a half interest in the Point Loma?
24    A.  Correct.
25    Q.  And he would do that by paying for certain

51

1  upgrades on the Point Loma; is that right?
2    A.  No.
3    Q.  How was he funding that purchase?  I'll
4  withdraw that.  Let me ask it this way.
5        In addition to purchasing the Mexico fishing
6  permit, Joe Cappuccio was also going to pay for certain
7  improvements or upgrades, however you want to phrase it,
8  to the Point Loma; is that right?
9    A.  Well, he was -- he would advance the money to
10  get that done.  He actually didn't do any upgrading or
11  anything like that; his whole contribution was money.
12  And it was used mostly for upgrade of the vessel and
13  maintaining the vessel and paying the bills for the
14  vessel.  And whatever the total amount would be would be
15  applied to his purchasing a 50 percent interest in the
16  Point Loma.  And I believe -- well, I don't know.  I
17  can't remember anything other than, really, that's the
18  basic thing that happened.  I don't want to say anything
19  that's wrong, because I don't know.
20    Q.  Eventually, Joe ended up not purchasing part of
21  the Point Loma; is that right?
22    A.  Correct.
23    Q.  And instead, the amounts advanced were
24  converted to a promissory note and mortgage against the
25  Point Loma; is that correct?

52

1    A.  That's the end result.
2    Q.  Right.  But the amounts that were included in
3  that promissory note were not just amounts for the
4  improvements on the Point Loma, were they?
5    A.  I don't think so.
6    Q.  You don't think I'm right?
7    A.  No.  I don't think that they were all just for
8  improvements on the Point Loma.  There were a lot of
9  maintenance issues; there was insurance to be paid.  The
10  boat got tied up for a long time, too, trying to get all
11  this done.  So there were expenses that were really not
12  upgrades, but they were maintenance of it.
13    Q.  Also included when you converted all this into
14  the promissory note were debts that you owed for
15  personal advances; is that correct?
16    A.  Well, I don't know.
17    Q.  Well, isn't it true that you previously have --
18  well, withdrawn.
19        Why don't you take a look at -- we'll mark this
20  as Exhibit 2.
21        (Whereupon, Exhibit 2 was
22          marked for identification.)
23        MR. WALSH:  I'm going to generally object to
24  this line of questioning on the basis of the parol
25  evidence rule.

53

1        THE WITNESS:  Okay.
2        MR. POULOS:  Q.  Have you seen this document
3  before?
4    A.  Yes, I have.
5    Q.  And you know that this is a document, also,
6  that Mr. Cantrell testified about a couple of weeks ago
7  when we took his deposition; right?
8    A.  Right.
9    Q.  And you were present for that deposition?
10    A.  Correct.
11    Q.  And you remember, if you turn to page 2 of this
12  memo from Mr. Cantrell, that it lists, in bullet points,
13  Mexico fishing permit $97,000; boat improvements,
14  $84,000; personal loans to Barry Cohen, $62,004; and
15  fishing loans prior to the JV of 53,411.  Do you see
16  that?
17    A.  Yes.
18    Q.  Isn't it true that the last three bullet points
19  there -- boat improvements, personal loans and fishing
20  loans, or some portions of all of those -- were what
21  were converted to the debt --
22    A.  Yes.
23    Q.  -- in the promissory note?
24    A.  That's what I believe.
25    Q.  So the promissory note wasn't a promissory note

14  (Pages 50 to 53)

74

1  Point Loma checking account? Because you also wrote
2  checks, personally wrote checks, on that same account to
3  deposit in the checking account of the Point Loma.
4  Isn't it that checking account that was used to pay the
5  insurance and all of the other expenses; not your
6  personal checking account, but the Point Loma account
7  that you also wrote checks to?
8      A.  Okay.  I don't know.  But yes, there was a
9  Point Loma account; there was my personal account; there
10  was checks written from me to me with full knowledge of
11  Joe Roggio, Joe Cappuccio.  So there was no problem with
12  doing it, whatever at the moment the reason was.
13      All of these things have been reviewed by them
14  for years, every year, every month.  Joe Roggio said he
15  reviewed all of this; he saw nothing in there he didn't
16  know.  So what does that mean?  It means that however
17  you want to come to this, we agreed $215,000 is
18  putting in a note.  I sign the note; my wife signs the
19  note; we're all happy -- the end of all this stuff,
20  because we all put everything like this into a note and
21  that's that.  And we guaranteed that note with a ship's
22  mortgage.  That's how simple this whole thing is.
23      Q.  But one of the important points that I think
24  the Court needs to understand is that that note secured
25  not just advances to fix up the boat, but also personal

76

1  in the profits at the end of the year.  Also, whatever
2  advances that I took were going to be used by Joe
3  Cappuccio to purchase a half interest in the boat.  So,
4  I have never changed from that.  That's why the boat's
5  involved in this thing:  Because Joe said, "I'm going to
6  buy half the boat."  Oh, I'm out of here.  I don't want
7  to buy half the boat, so, you know, let's take all the
8  money you owe me and we're going to put it into a note,
9  because I backed out and I'm going to get another boat,
10  and here's the note and here's the channel mortgage.
11      And that's it, and whoever wants to see it
12  different, that's up to them.  Joe Cappuccio was buying
13  half the boat, so he was going to use whatever money I
14  owed him as his money to purchase half the boat.  That's
15  why it's involved in it.  Okay.
16      Q.  How did you -- why did you owe Joe Cappuccio
17  money?
18      A.  For a lot of reasons.
19      Q.  What were the debts that you owed him that went
20  into it?
21      A.  I don't know all the debts that went into it,
22  but we have a record of all of them.  Joe Roggio could
23  answer them as well as I could.
24      Q.  What was your understanding of all the debts
25  that went into it?

75

1  loans that you had taken out.  It's that simple.
2      A.  That's not true.
3      MR. WALSH:  Wait a minute, Barry.  Don't answer
4  it.  That's not a question.  He has made a statement to
5  you about what the court is interested in.  It's not a
6  question.  Do not answer it.
7      THE WITNESS:  Okay.
8      MR. POULOS:  Q.  The $62,004 was not all used
9  for improvements to the boat, was it?
10      MR. WALSH:  Asked and answered.  Parol evidence
11  rule.
12      MR. POULOS:  You can answer.
13      THE WITNESS:  I answered this whole thing.
14  I'll do it again.
15      Joe Cappuccio was going to buy half the boat.
16  He didn't stipulate --
17      MR. POULOS:  Q.  Let me stop you.  I've asked a
18  very simple question.  Were all of the 62 --
19      A.  But that's beside the point.  You asked me to
20  tell the whole truth, and you weren't going to interrupt
21  when I'm talking.  So let me finish the whole truth, not
22  part truth.  I'm not going to answer the way you want me
23  to.  I'm going to answer the truth.
24      The truth is that -- I explained to you that
25  the money that was advanced to me was, one, for sharing

77

1      A.  Whatever I owed Del Mar as of the point that
2  I'm referring to, then that's what went into that
3  note -- or Joe Roggio's interpretation of everything,
4  because he's the one that did it.  I didn't do it.
5      You know what.  I didn't go through all these
6  papers; Joe Roggio did.  All the end result is he says
7  this is what you owe; Joe's not going to buy the boat.
8  We want to take this money instead of him buying the
9  boat.  And nobody ever stipulated to me, ever, that
10  because Joe is going to buy the boat and he's going to
11  pay for half the boat and not take an advance against
12  the half of the boat -- nobody even said I couldn't go
13  to Europe if I wanted.  It was:  I'm going to buy the
14  boat; we're going to figure out how much money and I'm
15  going to buy the boat.  That was the whole thing.
16      When he decided not to buy the boat, we took
17  all the money that I took for whatever reason and we put
18  it in a note because he asked me to.  I didn't have to
19  put it in a note; I had no obligation to put it in a
20  note.  I gave him a note because he asked me, in case
21  something happened to me, "So I won't have a fight with
22  your kids over who owes what, please put it in writing."
23      I had no obligation; I did it to make it good
24  for him because I understood what he meant.  I owed the
25  money, and he was going to -- he didn't want to buy the

20  (Pages 74 to 77)

78

1  boat, so he was going to let me pay it off. I said,
2  "Okay, fine." My wife and I signed the note. That's
3  how this whole thing happened. Any other way you want
4  to interpret it, I don't know, Greg, but that's it.
5      Q.  You cannot tell us any more specifically than
6  that what all the debts were that got conglomerated, for
7  lack of a better term, into that note?
8      A.  I just told you.
9      Q.  So whatever debts they were from whatever
10  source, whatever you did with that money, all that got
11  conglomerated into that one note when it was signed; is
12  that --
13      (Joe Roggio enters the conference room.)
14      A.  That's a misstatement of what I said. What I
15  said was Joe Cappuccio was going to buy half the boat.
16  That's where all this came from. Whether they were an
17  advance to me or whether I upgraded the boat, or
18  whatever I did, it was against the purchase of the boat.
19  Joe decided he didn't want to buy the boat. So, Joe
20  asked me, would I sign a note for the amount of money
21  that I owed, since he's not going to buy the boat, he's
22  not going to add up all the money and say, okay, at this
23  point I own half the boat. He said: I don't want to do
24  that; I want to -- I've got my own boat. So, whatever
25  money that was going to be used to purchase half the

79

1  boat is what went into the note. Okay.
2      Q.  We're still missing the question and the answer
3  of whatever the monies were that were going to go into
4  purchase of the boat. What were those monies? Where
5  did that money come?
6      A.  From Joe Cappuccio and Del Mar Seafoods.
7      Q.  And what did you get that money for?
8      A.  I can't tell you, Greg. Look at how many
9  checks there are. There's categories. You have all the
10  papers. You have what was called "upgrades"; you have
11  what's called "personal loans" or "fishermen advances."
12  You have all the data. It was -- well, Joe Roggio added
13  up all the things that were like outstanding for the
14  purchase of the boat, and we agreed on the amount and
15  made a note, and Chris and I signed it.
16      (Mr. Kelley enters the conference room.)
17      MR. POULOS: Let's have this marked as exhibit
18  next in order.
19      (Whereupon, Exhibit 4 was
20      marked for identification.)
21      MR. POULOS: Q.  We already talked about that
22  there was a separate checking account that you
23  retained -- or maintained for the Point Loma itself;
24  correct? We talked about that a few minutes ago.
25      A.  That I signed on, myself.

80

1      Q.  Well, you had a separate --
2      A.  Yes.
3      Q.  You as the owner of the Point Loma had a
4  checking account for the Point Loma?
5      A.  Yes.
6      Q.  And, then, you as the manager of the Del Mar
7  Foods, Inc., Olde Port Fisheries Division wrote checks
8  to that vessel, to your vessel, the Point Loma, that
9  were deposited into that Point Loma checking account;
10  right?
11      A.  Say that again.
12      Q.  As the manager of the Del Mar Seafoods, Inc.,
13  Olde Port Fisheries Division, you wrote checks to the
14  F/V, Fishing Vessel Point Loma, that were then deposited
15  in the Point Loma checking account; right?
16      A.  I may have, yes.
17      Q.  Would you look, please, at Exhibit 4 and tell
18  us if this is checks that you wrote on the Del Mar
19  Seafoods, Inc., Olde Port Fisheries Division checking
20  account payable to the F/V Point Loma, your fishing
21  boat, and deposited in that fishing -- in that checking
22  account.
23      A.  Of the ones I see, that's what it looks like.
24      Q.  Okay. And if you look at the first two pages
25  here on Exhibit 4, the checks that are attached are

81

1  checks that are shown on the ledger for the fishermen
2  advances for the F/V Point Loma; is that right?
3      A.  Before I answer that, all the ones checked are
4  the ones that are here?
5      Q.  Yes.
6      A.  So if I look at all these, I can answer all of
7  them at one time?
8      Q.  Yes.
9      A.  Okay. If I didn't miss any, all the ones in
10  here look like I wrote them, signed them and deposited
11  them in -- I'm going to say the Point Loma account, but
12  I'm not a hundred percent positive, because I didn't
13  check all the numbers on the checks. But I made them
14  and signed them.
15      Q.  And if you look at the first two pages, that's
16  the ledger for the fisherman advances for the Point Loma
17  that add up to the transfer balance of $53,410.50,
18  right, or fifty-something cents?
19      A.  410.50, rounded up to 411.
20      Q.  If you look back at Gene Glaser's -- I'm
21  sorry -- at Dave Cantrell's memo, Exhibit 2, the
22  "Fishing loans prior to JV" is 53,411; right?
23      A.  That's what I just made a reference to, yes.
24      Q.  Right. So what I'm -- again, those three last
25  bullet points on Dave Cantrell's memo, "Boat

21 (Pages 78 to 81)

BARRY ALLEN COHEN    January 9, 2008

94

1    Q. Within a month?
2    A. I don't know. It was definitely after. It
3  could have been a month; it could have been five months.
4  I don't know.
5    Q. Is there any document that you're aware of that
6  would help you place the time of when that specific
7  conversation took place?
8    A. No, I can't think of one.
9    Q. Did you -- at the time that you agreed to be
10  responsible for Michael and Leonard's debt, did you have
11  any balance owed to Del Mar other than the amount --
12  well, provided for under the promissory note? In other
13  words, did you have some separate balance or account
14  with them besides the promissory note amount?
15    A. After we closed the joint venture?
16    Q. Yes.
17    A. Yes.
18    Q. What was that other account?
19    A. We had -- I had a boat receivable for advance
20  fuel and ice for fishing, and I had a receivable for
21  Olde Port Fisheries, Inc., where we bought fish from
22  Del Mar. So I had that.
23    Q. So it was a Del Mar receivable?
24    A. Those were both Del Mar amounts. They were
25  owed to Del Mar, not the joint venture. It was closed.

