# Exhibit 11

DAVID ALAN KOBAK    January 8, 2008

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

DEL MAR SEAFOODS, INC.,            )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )   NO. C-07-2952-WHA
                                   )
BARRY COHEN, CHRIS COHEN (aka      )
CHRISTENE COHEN), in personam      )
and, F/V POINT LOMA, Official      )
Number 515298, a 1968             )
steel-hulled, 126-gross ton,       )
70.8 foot long fishing vessel,     )
her engines, tackle, furniture     )
apparel, etc., in rem, and         )
Does 1-10,                         )
                                   )
          Defendants.              )
_____    )


DEPOSITION OF

DAVID ALAN KOBAK

_____

January 8, 2008


REPORTED BY: RITA R. LERNER, CSR #3179    (2001-404169)

1

18

1  feel -- in your experience, was there much of a change
2  in the price of fish during that time?
3      A.  We got just a teenie bit of a raise this last
4  year for 2007, but not a lot; just a few cents here and
5  there.
6      Q.  If you had been -- the vessel was arrested on
7  June 7th of 2007 and was released on August 17th of
8  2007.  Is that consistent with your recollection?
9      A.  Yes.
10     Q.  Had you been able to fish in that time period,
11 is it your feeling that you would have caught roughly
12 the same amount of fish that you had caught in 2006?
13     A.  I imagine, yes.  I don't know, though, for
14 sure, because up here there's different quotas and
15 stuff.  But where I fish at, things change, so I
16 couldn't really go by anything there.
17         She has the stuff, but I guess you probably
18 have seen it, too.  But I have kept a very good track of
19 the weather all the time the boat was tied up, and I
20 figured out all the trips that I could have fished when
21 the weather was good or when the weather was bad, and I
22 came up with that we could have fished 13 trips.  So I
23 took the last 13 trips prior to that and added them up
24 to a gross, and they come up to $150,000.  I've taken
25 the last 13 trips since we got the boat back and come up

19

1  with like $140,000 that the boat would have grossed.
2      Q.  So doing this again, you figured out you could
3  have fished 13 trips?
4      A.  Yes.
5      Q.  And you figured out that in that 13 trips, you
6  could have grossed how much?
7      A.  Somewhere in that area.
8      Q.  140 to 160?
9      A.  Sure.
10     Q.  Okay.  And by "gross," you mean gross sales
11 before deductions of fuel and ice?
12     A.  Yes.
13     Q.  And what did you -- how did you reach that
14 calculation?
15     A.  I just added up all the grosses from the fish
16 in the 13 trips before and the 13 trips afterwards.
17     Q.  So you looked at the 13 trips immediately
18 preceding the arrest of the vessel?
19     A.  Uh-huh.
20     Q.  Yes?
21     A.  I did both:  Before and after.
22     Q.  Right.  And then you looked at the 13 trips
23 after?
24     A.  Yes.
25     Q.  Okay.  Do you historically have higher catches

20

1  in the preceding months before June than you do in that
2  time period between June and August?
3      A.  I'd have to look back at my records to prove
4  any of this to let you know for sure.  Fishing is pretty
5  much the same year-round for me, except you have some
6  glorious days like when we catch this petrale, and
7  sometimes when the dover are spawning, but I haven't run
8  across much of that recently.
9      Q.  Let me show you what Barry Cohen has produced
10 to us.  These are not yet Bates-numbered, but these were
11 handed to me at the deposition of David Cantrell
12 recently.  We'll have this package marked as Exhibit 1.
13         (Whereupon, Exhibit 1 was
14          marked for identification.)
15     MR. POULOS:  Q.  Taking a look at Exhibit 1 --
16 can I see this for a second?  Can you look on with him?
17         If you look at the period from June 2006 to
18 August of 2006, you see the gross catch listed there is
19 17,846.99; 27,572.37; and then 12,142.75.  Do you see
20 that?
21     A.  Yes.
22     Q.  You see that that is a significant drop down
23 from the gross for the periods of March, April and May
24 of 2006; right?
25     A.  Okay.

21

1      Q.  Do you see that?
2      A.  Uh-huh.
3      Q.  Yes?
4      A.  Yes.
5      Q.  And you see that it's actually also much lower
6  than the catch totals for September, August -- or
7  September, October and November of 2006; right?
8      A.  Yes.
9      Q.  Do you have an explanation for why in the --
10 well, first of all, do you know if these figures are
11 accurate?
12     A.  I hope they are.  I don't know for sure.  If
13 you have records of them back here from these pink
14 things, I see something there -- whether or not those
15 are accurate, if that's where you got these, these
16 settlement sheets -- the totals.
17     Q.  Let's assume, because these have been produced
18 by Barry Cohen, that they are accurate.  Do you have an
19 explanation for why the catch was lower in 2006 for the
20 months of June, July and August?
21     A.  Well, not really, no.  Only a couple of things.
22 Sometimes you go fishing and you don't catch much;
23 sometimes you go fishing and you break down.  I'd have
24 to look at all of my records, and they're not with me,
25 to see if I went out and tried real hard and didn't

6  (Pages 18 to 21)

26

1    Q.  During the period that the vessel was under
2  arrest, were you paid at all?
3    A.  Barry compensated us some, yes.
4    Q.  How much did Barry compensate you personally?
5    A.  He gave me checks for $5,000.
6    Q.  Total?
7    A.  Total.
8    Q.  I just want to be clear on this.  So, for the
9  time period that the vessel was under arrest, from June
10  7th to August 17th of 2007, Barry paid you a total of
11  $5,000 for that time period?
12    A.  Yes, sir.
13    Q.  How did he calculate that sum?
14    A.  He just sent us some money occasionally.  He
15  sent the crew men some money, too.  They were sent to
16  stay in a hotel, because they live on the boat.  They're
17  like vagrants, or whatever you want to call them.  They
18  wander around with the fisheries.
19    Q.  How much did Barry pay them?
20    A.  I think he gave them 2,000 a piece.
21    Q.  Total?
22    A.  Total.
23    Q.  When did he pay that money to you?
24    A.  Just sent me a check occasionally.
25    Q.  Was it during that time period that the vessel

27

1  was under arrest, or did he send it to you later?
2    A.  No.  During that time period.  That goes back
3  to where we had a problem with trying to get my stuff
4  off the boat.  One of your attorneys here said to make
5  it simple handwritten, barely descriptive or whatever.
6  I didn't realize I had to go to her and have her print
7  something out for me.
8        I just said, dirty clothes in a hamper.  I
9  don't know what more you'd need to know.  Red-striped
10  socks.  The boat doesn't own any of that stuff; it's our
11  stuff.
12        I could have went somewhere else, but the guys
13  had a sack or little bag of dirty clothes.  They went to
14  a laundromat to wash their clothes that day, and they
15  came back to the boat and it was locked up.  I didn't
16  see them.  That's all they had with them.  All of their
17  stuff, their fishing licenses; one of them had a
18  passport.  Just their personal stuff is on that vessel,
19  locked up, and they can't get to it.
20        They had no fishing license.  They could have
21  got a copy, if they had to, or they could have gone to
22  the secondhand store somewhere and got some clothing and
23  some rain gear, but it was kind of a bad situation for
24  all of us at the time.
25    Q.  Move to strike as nonresponsive.  No question

28

1  pending.
2        Occasionally, we'll put things on the record
3  for a judge to rule on later.  Unless for some reason
4  you're instructed not to answer a question, you don't
5  have to worry too much about that.
6        Let's talk about when the vessel was arrested.
7  At the time of the arrest, the vessel was at the Hyde
8  Street Pier; correct?
9    A.  Yes, sir.  Right where you boarded it
10  yesterday.
11    Q.  The vessel -- at the time of the arrest, you
12  were not on board the vessel; is that right?
13    A.  Not at all.
14    Q.  No, you were not on board the vessel?
15    A.  No, I wasn't.  If you want to know more, I came
16  to the boat that day, though, and left some groceries.
17  I left and came back later.
18    Q.  Right.  I'll get to that later.  At the time of
19  the vessel's arrest, there was a fishing net on board
20  the vessel; correct?
21    A.  Yes, sir.
22    Q.  What type of a fishing net was that?
23    A.  It's a big four-seam 120-foot footrope.  I
24  can't think of the name of it now.  15-inch (inaudible
25  word) footrope on it.  It's a big net.

29

1    Q.  And that's used for fishing where it's over 150
2  fathoms or something?
3    A.  Yes, sir.
4    Q.  So it's fishing in the EEZ, the Exclusive
5  Economic Zone?
6    A.  I guess.
7    Q.  Is that more than three miles offshore?
8    A.  Well, you've got to be outside of 150 fathoms,
9  whether it's three miles or 20 miles.
10    Q.  Where does the vessel generally fish?
11    A.  I usually fish off of Pigeon Point a lot, and
12  sometimes down to Point Sur.  Back and forth in those
13  areas.
14    Q.  And how far out?
15    A.  Point Sur, I fish right in to three and a half
16  miles out to 15 miles.  Up here, I fish mostly 20 miles
17  offshore when I've got that net, that big net.
18    Q.  Generally speaking, you're more than three
19  miles offshore?
20    A.  Yes, sir.
21    Q.  And less than 200 miles offshore; right?
22    A.  Yes.
23    Q.  How frequently in 2007, before the vessel was
24  arrested, did the vessel fish inside of three miles?
25    A.  Actually, I hadn't done any fishing inside of

8  (Pages 26 to 29)

---

**30**

1  three miles, but I was getting ready to when the vessel
2  was arrested. The net was tied up on the deck, stacked
3  up so I could pick it up and get it off the boat and put
4  the other net back on. We were going to go make a trip
5  the next day or two after the vessel was arrested,
6  whenever the weather was good.
7  Q. So in the time period of the arrest, the big
8  net was on the deck of the vessel, ready to be
9  off-loaded?
10  A. Yes, sir.
11  Q. So it was off the spool?
12  A. Yes.
13  Q. There was another, smaller net that you would
14  use for fishing inside of three miles or in the
15  shallower water?
16  A. Well, that other net is what they call a
17  "selective flatfish trawl," and if you fish inside of
18  100 fathoms, it has to have an 8-inch roller thing on
19  the footrope. You have to have that net to fish inside
20  of 100 fathoms. 150, actually, but the RCA covers from
21  150 in to 100, so you can't fish there anyway. But I
22  can fish from the three-mile line to the 100-fathom
23  curve with that small net. I can use that small net
24  outside when I know I'm fishing for petrale. That's one
25  of the reasons we got the net. I got 70,000 pounds of

---

**31**

1  petrale with that new net when we first got it.
2  Q. When did you get that net?
3  A. That's a date I don't know, either. We got it
4  October, probably, of 2007, I would guess.
5  Q. So the net that was --
6  A. No. Actually, it was 2006; wasn't it?
7  Q. Okay.
8  A. Yeah.
9  Q. So how many times had you fished with this
10  smaller net before the vessel was arrested?
11  A. I used it for most of November and most of
12  December, and I took it off somewhere in there, but I'm
13  not real sure what dates. I have all that stuff on the
14  boat. I didn't realize I needed it; otherwise, I would
15  have brought it. So I don't know. Sorry.
16  Q. Where was -- the smaller net is the one that
17  has been alleged went missing at some time around the
18  time of the arrest?
19  A. Yes.
20  Q. So if we refer to that as the smaller net,
21  you'll understand what I'm referring to?
22  A. Yes, sir.
23  Q. So that smaller net you think was purchased or
24  obtained sometime in around October of '06?
25  A. Somewhere in that area. I'd have to look it up

---

**32**

1  to get you the exact dates, if you need them.
2  Q. Okay. Where was the smaller net when the
3  vessel was arrested?
4  A. It was on Pier 45, and there's a reason for
5  this. I'll have to tell you it's going to be a little
6  long.
7  The boat's big, as you notice, and the net that
8  I have on the boat is huge. To get that net off, I have
9  to lift it with a hook line, a hook line where the rope
10  is. I have to lift it up into the air, put the rope
11  under that, and take my truck there and pull it off on
12  Pier 45. And there's only one spot I can do that. The
13  hoist on Pier 45 will not lift that net, and it's too
14  big to put in my truck; it's huge. So I put one on
15  there and take the other one off in that same area like
16  that between the two buildings on that side of Pier 45
17  there.
18  Q. Okay. Pier 45 is not where the Point Loma was
19  berthed at the time of the arrest?
20  A. No, it's just right across from it, though.
21  Q. It's across the water?
22  A. That's right. Across the bay there, the water.
23  Q. Right. So the smaller fishing net was on a
24  dock across the water from where the Point Loma was
25  berthed?

---

**33**

1  A. Yes, sir.
2  Q. The Hyde Street Pier is essentially -- is that
3  like Pier 49, then?
4  A. I don't know. Hyde Street Pier -- that's where
5  the old boats are there. But the fish dock -- I don't
6  know. The Hyde Street Pier is where the commercial
7  fishing vessels dock down.
8  MR. POULOS: Let me have marked as Exhibit 2
9  this photograph.
10  (Whereupon, Exhibit 2 was
11  marked for identification.)
12  MR. POULOS: Q. Exhibit 2 has Bates number
13  DMSI 00066. That's the number in the lower right-hand
14  corner, for your reference. This photograph shows the
15  Point Loma; correct?
16  A. Yes, sir.
17  Q. And it shows it tied up at the Hyde Street
18  Pier; is that correct?
19  A. Yes, sir.
20  Q. And in the distance, behind the vessel, across
21  the water there is Pier 45; is that right?
22  A. Yes, sir.
23  Q. So the net, the smaller net, was not even at
24  the same pier structure as the Point Loma?
25  A. No.

38

1  anything, actually ultimately was not returned to you?
2      A.  I had guns on the boat, but those came back to
3  me.  But there was a pair of binoculars upstairs, pretty
4  nice binoculars, which we never did find.  I had to buy
5  a new pair, because we had to have binoculars.
6      Q.  How much were the binoculars?
7      A.  It's in there, right there.
8      Q.  In the declaration?
9      A.  Yes.  I wrote the price down there somewhere.
10     Q.  You handed me a declaration, and then on this
11 declaration -- looks like it's original with your
12 signature?
13     A.  It was, yes.
14     Q.  And then you have a bunch of handwritten notes
15 on it.
16     A.  I just wrote down some stuff that came to mine
17 as I'm reading it and thinking about coming here.
18     Q.  When did you make these notes?
19     A.  I made some today, in fact, on the back there.
20     Q.  The ones in red on the back?
21     A.  Uh-huh.
22     Q.  What about the interlineations on the
23 declaration itself?
24     A.  That's something I put on it immediately when
25 got back, because whoever wrote it out there -- it says

39

1  8-foot or 8-inch or something -- didn't get it quite
2  straight.  I added little comments where it's in writing
3  of what it should be.
4      Q.  Who owns the area where you were storing the
5  smaller net?
6      A.  The harbor.
7      Q.  And who had given you permission to store it
8  over there?
9      A.  Hedley Prince, the harbormaster there, which I
10 found out later he shouldn't have, I guess.  But I tried
11 to talk to a lady called "Claudia Davison," and she got
12 mad at me, wasn't very nice at all; wasn't receptive to
13 the fact that it is a working fishing dock and that's a
14 fishing vessel.  And like I said, you can't take the net
15 off anywhere else unless you hire a crane and put it on
16 a flatbed truck.  I'm not equipped to do all that stuff.
17 I don't want to go that far.  But he said it was all
18 right if I set it there.
19     Q.  You don't have any reason to believe that
20 Del Mar took the smaller fishing net, do you?
21     A.  It could have been just anybody, couldn't it?
22     Q.  You don't know?
23     A.  Do you believe that Joe Cappuccio would come up
24 and take his net that he thought was his?  What do you
25 think?

40

1      I went down many trails trying to find that net
2  and I spent a lot of time doing it.  I've been to part
3  of Bodega Bay and wandered around other places, looking,
4  and right up here, Pier 26, looking around in places,
5  and I've never seen hide nor hair of it.  Nobody knows
6  anything about it.  I've talked to everybody out on the
7  dock out there at one time or the other.  I got little
8  leads here and there and I pulled them out, but none of
9  them helped me.
10     Q.  How would you describe the condition of the
11 Point Loma now?
12     A.  What do you think?  It's a mess.  It's been
13 that way since I've been on it.  It's too much for me to
14 want to fix up.  If it was my boat, I might have
15 attacked it, but you can't expect me to get my crew to
16 do that kind of work on that boat five or six days a
17 week just to get it cleaned up.  It would take a long
18 time.  It's sad that it's gotten in that shape.
19     Q.  Would you agree with me that it is in an
20 advanced state of deterioration?
21     A.  Pretty much so, yes, sir.  It still works -- is
22 what my comment would be.  It still works and everything
23 works on it, and it's productive when we go fishing.
24     Q.  Is it true that there is no routine
25 maintenance, but if something breaks, you fix it?

41

1      A.  We do a certain amount of routine maintenance
2  to keep stuff from falling apart, to a point.  Like the
3  rust you see and the damage that has already been done,
4  and there's not much you can do about a lot of it.  You
5  work around it, and if stuff breaks, you have to fix it.
6      Q.  I noticed on the port's railing near the stern,
7  there's a major chunk of metal missing from the railing
8  area there.
9      A.  Yeah.
10     Q.  Is that pretty symptomatic of the condition of
11 the vessel overall?
12     A.  I hope it's not that way everywhere, like the
13 part under the water.
14     Q.  Right.  It floats?
15     A.  It floats, yes.  Haven't had any problems
16 anywhere, but we keep our survival suits or life jackets
17 available.
18     Q.  Let's take a break for just a few seconds so I
19 can go ahead and make copies of these and attach them to
20 the record.
21     MS. FANGER:  I haven't seen these yet.  Can I
22 take a look at these?
23     MR. POULOS:  Sure.  While we're doing that,
24 let's just jump ahead a minute.  We'll mark that, then,
25 as Exhibit 3.

11 (Pages 38 to 41)

Exhibit 12



1   James P. Walsh, CSB. No. 184620
    Gwen Fanger, CSB No. 191161
2   DAVIS WRIGHT TREMAINE LLP
3   505 Montgomery Street, Suite 800
    San Francisco, California 94111-3611
4   Telephone: (415) 276-6500
    Facsimile: (415) 276-6599
5   budwalsh@dwt.com

6   Attorneys for Defendants and Claimant
    BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7   Claimant, F/V POINT LOMA Fishing Company, Inc.

8                    UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  DEL MAR SEAFOODS, INC.,                )
                                           )
12                 Plaintiff,              )   No. C-07-2952-WHA
                                           )
13         v.                              )   **DEFENDANTS BARRY COHEN,**
                                           )   **CHRIS COHEN'S (aka CHRISTENE**
14  BARRY COHEN, CHRIS COHEN (aka          )   **COHEN) RESPONSE TO**
    CHRISTENE COHEN), *in personam* and,   )   **PLAINTIFF'S FIRST SET OF**
15  F/V POINT LOMA, Official Number        )   **REQUESTS FOR ADMISSIONS**
    515298, a 1968 steel-hulled, 126-gross ton, )
16  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
17  Does 1-10,                             )
                                           )
18                 Defendants.             )
                                           )
19  ─────────────────────────────────

20  PROPOUNDING PARTY:    PLAINTIFF DEL MAR SEAFOODS, INC.

21  RESPONDING PARTY:     DEFENDANTS BARRY and CHRISTINE COHEN

22  SET NO.:              ONE

23         Defendants and Responding Parties, BARRY and CHRISTENE COHEN ("Responding

24  Parties"), respond and object to Plaintiff's First Set of Requests for Admissions as follows.

25                      **PRELIMINARY STATEMENT**

26         These responses are made solely for the purposes of this action and are subject to all

27  objections as to competence, relevance, materiality, propriety, and admissibility and any other

28  objections or grounds that would require the exclusion of any statement made herein if such

                                          1

*(left margin, vertical text)* DAVIS WRIGHT TREMAINE LLP

statement were made by a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

No incidental or implied admissions are intended by these responses. The fact that Responding Parties respond or object to any of the request for admissions should not be taken as an admission that Responding Parties accept or admit the existence of any facts assumed by such request for admissions, or that such response or objection constitutes admissible evidence as to any such assumed facts. The fact that Responding Parties respond to part or all of any request for admission is not intended to and shall not be construed to be a waiver by Responding Parties of any objection to any request for admission. Furthermore, Responding Parties' responses herein are made without waiving, and expressly reserving, the right: (a) to object to any effort to use any responses in any step or proceeding in this action or any other action, and (b) to object on any ground to other discovery requests regarding the subject matter of any request herein.

This action is still in the discovery phase and Responding Parties have not yet completed investigation of the facts related to the action; have not yet completed discovery in this action; and have not yet completed preparation for trial. Responding Parties' responses herein are based on, and reflect the current state of their knowledge. Responding Parties expressly reserve the right to supplement these responses at a later time should they deem such supplementation necessary or appropriate, but assume no obligation to do so.

**RESPONSE TO REQUESTS FOR ADMISSIONS**

**REQUEST FOR ADMISSION NO. 1:**

Admit that you are acting in this case as the agent for the interests of your marital community.

**RESPONSE TO REQUEST NO 1:**

Responding Parties object to the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the terms "acting" and "agent" as vague and ambiguous. Without waiving these

DAVIS WRIGHT TREMAINE LLP

objections, admit that Barry and Christene Cohen are each the agent of each other in their marital

community.

**REQUEST FOR ADMISSION NO. 2:**

Admit that in 2004 you transferred the ownership of the F/V POINT LOMA (the "Vessel")

to the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO 2:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to

which responding party, Barry or Christene Cohen, the request is directed at. Without waiving

this objection, admit that Barry and Christene Cohen jointly transferred the ownership of the F/V

Point Loma to the F/V Point Loma Fishing Company, Inc.

**REQUEST FOR ADMISSION NO. 3:**

Admit that you are the manager of the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO 3:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to

which responding party, Barry or Christene Cohen, the request is directed at. Without waiving

this objection, admit that Barry Cohen is the manager of the F/V Point Loma Fishing Company,

Inc.

**REQUEST FOR ADMISSION NO. 4:**

Admit that you and your wife each own 50% of the shares of the F/V Point Loma Fishing

Company, Inc.

**RESPONSE TO REQUEST NO 4:**

Responding Parties object to the use of the term "you" and "your" as vague and ambiguous

as to which responding party, Barry or Christene Cohen, the request is directed at. Without

waiving this objection, admit that Barry and Christene Cohen each own 50% of the shares of the

F/V Point Loma Fishing Company, Inc.

DAVIS WRIGHT TREMAINE LLP

3

**REQUEST FOR ADMISSION NO. 5:**

Admit that in this case you are acting as the agent for the owner of the Vessel, the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO 5:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the term "agent" as vague and ambiguous. Without waiving these objections, admit that Barry Cohen is acting as the agent to the extent he is acting as manager of the F/V Point Fishing Company, Inc.

**REQUEST FOR ADMISSION NO. 6:**

Admit that you have never used the Vessel to fish anywhere other than in the Exclusive Economic Zone off of California.

**RESPONSE TO REQUEST NO 6:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the term "fish" as vague and ambiguous to the extent Responding Parties make a distinction between "fishing" (catching fish) and "shrimping" (catching shrimp) activities. Without waiving these objections, admit that Barry Cohen has never used the Vessel to fish anywhere other than in the Exclusive Economic Zone off of California although he used the Vessel only one time off the coast of Oregon approximately 8-10 years ago for shrimping activities and not for fishing.

