IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEL MAR SEAFOODS, INC., | No. C 07-02952 WHA |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| BARRY COHEN, CHRIS COHEN (aka CHRISTINE COHEN), *in personam* and F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8 foot long fishing vessel, her engines, tackle, furniture apparel, etc., *in rem*, and DOES 1–10, | |
| Defendants. | |

**INTRODUCTION**

In this admiralty action, plaintiff Del Mar Seafood, Inc., a California fish-processing company, sued defendants Barry Cohen, Chris Cohen, and the vessel F/V Point Loma for breach of a promissory note and default on the vessel's mortgage. The Cohens counterclaimed, *inter alia*, for the allegedly wrongful arrest of their fishing vessel. Del Mar now moves for partial summary judgment against the counterclaims and against one item of damages in the counterclaim. For the reasons stated below, the motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

Del Mar is a California company that purchases, processes, and sells seafood. Defendants Barry and Chris Cohen are individuals who, although separated, are still legally

married to each other and reside within this district. At all relevant times, the Cohens have represented that they are the owners of the defendant vessel, the F/V Point Loma.

In 1999, plaintiff and Barry Cohen formed a joint venture to buy, process, and sell fish from a site that he leased in Avila Beach, California. Del Mar advanced funds to him as part of the venture. In 2003, Del Mar decided not to continue with the joint venture and both parties therefore entered into a promissory note secured by the ship mortgage. The note was executed on October 31, 2003, and it stated (Kelley Decl. Exhs. 6 and 7):

> For the value received, BARRY COHEN and CHRIS COHEN . . . promises to pay to the order of DEL MAR SEAFOODS, INC., . . . theسنم of two hundred fifteen thousand ($215,000.00) dollars at the rate of seven (7) percent per annum, as follows:
>
> Monthly payments of $3,000.00 or fifteen (15) percent of the gross landing receipts of each and every landing of seafood product made by the fishing vessel POINT LOMA, whichever is greater, commencing on January '04 and on the 15th day of each succeeding month until principal and interest are fully paid. Payments are to be applied to interest first.

The parties currently disagree over the amount of the balance due on the note. Del Mar claims that the principal balance is approximately $130,000, as a result of accrual of interest and further debts (including boat improvements, fishing loans, and personal loans). The Cohens, on the other hand, claim that the principal balance is $27,000.

Barry made his first payment of $5,000 on December 22, 2004. In November 2005, he made a large lump-sum payment of $175,000. This entire case, more or less, hangs on the question of whether the $175,000 payment was a prepayment of monthly installments until 2009 versus an adjustment of the overall debt with continuing monthly-payment obligations.

According to Barry, he was asked by Joe Cappuccio, the president of Del Mar, to make a lump-sum payment even though it was not required under the promissory note: "He asked me to do something like this . . [H]e told me what the problem was, that he needed my help, and I said I would see what I could do. And this is what I could do" (Fanger Decl. Exh. 6 at 139). Barry further explained (*id.* at 140–41) (emphasis added):[1]

---

[1] The record does not directly explain what the witness meant by "receivables."

2

> And Joe Cappuccio — what he said to me was the bank said: We're the bank and you're the fish company; we don't want to see those loans on your books when you borrow money from us. That's what he told me and it made sense. I said, "I'll do what I can," and that's how this came about. And that's why I was so emphatic that it was for the note on the boat, because that was the whole purpose of doing this. They didn't ever say anything about receivables or this. That's why he had a line of credit — to fund his receivables. *What he told me is that they just didn't like seeing that note that I had with them that Chris and I signed. And this was to pay down that note that much.*

Because Mr. Cappuccio expressed to Barry that the bank was uncomfortable with the note on the vessel and "asked [Barry] to do something like this," Barry believed the lump-sum amount applied to the balance under the note. During his deposition, he was asked, "And that was a check that you believe should have been applied to the balance under the promissory note; correct?" He responded, "Correct" (*id.* at 136).

Barry then delivered the check in person to Mr. Cappuccio. According to Barry, "[Mr. Cappuccio] looked at [the check] and said — I said, 'Here's the check that I said I would give.' He said, 'Thank you very much.' And I said, I'll pay you the rest as soon as I can.' And he said, 'Well, I'm not worried about — 'I'm not worried concerned' or 'not worried about it; it's such a small amount now" (*id.* at 137). This conversation caused Barry to further believe that the lump-sum payment would relieve his immediate duty to make monthly installments.

Barry also claims that he believed at the time of the lump-sum payment that the loan would not thereafter accrue interest. In his deposition, he stated (*id.* at 143–44):

> But Joe knew about it, because when I was in the hallway and I was with Joe, we were between the offices — there's a little hallway right there — and Joe said to me, "If you could do this, I'll see to it that the loan is interest-free." Well, I already thought it was interest-free, but okay, I'm going to do it anyhow. But I thought it was already interest-free, but he said it was, would be interest-free. So if that's what you mean, then that's one conversation that we had. I know Joe Roggio wanted to see it happen. I guess it's good not to have the bank unhappy with you. I felt like I was doing a good thing. That's all.