95

1    Q. When did you purchase the Point Loma?
2    A. Does a lease purchase count?
3    Q. I guess.
4    A. Well, you're asking the question. I'm asking,
5  does it count in your question?
6    Q. Sure.
7    A. In '92 or '93.
8    Q. Did you start out leasing it; lease to own,
9  basically?
10    A. Yes.
11    Q. And who did you buy it from?
12    A. Well, the lease option, I guess you would call
13  it, was with Dr. Aaron Kemp. Then I went to the bank
14  where I bank and paid off what was still owed on the
15  boat, because I think we counted half the lease payments
16  towards the purchase. I forgot what the terms exactly
17  are. But then I went to the bank and borrowed the rest
18  of the money to pay off the boat, and then I sent him a
19  check and paid off the boat, and then I owed the money
20  to the bank.
21    Q. Do you remember, when you started that lease
22  purchase, what the value of the boat was in terms of if
23  you had bought it outright?
24    A. Not offhand.
25    Q. When you borrowed money from the bank to make

96

1  the first purchase where you paid off the note, do you
2  remember what the value of the boat was at that time?
3    A. Well, the value of the boat is hard to tell.
4  I'm sure there's records of how much I borrowed to pay
5  off the boat, but off the top of my head I couldn't tell
6  you how much I had paid in lease payments towards the
7  purchase. And I believe it was at least a couple of
8  years. So you know what. I don't even remember what
9  our percentage of lease was. That's way too far back
10  for me. I just can't remember that.
11    Q. Have you ever had a valuation survey done on
12  the boat?
13    A. I believe so. I believe that when people do
14  surveys, they do valuation and replacement value and
15  stuff. I believe they do.
16    Q. When you first had a valuation done on the
17  boat, can you remember what the value of the boat was?
18    A. I do not.
19    Q. When was the last time you any valuation done
20  on the boat?
21    A. I don't remember.
22    Q. Do you remember how much the boat valued out at
23  the last time you had a valuation done on it?
24    A. I do not.
25    Q. Do you have an estimate as to the current value

97

1  of the boat?
2    A. I don't.
3    Q. When was the last time the boat was surveyed,
4  other than when we had it reviewed the other day?
5    A. I don't remember. I'd have to check with the
6  insurance company.
7    Q. What's your best estimate of when that was
8  done?
9    A. I'm going to guess.
10    MR. WALSH: Don't guess. If you don't know,
11  don't guess.
12    THE WITNESS: I don't know when it was.
13    MR. POULOS: Q. Was it in the last five years?
14    A. I'd be guessing.
15    Q. Do you remember who did a valuation on it last?
16    A. I do not. I just know that sometimes the
17  insurance company did appraisals or surveys, or whatever
18  they are, on the boat, and I guess they use that to see
19  if they want to insure it, or something.
20    Q. Have you maintained insurance on the boat
21  continuously since the promissory note and mortgage were
22  entered into?
23    A. I've maintained insurance on that boat since I
24  first got the boat.
25    Q. So the answer is, yes?

25 (Pages 94 to 97)

BARRY ALLEN COHEN   January 9, 2008

98

1    A.  Yes.  And before.
2        MR. WALSH:  We will provide an insurance
3    certificate, if that's the case.  The insurance company
4    will give us the information.
5        MR. POULOS:  Q.  Who was the insurance company?
6    A.  They change.  Who is it today?
7    Q.  No, I know who it is today.
8    A.  Who is it today?
9    Q.  I've got a certificate.
10   A.  They just changed it again.  It's Chase now.
11   Q.  Who was it in the last two years; do you
12   recall?
13   A.  No.  Let's go before two years and I'll tell
14   you who.
15   Q.  Tell me when the last time you know.
16   A.  Pettit & Morey (phonetically) at Newport Beach.
17   Now I think they're Chase Insurance Company.  Same
18   place, same people, just a buyout thing.
19       MR. POULOS:  Q.  Has Del Mar Seafoods, Inc.,
20   been listed as an additional insured under all the
21   insurance policies since the promissory note and
22   preferred mortgage were entered into?
23   A.  I don't think so.
24   Q.  When was the last time the vessel was
25   drydocked, if ever?

99

1    A.  If ever?  You want to add that, really?
2    Q.  I'm adding that because I don't want to get an
3    objection that I'm assuming something.  It's not meant
4    to be derogatory.  It's if it's ever been done.
5    A.  It's been done several times.  More than
6    several times.
7    Q.  Do you recall when?
8    A.  No, I don't.
9    Q.  Do you recall when the last time was?
10   A.  No.
11   Q.  Do you recall whether it was in the last five
12   years?
13   A.  I think it was more than five years.
14   Q.  Do you recall where it was done?
15   A.  It was either done in Channel Islands or in
16   San Pedro, but I think Channel Islands.
17   Q.  I don't recall the exact words from Captain
18   Kobak's deposition yesterday, but he described the
19   vessel generally as being in an advanced state of
20   disrepair or deterioration.  Do you agree with that?
21   A.  Well, I wouldn't know what he means by that, so
22   how would I agree or disagree with it?
23   Q.  How would you characterize the overall
24   condition of the vessel's hull presently?
25   A.  It needs a paint job.

100

1    Q.  That's it?
2    A.  I think so.
3    Q.  What type of maintenance have you done on the
4    vessel in the last year?
5    A.  I have not done any maintenance on it.
6    Q.  Have you hired somebody other than Captain
7    Kobak and the crew to do any maintenance on the vessel
8    in the last year?
9    A.  If there was any maintenance done -- I'm sure
10   there was maintenance done -- but if there's any
11   maintenance done, that would be Captain Kobak's
12   responsibility and he would take care of it.  If
13   something doesn't work on the boat, he fixes it or gets
14   a new one, whatever he needs to do.  He knows that.  And
15   he just decides what he needs to keep it working right.
16   Q.  How much income did you receive from the
17   fishing operations on the Point Loma in the last fiscal
18   year, so in 2007?
19   A.  I thought I sent you all of the money.
20   Q.  Do you remember how much you've actually
21   earned?  Because, actually, it doesn't give us that.
22   What it gives -- what you gave me, so the record is
23   clear, you gave me at Mr. Cantrell's deposition a stack
24   of documents, and I'll put it on the record here in a
25   minute.

101

1    A.  Which is the gross receipts for that.
2    Q.  What I'm asking is the net.
3    A.  I have no idea.
4    Q.  You have -- as the vessel owner, you receive 50
5    percent of the net income from the vessel after the
6    deduction of fuel and ice expenses; is that right?
7    A.  That's correct.
8    Q.  The other 50 percent goes to the crew; correct?
9    A.  Correct.  And the captain.
10   Q.  Right.  The captain.  From the 50 percent that
11   you receive, you have to pay for the dockage of the
12   vessel; right?
13   A.  Yes.
14   Q.  How much is that?
15   A.  It's $1200.  I don't know if that's monthly or
16   once every two months.  I'm not sure.  But it has a
17   place in San Francisco.  So whatever the dockage charge
18   is, I forget, but I send them a check when I get the
19   bill.
20   Q.  You pay for insurance from that 50 percent?
21   A.  Sure.
22   Q.  How much is the insurance?
23   A.  In the neighborhood of $25,000 a year.
24   Q.  From that 50 percent, you pay for maintenance
25   of the vessel; correct?

26 (Pages 98 to 101)

BARRY ALLEN COHEN    January 9, 2008

118

1    A. You're saying it was July --
2    Q. 20th.
3    A. So a month and a half later?
4    Q. Yes.
5    A. You know more about it than I do, then. I
6  didn't know those dates.
7    Q. Captain Kobak testified yesterday that he
8  informed you of those dates when the loss occurred. Are
9  you denying that he told you that?
10    A. I'm sure he did. I just don't remember the
11  dates. I told you, to my best recollection, I thought
12  it was a short time after the boat got arrested.
13    Q. Have you seen the claim that was submitted to
14  the United States Marshal for the Northern District of
15  California?
16    A. Have I seen the claim that what went to them?
17  No. Not that I'm aware of.
18    Q. Have you seen a declaration prepared by Captain
19  Kobak regarding the missing net?
20    A. I don't believe so.
21    MR. POULOS: Let's have this marked next in
22  order.
23    (Whereupon, Exhibit 5 was
24    marked for identification.)
25    THE WITNESS: Yeah, I don't remember seeing

119

1  this. In fact, I'm sure I haven't.
2    MR. POULOS: Let's have this marked as exhibit
3  next in order. 6.
4    (Whereupon, Exhibit 6 was
5    marked for identification.)
6    MR. WALSH: Want to take a break?
7    THE WITNESS: Sure.
8    MR. WALSH: Yeah. I'm wigging out here at the
9  end of the day. Let's take five minutes.
10    THE WITNESS: Yeah.
11    MR. WALSH: Your next exhibit is the
12  interrogatories?
13    MR. POULOS: Yeah.
14    MR. WALSH: Okay.
15    (Recess from 2:38 to 2:43)
16    THE WITNESS: We're back.
17    MR. POULOS: Q. What investigation did you do,
18  if any, before you asserted a claim against Del Mar for
19  loss of a fishing net to determine whether Del Mar was,
20  in your mind, responsible for that loss?
21    A. Say that again.
22    Q. Sure. What investigation did you do before
23  asserting a claim against Del Mar for loss of that
24  fishing net?
25    A. Told the captain to see if he could find out

120

1  where it went. And he told me he went to the police
2  department, dah-dah-dah-dah-dah-dah-dah, and it's not
3  around, and he talked to the harbor people and nobody
4  touched it. And so it seems like it's stolen, that
5  somebody took it without authorization.
6    So, since Del Mar had the boat arrested and
7  they said it included all appendages, or whatever you
8  call those things, appurtenances, and they considered
9  the net one of the appurtenances that were arrested --
10  because I know if anyone had tried to sell it, they
11  would have had a fit because they would have said it was
12  their net that had been arrested -- so I figure Del Mar
13  was responsible for arresting the net along with the
14  boat and they have to make it right.
15    Q. Were you aware that the net was never taken
16  into possession by the U.S. Marshal?
17    MR. WALSH: Objection. Calls for speculation.
18    MR. POULOS: Q. Were you told that by Captain
19  Kobak?
20    A. No.
21    Q. Were you aware that the boat -- that the net
22  was not with the boat?
23    A. I was aware of that, but I don't think that
24  precludes it from being under the control of the U.S.
25  Marshal when they arrest the boat. And it said on the

121

1  paper all of its appurtenances, or whatever you call it,
2  that were, which includes dah-dah-dah-dah-dah net. In
3  fact, Del Mar said it was their net. And so it got
4  arrested; it got arrested. The net got arrested with
5  the boat. It didn't matter if it was on the boat or
6  not. It still got arrested because it's still part of
7  the appurtenances.
8    Q. You were aware at all times -- at the time you
9  asserted your cross-complaint that the fishing net was
10  located at Pier 45, not at the Hyde Street Pier?
11    A. I knew it was at Pier 45. I don't know what
12  the Hyde Street Pier is.
13    Q. You knew there's a different structure, though?
14    A. I don't know where the Hyde Street Pier is. I
15  don't know; I don't know. I just know Pier 45 is where
16  all the fish companies are. He told me he had it kind
17  of in between two fish company places where he had
18  permission to put the net.
19    Q. And he told you that he thought it had been
20  stolen, possibly, by the crew of the Karen?
21    A. He told me several options.
22    Q. Was that one of them?
23    A. I believe it was the Karen that he mentioned --
24  one of the boats.
25    Q. Did you look at Exhibit 6, I think, the

Merrill Legal Solutions
(800) 869-9132

BARRY ALLEN COHEN    January 9, 2008

122

1  interrogatory responses?
2      A.  No, I just looked at 5.
3      Q.  Could you just take a look at that and tell me
4  if these are your responses and your verification of the
5  responses?  There, a page towards the back.
6      A.  Yes.
7          MR. WALSH:  It's at the back.  Just look at
8  that.
9          THE WITNESS:  Okay.  So what do you want me to
10  do?
11         MR. POULOS:  Q.  Are these the responses that
12  you verified were true under penalty of perjury?
13         MR. WALSH:  I'll just stipulate the
14  verification speaks for itself.  It says that "based on
15  information and belief, I believe the responses to be
16  true," signed Barry Cohen.  It looks like his signature.
17         Is that your signature?
18         THE WITNESS:  That's my signature.  Was -- I
19  didn't think you wanted me to reread the whole thing.
20         MR. POULOS:  Q.  Do you recall declaring under
21  penalty of perjury in the Avila Beach litigation that if
22  the attorneys' fees -- if you were not awarded
23  attorneys' fees in that litigation, you might have to
24  declare bankruptcy?
25     A.  I don't remember saying that, but there was a

123

1  good chance of that.
2      Q.  It was true that there was a possibility of
3  your declaring bankruptcy if you weren't able to recover
4  your attorneys' fees; is that right?
5      A.  I'd say there was a possibility.
6      Q.  And you did not recover your attorneys' fees,
7  did you?
8      A.  I don't know yet.  It's not done.
9      Q.  The Court denied your motion for award of
10  attorneys' fees; is that right?
11         MR. WALSH:  Objection.  Calls for speculation,
12  calls for a legal opinion.
13         MR. POULOS:  Q.  I'm just asking for your
14  understanding; I'm not asking you for a legal
15  conclusion.  Your understanding is that the trial court
16  denied the motion for attorneys' fees?  Now that's up on
17  appeal.
18     A.  My understanding is the whole thing is not done
19  yet.
20     Q.  In terms of the litigation?
21     A.  In terms of everything.  Attorneys' fees,
22  everything.  It's all still up in the air.
23     Q.  Have you actually filed suit against Miller
24  Starr for professional malpractice?
25     A.  Well, this law firm that we're working with --

124

1  they're handling the whole thing.  I don't know what
2  phase they're in.  So far, all they did is get all the
3  documents and talk to us about different things.  And
4  since that happened, we have never heard from Miller
5  Starr again.  So whatever they're doing, I don't know
6  exactly at this moment.  But Miller Starr has been put
7  on notice.  I know that for sure.  Whether they
8  officially filed or not, I don't know.
9      Q.  What law firm is representing you?
10     A.  It's in San Jose, and one of the attorneys is
11  Maureen -- I forget her last name.  Brad Jones.  It's
12  supposed to be a pretty big law firm.  That's all they
13  do -- is malpractice.
14         Maureen and Brad, Brad Jones.  I can't
15  remember.
16     Q.  You have an AOL account; correct?
17     A.  Correct.
18     Q.  And that's FishmanCohen@AOL.com?
19     A.  Correct.
20     Q.  How long have you had that e-mail address?
21     A.  Since I first got a computer.
22     Q.  How long ago was that?
23     A.  Boy, I don't know.  It's been a while.
24         MR. POULOS:  Mark this as next in order.
25         (Whereupon, Exhibit 7 was

125

1          marked for identification.)
2          MR. POULOS:  Would you take a moment to read
3  Exhibit 7, please.
4          MR. WALSH:  By the way, do you have the
5  original of this document?
6          MR. POULOS:  Yes, we do.
7          MR. WALSH:  The only reason I ask this question
8  is it seems to be a funny copy with all kinds of dark
9  streaks in it.
10         MR. POULOS:  I don't know why it copied that
11  way.  I know this is a document that's been copied quite
12  a few times.  Whether it's our copier or other
13  function -- but we do have the original.
14         MR. WALSH:  I think I'd like to look at the
15  original at some point.
16         MR. POULOS:  We can have it -- we don't have it
17  here at the office.  Joe has it and we can have it
18  brought up here.
19         MR. KELLEY:  Do you want a clean copy?  Maybe
20  we have a clear copy somewhere.
21         MR. POULOS:  Or just give me couple more
22  copies.  This is fine.  Here's the one -- okay.  We have
23  it.
24     Q.  Okay.  Have you had a chance to look at this,
25  Exhibit 7?