**REQUEST FOR ADMISSION NO. 7:**

Admit that at the end of 2005, in a meeting with both Joe Cappuccio and Joe Roggio, they told you that Del Mar's bank that provided credit to Del Mar, had expressed its concern to Del Mar about the size of Del Mar's loan to you for the Vessel.

**RESPONSE TO REQUEST NO 7:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this

DAVIS WRIGHT TREMAINE LLP

objection and without waiving it, deny that there was such a meeting with both Joe Cappuccio and Joe Roggio to the extent Barry Cohen can not recollect for certainty that Joe Roggio was also at the meeting.

## REQUEST FOR ADMISSION NO. 8:

Admit that at the meeting with Joe Roggio and Joe Cappuccio at the end of 2005 Joe Cappuccio asked you to make a large payment on the loan evidenced by the Note and Mortgage.

## RESPONSE TO REQUEST NO 8:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at.  Without waiving this objection, Barry Cohen responds that he can not recollect with certainty that both Joe Roggio and Joe Cappuccio were at the meeting; but admit that at a meeting with at least Joe Cappuccio at the end of 2005, Joe Cappuccio asked Barry Cohen to make a large payment on the loan evidenced by the Note and Mortgage.

## REQUEST FOR ADMISSION NO. 9:

Admit that you agreed with Del Mar that you would be responsible for the debts of your sons, Michael and Leonard, to Del Mar arising from amounts they owed the Avila Beach joint venture.

## RESPONSE TO REQUEST NO 9:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at.  Notwithstanding this objection and without waiving it, Barry Cohen denies this request.

## REQUEST FOR ADMISSION NO. 10:

Admit that when you made the $175,000 payment to Del Mar, you told Joe Cappuccio you would pay Del Mar the remaining balance owed to Del Mar.

## RESPONSE TO REQUEST NO 10:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at.  Without waiving

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

this objection, admit that when Barry Cohen gave the check for $175,000 to Joe Cappuccio, Joe Cappuccio said "thank you" and that when Barry Cohen said that he would pay the balance of the Note as soon as he could, Joe Cappuccio said that "it is such a small amount, I'm not even worried about it."

**REQUEST FOR ADMISSION NO. 11:**

Admit that you asked Del Mar to inform you of the amounts of your sons, Michael and Leonard's, debts to the Avila Beach joint venture in November, 2005.

**RESPONSE TO REQUEST NO 11:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies he asked Del Mar to inform him of the amounts his sons, Michael and Leonard's, debts to the Avila Beach joint venture in November, 2005.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the reason you requested the amount of your son's debts to Del Mar was so that you would know how much debt you were assuming on their behalf and how much you would be entitled to be reimbursed by them.

**RESPONSE TO REQUEST NO 12:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the phrase "requested the amount" as vague and ambiguous. Notwithstanding these objections and without waiving them, Barry Cohen denies this request.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Joe Roggio provided you with a spreadsheet (DMSI 0001) detailing the debts and payments regarding your and your son's debts to Del Mar in November 2005 in response to your request for such information.

DAVIS WRIGHT TREMAINE LLP

6

**RESPONSE TO REQUEST NO 13:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that Joe Roggio gave him the spreadsheet labeled DMSI 0001 and therefore denies the remainder of this request in full. Barry Cohen admits that in or around November 2005, Joe Roggio gave him a spreadsheet titled Schedule of Payments, attached as Exhibit F to Declaration of Barry Cohen in Support of Responding Parties' Motion to Vacate Order of Arrest, dated July 9, 2007, which is different than DMSI 0001.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after receiving the spreadsheet (DMSI 0001) you never told Joe Roggio or Joe Cappuccio that you disagreed with any of the amounts noted thereon.

**RESPONSE TO REQUEST NO 14:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that he ever received the spreadsheet labeled DMSI 0001 from Joe Roggio and therefore denies the remainder of the request in full. Barry Cohen admits that in or around November 2005, Joe Roggio gave him a different spreadsheet titled Schedule of Payments, attached as Exhibit F to Declaration of Barry Cohen in Support of Responding Parties' Motion to Vacate Order of Arrest, dated July 9, 2007, and after looking at the spreadsheet, Barry Cohen told Joe Roggio that the information in the spreadsheet "didn't look right to me."

**REQUEST FOR ADMISSION NO. 15:**

Admit that after receiving the spreadsheet (DMSI 0001) you never told Joe Roggio or Joe Cappuccio that you disagreed with how your payments had been applied as evidenced thereon.

**RESPONSE TO REQUEST NO 15:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that he ever received the spreadsheet labeled

DAVIS WRIGHT TREMAINE LLP

7

DMSI 0001 from Joe Roggio and therefore denies the remainder of the request in full. Barry Cohen admits that in or around November 2005, Joe Roggio gave him a different spreadsheet titled Schedule of Payments, attached as Exhibit F to Declaration of Barry Cohen in Support of Responding Parties' Motion to Vacate Order of Arrest, dated July 9, 2007, and after looking at the spreadsheet, Barry Cohen told Joe Roggio that the information in the spreadsheet "didn't look right to me."

## REQUEST FOR ADMISSION NO. 16:

Admit that after receiving the spreadsheet (DMSI 0001) you never told Joe Roggio or Joe Cappuccio that you disagreed with treating the debts listed thereon under "Michael Cohen," "Olde Port Inn," "Inventory," and "Point Loma" as advances under the Note and Mortgage.

## RESPONSE TO REQUEST NO 16:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen denies that he ever received the spreadsheet labeled DMSI 0001 and therefore denies the remainder of the request in full.

## REQUEST FOR ADMISSION NO. 17:

Admit that after receiving the newer revised spreadsheet from Joe Roggio in approximately December 2006, as you have stated in your Declaration dated July 9, 2007 on pg. 3, lines 2-4, you never told Joe Roggio or Joe Cappuccio that you disagreed with treating the debts listed thereon under "Olde Port Balance," "Point Loma Balance," and "Fees for Olde Port Case" as advances under the Note and Mortgage.

## RESPONSE TO REQUEST NO 17:

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to this request to the extent the statement in Barry Cohen's Declaration referred to in this request appears at page 5 of the Declaration and not page 3. Notwithstanding these objections and without waiving them, Barry Cohen denies this request.

DAVIS WRIGHT TREMAINE LLP

**REQUEST FOR ADMISSION NO. 18:**

Admit that on or about January 30, 2007 that you authored the document DMSI 0078.

**RESPONSE TO REQUEST NO 18:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen responds that after a diligent search of his records he has no recollection of whether he authored the document DMSI 0078 and therefore denies this request.

**REQUEST FOR ADMISSION NO. 19:**

Admit that in approximately January 2007 Joe Roggio asked you to make payments on the amounts you owed Del Mar.

**RESPONSE TO REQUEST NO 19:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the phrase "the amounts you owe Del Mar" as vague and ambiguous as to what specific amounts are being referred to. Without waiving this objection, Barry Cohen admits that Joe Roggio asked him to make payments but Joe Roggio did not say what the payments would be for or state the amount that the payments should be.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Del Mar has a valid maritime lien on the Vessel.

**RESPONSE TO REQUEST NO 20:**

Responding Parties object to this request on the grounds that it calls for a legal conclusion as to what constitutes a valid maritime lien. Without waiving this objection, admit that if Del Mar has a valid Preferred Ship Mortgage, then it has a security interest in the Vessel in the form of a maritime lien.

**REQUEST FOR ADMISSION NO. 21:**

Admit that under the terms of the Mortgage that you signed (DMSI 0101 – DMSI 0110) Del Mar is not, and was not, required to give you notice before foreclosing on the Mortgage.

9

DAVIS WRIGHT TREMAINE LLP

**RESPONSE TO REQUEST NO 21:**

Responding Parties object to this request on the grounds that it calls for a legal conclusion as to the notice requirements under the terms of the Mortgage. Responding Parties also object that the use of the phrase "terms of the Mortgage" is vague and ambiguous as the "terms" of the Mortgage also include covenants of good faith and fair dealing, which in light of the extensive prior dealings among the parties and the lump-sum payment by the Cohens at the request of Plaintiff, required at minimum, an inquiry into the ability of the Cohens to make payments on the Note and notice prior to foreclosure. Notwithstanding these objections and without waiving them, deny.

**REQUEST FOR ADMISSION NO. 22:**

Admit that under the terms of the Mortgage that you signed (DMSI 0101 – DMSI 0110) there is no provision relieving you, the mortgagor, from your obligation to continue to make monthly payments even if you make a large payment in excess of your monthly obligation under the Note and Mortgage.

**RESPONSE TO REQUEST NO 22:**

Responding Parties object to this request on the grounds that it calls for a legal conclusion as to the mortgagor's obligations under the terms of the Mortgage. Notwithstanding this objection and without waiving it, deny.

**REQUEST FOR ADMISSION NO. 23:**

Admit that under the terms of the Note and Mortgage you, the mortgagor, were, and are, required to make monthly payments of $3,000 or 15% of the Vessel's monthly gross landing receipts starting on January 1, 2004 and continuing until paid in full.

**RESPONSE TO REQUEST NO 23:**

Responding parties deny this request. The parties amended the Note and payment obligations by their mutual performance in two ways: 1) the Cohens' lump-sum payment in the amount of $175,000, that was not required under the terms of the Note, includes advance payments under the Note making them current to-date, and 2) Del Mar has never demanded interest on the Note at any time nor have the Cohens paid any interest on the Note.

DAVIS WRIGHT TREMAINE LLP

10

1  **REQUEST FOR ADMISSION NO. 24:**

2      Admit that from January 1, 2004 until December 22, 2004 you failed to make a single

3  payment to Del Mar towards your obligations under the Note and Mortgage.

4  **RESPONSE TO REQUEST NO 24:**

5      Responding Parties object to the use of the term "you" as vague and ambiguous as to

6  which responding party, Barry or Christene Cohen, the request is directed at.  Without waiving

7  this objection, Barry Cohen admits this request.

8  **REQUEST FOR ADMISSION NO. 25:**

9      Admit that after your $5,000 payment dated December 22, 2004 you did not make another

10  payment until November 9, 2005.

11  **RESPONSE TO REQUEST NO 25:**

12      Responding Parties object to the use of the term "you" as vague and ambiguous as to

13  which responding party, Barry or Christene Cohen, the request is directed at.  Responding Parties

14  also object to the use of the term "payment" as to what type of payments this request is referring.

15  Without waiving these objections, Barry Cohen admits that he did not make another payment by

16  check until November 9, 2005, when the Cohens made a lump sum payment on the Note in the

17  amount of $175,000, although plaintiff's spreadsheet labeled DMSI 0001 shows other "payments"

18  credited against the amount Barry Cohen allegedly owes them during the time period from

19  December 22, 2004 to November 9, 2005.

20  **REQUEST FOR ADMISSION NO. 26:**

21      Admit that your last payment to Del Mar was on April 23, 2007.

22  **RESPONSE TO REQUEST NO 26:**

23      Responding Parties object to the use of the term "you" as vague and ambiguous as to

24  which responding party, Barry or Christene Cohen, the request is directed at.  Responding Parties

25  also object to the use of the term "payment" as to what type of payments this request is referring.

26  Without waiving these objections, Barry Cohen admits that his last direct payment by check was

27  April 23, 2007, although by virtue of his lump sum advance payment in the amount of $175,000,

28

*DAVIS WRIGHT TREMAINE LLP*

11

1
2   he continues to make payments and is current under the Note and Mortgage through at least

3   February 2009.

**REQUEST FOR ADMISSION NO. 27:**

4
5       If your response to the previous Request was to admit it, also admit that after your last

6   payment on April 23, 2007 there was an outstanding balance due under the Note and Mortgage.

**RESPONSE TO REQUEST NO 27:**

7
8       Responding Parties object to the use of the term "you" as vague and ambiguous as to

9   which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

10  also object to the use of the term "payment" as to what type of payments this request is referring.

11  Without waiving these objections, Barry Cohen admits that there is an outstanding balance

12  remaining under the Note and Mortgage in the amount of $27,000 although no payments are

13  currently due until at least February 2009.

**REQUEST FOR ADMISSION NO. 28:**

14
15      If your response to Request No. 26 was anything other than an unqualified "admit," admit

16  that you currently owe money to Del Mar under the Note and Mortgage.

**RESPONSE TO REQUEST NO 28:**

17
18      Responding Parties object to the use of the term "you" as vague and ambiguous as to

19  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

20  also object to the use of the term "payment" as to what type of payments this request is referring.

21  Without waiving these objections, Barry Cohen admits that there is an outstanding balance

22  remaining under the Note and Mortgage in the amount of $27,000 although no payments are

23  currently due until at least February 2009.

**REQUEST FOR ADMISSION NO. 29:**

24
25      Admit that the Vessel is your only source of income, other than Social Security.

**RESPONSE TO REQUEST NO 29:**

26
27      Responding Parties object to the use of the term "your" as vague and ambiguous as to

28  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

DAVIS WRIGHT TREMAINE LLP

12

also object as to the use of the phrase "source of income" as vague and ambiguous. Without

waiving these objections, Barry Cohen admits that the Vessel is his only source of income, other

than Social Security.

**REQUEST FOR ADMISSION NO. 30:**

Admit that you wrote checks made out to yourself as payee on Del Mar's Wells Fargo

account no. 4435703640.

**RESPONSE TO REQUEST NO 30:**

Responding Parties object to the use of the terms "you" and "yourself" as vague and

ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at.

Notwithstanding this objection and without waiving it, Barry Cohen cannot admit or deny this

request because he lacks sufficient information to identify the account number of one of plaintiff's

own checking accounts.

**REQUEST FOR ADMISSION NO. 31:**

If your response to the previous Request was to admit it, admit also that the checks your

wrote on that account made payable to yourself as payee were not authorized by Del Mar.

**RESPONSE TO REQUEST NO 31:**

Responding Parties object to the use of the term "your" as vague and ambiguous as to

which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

also object to the use of the term "authorized" as vague and ambiguous. Notwithstanding these

objections and without waiving them, Barry Cohen denies this request. Barry Cohen admits that,

as manager and equal partner of the Avila Beach Joint Venture, he had the authority to write

checks on behalf of the Avila Beach Joint Venture.

**REQUEST FOR ADMISSION NO. 32:**

Admit that you spent some of the money you obtained from Del Mar's Wells Fargo

account no. 4435703640 on items that were not related to the Olde Port Fisheries joint venture.

DAVIS WRIGHT TREMAINE LLP

13

**RESPONSE TO REQUEST NO 32:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen cannot admit or deny this request because he lacks sufficient information to identify the account number of one of plaintiff's own checking accounts. Barry Cohen further denies that there was a joint venture involving Old Port Fisheries.

**REQUEST FOR ADMISSION NO. 33:**

Admit that you agreed to pay Del Mar for its attorneys fees it incurred in the Avila Beach litigation you instituted against the Port of Avila Beach.

**RESPONSE TO REQUEST NO 33:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this objection and without waiving it, Barry Cohen admits that in a meeting with Joe Roggio, he tentatively and orally agreed to pay the legal fees; however, he received no consideration, felt pressure to make such an agreement as he was an employee of Del Mar at the time, never received an accounting as to the amount of the fees, and never agreed, orally or otherwise, to add these fees to the Note.

DATED this 21st day of December, 2007.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By _____
James P. Walsh
Gwen Fanger
Attorneys for DEFENDANTS and
CLAIMANT BARRY COHEN, CHRIS
COHEN (aka CHRISTENE COHEN), the F/V
POINT LOMA and Claimant, F/V POINT
LOMA FISHING COMPANY, INC.

DAVIS WRIGHT TREMAINE LLP

14

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

# PROOF OF SERVICE

I, the undersigned, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

I am employed in the City and County of San Francisco, State of California, in the office of a member of the bar of this court, at whose direction the service was made. I am over the age of eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee of DAVIS WRIGHT TREMAINE LLP, and my business address is 505 Montgomery Street, Suite 800, San Francisco, California 94111.

I caused to be served the foregoing **DEFENDANTS BARRY COHEN, CHRIS COHEN'S (aka CHRISTENE COHEN) RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS** on the parties indicated below by the following means:

**I enclosed a true and correct copy of said document in an envelope and placed it for collection and mailing with the United States Post Office on December 21, 2007, following the ordinary business practice to the following:**

Gregory W. Poulos
Max L. Kelley
Cox, Wootton, Griffin,
Hansen & Poulos LLP
190 The Embarcardero
San Francisco, CA 94105

Richard P. Wagner
The Law Offices of Richard P. Wagner
400 Oceangate, Suite 700
Long Beach, CA 90802

I am readily familiar with my firm's practice for collection and processing of correspondence for delivery in the manner indicated above, to wit, that correspondence will be deposited for collection in the above-described manner this same day in the ordinary course of business.

Executed on December 21, 2007, at San Francisco, California.

Robin D. Huey

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

# Exhibit 13

**Fanger, Gwen**

| | |
|---|---|
| **From:** | Walsh, James |
| **Sent:** | Friday, September 07, 2007 8:26 AM |
| **To:** | Fanger, Gwen |
| **Subject:** | FW: The Point Loma |

**James Walsh** | Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800 | San Francisco, CA 94111
Tel: (415) 276-6556 | Fax: (415) 276-6599
Email: budwalsh@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/WalshJames.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** fishmancohen@aol.com [mailto:fishmancohen@aol.com]
**Sent:** Wednesday, September 05, 2007 5:08 PM
**To:** Walsh, James
**Subject:** Fwd: The Point Loma

-----Original Message-----
From: revival@sonic.net
To: fishmancohen@aol.com
Cc: fishmancohen@aol.com
Sent: Tue, 4 Sep 2007 7:04 pm
Subject: The Point Loma

Enclosed is information requested for the Point Loma :

6/04/07-last trip delivered in San Francisco , gross was $11,790.84

6/07/07-Boat was seized by U.S. Marshals

6/21/07-Boat was towed away by Parker Diving Services to Sugar Dock Richmond

Enclosed is weather information and information on trips missed.

6/06/07 thru 6/17/07 weather was bad N/W 30 knots

6/17/07 thru 6/22/07 weather was good missed 1 trip

6/23/07 thru 6/26/07  weather bad N/W 30 knots

6/27/07 thru 7/04/07 weather was good, missed two trips

10/12/2007

COHEN00056

'7/05/07 thru 7/07/07 weather was bad

7/8/07 thru 7/28/07 weather was good missed 5 trips

7/29/07 thru 8/01/07 weather was bad

8/02/07 thru 8/016/07 weather was good missed 3 trips

8/17/07 weather bad

8/18/07 thru 8/21/07 weather good missed 1 trip

8/22/07 weather bad N/W 20 to 30 knots

8/23/07 weather good at Half Moon Bay bouy south 4 knots good forecast for
friday thru monday 8/27/07 1 more missed trip if we do not get boat back
in a timely manner.We did get boat back on Friday August 24th but unable
to go fishing until August 28th due to order from Judge. Received
information from Lawyer late Monday afternoon.

Total missed trips -13

---

Email and AIM finally together. You've gotta check out free AOL Mail!

10/12/2007

COHEN00057

# Exhibit 14

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

Fish & Game Tag #: **ZPOINT** K127187
Delivery Date: 01/04/07

RECEIVED FROM:    BARRY COHEN
PO BOX 40

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 14623.0 | LPR | LARGE PETRALE RD WILD | SF | 1.05000 | 15,354.15 |
| | | | | 0.00000 | 0.00 |
| 68.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 | 132.60 |
| | | | | 0.00000 | 0.00 |
| 107.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 | 165.85 |
| | | | | 0.00000 | 0.00 |
| 113.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 | 146.90 |
| | | | | 0.00000 | 0.00 |
| 59.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 64.90 |
| | | | | 0.00000 | 0.00 |
| 370.0 | ER | ENGLISH ROUND WILD | SF | 0.32000 | 118.40 |
| | | | | 0.00000 | 0.00 |
| 2301.0 | RFR | ROSE FISH ROUND WILD USA | SF | 0.32000 | 736.32 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -835.96 |

| 17,641.0 | Total Weight | | | |
|---|---|---|---|---|

| | | |
|---|---|---|
| Gross Fish Receipts | | 16,719.12 |
| | | 0.00 |
| Deductions | | -835.96 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| **Amount Due** | | 15,883.16 |

#155664
15883.16
1-15-07

COHEN00020



# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

Fish & Game Tag #: **ZPOINT** K127189
Delivery Date: 01/24/07

RECEIVED FROM: BARRY COHEN
PO BOX 40

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 272.0 | DSSW | DOVER SOLE SW WILD | SF | 0.38000 | 103.36 |
| | | | | 0.00000 | 0.00 |
| 3037.0 | LPR | LARGE PETRALE RD WILD | SF | 0.75000 | 2,277.75 |
| | | | | 0.00000 | 0.00 |
| 64.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 | 124.80 |
| | | | | 0.00000 | 0.00 |
| 143.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 | 221.65 |
| | | | | 0.00000 | 0.00 |
| 304.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 | 395.20 |
| | | | | 0.00000 | 0.00 |
| 259.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 284.90 |
| | | | | 0.00000 | 0.00 |
| 30.0 | RCR | ROCK COD ROUND WILD | SF | 0.50000 | 15.00 |
| | | | | 0.00000 | 0.00 |
| 48.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.00000 | 48.00 |
| | | | | 0.00000 | 0.00 |
| 185.0 | ER | ENGLISH ROUND WILD | SF | 0.32000 | 59.20 |
| | | | | 0.00000 | 0.00 |
| 268.0 | SNR C.A. Assessment | SPLIT NOSE ROCK FISH | SF | 0.32000 | 85.76 |
| | | | | 0.00000 | 0.00 |
| 441.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.33000 | 145.53 |
| | | | | 0.00000 | 0.00 |
| 1426.0 | MPR | MED PETRALE RD WILD | SF | 0.38000 | 541.88 |
| | | | | -0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -215.15 |

| 6,477.0 | Total Weight |
|---|---|

| | | |
|---|---|---|
| Gross Fish Receipts | | 4,303.03 |
| | | 0.00 |
| Deductions | | -215.15 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 4,087.88 |

3037
1421
4458

#156507
2-1-07
$4087.88

COHEN00022

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

## SETTLEMENT SHEET

Fish & Game Tag #:  **ZPOINT**
K127191
Delivery Date:  02/01/07

RECEIVED FROM: BARRY COHEN
PO BOX 40

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 7052.0 | DSSW | DOVER SOLE SW WILD | SF | 0.38000 | 2,679.76 |
| | | | | 0.00000 | 0.00 |
| 62.0 | LPR | LARGE PETRALE RD WILD | SF | 0.75000 | 46.50 |
| | | | | 0.00000 | 0.00 |
| 114.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 | 222.30 |
| | | | | 0.00000 | 0.00 |
| 162.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 | 251.10 |
| | | | | 0.00000 | 0.00 |
| 3545.0 | SNR | SPLIT NOSE ROCK FISH | SF | 0.32000 | 1,134.40 |
| | CA Assessment | | | 0.00000 | 0.00 |
| 540.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 | 702.00 |
| | | | | 0.00000 | 0.00 |
| 1594.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 1,753.40 |
| | | | | 0.00000 | 0.00 |
| 185.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.33000 | 61.05 |
| | | | | 0.00000 | 0.00 |
| 2083.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.00000 | 2,083.00 |
| | | | | 0.00000 | 0.00 |
| 1055.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.55000 | 580.25 |
| | | | | 0.00000 | 0.00 |
| 4159.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.60000 | 2,495.40 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -600.45 |

| 20,551.0 | Total Weight | | | Gross Fish Receipts | 12,009.16 |
|---|---|---|---|---|---|
| | | | | | 0.00 |
| | | | | Deductions | -600.45 |
| | | | FMA Dues | 0.0% | 0.00 |
| | | | Other Deductions | 0.0% | 0.00 |
| | | | | Amount Due | 11,408.71 |