Later at a deposition, Controller Roggio was asked the following questions regarding interest payments (Fanger Decl. Exh. 22 at 199–200):

> Q: Was Barry Cohen, to your knowledge, assessed interest under the terms of the promissory note he signed in favor of Del Mar Seafoods, Inc.?

3

      A: The promissory note does state an interest rate.

      Q: Was he ever asked to pay it?

      A: No.

      Q: Why?

      A: We just didn't do that. It was just, basically, just to have something on paper just in case. You never know. You know, something may happen to poor little Barry, but it's just to formalize it.

Del Mar collected no payments from the Cohens in 2006. In December 2006, Controller Roggio called Barry to discuss further monthly payments on the note. Because Barry did not pick up, Controller Roggio left a voicemail.

On January 30, 2007, Barry made a $2,000 payment. The check was accompanied by the following note (Kelley Decl. Exh. 10):[2]

> Joe,
>
> Please credit my account. With this payment, if your analysis was correct, the new balance should be $139,749.79. I will try to send you at least $2,000/month, sometimes $3,000. I'm sick right now and if I try to talk I start coughing, so instead, you get this note. I'm still unemployed, but this gives me a chance to help Michael [Barry's son] make Olde Port better. I hope things are good for you and your family. Please give Yvonne my regards. Too bad our families never got the chance to become better friends. Oh, well, things usually happen for a reason. Well, take care of yourself.
>
> Barry

Barry's note seems at odds with his whole theory of the case, inasmuch as it stated a large balance was due. Barry later testified at his deposition that he "did not recall" writing this document. He then made further payments of $3,000 on February 15, 2007, and $3,000 on April 23, 2007. There were no more payments after April 2007.[3]

---

[2] Del Mar claims that the $139,749.79 amount mentioned in Barry's note was the true reflection of the Cohens' debts at that time, even after including the lump-sum payment. Because a large balance still existed, the Cohens were obligated to continue paying monthly installments, Del Mar says.

[3] Barry contends that the remaining balance is $27,000, which is the original $215,000 on the promissory note minus his lump-sum payment in November 2005 ($175,000), his December 2004 payment ($5,000), January 2007 payment ($2,000), February 2007 payment ($3,000), and April 2007 payment ($3,000).

4

1    In the meantime, Del Mar began to receive what it considered to be "other disturbing
2 news regarding the Cohens' financial condition" (Br. 7). It discovered that, in a separate
3 lawsuit, Barry had filed a sworn declaration in support of a motion for attorney's fees in an
4 unrelated litigation that "[d]enial of our total lawsuit expenses may actually cause me to be
5 forced out of business totally and into bankruptcy" (Req. for Judicial Notice Exh. 1 at ¶ 22).
6 Del Mar also learned that the Cohens would be undergoing a nasty divorce.

7    Because it was concerned about the Cohens' financial condition, Del Mar contacted
8 its general counsel, Richard Wagner, in May 2007. Attorney Wagner referred them to
9 maritime attorney Mark Holmes. In a sworn declaration, Controller Roggio stated that he
10 "told Mr. Holmes the situation surrounding Del Mar's concerns over Barry's financial situation
11 and sent him the note, mortgage, and loan history to review. After Mr. Holmes had had a
12 chance to consider the situation, he recommended that Del Mar proceed to arrest the Vessel"
13 (Roggio Decl. ¶ 12). Del Mar never sent any notice to defendants that they were late on any
14 payments, nor did it ever send notice that a payment of interest was due before the arrest
15 (Fanger Decl. Exh. 7 at 139–40).

16    Del Mar subsequently proceeded with an *in rem* action against the fishing vessel.
17 On June 7, 2007, Del Mar filed a verified complaint against defendants, alleging that they were
18 in default of the note and mortgage as of May 2007. They also made an *ex parte* application for
19 the arrest of the Cohens' fishing vessel, which this Court granted. In its application, however,
20 Del Mar did not disclose that Barry had arguably paid $188,000 on the note to date.
21 A United States Marshal arrested the vessel at the Hyde Street Pier in San Francisco and turned
22 custody of the vessel over to the court-appointed substitute custodian, National Maritime
23 Services. On June 21, 2007, NMS moved the vessel to Point Richmond and turned custody
24 over to Sugar Dock, LLC.