32 (Pages 122 to 125)

BARRY ALLEN COHEN    January 9, 2008

126

1    A.  Yes.
2        (Cell phone interruption)
3        (Recess from 2:56 to 2:59)
4        THE WITNESS:  I want to go home as early as I
5    can.  I'm tired.
6        MR. POULOS:  Q.  We're getting there.  Have you
7    seen Exhibit 7 before?
8    A.  Yes, I have.
9    Q.  Did you write Exhibit 7?
10   A.  I don't remember writing it.  I don't remember
11   writing it.  I'm not saying I didn't.  I just don't
12   remember.
13   Q.  Do you on occasion write notes using the AOL
14   e-mail program and then just print out the e-mail and
15   send it by regular mail?
16   A.  You know, I do write things in there and I do
17   print them out.  I don't remember mailing them, but I'm
18   not saying I didn't do this.  I'm saying I really don't
19   remember it.  I don't know what else to tell you on
20   that.  I don't remember; I don't remember doing it.
21   Q.  Okay.  Do you remember whether you were ill
22   around this same time last year, January?  I know you've
23   got the flu now and I appreciate your coming up.  I want
24   that on the record.  You know, you have done that and I
25   appreciate it.

127

1        This is about a year ago.  Do you remember
2    whether you were sick about a year ago?
3    A.  I was sick -- I was sick last year.
4    Q.  In the time frame -- this is dated January
5    30th?
6    A.  You know, I see that.  I can't be positive; I
7    can't be sure.  It's possible.
8    Q.  Do you remember telling Del Mar that you would
9    try to send them at least $2-$3,000 a month?
10   A.  I would say that could very well be what I
11   would say.  I don't remember writing this; I don't
12   remember saying this, but it's not far-fetched that I
13   would say that.
14   Q.  Let's have -- we started to mark this before I
15   mis-marked it.  Could you put the stamp over this one so
16   it's Exhibit 8.
17       (Whereupon, Exhibit 8 was
18        marked for identification.)
19       THE WITNESS:  That's different?
20       MR. POULOS:  Q.  Right.  Notice this one has
21   the payments.
22   A.  Okay.
23   Q.  There's one for you, Bud.
24       Looking at Exhibit 8, which I believe is a copy
25   of DMSI 0001 --

128

1    A.  Wait.  Say that again.
2    Q.  It's a copy of DMSI 0001.  I have another copy
3    with that number on it, just to --
4    A.  Your copier is screwed up.
5    Q.  Yes.
6    A.  This looks like the same one.
7        MR. WALSH:  I agree.
8        MR. POULOS:  Okay.  So what we're looking at as
9    Exhibit 8 --
10       THE WITNESS:  These two get mixed up.
11       MR. POULOS:  Q.  What we're looking at as
12   Exhibit 8 is a copy of what's also been produced under a
13   Bates number from my office, No. DMSI 0001.  I'm just
14   putting that on the record.  You can look at Exhibit 8
15   because I think it's a cleaner copy.
16       This is basically an expansion of the earlier
17   schedule of payments that we looked at.  Do you see
18   that?
19   A.  Yes.
20   Q.  So this takes that original document we looked
21   at, which is Exhibit what -- what's the other exhibit,
22   Barry, the exhibit number on that one?
23   A.  1.
24   Q.  1.  So this takes Exhibit 1 and then shows some
25   additional payments?

129

1    A.  No.
2    Q.  Doesn't it?
3    A.  No.  There's one in between here.
4    Q.  But what this Exhibit 8 shows is that it does
5    reflect three payments that you made on February 5th,
6    February 20th, and April 25th of 2007.  Do you see that?
7    A.  Yes.
8    Q.  And you agree you made those additional
9    payments?
10   A.  I believe so.  I didn't check it on my
11   checkbook, but I made three payments.
12   Q.  Okay.  And you recall making them early last
13   year?
14   A.  Yes.
15   Q.  And the payment for $2000 on February 5th -- do
16   you recall if you mailed those payments in?
17   A.  Do I remember?  No.  Did I probably?  Yes.
18   Q.  Okay.  I'll represent to you that the Exhibit 7
19   was sent to Del Mar accompanying the payment for $2000
20   dated February 5th, 2007.  If you accept that, does that
21   refresh your recollection that you may have in fact
22   mailed this around that time?
23   A.  I can say it again.  I don't remember doing
24   this.  There's nothing -- I can't think of how you would
25   make my mind remember it.  But I said it's possible I

33  (Pages 126 to 129)

134

1      MR. WALSH: Objection. I don't think it's been
2  established it's an e-mail. Whatever you want to call
3  it, piece of paper, I'm not sure it's an e-mail.
4      MR. POULOS: On Exhibit 7 -- it's the same as
5  what's on the Exhibit 7, right?
6      THE WITNESS: It's the same date on both of
7  them.
8      MR. POULOS: Q. Okay. Does tying those two
9  things together -- the fact that the check is dated
10  January 30th and the Exhibit 7 is dated January 30th --
11  does that help refresh your recollection as to whether
12  you are the author of Exhibit 7?
13      A. No.
14      Q. The next page is a check dated February 15th,
15  2007, for $3,000. Is that right?
16      A. Correct.
17      Q. Okay. And is that also a check that you wrote
18  on the Point Loma checking account to Del Mar Seafoods
19  for payment?
20      A. Correct.
21      Q. And when you wrote "on account," what account
22  were you referring to?
23      A. This was on the note account.
24      Q. And the same goes for the first page, where it
25  says "on account"?

135

1      A. Correct.
2      (Discussion off the record)
3      MR. POULOS: Q. You have the other $3000
4  check?
5      A. Yes. 4-23 is the date on it.
6      Q. So the next page is the check dated 4-23 for
7  $3,000?
8      A. That's what I have.
9      Q. Yes. Okay. That also is a check written on
10  your F/V Point Loma account signed by you; correct?
11      A. Correct.
12      Q. Do you believe that those are the three checks,
13  then, that are reflected on Exhibit 8 as payments on
14  account?
15      A. Say that again.
16      Q. Do you believe that those, then, are the three
17  checks that are reflected on Exhibit 8?
18      A. On this?
19      Q. Yes, as payments on account.
20      A. I believe they are.
21      Q. Now, you had made -- at the heart of this case
22  is your payment of $175,000; correct?
23      A. Correct.
24      MR. POULOS: Let's have that marked as Exhibit
25  11.

136

1      (Whereupon, Exhibit 11 was
2      marked for identification.)
3      MR. POULOS: Q. That is the check for $175,000
4  that you've testified about making; is that right?
5      A. Correct.
6      Q. And that was a check that you believe should
7  have been applied to the balance under the promissory
8  note; correct?
9      A. Correct. And this is a copy of the check; not
10  the check.
11      Q. Right. You delivered that check in person;
12  correct?
13      A. Correct.
14      Q. And you first took it to Joe Cappuccio when he
15  was in his office; is that right?
16      A. That's the only place I took it.
17      Q. Didn't he tell you to take that over to Joe
18  Roggio?
19      A. No.
20      Q. So he accepted the check -- is your testimony?
21      A. That's my testimony.
22      Q. Can you tell me when that occurred, when you
23  actually handed that to him, that check?
24      A. I can't say exactly, but it had to be very
25  close to that date. I don't think that I held onto it.

137

1  I think I made it the day I gave it to him.
2      Q. So you think you gave it to him on November 9th
3  of 2005?
4      A. I believe so. But I want to correct one thing
5  because I just want this understood. I know for sure
6  that I handed this check to Joe Cappuccio, because when
7  I saw Joe Roggio I told him I want to give this to Joe
8  myself.
9      I gave it to Joe Cappuccio. He looked at it
10  and said -- I said, "Here's the check that I said I
11  would give." He said, "Thank you very much." And I
12  said, "I'll pay you the rest as soon as I can." And he
13  said, "Well, I'm not worried about" -- "I'm not
14  concerned" or "not worried about it; it's such a small
15  amount now."
16      After that point, I don't know; I don't
17  remember if he gave me back the check and I took it. I
18  don't remember that at all. So if somebody is saying
19  that's what happened, that may have been, because all I
20  remember very clearly in my mind is I handed him the
21  check because I knew it was important to him, and I know
22  he thanked me and said he wasn't worried about the rest
23  because I told him I would pay as soon as I can. He
24  said, "Whatever you can do, I'm not worried about it
25  anymore; it's such a small amount." After that point I

35 (Pages 134 to 137)

BARRY ALLEN COHEN    January 9, 2008

138

1  don't remember really. So if I took it or they're
2  saying I took it to Joe Roggio, it's possible, but I
3  don't remember that. That's for clarification.
4    Q. Fine. What else do you recall, if anything,
5  about the conversation that you had with Joe Cappuccio?
6  Was there more to it than that, or is that all that you
7  remember?
8    A. I think that was the whole conversation.
9    Q. So I take it this whole exchange probably
10 lasted less than a minute?
11   A. Maybe two. Yes, very short.
12   Q. And you don't remember, then, any conversation
13 with Joe Roggio about this check because you don't
14 remember whether you took it to him or not, so I'm
15 assuming you don't remember a conversation?
16   A. I didn't think I took it to him, but I just got
17 the feeling, because you asked that question, that maybe
18 somebody said I did. And maybe somebody will remember
19 something I don't. All I'm going to tell you is this is
20 what I remember; that's what I don't remember. I
21 thought I just left. If I took the check, if he said,
22 "Take it to Joe Roggio," I don't remember that at all.
23   Q. Okay. And do you remember whether you had any
24 subsequent -- on that day or others -- conversations
25 with Joe Roggio about this payment?

139

1    A. I don't know. I don't know in what context
2  you're talking about. I gave the check to Joe. Is that
3  what you mean?
4    Q. No. I just want to know what other
5  conversations, if any -- and I'm not saying there were;
6  I'm not saying there weren't. I'm asking you, did you
7  have any other conversations or any conversations with
8  Joe Roggio about this check that you remember? I don't
9  want to hear at trial, "Oh, I remember I had a
10 conversation with Joe." Tell me if you do or you don't.
11 It's that simple.
12   A. I'm not going to do that. I don't remember any
13 after. I don't know for how long a period of time
14 you're talking. A week later, did I? I don't know. A
15 week before? Yeah, I'm sure I did. I know I told Joe
16 Roggio I was coming. He knew I was coming because I
17 went to him first and said, "I made the check out and I
18 want to give it to Joe myself," because I thought it was
19 my place to do that. And pretty much, that's what I
20 remember about the actual giving of the check.
21   Q. How did the giving of this check come about?
22 Why did you give them -- let me rephrase.
23     Why did you give them a check for 175?
24     MR. WALSH: Objection. Asked and answered.
25 You can answer it again.

140

1    THE WITNESS: Want me to answer it again? Not
2  the whole big dissertation I made; right?
3    Joe Cappuccio asked me to do something like
4  this.
5    MR. POULOS: Q. Did he specify the amount?
6    A. No, he told me what the problem was, that he
7  needed my help, and I said I would see what I could do.
8  And this is what I could do.
9    Q. When was that conversation? I'm sorry. Did
10 you say Roggio or Cappuccio?
11   A. Cappuccio.
12   Q. When did you have that conversation with Joe
13 Cappuccio?
14   A. Of him asking me if I could help him do this?
15   Q. Yes.
16   A. I would guess -- my best estimate -- a couple
17 of months before this check, because after he asked, I
18 went home, talked to my wife about it and went about
19 trying to get a second on the house. So, however long
20 that took, that's when I did it. I didn't wait a month
21 or two; I tried to do it when he asked me. And I told
22 you why he said he needed it: Because the bank that he
23 gets his credit line with was unhappy with that type of
24 loan on his books.
25     And Joe Cappuccio -- what he said to me was the

141

1  bank said: We're the bank and you're the fish company;
2  we don't want to see those loans on your books when you
3  borrow money from us. That's what he told me and it
4  made sense. So I said, "I'll do what I can," and that's
5  how this came about. And that's why I was so emphatic
6  that it was for the note on the boat, because that was
7  the whole purpose of doing this. They didn't ever say
8  anything about receivables or this. That's why he had a
9  line of credit -- to fund his receivables. What he told
10 me is they just didn't like seeing that note that I had
11 with them that Chris and I signed. And this was to pay
12 down that note that much.
13   Q. Do you remember anything else about the
14 conversation, besides what you've told me so far?
15   A. With Joe Cappuccio?
16   Q. Right.
17   A. That's the essence of it. I don't remember
18 words verbatim, but he told me that the bank
19 dah-dah-dah -- the things I just said, and this is the
20 result of what he asked me to do.
21   Q. Okay. Do you recall -- you've mentioned a
22 conversation you had with Joe Roggio before this payment
23 was made in which you told Joe that you wanted to give
24 Joe Cappuccio the check personally.
25   A. Yeah.

36 (Pages 138 to 141)

BARRY ALLEN COHEN    January 9, 2008

142

1    Q.  With respect to that conversation, do you
2  remember anything else about that conversation besides
3  you were just telling him I'm bringing the check and I
4  want to give it to Joe Cappuccio myself?
5    A.  No.  Joe Roggio and I had conversations steady
6  all the time.  I just remember in this particular case I
7  wouldn't know what we said ten minutes before, because
8  it was not significant.  This check was significant
9  enough and I felt that I wanted to do it; I didn't want
10 anybody else to do it.  That's why I remember it.
11   Q.  Okay.
12   A.  And I remember going in his office and doing
13 it, like I said.
14   Q.  Do you remember any other conversations that
15 you had specifically with Joe Roggio about making this
16 payment, besides that one that you just told us about?
17   A.  I don't know what you mean.
18   Q.  Again, I'm just trying to make sure I know all
19 the conversations that you remember.  I'm not saying
20 there were or there weren't.  I'm just trying to
21 understand.
22   A.  In reference to giving Joe Cappuccio this
23 check?
24   Q.  Yes.
25   A.  No, I don't remember any others.

143

1    Q.  Or making the payment.  You made the payment.
2  Were there any conversations you remember about making
3  this payment other than what you've told us so far?
4    A.  Well, I don't know if this is what you mean.
5  As far as giving this check, I only showed it to Joe
6  Roggio.  I said, "I want to give this to Joe myself,"
7  and I walked in and did it.
8        Were there other conversations about me going
9  to do this?  Yes, there were, but that was not giving
10 the check.  That was prior to even having a check.
11   Q.  What conversations were those?
12   A.  I talked to Joe -- Joe Roggio talked to me
13 after Joe Cappuccio told me about the bank.  I thought
14 Joe Roggio was at that meeting, but I corrected that
15 when Joe said he wasn't there, because maybe he wasn't
16 there.  But Joe knew about it, because when I was in the
17 hallway and I was with Joe, we were between the
18 offices -- there's a little hallway right there -- and
19 Joe said to me, "If you could do this, I'll see to it
20 that the loan is interest-free."  Well, I already
21 thought it was interest-free, but okay, I'm going to do
22 it anyhow.  But I thought it was already interest-free,
23 but he said it was, would be interest-free.  So if
24 that's what you mean, then that's one conversation that
25 we had.  I know Joe Roggio wanted to see it happen.  I

144

1  guess it's good not to have the bank unhappy with you.
2  I felt like I was doing a good thing.  That's all.
3    Q.  When did this conversation occur with Joe
4  Roggio where he supposedly told you that if you could
5  make this payment, he would make the loan interest-free?
6    A.  He didn't say he would make it interest-free.
7  He said he would see to it that it was interest-free.
8        When was it?
9    Q.  Yes.
10   A.  It was after I talked to Joe Cappuccio.
11   Q.  The same day or a week later?
12   A.  I thought it was right after.
13   Q.  Same day, within minutes, or a short time
14 after?
15   A.  That would be my recollection.
16   Q.  You said that you thought that the note already
17 was interest-free.
18   A.  Well, I did.
19   Q.  The note you're talking about is the promissory
20 note; right?
21   A.  Right.
22        MR. POULOS:  We might as well mark that as an
23 exhibit.
24        (Whereupon, Exhibit 12 was
25          marked for identification.)