#156723
2-12-07
$23810.10

Page 1 of 1

COHEN00025



# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

ZPOINT
Fish & Game Tag #:   K127193
Delivery Date:   02/07/07

RECEIVED FROM:   BARRY COHEN
PO BOX 40

| WEIGHT | ITEM | | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 3774.0 | DSSW | DOVER SOLE SW WILD | SF | 0.38000 | 1,434.12 |
| | | | | 0.00000 | 0.00 |
| 178.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 | 347.10 |
| | | | | 0.00000 | 0.00 |
| 564.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 | 874.20 |
| | | | | 0.00000 | 0.00 |
| 1041.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 | 1,353.30 |
| | | | | 0.00000 | 0.00 |
| 2012.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 2,213.20 |
| | | | | 0.00000 | 0.00 |
| 4632.0 | RCR | ROCK COD ROUND WILD | SF | 0.50000 | 2,316.00 |
| | | | | 0.00000 | 0.00 |
| 1308.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.00000 | 1,308.00 |
| | | | | 0.00000 | 0.00 |
| 4034.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.60000 | 2,420.40 |
| | | | | 0.00000 | 0.00 |
| 35.0 | SQF | SQUID FRESH WILD USA | SF | 0.25000 | 8.75 |
| | CA Assessment | | | 0.00000 | 0.00 |
| 1526.0 | SNR | SPLIT NOSE ROCK FISH | SF | 0.32000 | 488.32 |
| | CA Assessment | | | 0.00000 | 0.00 |
| 9.0 | LCR | LING COD ROUND WILD | SF | 0.65000 | 5.85 |
| | | | | 0.00000 | 0.00 |
| 275.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.33000 | 90.75 |
| | | | | 0.00000 | 0.00 |
| 647.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.30000 | 194.10 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -652.70 |

| 20,035.0 | Total Weight |
|---|---|

| | | |
|---|---|---|
| Gross Fish Receipts | | 13,054.09 |
| | | 0.00 |
| Deductions | | -652.70 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 12,401.39 |

COHEN00028

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

## SETTLEMENT SHEET

ZPOINT
Fish & Game Tag #: K127194
Delivery Date: 02/26/07

RECEIVED FROM:    BARRY COHEN
PO BOX 40

| WEIGHT | CODE | ITEM | BOAT | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 18277.0 | DSSW | DOVER SOLE SW WILD | SF | 0.38000 / 0.00000 | 6,945.26 / 0.00 |
| 51.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 / 0.00000 | 99.45 / 0.00 |
| 175.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 / 0.00000 | 271.25 / 0.00 |
| 468.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 / 0.00000 | 608.40 / 0.00 |
| 1610.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 / 0.00000 | 1,771.00 / 0.00 |
| 264.0 | RCR | ROCK COD ROUND WILD | SF | 0.50000 / 0.00000 | 132.00 / 0.00 |
| 953.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.00000 / 0.00000 | 953.00 / 0.00 |
| 1773.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.60000 / 0.00000 | 1,063.80 / 0.00 |
| 138.0 | SNR CA Assessment | SPLIT NOSE ROCK FISH | SF | 0.32000 / 0.00000 | 44.16 / 0.00 |
| 40.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.33000 / 0.00000 | 13.20 / 0.00 |
| 409.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.30000 / 0.00000 | 122.70 / 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -601.21 |

24,158.0    Total Weight

| | | |
|---|---|---|
| Gross Fish Receipts | | 12,024.22 |
| | | 0.00 |
| Deductions | | -601.21 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 11,423.01 |

3/1/07
#157391
$11,423.01

COHEN00033



# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

Fish & Game Tag #: **ZPOINT**
K127197
Delivery Date: 03/05/07

RECEIVED FROM:    **BARRY COHEN**
**PO BOX 40**

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 15930.0 | DSSW | DOVER SOLE SW WILD | SF | 0.38000 | 6,053.40 |
| | | | | 0.00000 | 0.00 |
| 1754.0 | LPR | LARGE PETRALE RD WILD | SF | 1.05000 | 1,841.70 |
| | | | | 0.00000 | 0.00 |
| 103.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 | 200.85 |
| | | | | 0.00000 | 0.00 |
| 370.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 | 573.50 |
| | | | | 0.00000 | 0.00 |
| 731.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 | 950.30 |
| | | | | 0.00000 | 0.00 |
| 1865.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 2,051.50 |
| | | | | 0.00000 | 0.00 |
| 264.0 | SFEXX | SABLE FISH EEXSM WILD USA | SF | 0.35000 | 92.40 |
| | | | | 0.00000 | 0.00 |
| 924.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.00000 | 924.00 |
| | | | | 0.00000 | 0.00 |
| 2900.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.60000 | 1,740.00 |
| | | | | 0.00000 | 0.00 |
| 296.0 | ER | ENGLISH ROUND WILD | SF | 0.32000 | 94.72 |
| | | | | 0.00000 | 0.00 |
| 200.0 | SNR | SPLIT NOSE ROCK FISH | SF | 0.32000 | 64.00 |
| | CA Assessment | | | 0.00000 | 0.00 |
| 372.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.33000 | 122.76 |
| | | | | 0.00000 | 0.00 |
| 146.0 | MPR | MED PETRALE RD WILD | SF | 0.38000 | 55.48 |
| | | | | 0.00000 | 0.00 |
| 890.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.30000 | 267.00 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -751.58 |

| 26,745.0 | **Total Weight** |
|---|---|

| | | |
|---|---|---|
| Gross Fish Receipts | | 15,031.61 |
| | | 0.00 |
| Deductions | | -751.58 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| **Amount Due** | | 14,280.03 |

COHEN00036

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

RECEIVED FROM:

ZPOINT
Fish & Game Tag #: K127199
Delivery Date: 03/08/07

BARRY COHEN
PO BOX 40

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 8044.0 | DSSW | DOVER SOLE SW WILD | SF | 0.38000 | 3,056.72 |
| | | | | 0.00000 | 0.00 |
| 4085.0 | LPR | LARGE PETRALE RD WILD | SF | 1.05000 | 4,289.25 |
| | | | | 0.00000 | 0.00 |
| 70.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 1.95000 | 136.50 |
| | | | | 0.00000 | 0.00 |
| 485.0 | ER | ENGLISH ROUND WILD | SF | 0.32000 | 155.20 |
| | | | | 0.00000 | 0.00 |
| 253.0 | SFM | SABLE FISH MED WILD USA | SF | 1.55000 | 392.15 |
| | | | | 0.00000 | 0.00 |
| 632.0 | RFR | ROSE FISH ROUND WILD USA | SF | 0.32000 | 202.24 |
| | | | | 0.00000 | 0.00 |
| 857.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.30000 | 1,114.10 |
| | | | | 0.00000 | 0.00 |
| 1282.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 1,410.20 |
| | | | | 0.00000 | 0.00 |
| 280.0 | SFEXX | SABLE FISH EEXSM WILD USA | SF | 0.35000 | 98.00 |
| | | | | 0.00000 | 0.00 |
| 149.0 | CHI | CHILLIES ROUND WILD USA | SF | 0.50000 | 74.50 |
| | | | | 0.00000 | 0.00 |
| 382.0 | MPR | MED PETRALE RD WILD | SF | 0.38000 | 145.16 |
| | | | | 0.00000 | 0.00 |
| 700.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.00000 | 700.00 |
| | | | | 0.00000 | 0.00 |
| 1040.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.30000 | 312.00 |
| | | | | 0.00000 | 0.00 |
| 2412.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.60000 | 1,447.20 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -676.66 |

| 20,671.0 | Total Weight |
|---|---|

| Gross Fish Receipts | 13,533.22 |
|---|---|
| | 0.00 |
| Deductions | -676.66 |
| FMA Dues  0.0% | 0.00 |
| Other Deductions  0.0% | 0.00 |
| Amount Due | 12,856.56 |

3/16/07
#157732
$27136.59

COHEN00039



# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

RECEIVED FROM:

Fish & Game Tag #: **ZPOINT** K127158
Delivery Date: 04/23/07

BARRY COHEN
PO BOX 40

| | | | | | |
|---|---|---|---|---|---|
| 14306.0 | DSSW | DOVER SOLE SW WILD | SF | 0.40000 | 5,722.40 |
| | | | | 0.00000 | 0.00 |
| 1510.0 | LPR | LARGE PETRALE RD WILD | SF | 1.10000 | 1,661.00 |
| | | | | 0.00000 | 0.00 |
| 96.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 2.00000 | 192.00 |
| | | | | 0.00000 | 0.00 |
| 250.0 | ER | ENGLISH ROUND WILD | SF | 0.32000 | 80.00 |
| | | | | 0.00000 | 0.00 |
| 162.0 | SFM | SABLE FISH MED WILD USA | SF | 1.60000 | 259.20 |
| | | | | 0.00000 | 0.00 |
| 360.0 | RFR | ROSE FISH ROUND WILD USA | SF | 0.32000 | 115.20 |
| | | | | 0.00000 | 0.00 |
| 456.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.35000 | 615.60 |
| | | | | 0.00000 | 0.00 |
| 1445.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 1,589.50 |
| | | | | 0.00000 | 0.00 |
| 179.0 | RCR | ROCK COD ROUND WILD | SF | 0.50000 | 89.50 |
| | | | | 0.00000 | 0.00 |
| 255.0 | MPR | MED PETRALE RD WILD | SF | 0.38000 | 96.90 |
| | | | | 0.00000 | 0.00 |
| 572.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.05000 | 600.60 |
| | | | | 0.00000 | 0.00 |
| 777.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.35000 | 271.95 |
| | | | | 0.00000 | 0.00 |
| 2380.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.65000 | 1,547.00 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -642.04 |

| | | |
|---|---|---|
| 22,748.0 | **Total Weight** | |

| | | |
|---|---|---|
| Gross Fish Receipts | | 12,840.85 |
| Deductions | | -642.04 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 12,198.81 |

yp d  5/3/7
✓ 158702  158844
$12,198.81

COHEN00041

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

RECEIVED FROM:    BARRY COHEN
PO BOX 40

Fish & Game Tag #:    **ZPOINT**
K127161
Delivery Date:    05/05/07

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 8201.0 | DSSW | DOVER SOLE SW WILD | SF | 0.40000 | 3,280.40 |
| | | | | 0.00000 | 0.00 |
| 138.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 2.00000 | 276.00 |
| | | | | 0.00000 | 0.00 |
| 406.0 | SFM | SABLE FISH MED WILD USA | SF | 1.60000 | 649.60 |
| | | | | 0.00000 | 0.00 |
| 1271.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.35000 | 1,715.85 |
| | | | | 0.00000 | 0.00 |
| 2458.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 2,703.80 |
| | | | | 0.00000 | 0.00 |
| 280.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.36000 | 100.80 |
| | | | | 0.00000 | 0.00 |
| 652.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.05000 | 684.60 |
| | | | | 0.00000 | 0.00 |
| 544.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.35000 | 190.40 |
| | | | | 0.00000 | 0.00 |
| 931.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.65000 | 605.15 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -510.33 |

| 14,881.0 | Total Weight |
|---|---|

| | | |
|---|---|---|
| Gross Fish Receipts | | 10,206.60 |
| | | 0.00 |
| Deductions | | -510.33 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 9,696.27 |

COHEN00043

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

RECEIVED FROM:

BARRY COHEN
PO BOX 40

Fish & Game Tag #: **ZPOINT**  K127162
Delivery Date: 05/10/07

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 25035.0 | DSSW | DOVER SOLE SW WILD | SF | 0.39000 | 9,763.65 |
| | | | | 0.00000 | 0.00 |
| 101.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 2.00000 | 202.00 |
| | | | | 0.00000 | 0.00 |
| 235.0 | SFM | SABLE FISH MED WILD USA | SF | 1.60000 | 376.00 |
| | | | | 0.00000 | 0.00 |
| 110.0 | RFR | ROSE FISH ROUND WILD USA | SF | 0.32000 | 35.20 |
| | | | | 0.00000 | 0.00 |
| 470.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.35000 | 634.50 |
| | | | | 0.00000 | 0.00 |
| 1510.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 1,661.00 |
| | | | | 0.00000 | 0.00 |
| 70.0 | SQF C.A. Assessment | SQUID FRESH WILD USA | SF | 0.20000 | 14.00 |
| | | | | 0.00000 | 0.00 |
| 175.0 | SFEXX | SABLE FISH EEXSM WILD USA | SF | 0.35000 | 61.25 |
| | | | | 0.00000 | 0.00 |
| 1247.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.05000 | 1,309.35 |
| | | | | 0.00000 | 0.00 |
| 1803.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.35000 | 631.05 |
| | | | | 0.00000 | 0.00 |
| 2752.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.65000 | 1,788.80 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -823.84 |

| 33,508.0 | **Total Weight** |
|---|---|

| | | |
|---|---|---|
| Gross Fish Receipts | | 16,476.80 |
| | | 0.00 |
| Deductions | | -823.84 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 15,652.96 |

5/15/07
#158903
$25349.23

COHEN00047

# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

#37

# SETTLEMENT SHEET

RECEIVED FROM:

BARRY COHEN
PO BOX 40

ZPOINT
Fish & Game Tag #: K127164
Delivery Date: 05/20/07

| WEIGHT | | ITEM | PORT | UNIT PRICE | AMOUNT |
|--------|------|------|------|-----------|--------|
| 9149.0 | DSSW | DOVER SOLE SW WILD | SF | 0.39000 | 3,568.11 |
| | | | | 0.00000 | 0.00 |
| 14.0 | LPR | LARGE PETRALE RD WILD | SF | 1.10000 | 15.40 |
| | | | | 0.00000 | 0.00 |
| 84.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 2.00000 | 168.00 |
| | | | | 0.00000 | 0.00 |
| 236.0 | SFM | SABLE FISH MED WILD USA | SF | 1.60000 | 377.60 |
| | | | | 0.00000 | 0.00 |
| 422.0 | RFR | ROSE FISH ROUND WILD USA | SF | 0.32000 | 135.04 |
| | | | | 0.00000 | 0.00 |
| 493.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.35000 | 665.55 |
| | | | | 0.00000 | 0.00 |
| 923.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 1,015.30 |
| | | | | 0.00000 | 0.00 |
| 122.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.36000 | 43.92 |
| | | | | 0.00000 | 0.00 |
| 116.0 | SFEXX | SABLE FISH EEXSM WILD USA | SF | 0.35000 | 40.60 |
| | | | | 0.00000 | 0.00 |
| 437.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.05000 | 458.85 |
| | | | | 0.00000 | 0.00 |
| 929.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.35000 | 325.15 |
| | | | | 0.00000 | 0.00 |
| 1496.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.65000 | 972.40 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -389.30 |

| 14,421.0 | Total Weight |
|----------|--------------|

| Gross Fish Receipts | | 7,785.92 |
|---------------------|------|--------|
| | | 0.00 |
| Deductions | | -389.30 |
| FMA Dues | 0.0% | 0.00 |
| Other Deductions | 0.0% | 0.00 |
| Amount Due | | 7,396.62 |

pd ck# 159382
6-1-07
$ 7396.62

COHEN00051



# CAITO FISHERIES, INC.

P.O. Box 1370, Fort Bragg, California 95437
TELEPHONE (707) 964-6368
FAX (707) 964-6439

# SETTLEMENT SHEET

RECEIVED FROM: BARRY COHEN
PO BOX 40

| | ZPOINT |
|---|---|
| Fish & Game Tag #: | K127169 |
| Delivery Date: | 06/04/07 |

| WEIGHT | ITEM | | PORT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 12860.0 | DSSW | DOVER SOLE SW WILD | SF | 0.39000 | 5,015.40 |
| | | | | 0.00000 | 0.00 |
| 605.0 | SQF | SQUID FRESH WILD USA | SF | 0.20000 | 121.00 |
| | CA Assessment | | | 0.00000 | 0.00 |
| 109.0 | SFLG | SABLE FISH LARGE WILD USA | SF | 2.00000 | 218.00 |
| | | | | 0.00000 | 0.00 |
| 311.0 | SFM | SABLE FISH MED WILD USA | SF | 1.60000 | 497.60 |
| | | | | 0.00000 | 0.00 |
| 2703.0 | RFR | ROSE FISH ROUND WILD USA | SF | 0.32000 | 864.96 |
| | | | | 0.00000 | 0.00 |
| 750.0 | SFS | SABLE FISH SMALL WILD USA | SF | 1.35000 | 1,012.50 |
| | | | | 0.00000 | 0.00 |
| 5.0 | SFEXS | SABLE FISH EX SMALL WILD USA | SF | 1.10000 | 2,161.50 |
| | | | | 0.00000 | 0.00 |
| 90.0 | RSR | REX SOLE ROUND WILD USA | SF | 0.36000 | 32.40 |
| | | | | 0.00000 | 0.00 |
| 612.0 | THLG | THORNYHEADS LG WILD USA | SF | 1.05000 | 642.60 |
| | | | | 0.00000 | 0.00 |
| 1538.0 | THEX | THORNYHEADS EX SM WILD USA | SF | 0.35000 | 538.30 |
| | | | | 0.00000 | 0.00 |
| 2011.0 | THSM | THORNYHEADS SM WILD USA | SF | 0.65000 | 1,307.15 |
| | | | | 0.00000 | 0.00 |
| | B-BACK | GROUNDFISH BUYBACK | | | -620.57 |

| 23,554.0 | Total Weight | | | Gross Fish Receipts | 12,411.41 |
|---|---|---|---|---|---|
| | | | | | 0.00 |
| | | | | Deductions | -620.57 |
| | | | FMA Dues 0.0% | | 0.00 |
| | | | Other Deductions 0.0% | | 0.00 |
| | | | | Amount Due | 11,790.84 |



pd #159705
6/14/7
†11790.84

COHEN00055

# Exhibit 15

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4               ---oOo---

5   DEL MAR SEAFOODS, INC.,      )
                                 )
6            Plaintiff,          )
                                 )
7   vs.                          )    No. C-07-2952-WHA
                                 )
8   BARRY COHEN, CHRIS COHEN     )
    (aka CHRISTENE COHEN), in    )
9   personam, and F/V POINT LOMA,)
    Official Number 515298, a    )
10  1968 steel-hulled, 126-gross )
    ton, 70.8 foot long fishing  )
11  vessel, her engines, tackle, )
    furniture apparel, etc., in  )
12  rem, and Does 1-10,          )
                                 )
13           Defendants.         )
    _____)

14

15

16      DEPOSITION OF JOSEPH FRANK CAPPUCCIO

17            December 14, 2007

18

19

20         Taken before JANE GROSSMAN

21            CSR No. 5225

22

23      JANE GROSSMAN REPORTING SERVICES
           Certified Shorthand Reporters
24      1939 Harrison Street, Suite 460
           Oakland, California 94612
25            (510) 444-4500

**Condensed Transcript**

J|G Jane GROSSMAN
R|S REPORTING Services

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

1

1    A.  I had a pumpkin-cream-cheese muffin, and I'm
2 now having a cup of coffee.  Nothing.
3    Q.  Did you talk to Mr. Roggio?
4    A.  No, I have not.  Regarding this matter, no, I
5 did not.
6    Q.  You did not talk to him about his deposition
7 yesterday?
8    A.  No, I have not.
9    Q.  Let's get some preliminaries out of the way.
10       Your home address would be, for the record,
11 please?
12    A.  59 Alta Mesa Circle, Monterey, California
13 93940.
14    Q.  And you're currently employed as what?
15    A.  President of Del Mar Seafoods.
16    Q.  Where is Del Mar Seafoods located, please?
17    A.  331 Ford Street, Watsonville, California
18 95076.
19    Q.  Is that the only plant for Del Mar Seafoods?
20    A.  No.  There's another factory in Oregon.
21    Q.  Where in Oregon?
22    A.  No. 2 Hangar Way, like the airplane hangar,
23 Astoria, Oregon 97103.
24    Q.  Mr. Cappuccio, could you give me a summary, if
25 you could, of your education after high school, please?

7

1    A.  I have a four-year bachelor's degree in
2 business and marketing.
3    Q.  From what university, please?
4    A.  University of the Pacific.
5    Q.  University of the Pacific.  Okay.
6       Do you have an MBA degree?
7    A.  No, I do not.
8    Q.  After you completed the University of the
9 Pacific -- what year was that?
10    A.  1986.
11    Q.  What did you next do as employment?
12    A.  I worked for my father's company, U.S. Freezer
13 Company, as an employee.
14    Q.  U.S. Freezer Company?  Could you describe what
15 U.S. Freezer Company is?
16    A.  It's a seafood processing company, similar to
17 Del Mar Seafoods.
18    Q.  Is it a predecessor to Del Mar, or is it a
19 separate company?
20    A.  A separate company.
21    Q.  Okay.  What was your position with U.S.
22 Freezer?
23    A.  Production supervisor.
24    Q.  And what did you do in that position?
25    A.  Supervised production.

8

1    Q.  Production of what?
2    A.  Of seafood.  Excuse me.  I'm sorry.
3    Q.  Did that mean that you were buying fish?
4    A.  No.
5    Q.  That you were producing it through --
6    A.  I supervised the packaging, freezing, general
7 seafood processing steps.
8    Q.  So, U.S. Freezer -- did it sell fresh fish as
9 well as frozen fish?
10    A.  Only frozen fish.
11    Q.  Fillets mainly?
12    A.  No.
13    Q.  What was the form of the freezing?
14    A.  Whole round frozen squid and herring.
15    Q.  So, how long did you work for U.S. Freezer?
16    A.  Three years -- approximately three years.
17    Q.  Until about 1989?
18    A.  That is correct.
19    Q.  Then what did you do next for employment?
20    A.  I -- then there was the creation of Del Mar
21 Seafoods.
22    Q.  Who created Del Mar Seafoods?
23    A.  Myself and my father, Santo Cappuccio.
24    Q.  And was this formed as a partnership or a
25 corporation?

9

1    A.  A C Corporation.
2    Q.  A C Corporation?
3    A.  A Chapter C Corporation.
4    Q.  At that time did the two of you go into that
5 business exclusively at Del Mar Seafoods?
6    A.  That is correct.
7    Q.  What kind of seafood business did Del Mar
8 engage in?
9    A.  Whole round frozen squid and herring.
10    Q.  So, essentially the same business as U.S.
11 Freezer?
12    A.  Exactly.
13    Q.  And U.S. Freezer, did that go out of business?
14    A.  No, it did not.
15    Q.  It continued?
16    A.  Absolutely.
17    Q.  Okay.  And where was Del Mar located during
18 this period of time when you and your father worked
19 together there?
20    A.  Watsonville, California.
21    Q.  Did you have other plants?
22    A.  No.
23    Q.  At any time since 1989, when you were with
24 Del Mar Seafoods, did Del Mar Seafoods also own vessels?
25    A.  Yes.