25    The Cohens filed an answer to and counterclaims against Del Mar on June 25, 2007.
26 The counterclaim alleged wrongful arrest, intentional and/or negligent interference with the
27 Cohens' prospective economic advantage, and a breach of the implied covenant of good faith
28 and fair dealing. The wrongful arrest caused the Cohens to miss at least thirteen fishing trips,

5

which was important to their regular income (Fanger Decl. Exh. 11 at 19).  On August 17, 2007, after learning that the $188,000 payment had been made, the Court ordered that the vessel be released due to a lack of probable of cause for the arrest.[4]

## ANALYSIS[5]

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FRCP 56(c).  A district court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).  A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000).  When the moving party meets its initial burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A threshold question in this matter is what law should be applied.  "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 22–23 (2004). "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other

---

[4] Internal citations are omitted from all cite unless indicated otherwise.

[5] This order notes that both sides have accused each other of having raised issues outside the pleadings and of having relied on evidence not disclosed under FRCP 26. At trial, the parties can reassert all such objections. Just because an issue has been discussed in this order, however, does not mean that it is "in the case" for trial purposes.

6

vessel was involved in the dispute . . . Nor can we simply look to the place of the contract" formation or performance. Instead, the answer 'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Id.* at 24–25. "A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law . . . But when state interests cannot be accommodated without defeating a federal interest . . . then federal substantive law should govern." *Id*. at 27–28. Accordingly, this order applies California law on contracts with respect to the promissory note and related issues because there is no applicable overarching admiralty rule. Neither party disputes this. The wrongful-arrest claim, on the other hand, is governed by federal maritime law.

### 1. DID THE COHENS BREACH THE TERMS OF PAYMENT UNDER THE PROMISSORY NOTE AND MORTGAGE?

Del Mar moves for partial summary judgment that the Cohens are in default under the terms of the promissory note and mortgage. The alleged three acts of default are: (i) defendants' failure to make monthly payments; (ii) defendants' failure to maintain the vessel; and (iii) defendants' failure to name Del Mar as a loss payee under the insurance policies. Both parties concede that the *amount* due under the note is a genuine issue of material fact that should be resolved at trial.

### A. DID THE COHENS BREACH THE PAYMENT TERMS?

As stated, the parties contest the amount due under the promissory note. Whether defendants owe $27,000 or $130,000, however, it is undisputed that the Cohens still owe Del Mar *some amount*. According to Del Mar, because there continued to be a balance due under the note, the Cohens were still obligated to make monthly payments. Since January 2004, the Cohens had only made five payments. A note from Barry that accompanied the January 2007 payment stated that, "I will try to send you at least $2,000/month, sometimes $3,000," supposedly in recognition of the duty to provide monthly payments (Kelley Decl. Exh. 10). The last payment was made in April 2007, so the Cohens began breaching the payment terms of the note when they failed to make a monthly payment in March and May 2007, Del Mar says.

7

1  Furthermore, Del Mar argues that the Cohens could not use the lump-sum payment in "two
2  conflicting ways," *i.e.*, defendants should not be able to claim that the payment was made to pay
3  down the principal *and* as a pre-payment of future monthly obligations. Plaintiff proceeded
4  with its *in rem* action in June 2007.

5  Although the Cohens concede that no provision in the note required them to make the
6  lump-sum payment, they claim that the terms of the note had been modified. Under California
7  Civil Code § 1698(b), "[a] contract in writing may be modified by an oral agreement to the
8  extent that the oral agreement is executed by the parties." The Cohens argue that they did not
9  breach the payment terms of the note because the parties amended the terms by actual
10 performance. According to Barry's deposition, Mr. Cappuccio's bank had become concerned
11 about the loan, so Mr. Cappuccio asked Barry "to do something like this" (Fanger Decl. Exh. 6
12 at 140). Barry then personally delivered a check for $175,000 in November 2005.
13 Because Mr. Cappuccio had expressed his concerns regarding the note and stated, after he
14 received the check, that he was "not worried about it; it's such a small amount now,"
15 Barry believed that the advance payment applied to the $215,000 then due under the note.
16 And in exchange for the large lump-sum payment, Del Mar would not charge any interest on the
17 loan, say defendants. Furthermore, Del Mar never collected any payments in 2006. A
18 factfinder could reasonably find that the lump-sum payment was indeed intended to be a
19 prepayment of the monthly installments.

20 Del Mar counters that there is no evidence that the note was ever modified.
21 California Civil Code § 1698(b) does not apply, plaintiff says, because there was never any oral
22 agreement to begin with. The supposed conversation between Barry and Mr. Cappuccio could
23 not be reasonably interpreted as an oral modification. Moreover, Barry's later note saying that
24 the "new balance should be $139,749.79" meant that the Barry was aware of his continued duty
25 to pay monthly installments on the note.