145

1        MR. POULOS:  Q.  Can you take a look at Exhibit
2  12, please?  That's the promissory note that you were
3  just testifying about?
4    A.  I believe so.
5    Q.  That's your signature on the third page?
6    A.  Yes, it is.
7    Q.  And that's your wife's signature, Chris Cohen,
8  on the last page?
9    A.  Yes.  My only question is if there was anything
10 in between the first and the last page.  I don't
11 remember.  But that is, in essence, what we signed.
12   Q.  You read it before you signed it, I assume, did
13 you?
14   A.  Yeah, we read it, but it was -- it came with a
15 narrative.
16   Q.  We'll get to that in a second.  You notice in
17 the first paragraph it says the note is at 7 percent
18 interest per annum?
19   A.  Yes, I see that.
20   Q.  Was there some narrative at the time this came
21 to you that made you believe that that was not going to
22 be the case?
23   A.  Yes.
24   Q.  What was that narrative?
25   A.  That this was asked of us; it was not a

Merrill Legal Solutions
(800) 869-9132

BARRY ALLEN COHEN          January 9, 2008

146

1   requirement of us. This was not a requirement of my
2   wife and I. We got nothing in return for this. We had
3   already done everything we did, and what this -- the
4   essence of what this is is to memorialize the amount of
5   money that I owed Del Mar; in the event that something
6   happened to me, that there would not be a problem with
7   my family or the kids claiming anything; that Del Mar
8   would be covered by equity in the boat to get their
9   money back on the money that they put up and we signed
10  the note for.
11       Joe Roggio told me that this note -- he didn't
12  have an attorney do it. All he did was he took an old
13  note that they had and he changed the dates and the name
14  and the amount. That's it, and that's all he did. So
15  we don't have to go to, you know, a regular full -- he
16  just took one out of the file for somebody else; this
17  was somebody else's note. This was a copy, a changed
18  copy of someone else's note. And it was explained to me
19  this was to secure their position. They never even
20  asked me for a payment. So that's why I thought it was
21  what it was, because I was never asked for interest. It
22  was to memorialize the things; it was not to make money
23  on it.
24       You have to remember where this money came
25  from. Joe was going to buy half the boat. He backed

147

1   out. It's kind of hard to charge a guy interest when
2   you back out of the deal. This was in case something
3   happened to me, and that's what it was and that's what
4   it is. And I guess everybody can change -- try to
5   change what it is and was, but they can't.
6       Q. Did he specifically tell you don't worry, that
7   he would not charge interest, at the time he gave you
8   this note?
9       A. He just told me -- he didn't mention all the
10  ramifications. He said this is only to memorialize the
11  money. This is nothing more. There's nothing else
12  behind it. Nothing. Period, amen. That's what he
13  said.
14       You know what? I trust him. When you say it's
15  to make sure in case something happens to me, to me
16  that's fair. Had it been a stranger, I would have said
17  cross all this stuff off. I thought I had a lifetime
18  job with this company, the whole thing. So if he tells
19  me -- he's my boss, too. If he tells me this is just to
20  memorialize it, I believed him.
21       Q. My question to you is really just very
22  specific. I need to be clear for this.
23       Did he tell you that he would not charge
24  interest at the time he gave you this note; specifically
25  that he would not charge interest? Yes or no?

148

1       A. I can't answer that yes or no because it would
2   be misleading. Because if I asked you to drive to the
3   store and pick up something for me, do I have to
4   specifically tell you to turn the key? No. We're going
5   to assume if you're just going to drive to the store,
6   you're going to turn the key.
7       Q. Did the word "interest" come up in that
8   conversation?
9       A. We're going to argue this point. I told you
10  what he told me. Do you want me to tell you again?
11       He told me -- I didn't say he told me anything
12  about interest. He told me this was only to memorialize
13  the thing. You can ask me any different way you want
14  to. I told you exactly what he said. He didn't say
15  anything else.
16       Q. I'm good with that.
17       A. Thank you.
18       MR. POULOS: Let's have this marked as next in
19  order. Again, I just brought one copy.
20       (Whereupon, Exhibit 13 was
21       marked for identification.)
22       MR. POULOS: I don't think this is
23  controversial, either. Can you please confirm that that
24  is the first preferred ship mortgage?
25       MR. WALSH: You don't need to worry about that.

149

1   That's not your problem.
2       MR. POULOS: Q. Is that the first preferred
3   ship mortgage that Del Mar has on the Point Loma?
4       A. Without reading, all the first page is my
5   writing, and the last page is mine and Chris's
6   signature. So if everything in here is according to
7   page by page, then it is. I have no reason to doubt it.
8       Q. When did you separate from Chris Cohen for
9   purposes of your marriage?
10      A. You mean physically or legally?
11      Q. Well, if you know, legally. I mean in some
12  respects it calls for a legal conclusion. You may not
13  know that.
14      A. That I don't know.
15      Q. So, physically, when she or you moved out of
16  the house. I don't know which one and I don't really
17  care.
18      A. Then I won't tell you. In January '07.
19      Q. Okay. Chris now lives in Arizona, correct?
20      A. Correct.
21      Q. Did she move to Arizona in January of '07?
22      A. No.
23      Q. When did she move to Arizona?
24      A. I don't remember.
25      Q. In your own mind, when you formally separated

**BARRY ALLEN COHEN    January 9, 2008**

150

1  for purposes of the marriage, was that the January of
2  '07 when you said we're separated, we're getting a
3  divorce, whatever?
4      A.  Was that in my mind what?
5      Q.  Was that in January '07?
6      A.  Yes.
7      Q.  You think that was the date of separation?
8      A.  That's what I think.  We didn't live together
9  anymore.  That's what I would think that separation is.
10     Q.  Okay.  Have you since that time period -- I
11  want to make a bright line in respects.  After that
12  date, have you discussed this litigation with Chris
13  Cohen?
14     A.  I don't think so.
15     Q.  Have you corresponded with her; not through
16  your attorney, but have you personally corresponded with
17  Chris Cohen in writing or by e-mails about this
18  litigation since that bright line separation?
19     A.  Not that I can recall.
20     Q.  Going to the other side of that bright line, so
21  during the marriage -- we have to make another bright
22  line for you -- I only want to know about communications
23  you had with Chris as a shareholder of the Point Loma
24  Fishing Company, Inc., okay, because you're 50-50
25  owners, right, in that business?  Right?

151

1      A.  Yes.
2      Q.  Did you have any discussions with Chris about
3  the payments that you were making to Del Mar on the
4  promissory note and preferred ship mortgage?
5      A.  To my best recollection, the only one I
6  discussed with her was the $175,000.  You want to ask me
7  if she liked it?
8      Q.  No.
9      A.  You're married, right?
10     Q.  Was Chris also an employee of Del Mar Seafoods
11  Olde Port Fisheries Division?
12     A.  The Avila Beach joint venture, as you call it?
13  Yes.
14     Q.  And during what time period was she an employee
15  of that joint venture?
16     A.  Joe Roggio might know that better, but I think
17  from the beginning until the end of the joint venture.
18     Q.  What did she do as an employee; what was her
19  job?
20     A.  She worked with the employees and she did the
21  hire packets, terminations, Workers' Comp, all things to
22  do with employees.  Personnel manager, I guess you call
23  it.  And she worked with Joe on insurance things, like
24  the Workers' Comp.  I don't know what else, what other
25  insurance.

152

1      Q.  So, a human resources job?
2      A.  Correct.
3      Q.  Did she have anything to do with the transfer
4  of inventory from the JV to the Olde Port Fisheries,
5  Inc.?
6      A.  No.
7      Q.  Did she have anything to do with agreements by
8  you to be responsible for the debts of Michael or
9  Leonard?
10     A.  The receivables?
11     Q.  Yes.
12     A.  She had nothing to do with any of those things.
13     Q.  Was Chris deposed in the Avila Beach
14  litigation?
15     A.  I don't believe so.
16     Q.  Have you ever declared bankruptcy?
17     A.  No.
18     Q.  Have you ever consulted with a bankruptcy
19  lawyer about the possibility of declaring bankruptcy in
20  the last, say, five years?
21     A.  I talked to one about it.
22     Q.  And when was that?
23     A.  Several years ago; a couple years ago.
24     Q.  Was it around the time of the conclusion of
25  the -- well, it's not concluded -- around the time of

153

1  the motion for recovery of your attorneys' fees from the
2  Avila Beach litigation?
3      A.  It was before that.  I went there to know where
4  I stood, only.  It was like an exploratory visit -- know
5  what I'm trying say -- to find out how this worked.  In
6  case anything happened where I had to really consider
7  it, I wanted to know what I would be up against.  And so
8  that's what happened.  He explained to me pretty much
9  how that works, which was a lot different than I
10  thought.  And I consulted with him again when the boat
11  was arrested, only because I didn't know any other
12  attorneys, and him and I got along good, and I asked him
13  what should I do?  And he talked about it and he
14  considered what he could do as a bankruptcy attorney.
15  He said, "But it's better to get involved with somebody
16  that knows maritime law."  And I got in touch with Bud,
17  and Bud and him talked, and Bud said --
18         MR. WALSH:  Don't say anything about what I
19  said.  You can tell what he said about bankruptcy
20  attorney, but don't tell them what I said.
21         THE WITNESS:  Bud and I are here.
22         MR. WALSH:  That's all you need to say.  And
23  you haven't declared bankruptcy?
24         THE WITNESS:  Right.
25     Q.  The Point Loma Fishing Company, Inc., was a

**Merrill Legal Solutions
(800) 869-9132**

# Exhibit 7

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4                   ---oOo---

 5   DEL MAR SEAFOODS, INC.,        )
                                    )
 6              Plaintiff,          )
                                    )
 7   vs.                           )    No. C-07-2952-WHA
                                    )
 8   BARRY COHEN, CHRIS COHEN      )
     (aka CHRISTENE COHEN), in     )
 9   personam, and F/V POINT LOMA,)
     Official Number 515298, a     )
10   1968 steel-hulled, 126-gross )
     ton, 70.8 foot long fishing  )
11   vessel, her engines, tackle, )
     furniture apparel, etc., in   )
12   rem, and Does 1-10,           )
                                    )
13              Defendants.         )
     _____)