10

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

4 (Pages 7 to 10)

1   Q.   What kind of vessels?
2   A.   Two purse seine vessels and one trawler.  It's
3 purse seine, like "purse" and s-e-i-n-e.
4   Q.   With regard to the purse seine vessels, which
5 fishery did they engage in?
6   A.   The two purse seiners do squid and sardines.
7        The trawler does bottom fish.
8   Q.   Today does Del Mar own any fishing vessels?
9   A.   Only two purse seiners, the Ocean Angel I and
10 the Ocean Angel II.
11   Q.   Do you personally own any vessels?
12   A.   I own the limited liability corporations that
13 own the purse seine vessels.
14   Q.   So, today you do not have a vessel that's
15 licensed for the groundfisheries?
16   A.   Absolutely not.
17   Q.   Why do you say, "Absolutely not"?
18   A.   Oh, it's just -- no.
19   Q.   When did you become president of Del Mar
20 Seafoods?
21   A.   At its inception, 1989.
22   Q.   1989?
23   A.   Or December of 1988, I think, thereabouts.
24   Q.   So, was there any kind of -- you just formed
25 the company with your father; is that correct?

11

1   A.   That's correct.
2   Q.   And you were the exclusive stockholders or
3 interest-holders?
4   A.   That is correct.
5   Q.   Do you have a board of directors?
6   A.   Yes, of course.
7   Q.   Are you on the board of directors?
8   A.   Yes, I am.
9   Q.   Who else?
10   A.   Joe Roggio.
11   Q.   And who else?
12   A.   Roseanne Rito.
13   Q.   So, these are the only two companies that you
14 have ever worked for since you graduated from college;
15 is that correct?
16   A.   That's correct.
17   Q.   Let's start by asking some questions about
18 when you first met Mr. Barry Cohen.
19        When was that?
20   A.   I don't remember exactly.
21   Q.   Ten years ago?
22   A.   I honestly don't remember exactly.
23        It was probably longer.
24   Q.   If you can't remember the time, tell me what
25 were the circumstances under which you first met

12

1 Mr. Barry Cohen.
2   A.   He owned and operated Olde Port Fisheries.
3 And we were a customer of his, buying two specific
4 species of fish from his facility.
5   Q.   Where is Olde Port Fisheries located?
6 Avila Beach?
7   A.   It was in Avila Beach, yes.
8   Q.   And did you -- when you first met with him and
9 when you first got to know him, it was basically in the
10 capacity that you were his customer?
11   A.   That is correct.
12   Q.   What kind of fish did he sell to you again?
13   A.   Black cod and channel rock.
14   Q.   Was he a large supplier of fish to you?
15   A.   He was the only supplier of channel rock and a
16 good supplier of black cod.
17   Q.   What was sort of the annual --
18   A.   I don't remember.
19   Q.   You don't remember.
20        MR. POULOS:  When you say "you," are you
21 referring to Del Mar or to U.S. Freezer?
22        You kept saying he was a customer of "you."
23 Which "you" are you referring to?
24        MR. WALSH:  Well, I'm referring to him
25 personally about meeting him.  That was my question.

13

1        MR. POULOS:  Okay.  Well, I don't think --
2        MR. WALSH:  Well, I don't think you can think
3 what he thinks.
4        MR. POULOS:  I'm going to object that it's
5 vague and ambiguous.
6        MR. WALSH:  That's fine.
7        MR. POULOS:  Do you understand that the "you"
8 is not your company, but it is you personally?
9        Were you personally buying the fish from
10 Mr. Cohen?
11        THE WITNESS:  Del Mar Seafoods was purchasing
12 the fish from Mr. Cohen.
13        MR. WALSH:  Thank you.
14        THE WITNESS:  Sorry.
15        MR. WALSH:  Q.  Now, did you -- did you come
16 to enter into a joint venture with Mr. Cohen relating to
17 the Olde Port facility?
18   A.   Yes.
19   Q.   Do you recall what year that was?
20   A.   No.
21   Q.   Do you recall what the joint venture involved?
22   A.   Vaguely, yes.
23   Q.   Can you tell me what you recall?
24   A.   We were to finance the receivables of his
25 fillet fish operation -- the company.  And then Del Mar

14

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

1 Seafoods was to purchase -- remain purchasing or
2 continue to purchase the channel rock and black cod from
3 Olde Port Fisheries.
4    Q.   Was there any agreement in writing with
5 respect to this joint venture?
6    A.   I don't remember, honestly.
7    Q.   Do you recall any of the terms of the joint
8 venture as to profit sharing or loss sharing?
9    A.   We were to share the profits of Olde Port
10 Fisheries -- Del Mar Seafoods and Mr. Barry Cohen --
11 50/50 after all expenses.
12    Q.   Now, how long did this joint venture continue?
13 Do you recall?
14    A.   I don't remember exactly.
15    Q.   Did you also have another business arrangement
16 with Mr. Cohen relative to some activities in Mexico?
17    A.   Yes.
18    Q.   Can you describe what those arrangements and
19 discussions were about?
20    A.   It was a fishing operation in Mexico.
21    Q.   What were you planning to do in Mexico?
22    A.   Fish.
23    Q.   How?
24    A.   With a trawler.
25    Q.   A U.S. trawler or a Mexican trawler?

15

1    A.   Yes.
2    Q.   What did you tell him?
3    A.   He was no longer employed by Del Mar Seafoods.
4    Q.   When was this?  Do you recall?
5    A.   I don't remember.
6    Q.   Two years ago, ten years ago?
7    A.   Sadly, I don't exactly remember.
8         Instead of speculating or guessing, as
9 instructed not to, I'll just say, "I don't remember."
10    Q.   Do you recall a note entered into between
11 Del Mar Seafoods and Christene and Barry Cohen -- a
12 promissory note?
13    A.   I know there's a note existing between
14 Del Mar Seafoods and Christene and Barry Cohen, yes.
15    Q.   Did you review that note prior to it being
16 signed?
17    A.   That would have been Joe Roggio's job.
18    Q.   You didn't review it?
19    A.   No.
20         Joe Roggio is more capable on that than I am.
21    Q.   Did you know that there was a preferred ship
22 mortgage associated with that promissory note?
23    A.   What is a "preferred ship mortgage"?
24    Q.   You don't know what a "preferred ship
25 mortgage" is?

17

1    A.   A U.S. trawler with a Mexican flag.
2    Q.   And were you going to invest in this
3 personally yourself or was Del Mar?
4    A.   In what?
5    Q.   The joint venture.
6    A.   Invest in the joint venture?  I bought a
7 permit for the trawler, which belonged to Barry.
8    Q.   Was it the Mexican permit?
9    A.   Yes.
10    Q.   Were there any other details to this
11 arrangement that you can recall?
12    A.   There were other details, but I don't recall
13 every one of them.  I'm sorry.
14    Q.   Let me ask you about whether Mr. Cohen ever
15 worked for you, Del Mar.
16    A.   Mr. Cohen was employed by Del Mar Seafoods,
17 yes.
18    Q.   Do you recall how long he was employed by
19 Del Mar Seafoods?
20    A.   I don't exactly remember how long, no.
21    Q.   Do you recall the time when he was no longer
22 employed?  What that date was?
23    A.   The day (sic), no.
24    Q.   Did you yourself meet with him and tell him
25 that he was no longer employed?

16

1    A.   Not technically.
2    Q.   Even though you own vessels, you have never
3 taken a loan secured by a preferred ship mortgage?
4    A.   My boats are paid for.
5    Q.   So, you've never yourself been involved in any
6 finance --
7    A.   I --
8    Q.   Let me finish.
9    A.   Okay.
10    Q.   -- any financing arrangement whereby you
11 needed to borrow money from somebody and secure it with
12 a mortgage?
13    A.   Well, I've had a mortgage before, yeah.
14    Q.   A ship mortgage?
15    A.   Well, I've had a mortgage on homes, and I've
16 had bank loans for fishing boats.
17    Q.   But you've never had an experience securing
18 any of these loans on a vessel with a ship mortgage?
19    A.   I don't remember.
20    Q.   Now, you're aware of the note.
21         Do you recall the size of the note?
22    A.   Not exactly.
23    Q.   Does $215,000 spur your recollection?
24    A.   It's a substantial amount.
25    Q.   But you don't -- you yourself don't know if

18

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

1 it's $215,000?

2    A.   That's Joe Roggio's job.  He'll know exactly

3 to the penny what the mortgage would be.

4    Q.   I see.  Do you know if Del Mar Seafoods had

5 any other written promissory note with Mr. Cohen other

6 than the one that we've just discussed?

7    A.   That would be Joe Roggio's job.

8    Q.   Did there come a time in 2005 that you met

9 with Mr. Cohen to talk about concerns that had been

10 raised with this note by your bank?

11    A.   I don't remember.

12    Q.   So, you don't remember that you met with

13 Mr. Cohen and said, "The bank is concerned about the

14 size of the note, and I need some -- I need some help"?

15    A.   I don't have any specific recollection.

16    Q.   Do you recall in 2005 that there was an audit

17 of your company that raised a question about the size of

18 this note?

19    A.   The bank audits loans of our size annually.

20 It's standard procedure.

21    Q.   But do you recall the audit in 2005?

22    A.   The bank audits every company of a company our

23 size annually.

24       But I don't remember or have any detailed

25 knowledge of the 2005 audit, no.  I only assume there

            19

---

1    A.   I don't remember.

2    Q.   You don't remember what month?

3    A.   No.

4    Q.   You don't remember what year?

5    A.   No.

6    Q.   Did you accept the $175,000 check?

7    A.   I was surprised he gave it to me.  I kept

8 telling him, "Why are you giving it to me?  Give it to

9 Joe Roggio."

10    Q.   Did you have -- did you have any conversation

11 with Mr. Cohen after he handed you the check?

12    A.   I don't really remember.

13    Q.   Let's go back to the time just before you

14 asked lawyers to arrest the vessel, which would be

15 April/May of this year.

16    A.   Okay.

17    Q.   Okay.  Did you have a conversation with

18 Joe Cappuccio -- I mean with Joe Roggio about

19 Barry Cohen and his loan?

20    A.   Yes.

21    Q.   When was this conversation?

22    A.   I don't remember.

23    Q.   What did you discuss in that conversation?

24    A.   I don't remember.

25    Q.   Well, didn't you discuss that you wanted to

            21

---

1 was one.

2    Q.   So, you didn't -- you never did talk to a bank

3 at any time?

4    A.   That would have been Joe Roggio's department.

5    Q.   So, you didn't discuss the note with the bank

6 at all?

7    A.   That's Joe Roggio's job.

8    Q.   That's Joe Roggio's job.  Okay.

9       In this case, with respect to the note, do you

10 recall any of the terms of the note?

11    A.   No.

12    Q.   You don't recall if Mr. Cohen had to make

13 payments of $3,000 a month, for example?

14    A.   Joe Roggio would have worked that out with

15 Mr. Cohen.

16    Q.   I see.  Do you recall a time when

17 Mr. Barry Cohen came into your office and handed you a

18 check for $175,000?

19    A.   Yes, I remember that actually.

20    Q.   Do you recall the date?

21    A.   No.  I told him, "That's great.  Thank you.

22 Go give it to Joe Roggio."

23    Q.   Was it in your office?

24    A.   Yes, it was.

25    Q.   Was it in the morning or in the afternoon?

            20

---

1 consider a way to possibly arrest the vessel?

2    A.   No.

3    Q.   Do you remember whether you discussed

4 Mr. Cohen's divorce at that time with Mr. Roggio?

5    A.   We discussed the security of the asset or the

6 money because his situation looked bad.

7    Q.   Now, you said you discussed "the asset."

8       What asset would that be?

9    A.   We wanted to make sure that our interest was

10 protected.  Our asset was the fishing boat.  We wanted

11 to make sure it was secure from possible financial

12 situations that could have got us -- to put Del Mar

13 Seafoods in a position that it would lose its security

14 of the loan.

15    Q.   So, it's your testimony here today that you

16 and Mr. Roggio talked in detail about the vessel and its

17 security?

18    A.   Not in detail.  We just wanted to make sure

19 that the assets were protected, that our security was

20 enhanced with Barry's position.

21    Q.   "Enhanced," did you say?

22    A.   We wanted to make sure that the -- that our

23 collectibility of the debt was in a more safe and secure

24 position.

25       And I told him to do that.

            22

---

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

1    Q.   So, in order to make sure, what did you tell
2 Mr. Roggio to do?
3    A.   Talk to our attorney.
4    Q.   Did you have any discussion about whether
5 Mr. Roggio would investigate whether the vessel was, in
6 fact, working at that time?
7    A.   Whether the boat was fishing?
8    Q.   Right.
9    A.   Yes, it was fishing.
10    Q.   Did you talk about it with Mr. Roggio?
11    A.   I don't remember.
12    Q.   Did you suggest to Mr. Roggio that he ought to
13 call Barry on the phone and find out what's going on?
14    A.   I don't remember.
15    Q.   Did you suggest to Mr. Roggio that he ought to
16 write a letter to Barry and to Chris Cohen and say,
17 "What's your status?  Can you pay the loan?"
18    A.   I don't remember.
19    Q.   Did you discuss with Mr. Roggio the amount of
20 money that Barry might be owing?
21    A.   I don't specifically remember.
22    Q.   Do you recall if you asked Mr. Roggio to check
23 the Coast Guard records to see who owned the boat?
24    A.   I don't remember.
25    Q.   I'm going to show you what is -- we're not

23

1    MR. WALSH:  No.
2    Q.   So, you don't recall any such conversation?
3    A.   Not specifically, no.
4    Q.   Did you and Joe Roggio have any discussion
5 about the ownership of the vessel relative to your
6 security?
7    A.   Yeah.  He's not -- we were surprised that the
8 Coast Guard would allow the transfer without making us
9 whole or at least notifying us.
10    Q.   Well, did somebody talk to the Coast Guard?
11    A.   No.
12    We were just surprised that this could even
13 happen without us being advised as lenders on this boat.
14 He owed money based on this asset.
15    I mean, you (sic) shouldn't be able to change
16 title without making us whole or being notified.  We'd
17 have to sign off on that.
18    Q.   Now, did you have a discussion with Mr. Roggio
19 before the vessel seizure?
20    A.   I don't specifically remember.
21    Q.   But you did have that conversation at some
22 point?
23    A.   At some point, yes.
24    Q.   Okay.
25    A.   We were just kind of surprised that it was

25

1 going to mark this as an exhibit -- a bill of sale.
2    What I'll tell you, Mr. Cappuccio, is that is
3 a bill of sale that sells a vessel to a corporation.
4    MR. POULOS:  Do you have a copy for me?
5    MR. WALSH:  I think I gave one to you
6 yesterday.
7    MR. POULOS:  You also said we weren't going to
8 use the same exhibits.
9    Fortunately, I think I brought my copies.
10    MR. WALSH:  Good.  Good job.
11    Q.   My question is, Do you recall a time talking
12 to Mr. Cohen about -- where he asked you a question
13 about possibly putting his vessel into a corporation?
14    A.   I don't specifically remember.
15    MR. POULOS:  Do you want to wait a minute,
16 Counsel, while I locate the document?
17    MR. WALSH:  That's all I've got.
18    THE WITNESS:  Keep that one (tendering).
19    MR. WALSH:  Keep that one.
20    MR. POULOS:  You marked it as an exhibit.
21    MR. WALSH:  It's not marked as an exhibit.
22    I just wanted to refresh his recollection.
23    It may be from yesterday.
24    MR. POULOS:  I thought you said you were
25 marking it as Exhibit No. 1.

24

1 allowed to happen.
2    Q.   Now, you said you were concerned about
3 Mr. Cohen's financial position.
4    What was the basis of those concerns prior to
5 the time that you asked the vessel to be seized?
6    A.   Well, my attorney in January, Richard Wagner,
7 advised -- well, we saw the transcripts of some
8 deposition where Barry admitted and said that if he
9 were to lose the Avila case legal reimbursement that he
10 was going to go bankrupt -- he was going to be forced
11 into bankruptcy.
12    Then his wife called the office.  They were
13 going through a real nasty divorce.  And she accused him
14 of beating her.
15    So, I went, "Uh-oh.  This is getting ugly."
16    And that made me say, "We better secure the
17 asset."
18    And at that point, we advised their (sic)
19 attorney what our options were.
20    We never advised him what to do.  We asked him
21 what to do.
22    Q.   So, it was the call from your attorney and you
23 said you got a call from Chris Cohen.
24    A.   The office did.  I didn't personally receive
25 the call from Chris Cohen.

26

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

**Page 27**

```
 1   Q.  Who received the call from Chris Cohen?
 2   A.  I'm not exactly sure.
 3   Q.  During the period of time that we're talking
 4 about, from 1999 to 2006, did you ever have any business
 5 dealings with Chris Cohen yourself?
 6   A.  No, uh-uh.
 7   Q.  So, it was the lawsuit having to do with legal
 8 fees; correct?
 9   A.  It was Barry's admission that he might be
10 forced to declare bankruptcy if the Court were not to
11 reimburse his legal fees in the Avila case.  It was his
12 testimony that prompted me to believe that he might be
13 going bankrupt.  It was his words verbatim.
14   Q.  You believed that he was going to go bankrupt?
15   A.  He did, and it was in writing.  And I read it.
16 And it was under oath and perjury and whatever (sic).
17 He said he was going to go broke if he was not
18 reimbursed his legal bills.  In January I came to that
19 knowledge.
20   Q.  Mr. Cappuccio, as you sit here today, now that
21 you know that the vessel, the asset you were concerned
22 about, is in a separate corporation, that it is not
23 personally owned by Barry, do you feel more secure or
24 less secure?
25   A.  I would --
```

**Page 28**

```
 1      MR. POULOS:  I would just say I'm going to
 2 interpose an objection that that mischaracterizes the
 3 evidence, since the testimony is that Mr. Cohen is the
 4 sole owner of the corporation that he transferred the
 5 title to.  So, it still is the corporation and his
 6 asset.
 7      MR. WALSH:  Q.  You can answer the question.
 8   A.  I'm not an attorney.  I'm a fish salesman.  I
 9 don't know.
10   Q.  I know you're a fish salesman.
11      But you, Mr. Cappuccio, just talked about
12 concern about security of the asset.
13   A.  That's why I asked my attorney.
14   Q.  But you said you had conversations with
15 Mr. Roggio about the security of the asset and the
16 ownership issue having to do with the corporate owner.
17      Didn't you just say that?
18   A.  We were -- we were commenting how the Coast
19 Guard -- why would the Coast Guard let that transfer
20 without notifying us.
21      On mortgages for property, which I knew
22 something about, the lender would be advised of any
23 transfer of property and be made whole on any note
24 against such said (sic) property.
25      Now, maybe ships are different.  I don't know.
```

**Page 29**

```
 1 I'm not an attorney.
 2   Q.  But you have owned some fishing vessels;
 3 right?
 4   A.  But that doesn't make me an attorney.
 5   Q.  No, I'm sure it doesn't.
 6      But you didn't get any information out of that
 7 ownership about --
 8   A.  I -- I'm a fish salesman.
 9      I'm really not an attorney.  And that's why
10 when I have issues like this, I call my attorney.  And
11 that's what I always do when I get stuff like this.  And
12 I say, "What's this?"  And he explains it to me.  And I
13 pay him.  That's how it usually works.
14      I'm not a play attorney.  I'm not an amateur
15 attorney.
16   Q.  But you --
17   A.  I'm a fish salesman.
18   Q.  In terms of security, you are telling me you
19 don't understand the difference in your security
20 situation when the vessel is owned by a separate
21 corporation, and Barry, you said, stated on the record
22 that he personally was to go into bankruptcy --
23 so, you don't understand the difference?
24   A.  I understand enough to call my attorney.  And
25 if he doesn't understand that, I call my accountant.
```

**Page 30**

```
 1      Joe Roggio is a CPA.
 2      He's an attorney (indicating Mr. Poulos).
 3      I'm a fish salesman.
 4      I appreciate the credit you're giving me, but
 5 I'm not that -- I'm not that gifted.  This is very
 6 confusing, meticulous, very specific knowledge that I
 7 just don't possess.
 8   Q.  Then you don't understand that with a
 9 preferred ship mortgage, your debt is prior to any debt
10 that would be personal to Barry?
11   A.  I don't know that.  I am not an attorney.
12   Q.  Did you find that out before you seized the
13 vessel or had the government arrest the vessel?
14   A.  I asked my attorney to collect the money and
15 secure -- make sure that money was secure.  And he did
16 what he is supposed to do.
17   Q.  So, did you yourself personally go over with
18 Joe Roggio all the debts that Mr. Cohen might owe before
19 the arrest?
20   A.  You know, I'm sure I did, but I really don't
21 specifically remember.
22   Q.  Yesterday we had a document called an
23 "Assignment of Joint Venture."
24      Have you ever heard of such a thing?
25   A.  Yes.
```

DEPOSITION OF JOSEPH FRANK CAPPUCCIO

# Exhibit 16

1    **COX, WOOTTON, GRIFFIN,**
     **HANSEN & POULOS, LLP**
2    Gregory W. Poulos (SBN 131428)
     Max L. Kelley (SBN 205943)
3    190 The Embarcadero
     San Francisco, California 94105
4    Telephone No.: (415) 438-4600
     Facsimile No.: (415) 438-4601
5
     **LAW OFFICES OF RICHARD P. WAGNER**
6    Richard P. Wagner (SBN 166792)
     700 Oceangate, Suite 700
7    Long Beach, CA 90802
     Telephone No.: (562) 216-2946
8    Facsimile No.: (562) 216-2960

9    Attorneys for Plaintiff
     DEL MAR SEAFOODS, INC.
10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**
                   **SAN FRANCISCO DIVISION**
13

14   DEL MAR SEAFOODS, INC.,          )    Case No.  CV-07-02952 WHA
                                       )
15            Plaintiff,              )    **PLAINTIFF'S RESPONSES TO**
                                       )    **DEFENDANTS' REQUEST FOR**
16   v.                               )    **ADMISSIONS, SET ONE**
                                       )
17   BARRY COHEN, CHRIS COHEN (aka    )
     CHRISTENE COHEN) *in personam* and )
18   F/V POINT LOMA, Official Number  )
     515298, a 1968 steel-hulled, 126-gross ton, )
19   70.8 foot long fishing vessel, her engines, )
     tackle, furniture, apparel, etc., *in rem*, and )
20   Does 1 through 10, inclusive,    )
                                       )
21            Defendants.             )
     _____ )
22                                     )
     And Related Counterclaims.        )
23   _____ )

24

25

26

27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL (415) 438-4600
FAX (415) 438-4601

| | |
|---|---|
| 1 | DEMANDING PARTY: |
| | **Defendants BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and Claimant F/V POINT LOMA FISHING COMPANY, INC.** |
| 2 | |
| 3 | |
| | RESPONDING PARTY: |
| | **Plaintiff DEL MAR SEAFOODS, INC.** |
| 4 | SET NO.: |
| | **ONE** |
| 5 | |

6    Plaintiff DEL MAR SEAFOODS, INC. submits the following responses to

7  Defendants' Request for Admissions, Set One:

8                     **PRELIMINARY STATEMENT**

9    The following responses are based upon discovery and analysis available to date.  It

10  is anticipated that further discovery, analysis, independent investigation, legal research, and

11  legal analysis will supply additional facts and add meaning to known facts as well as

12  establish entirely new factual conclusions and legal contentions, all of which may lead to

13  additions to and/or changes in the contentions set forth here.  Because discovery and

14  analysis are continuing, defendant's responses are subject to change, and are made without

15  prejudice and under reservation of all rights to subsequently change any and all responses as

16  additional facts may be ascertained or recalled, and where additional analysis, research or

17  contentions are made.  Subject to the above, the responses set forth below are as complete

18  and straightforward as the information reasonably available to the defendant permits, and

19  any Request for Admission that cannot be answered completely is answered to the extent

20  possible.