26 These are decent, perhaps even strong, arguments — but they must be made at trial.
27 Whether there was a valid modification by oral agreement is a genuine issue of material fact
28 and credibility will cut a large figure at trial. Barry testified at his deposition that he had

8

conversations with Mr. Cappuccio, the president of Del Mar, where they discussed making the advance payment to "pay down the note." Mr. Cappuccio also purportedly stated, "If you could do this, I'll see to it that the loan is interest-free" (Fanger Decl. Exh. 6 at 137). Controller Roggio admitted at his deposition that Barry was never asked to pay interest on the note. Barry then delivered a check for $175,000, supposedly to execute the oral agreement.

Furthermore, even though Barry later wrote a note citing a balance of $139,749.79, a factfinder could find that he was referring to the amount due under the secured note *and/or* other unsecured accounts payable. Barry did not state in the January 2007 note that *all* of his debts were secured. Nor did the writing admit that he was still obligated to pay monthly installments under the note. A factfinder could conclude that Barry was ahead on his payments under the note but owed on an unsecured open account. An earlier order dated August 17, 2007, stated (Dkt. No. 57 at 5):

> Under the note, defendants were to make monthly payments of the greater of '$3,000.00 or fifteen (15) percent of the gross landing receipts.' From January 2004 through May 15, 2007, the last payment date prior to the order of arrest, 41 monthly payments should have been made on the note. At a rate of $3000 per month, defendants should have paid a total of $123,000. From the time the promissory note went into effect in January 2004 until the time the boat was seized in June 2007, it is undisputed that defendants paid at least $188,000 to plaintiff. It is true that most of this amount — $175,000 — was paid in a lump sum in November 2005. But paying via lump-sum prepayment rather than by monthly payments does not mean defendants are in default.

Defendants have presented evidence that, when viewed in the light most favorable to the non-moving party, could lead a factfinder to reasonably resolve the dispute in their favor. Because this order denies summary judgment on this issue, there is no need to address whether Del Mar was obligated to send any notice to the Cohens regarding the allegedly late payments.

### B.   DID THE COHENS FAIL TO MAINTAIN THE FISHING VESSEL?

Del Mar contends that the Cohens defaulted on the mortgage because they failed to maintain the fishing vessel. According to Section 7 of Article I of the mortgage agreement, entitled "Particular Covenants of Owner," the "[o]wner shall at his (its) own expense at all times maintain the vessel in thorough repair and working order and shall make all proper renewals and replacements" (Kelley Decl. Exh. 7). Del Mar says that the Cohens did not do so.

9

The deposition of Captain David Kobak, who maintained the fishing vessel, was as follows (Kelley Decl. Exh. 15 at 40–41):

> Q: How would you describe the condition of the Point Loma now?
>
> A: What do you think? It's a mess. It's been that way since I've been on it. It's too much for me to want to fix up. If it was my boat, I might have attacked it, but you can't expect me to get my crew to do that kind of work on that boat five or six days a week just to get it cleaned up. It would take a long time. It's sad that it's gotten in that shape.
>
> Q: Would you agree with me that it is in an advanced state of deterioration?
>
> A: Pretty much so, yes, sir. It still works — is what my comment would be. It still works and everything works on it, and it's productive when we go fishing.
>
> Q: Is it true that there is no routine maintenance, but if something breaks, you fix it?
>
> A: We do a certain amount of routine maintenance to keep stuff from falling apart, to a point. Like the rust you see and the damage that has already been done, and there's not much you can do about a lot of it. You work around it, and if stuff breaks, you have to fix it.

Del Mar also hired marine surveyor Ken Moore to evaluate the condition and value of the boat. Surveyor Moore concluded, "In general the vessel was found to be functional. However, the maintenance condition was very poor. The Captain advised this Surveyor at attendance that if something failed he would fix it to function. But, there was no preventive maintenance authorized" (Kelley Decl. Exh. 16). Given this evidence, Del Mar argues, the Cohens breached their obligations under the mortgage agreement and are therefore in default.

Again, plaintiff's arguments are not so compelling as to warrant summary judgment. Article II of the mortgage agreement, which is entitled "Default," does not include failure to maintain the vessel as an event of default (Kelley Decl. Exh. 7). Although defendants raise this point in their opposition memorandum, plaintiff does not contest it. Furthermore, a factfinder could reasonably find that the Cohens fulfilled their maintenance obligations under the mortgage agreement. They must "maintain the vessel in thorough repair and working order and shall make all proper renewals and replacements" (*id.* at ¶ 7). Nowhere in the mortgage agreement does it say that preventive maintenance, per se, was required. Although Captain

10

Kopak complained about the condition of the fishing vessel, he nonetheless stated, "It still works — is what my comment would be. It still works and everything works on it, and it's productive when we go fishing" (Kelley Decl. Exh. 15 at 40). Captain Kopak further testified that if something broke, he and his crew repaired it — "to keep stuff from falling apart" (*id.* at 40–41). This order denies summary judgment.