14

15

16            DEPOSITION OF JOSEPH ROGGIO

17              December 13, 2007

18

19

20          Taken before JANE GROSSMAN

21              CSR No. 5225

22

23        JANE GROSSMAN REPORTING SERVICES
            Certified Shorthand Reporters
24         1939 Harrison Street, Suite 460
              Oakland, California 94612
25               (510) 444-4500
```

**Condensed Transcript**

J G  Jane GROSSMAN
R S  REPORTING Services

DEPOSITION OF JOSEPH ROGGIO

1

1   A.   I believe the -- October was the final month
2 that we started keeping track of the joint venture's
3 operations (sic).
4   Q.   Okay.  Now, to close the books -- who closed
5 the books?
6   A.   I did.
7   Q.   Of the Olde Port Fisheries Joint Venture;
8 correct?
9   A.   Yes.
10   Q.   Okay.  Good.
11      Now, the next item, No. 1 -- do you see that?
12 It's:
13      "$13,000 (sic) owed by Michael Cohen for
14      accounts receivables."
15   A.   Correct.
16   Q.   Who is Michael Cohen?
17   A.   Michael Cohen is Barry's son and someone who
18 was operating his own fish business.
19   Q.   And it says "for accounts receivables."
20      Tell me what that would have been.
21   A.   Well, when we -- when the joint venture
22 stopped operating and there was, obviously, receivables
23 and payables that still existed, the $13,920 was one of
24 those receivables that still existed when we closed down
25 the operation.  It is one of the receivables that still

35

1 existed.
2   Q.   And so, he bought fish?
3   A.   I'm assuming the joint venture sold fish, so
4 I'm assuming he bought fish.
5   Q.   You're assuming?
6   A.   I did not see those invoices.  But my guess is
7 he purchased fish.
8   Q.   I don't need your guess.
9      I need your best answer.
10      If you don't know, don't guess.
11   A.   He purchased fish.
12      I don't want you to show me an invoice where
13 Barry sold him a piece of equipment because --
14   Q.   I'm just asking what you know.
15   A.   I'm not sure what they --
16   Q.   You're not sure?
17   A.   Well, I'm assuming it was fish, because that's
18 what we did.
19   Q.   That's your answer.  Thank you.
20      So, I guess what I don't understand is why, if
21 Del Mar and Barry Cohen were 50/50 joint venture
22 partners, all this money is owed to Del Mar.
23      Isn't it owed to the joint venture?
24   A.   No, because the joint venture accounted for it
25 already in the profits and losses.

36

1      When the joint venture stopped maintaining its
2 books, these sales that were made to Michael Cohen and
3 to the restaurant, the Olde Port Inn Restaurant, they
4 were accounted for in profits and losses.
5      So, in essence, Barry's 50 percent share was
6 already accounted for in the -- by recognizing these
7 sales.
8   Q.   Is that in some final wind-up document
9 relating to the joint venture?
10   A.   It's debits and credits.  It's accounting.
11   Q.   There's no single wind-up document for the
12 joint venture; is that correct?
13   A.   There's a final balance sheet and P-and-L
14 statement.
15   Q.   Did you prepare it?
16   A.   Dean prepared it up to September, and then we
17 let him go -- or whatever month Dean's last month was.
18      Then, obviously, there were still receivables
19 and payables that needed to get paid.  And I took over
20 at that point.
21   Q.   So, you're saying that despite the fact that
22 it was a 50/50 joint venture, the $58,000 in advances
23 were not owed to the joint venture?  They were owed only
24 to Del Mar, correct --
25   A.   Well --

37

1   Q.   -- if you know?
2   A.   Yeah, they would be owed to Del Mar.
3   Q.   Why if it was a 50/50 joint venture and you
4 were closing the books of the joint venture?
5   A.   Because if they weren't collected, that means
6 the joint venture would be writing those amounts off,
7 which would increase the losses of the joint venture.
8   Q.   Yes, but Barry gets the losses, too, doesn't
9 he?
10   A.   Of course, he gets half the losses and half
11 the profits.  But those were included in the profits.
12   Q.   Do you know if you submitted the final P and L
13 statements that show all of these receivables?
14   Q.   Submit it to who?
15   A.   Of the joint venture.
16   Q.   Submit it to who?
17   Q.   To us.  Did you provide those in the
18 documents?  Do you know?
19   A.   I believe there's a balance sheet and income
20 statement in there that shows the month-to-month
21 activity for 2004.
22   Q.   Now, I believe your position is that Barry
23 orally agreed to add these to his note; is that correct?
24   A.   Correct.
25   Q.   Never in writing?

38

DEPOSITION OF JOSEPH ROGGIO

14 (Pages 35 to 38)

1    A.   Not in writing.
2    Q.   Okay.  Were you aware that oral agreements
3 have a two-year statute of limitation?
4       MR. POULOS:  Objection.
5       MR. WALSH:  Q.  If you know the answer to the
6 question --
7       MR. POULOS:  It calls for a legal conclusion.
8       THE WITNESS:  I -- I wouldn't know, but --
9 well --
10      MR. WALSH:  Q.  If you don't know, you don't
11 know.
12   A.   I don't know.
13   Q.   So, where are the joint venture's books now,
14 if you know?
15   A.   I'm assuming they're in Avila Beach.
16   A.   Held by somebody else?
17   A.   I'm assuming they're still under Barry's
18 control.
19   Q.   Right.  And did you review those books before
20 you looked over this document and signed it?
21   A.   I didn't have to.  These were things that were
22 forwarded to me by Dean Smith.
23   Q.   These are just items that you got from some
24 other document?
25   A.   Well, they come from a general ledger of the

                                                    39

1 Avila Beach Joint Venture accounting records.
2    Q.   So, it's your position that Del Mar is owed
3 100 percent of this in the final accounting, correct --
4 100 percent of the 58,000?
5    A.   Again, I'd have to see the balance sheet and
6 the income statement and see how this 58,000 number is
7 -- I just don't recall.
8    Q.   So, you're not sure, as we sit here today?
9       MR. POULOS:  I'm not sure what the question
10 is.
11      The $58,000 is as broken down here, if that's
12 what the question is?
13      THE WITNESS:  Yes, this is the break-out of
14 the $58,000; right?
15      MR. POULOS:  That's what it -- yeah.  I mean,
16 if you --
17      THE WITNESS:  Yeah.
18      MR. POULOS:  -- you add these up --
19      THE WITNESS:  And my understanding is that
20 that $58,000 is owed to Del Mar Seafoods.
21      MR. WALSH:  Q.  Okay.  Fine.  That's the
22 answer to my question.
23      So, where are the documents that show how the
24 50/50 allocation was done at the end of the joint
25 venture?  Do you know?

                                                    40

1    A.   Well, it would be the profit-and-loss
2 statement.
3    Q.   The profit-and-loss statement?
4       But if there are debts left over, was there --
5 that's what you stated, I believe; right?
6    A.   There were outstanding receivable balances.
7    Q.   Was there a document that then allocated those
8 debts to each of you 50/50?
9    A.   Any documents?  No, except for the documents
10 that substantiate these amounts.
11   Q.   So, we don't have anything that can show how
12 this $58,000 shows --
13   A.   Sure, we do.
14   Q.   No.  Let me finish.
15      -- shows in relation to total allocations 50/50
16 of the joint venture, do we?
17      MR. POULOS:  Vague and ambiguous.
18      I'm not sure I understand the question from an
19 accounting standpoint.
20      MR. WALSH:  He's the accountant.
21      If he can answer the question --
22      THE WITNESS:  These amounts are included in
23 the profit and losses of the joint venture accounting
24 records.  They're already accounted for.  They have just
25 not been collected.

                                                    41

1       So, it's just like if we had a receivable from
2 American Fish Company.  If they pay that receivable
3 after we set down the joint venture, it would come to
4 Del Mar Seafoods.
5       MR. WALSH:  Q.  Why?
6    A.   Because it was already recognized in the
7 profit and losses.
8    Q.   But if it's already been -- if everything has
9 already been recognized in the profit and losses --
10   A.   You're assuming that we wrote these amounts
11 off, but we didn't.  I think that's where the confusion
12 is here.  These amounts were not written off.
13   Q.   No.  I'm trying to understand how you can say
14 that these advances --
15   A.   They're not advances --
16   Q.   Let me finish the question.
17      It says:
18      "The advances were as follows:
19      "...to close the books of the Olde Port
20      Fisheries joint venture," and it's
21      $58,000.
22      How can you calculate, in a 50/50 joint
23 venture, that that was owed exclusively to Del Mar --
24 how did you determine that?
25      Why isn't he owed half of that?  Why shouldn't

                                                    42

DEPOSITION OF JOSEPH ROGGIO

**Page 43**

```
1  he collect 50 percent from his own son?
2       MR. POULOS:  Asked and answered.
3       THE WITNESS:  Yeah, I think I answered that
4  several times.
5       MR. WALSH:  Q.  Because it's in the books of
6  the joint venture?
7       MR. POULOS:  No, because it's asked and
8  answered.
9       MR. WALSH:  Q.  You can answer the question.
10  A.  I believe I did.
11  Q.  You have nothing further to add?
12  A.  Except for these amounts, again, were included
13 in the profits and losses of the joint venture.
14  Q.  As of October 2004; correct?
15  A.  Correct.
16  Q.  Okay.  Did you ever send, in October or after
17 October 2004, a notice in writing to Mr. Cohen that he
18 owed these items and explain why he owed them?
19  A.  I discussed them with Barry.  And he said to
20 add them to his balance.
21       Otherwise, I would have gone after the
22 individuals who owed that money.
23       MR. WALSH:  Move to strike as nonresponsive.
24  Q.  Did you ever write a letter to Mr. Cohen
25 outlining that these are the amounts that are owed to
```

**Page 44**

```
1  the joint venture?
2  A.  No.
3  Q.  Did you ever write a letter to Chris Cohen
4  outlining that these were the amounts owed to the joint
5  venture?
6  A.  No.
7       MR. POULOS:  I object that the question
8  mischaracterizes the testimony.
9       He didn't testify that they were amounts owed
10 to the JV.
11       He testified they were amounts owed to
12 Del Mar.
13       MR. WALSH:  Q.  "(b) $7,417 (sic) owed for
14       accounts receivable..."
15       What are those amounts -- what is that amount?
16 Can you explain it further?
17  A.  Can we look at my schedule?
18  Q.  You don't recall, as we sit here?
19  A.  I do recall.  I do recall, but I don't know
20 where it falls on the spreadsheet.
21       I believe those are -- when Barry came to work
22 for us, he was selling fish -- my understanding is when
23 we pulled out of the Avila Beach Joint Venture,
24 Michael Cohen had taken over and was continuously
25 running the retail market in Avila Beach.
```

**Page 45**

```
1       When Barry came to work for us, he was selling
2  fish to Michael Cohen for him to sell at his -- at the
3  retail in Avila Beach.
4  Q.  Okay.
5  A.  Okay?
6  Q.  Okay.
7  A.  And I believe that amount there is the
8  receivables that Michael Cohen owed to Del Mar Seafoods.
9  Q.  Okay.  So, this is a debt --
10  A.  Outside of the joint venture.
11  Q.  -- outside of the joint venture by a different
12 person, Michael Cohen; correct?
13  A.  Well, a different person than who?
14  Q.  Than Barry.
15  A.  Yeah.
16  Q.  And so, Michael owes this to Del Mar; correct?
17  A.  Correct.
18  Q.  It had nothing to do with the Olde Port
19 Fisheries Joint Venture?
20  A.  It does not.
21  Q.  Okay.
22  A.  But it is an amount that Barry agreed to pay.
23  Q.  In writing?
24  A.  Not in writing.
25  Q.  How about Michael Cohen; did he agree to pay
```

**Page 46**