21                 **RESPONSES TO REQUESTS FOR ADMISSION**

22  **Request for Admission No. 1:**

23    Admit that document number COHEN 00014-00015, attached to Defendants' Initial

24  Disclosures, is a true and correct copy of the "Assignment of Joint Venture Interest"

25  prepared by, or at the direction of, Del Mar.

26  **Response to Request No. 1:**

27    Plaintiff admits that it is a true and correct copy but denies that it was prepared by,

28  or at the direction of, Del Mar.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL (415) 438-4600
FAX (415) 438-4601

1    **Request for Admission No. 2:**

2        Admit that Joe Roggio's signature appears on page 2 of the "Assignment of Joint

3    Venture Interest" at COHEN 00015.

4    **Response to Request No. 2:**

5        Admitted.

6    **Request for Admission No. 3:**

7        Admit that Joe Roggio signed document number COHEN 00014-00015,

8    "Assignment of Joint Venture Interest," effective October 22, 2004, on behalf of Plaintiff.

9    **Response to Request No. 3:**

10        Admitted.

11    **Request for Admission No. 4:**

12        Admit that document number DMSI 0098-0100, attached to Plaintiff's Supplemental

13    Initial Disclosures, is a true and correct copy of the Promissory Note dated October 31,

14    2003, prepared by, or at the direction of, Del Mar.

15    **Response to Request No. 4:**

16        Plaintiff admits that it is a true and correct copy but denies that it was prepared by,

17    or at the direction of, Del Mar, rather, it was prepared by agreement between the parties.

18    **Request for Admission No. 5:**

19        Admit that the document number DMSI 0101-0110, attached to Plaintiff's

20    Supplemental Initial Disclosures, is a true and correct copy of the First Preferred Mortgage,

21    dated October 31, 2003, prepared by, or at the direction of, Del Mar.

22    / / /

23

24    / / /

COX, WOOTTON, 25
GRIFFIN, HANSEN
& POULOS, LLP

26    / / /

110 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL (415) 438-4600
FAX (415) 438-4601    27

28    / / /

Case No.: CV-07-02952 WHA

PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS, SET ONE

1

**Response to Request No. 5:**

2      Plaintiff admits that it is a true and correct copy but denies that it was prepared by,

3   or at the direction of, Del Mar, rather, it was prepared by agreement between the parties..

4

5   Dated: November 28, 2007                COX, WOOTTON, GRIFFIN,
                                            HANSEN & POULOS, LLP
6                                           Attorneys for Plaintiff
                                            DEL MAR SEAFOODS, INC.
7

8

9                                   By: _____
                                            Gregory W. Poulos
10                                          Max L. Kelley

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COX, WOOTTON, 25
GRIFFIN, HANSEN
& POULOS, LLP
26
190 THE EMBARCADERO
SAN FRANCISCO, CA  94105
TEL (415) 438-4600      27
FAX (415) 438-4601

28

Case No.: CV-07-02952 WHA

PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS, SET ONE

## VERIFICATION

I, JOE ROGGIO, hereby state:

1.   I am an officer of DEL MAR SEAFOODS, INC., Plaintiff and Counter-Defendant in the instant action.

2.   I have read the contents of the preceding Plaintiff's Responses to Defendants' First Request for Admissions and hereby verify the responses contained therein are true and correct to the best of my knowledge, information, and belief.

4.   I am authorized on behalf of DEL MAR SEAFOODS, INC. to verify these responses.

I declare under penalty of perjury under the laws of the State of California and the United States that the forgoing is true and correct and that this verification was executed at Watsonville, California on November 29, 2007.

JOE ROGGIO

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP
FOUR EMBARCADERO
CENTER
SUITE 1450
SAN FRANCISCO,
CA 94111
TEL. (415) 438-4600
FAX (415) 438-4601

## PROOF OF SERVICE

Case:        *Del Mar Seafoods, Inc. v. Barry Cohen, Chris Cohen and F/V Point Loma*

Case No.:    U.S. District Court, Northern Dist. Case No.: CV 07-02952 WHA

I am employed in the City and County of San Francisco by the law firm of COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP, 190 The Embarcadero, San Francisco, California 94105. I am over the age of 18 years and not a party to the within action.

On November 29, 2007, I served the attached document(s):

**PLAINTIFF'S RESPONSES TO DEFENDANTS' REQUEST FOR ADMISSIONS, SET ONE**

on the parties, through their attorneys of record, by placing copies thereof in sealed envelopes (except facsimile transmission(s)), addressed as shown below, for service as designated below:

**(A)**    By First Class Mail:  I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in a recognized place of deposit of the U.S. mail in San Francisco, California, for collection and mailing to the addressee on the date indicated.

**(B)**    By Personal Service:  I caused each such envelope to be personally delivered to the addressee(s) by a member of the staff of this law firm on the date indicated.

**(C)**    By Messenger Service:  I caused each such envelope to be delivered to a courier employed by FIRST LEGAL SUPPORT SERVICES or by WORLDWIDE ATTORNEY SERVICES, with both of whom we have a direct billing account, who personally delivered each such envelope to the addressee(s) on the date indicated.

**(D)**    By Federal Express:    I caused each such envelope to be delivered to Federal Express Corporation at San Francisco, California, with whom we have a direct billing account, to be delivered to the addressee(s) on the next business day. I deposited each such envelope/package at the Three Embarcadero Center location of Federal Express Corporation.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

Dmsi.Point Loma/2504

PROOF OF SERVICE                                                    Case No.: CV 07-02952 WHA

(E)    By Facsimile:  I caused such document to be served via facsimile electronic equipment transmission (fax) on the party(ies) in this action by transmitting a true copy to the following fax numbers:

| SERVICE | ADDRESSEE | PARTY REPRESENTED |
|---------|-----------|-------------------|
| A | James P. Walsh<br>Gwen Fanger<br>DAVIS WRIGHT TREMAINE LLP<br>505 Montgomery Street<br>Suite 800<br>San Francisco, CA 94111<br>Tel: 415-276-6500<br>Fax: 415-276-6599<br>Budwalsh@dwt.com | Counsel for Defendants and Claimant<br>BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and Claimant F/V POINT LOMA Fishing Company, Inc. |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this court at whose direction the service was made.  Executed on November 29, 2007 at San Francisco, California.

Zoe Conner

COX, WOOTTON,<br>GRIFFIN, HANSEN<br>& POULOS, LLP<br><br>190 THE EMBARCADERO<br>SAN FRANCISCO, CA<br>94105<br>TEL 415-438-4600<br>FAX 415-438-4601<br><br>Denvi.Point Loma/2504

Exhibit 17

**COX, WOOTTON, GRIFFIN,**
**HANSEN & POULOS LLP**
Gregory W. Poulos  (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA  94105
Telephone No.:  415-438-4600
Facsimile No.:  415-438-4601

**LAW OFFICES OF RICHARD P. WAGNER**
Richard P. Wagner (SBN 166792)
700 Oceangate, Suite 700
Long Beach, CA 90802
Telephone: (562) 216-2946
Facsimile: (562) 216-2960

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC. | Case No.: CV 07-02952 WHA |
| Plaintiff, | **PLAINTIFF DEL MAR SEAFOODS, INC.'S DISCLOSURE OF EXPERT WITNESS** |
| vs. | |
| BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8- foot long fishing vessel, her engines, tackle, furniture, apparel, etc., *in rem*, and Does 1-10, | |
| Defendants. | |
| And Related Counterclaims | |

Plaintiff DEL MAR SEAFOOD, INC. hereby discloses the following expert witness

to testify at trial:

1.    Kenneth D. Moore, to testify regarding the survey he performed on January 7,

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/Seafoods/2504

-1-

Case No.: CV 07-02952 WHA

EXPERT WITNESS DISCLOSURE, F.R.C.P. 26(a)(2)

1    2008 of the defendant vessel F/V POINT LOMA regarding the vessel's valuation and

2    condition.

3         2.    Mr. Moore's expert report and qualifications are attached hereto as **Exhibit 1**.

4         3.    Mr. Moore has not provided any deposition or trial testimony within the past

5    four years, nor has he published any materials in the past 10 years.

6         4.    Mr. Moore charges $150 per hour for deposition and trial testimony.  Mr.

7    Moore's professional surveying rate is $102.50 per hour.

8         5.    A copy of Mr. Moore's expert report is attached hereto as **Exhibit 2**.

9         6.    Plaintiff reserves the right to supplement this list with additional experts

10   and/or to add to the opinions of its experts, and to call as its own expert those disclosed by

11   any other party.

12

13   Dated:  January 11, 2008              COX, WOOTTON, GRIFFIN,
                                           HANSEN & POULOS, LLP
14                                         Attorneys for Plaintiff
                                           DEL MAR SEAFOODS, INC.
15

16

17
                                    By: _____
18                                        Max L. Kelley
19

20

21

22

23

24

25

26   COX, WOOTTON,
     GRIFFIN, HANSEN
     & POULOS LLP
27   190 THE EMBARCADERO
     SAN FRANCISCO, CA
     94105
     TEL 415-438-4600
28   FAX 415-438-4601

     DelMarSeafoods/2504

                                          -2-                    Case No.: CV 07-02952 WHA



**MARINE SURVEYORS**
Crew & Passenger Injuries
Hull Damage & Machinery Claims
Cargo Surveys
NAMS Cert. #105204

**K.D. MOORE ASSOCIATES**

**CASUALTY INVESTIGATORS**
Construction Liability Losses
Machinery & Equipment Failures
Energy Casualties
CA Pvt. Invest. Lic. AQ007623

| | |
|---|---|
| **RESUME OF EXPERIENCE** | **KENNETH D. MOORE** |
| **FORMAL EDUCATION** | B.S. Nautical Science - 1954<br>California Maritime Academy<br>(Seamanship & Navigation)<br><br>Bachelor of Foreign Trade - 1958<br>American Institute for Foreign Trade |
| **EXPERIENCE** | |
| 1968 - Present | Owner and Principal Surveyor<br>K. D. Moore, Associates<br><br>Conducted wood, steel and fiberglass<br>hull Condition & Value and Damage Surveys as<br>well as Marina Facilities Inspections.<br>Cargo Damage Surveys.<br>Coordinate salvage operations.<br><br>Marine casualty investigations,<br>counsel's consultant in litigation,<br>expert witness. |
| 1964 - 1968 | Principal Surveyor, GAB, Inc.<br><br>Conducted wood, steel and fiberglass<br>hull Condition & Value and Damage<br>Surveys as well as Cargo Damage Surveys.<br>Coordinate salvage operations. |
| 1963 - 1964 | Port Captain, American President Lines,<br>San Francisco, CA<br><br>Planned and directly supervised loading<br>and stowage of cargo, including various<br>size and type containers on break-bulk<br>vessels. |
| 1960 - 1963 | Container Operations Coordinator, Matson<br>Navigation Company, San Francisco, CA |
| 1958 - 1960 | Lykes Lines: New Orleans, Los Angeles<br>and Galveston, TX<br><br>Operations Manager, Lykes Caribbean<br>Line, Pallet Container Operations. |

K. D. MOORE ASSOCIATES, INC. • PMB B-1 • 1415 Fulton Road #205 • Santa Rosa, California 95403
Telephone: 707/546-3519 • Fax: 707/546-3718 • E-mail: Kdma@aol.com

**MARINE SURVEYORS**
Crew & Passenger Injuries
Hull Damage & Machinery Claims
Cargo Surveys
NAMS Cert. #105204


*K.D. MOORE ASSOCIATES*

**CASUALTY INVESTIGATORS**
Construction Liability Losses
Machinery & Equipment Failures
Energy Casualties
CA Pvt. Invest. Lic. AQ007623

**Resume/K. D. Moore/Page 2**

**MILITARY**

1950 - 1984      Continuous active U.S. Naval Reserve participation with Military Sealift Command, including several Command assignments.   Retired at rank of Captain.

**AFFILIATIONS**     National Association of Marine Surveyors past Chairman of Pacific Coast Screening and Examining Committee

Maritime Law Association of the United States

International Association of Marine Investigators

Licensed Private Investigator, State of California

Association of Marine Underwriters of San Francisco

**MARINE SURVEYORS**
Crew & Passenger Injuries
Hull Damage & Machinery Claims
Cargo Surveys
NAMS Cert. #105204



*K.D. MOORE ASSOCIATES*

**CASUALTY INVESTIGATORS**
Construction Liability Losses
Machinery & Equipment Failures
Energy Casualties
CA Pvt. Invest. Lic. AQ007623

## SURVEY OF CONDITION AND VALUE
### OUR CASE: 16616-I
**SURVEY HELD AT THE REQUEST OF GREG POULOS, ATTORNEY, ON BEHALF OF INTERESTED PARTIES AT THE HYDE STREET HARBOR, SAN FRANCISCO, CA; ON THE 7TH DAY OF JANUARY, 2008.**

### GENERAL INFORMATION

| | | | | | | |
|---|---|---|---|---|---|---|
| **OWNER** | : | Barry Cohen <br> Point Loma Fishing Company, Inc. | **ADDRESS** | : | 874 W. Grand Ave. <br> Grover Beach, CA 93433 | |
| **VESSEL NAME** | : | "POINT LOMA" | **REG. / DOC. #** <br> **IMO NUMBER** | : <br> : | 515298 <br> 7049354 | |
| **MOORAGE** | : | Hyde Street Harbor, San Francisco, CA | **TONS – GROSS** | : | 126   **NET** : 86 | |
| **TYPE VESSEL** | : | Commercial Fishing Vesel | **INSPECTION ASHORE /AFLOAT** | | : Afloat | |
| **BUILDER** | : | SIRACUSA SHIPYARD, INC. <br> Siracusaville, LA | **YEAR BUILT** | : | 1968 | |
| **INTENDED SERVICE** | : | Bottom Trawling | | | | |
| **EST. PRESENT VALUE** | : | $140,000 | **EST. REPLACEMENT VALUE** | : | $950,000 | |

### HULL

**LENGTH - LOA** : 76'   **REG** : 70.8'   **BEAM** : 21.5'   **DRAFT** : 10'   **DEPTH** : 11.7'

| | | | |
|---|---|---|---|
| **PLANTING** : | 3/8" Welded Steel | **TRANSVERSE/LONGITUDINAL FRAMING** | : 5/16-3/8 x 4" Welded Steel bar; on 2' Centers |
| **DATE LAST HAULED** | : Unknown | **CONVERTED / REBUILT** | : Converted from Shrimper to Trawler; Year unknown |

### PROPULSION MACHINERY

| | | | | | | |
|---|---|---|---|---|---|---|
| **# OF ENGINES** | : | 1 | **MAKE** | : Caterpillar | **SPEED – AVG** | : 7 Knots |
| **HP (TOTAL)** | : | 670 | **MODEL** | : 3412 | **MAX** | : 9 ½ Knots |
| **SERIAL NOS** | : | 60M04036 | **FUEL** | : Diesel | **TEMP. GAUGES** | : Yes |
| **ENGINE HRS** | : | Unknown | | | **TYPE EXHAUST** | : Dry Stack |
| **OVHL DATE** | : | Unknown | | | | |
| **TURBOCHARGED** | : | Yes | | | **KEEL COOLER** | : Yes |
| **BILGE PUMPS** | : | 3 hp Electric | | | | |

## UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
### PAGE 2 of 5 / JANUARY 11, 2008

### ELECTRICAL SYSTEM

| | | | | | | |
|---|---|---|---|---|---|---|
| **GENERATOR MAKE** | : CT 3304 | **HOURS** | : Unknown | **RATING** | : 65 KW |
| **BATTERIES** | : 4 HD | **CHOCKED** | : Yes | **COVERED** | : Yes |
| **WIRING** | : Adequate | **FUSED/BKR** | : Circuit Breakers | **WIRED FOR** | : 220 / 110 v |
| **RUNNING LIGHTS USCG APPROVED** | | | : Yes | | |

### TANKS AND FUEL LINES

| | | | | |
|---|---|---|---|---|
| **NO. OF FUEL TANKS** | : 2 | **SHUT-OFF VALVES ACCESSIBLE** | : | Yes |
| **TOTAL FUEL CAPACITY** | : Est.10,000 gallons | **EQUIPPED WITH VENT LINES** | : | Yes |
| **SHAPE** | : Integral with hull | **LOCATION OF FUEL LINES** | : | Under deck; protected |
| **CONDITION** | : No Leaks Noted | | | |
| **NO. OF WATER TANKS** | : 1 | **VENTS OVERBOARD** | : | Yes |
| **TOTAL WATER CAPACITY** | : 7,000 gallons | | | |

### ALARM SYSTEMS

**Alarm Panel on Bridge with the following Audio/visual Alarms:**

Main Water Level
Main Oil Pressure
Main Water Temperature
Auxiliary Water Level
Auxiliary Oil Pressure
Auxiliary Water Temperature
Hydraulic Tank Level
Engine room Bilge Alarm
Fish Hold Bilge Alarm
Lazarette Bilge Alarm
Fire
Gear Pressure

### GALLEY

| | | | | | |
|---|---|---|---|---|---|
| **TYPE OF STOVE** | : AC Electric | **MAKE** | : Admiral | **SECURED** | : Yes |
| **VENTILATION** | : Adequate | | | **OTHER** | : GE Microwave |
| | | | | | Toaster |
| | | | | | Coffee maker |
| | | | | | Hot plate |
| | | | | | Magic Chef Refrigerator |
| | | | | | Stainless Steel Double Sink |
| | | | | | Orion CCD-TV |

## UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
### PAGE 3 of 5 / JANUARY 11, 2008

### FIRE AND SAFETY

| | | | | |
|---|---|---|---|---|
| **NO. OF EXTINGUISHERS** | : 5 | **TYPE / SIZE** | : | 5lb & 10lb ABC Dry Chemical |
| **DATE LAST INSP.** | : 27 September 2007 | **LOCATION** | : | Throughout vessel; Bridge, Main Passage, Engine room |

| | | | | | | |
|---|---|---|---|---|---|---|
| **LIFE PRESERVERS** | : 4 Adult | **LOCATION** | : Staterooms | | | |
| **OTHER RAFTS** | : 1 "Zodiac" | **TYPE** | : 4 person, inflatable | **LOCATION** | : | Top of Pilot House |

| | | | | | | |
|---|---|---|---|---|---|---|
| **SURVIVAL SUITS** | : 4 | **LOCATION** | : Staterooms | **FIRST AID KIT** | : yes | |
| **EPIRB** | : Yes | **LOCATION** | : Top of Pilot House | **FLARES** | : Yes | |
| **RING BUOYS** | : 2 | **NO. WITH LIGHT** | : 0 | **NO. WITH LINE** | : 2 | |

### DOCK AND GROUND TACKLE

**NO. OF ANCHORS** : 1          **TYPE/SIZE** : Stockless; estimated 300lb

**WINDLASS** : See comments

### VESSEL LAYOUT

**MAIN DECK:**
A. Fore Deck
B. Pilot house
C. Galley
D. Starboard Forward Stateroom
E. Portside Head and Shower
F. Starboard Amidships Stateroom
G. Starboard Aft Stateroom
H. Aft Fish Deck

**LOWER DECK:**
A. Forepeak
B. Forward Storage and Shop
C. Engine Room
D. Fish holds
E. Lazarette

### FISHING EQUIPTMENT

Masts- (2) 8" Diameter Steel Pipes
Boom- (1) 6" Diameter Steel Pipe
(1) Hydraulic Boom Hook Winch
(2) Hydraulic Drag Winches with 5/8" Wire Rope Drag Lines
(2) Steel Drag Doors
(2) Hydraulic Net Reels
(1) Large Drag Net on Aft Reel
(No Net on Forward Reel)

UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
PAGE 4 of 5 / JANUARY 11, 2008

## NAVIGATION / ELECTRONIC EQUIPMENT

**PILOT HOUSE:**

FURUNO Multi-scale Partition LP-1000
FURUNO XBX Radio Beacon Receiver
RDI Bridgewatch timer device
FURUNO GPS Navigator GP 50 mk 2
COMNAV Marine 2001 Auto Pilot
FURUNO GaAs Radar display
Standard horizon hailer
FURUNO SSB Transceiver FS-1503
West Marine VHF 600 DSC Radio
FURUNO Color Video Sounder FCV-1000
FURUNO Color Sonar
Desktop PC
NEWMAR 115-24-15R Radar
(2) Orion CCD for cameras 2& 3 on deck
Barometer / clock/ hydrometer
DIRIGO gimbaled Compass
Auxiliary Autohelm Compass
Gages; oil pressure, oil temperature, Engine RPM, Water temperature, Rudder RPM
COMNAV Rudder Angle Indicator

*Note: Some obsolete Electronic Equipment observed in pilot house; fastened to bulkheads but not in use.*

## SURVEYORS COMMENTS

- In general, the vessel was found to be functional. However, the maintenance condition was very poor. The Captain advised this Surveyor at attendance that if something failed he would fix it to function. But, there was no preventive maintenance authorized. Most significantly he did not know when the vessel was last hauled nor hours of when the engines were last overhauled.

- The interior below deck surface are in exceptionally poor condition with heavy rust.

- The exterior coatings are rusting and do not appear to have been painted for some years.

- The bulwark rails are rusted through.

- The hydraulic hoses on all equipment are leaking and in need of replacement.

- The anchor windlass does not function and the wire rope rode is heavily rusted.

- This surveyor observed no evidence of preventive maintenance for several years.

Enclosure: Photographs (5 pages)

UNDERWRITING SURVEY OF CONDITION AND VALUE / OUR CASE: 16616-I
PAGE 5 of 5 / JANUARY 11, 2008

THIS SURVEY IS IS NOT A CONDITION
OF SALE OR TITLE TRANSFER
-------------------------------------------------

This survey sets forth the apparent condition of the vessel, including hull, machinery, equipment and fittings and gear to the best of the surveyor's ability without borings, removal of bulkheads, panelings, ceilings or other portions of her structure without climbing masts or inspections of spars above that normally visible from the deck and without the operation or opening of her machinery, electronics or auxiliaries for internal examination of their operation for performance study; nor was any evaluation made of the vessel's stability. It represents the surveyor's honest and unbiased opinion, but in submitting this survey, it is understood by all parties concerned that this is survey is not to be considered a guarantee of its accuracy, nor does it create any liability on the part of the surveyor or his employers arising out of the reliance on information in this survey.

DATE: 01/11/08

_____
Ken Moore, Marine Surveyor

/frc
/16616C&V

VESSEL    : F/V "POINT LOMA"                    OUR CASE: 16616-I
The following photographs were taken by Surveyor Ken Moore, while in attendance at Hyde
Street Harbor, San Francisco, CA on 01/07/08.