### C. DID THE COHENS FAIL TO PROPERLY INSURE THE FISHING VESSEL?

Similarly, Del Mar argues that the Cohens failed to name Del Mar as a loss payee on the relevant insurance policies. Section 3 of Article I of the mortgage agreement provided that "[a]ll insurance shall be taken out in the name of Owner and *shall by its terms be payable to Mortgage* for account of Mortgage and Owner as their respective interests may appear" (Kelley Decl. Exh. 7) (emphasis added). Article II then lists as an event of default "[d]efault in the punctual payment of the principal of the note secured hereby or any installment thereof, or in the due and punctual performance of any provision of Sections *3*, 4, 5, 6, 8 and 10 or Article I hereof" (*ibid.*) (emphasis added). As mortgagee, Del Mar should have been named the loss payee on the insurance policies. The Cohens did not do so. Rather, the Cohens either listed "Barry Cohen" or "F/V Point Loma Fishing Co., Inc." as the loss payees (Kelley Decl. Exh. 17). Defendants are therefore in default of the mortgage agreement's insurance provisions, Del Mar says.

Not so. Although the Cohens may have breached this particular provision of the mortgage agreement, the alleged breach was immaterial, or so a factfinder could reasonably conclude. "The law sensibly recognizes that although every instance of noncompliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated . . . California courts allow termination only if the breach can be classified as 'material,' 'substantial,' or 'total.'" *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051 (1987). Furthermore, "[t]he question is one of degree, to be answered, if there is doubt, by the triers of the facts . . . We must weigh the purpose to be served, the desire to be gratified, the excuse for deviation from the letter, the cruelty of enforced adherence . . . [T]he law will be slow to impute the purpose, in the silence of the parties, where the

11

significance of the default is grievously out of the proportion to the oppression of the forfeiture. California too accepts that '[w]hether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact.'" *Id.* at 1051–52.

Here, the alleged breach seems immaterial, or so a factfinder could conclude. At his deposition, Barry testified to the following (Fanger Decl. Exh. 6 at 97–98):

> Q: Have you maintained insurance on the boat continuously since the promissory note and mortgage were entered into?
>
> A: I've maintained insurance on that boat since I first got the boat.
>
> Q: So the answer is, yes?
>
> A: Yes. And before.

In addition, Del Mar never raised the lack-of-insurance claim in its verified complaint or before the arrest (Fanger Decl. Exh. 1). It is unclear when this claim was first raised. It is also unclear from the record whether or not Del Mar ever contacted the Cohens about naming Del Mar as the loss payee before it tried to arrest the fishing vessel. Defendants' opposition memorandum implies that Del Mar did not, which would have given the Cohens an opportunity to quickly remedy the alleged breach: "Naming Del Mar as a loss payee could have easily been amended had Plaintiff contacted Defendants prior to the arrest. This raises the question as to whether it was objectively reasonable for Plaintiff to have the Vessel arrested on this ground" (Opp. 15–16). Del Mar is silent on this point in its reply memorandum. At all events, even if the breach had been material, a factfinder will have to decide if any breach were material.

### 2. DID DEL MAR WRONGFULLY ARREST THE COHENS' FISHING VESSEL?

Defendants counterclaimed that their fishing vessel had been wrongfully arrested. In their verified complaint and counterclaim, they alleged the following (Fanger Decl. Exh. 20 at ¶¶ 39–40):

> The arrest of the F/V POINT LOMA by Plaintiff was wrongful in that (a) Plaintiff has refused, without cause, to admit that Defendants have paid $188,000 on the Promissory Note, including an advance payment of $175,000; (b) Defendants were therefore not in default under the Promissory Note; (c) Plaintiff improperly alleges that the total amount of the loan was greater than $215,000 because of advances under the Promissory Note that Defendants

12

> never agreed were subject to the Promissory Note and Ship Mortgage; and (d) none of these relevant, material facts were disclosed to the Court when Plaintiff sought the arrest warrant in this case. Because defendants paid in November 2005 an amount equivalent to 37 monthly payments in advance, Defendants were not in default and the arrest of the vessel is in breach of the Promissory Note and the Ship Mortgage.

Del Mar moves for partial summary judgment on defendants' counterclaim for wrongful arrest on the ground that defendants failed to plead and prove that Del Mar acted with malice, bad faith, or gross negligence.