```
1  it in writing?
2  A.  Well, I think our invoices stipulate that he
3  owes that amount.
4       Well, Michael Cohen -- this is --
5  Q.  He didn't sign a piece of paper, did he?
6       THE WITNESS:  (Addressing Mr. Poulos) Can I
7  elaborate?
8       MR. POULOS:  Just answer his question.
9       MR. WALSH:  Q.  You can just answer my
10 question.  He can clarify it later, if he wants to.
11  A.  We don't have any of our customers verify in
12 writing that they owe us the money.
13       We sell them something, and we send them an
14 invoice.
15  Q.  Okay.  How about (c), expenses --
16       Well, before we leave (b), do you know the
17 dates of those accounts receivables?
18  A.  No, but I can find those out.
19  Q.  Was it after 2004 or before?
20  A.  I would believe it would be after.
21  Q.  With regard to that amount, have you ever
22 filed suit against Michael Cohen to recover those
23 accounts?
24  A.  I called him on several occasions.
25  Q.  The question is, Did you file a lawsuit to
```

DEPOSITION OF JOSEPH ROGGIO

16 (Pages 43 to 46)

1    Q.  I see.  So, after you prepared it, you never
2 looked at it again; is that fair to say?
3        MR. POULOS:  Mischaracterizes his testimony.
4        THE WITNESS:  I can't say that.  I'm sure I
5 looked at it before (sic).
6        MR. WALSH:  Q.  Well, I guess the question
7 more specifically is, Before you talked to the lawyers,
8 did you look in the provisions of the ship mortgage with
9 regard to what your possible remedies were?
10       A.  I forwarded the document to the attorney
11 and --
12       Q.  I see.
13       MR. POULOS:  I'm going to move to strike.
14   You're crossing into that line of
15 attorney-client communications.
16       MR. WALSH:  Q.  I don't want to know about
17 that.
18       MR. POULOS:  He's asking a very specific
19 question, which is:  Before you ever got lawyers
20 involved, but at the time that you were thinking of
21 sending it to lawyers, did you pull this out and read
22 the document?  Yes or no?
23       THE WITNESS:  No.
24       MR. POULOS:  Okay.
25       THE WITNESS:  I did not.

                                                63

1        MR. WALSH:  Q.  Okay.
2        MR. POULOS:  I move to strike his prior answer
3 as inadvertent disclosure of attorney-client
4 communications.
5        MR. WALSH:  I don't think we learned anything.
6        MR. POULOS:  I'm just protecting my record.
7        MR. WALSH:  This is the next one.
8        (Deposition Exhibit 5 was marked for
9         identification.)
10       MR. WALSH:  Q.  Now, if you could, look this
11 over, Mr. Roggio, and when you're finished looking it
12 over, let me know.
13       A.  Okay.
14       Q.  Is this the promissory note we've been
15 discussing?
16       A.  Yes, it is.
17       Q.  And this is the one that is secured by the
18 first preferred ship mortgage; is that correct?
19       A.  Yes.
20       Q.  Did you draft this?
21       A.  Well, I mean, yes -- yes, but it was
22 originally drafted by somebody else that we had a
23 preferred ship mortgage with -- another vessel.
24       Q.  So, you just copied it?
25       A.  Basically.

                                                64

1    Q.  And before you asked the lawyers to have the
2 vessel arrested, did you read this note over to find out
3 what your remedies were?
4    A.  No, I did not.
5    Q.  Now, has this promissory note ever been
6 amended in writing that you know of?
7    A.  No.
8        MR. WALSH:  Why don't we take a short break?
9   Then what I would like to do is to go until
10 1:00 and then take a lunch break.
11       THE WITNESS:  I would like to keep moving
12 along.
13       MR. WALSH:  We'll just take a short break.
14 Then we'll go until 1:00, and we'll have a half-hour
15 break for lunch.
16       Off the record.
17       (Recess taken:  12:04 p.m. until 12:15 p.m.)
18       MR. WALSH:  Q.  So, let's set aside this note
19 for now.
20   Let's talk about balance sheets.
21       (Deposition Exhibit 6 was marked for
22        identification.)
23       MR. WALSH:  Q.  If you could, look over this
24 document.
25       MR. POULOS:  Is this Exhibit 6?

                                                65

1        MR. WALSH:  This is Exhibit 6.
2    Q.  I'll tell you that this document was produced
3 to us by your attorneys in response to our Request for
4 Production of Documents.
5        MR. POULOS:  Actually, I believe this was part
6 of the initial disclosures, based on the Bates
7 numbering.
8        MR. WALSH:  Correct.  Well, whatever.  You
9 gave it to us.
10       Q.  An accountant yawning at figures.  I thought
11 this would be where you would wake up.
12       A.  And get all excited?
13       Q.  Can you tell me what these documents are, if
14 you know?
15       A.  Well, this is a balance sheet --
16       Q.  Right.
17       A.  -- and income statement -- excuse me.
18   Balance sheet, balance sheet.  It's from the
19 books of the joint venture.
20       MR. POULOS:  Let's break this down because
21 there are seven pages here, I guess.
22       MR. WALSH:  We'll go through each page.
23       Q.  Generally describe them.
24       MR. POULOS:  As you are looking at it -- you
25 just said "Balance sheet, balance sheet."

                                                66

DEPOSITION OF JOSEPH ROGGIO

1    Q.  Well, if, as you say, you and Barry discussed
2 about how to allocate it and then you prepared this
3 document, then you must have had a second meeting after
4 that, giving him a copy of the document.
5        Is that what happened?  Do you know?  Do you
6 recall?
7        MR. POULOS:  Argumentative; asked and
8 answered.
9        MR. WALSH:  Q.  You can answer the question.
10    A.  Barry -- we talked about who owed what.  And
11 he asked if he can get a schedule of who owed what.
12 That was one meeting we had.
13        Then when the payment was made, obviously we
14 talked about how it was going to be allocated.  That was
15 another meeting.
16        And then when he received this copy, I guess
17 you can say that was probably a third meeting.
18        And we probably had many other meetings about,
19 you know, the additional payments that he was making
20 after that.
21    Q.  So, the ending balance is how much?
22    A.  On this document that you are showing me, it's
23 111,884.70.
24    Q.  Okay.  One thing about this is that each of
25 these totals at the top are the -- are the amounts owed,

                                                        111

1 but there doesn't seem to be any interest involved here.
2 You don't identify interest.  You don't identify it as
3 being paid to anything but principal.
4        Can you clarify that?
5    A.  Just that the interest was going to be
6 calculated at the end of the note.  We didn't accrue the
7 interest on the books month to month.  At the end of the
8 note, then the interest would come due.
9    Q.  At the end of the note?
10    A.  Well, when he made the final payment, then I
11 would have told him what the interest balance was, which
12 we had discussed.  And I had showed him another schedule
13 that had the interest on there.
14    Q.  But there's none on this one --
15    A.  There's none on this one.
16    Q.  -- correct?
17    A.  Correct.
18    Q.  Right.  So, you're saying you guys did a
19 separate agreement that said he didn't have to pay
20 interest until the end of the note?
21    A.  No, I didn't say that.
22    Q.  What did you say?
23    A.  I said that I created another document that
24 had the interest amounts that were due that I showed
25 Barry.

                                                        112

1    Q.  But you didn't discuss interest with regard to
2 the preparation of this document.  How come?
3        MR. POULOS:  Asked and answered.
4        THE WITNESS:  Yeah, we just didn't.  He didn't
5 ask; I didn't ask.  It just wasn't something that was
6 discussed when this document was created.
7        This document was created so that he had an
8 understanding of what he would need to collect from his
9 kids, since he made the payments on their behalf.
10        MR. WALSH:  Q.  Well, that doesn't make sense
11 because Barry is not going to collect from his kids what
12 he owes, is he?
13    A.  He's going to collect from his kids what they
14 owe.
15        MR. POULOS:  Objection.  Argumentative.
16        (Addressing the witness) But you can answer.
17        MR. WALSH:  Q.  But this document includes
18 what he owes, not just what his sons owe, doesn't it?
19    A.  Yeah, of course.
20    Q.  Okay.  Right.  So, in fact, you're telling him
21 what he owes, aren't you?
22    A.  Along with what his kids owe.
23    Q.  Right, exactly.
24    A.  Yes.
25    Q.  And you didn't calculate any interest in

                                                        113

1 there, did you?
2    A.  In this document, no.
3    Q.  But, yet, you were purporting to tell him what
4 his kids owed and what he owed as of that date; is that
5 correct?
6    A.  I mean, I -- when this document was created --
7 the purpose, again, of this document was to create a
8 document for him to know what his kids owed him.
9        And, yes, I did include the amounts that he
10 owed also on this same document.
11    Q.  Absolutely you did, didn't you?
12    A.  Yes.  And it does not include interest.
13    Q.  That's right.  It doesn't, does it?
14        MR. POULOS:  Well, let him finish, Mr. Walsh.
15        THE WITNESS:  That doesn't mean -- there was a
16 separate document that I had given him that did include
17 the interest.
18        (Off-the-record discussion between the witness
19 and his counsel.)
20        MR. WALSH:  Let's go to the next document.
21        (Deposition Exhibit 21 was marked for
22        identification.)
23        MR. WALSH:  Q.  So, Mr. Roggio, can you tell
24 me about this document?
25        MR. POULOS:  Objection.  It's a

                                                        114

1    Q.    Okay.  So, "Olde Port Balance" -- do you see
2 that at 12/5/2006.  Do you see that?
3    A.    Uh-huh.
4        MR. POULOS:  You've really got to watch the
5 "uh-huhs."
6        THE WITNESS:  Yes.
7        MR. WALSH:  Q.  That was put on after you
8 created this instrument, sometime --
9    A.    Yes.
10    Q.    -- around the time that he made the $175,000
11 payment; is that correct?
12    A.    Yes.
13    Q.    Is that related at all to the joint venture
14 agreement?
15    A.    No.
16    Q.    What does that comprise?
17    A.    That is when Barry was employed by just
18 Del Mar Seafoods, outside of the joint venture, he was
19 selling fish to Olde Port Fisheries, which was being run
20 by his son.  And that was a receivable balance that he
21 incurred with Del Mar Seafoods.
22        And I tried collecting that money from
23 Michael.  And he said, "Go see my dad."
24        So, I proceeded to see Barry.
25        And Barry said he will (sic) take care of it;

119

1 add it to his balance.
2    Q.    When did this conversation with Barry occur?
3 Do you recall?
4    A.    On or around December 5th of 2006, when it was
5 put on the schedule.
6    Q.    Okay.  The term used was "balance" again,
7 right, as you recall?
8    A.    Well, it was -- I don't recall the exact word
9 used, but it was clear that Barry was going to take
10 responsibility for it.
11    Q.    But you don't recall that he said, "I agree to
12 add it to the note and the ship mortgage"?
13        MR. POULOS:  In those specific terms?
14        MR. WALSH:  That's my question.
15        THE WITNESS:  I know he specifically -- and he
16 was very clear about it -- said that he was going to
17 take care of it.
18        MR. WALSH:  Q.  Did he say, "I'm willing to
19 add it to the note and the ship mortgage"?
20    A.    I don't recall if he used those words.
21    Q.    You don't recall, or he didn't?
22    A.    I don't recall.
23        I don't know what words exactly he used except
24 for that it was clear that he was taking responsibility
25 for it.

120

1    Q.    Did you have any conversation with Chris Cohen
2 as to whether she was willing to have the note amended
3 and have that amount added to the note?
4    A.    No.
5    Q.    The next item, "Point Loma Balance," what's
6 that?
7    A.    When Barry's boat started fishing for just
8 Del Mar Seafoods, he was taking fuel, ice, and other
9 advances.  And when he was delivering fish, we were
10 deducting those to his charges that he put on our
11 accounts.  And when he stopped fishing for us, that was
12 the leftover balance.
13    Q.    How about the "Fees for Olde Port Case"?
14        MR. POULOS:  What about them?
15        MR. WALSH:  Can you wait until I --
16        MR. POULOS:  Sure.
17        MR. WALSH:  Q.  Why do they get added to this
18 schedule?
19    A.    Because they were discussed with Barry.
20        And, again, he was taking responsibility for
21 those fees that were incurred for his -- you'll have to
22 ask him -- for his case with the Avila Beach Port --
23 with the Port of Avila Beach.
24    Q.    Who had the discussion with him about these
25 fees?

121

1    A.    I did.
2    Q.    And these were -- whose fees were they?
3    A.    Our attorneys' fees in order to support and
4 help Barry defend his case with the Port of Avila Beach.
5    Q.    Were you a party to the case?
6    A.    I was depo'ed (sic) in that case and testified
7 in that case.
8    Q.    But as far as you know, you weren't sued, were
9 you?
10    A.    We were not sued.
11    Q.    So, you weren't a party to the case is your
12 understanding?
13        You don't need to look at him.  It's what you
14 know.
15        MR. POULOS:  To the extent you have an
16 understanding of what your legal relationship was to the
17 case is what he's asking you about.
18        Do you know?
19        THE WITNESS:  I don't.
20        MR. WALSH:  Q.  You don't recall that your
21 company had been sued?
22    A.    Del Mar Seafoods, no, was not.
23    Q.    No, it was not sued.
24        So, these are the fees related to the
25 depositions?

122

DEPOSITION OF JOSEPH ROGGIO

1   A.   No.
2   Q.   What were they related to?
3   A.   I'd have to go back and look at the bills. I
4 mean, I don't know.
5   Q.   You don't know. Okay.
6        And so, Barry agreed to pay your legal fees
7 because of the participation of Del Mar in the case; is
8 that correct?
9   A.   I don't think it had anything to do with
10 defending Del Mar in this case.
11       I think it had to do with helping Barry or
12 helping support Barry's case against the Port.
13  Q.   Did he -- what exactly was his agreement with
14 regard to -- what did he get in return for paying your
15 legal fees?
16  A.   I wasn't that involved in the case. I don't
17 know.
18  Q.   But you were subpoenaed to appear in the case,
19 and you had to give a deposition by law.
20       What did Barry get out of your participation
21 in the case?
22       Did he get any monetary benefit?
23       MR. POULOS:  Objection. Asked and answered.
24       MR. WALSH:  Q.  If you know.
25  A.   I wasn't there.
                                                    123

1        I don't know what he got.
2   Q.   So, tell me exactly what he said when he
3 agreed to take on what was your debt.
4        That's right? This was your debt to your
5 lawyers; right?
6        MR. POULOS:  Del Mar, you mean?
7        THE WITNESS:  Yes. They billed Del Mar
8 Seafoods.
9        MR. WALSH:  Q.  So, it was Del Mar's debt?
10  A.   A lot of the conversations in those bills were
11 between Barry and Del Mar's attorney.
12  Q.   But the law firm billed you; correct?
13  A.   Well, yeah. Yeah, they did because they
14 wanted to get paid.
15  Q.   Did you pay them?
16  A.   Yes.
17  Q.   Del Mar paid them?
18  A.   Yeah.
19  Q.   So, it's Del Mar's debt to the attorneys that
20 were paid.
21       Tell me about your conversation with Mr. Cohen
22 where he said, "Yes, I will pay your legal fees." Tell
23 me about that conversation. When was it held?
24  A.   I don't know when it was held, but it was
25 obviously held during the time that Del Mar was
                                                    124

1 receiving these bills. And I recall going into his
2 office and telling him that, "We're not going to be
3 responsible for these," that, "you are going to be
4 responsible for those."
5   Q.   Was he your employee at that time?
6   A.   Yeah, he was.
7   Q.   So, you gave him no choice?
8   A.   There --
9        MR. POULOS:  Objection. Argumentative.
10       MR. WALSH:  Q.  You can answer the question.
11  A.   It wasn't an employment -- employer/employee
12 relationship discussion. This had nothing to do with
13 his employment with Del Mar Seafoods.
14  Q.   Did you get any kind of written agreement?
15  A.   No.
16  Q.   Let's go to the next item, "Payment."
17 Actually there are three of them there. These are all
18 payments; right?
19  A.   Yes.
20  Q.   So, as of April 30, 2007, Barry owed
21 $128,749.79; is that correct?
22  A.   I'm sorry. As of what date?
23  Q.   It looks like 4/30/2007 --
24  A.   Yes.
25  Q.   -- when you printed this out.
                                                    125

1        Did you give this to Barry?
2   A.   Well, I know Barry -- at what point of this
3 spreadsheet was it given to Barry? I don't know.
4        But Barry has definitely got this spreadsheet.
5        I mean, was it at, you know, this part of the
6 spreadsheet? Was it at this part of the spreadsheet? I
7 don't know.
8   Q.   This particular document, do you recall ever
9 giving it to Barry Cohen?
10  A.   Yeah.
11  Q.   When?
12  A.   Oh, you're talking about with all of these
13 items on it (indicating)?
14  Q.   Yes, this particular one on it (indicating).
15       MR. POULOS:  This one with the handwriting?
16       MR. WALSH:  Q.  Yes, the one with the
17 handwriting on it.
18  A.   Oh, no, not with the handwriting on it.
19  Q.   Did you mail it to him with a cover letter?
20  A.   No.
21  Q.   Did you mail a copy of this to Chris Cohen
22 with a cover letter?
23  A.   No.
24  Q.   Did you ever write a letter demanding that he
25 make this payment?
                                                    126

DEPOSITION OF JOSEPH ROGGIO

1    A.  No.
2        MR. POULOS:  Which payment?
3        MR. WALSH:  The $128,749.