1.  View of Port Bow;



2.  View Starboard Bow;



VESSEL    : F/V "POINT LOMA"                         OUR CASE: 16616-I

3.  View Fore deck; note advanced corrosion on pipe rail.



4.  View of forward anchor windlass; non-functioning.



VESSEL     : F/V "POINT LOMA"                OUR CASE: 16616-I

PAGE 3 of 5

5.  View of mooring cleat; note advanced corrosion, typical of all fittings and fixtures aboard vessel.



6.  Typical view of hydraulic apparatus, fittings, and manifolds; note advanced corrosion.



VESSEL    : F/V "POINT LOMA"                    OUR CASE: 16616-I

PAGE 4 of 5

7.  View of overhead in engine room; note advanced corrosion through deck plating.



8.  View of Generator; condition typical of all internal machinery.



VESSEL    : F/V "POINT LOMA"                    OUR CASE: 16616-I

PAGE 5 of 5

9.  View Fish Hold;



10. Typical view of overhead in fish hold; note advanced corrosion to all ferrous components.



/frc
/16616phc01.07.08

1

## PROOF OF SERVICE

2   Case:          *Del Mar Seafoods, Inc. v. Barry Cohen, Chris Cohen and F/V Point Loma*

3   Case No.:      U.S. District Court, Northern Dist. Case No.: CV 07-02952 WHA

4          I am employed in the City and County of San Francisco by the law firm of COX,

5   WOOTTON, GRIFFIN, HANSEN & POULOS, LLP, 190 The Embarcadero, San

6   Francisco, California 94105.  I am over the age of 18 years and not a party to the within

7   action.

8          On January 11, 2008, I served the attached document(s):

9          • **PLAINTIFF'S DISCLOSURE OF EXPERT WITNESS**

10  on the parties, through their attorneys of record, by placing copies thereof in sealed

11  envelopes (except facsimile transmission(s)), addressed as shown below, for service as

12  designated below:

13  **(A)**    By First Class Mail:  I caused each such envelope, with first-class postage thereon

14  fully prepaid, to be deposited in a recognized place of deposit of the U.S. mail in San

15  Francisco, California, for collection and mailing to the addressee on the date indicated.

16  **(B)**    By Personal Service:  I caused each such envelope to be personally delivered to the

17  addressee(s) by a member of the staff of this law firm on the date indicated.

18  **(C)**    By Messenger Service:  I caused each such envelope to be delivered to a courier

19  employed by FIRST LEGAL SUPPORT SERVICES or by WORLDWIDE ATTORNEY

20  SERVICES, with both of whom we have a direct billing account, who personally delivered

21  each such envelope to the addressee(s) on the date indicated.

22  **(D)**    By Federal Express:     I caused each such envelope to be delivered to Federal

23  Express Corporation at San Francisco, California, with whom we have a direct billing

24  account, to be delivered to the addressee(s) on the next business day.  I deposited each such

25  envelope/package at the Three Embarcadero Center location of Federal Express

26  Corporation.

27  **(E)**    By Facsimile:  I caused such document to be served via facsimile electronic

28  equipment transmission (fax) on the party(ies) in this action by transmitting a true copy to

the following fax numbers:

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DmrL Point Loma/2504

| SERVICE | ADDRESSEE | PARTY REPRESENTED |
|---------|-----------|-------------------|
| C | James P. Walsh<br>Gwen Fanger<br>DAVIS WRIGHT TREMAINE LLP<br>505 Montgomery Street<br>Suite 800<br>San Francisco, CA 94111<br>Tel: 415-276-6500<br>Fax: 415-276-6599<br>Budwalsh@dwt.com | Counsel for Defendants and Claimant<br>BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and Claimant<br>F/V POINT LOMA Fishing Company, Inc. |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on January 11, 2008 at San Francisco, California.

_____
Zoe Conner

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

Decl.Point Loma/2504

Exhibit 18



Wells Fargo Insurance Services of Oregon, Inc.

# Fax Transmittal Sheet

1231-A SE Bay Boulevard
P.O. Box 1610
Newport, OR 97365
541.265.4500 / 800.451.9850
541.265.4262 Fax

| To: | GWEN FANGER | From: | VICKI MASSIE |
|---|---|---|---|
| Date: | 1/9/08 | Time: | 11:20 AM |
| Location: | DAVIS, WRIGHT & TREMAIN | RE: | BARRY COHEN |
| Fax Number: | 415.276.6599 | Number of Pages: | 13 (Including Cover Page) |

**Comments:** F/V "POINT LOMA"

DEAR GWEN:

FURTHER OUR CONVERSATION, TO FOLLOW, PLEASE FIND DECLARATION/POLICY
COVER PAGES FROM DECEMBER 2003 TO CURRENT POLICY RENEWAL.

REGARDS,

*Vicki Massie*

VICKI MASSIE

**Confidentiality Notice:** The information contained in this facsimile message, and in any accompanying documents, constitutes confidential information belonging to Wells Fargo Insurance Services and is intended only for the use of the individual or entity named above. If you are not the intended recipient of this communication, you are hereby notified that any dissemination, disclosure, copying, or the taking of any action in reliance on this communication, is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the address above via the U.S. Postal Service.

If you do not receive the entire fax, please contact the sender immediately.

COHEN
751

## Acordia of Oregon, Inc.

P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO.  YA-03253

# POLICY OF INSURANCE

### (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names.  All subject to the terms and conditions of the forms and endorsements attached herein:

| | |
|---|---|
| Assured: | BARRY COHEN<br>C/O OLD POINT FISHERIES<br>P.O. BOX 40, AVILA BEACH, CA. 93424 |
| For account of: | HIMSELF |
| Loss, if any, payable to: | ASSUREDS OR ORDER |
| Total amount insured: (100%) | $250,000.00 H&M/$1,000,000.00 P&I |
| Interest: | HULL & MACHINERY/PROTECTION & INDEMNITY |
| Vessel(s): | F/V "POINT LOMA" |
| At and From: | NOVEMBER 23, 2003,  Noon, Pacific Standard Time to<br>NOVEMBER 23, 2004  Noon, Pacific Standard Time. |

Conditions: (as per form and endorsement attached)
**TRADING/LAY UP WARRANTY, INSTITUTE SERVICE OF SUIT; BROKERS AND/OR AGENTS CANCELLATION CLAUSE/LIEN CLAUSE; FISHING VESSEL CLAUSES; P&I FISHING VESSEL CLAUSES; INSTITUTE EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION END., TRIA END; INSTITUTE CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMGNETIC WEAPONS & CYBER ATTACH EXCLUSION CLAUSE;  AMERICAN INSTITUTE HULL CLAUSES; POLLUTION EXCLUSION; SP-38 P&I CLAUSES; PREMIUM FINANCE END; TRIA EXCLUSION;**

| | | | |
|---|---|---|---|
| Amount Insured Hereunder: | $250,000.00 H&M<br>$1,000,000.00 P&I | RATE:  3.45%<br>AGREED | |
| PREMIUM | $ 8,625.00 H&M<br>$14,700.00 P&I | DEDUCTIBLE $10,000<br>$5,000 | |

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein.  It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured. In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at **Newport, Oregon** this 23RD  day of NOVEMBER, 2003.

COHEN
752

POLICY          YA-03253

INSURED         BARRY COHEN

VESSEL          "POINT LOMA"

ENDORSEMENT     12

EFFECTIVE       DECEMBER 23, 2003

IN CONSIDERATION OF PREMIUMS CHARGED, IT IS HEREBY UNDERSTOOD
AND AGREED THAT THE EFFECTIVE DATES ON THE "DEC PAGE",
ENDORSEMENT 10 AND LINES 21 AND 22 CF THE AMERICAN INSTITUTE
HULL CLAUSES ARE CORRECTED TO READ FROM:  "DECEMBER 23, 2003,
NOON, PACIFIC STANDARD TIME TO DECEMBER 23, 2004, NOON, PACIFIC
STANDARD TIME".

BY: _____         #PP1893/03
    SUNDERLAND MARINE THRU A.E.S.


BY: _____         #03-0269A
    SUNDERLAND MARINE THRU H.M.U.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
SK 1/20/04

Acordia of Oregon, Inc.



1231-A SE Bay Boulevard
P.O. Box 1610
Newport, OR 97365
(541) 265-4500 • Fax: (541) 265-4262
Toll Free Call (800) 451-9850

COHEN
753

# CERTIFICATE OF INSURANCE
## American E & S Insurance Brokers
### Seattle

RENEWAL OF:
NEW

OP03 2117

**THIS IS TO CERTIFY THAT** American E & S Insurance Brokers in accordance with authorization granted them have procured insurance as hereinafter from: **Underwriters at Lloyd's, London - 100%**

| | |
|---|---|
| PREMIUM: | $589.00 |
| POLICY FEE: | $125.00 |
| TOTAL: | $714.00 |

**ASSURED:** Barry Cohen
C/o Old Point Fisheries

**ADDRESS:** P O Box 40 ,
Avila Beach, CA 93424

**POLICY PERIOD:** From: December 23, 2003    To: December 23, 2004
Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED: AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that American E &S Insurance Brokers is not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to American E &S Insurance Brokers. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by American E &S Insurance Brokers in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of American E &S Insurance Brokers endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by American E &S Insurance Brokers

Dated at Seattle, WA this  23rd  day of  December 2003

By

*American E & S Insurance Brokers*

AES-CERT 5/02

COHEN
754

# ACORDIA OF OREGON, INC.

P.O. Box 1610 * Newport, Oregon 97365  1-800-451-9850 * Fax: (541) 265-4262
1231-A S.E. Bay Boulevard, Newport, Oregon, 97365

**POLICY NO: YA-04242**

# POLICY OF INSURANCE
## (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

Assured:

~~BARRY COHEN~~ *F/V Point Loma Fishing Co. Inc*
*end #15*
C/O OLD POINT FISHERIES
P.O. BOX 40
AVILA BEACH, CA. 93242

For account of:                  HIMSELF

Loss, if any, payable to:        ASSURED OR ORDER

Total amount insured: (100%)     $250,000 H&M/$1,000,000 P&I

Interest:                        HULL & MACHINERY / PROTECTION & INDEMNITY

Vessel(s):                       F/V "POINT LOMA"

At and From:                     DECEMBER 23, 2004, NOON, LOCAL TIME to
                                 DECEMBER 23, 2005 NOON, LOCAL TIME

Conditions: (as per form and endorsement attached) SP-38 P&I CLAUSES;P&I FISHING VESSEL CLAUSES;TRIA EXCLUSION;CL 370;CL380;ASBESTOS EXCLUSION;POLLUTION EXCLUSION;EXCESS COLL. END;SERVICE OF SUIT CLAUSE;FISHING VESSEL CLAUSES;AMERICAN INSTITUTE HULL CLAUSES; CANCELLATION/LIEN CLAUSES;PREMIUM FINANCE END;TRADING WARRANTY/LAY UP WARRANTY; UNITED STATES ECONOMIC AND TRADE SANCTIONS CLAUSE;

Amount Insured Hereunder:    $250,000.00 H&M
                             $1,000,000.00 P&I            RATE:  3.45%
                                                                  AGREED

        Premium:             $8,625.00H&M
                             $14,700.00 P&I            Deductible: $10,000.00
                                                                   $5,000.00

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at *Newport, Oregon* this 23RD day *of DECEMBER 2004.*

t:/template:AIHC

# CERTIFICATE OF INSURANCE

**RENEWAL OF:**
OP03 2117

*American E & S Insurance Brokers*
Seattle

**CERTIFICATE NO.**
**OP04 3127**

**THIS IS TO CERTIFY THAT American E & S Insurance Brokers in accordance with authorization granted them have procured insurance as hereinafter from:**    **Underwriters at Lloyd's, London  -  100%**

**ASSURED:**   Barry Cohen

C/o Old Point Fisheries

**ADDRESS:**   P O Box 40 ,

Avila Beach, CA 93424

| | |
|---|---|
| **PREMIUM:** | $648.00 |
| **POLICY FEE:** | $125.00 |
| **TOTAL:** | $773.00 |

**POLICY PERIOD:**      From:  December 23, 2004         To:  December 23, 2005

Both days at  12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED:   AS PER ATTACHED FORMS**

1.
It is expressly understood and agreed by the Assured by accepting this instrument that American E &S Insurance Brokers is not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2.
If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to American E &S Insurance Brokers. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by American E &S Insurance Brokers in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of American E &S Insurance Brokers endorsed hereon.

4.
This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which
5. are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by American E &S Insurance Brokers

Dated at Seattle, WA this  December 8, 2004

AES-CERT 5/02

By _____

*American E & S Insurance Brokers*

COHEN
756



# Acordia of Oregon, Inc.

P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO.  YA-05252

# POLICY OF INSURANCE

(Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

Assured:

> **F/V POINT LOMA FISHING CO., INC.**
> **C/O OLD POINT FISHERIES**
> **P.O. BOX 40**
> **AVILA BEACH, CA. 93242**

For account of:              **THEMSELVES**

Loss, if any, payable to:     ASSURED OR ORDER

Total amount insured: (100%)     $250,000 H&M/$1,000,000 P&I

Interest:          HULL & MACHINERY AND PROTECTION & INDEMNITY

Vessel(s):          **"POINT LOMA"**

At and From:      **DECEMBER 23, 2005   Noon, Local Time to**
                  **DECEMBER 23, 2006, Noon, Local Time**

Conditions: (as per form and endorsement attached)TRADING & LAY UP WARRANTY;FISHING VESSEL CLAUSES; BROKERS &/OR AGENTS CANCELLATION CLAUSE;SERVICE OF SUIT CLAUSE; LIEN CLAUSE;CL.380;CL.370;ASBESTOS EXCLUSION; TRIA EXCLUSION;POLLUTION EXCLUSION CLAUSE;AMERICAN INSTITUTE HULL CLAUSES;P&I FISHING VESSEL CLAUSES;SP-38 P&I CLAUSES; EXCESS COLLISION END;PREMIUM FINANCE END;U.S. ECONOMIC & TRADE SANCTIONS CLAUSE.

Amount Insured Hereunder:     $250,000.00 H&M          RATE:  3.45 %
                              $1,000,000.00 P&I       AGREED

PREMIUM                       $8,625.00 H&M     DEDUCTIBLE:  $10,000
                              $14,700.00 P&I                 $5,000

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at **Newport, Oregon** this 23RD day of DECEMBER, **2005.**

04 3127          *Seattle*          **OP05 4146**

HIS IS TO CERTIFY THAT **Salvus Bain Management (USA) LLC** in accordance with authorization granted
em have procured insurance as hereinafter from:     **Underwriters at Lloyd's, London - 100%**

| | |
|---|---|
| PREMIUM: | $648.00 |
| POLICY FEE: | $125.00 |
| **TOTAL:** | **$773.00** |

SURED:   F/v Point Loma Fishing Company, Inc.

DDRESS:

    P O Box 40 ,
    Avila Beach, Ca 93424

LICY PERIOD:    From:   December 23, 2005     To:   December 23, 2006
           Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

TEREST COVERED:   **AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that Salvus Bain Management (USA) LLC in not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to Salvus Bain Management (USA) LLC. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by Salvus Bain Management (USA) LLC in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of Salvus Bain Management (USA) LLC endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

his Certificate shall not be valid unless signed by Salvus Bain Managment (USA) LLC