Federal law governs the wrongful-arrest claim. *See* Federal Maritime Law and the Ship Mortgage Act, 46 U.S.C. 31301–43. "The arrest of a vessel in admiralty 'is an inconvenience to which the owners must submit as one caused by the exercise of a legal right on the part of the plaintiff, and unless the attachment is mala fide, or by such gross negligence as to amount to bad faith, no damages can be recovered for detention caused by such arrest.'" *Stevens v. F/V Bonnie Doon*, 655 F.2d 206, 209 (9th Cir. 1981). The Fifth Circuit has held that "[t]he gravamen of the right to recover damages for wrongful seizure or detention of vessels is the bad faith, malice, or gross negligence of the offending party." *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937). This order denies summary judgment on this issue because there are material facts in dispute.

Del Mar argues that nothing in the counterclaim or the record provides an allegation or facts supporting a claim of bad faith, malice, or gross negligence. Del Mar asserts that its arrest of the fishing vessel was in good faith. At the time of the arrest, Del Mar's accounting showed that the Cohens still owed over $180,000 on the note. In January 2007, Del Mar received a payment from Barry that was accompanied by a note stating that there was still an outstanding balance and that Barry was sick and unemployed. In addition, Del Mar learned of the Cohens' purportedly dire financial situation and impending divorce. According to Del Mar, it then sought and relied upon the advice of counsel (Attorney Holmes) to arrest the vessel. The Fifth Circuit has held "that the advice of competent counsel, honestly sought and acted upon in good faith is alone a complete defense to an action for malicious prosecution. The same principle controls [a case recovering damages for wrongful seizure or detention of vessels]."

13

*Frontera Fruit*, 91 F.2d at 97. Controller Roggio stated that he was advised by Attorney Holmes to arrest the vessel. Del Mar then acted accordingly.

This order finds plaintiff's argumentsunavailing. It is possible that Del Mar completely acted in good faith. But it is also possible that Del Mar did not. There are enough allegations and facts in the record that could support a finding of bad faith, malice, or gross negligence. The August 2007 order granted defendants' motion to vacate the order of arrest on the ground that Del Mar "has failed to meet its burden of establishing probable cause because there is not sufficient evidence that defendants were in default at the time the order of arrest was issued" (Dkt. No. 57 at 5). As discussed in an earlier section, on the summary-judgment record, there continues to be a factual dispute regarding whether or not the Cohens were in default. There are other possibly damning facts that should be reserved for trial. *First*, when Del Mar made an *ex parte* application for the arrest of the fishing vessel, it failed to inform the Court that the Cohens had already paid $188,000. *Second*, defendants assert that Del Mar never sent any notice that they were late on any payments, which Del Mar does not dispute. It is unclear from the record whether the Cohens could have assuaged Del Mar's fears regarding the debt had they been notified. *Third*, Del Mar can only benefit from the reliance-on-counsel defense if it can show that the advice was "honestly sought and acted upon in good faith." The record does not show that Del Mar has explicitly waived the attorney-client privilege and allowed discovery into these circumstances. There are questions of material fact as to whether this was the case. A factfinder could reasonably decide in favor of the Cohens. Accordingly, summary judgment is denied on this issue (and this order need not reach defendants' arguments that Del Mar breached the express terms of the loan agreement).

### 3. WAS THERE INTENTIONAL OR NEGLIGENT INTERFERENCE WITH THE COHENS' PROSPECTIVE ECONOMIC ADVANTAGE?

Defendants further counterclaimed that there was intentional or negligent interference with their prospective economic advance when Del Mar improperly seized the vessel. In addition to the aforementioned allegations, the verified answer and counterclaims stated: "The wrongful arrest of the F/V POINT LOMA has disrupted the fishing activities of the Vessel

14

1   and prevents it from earning income for the benefit of Defendants, including as a source of

2   income for the benefit of Defendants, including as a source of income to pay off the remaining

3   amount due to Plaintiff under the Promissory Note. Plaintiff has intentionally and negligently

4   interfered with Defendants [sic] prospective economic advantage" (Fanger Decl. Exh. 20 at

5   ¶ 41).

6   Although Del Mar claims that the Cohens did not plead the specifics of these claims,

7   federal notice pleading rules only require that the pleading contain "a short and plain statement

8   of the claim showing that the pleader is entitled to relief." FRCP 8(a). We are well beyond the

9   stage for attacking pleadings; this is the summary-judgment stage.

### A. INTENTIONAL INTERFERENCE.

According to *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003), there are the following elements establishing intentional interference with prospective economic advantage: "(1) an economic relationship between the [Cohens] and some third party, with the probability of future economic benefit to the [Cohens]; (2) [Del Mar's] knowledge of the relationship; (3) intentional acts on the part of [Del Mar] designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the [Cohens] proximately caused by the acts of [Del Mar]." The California Supreme Court added a sixth element in *Korea Supply*: there is "the added understanding that a plaintiff must plead that the defendant engaged in an act that is wrongful apart from the interference itself." *Id.* at 1153–54.