4    Q.  Is the answer still no?
5    A.  Uh-huh.
6        MR. POULOS:  That's a "yes"?
7        THE WITNESS:  Yes.
8        MR. WALSH:  Q.  With regard to these amounts
9  at the top, except for Barry, these beginning
10 balances -- those all go back to the joint venture, is
11 that correct?  The 13,000, 18,000, 10,000, the 16-, they
12 all go back to the joint venture books; correct?
13       MR. POULOS:  Wait a minute.
14       (Addressing the reporter) Can I have that
15 question read back?
16       (Whereupon, the record was read as follows:
17       "Question:  With regard to these amounts
18       at the top, except for Barry, these
19       beginning balances, is that correct?  The
20       the joint venture, is that correct?  The
21       13,000, 18,000, 10,000, the 16-, they all
22       go back to the joint venture books;
23       correct?")
24       MR. POULOS:  Objection.  Argumentative; asked
25 and answered; mischaracterizes prior testimony.
                                                     127

1        MR. WALSH:  Q.  You can answer the question.
2    A.  Yes.  They were funded by Del Mar Seafoods.
3    Q.  So, presumably all of these were before --
4  correct me if I am wrong -- 12/28/2004, when you made a
5  $5,000 payment.
6    A.  Yeah -- yes.
7    Q.  Okay.  Then he made the $175,000 payment, it
8  looks like, November 10th, 2005; is that correct?
9    A.  Yes.
10   Q.  Is there any item for interest in this
11 document that you can point to?
12   A.  No.
13       This document related to the principal only --
14 the principal balances only.
15       MR. WALSH:  Let's mark this as the next
16 document.
17       (Deposition Exhibit 22 was marked for
18       identification.)
19       MR. WALSH:  Q.  If you could, look over this
20 document, and then tell me when you are ready.  Then
21 I'll ask you some questions about it.
22   A.  I'm ready.
23   Q.  Mr. Roggio, have you seen this document
24 before?
25   A.  Yes, I have.
                                                     128

1        MR. WALSH:  For the record, I'll identify it
2  as something entitled "ASSIGNMENT OF JOINT VENTURE
3  INTEREST."
4    Q.  The date at the top, 22nd October, 2004 -- do
5  you see that?
6    A.  Yes.
7    Q.  That seems to coincide with about the time
8  the joint venture was dissolved, so to speak; right?
9    A.  Yes.
10   Q.  Is that your signature on page 2?
11   A.  Yes.
12   Q.  And that Mr. Cohen's?
13   A.  Yes.
14   Q.  What is your recollection as to the purpose of
15 this particular assignment?
16   A.  Without knowing all the ins and outs of the
17 legal (sic), that basically Del Mar was assigning its
18 interest in the joint venture, but not its -- yeah, its
19 interest, but not its rights.
20   Q.  So, your understanding of this document is
21 that it assigns an interest, but not its rights?
22   A.  Yeah.
23   Q.  Have you read -- have you read paragraph 2?
24   A.  Yeah.
25   Q.  I'll read it for the record.
                                                     129

1    A.  Yeah.  Do you mean D.?
2    Q.  Tell me if I am correct in reading this.
3        "ASSIGNMENT:  Assignor --" which is
4        Del Mar; correct?
5    A.  Uh-huh.
6    Q.  -- "hereby confirms and reaffirms its
7        prior assignment and transfer to Assignee
8        to the fullest extent possible and without
9        restriction, all of Assignor's entire
10       interest in the Joint Venture, including
11       but not limited to the Joint Venture's
12       claims, if any, against the District, and
13       including without limitation all rights,
14       entitlements and/or interests in and to
15       any claims, rights of action, causes of
16       action, recoveries, damages or other legal
17       recourse owned or held by the Joint
18       Venture."
19       Did I read that correctly?
20   A.  You read what was on the piece of paper.
21   Q.  But I read it correctly?
22   A.  Yes.
23   Q.  So, your answer that this assignment did not
24 transfer your right -- the rights of Del Mar, do you
25 still think that's a correct statement?
                                                     130

DEPOSITION OF JOSEPH ROGGIO

1 Your question was argumentative.
2        (Addressing the witness) He's got a new
3 question pending now.
4        THE WITNESS: Our discussions were like I
5 told you at the very beginning of this deposition: It
6 was that Barry was encumbered with debts, and we were
7 concerned about our interest or the funds that were owed
8 to Del Mar Seafoods. That's what we discussed.
9        MR. WALSH: Q. But you did not discuss --
10 correct me if I was wrong. So, you did not discuss the
11 principal asset that you had security in, the boat, in
12 any detail?
13        MR. POULOS: Objection. Argumentative.
14        (Addressing the witness) If you remember
15 discussing the boat with Joe --
16        THE WITNESS: We knew we had a security
17 interest in the boat and that we would have to go after
18 the boat. Yes, we discussed that.
19        MR. WALSH: Q. Did you discuss the value of
20 that security interest?
21        A. I don't recall.
22        I mean, Joe -- Joe understands boats a lot
23 better than I do. So, he probably would have a better
24 understanding of what the value of that boat would be
25 and what the permit value of that boat would be than I

135

1 would.
2        Q. Do you recall any discussion with
3 Joe Cappuccio whereby, because you were concerned
4 about this divorce and these other lawsuits --
5        A. Right.
6        Q. -- what position your ship mortgage would put
7 you in relative to those debts? Did you have any
8 discussion like that?
9        A. No, that -- no.
10        Q. Did you have any discussion as to whether
11 Barry held the fishing permit on the vessel, as opposed
12 to, say, someone else, if you had any such conversation?
13        A. I don't recall a conversation of who may have
14 had the fishing permit or...
15        Q. Do you have any idea what the value of the
16 permit is?
17        A. I do not.
18        Q. Would Mr. Cappuccio know?
19        A. Yeah, probably.
20        Q. So, when you had this conversation with
21 Mr. Cappuccio about Barry's finances, did you at any
22 time discuss that you can recall whether either you or
23 Mr. Cappuccio said, "Well, what would this do to Barry's
24 income from the boat?"
25        A. I don't recall a conversation like that.

136

1        Q. Did you understand that if you seized the
2 boat, his income would stop?
3        MR. POULOS: Objection to the use of the word
4 "seize."
5        The proper term is "arrest."
6        MR. WALSH: Q. Will you answer the question?
7        MR. POULOS: As with prior instructions,
8 understanding that to be a reference to the arrest.
9        MR. WALSH: Q. Did you understand that it
10 would stop his income if the vessel was arrested?
11        A. I didn't even think about it. I didn't even
12 think of that. I honestly --
13        Q. There's no question pending.
14        (Deposition Exhibit 25 was marked for
15        identification.)
16        MR. WALSH: Q. Mr. Roggio, if you could, look
17 at this document. It's a canceled check dated 12/24/04
18 (sic).
19        Do you recognize this document?
20        A. It's a check written from the Fishing Vessel
21 Point Loma.
22        Q. Is that Mr. Cohen's signature?
23        A. Yes.
24        Q. And did you, in fact, receive this check?
25        A. Yes.

137

1        Q. Did you, in fact, cash this check and treat it
2 as income?
3        A. We cashed the check. We applied it to his
4 loan balance.
5        Q. Thank you.
6        (Deposition Exhibit 26 was marked for
7        identification.)
8        MR. WALSH: Q. Mr. Roggio, this is another
9 check, signed by Barry Cohen.
10        That is his signature, is it not?
11        A. Yes.
12        Q. What's the amount of this check?
13        A. $175,000.
14        Q. Now, Mr. Roggio, do you recall a provision in
15 the promissory note that required Mr. Cohen to make a
16 $175,000 payment under the note?
17        MR. POULOS: A specific provision about that?
18        MR. WALSH: That's correct.
19        THE WITNESS: I don't think it said anything
20 about making a $175,000 payment at any one time.
21        MR. WALSH: Q. I believe there were monthly
22 payments, weren't there?
23        A. It calls for monthly payments or a percentage
24 of the landing receipts.
25        Q. And I believe the amount for the monthly

138

DEPOSITION OF JOSEPH ROGGIO

39 (Pages 135 to 138)

1 payment was $3,000.
2    A.   Or 15 percent of the landing receipts,
3 whichever one is greater.
4    Q.   Right.  And did you, at any time after the
5 note was entered into, send Mr. Cohen a notification as
6 to what might be due under the landing receipt
7 provision?
8    A.   No.
9    Q.   But you could calculate that, couldn't you?
10    A.   If he provided me with the proper records,
11 yeah, I could.
12    Q.   Correct.  And when he delivered it to Del Mar,
13 you knew what his landing receipts were, did you not?
14    A.   Yes.
15    Q.   But at no time did you ever send a letter
16 saying, "We want you to pay a percentage of the landing
17 receipts," did you?
18    A.   No.
19    Q.   Did you ever send a notice to him that he was
20 late on a payment under the note?
21    A.   No.
22    Q.   Did you ever send him a notice that told him
23 that interest was due?  Did you send him a letter or a
24 writing that interest was due?
25    A.   No.

                                            139

1    Q.   I assume the answer would be the same with
2 respect to Christene Cohen as well.
3    A.   Yes.
4    Q.   So, tell me again the circumstances under
5 which this $175,000 payment was made.
6        Did you talk to Barry about why he made this
7 payment?  That's the first question:  Did you talk to
8 Barry about why he made this payment?
9    A.   Did I talk to Barry?
10    Q.   Yes.
11    A.   I know we had talked about him making a
12 payment or that a payment was coming.
13    Q.   Tell me about those conversations.
14    A.   He told me that he was going to get an equity
15 line against his home and that he was going to pay off
16 some bills and make a payment to -- and make a payment
17 to Del Mar Seafoods.
18        MR. POULOS:  Can we take a break?  I need to
19 use the restroom.
20        MR. WALSH:  Sure.
21        (Recess taken:  2:36 p.m. until 2:47 p.m.)
22        (Deposition Exhibits 27 and 28 were
23           marked for identification.)
24        MR. WALSH:  Q.  I'm going to show you two
25 exhibits at once.

                                            140

1        MR. POULOS:  This is 27 and 28?
2        MR. WALSH:  I think they're the same, but I
3 don't know for sure.
4    Q.   Can you look at those two?
5    A.   These two (indicating)?
6    Q.   Yes.
7    A.   Yes.
8    Q.   Did you prepare them?
9    A.   I did not.
10    Q.   Who prepared them?
11        MR. POULOS:  Which is which?  Can we just do
12 that first?
13        (Addressing the reporter) Which is 27, and
14 which is 28?
15        THE REPORTER:  Exhibit 28 has the "3" on it.
16        MR. POULOS:  Exhibit 28 has the "3" on it.
17        (Discussion off the record.)
18        MR. WALSH:  Q.  So, you didn't prepare this?
19    A.   No, I did not.
20    Q.   So, do you know anything about it?
21    A.   I'm somewhat familiar with it, yes.
22    Q.   Can you say who did prepare it?
23        If you say your lawyers, I don't want to hear
24 about it.
25        But who would have prepared it other than you?

                                            141

1 Do you know?
2        MR. POULOS:  This may have been --
3        MR. WALSH:  This was an exhibit used in court
4 by you guys.
5        MR. POULOS:  I believe that this -- I'll say
6 on the record, because I'm not sure if the witness
7 knows or not, I believe that this was prepared by
8 Richard Wagner.
9        (Addressing the witness) So, to the extent
10 that you know about this -- Richard Wagner being one of
11 the attorneys -- if you can testify about sums in here,
12 that's fine.
13        But you cannot testify about conversations you
14 had with Mr. Wagner about this document.
15        THE WITNESS:  Okay.
16        MR. POULOS:  But if you understand parts of
17 the document, then you are certainly able to testify to
18 that.
19        MR. WALSH:  Actually, I don't plan to ask any
20 questions because it's attorney work product, at least
21 what we have discerned is attorney work product.
22        I'm not so sure what I could do with it now
23 that you have disclosed that to me.
24        MR. POULOS:  Okay.
25        MR. WALSH:  The Supreme Court has just

                                            142

DEPOSITION OF JOSEPH ROGGIO

# Exhibit 8

Nov 16 05 04:18p

Sent by: FIRST NATIONAL BANK;

Account:                    102500296
Check:                      9146
Amount:                     5000.00
Date Cleared:               12/31/04

F/V POINT LOMA
LIC NO949596
PH 805-474-5719
899 N 2ND STREET
GROVER BEACH, CA  93433

90-4257/1222
105500296

8146

DATE  12/23/04

PAY TO THE
ORDER OF   Del Mar Seafoods          $ 5000.00

Five thousand +                      DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420

MEMO  On Account            Gary A. Cohen

⑆122242526⑆9146  102 500201⑈  ⑆000500000⑆

PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
FOR DEPOSIT ONLY
DEL MAR SEAFOODS, INC.
4427067053

UFB NA FRB# 12302004
3877  0371011700   4
1221-0587-8
1411   14 ESU 47

252126507

COHEN 00004

Item Viewer-Details

Web Client-Redmage Coast National Bank

| | |
|---|---|
| Find | |
| Clear | |
| Print | |
| Log Off | |

**Account Number** 102000579  **Tracer Number** R:1 B:7 S:15

**Amount** 175,000.00

**Posting Date** 11/14/2005

**Check Number** 7689

**TrunCode** 7689

**Routing Number**

View Query Results    View Front    View Back    View Front AND Back

BARRY A. COHEN  LIC.  M0249595
CHRIS L. COHEN  LIC.  B6943892
PH. 831-661-0867
7121 FERN FLAT RD.
APTOS, CA 95003

90-4252/1222
102000579

7689

DATE 11/9/05

PAY TO THE ORDER OF  DEL MAR SEAFOODS  $175,000 00/100

One Hundred & Seventy-Five Thousand & 00/100 DOLLARS

COAST NATIONAL BANK
1199 Grand Avenue
Arroyo Grande, CA 93420
805-473-4348

*

MEMO

Barry A Cohen

⑈122245262⑈7689 102000579⑈  001750000⑈

ENDORSE HERE

CREDITED TO THE ACCOUNT OF
WITHIN NAMED PAYEE
D.C.  LACK OF ENDORSEMENT GUARANTEED
WELLS FARGO BANK, N.A.  AU 00592
AU 00592

WFB NA FREM 11102005
3278  04310491808  4
>1221-0527-8< 4
1643:  14 ESU 44

Received  06-27-07  10:31am  From-  To-DWT SF  Page 001

COHEN 00005

Nov 16 05 01:53p                                                                    p.4
Item Viewer-Details

Web Client-NetImage Coast National Bank

| | | | | |
|---|---|---|---|---|
| Account Number | 102509277 | | Tracer Number | R:1 B:6 S:1370 |
| Amount | 3,000.00 | | | |
| Posting Date | 02/23/2007 | | | |
| Check Number | 4020 | | | |
| TranCode | 4020 | | | |
| Routing Number | | | | |

Find
Clear
Print
Log Off

○ View Query Results  ○ View Front  ○ View Back  ● View Front AND Back

F/V POINT LOMA                                                    4020
PO BOX 40
AVILA BEACH CA 93424                                    90-4252/1222

                                                DATE 2/15/07

PAY TO THE
ORDER OF    DEL MAR SEAFOODS            $ 3,000 00/100

Three Thousand                         DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-746-2530

MEMO  ON ACCOUNT                      Barry A. Cohen

⑈1222452526⑈4020  102 509277⑈  ⑈0000300000⑈

WFB NA FREN 0221200?
3825  93618658090  4
          >1221-0527-8<
664:     14 ESU 53.

Received  06-27-07  10:31am    From-              To-DWT SF            Page  004

COHEN 00006

Web Client Nutimage Coast National Bank

| | |
|---|---|
| Find | |
| Clear | |
| Print | |
| Log Off | |

| | | |
|---|---|---|
| Account Number | 102509277 | Tracer Number  R:1 B:4 S:330 |
| Amount | 2,000.00 | |
| Posting Date | 02/12/2007 | |
| Check Number | 4008 | |
| TranCode | 4008 | |
| Routing Number | | |

○ View Query Results ○ View Front ○ View Back ◉ View Front AND Back

F/V POINT LOMA
PO BOX 40
AVILA BEACH CA 93424                                                        4008
                                                                    90-4252/1222

DATE 1/30/07

PAY TO THE ORDER OF   Del Mar Seafoods              $ 2,000 00/100

Two Thousand & ————————————— 00/100 DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
808-746-2530

MEMO   On Account                              Barry A Cohn

⑈122425 26⑈4008 102 509277⑈  ⑈0000200000⑈

ENDORSE HERE
X
PAY TO THE ORDER OF
WELLS FARGO BANK, N.A.
FOR DEPOSIT ONLY
DEL MAR SEAFOODS, INC.
4427067053

WFB NA FREM 02092007
3720  04010887695   4
      >1221-0587-8<
3412:    14 ESU 52

Received   06-27-07   10:31am   From-              To-DWT SF              Page   002

COHEN 00007

Nov 16 05 01:53p

Web Client-NetImage Coast National Bank

| Account Number | 102509277 | Tracer Number | R:1 B:5 S:1290 |
|---|---|---|---|
| Amount | 3,000.00 | | |
| Posting Date | 04/27/2007 | | |
| Check Number | 4063 | | |
| TranCode | 4063 | | |
| Routing Number | | | |

Find
Clear
Print
Log Off

○ View Query Results  ○ View Front  ○ View Back  ⊙ View Front AND Back

F/V POINT LOMA
PO BOX 40
AVILA BEACH CA 93424

4063
90-4252/1222

DATE 4/23/07

PAY TO THE ORDER OF  Cci Mar Seafoods    $ 3000 00

Three Thousand                           DOLLARS

1199 Grand Avenue
Arroyo Grande, CA 93420
888-746-2530

MEMO  Bait on Account          Barry A. Cohn

⑈1222425262⑆4063 ⑆02 509279⑈    ⑈0000300000⑈

ENDORSE HERE
X
CREDITED TO THE ACCOUNT OF
WITHIN NAMED PAYEE
LACK OF ENDORSEMENT GUARANTEED
WELLS FARGO BANK, N.A.
AU 00592

WFB NA FREM 0425 2007
3500  0371007635
>1251-0055<
2865:    14 ESO 48

https://itemresearch.intercept.net/ItemViewer.ASP?WCI=Modify&WCU=BankID%3dfi02...    6/21/2007

COHEN 00008

# Exhibit 9

## ASSIGNMENT OF JOINT VENTURE INTEREST

This two-page ASSIGNMENT OF JOINT VENTURE INTEREST ("Assignment") is made effective as of the 22nd day of October, 2004 (the "Effective Date"), by DEL MAR SEAFOODS, INC. (hereinafter referred to as "Assignor") in favor of BARRY A. COHEN ("Assignee").

### R E C I T A L S:

THIS ASSIGNMENT is made with reference to the following facts:

A.    Assignor and Assignee were joint venturers operating a fish processing business (the "Joint Venture") on Harford Pier at Port San Luis, California from 1999 until 2004. Assignor and Assignee each had a fifty-percent interest in the net profits of the Joint Venture.

B.    Assignor withdrew from the Joint Venture in about September of 2004.

C.    Assignee sued the Port San Luis Harbor District ("District") in San Luis Obispo Superior Court, Case No. CV 040897, (the "Case") to, in part, recover from the District damages that Assignee alleges were suffered by the Joint Venture while it operated at the Harford Pier.

D.    Assignor did not and does not intend to pursue any claims against the District relating to the Joint Venture, and also does not intend to participate in the Case between Assignee and the District. By that certain document dated December 15, 2005, Assignor previously intended to and did assign to Assignee, to the fullest extent possible, any and all of Assignor's right, title and interest in the Joint Venture, including but not limited to the Joint Venture's claims, if any, against the District.

E.    By this Assignment, Assignor intends to confirm and reaffirm its prior assignment referenced in Recital D above.

ACCORDINGLY, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor agrees as follows:

### A G R E E M E N T

1.    INCORPORATION OF RECITALS:    The above Recitals, including all facts and defined terms set forth therein, are incorporated herein by this reference and are a part hereof.

2.    ASSIGNMENT:    Assignor hereby confirms and reaffirms its prior assignment and transfer to Assignee to the fullest extent possible and without restriction, all of Assignor's entire interest in the Joint Venture, including but not limited to the Joint Venture's claims, if any, against the District, and including without limitation all rights, entitlements and/or interests in and to any claims, rights of action, causes of action, recoveries, damages or other legal recourse owned or held by the Joint Venture.

CRAA\4415\865\8046.1

Jan 23 06 07:12p                                                    p.3

_____    IRREVOCABILITY OF ASSIGNMENT:  Assignor intends, represents,
and warrants that the assignment described herein is irrevocable, and that Assignor has no further
interest whatsoever in the assigned interest

    IN WITNESS WHEREOF, Assignor has executed this Assignment effective as of
the day and year first above written.

Assignor:                   DEL MAR SEAFOODS, INC.

                            By:  _____

                            Name:  _____

    Assignee hereby accepts this Assignment, effective as of the day and year first
above written.

Assignee:                   BARRY A. COHEN

Exhibit 10

1   James P. Walsh, CSB. No. 184620
2   Gwen Fanger, CSB No. 191161
    DAVIS WRIGHT TREMAINE LLP
3   505 Montgomery Street, Suite 800
    San Francisco, California 94111-3611
4   Telephone: (415) 276-6500
    Facsimile: (415) 276-6599
5   budwalsh@dwt.com

6   Attorneys for Defendants and Claimant
    BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7   Claimant, F/V POINT LOMA Fishing Company, Inc.

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11  DEL MAR SEAFOODS, INC.,                     )
                                                )
12                       Plaintiff,             )   No. C-07-2952-WHA
                                                )
13          v.                                  )   **DEFENDANTS BARRY COHEN,**
                                                )   **CHRIS COHEN'S (aka CHRISTENE**
14  BARRY COHEN, CHRIS COHEN (aka               )   **COHEN) FIRST SUPPLEMENTAL**
    CHRISTENE COHEN), *in personam* and,        )   **RESPONSE TO PLAINTIFF'S FIRST**
15  F/V POINT LOMA, Official Number             )   **SET OF INTERROGATORIES**
    515298, a 1968 steel-hulled, 126-gross ton, )
16  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
17  Does 1-10,                                  )
                                                )
18                       Defendants.            )
                                                )
    _____ )

19

20  PROPOUNDING PARTY:   PLAINTIFF DEL MAR SEAFOODS, INC.

21  RESPONDING PARTY:    DEFENDANTS BARRY and CHRISTENE COHEN

22  SET NO.:             ONE

23          Barry and Christene Cohen ("Responding Parties") hereby submit the following First

24  Supplemental Response to Plaintiff's First Set of Interrogatories (the "Interrogatories"),

25  propounded by Plaintiff, Del Mar Seafoods, Inc. ("Del Mar").

26

27

28

                                          1

**GENERAL LIMITATIONS AND OBJECTIONS**

1.      Responding Parties have not completed their investigation of the facts relating to the case and have not completed its discovery. The following responses, therefore, are provided without prejudice to the production or use of additional information not set forth in the responses. Furthermore, Responding Parties do not waive their right to object to the use at trial of any information identified by the responses.

2.      Responding Parties object to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, constitutional or statutory rights of privacy, the trade secrets privilege or any other applicable privilege, or documents containing commercially sensitive information.

3.      Responding Parties further object to the Interrogatories to the extent they seek to impose obligations on Responding Parties beyond those established by the Federal Rules of Civil Procedure.

4.      Specific objections to each Interrogatory are made on an individual basis in the responses below. The General Responses and Objections are hereby incorporated into the response to each separate interrogatory as though set forth in full therein.

5.      Responding Parties renew their objections to Interrogatories numbers 26-30 as they exceed 25, the maximum number of interrogatories allowed under Fed. R. Civ. P. 33.

**OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

Responding Parties provide the supplemental responses to Plaintiff's Interrogatories and renew their objections set forth in their Responses to the Interrogatories to the instructions, definitions, and Interrogatories to the extent that they purport to require Responding Parties to locate or produce information not known to them or not in their possession, custody or control. Responding Parties also object to the extent that they purport to impose on Responding Parties any obligations greater than those provided by the Federal Rules of Civil Procedure, case law and other law governing the proper scope and extent of discovery.  Responding Parties further object

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' FIRST SUPP. RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES     SFO 401128v1 0084289-000001
Case No. C-07-2952-WHA

1  on the grounds that the definitions of "YOU," "YOUR," "defendants," and "YOURSELF" are

2  overbroad, unduly burdensome and oppressive.

3      Responding Parties adopt the terms defined by the Plaintiff solely for convenience in

4  responding to the requests herein.  Responding Parties do not accept or concede that any of the

5  terms or definitions are appropriate, descriptive or accurate.  The above general objections are

6  incorporated into each response below.

7                    **SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

8  **INTERROGATORY NO. 2:**

9      IDENTIFY by name, last known address, phone number, and type of service provided,

10  each person and company that performed maintenance or repair services on the Vessel or provided

11  equipment used aboard the vessel between January 1, 2001 and the present.

12  **RESPONSE TO INTERROGATORY NO. 2:**

13      Responding Parties renew their objections to this interrogatory on the grounds that it is

14  compound containing at least nine distinct subparts requesting 1) the name; 2) the last known

15  address; 3) the phone number, and 4) the type of service provided by 5) each person and 6) each

16  company that performed 7) maintenance or 8) repair or 9) equipment to the F/V Point Loma

17  between January 1, 2001 and the present.  Responding Parties also object to this interrogatory on

18  the grounds that the identity and contact information of the persons and companies providing

19  maintenance, repair, and equipment to the vessel is not relevant to the issues in this action, the

20  information is unlikely to lead to admissible evidence, and the time period for which the

21  information is requested is overly broad and irrelevant in that it covers a period of time well before

22  the Note and Mortgage, the basis of this lawsuit, were even signed.  Without waiving these

23  objections, Responding Parties supplement their response as follows:  in addition to the

24  information provided in Responding Parties' initial response to Interrogatories, information, if

25  any, responsive to this interrogatory has been made available for Plaintiff's inspection at

26  Defendants' Avila Beach plant.  Responding Parties do not waive any privileges with respect to

27  Plaintiff's inspection of documents at the Avila Beach plant.

28

DAVIS WRIGHT TREMAINE LLP

3

**INTERROGATORY NO. 3:**

IDENTIFY the fishing net that YOU have alleged was lost during the arrest of the Vessel by providing the size and type of net, the date of purchase and purchase price, the location from where the net was purchased, and the documents that support this information.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding Parties renew their objection to this interrogatory on the grounds that it is compound containing at least six subparts requesting 1) the size of the net 2) the type of the net, 3) the date of purchase of the net, 4) the purchase price, 5) the location from where the net was purchased, and 6) documents that support this information. Responding Parties will construe this interrogatory as two requests to the extent the information in subparts 1-5 seek information to substantiate Responding Parties' claim for damages for the lost net. Without waiving this objection, Responding Parties supplement their response to part 6 of this request as follows: Additional documents supporting the information regarding the lost net are identified as: Invoice from K&K Knots, dated October 1, 2007 (COHEN 00719); check register from Coast National Bank (COHEN 00720); and Bill for Net.txt (COHEN 00721)

**INTERROGATORY NO. 11:**

State the amount of attorneys' fees, if any, that YOU owed to the law firm of Miller, Starr & Regalia as of August 1, 2007.

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Parties renew their objections to this interrogatory on the grounds that is irrelevant to the issues in this case; namely the amount of the debt remaining under the Note and the unlawful arrest of the Vessel. Notwithstanding this objection and without waiving it, Responding Parties supplement their response as follows: This interrogatory seeks a legal opinion as to whether Mr. Cohen in fact owes anything to Miller Starr & Regalia. It is Mr. Cohen's position that he does not owe any attorney fees to Miller Starr & Regalia as supported by the malpractice suit he is considering filing against them. Moreover, Miller Starr& Regalia have made no effort to collect any fees against him.

DAVIS WRIGHT TREMAINE LLP

1  **INTERROGATORY NO. 12:**

2      State what YOUR gross earnings were for each voyage of the Vessel between October 31,

3  2001 and the present.

4  **RESPONSE TO INTERROGATORY NO. 12:**

5      Responding Parties renew their object to this interrogatory on the grounds that it is overly

6  broad and unduly burdensome as it requests gross earnings for *each* voyage of the Vessel back to

7  2001, well before the timing of the underlying issues in this case. Responding Parties further

8  object on the grounds that it requests confidential, competitive information and is irrelevant to the

9  underlying issues in this case, namely the amount of the debt remaining under the Note (signed in

10  2003) and the wrongful arrest of the Vessel. Without waiving these objections, Responding

11  Parties respond that Exhibit 1, prepared by Barry Cohen and attached hereto, is an accurate

12  description of the monthly gross earnings of the Vessel for the end of 2005 through the present.

13  **INTERROGATORY NO. 13:**

14      State what YOUR net earnings (gross earnings less expenses) were for each voyage of the

15  Vessel between October 31, 2001 and the present.

16  **RESPONSE TO INTERROGATORY NO. 13:**

17      Responding Parties renew their objections to this interrogatory on the grounds that it is

18  overly broad and unduly burdensome as it requests gross earnings for *each* voyage of the Vessel

19  back to 2001, well before the timing of the underlying issues in this case. Responding Parties

20  further object on the grounds that it requests confidential, competitive information and is irrelevant

21  to the underlying issues in this case, namely the amount of the debt remaining under the Note

22  (signed in 2003) and the wrongful arrest of the Vessel. Without waiving these objections,

23  Responding Parties respond that Exhibit 1 prepared by Barry Cohen and attached hereto, is an

24  accurate description of the monthly net earnings of the Vessel for the end of 2005 through the

25  present.

26

27

28

DAVIS WRIGHT TREMAINE LLP

5

DEFENDANTS' FIRST SUPP. RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES    SFO 401128v1 0084289-000001
Case No. C-07-2952-WHA

1  **INTERROGATORY NO. 23:**

2      IDENTIFY the bank from whom YOU obtained the loan to make the lump sum payment

3  of $175,000.00 against the Note and Mortgage, including the name of the bank, the branch, the

4  person at the bank that YOU dealt with, YOUR loan number, and the loan amount.

5  **RESPONSE TO INTERROGATORY NO. 23:**

6      Responding Parties renew their objections to this interrogatory on the grounds that it is not

7  reasonably calculated to lead to the discovery of admissible evidence and that it is unduly

8  burdensome, harassing, violates their right to privacy.  Without waiving these objections,

9  Responding Parties supplement their response as follows:  Any public information responsive to

10  this interrogatory is equally available to Plaintiff through a public records search of their home

11  secured by the loan that was located at 7121 Fern Flat Rd. in Aptos, California.

12

13

14  Dated: January ___9___, 2008.

15

16                                    DAVIS WRIGHT TREMAINE LLP

17

18                                    By: _____

19                                         James P. Walsh
                                            Gwen Fanger
20                                    Attorneys for DEFENDANTS and
                                        CLAIMANT BARRY COHEN, CHRIS
21                                    COHEN (aka CHRISTENE COHEN), the F/V
                                        POINT LOMA and Claimant, F/V POINT
22                                    LOMA FISHING COMPANY, INC.

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

6

## VERIFICATION

I, Barry A. Cohen, declare:

I am authorized to sign this Verification on behalf of Responding Parties. I have read the foregoing Supplemental Responses to Plaintiffs First Set of Interrogatories to Defendants Barry and Christene Cohen and know the contents thereof, and based on information and belief, I believe the responses to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _____ day of January, 2008 at _____ California.

_____
Barry A. Cohen

**PROOF OF SERVICE**

I, the undersigned, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

I am employed in the City and County of San Francisco, State of California, in the office of a member of the bar of this court, at whose direction the service was made. I am over the age of eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee of DAVIS WRIGHT TREMAINE LLP, and my business address is 505 Montgomery Street, Suite 800, San Francisco, California 94111.

I caused to be served the foregoing **DEFENDANTS BARRY COHEN, CHRIS COHEN'S (aka CHRISTENE COHEN) SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** on the parties indicated below by the following means:

**I enclosed a true and correct copy of said document in an envelope, and consigned it for hand delivery by messenger on January 10, 2008, following ordinary business practice to the following:**

Gregory W. Poulos
Max L. Kelley
Cox, Wootton, Griffin,
Hansen & Poulos LLP
190 The Embarcadero
San Francisco, CA 94105

Richard P. Wagner
The Law Offices of Richard P. Wagner
400 Oceangate, Suite 700
Long Beach, CA 90802

I am readily familiar with my firm's practice for collection and processing of correspondence for delivery in the manner indicated above, to wit, that correspondence will be deposited for collection in the above-described manner this same day in the ordinary course of business.

Executed on January 10, 2008, at San Francisco, California.

Robin D. Huey

---

DEFENDANTS' SUPP. RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
Case No. C-07-2952-WHA

SFO 401128v1 0084289-000001

# EXHIBIT 1

## TRIPS BY THE MONTH

| MONTH/YR. | GROSS | NET | NOTES |
|---|---|---|---|
| 11/05 | 9,939.96 | 8,314.12 | PARTIAL MONTH |
| 12/05 | 11,172.89 | 6,794.21 | |
| | | | |
| 1/06 | 15,323.89 | 8,662.42 | |
| 2/06 | 13,879.91 | 9,332.91 +1,835.54 = 11,168.45 | |
| 3/06 | 8,534.61 | 6,036.65 | |
| 4/06 | 30,398.60 | 24,086.42 | NEW CAPTAIN |
| 5/06 | 33,312.88 | 23,555.18 | |
| 6/06 | 17,846.99 | 10,246.62 | |
| 7/06 | 27,572.37 | 15,673.20 | |
| 8/06 | 12,142.75 | 8,230.51 | |
| 9/06 | 43,148.76 | 35,031.22 | |
| 10/06 | 27,697.28 | 22,296.22 | |
| 11/06 | 73,184.03 | 69,525.31 | |
| 12/06 | 19,278.69 | 15,138.42 | |
| | | | |
| 1/07 | 19,971.04 | 16,686.00 | |
| 2/07 | 35,233.11 | 23,001.52 | |
| 3/07 | 27,136.59 | 22,153.67 | |
| 4/07 | 37,969.01 | 23,138.57 | |
| 5/07 | 32,745.85 | 25,539.66 | |
| 6/07 ① TRIP | 11,790.84 | 9,160.60 | BOAT "ARRESTED" |
| 7/07 | Ø | Ø | UNDER "ARREST" |
| 8/07 | Ø | Ø | UNDER "ARREST" |
| 9/07 | 49,494.83 | 35,534.02 | BOAT RELEASED |

COHEN
00676

# TRIPS BY THE MONTH

| MONTH/YR. | GROSS | NET | NOTES |
|---|---|---|---|
| 10/07 | 36,523.05 | 27,228.31 | |
| 11/07 | 40,900.71 | 36,288.31 | |

COHEN
00677