ated at Seattle, WA this   December 8, 2005

ES-CERT 5/02          By   _[signature]_

                          Salvus Bain Management (USA) LLC

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                    4617
CONNECTION TEL                          14152766599
CONNECTION ID
ST. TIME                   08/21 08:40
USAGE T                    02'04
PGS. SENT                  3
RESULT                     OK
```



**Wells Fargo Insurance Services of Oregon, Inc.**

# Fax Transmittal Sheet

1231-A SE Bay Boulevard
P.O. Box 1610
Newport, OR 97365
541.265.4500 / 800.451.9850
541.265.4262 Fax

| To: | BUD WALSH | From: | SUE KEESEE |
|---|---|---|---|
| Date: | August 21, 2007 | Time: | 8:31 AM |
| Location: | | RE: | F/V POINT LOMA FISHING CO. INC F/V "POINT LOMA" |
| Fax Number: | 415 276 6599 | Number of Pages: | 3 (Including Cover Page) |

**Comments:**  DEAR MR. WALSH:

TO FOLLOW ARE COPIES OF THE DEC SHEETS FOR THE INSURANCE ON THE F/V "POINT LOMA".  THE ACCOUNT IS PAID IN FULL.

PLEASE LET ME KNOW IF YOU NEED ANYTHING MORE.

SINCERELY,

*Sue Keesee*

SUE KEESEE

# Acordia of Oregon, Inc.

P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO.  YA-06260

# POLICY OF INSURANCE
### (Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

**Assured:**            F/V POINT LOMA FISHING CO., INC.
                        C/O OLD POINT FISHERIES
                        P.O. BOX 40
                        AVILA BEACH, CA. 93242

For account of:         **THEMSELVES**

Loss, if any, payable to:   ASSURED OR ORDER

Total amount insured: (100%)    $250,000 H&M/$1,000,000 P&I

Interest:               HULL & MACHINERY AND PROTECTION & INDEMNITY

Vessel(s):              "POINT LOMA"

At and From:            DECEMBER 23, 2006   Noon, Local Time to
                        DECEMBER 23, 2007, Noon, Local Time

Conditions: (as per form and endorsement attached)TRADING & LAY UP WARRANTY;FISHING VESSEL CLAUSES; BROKERS &/OR AGENTS CANCELLATION CLAUSE;SERVICE OF SUIT CLAUSE; LIEN CLAUSE;CL 380;CL 370;ASBESTOS EXCLUSION; TRIA EXCLUSION;POLLUTION EXCLUSION CLAUSE;AMERICAN INSTITUTE HULL CLAUSES;P&I FISHING VESSEL CLAUSES;SP-38 P&I CLAUSES;U.S. ECONOMIC & TRADE SANCTIONS CLAUSE;EXCESS COLLISION END;PREMIUM FINANCE END.

Amount Insured Hereunder:       $250,000.00 H&M        **RATE:**  3.45%
                                $1,000,000.00  P&I                AGREED

PREMIUM                         $8,625.00 H&M        **DEDUCTIBLE:** $10,000 H&M
                                $15,900.00  P&I                    $5,000 P&I

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at **Newport, Oregon** this 23RD day of DECEMBER, 2006.

COHEN
760

# CERTIFICATE OF INSURANCE

RENEWAL OF:
OP05 4146

**Salvus Bain Management (USA) LLC**

*Seattle*

CERTIFICATE NO.

## OP06 5158

**THIS IS TO CERTIFY THAT Salvus Bain Management (USA) LLC** in accordance with authorization granted them have procured insurance as hereinafter from:    **Underwriters at Lloyd's, London – 100%**

**ASSURED:**    F/V Point Loma Fishing Company, Inc.

c/o Old Point Fisheries

**ADDRESS:**    P O Box 40 ,

Avila Beach, CA 93424

| | |
|---|---|
| **PREMIUM:** | $646.00 |
| **POLICY FEE:** | $125.00 |
| **TOTAL:** | $771.00 |

**POLICY PERIOD:**    From:   December 23, 2006    To:   December 23, 2007

Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED: AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that Salvus Bain Management (USA) LLC in not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to Salvus Bain Management (USA) LLC. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by Salvus Bain Management (USA) LLC in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of Salvus Bain Management (USA) LLC endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by Salvus Bain Managment (USA) LLC

Dated at Seattle, WA this   December 13, 2006

AES-CERT 5/02

By _____

Salvus Bain Management (USA) LLC



*Wells Fargo Insurance Services of Oregon, Inc.*
P.O. Box 1610 * Newport, Oregon 97365 * 1-800-451-9850 * Fax (541) 265-4262
1213-A S.E. Bay Boulevard, Newport, Oregon 97365

POLICY NO. YA-07264

# POLICY OF INSURANCE
(Combined Companies Form)

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure the assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein:

**Assured:**

F/V POINT LOMA FISHING CO., INC.
C/O OLD POINT FISHERIES
P.O. BOX 40
AVILA BEACH, CA. 93242

For account of:     **THEMSELVES**

Loss, if any, payable to:    ASSURED OR ORDER

Total amount insured: (100%)    $250,000 H&M/$1,000,000 P&I

Interest:    HULL & MACHINERY AND PROTECTION & INDEMNITY

Vessel(s):    "POINT LOMA"

At and From:    DECEMBER 23, 2007   Noon, Local Time to
DECEMBER 23, 2008, Noon, Local Time

Conditions: (as per form and endorsement attached)TRADING & LAY UP WARRANTY;FISHING VESSEL CLAUSES; BROKERS &/OR AGENTS CANCELLATION CLAUSE;SERVICE OF SUIT CLAUSE; LIEN CLAUSE;CL 380;CL 370;ASBESTOS EXCLUSION; TRIA EXCLUSION;POLLUTION EXCLUSION CLAUSE;AMERICAN INSTITUTE HULL CLAUSES;P&I FISHING VESSEL CLAUSES;SP-38 P&I CLAUSES;U.S. ECONOMIC & TRADE SANCTIONS CLAUSE;EXCESS COLLISION END;PREMIUM FINANCE END.

Amount Insured Hereunder:    $250,000.00 H&M
$1,000,000.00 P&I     RATE:   3.45%
         AGREED

PREMIUM    $8,625.00 H&M
$15,900.00   P&I    DEDUCTIBLE: $10,000 H&M
            $5,000 P&I

Any provisions required by law to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.

In witness whereof, the companies hereinafter named have caused this policy to be issued and signed by a duly authorized officer, attorney, or agent at **Newport, Oregon** this 23RD day of DECEMBER, 2007.

COHEN
762

## CERTIFICATE OF INSURANCE

**Salvus Bain Management (USA) LLC**

*Seattle*

**RENEWAL OF:**
OP06 5158

**OP07 6159**

THIS IS TO CERTIFY THAT **Salvus Bain Management (USA) LLC** in accordance with authorization granted them have procured insurance as hereinafter from: **Underwriters at Lloyd's, London – 100%**

**ASSURED:**   F/V Point Loma Fishing Company, Inc.

c/o Old Point Fisheries

**ADDRESS:**   Po Box 40

Avila Beach, CA 93242

| | |
|---|---|
| **PREMIUM:** | $775.00 |
| **POLICY FEE:** | $125.00 |
| **TOTAL:** | $900.00 |

**POLICY PERIOD:**    From: December 23, 2007    To: December 23, 2008

Both days at 12:00 NOON P.S.T. (Pacific Standard Time)

**INTEREST COVERED: AS PER ATTACHED FORMS**

1. It is expressly understood and agreed by the Assured by accepting this instrument that Salvus Bain Management (USA) LLC in not one of the Insurers hereunder and neither is nor shall be in any way or to any extent liable for any loss or claim whatever, as an Insurer, but the Insurers hereunder are only those whose names are on file as hereinbefore set forth.

2. If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Certificate shall become void and all claims hereunder shall be forfeited.

3. Unless otherwise provided herein, this Certificate may be cancelled on the customary short rate basis by the Assured at any time by written notice or by surrender of this Certificate to Salvus Bain Management (USA) LLC. This Certificate may also be cancelled, with or without the return or tender of the unearned premium, by Insurers, or by Salvus Bain Management (USA) LLC in their behalf by delivering to the Assured or by sending to the Assured by mail, registered or unregistered, at the Assured's address as shown herein, not less than 10 days' written notice stating when the cancellation shall be effective, and in such case Insurers shall refund the paid premium less the earned portion thereof on demand, subject always to the retention by Insurers hereon of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by Insurers or Assured.

4. This Certificate of Insurance shall not be assigned either in whole or in part, without the written consent of Salvus Bain Management (USA) LLC endorsed hereon.

5. This insurance is made and accepted subject to all the provisions, conditions and warranties set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the Certificate provisions stated above shall supercede such Certificate provisions insofar as they are inconsistent therewith.

6. This document is intended for use as evidence that insurance described herein has been effected against which Insurers' policy(ies) may be issued, and conditions of such policy(ies) when received by the Assured shall supercede conditions of this Certificate. Immediate advice must be given of any discrepancies or necessary changes.

This Certificate shall not be valid unless signed by Salvus Bain Managment (USA) LLC

Dated at Seattle, WA this   December 10, 2007

By _____

Salvus Bain Management (USA) LLC

AES-CERT 5/02

# Exhibit 19

Joe,

Please credit my account. With this payment, if your analysis was correct, the new balance should be $139,749.79.

I will try to send you at least $2,000/month, sometimes $3,000.

I'm sick right now and if I try to talk I start coughing, so instead, you get this note.

I'm still unemployed, but this gives me a chance to help Michael make Olde Port better.

I hope things are going good for you and your family. Please give Yvonne my regards. Too bad our families never got the chance to become better friends. Oh, well, things usually happen for a reason. Well, take care of yourself.

Barry



EXHIBIT 7
Cohen
1-9-08

DMSI 0078

Exhibit 20

James P. Walsh, CSB. No. 184620
Gwen Fanger, CSB No. 191161
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
budwalsh@dwt.com

Attorneys for Defendants and Claimant
BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
Claimant, F/V POINT LOMA Fishing Company, Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC., | ) |
| Plaintiff, | ) No. C-07-2952-WHA |
| v. | ) **ANSWER TO VERIFIED** |
| | ) **ADMIRALTY AND MARITIME** |
| BARRY COHEN, CHRIS COHEN (aka | ) **COMPLAINT (In Personam and In** |
| CHRISTENE COHEN), *in personam* and, | ) **Rem); VERIFIED COUNTERCLAIM** |
| F/V POINT LOMA, Official Number | ) |
| 515298, a 1968 steel-hulled, 126-gross ton, | ) |
| 70.8 foot long fishing vessel, her engines, | ) |
| tackle, furniture apparel, etc., *in rem,* and | ) |
| Does 1-10, | ) |
| Defendants. | ) |

BARRY COHEN and CHRIS COHEN (aka CHRISTENE COHEN), sued *in personam*, the F/V

POINT LOMA, sued *in rem*, and the F/V POINT LOMA FISHING COMPANY, INC., as Claimant

(hereinafter "Defendants"), hereby Answer the Verified Admiralty and Maritime Complaint of DEL

MAR SEAFOODS, INC. (hereinafter "Plaintiff") and allege their Verified Counterclaim, as follows:

**ANSWER TO COMPLAINT**

1.    Paragraph 1 of the Complaint describes the action and contains legal conclusions to

which no response is required.

2.    Paragraph 2 of the Complaint contains legal conclusions to which no response is

1   required.

2       3.      Defendants aver that CHRIS COHEN resides in Scotsdale, Arizona.  Defendants admit

3   the remaining allegations in Paragraph 3 of the Complaint.

4       4.      Defendants lack sufficient information to form a belief as to the allegations in Paragraph

5   4 of the Complaint, and therefore deny them.

6       5.      Defendants admit the allegations in Paragraph 5 of the Complaint.

7       6.      Defendants deny the allegations in Paragraph 6 of the Complaint.

8       7.      Defendants admit that, at the time the Promissory Note and Ship Mortgage were signed

9   in 2003, Defendants BARRY COHEN and CHRIS COHEN were the owners of the F/V POINT

10  LOMA.  The ownership of the F/V POINT LOMA has since been transferred to the F/V POINT

11  LOMA FISHING COMPANY, INC., subject to the Ship Mortgage.  Defendants deny all other

12  allegations in Paragraph 7 of the Complaint.

13      8.      No response to Paragraph 8 of the Complaint is required.

14      9.      Defendants admit the allegations in Paragraph 9 of the Complaint.

15      10.     Defendants aver that the terms of the Promissory Note speak for themselves.  Defendants

16  deny all other allegations in Paragraph 10 of the Complaint.

17      11.     Defendants admit the allegations in Paragraph 11 of the Complaint.

18      12.     Defendants aver that the terms of the Promissory Note speak for themselves.  Defendants

19  deny all other allegations in Paragraph 12 of the Complaint.

20      13.     Defendants aver that the terms of the Promissory Note speak for themselves.  Defendants

21  deny all other allegations in Paragraph 13 of the Complaint.

22      14.     Defendants aver that the terms of the Promissory Note speak for themselves.  Defendants

23  deny all other allegations in Paragraph 14 of the Complaint.

24      15.     Defendants deny the allegations in Paragraph 15 of the Complaint.  Defendants aver that

25  they have paid $188,000 on the note, including an advance payment of $175,000 made at the request of

26  Plaintiff on November 10, 2005.

27      16.     Defendants deny the allegations in Paragraph 16 of the Complaint.  Defendants aver that

28  there is no default on the terms of the Promissory Note because of the advance payment of $175,000 in

Case No. C-07-2952-WHA  ANSWER/COUNTERCLAIMS        2

SFO 363973v1 0084289-000001

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

1 │ 2005 and additional payments of $13,000, which covers the required $3,000 monthly payments under

2 │ the Promissory Note through at least February 2009.

3 │       17.    Defendants admit the allegations in Paragraph 17 of the Complaint.

4 │       18.    No response to Paragraph 18 of the Complaint is required.

5 │       19.    Defendants admit the allegations in Paragraph 19 of the Complaint.

6 │       20.    Defendants deny the allegations in Paragraph 20 of the Complaint.

7 │       21.    Defendants deny the allegations in Paragraph 21 of the Complaint.

8 │       22.    Defendants deny the allegations in  Paragraph 22 of the Complaint.

9 │       23.    Defendants admit that Plaintiff has a maritime lien on the F/V POINT LOMA but deny

10 │ that Plaintiff has any right to foreclose that lien because Defendants are not in default under the

11 │ Promissory Note due to the advance payment of $188,000.  Defendants deny that any fishing permit or

12 │ fishing history is subject to such lien because fishing permits and fishing history are intangibles and

13 │ must be specifically listed in the Promissory Note and Ship Mortgage in order to be subject to a

14 │ maritime lien.  Defendants deny all other allegations in Paragraph 23 of the Complaint.

15 │       24.    Defendants deny that Plaintiff is entitled to attorneys fees and costs because Defendants

16 │ are not in default under the Promissory Note.  Defendants aver that Plaintiff owes Defendants attorneys

17 │ fees and costs under the Promissory Note for seizing the F/V POINT LOMA without legal cause.

18 │       25.    No response to Paragraph 25 of the Complaint is required.

19 │       26.    Defendants admit that Plaintiff has a maritime lien on the F/V POINT LOMA but deny

20 │ that Plaintiff has any right to foreclose that lien because Defendants are not in default under the

21 │ Promissory Note due to the advance payment of $188,000.  Defendants deny that any fishing permit or

22 │ fishing history is subject to such lien because fishing permits and fishing history are intangibles and

23 │ must be specifically listed in the Promissory Note and Ship Mortgage in order to be subject to a

24 │ maritime lien. Defendants deny all other allegations in Paragraph 26 of the Complaint.

25 │       27.    Defendants deny the allegations in Paragraph 27 of the Complaint.

26 │       28.    The remainder of the Complaint contains a prayer for relief.  Defendants deny that

27 │ Plaintiff is entitled to any relief.

28 │       29.    Defendants deny each and every allegation in the Complaint, whether express or implied,

Case No. C-07-2952-WHA  ANSWER/COUNTERCLAIMS    3

SPO 363973v1 0084289-000001

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

1  that Defendants have not previously or expressly admitted in this Answer.

2  ## AFFIRMATIVE DEFENSES

3  30.    Plaintiff has failed to state a claim for which relief may be granted.

4  31.    The Court lacks subject matter jurisdiction over Plaintiff's claim.

5  32.    Plaintiff lacks standing to bring its claim.

6  33.    Plaintiff's claims are barred by estoppel.

7  34.    Plaintiff's claims are barred by accord and satisfaction.

8  35.    Plaintiff has consented to the acts of Defendants complained of in the Complaint.

9  36.    Plaintiff does not come into Court with clean hands.

10  37.    Plaintiff has failed to obtain affirmative consent to make any alleged advances under the
11  Promissory Note for debts completely unrelated to the operation and use of the F/V POINT LOMA.

12  38.    Plaintiff has failed to document in writing any alleged advances under the Promissory
13  Note.

14  ## COUNTERCLAIM

15  For their Counterclaim against Plaintiff, Defendants allege as follows:

16  39.    The arrest of the F/V POINT LOMA by Plaintiff was wrongful in that (a) Plaintiff has
17  refused, without cause, to admit that Defendants have paid $188,000 on the Promissory Note, including
18  an advance payment of $175,000; (b) Defendants were therefore not in default under the Promissory
19  Note; (c) Plaintiff improperly alleges that the total amount of the loan was greater than $215,000
20  because of advances under the Promissory Note that Defendants never agreed were subject to the
21  Promissory Note and Ship Mortgage; and (d) none of these relevant, material facts were disclosed to
22  the Court when Plaintiff sought the arrest warrant in this case.

23  40.    Because Defendants paid in November 2005 an amount equivalent to 37 monthly
24  payments in advance, Defendants are not in default and the arrest of the vessel is in breach of the
25  Promissory Note and the Ship Mortgage.

26  41.    The wrongful arrest of the F/V POINT LOMA has disrupted the fishing activities of the
27  Vessel and prevents it from earning income for the benefit of Defendants, including as a source of
28  income to pay off the remaining amount due to Plaintiff under the Promissory Note. Plaintiff has

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

1    therefore intentionally and/or negligently interfered with Defendants prospective economic advantage.

2        42.    In taking the action it did, Plaintiff has breached the implied Covenant of Good Faith and

3    Fair Dealing incorporated into the Promissory Note and Ship Mortgage.

### REQUEST FOR RELIEF

5    WHEREFORE, Defendants respectfully request that the Court:

6        a.    Enter an order quashing the arrest of the F/V POINT LOMA as wrongful and not

7    authorized under the terms of the Promissory Note and Ship Mortgage;

8        b.    Enter an order finding Plaintiff in breach of the Promissory Note and the Ship

9    Mortgage;

10        c.    Enter an order finding that Plaintiff has intentionally and/or negligently interfered

11    with the prospective economic advantage of Defendants;

12        d.    Enter an order awarding Defendants damages for wrongful or improper arrest, for

13    breach of the Promissory Note and Ship Mortgage, and for intentional and/or negligent interference

14    with Defendants' prospective economic advantage;

15        e.    Enter an order awarding Defendants their attorney's fees and costs; and

16        f.    Grant Defendants such further relief as may be appropriate and fair.

17    DATED this 25th day of June, 2007.

18

19                        Respectfully submitted,

20        _/s/ James P. Walsh_
                        James P. Walsh (CSB No. 184620)
21                        Gwen Fanger (CSB No. 191161)
                        DAVIS WRIGHT TREMAINE LLP
22                        505 Montgomery Street, Suite 800
                        San Francisco, CA 94111-3834
23                        Telephone:  (415) 276-6556
                        Facsimile:    (415) 276-6599
24
                        Attorneys for Defendants
25

26

27

28

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

## VERIFICATION

I, Barry Cohen, hereby state the follows:

1.    I am a resident of the State of California and a defendant in this case and an officer in F/V POINT LOMA Fishing Company, Inc., a company organized under the laws of the State of California.

2.    I have read the above Answer to Admiralty and Maritime Complaint and Verified Counterclaim and hereby verify the facts set forth therein to the best of my knowledge and belief.

3.    I am authorized on behalf of all Defendants to verify the Counterclaim to Plaintiff's Complaint.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this verification was entered into at Avila Beach, California.

Dated this 25 day of June, 2007.

BY:  _Barry A. Cohen_
Barry Cohen

Case No. C-07-2952-WHA  ANSWER/COUNTERCLAIMS       6
SFO 363973v1  DOR4289-000001

Davis Wright Tremaine LLP
LAW OFFICES
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
(415) 276-6500 · Fax: (415) 276-6599

Exhibit 21

Deposition of CHRISTENE COHEN January 11, 2008

DEL MAR SEAFOODS v COHEN

Page 1 to Page 67

FOR:
GWEN L. FANGER, ESQUIRE

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

# NICHOLS CERTIFIED COURT REPORTERS
2607 N. Hayden Road, Scottsdale, AZ 85257
110 West "C" Street, Suite 1300, San Diego, CA 92101

Phone:   1-800-227-0577
FAX:    1-480-990-7955

**DISK
ENCLOSED**

## Page 5

1    Scottsdale, Arizona
2    Friday, January 11, 2008
3    10:00 a.m.
4
5    CHRISTENE COHEN,
6  a witness herein, after having been first duly sworn,
7  testified as follows:
8    * * *
9
10    EXAMINATION
11 BY MR. POULOS:
12    Q.   Good morning, Ms. Cohen. Could you state your
13 full name for the record.
14    **A.   Christene, spelled e-n-e. Christene Layne,**
15 **L-a-y-n-e, Cohen, C-o-h-e-n.**
16    Q.   Ms. Cohen, have you ever had your deposition
17 taken before?
18    **A.   No.**
19    Q.   You're currently separated from your husband,
20 Barry Cohen; is that right?
21    **A.   Yes.**
22    Q.   And how long have you been separated?
23    **A.   Since December 28th of '07.**
24    Q.   When did you file for divorce?
25    **A.   The exact date, I'm not -- I don't know.**

## Page 6

1    Q.   What's your best estimate?
2    **A.   Maybe that same day.**
3    Q.   Let me tell you some of the ground rules for a
4  deposition so you kind of understand what we're doing here;
5  okay? The main thing that you need to know is that the oath
6  that you've taken is the same oath that you take if you're
7  testifying in court.
8    **A.   Correct.**
9    Q.   So the same obligation, tell the truth, the whole
10 truth, nothing but the truth. The whole thing you've heard
11 on television before, it's the same, even though we're
12 sitting in a court reporter's office; okay?
13    **A.   Uh-huh.**
14    Q.   Is that yes?
15    **A.   Yes.**
16    Q.   Rule No. 2, we need verbal, audible responses.
17 Uh-huh or nods of the head, the problem is, they require the
18 court reporter to actually interpret whether you're shaking
19 your head up or down or sideways or what uh-huh means,
20 whether it's yes or no, so it's important for you to give us
21 verbal, audible responses; okay?
22    **A.   Okay.**
23    Q.   Everything that you say is going to be taken down
24 by the court reporter, and at the end of the deposition,
25 some time in the next few weeks, you'll be given a

## Page 7

1  transcript of the deposition and you'll have a chance to
2  read it and make any changes to the deposition if they're
3  necessary to correct your answers; okay?
4    **A.   Okay.**
5    Q.   Easy process. She'll either give you an errata
6  sheet to write it down, or you can write it down, cross
7  something out, write in the correct answer above it, initial
8  it.
9    I want to caution you, you're always welcome to
10 change your answers. You can't change my questions, but if
11 you do change your answers in a significant way, I or your
12 own counsel in this case could comment on those, and it
13 might affect how the judge views your testimony at trial.
14 So it's important for us to get your best testimony today;
15 okay?
16    **A.   Okay.**
17    Q.   To that end, if we're going through the testimony
18 today and you need to go back and change something, that's
19 perfectly fine for you to do that. Just tell me, wait a
20 minute; this reminds me of something else I said earlier; I
21 want to change that or I want to revisit that issue. It's
22 perfectly fine to do that.
23    In some respects, this is more of a conversation
24 than just a question/answer session; okay?
25    **A.   Okay.**

## Page 8

1    Q.   As a conversation, if you don't understand my
2  questions, just tell me that. I'm happy to work with you.
3  I want to make sure that you understand what I'm asking you
4  before you provide an answer; okay?
5    **A.   Okay.**
6    Q.   If you need to take a break at any time, you're
7  more than welcome to do that. Again, just let me know;
8  okay?
9    **A.   Okay.**
10    Q.   Is there any reason that you know of, whether
11 you're on medication or something that might affect your
12 ability to recall events, or you're not feeling well; is
13 there any reason why you can't give your best testimony
14 today?
15    **A.   No.**
16    Q.   You're aware we're here because of a lawsuit
17 filed by Del Mar Seafoods against yourself and Barry Cohen;
18 is that right?
19    **A.   Yes.**
20    Q.   When did you first learn of that lawsuit?
21    **A.   When my attorney was served.**
22    Q.   Which attorney are you talking about?
23    **A.   That would be Dennis Caspe, my divorce attorney,**
24 **when he was notified.**
25    Q.   Do you recall when that was?

## Page 45

1  A.  No.

2  Q.  This is a bad copy, but it was the one that was

3 attached to the Initial Disclosures.  I'm showing you

4 Exhibit-4, and a document with Bates numbers Cohen00009.

5      Have you ever seen that document before?

6  A.  No.

7  Q.  Have you ever discussed with Barry a schedule of

8 payments that he was given by Joe Roggio?

9  A.  No.

10  Q.  How well do you know Joe Roggio?  You worked --

11  A.  Pretty well.  I like him a lot.

12  Q.  Do you think -- do you have any reason to believe

13 that Joe Roggio has any malice or ill-will towards you?

14  A.  No.

15  Q.  Do you have any reason to believe that he has any

16 malice or ill-will towards Barry?

17  A.  I don't know.

18  Q.  Do you think he -- from your knowledge and

19 experience working with him, do you think he's an honest

20 guy?

21  A.  Pretty much.

22  Q.  That's a little equivocal.

23      Do you have any reason to believe he would be

24 dishonest in any of his representations in this case?

25  A.  I don't know.

## Page 46

1  Q.  Do you have any reason to believe that?

2  A.  I don't know.

3  Q.  As you sit here today, can you think of any

4 occasion where he's been dishonest with you?

5  A.  No.

6  Q.  Let me show you a better copy of that schedule of

7 payments.  I found one.  The one I'm going to show you was

8 marked as an exhibit to Barry's deposition in the Avila

9 Beach litigation.

10      (Exhibit-6 was marked.)

11      That's, I believe, just a better copy of that

12 schedule of payments.

13      Does that help you in terms of whether you've

14 ever seen that before?

15  A.  No.

16  Q.  You still have never seen it?

17  A.  I have never seen it.

18  Q.  In your employment with Old Port Fisheries/Del

19 Mar, you were not the person responsible for keeping track

20 of the debts of Michael or Leonard to that entity; were you?

21  A.  No.

22  Q.  Who was?

23  A.  I don't know.

24  Q.  Does the name -- I think it's Harriett Shields?

25  A.  The bookkeeper was Harriett Shields and Dean

## Page 47

1 Smith.

2  Q.  Okay.  Do you know if they were the people who

3 would track those?

4  A.  Yes.

5      (Exhibit-7 was marked.)

6  Q.  Have you ever seen Exhibit-7 before?

7  A.  No.

8  Q.  How well do you know Joe Cappuccio?

9  A.  Pretty well.

10  Q.  All right.  Do you have any reason to believe

11 that Joe Cappuccio has any malice or ill-will toward you or

12 Barry?

13  A.  Not towards me, but I'm sure with Barry.

14  Q.  And why are you sure with Barry?

15  A.  They're in a lawsuit.

16  Q.  Okay.  Other than the fact that they're in a

17 lawsuit.  I mean, he never made any statements to you --

18  A.  No.

19  Q.  -- that he was angry at Barry or --

20  A.  Never.

21  Q.  Okay.  And he had never done anything to you that

22 made you think that he was not -- that he had some personal

23 reason to try to cause any harm to you or Barry?

24  A.  Not to me.

25  Q.  Anything with respect to Barry other than this

## Page 48

1 lawsuit?

2  A.  Nothing comes to mind.

3  Q.  Did you feel you were treated fairly as an

4 employee?

5  A.  Yes.

6  Q.  Are you aware of any claim being filed on your

7 behalf with the United States Marshal Service arising from

8 the loss of that fishing net?

9  A.  No.

10  Q.  How much was the net worth?

11  A.  They're usually around $30,000.00 a net.

12  Q.  Do you know what size net this was?

13  A.  No.

14  Q.  Do you know when it had been purchased?

15  A.  No.

16  Q.  Looking at Exhibit-6 or 7, did Barry ever discuss

17 with you the addition of amounts beyond the $215,000.00 to

18 the promissory note?

19  A.  No.

20  Q.  Where did you get the $175,000.00 that was used

21 to make the payment on the note?

22  A.  A second mortgage on our house.

23  Q.  Was that mortgage taken out solely for that

24 purpose, or was it for some other purposes?

25  A.  It was taken out for that purpose, and also -- I

# Exhibit 22

```
00168
  1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

  2          IN AND FOR THE COUNTY OF SAN LUIS OBISPO

  3

  4

  5  BARRY A. COHEN; LEONARD A. COHEN,

  6  OLDE PORT INN, INC. and OLDE PORT

  7  FISHERIES, INC.,

  8            Plaintiffs,

  9       vs.          Case No. CV 040897

 10  PORT SAN LUIS HARBOR DISTRICT; and

 11  DOES 1 to 50, inclusive,

 12            Defendants.

 13  _____

 14

 15

 16        DEPOSITION OF JOSEPH ROGGIO

 17          VOLUME 2/PAGE 168 - 364

             Tuesday, November 29, 2005, 10:10 a.m.
 18

 19

 20

 21          LOCATION:
       OFFICES OF MONTEREY PENINSULA COURT REPORTERS
 22          2801 Monterey-Salinas Highway, Suite E
                  Monterey, California