Del Mar contends that the Cohens cannot establish all the elements of their intentional-interference counterclaim. The Cohens did not satisfy the first element because they have not produced any copy of a contract with third parties with whom there was such interference, plaintiff says. This order finds, however, that the Cohens did not have to do so. Under *Korea Supply*, 29 Cal. 4th at 1157–58:

> [W]e concluded that the tort of interference with prospective economic advantage "is considerably more inclusive than actions based on contract or interference with contract, and is thus is not dependent on the existence of a valid contract." . . . "[T]he basic tort of interference with economic relations can be established by showing, *inter alia*, an interference with an existing contract or a contract which is certain to be consummated." Thus, a plaintiff who believes that he or she has a contract but who recognizes that

United States District Court
For the Northern District of California

> the trier of fact might conclude otherwise might bring claims for
> both torts so that in the event of a finding of no contract, the
> plaintiff might prevail on a claim for interference with prospective
> economic advantage.

There simply had to be "an economic relationship between the [Cohens] and some third party, with the probability of future economic benefit to the [Cohens]." Defendants provided settlement sheets from a fish wholesaler, Caito Fisheries, to whom defendants regularly sell fish. The sheets showed sales for trips prior to the arrest of defendants' fishing vessel (Fanger Decl. Exh. 14). Viewing the evidence in the light most favorable to the non-movants, a factfinder could reasonably conclude that the Cohens had an economic relationship with fish purchasers with the probability of future economic benefit.

Del Mar also argues that the Cohens did not satisfy the second element; again, not only did the counterclaim fail to allege awareness, but there was no evidence showing that Del Mar was aware of any specific relationship between the Cohens and a third party. This order disagrees. As stated, Del Mar just had to be aware of the economic relationship. Defendants provided evidence that Del Mar had known the Cohens for years and knew the kind of business the Cohens was engaged in (Fanger Decl. Exh. 15 at 10–12). Again, a factfinder could reasonably conclude that Del Mar was aware of an economic relationship between the Cohens and fish wholesalers.

The Cohens, according to Del Mar, did not satisfy the third element because they did not provide evidence that Del Mar had the specific intent of interference. Plaintiff cites *Seaman's Direct Buying Serv. v. Std. Oil Co.*, 36 Cal. 3d 752, 765 (1984), overruled on other grounds by *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85 (1995), for the proposition that Del Mar must have had the specific intent to interfere with or disrupt the relationship between the Cohens and third parties. The standard cited by Del Mar is incorrect. The California Supreme Court concluded "that a plaintiff need not plead that the defendant acted with the specific intent to interfere with the plaintiff's business expectancy in order to state a claim for this tort [of interference with prospective economic advantage]." *Korea Supply*, 29 Cal. 4th at 1141. Instead, "[w]hile a plaintiff may satisfy the intent requirement by pleading specific intent, *i.e.*, that the defendant desired to interfere with the plaintiff's prospective economic

16

advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Id.* at 1155. The Cohens provide enough evidence to defeat Del Mar's motion for summary judgment here. Del Mar's president, Mr. Cappuccio, admitted to knowing that the boat was fishing at the time of arrest (Fanger Decl. Exh. 15 at 23). As stated, Del Mar had known the Cohens for years and was aware of what they did for a living. In light of the proffered evidence, a factfinder could reasonably conclude that Del Mar knew that the interference was substantially certain to occur as a result of the arrest.

The remaining elements are that there had to be an actual disruption of the relationship, there had to be an economic harm to the Cohens proximately caused by the arrest, and the arrest was independently wrong. That the vessel was taken away from the Cohens certainly disrupted any fishing expeditions they had planned and any fish they would have sold to wholesalers. There was economic harm as well. Captain Kopak testified that the arrest caused defendants to miss at least thirteen fishing trips and the income the trips would bring (Fanger Decl. Exh. 11 at 19). Finally, this order has already discussed that there is a genuine dispute of material fact as to whether the arrest was independently wrong. Del Mar's motion for summary judgment is denied on this issue.

### B. NEGLIGENT INTERFERENCE.

Del Mar also moves for summary judgment on the Cohens' negligent-interference counterclaim. The elements of negligent interference are similar to those for intentional interference. "The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or

disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (1997). Del Mar reiterates its earlier arguments — "there is no pleading or evidence of any contract that was actually interfered with and therefore there can be no recovery for either intentional or negligent interference with contract" (Br. 21–22).