 23

 24
       REPORTED BY:
 25  LISA A. YORK MEESKE, CSR 10617
```

00197

1    A.   Just -- just curious.

2    Q.   Why was it you were curious?

3    A.   I mean, I don't know if there was a

4 specific reason. But sometimes I -- you know, one thing

5 that I always liked the bookkeeper down there to provide

6 were the -- you know, I wasn't involved in the day-to-day

7 operations. So the only thing that, obviously, made Joe

8 comfortable was being able to provide backups to the

9 balance sheet numbers.

10    Q.   Was Joe Cappuccio getting concerned during

11 the last quarter of 2003 about the amount of money he was

12 losing through the operation in Avila?

13    MR. SPEIR: Objection; calls for speculation.

14    THE WITNESS: Yeah. I don't know that. These

15 advances have nothing to do with that, though.

16 BY MR. MOROSKI:

17    Q.   But they were reflected in the books of

18 Olde Port Fisheries Division of Del Mar Seafoods, Inc.;

19 correct?

20    A.   Yeah. That operation is the one who did

21 the advances.

22    Q.   To Barry Cohen, Point Loma?

23    A.   To both.

24    Q.   Why was it that Barry Cohen was asked to

25 sign a promissory note in favor of Del Mar Seafoods, Inc.

ROGGIO, Joseph (vol. 2) 11-29-05                    Page 197

00198
1  in October of 2003?

2      A.  Well, just to formalize it.

3      Q.  Why?

4      A.  I don't think any particular reason except

5  for just to formalize it.

6      Q.  Did you receive instructions from Joe

7  Cappuccio to formalize the amount of money that Barry

8  Cohen owed Del Mar Seafoods, Inc.?

9      A.  My guess it's probably something Joe and

10  Barry talked about, but you'd have to ask him to be sure.

11     Q.  I'm just asking -- I'm taking your

12  deposition today.

13     A.  Okay. Yeah, no, I don't know.

14     Q.  You don't recall --

15     A.  Joe was, obviously, aware of us preparing

16  the promissory note, but I can't recall if it's something

17  he had instructed me to do. It's something Barry had

18  instructed me to do, but it's something that we did. And

19  the only thing behind it is just to formalize it. There's

20  no -- we're not out to get him. He's not out to get us.

21     Q.  My question is whether you have any

22  recollection of receiving an instruction from Joe

23  Cappuccio some time in or around the last quarter of 2003

24  to figure out how much money Barry Cohen owes Del Mar

25  Seafoods, Inc. and reduce it to a promissory note.

ROGGIO, Joseph (vol. 2) 11-29-05              Page 198

00199
1     A.  I don't know that.

2     Q.  You don't have that recollection?

3     Again, what I'm looking for is, either --

4  whether you have a recollection or whether you're saying

5  categorically, no, that did not happen?

6     A.  I mean, Joe -- this -- Joe would be well

7  aware of this from the start.  Now, how it started, you'd

8  have to ask him.

9     Q.  What I'm trying to get --

10     A.  I mean, you're asking me if I -- you know,

11  if he instructed me to do it.  I mean, he is aware of it.

12  It's probably something we had talked about.  I mean, I

13  don't know exactly how it came about, but there's no

14  substance behind it except for just to formalize it.

15     Q.  Was Barry Cohen, to your knowledge,

16  assessed interest under the terms of the promissory note

17  he signed in favor of Del Mar Seafoods, Inc.?

18     A.  The promissory note does state an interest

19  rate.

20     Q.  Was he ever asked to pay it?

21     A.  No.

22     Q.  Was he ever invoiced?

23     A.  No.

24     Q.  Why?

25     A.  We just didn't do that.  It was just,

ROGGIO, Joseph (vol. 2) 11-29-05          Page 199

00200

1  basically, just to have something on paper just in case.

2  You never know. You know, something may happen to poor

3  little Barry, but it's just to formalize it.

4      Q.  Okay. And was Barry Cohen ever asked to

5  sign any other promissory note in favor of Del Mar

6  Seafoods, Inc.?

7      A.  No. They -- the purpose of the promissory

8  note was just to formalize it, and that was it.

9      Q.  Can I see the Chris Cohen W-2s.

10      When did Chris Cohen cease being an employee of

11  Del Mar Seafoods, Inc.?

12      A.  Well, when Barry had completed the -- I

13  don't know the exact dates. But, obviously, when Barry

14  chose it was time to let her go.

15      Q.  When Barry chose to let her go?

16      A.  Correct. Barry -- you know, who laid off

17  the people when he felt it was appropriate.

18      Q.  Are you talking about the people who were

19  employed by Del Mar in Avila?

20      A.  The people he employed in the Avila Beach

21  operation; correct.

22      Q.  Who were on Del Mar Seafoods Inc.'s

23  payroll?

24      A.  Well, we just prepare the checks for him.

25      Q.  Okay. They were, technically, Del Mar

# Exhibit 23

ov 25 05 01:47p
Case 3:07-cv-02952-WHA    Document 22-3    Filed 12/05/

OMB APPROVED
2115-0110

DHS, USCG, CG-1270 (REV. 06-03)

# UNITED STATES OF AMERICA

## DEPARTMENT OF HOMELAND SECURITY
### UNITED STATES COAST GUARD

### NATIONAL VESSEL DOCUMENTATION CENTER

# CERTIFICATE OF DOCUMENTATION

| VESSEL NAME | OFFICIAL NUMBER | IMO OR OTHER NUMBER | YEAR COMPLETED |
| --- | --- | --- | --- |
| POINT LOMA | 515298 | 7049354 | 1988 |

| HAILING PORT | HULL MATERIAL | | MECHANICAL PROPULSION |
| --- | --- | --- | --- |
| PORT SAN LUIS, CA | STEEL | | YES |

| GROSS TONNAGE | NET TONNAGE | LENGTH | BREADTH | DEPTH |
| --- | --- | --- | --- | --- |
| 128 GRT | 86 NRT | 70.8 | 21.5 | 11.7 |

| PLACE BUILT |
| --- |
| SIRACUSAVILLE, LA |

| OWNERS | OPERATIONAL ENDORSEMENTS |
| --- | --- |
| F/V POINT LOMA FISHING COMPANY INC | FISHERY |

MANAGING OWNER
F/V POINT LOMA FISHING COMPANY INC
7121 FERN FLAT ROAD
APTOS, CA 95003

RESTRICTIONS
NONE

ENTITLEMENTS
NONE

REMARKS
NONE

ISSUE DATE
DECEMBER 15, 2006

THIS CERTIFICATE EXPIRES
JANUARY 31, 2008

*Prma H. Willis*
DIRECTOR, NATIONAL VESSEL DOCUMENTATION CENTER

VDS

PREVIOUS EDITION OBSOLETE. THIS CERTIFICATE MAY NOT BE ALTERED.

COHEN 00001

# Exhibit 24

1   James P. Walsh, CSB. No. 184620
2   Gwen Fanger, CSB No. 191161
    DAVIS WRIGHT TREMAINE LLP
3   505 Montgomery Street, Suite 800
    San Francisco, California 94111-3611
4   Telephone: (415) 276-6500
    Facsimile:  (415) 276-6599
5   budwalsh@dwt.com

6   Attorneys for Defendants and Claimant
    BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7   Claimant, F/V POINT LOMA Fishing Company, Inc.

8

9                   UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

12   DEL MAR SEAFOODS, INC.,                        )
                                                    )
13                       Plaintiff,                 )   No. C-07-2952-WHA
                                                    )
14          v.                                      )   DECLARATION OF BARRY A.
                                                    )   COHEN IN SUPPORT OF
15   BARRY COHEN, CHRIS COHEN (aka                  )   DEFENDANTS' MOTION TO
     CHRISTENE COHEN), in personam and,             )   VACATE ORDER OF ARREST
16   F/V POINT LOMA, Official Number                )
     515298, a 1968 steel-hulled, 126-gross ton,    )   Date: August 16, 2007
17   70.8 foot long fishing vessel, her engines,    )   Time: 8:00 a.m.
     tackle, furniture apparel, etc., in rem, and   )   Place: Courtroom 9, 19th Floor
18   Does 1-10,                                      )
                                                    )
19                       Defendants.                )
                                                    )

20

21          I, Barry A. Cohen, declare as follows:

22          1.      I am a resident of the State of California and currently reside in Santa Maria,

23   California.  I am a named Defendant in this lawsuit.  I make this declaration in support of

24   Defendant's Motion to Vacate Order of Arrest.  The facts set forth in this declaration are

25   personally known to me to be true and, if called as a witness, I could and would testify to the

26   following:

27          2.      For most of my adult life, I have been engaged in various aspects of the fishing

28

                                                    1

DAVIS WRIGHT TREMAINE LLP

1  industry in California, including in the processing sector and in owning and operating fishing

2  vessels. I have been engaged in the fisheries business in California for over 40 years.

3      3.    For at least 10 years, I have done business with the Plaintiff in this case, Del Mar

4  Seafoods, Inc. ("Del Mar"). In fact, from 2004 until 2006, I was employed by Del Mar in its

5  processing plant at Watsonville, California and was paid $2,000 a week. The company also

6  asked me to help deal with issues at its processing plant in Astoria, Oregon in 2006, which I did.

7  Upon my return from Oregon, I was let go in October 2006 because I was told by Joe Cappuccio

8  that the company no longer wished to be in the groundfish business. I had been told by Joe

9  Roggio, prior to moving from Cambria, California to Aptos, California in 2004, that I could have

10  a job with Del Mar as long as I wanted if I moved up there to work for them.

11      4.    In February 1999, Del Mar and I formed a joint venture, the purpose of which was

12  to buy, process, and sell fish from a site I leased at the Port San Luis Pier in Avila Beach,

13  California. Del Mar agreed to fund the joint venture and I supplied a processing crew, access to

14  fishing vessel production, and sales relationships. In 2001, or thereabouts, Del Mar and I began

15  planning for a new joint venture in Mexico, using the F/V POINT LOMA. In this context, I was

16  dealing with Joe Cappuccio, the President of Del Mar. Del Mar had advanced funds to me to

17  upgrade the F/V POINT LOMA as part of an anticipated 50/50 partnership in the Vessel. The

18  agreement for this 50/50 partnership was oral. Later that year, because Del Mar did not want to

19  continue the 50/50 partnership, but had provided funds to upgrade the vessel, we agreed to turn

20  Del Mar's contributed funds into a loan.

21      5.    About two years later, in 2003, Del Mar requested that we provide security for this

22  prior loan. We then entered into a Promissory Note with Del Mar to make arrangements to repay

23  the company over an extended period of time. We also entered into a Ship Mortgage with Del

24  Mar as security for repayment of the loan amount of $215,000. In the transaction, we were not

25  represented by counsel. Del Mar's attorneys drafted the Promissory Note and Ship Mortgage.

26  The entire purpose of the financing arrangement was to provide security for repayment of the

27  funds used to upgrade the vessel, and no other.

28

DAVIS WRIGHT TREMAINE LLP

2

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

1      6.    Chris Cohen and I are still married and I am acting in this case as agent for the

2    interests of the marital community. My wife currently resides in Arizona.

3      7.    In 2004, we transferred, the ownership of the F/V POINT LOMA to a Subchapter S

4    corporation, the F/V Point Loma Fishing Company, Inc., of which I am the President and

5    manager and in which my wife and I own the stock 50/50. The F/V POINT LOMA remains

6    subject to Del Mar's Ship Mortgage. Attached as Exhibit A to this declaration is a true copy of

7    the vessel's current documentation certificate issued by the U.S. Coast Guard. I am acting in this

8    case as the agent for the owner of the vessel, the F/V Point Loma Fishing Company, Inc.

9      8.    The F/V POINT LOMA engages in the groundfish fisheries located outside the

10   State of California and in the U.S. Exclusive Economic Zone ("EEZ")(from three to 200 nautical

11   miles) and is licensed to land its catch only in the State of California. The vessel's home port is

12   Port San Luis, California. I have never used the vessel to fish anywhere except in the EEZ off

13   California. At no time have I ever threatened to move the vessel to another state or another part

14   of California, nor could I do so very easily without obtaining new licenses and new markets.

15     9.    A special limited entry permit is required to engage in the Pacific Groundfish

16   Fisheries off California regulated by the National Oceanic and Atmospheric Administration

17   ("NOAA") in the U.S. EEZ. However, unlike most other such permits, the NOAA permit is

18   issued not to the vessel but to a person qualifying as the owner of the permit. The NOAA permit

19   has been issued to, and is owned by, the F/V Point Loma Fishing Company, Inc. Attached as

20   Exhibit B is a copy of the NOAA permit held by the company. The permit may be used on the

21   F/V POINT LOMA or it may be transferred to another vessel of similar length.

22     10.   The Promissory Note and Ship Mortgage do not cover the NOAA permit for at

23   least two reasons. First, neither the Promissory Note nor the Ship Mortgage contains language

24   that includes the NOAA permit as security. Second, and more importantly, NOAA does not

25   recognize the existence of liens against such permits. Attached as Exhibit C is a copy of a letter

26   from NOAA confirming this position. Thus, I have never agreed to provide Del Mar a security

27   interest in this NOAA permit.

28

DAVIS WRIGHT TREMAINE LLP

3

1        11.    In December of 2004, while I was working for Del Mar, I made a $5,000 payment

2    on the Promissory Note. Attached as Exhibit D is the check representing this payment. At the

3    end of 2005, Joe Cappuccio and Joe Roggio, in a meeting, told me that Del Mar's bank, which

4    provided a credit line to the company, had expressed concern about the size of the loan for the

5    F/V POINT LOMA. Joe Cappuccio asked me to make a large advance payment on the loan.

6    Later, Joe Roggio told me at another meeting that, if I made the advance payment, he would see

7    to it that the vessel loan with Del Mar would be interest free. Because of this promise and

8    understanding, we took out a home equity loan on our house and paid Del Mar $175,000, with the

9    expectation that no interest would be due on the Promissory Note and that the payment comprised

10    advance monthly payments into the future. The payment date was November 10, 2005. Attached

11    as Exhibit E is the check for this advance payment on the Promissory Note. It was my

12    understanding that this payment (and the earlier one) reduced the total amount of the debt from

13    $215,000 to $35,000; that monthly payments were covered well into the future; and that no

14    interest would be due on payment of the remaining amount. When I delivered the check to Joe

15    Cappuccio, I told him I would pay the rest as soon as I can. In response, he said it was now such

16    a small amount that he was not concerned about it any more, which reinforced my understanding

17    that I had made advance payments on the Note.

18        12.    Within a month or so after this advance payment, I recall receiving a piece of paper

19    which purported to be a Schedule of Payments from Joe Roggio. Attached as Exhibit F is the

20    copy of the document I received from Joe Roggio. The Schedule contains references to various

21    debts not related to the Promissory Note. I looked it over and told him this does not look right to

22    me. He said he was just "cleaning up the books." I didn't want to tell him how to keep his books

23    but I did not tell him that the $175,000 payment could be applied to anything other than the

24    Promissory Note, nor did I agree with any of the amounts listed in his Schedule of Payments. For

25    certain, he did not expressly ask if I was agreeable to applying the $175,000 to these other debts

26    or to treating the other debts as "advances" under the Promissory Note, which would then be

27    secured by the Ship Mortgage.

28

DAVIS WRIGHT TREMAINE LLP

4

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

13.    After I was let go by the company in October 2006, I asked Joe Roggio to let me know where I stood with the company. He then gave me a newer revised version of the Schedule of Payments, probably in December 2006. That new Schedule showed new debts called "Olde Port Balance, Point Loma Balance, and Fees for Olde Port Case." I, again, never agreed that these amounts would be treated as "advances" under the Promissory Note, to be secured by the Ship Mortgage, nor did I ever agree that they were correct in any way.

14.    I made additional payments on the Promissory Note in January ($2,000), February ($3,000) and March ($3,000), 2007. Attached as Exhibit G are the checks that represent those payments. I did so after being asked by Joe Roggio to make payments on what I owed, but did not specify any amount or for what.

15.    The seizure of the F/V POINT LOMA on June 7, 2007 came as a complete shock to me. I never received any prior notice, orally or written, from Del Mar that I had to make any monthly payments or owed any interest after the advance payment was made in November 2005 or the vessel would be seized. It has always been my understanding that the advance payments made me current on the Note through February 2009.

16.    The seizure of the vessel has completely disrupted its operations. At present, I am losing at least $20,000 a month in gross sales for the vessel. I have been trying to keep the captain, Dave Kobak, and the two crew members available so that I can take the vessel fishing as soon as possible, paying about $2,000 a week to date. The vessel is my only source of income at present, other than my Social Security payments.

17.    I believe that the seizure of the Vessel is unfair and unnecessary and not consistent at all with my agreements with Del Mar.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED this 9th day of July, 2007.

/s/ *Barry A. Cohen*
Barry A. Cohen

DECLARATION OF BARRY A. COHEN IN SUPPORT OF
DEF'S MOTION TO VACATE ORDER OF ARREST
Case No. C-05-3927-CW

SFO 367679v1 0084289-000001

Exhibit 25

CERTIFIED COPY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
* * *

DEL MAR SEAFOODS, INC.,              )
                                     )
          PLAINTIFF,                 )
                                     )
     VS.                             )  CASE NO. CV 07-02952 WHA
                                     )
BARRY COHEN, CHRIS COHEN,            )
(AKA CHRISTENE COHEN) IN             )
PERSONAM AND F/V POINT LOMA,         )
OFFICIAL NUMBER 515298, A            )
1968 STEEL-HULLED, 126-GROSS         )
TON, 70.8-FOOT LONG FISHING          )
VESSEL, HER ENGINES, TACKLE,         )
FURNITURE, APPAREL, ETC.,            )
IN REM, AND DOES 1-10,               )
                                     )
          DEFENDANTS.                )
_____)
                                     )
AND RELATED COUNTERCLAIMS.           )
_____)


DEPOSITION OF LEONARD COHEN
SAN LUIS OBISPO, CALIFORNIA
THURSDAY, JANUARY 10, 2008
11:06 A.M. - 11:40 A.M.


REPORTED BY CINDY D. GRIFFITH
CSR #7281

**LEONARD CHOEN**                                                    **January 10, 2008**

Page 10

1  COULD RECOVER FUNDS FROM YOU IN CONNECTION WITH THE
2  TRANSACTIONS WE'RE GOING TO DISCUSS. DO YOU UNDERSTAND
3  THAT?
4       THE WITNESS: OKAY.
5       (DISCUSSION HELD OFF THE RECORD.)
6  MR. POULOS: LET'S GET GOING. HOPEFULLY THIS
7  WON'T TAKE TOO LONG.
8  Q   MR. COHEN, WITH RESPECT TO THE AVILA BEACH
9  LITIGATION, THAT WAS THE LITIGATION, I USE THAT
10  SHORTHAND, BUT I'M REFERRING TO THE LITIGATION THAT WAS
11  BETWEEN YOUR FATHER, YOURSELF, OLDE PORT INN AND OLDE
12  PORT FISHERIES, INC. AGAINST THE PORT SAN LUIS HARBOR
13  DISTRICT. DO YOU KNOW THAT LITIGATION?
14  A   YES.
15  Q   OKAY. AND IN THAT LITIGATION, YOU AND YOUR
16  FATHER RETAINED THE LAW FIRM OF MILLER, STAR, RIGALLI;
17  IS THAT RIGHT?
18  A   THAT IS CORRECT.
19  Q   AND YOU RECEIVED INVOICES FROM THAT LAW FIRM
20  FOR THEIR SERVICES; IS THAT CORRECT?
21  A   THAT IS CORRECT.
22  Q   AND BY AND LARGE, YOU PAID FOR MUCH OF THOSE
23  LEGAL FEES; IS THAT CORRECT?
24  A   THAT IS CORRECT.
25  Q   BUT THEY WERE SENT TO BOTH YOU AND YOUR FATHER

Page 11

1  BEING JOINTLY LIABLE FOR THOSE FEES?
2  A   THAT WOULD BE MY UNDERSTANDING.
3  Q   ALL RIGHT. IS THERE AN AMOUNT OF THOSE FEES
4  THAT HAS NOT BEEN PAID?
5  A   YES.
6  Q   AND CAN YOU TELL US HOW MUCH OF THE FEES ARE
7  OUTSTANDING THAT HAVE NOT BEEN PAID?
8  A   THIS IS JUST AN APPROXIMATION.
9  Q   YES.
10  A   ABOUT A MILLION TWO.
11  Q   OKAY. AND HOW MUCH -- IN ADDITION TO THAT
12  OUTSTANDING AMOUNT, HOW MUCH IS -- WAS PAID?
13  A   A LITTLE OVER A MILLION DOLLARS.
14  Q   SO THE TOTAL FEES, UNDERSTANDING THIS IS AN
15  ESTIMATE, IS SOMEWHERE AROUND 2.2 MILLION?
16  A   ON OUR SIDE, CORRECT.
17  Q   IN -- WITH RESPECT TO THOSE FEES, IS THERE ANY
18  AGREEMENT BETWEEN YOU AND YOUR FATHER REGARDING WHICH OF
19  YOU WILL BE RESPONSIBLE FOR PAYING THOSE FEES ULTIMATELY
20  IF -- IF THEY ARE OWED?
21  A   THE ONLY AGREEMENT THAT I'M AWARE OF BETWEEN MY
22  FATHER AND I WAS WHEN WE FILED THE LAWSUIT, WE BOTH
23  AGREED THAT WE WOULD BE 50-50, AS FAR AS RESPONSIBILITY
24  FOR -- WE DIDN'T EVEN KNOW WHAT WAS COMING UP. JUST
25  RESPONSIBLE FOR WHATEVER.

Page 12

1  Q   OKAY. THE -- IN THAT LITIGATION, THERE WAS A
2  MOTION FOR RECOVERY OF ATTORNEYS FEES BY YOU AND YOUR
3  FATHER AND YOUR RESPECTIVE COMPANIES CONTENDING YOU WERE
4  THE PREVAILING PARTIES; IS THAT RIGHT?
5  A   I BELIEVE SO.
6  Q   AND YOU RECALL THAT THE COURT DID NOT AWARD YOU
7  THE FEES ON THAT MOTION?
8  A   I AGREE.
9  Q   IN THAT LITIGATION, YOUR FATHER FILED A
10  DECLARATION, BARRY COHEN FILED A DECLARATION SAYING THAT
11  IF HE DID NOT RECOVER THE ATTORNEYS' FEES ON THAT
12  MOTION, THAT HE MIGHT HAVE TO FILE -- OR IN THAT
13  LITIGATION, HE MIGHT HAVE TO FILE FOR BANKRUPTCY. ARE
14  YOU AWARE OF THAT DECLARATION?
15  A   POSSIBLY. YOU KNOW, I DON'T RECALL EVERY --
16  EVERY DECLARATION IN THE 1,700 PAGES THAT WERE -- THAT
17  WERE PRODUCED. JUST IN THAT ASPECT, BUT --
18  Q   IS IT -- DID YOU EVER DISCUSS WITH YOUR FATHER
19  THE POSSIBILITY THAT HE WOULD DECLARE BANKRUPTCY IF HE
20  DID NOT RECOVER THE ATTORNEYS' FEES?
21  A   I HAVE NOT DISCUSSED -- I DO NOT RECALL HIM
22  MENTIONING TO ME FILING BANKRUPTCY IN RELATIONSHIP TO
23  THIS LEGAL ACTION, BECAUSE THIS LEGAL ACTION ISN'T OVER
24  YET.
25  Q   THE LEGAL ACTION AGAINST THE HARBOR DISTRICT?

Page 13

1  A   CORRECT.
2  Q   HAS HE MENTIONED TO YOU THE POTENTIAL FOR HIS
3  FILING OF BANKRUPTCY IN ANY OTHER CONTEXT?
4  A   I DO NOT RECALL HIM MENTIONING TO ME ANYTHING
5  TO DO WITH BANKRUPTCY.
6  Q   THE OLDE PORT INN OPERATES AT A FACILITY IN --
7  ON THE PIER AT AVILA BEACH; IS THAT CORRECT?
8  A   YOU MIGHT HAVE TO HELP ME OUT ON "FACILITY."
9  YOU MEAN ON A LEASE, LEASED AREA?
10  Q   YEAH. YOU SHARE A COMMON LEASED AREA FOR OLDE
11  PORT INN AND OLDE PORT FISHERIES, INC.; IS THAT RIGHT?
12  A   IT COULD BE DESCRIBED THAT WAY.
13  Q   AND THAT'S ON THE PIER AT THE PORT THERE IN --
14  IN AVILA BEACH?
15  A   CORRECT.
16  Q   THE -- WITH RESPECT TO OLDE PORT INN, THAT IS A
17  RESTAURANT BUSINESS; IS THAT CORRECT?
18  A   CORRECT.
19  Q   AND WHERE DO YOU GET THE FISH INVENTORY THAT
20  YOU SELL AT THE RESTAURANT?
21  A   PLEASE DESCRIBE A TIME PERIOD.
22  Q   OKAY. DURING THE TIME PERIOD, SAY, OF 1999 TO
23  2004.
24  A   I WOULD SAY CENTRAL COAST SEAFOODS IS ONE
25  PURVEYOR. JORDANOS WAS ANOTHER SEAFOOD PURVEYOR FOR

4 (Pages 10 to 13)