The first element is similar to those for intentional interference, as discussed earlier. With respect to the other three elements, there are disputes of material fact that do not justify granting Del Mar summary judgment. For example, the Cohens provided evidence showing that Del Mar knew of the Cohens' fishing business and their relationships with fish wholesalers. Del Mar was therefore aware or should have been aware that if it did not act with due care that its actions –- such as a wrongful arrest — would cause the Cohens to lose the probable future economic benefit or advantage of these relationships with fish wholesalers. In addition, under *North American Chemical*, 59 Cal. App. at 785–86, a contract between the parties imposes a legal duty to perform with due care. A party's alleged failure to do so constitutes a breach of that legal duty. The Cohens argue that Del Mar owed them a duty under their promissory note not to interfere with their business and arrest their fishing vessel without just cause. That Del Mar did so showed that Del Mar was negligent. Finally, this alleged negligence caused damage to the Cohens in that their relationships with fish wholesalers were actually interfered with and the Cohens lost whatever economic benefits they would have reaped from the missed thirteen fishing trips. Summary judgment is denied on this issue.

### 4. DID DEL MAR BREACH THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING?

In their answer and counterclaim, the Cohens alleged that the fishing vessel was wrongfully arrested, which disrupted their fishing activities and prevented them from earning income (for their own benefit and to pay off their loan). Del Mar did so without making a good-faith inquiry into the financial condition prior to arrest, the Cohens argue. "In taking the action it did, Plaintiff has breached the implied Covenant of Good Faith and Fair Dealing incorporated into the Promissory Note and Ship Mortgage" (Fanger Decl. Exh. 20 at ¶ 42). This is a tort claim.

18

"It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing." *Seaman's*, 36 Cal. 3d at 768. "While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition . . . that breach of the covenant always gives rise to an action in tort — is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. No doubt there are other relationships with similar characteristics and deserving of similar legal treatment." *Id*. at 768–79.

This order holds that the Cohens have not provided any evidence of a special relationship that would impose a *tort* for breach of the covenant of fair dealing. Del Mar may have been familiar with the Cohens and their business for many years, but this was like any other business relationship. No evidence supports any allegation that Del Mar and the Cohens had a special relationship justifying a tort remedy for a breach of the implied covenant of good faith and fair dealing. This order grants summary judgment on this issue.

### 5. SHOULD DEFENDANTS RECOVER DAMAGES RELATED TO THE LOSS OF THE FISHING NET?

Del Mar requests that the Cohens not be able to recover any damages related to the loss of a fishing net. The proof of a maritime tort requires findings of negligence and causation. *State of Maryland Dept. of Natural Resources v. Kellum*, 51 F.3d 1220, 1224 (4th Cir. 1995).

This order agrees that there was no proximate-cause relationship between the arrest of the fishing vessel and the disappearance of the net. In maritime law, the "duty of care [of a substitute custodian] extends only to property actually in its custody." *Scotiabank de Puerto Rico v. M/V/ ATUTI*, 326 F. Supp.2d 282, 285 (D.P.R. 2004) (citing *Matoil Serv. & Transp. Co.*, 129 F.2d 392, 394 (3d Cir. 1942)). The missing net was not on or near the fishing vessel at the time of arrest and was therefore not taken into the marshal's custody.

The vessel was arrested on June 21, 2007. Captain Kopak testified at his deposition that, at that time, the fishing net was on Pier 45, which was not where the vessel was arrested. Captain Kopak "saw that net after the vessel was arrested for a while, because [he] went down

19

there a few times" (Kelley Decl. Exh. 15 at 31–34). He then noted that "[t]he net went missing about between 7-16 and 7-17. My crew man called me upon one of those dates and said they had walked down the dock there, walked by the net and the net was gone, but the ground was still wet where the net had been. So they figured it disappeared right in that area at that time" (*id.* at 34). According to a police report filed by Captain Kopak, he last saw the net on July 4, 2007, and he noticed it was missing on July 16, 2007, at 10:30 a.m. Captain Kopak even suspected a third unrelated party of having taken the net — "Kopak added that he believes that [it] is possible that the crew of the Karen stole his net due to the fact that the Karen is a large enough vessel to carry the net" (Kelley Decl. Exh. 21).

Defendants argue that the net *was* within Del Mar's control during the time of arrest because the arrest warrant was issued against "the F/V POINT LOMA (Official No. 515298), *her rigging, tackle apparel, furniture, engines, bunkers, and all other necessaries thereunto appertaining and belonging (the 'Vessel')*" (Fanger Decl. Exh. 1) (emphasis added). This order finds defendants' argument unconvincing at best. No factfinder could reasonably conclude that there was a causal connection between the lost net and wrongful arrest. The net was in an entirely different location from the arrested vessel, was stolen more than three weeks after the arrest, and was never in the actual custody of the custodian. Significantly, Captain Kopak suspected another boat crew of having stolen the net. Summary judgment is granted with respect to this issue.

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is granted against Del Mar's counterclaims for (i) breach of the implied covenant of good faith and fair dealing and (ii) damages relating to the missing fishing net.

**IT IS SO ORDERED.**

Dated: April 11, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE