1    **COX, WOOTTON, GRIFFIN,**
     **HANSEN & POULOS LLP**
2    Gregory W. Poulos  (SBN 131428)
     Max L. Kelley (SBN 205943)
3    190 The Embarcadero
     San Francisco, CA  94105
4    Telephone No.:  415-438-4600
     Facsimile No.:  415-438-4601
5
     **LAW OFFICES OF RICHARD P. WAGNER**
6    Richard P. Wagner (SBN 166792)
     700 Oceangate, Suite 700
7    Long Beach, CA 90802
     Telephone: (562) 216-2946
8    Facsimile:  (562) 216-2960
9    Attorneys for Plaintiff
     DEL MAR SEAFOODS, INC.
10
11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13                    SAN FRANCISCO DIVISION
14
     DEL MAR SEAFOODS, INC.              )   Case No.: CV 07-02952 WHA
15                                       )
                     Plaintiff,          )   **PLAINTIFF'S DESIGNATION OF**
16                                       )   **WITNESS EVIDENCE BY**
          vs.                            )   **DEPOSITION, RESPONSES TO**
17                                       )   **REQUESTS FOR ADMISSIONS AND**
     BARRY COHEN, CHRIS COHEN (aka       )   **INTERROGATORY RESPONSES,**
18   CHRISTENE COHEN), *in personam* and )   **DEFENDANT'S OBJECTIONS TO**
     F/V POINT LOMA, Official Number     )   **DESIGNATION OF RESPONSES TO**
19   515298, a 1968 steel-hulled, 126-gross ton, )  **ADMISSIONS**
     70.8- foot long fishing vessel, her engines, )
20   tackle, furniture, apparel, etc., *in rem*, and )
     Does 1-10,                         )
21                                       )
                     Defendants.         )
22                                       )
                                         )
23   _____ )
                                         )   TRIAL: May 20, 2008, 7:30 a.m.
24   And Related Counterclaims           )   Courtroom 9, 19th Floor
                                         )   Hon. William H. Alsup
25
             Pursuant to the Court's order dated March 5, 2007, Plaintiff Del Mar Seafoods, Inc.
26
     attaches the following designations of witness testimony for witnesses that it intends to call
27
     by deposition, and the Responses to Requests for Admissions and Interrogatory Responses
28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DMSLPoint Loma/2501

1    that it intends to rely on at trial:

2    **I.**      Christene Cohen

3    **II.**     Leonard Cohen

4    **III.**    Michael Cohen

5    **IV.**    David Alan Kobak

6    **V.**     Defendants Barry Cohen, Chris Cohen's (aka Christene Cohen) Response to

7             Plaintiff's First Set of Requests for Admissions; and

8    **VI.**    Defendants Barry Cohen, Chris Cohen's (aka Christene Cohen) Response to

9             Plaintiff's First Set of Interrogatories

10

11   *A ruling is needed only as to Defendants' response to RFA No. 20: RFA No. 20*

12   *requests Defendants to admit Del Mar has a valid maritime lien on the Vessel. Defendants*

13   *have objected to the response as cumulative based on the misunderstanding that the*

14   *admitted fact has already been stipulated to in the Joint Final Pretrial Order. All that was*

15   *stipulated to in the Joint Final Pretrial Order, however, was that Del Mar has a valid*

16   *Preferred Ship Mortgage on the Vessel under 46 U.S.C. § 31321 et seq. (Stipulated Fact*

17   *No. 5 at pg. 3) which is not the same as Defendants' response to RFA No. 20 admitting*

18   *Del Mar has a valid maritime lien, if Del Mar has a valid Preferred Ship Mortgage..*

19

20

21   Dated:    May 19, 2008                COX, WOOTTON, GRIFFIN,
                                           HANSEN & POULOS, LLP
22                                         Attorneys for Plaintiff
                                           DEL MAR SEAFOODS, INC.
23

24

25

26                                        By: _____/s/_____
                                              Gregory W. Poulos
27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DMSI Point Loma/2504

Deposition of CHRISTENE COHEN January 11, 2008

## DEL MAR SEAFOODS v COHEN

Page 1 to Page 67

FOR:
GREGORY W. POULOS, ESQUIRE

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

## NICHOLS CERTIFIED COURT REPORTERS
2607 N. Hayden Road, Scottsdale, AZ 85257
110 West "C" Street, Suite 1300, San Diego, CA 92101

Phone:  1-800-227-0577
FAX:    1-480-990-7955



Deposition of CHRISTENE COHEN     BBA XMAX(1/1)     January 11, 2008

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 3  DEL MAR SEAFOODS, INC.,          )
 4                                   )
 5                      Plaintiff,   )
 6                                   )
 7  vs.                              )
 8                                   )  No. CV 07-02952 WHA
 9  BARRY COHEN, CHRIS COHEN (aka    )
10  CHRISTENE COHEN), in personam    )
11  and F/V POINT LOMA, Official     )
12  Number 515298, A 1968            )
13  steel-hulled, 126-gross ton,     )
14  70.8-foot long fishing vessel,   )
15  her engines, tackle,             )
16  furniture, apparel, etc., in     )
17  rem, and Does 1-10,              )
18                                   )
19                     Defendants.   )
20  _____ )
21            DEPOSITION OF CHRISTENE COHEN
22                  Scottsdale, Arizona
23             Friday, January 11, 2008
24                    10:00 a.m.
25  REPORTED BY RANDI J. FRIEDMAN, Arizona CSR No. 50505
```

## Page 2

```
 1  APPEARANCES:
 2
 3     COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
          (BY:  GREGORY W. POULOS)
 4       190 The Embarcadero
         San Francisco, California  94105
 5       Appearing on Behalf of Plaintiff
 6
 7     DAVIS, WRIGHT, TREMAINE, LLP
          (BY:  GWEN L. FANGER)
 8       505 Montgomery Street, Suite 800
         San Francisco, California  94111
 9       Appearing on Behalf of Defendants
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1  I N D E X        CHRISTENE COHEN
 2  E X A M I N A T I O N                        PAGE
 3
    BY:  Mr. Poulos                               5
 4                        * * *
 5
 6            E X H I B I T S
 7                                                PAGE
 8  1    Promissory Note                          28
 9  2    Declaration of Christene Cohen           29
10  3    Letter from Barry Cohen to Joe           30
11  4    Defendants' Initial Disclosures          37
12  5    Assignment of Joint Venture Interest     40
13  6    Schedule of Payments                     46
14  7    Schedule of Payments                     47
15  8    Plaintiff's Requests for Production of   60
         Documents
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2
 3
 4
 5
 6                        * * *
 7
 8       The Deposition of CHRISTENE COHEN, a witness
 9  herein, taken pursuant to Notice, before Randi J. Friedman,
10  Certified Court Reporter, State of Arizona, at A.A. NICHOLS
11  CERTIFIED REPORTERS, 2607 N. Hayden Road, Scottsdale,
12  Arizona, on Friday, January 11, 2008, commencing at or about
13  (10:00) a.m.
14
15                        * * *
16
17
18
19
20
21
22
23
24
25
```

BSA XMAX(2/2)

## Page 5

1  Scottsdale, Arizona
2  Friday, January 11, 2008
3  10:00 a.m.
4
5  CHRISTENE COHEN,
6  a witness herein, after having been first duly sworn,
7  testified as follows:
8                                  * * *
9
10           EXAMINATION
11  BY MR. POULOS:
12      Q.   Good morning, Ms. Cohen. Could you state your
13  full name for the record.
14      A.   Christene, spelled c-n-e, Christene Layne,
15  L-a-y-n-e, Cohen, C-o-h-e-n.
16      Q.   Ms. Cohen, have you ever had your deposition
17  taken before?
18      A.   No.
19      Q.   You're currently separated from your husband,
20  Barry Cohen; is that right?
21      A.   Yes.
22      Q.   And how long have you been separated?
23      A.   Since December 28th of '07.
24      Q.   When did you file for divorce?
25      A.   The exact date, I'm not -- I don't know.

## Page 6

1      Q.   What's your best estimate?
2      A.   Maybe that same day.
3      Q.   Let me tell you some of the ground rules for a
4  deposition so you kind of understand what we're doing here;
5  okay? The main thing that you need to know is that the oath
6  that you've taken is the same oath that you take if you're
7  testifying in court.
8      A.   Correct.
9      Q.   So the same obligation, tell the truth, the whole
10  truth, nothing but the truth. The whole thing you've heard
11  on television before, it's the same, even though we're
12  sitting in a court reporter's office; okay?
13      A.   Uh-huh.
14      Q.   Is that yes?
15      A.   Yes.
16      Q.   Rule No. 2, we need verbal, audible responses.
17  Uh-huh or nods of the head, the problem is they require the
18  court reporter to actually interpret whether you're shaking
19  your head up or down or sideways or what uh-huh means, or
20  whether it's yes or no, so it's important for you to give us
21  verbal, audible responses; okay?
22      A.   Okay.
23      Q.   Everything that you say is going to be taken down
24  by the court reporter, and at the end of the deposition,
25  some time in the next few weeks, you'll be given a

## Page 7

1  transcript of the deposition and you'll have a chance to
2  read it and make any changes to the deposition if they're
3  necessary to correct your answers; okay?
4      A.   Okay.
5      Q.   Easy process. She'll either give you an errata
6  sheet to write it down, or you can write it down, cross
7  something out, write in the correct answer above it, initial
8  it.
9           I want to caution you, you're always welcome to
10  change your answers. You can't change my questions, but if
11  you do change your answers in a significant way, I or your
12  own counsel in this case could comment on those, and it
13  might affect how the judge views your testimony at trial.
14  So it's important for us to get your best testimony today;
15  okay?
16      A.   Okay.
17      Q.   So that said, if we're going through the testimony
18  today and you need to go back and change something, that's
19  perfectly fine for you to do that. Just tell me, wait a
20  minute; this reminds me of something else I said earlier I
21  want to change that or I want to revisit that issue. It's
22  perfectly fine to do that.
23           In some respects, this is more of a conversation
24  than just a question/answer session; okay?
25      A.   Okay.

## Page 8

1      Q.   As a conversation, if you don't understand my
2  questions, just tell me that. I'm happy to work with you.
3  I want to make sure that you understand what I'm asking you
4  before you provide an answer; okay?
5      A.   Okay.
6      Q.   If you need to take a break at any time, you're
7  more than welcome to do that. Again, just let me know;
8  okay?
9      A.   Okay.
10      Q.   Is there any reason that you know of, whether
11  you're on medication or something that might affect your
12  ability to recall events, or you're not feeling well; is
13  there any reason why you can't give your best testimony
14  today?
15      A.   No.
16      Q.   You're aware we're here because of a lawsuit
17  filed by Del Mar Seafoods against yourself and Barry Cohen;
18  is that right?
19      A.   Yes.
20      Q.   When did you first learn of that lawsuit?
21      A.   When my attorney was served.
22      Q.   Which attorney are you talking about?
23      A.   That would be Dennis Caspe, my divorce attorney,
24  when he was notified.
25      Q.   Do you recall when that was?

Deposition of CHRISTENE COHEN                USA XMAX(3/3)                January 11, 2008

**Page 9**

1   A.   Approximately -- exact date, no.

2   Q.   In a deposition, if you don't know something, the

3   answer you just gave is perfectly acceptable. If you don't

4   know something, "I don't know" is a great answer. I'm

5   entitled to your best estimate when you have one, where you

6   can come up with one. And I want to make a distinction for

7   you between a guess and an estimate.

8        If you're just picking a time, a date out of thin

9   air and you have no rational basis for it, that's a guess.

10  I don't want you to guess about anything, but I am entitled

11  to your best estimate. So, for example, when I ask you for

12  a date or a time, you may not recall specifically as you did

13  with your date of separation or the date you filed your

14  divorce. It may have been the same day, you know, if you

15  can narrow it down, I'm entitled to that; okay?

16  A.   Okay.

17  Q.   So when I ask you, you know, when you first

18  learned about it and you said, well, it was when my attorney

19  was served, I've asked you now when was that; you don't

20  know, but can you narrow the time period? Can you give me

21  an estimate or an approximate time?

22  A.   No.

23  Q.   Was it within the last month or two?

24  A.   No.

25  Q.   Was it within the last six months?

**Page 10**

1   A.   Yes.

2   Q.   Who is your divorce attorney?

3   A.   Dennis Caspe, C-a-s-p-e, from Santa Cruz.

4   Q.   Where was your divorce proceeding filed? Is that

5   in Santa Cruz?

6   A.   Correct.

7   Q.   How far along are your divorce proceedings?

8   A.   We have not started discovery.

9   Q.   Have you prepared in your divorce proceedings a

10  listing of assets and liabilities?

11       MR. FANGER:   I'm going to object. What she's

12  been doing in her divorce proceedings is privileged, because

13  that's between her and Mr. Caspe.

14       MR. POULOS:   Actually, it's not. It's public

15  record.

16       MS. FANGER:   You can ask if she's prepared

17  anything public.

18       MR. POULOS:   She may not know whether it's

19  public or not, but anything that she's prepared in terms of

20  assets and liabilities is something that would be filed with

21  the court, and it becomes part of public record.

22       MS. FANGER:   Are you asking what she's filed?

23       MR. POULOS:   I'm asking her what she's

24  prepared, whether it has yet been filed or not. I'm

25  entitled to know whether she's prepared it, and then we

**Page 11**

1   can -- without going into specifics yet, we'll find out then

2   if it's been filed. And then if it's been filed, we can go

3   into that.

4        MS. FANGER:   But what she's prepared may or

5   may not become filed, so --

6        MR. POULOS:   Preparation by her of a document

7   is not attorney/client communication. It's a preparation of

8   a document by her.

9        MS. FANGER:   But she's prepared it with her

10  attorney.

11       MR. POULOS:   I don't know that, and I don't

12  think you do either.

13       MS. FANGER:   What if we start with if she's

14  filed anything, if she knows the attorney's filed anything,

15  and we can ask about the public files first.

16  BY MR. POULOS:

17  Q.   Do you know if your attorney has filed any

18  statement of assets or liabilities?

19  A.   No.

20  Q.   You don't know or he has not?

21  A.   He has not.

22  Q.   Have you sat down and prepared on your own a list

23  of your assets and liabilities?

24  A.   No.

25  Q.   Have you received from Barry a list of assets and

**Page 12**

1   liabilities?

2   A.   No.

3   Q.   Are you aware of any debt that you owe to Del Mar

4   Seafoods?

5   A.   Yes.

6   Q.   All right. Do you know how much that debt is?

7   A.   No.

8   Q.   What is the debt for?

9   A.   An agreement between Joe Cappuccio and Barry

10  Cohen.

11  Q.   For what?

12  A.   I'm not sure.

13  Q.   What is your understanding of it?

14  A.   A business that -- an agreement that the two of

15  them had.

16  Q.   What was that business agreement for?

17  A.   The boat. It had to do with the Point Loma.

18  Q.   Do you know what it had to do with the Point

19  Loma?

20  A.   No.

21  Q.   Have you ever been served an initial initial

22  disclosure in this case?

23  A.   I don't know.

24  Q.   Have you seen any pleadings in this case?

25  A.   Yes.

NICHOLS CERTIFIED COURT REPORTERS          1-800-227-0577          Page 9 to Page 12

Deposition of CHRISTENE COHEN                    DSA XMAX(8/6)                    January 11, 2008

## Page 17

1  windy, da-dee-dee-da. Oh, I'm sorry. If they were at home
2  port or, you know, where they were.
3      Q.  Did you talk to captains all about their catch
4  and how the vessel was doing?
5      A.  Yes.
6      Q.  Yes?
7      A.  Yes.
8      Q.  All right. And that was -- were you -- since you
9  were doing payroll, were you also doing payroll for the
10 fishing vessel, Point Loma?
11     A.  No.
12     Q.  Who was doing that?
13     A.  Barry Cohen.
14     Q.  Do you know what the earnings were for the Point
15 Loma in, say, between 2004 and 2007?
16     A.  No.
17     Q.  Do you have any information at all about the
18 profits and loss of the vessel during any period of that
19 time?
20     A.  No.
21     Q.  The fishing vessel is controlled through a Sub
22 S-Corporation; isn't it?
23     A.  Clarify. I don't know.
24     Q.  It's owned by you, but then you transferred title
25 to the Point Loma Fishing Company, Inc.; is that right?

## Page 18

1      A.  I don't know.
2      Q.  You don't know what the current ownership is of
3  the fishing vessel?
4      A.  No.
5      Q.  You said you're a half owner of it. You say you
6  do not know how it's owned?
7      A.  I do not.
8      Q.  Did you participate in setting up a California
9  Sub S-Corporation?
10     A.  There was a meeting and I don't know the
11 specifics about it.
12     Q.  When you say there was a meeting, what meeting
13 are you referring to?
14     A.  Some kind of meeting. Barry told me that we
15 needed protection in case a crew person got injured on the
16 boat or something like that.
17     Q.  Did he tell you, you needed protection in case --
18 well, you're aware of a lawsuit filed against the Port St.
19 Louis Harbor District; is that right?
20     A.  Yes.
21     Q.  Did Barry tell you, you needed protection against
22 the possible loss of that lawsuit?
23     A.  No.
24     Q.  Was the vessel transferred into the Sub
25 S-Corporation in order to protect it in case you needed to

## Page 19

1  declare bankruptcy?
2      A.  I don't know.
3      Q.  Was that discussed at all?
4      A.  No.
5      Q.  When was the meeting that Barry told you that
6  they were transferring the vessel because you needed
7  protection?
8      A.  I can only give a window period on this question.
9  We lived in Cambria. It's before we moved to Aptos.
10     Q.  When did you move to Aptos?
11     A.  I will have to look at the documents. I don't
12 know.
13     Q.  What documents would you look into?
14     A.  Purchase of the home.
15     Q.  You moved to Aptos when Barry took a position
16 with Del Mar Seafoods up in Monterey; is that right?
17     A.  Watsonville, yes.
18     Q.  Watsonville.
19         What did Barry discuss with you regarding that
20 employment with Del Mar?
21     A.  That -- that it was a good thing that we were
22 moving up there, and that he could be part of the Del Mar
23 team.
24     Q.  Did he tell you that he was guaranteed lifetime
25 employment?

## Page 20

1      A.  I don't know.
2      Q.  Do you have any knowledge of the damages that are
3  alleged to have been sustained by the fishing vessel as a
4  result of the arrest?
5      A.  Just what I have read.
6      Q.  What have you read?
7      A.  What was in the lawsuit. The papers from the
8  lawsuit.
9      Q.  Okay. But independent of just papers in the
10 lawsuit --
11     A.  No.
12     Q.  -- you actually don't have any knowledge of that?
13     A.  No.
14     Q.  All right. Do you have any knowledge of what the
15 earnings have been of the fishing vessel in 2007?
16     A.  No.
17     Q.  Do you have any knowledge of the amount of the
18 mortgage owed on the vessel?
19     A.  No.
20     Q.  Do you have any knowledge of the amount of money
21 owed under a promissory note to Del Mar?
22     A.  No.
23     Q.  Did you have knowledge of the amount owed on a
24 promissory note at the time that you signed that note?
25     A.  Could you repeat that?

Deposition of CHRISTENE COHEN                                   January 11, 2008

## Page 21

1  Q.   You signed a promissory note to Del Mar; is that
2  right?
3  A.   Uh-huh yes.
4  Q.   And you signed a promissory mortgage, giving Del
5  Mar a preferred mortgage over that vessel; is that right?
6  A.   I don't know.
7  Q.   When you signed the promissory note, do you
8  recall what the amount of the note was?
9  A.   I believe it was 215,000.
10  Q.   Do you recall how the signing of a -- or entering
11  into a promissory note with Del Mar came about?  What was
12  the background on that?
13  A.   What I recall is that there were repairs done to
14  the boat.  What repairs, I do not know.
15  Q.   Do you recall when the promissory note was made?
16  A.   No.
17       MR. POULOS:   Let's go off the record for a
18  second.
19       (Whereupon there was a discussion off the
20  record.)
21  BY MR. POULOS:
22  Q.   Did you have any discussion with Barry regarding
23  his termination of employment from Del Mar?
24  A.   Yes, I believe I asked him when he came home,
25  what happened.

## Page 22

1  Q.   And what did he tell you?
2  A.   I don't know.
3  Q.   You're aware that in the lawsuit against the Port
4  St. Louis Harbor District, there was a request for
5  attorneys' fees; is that right?
6  A.   Yes.
7  Q.   And you're aware that the request by Barry to
8  receive his attorneys' fees was denied by the Court?
9  A.   Yes.
10  Q.   And you're aware that the attorneys' fees in that
11  case owed to the Miller Star firm that represented Barry are
12  somewhere in the range of 2.2 million dollars; is that
13  right?
14  A.   I don't know.
15  Q.   You know it's in the million-dollar plus range?
16  A.   Yes.
17  Q.   Do you know it's in the 2 million dollar plus
18  range?
19  A.   No.
20  Q.   What was your understanding of the amount?
21  A.   At the time the trial ended, I believed it was
22  over a million dollars.
23  Q.   In that litigation, I'll represent to you that
24  Barry filed a declaration with the Court in which he said
25  that if he does not recover his attorneys' fees, he might

## Page 23

1  have to declare bankruptcy; were you aware of that?
2  A.   No.
3  Q.   Did Barry ever discuss with you the prospect that
4  he might have to declare bankruptcy?
5  A.   No.
6  Q.   Has that come up in your divorce proceedings?
7  A.   No.
8  Q.   What payments, if any, are you aware of under the
9  promissory note?
10  A.   Only the 175,000-dollar one.
11  Q.   When was that payment made?
12  A.   When we lived in Aptos.  The exact date, I don't
13  know.
14  Q.   Do you have an understanding why that payment was
15  made?
16  A.   Joe Roggio and Joe Cappuccio wanted a payment.  A
17  big payment.
18  Q.   Were you ever party to any discussions about what
19  would happen if a big payment was made?
20  A.   No.
21  Q.   Were you party to any discussions about the
22  accrual of interest on the promissory note?
23  A.   No.
24  Q.   Were you ever party to any discussions about the
25  forgiveness of any debt in return for payment?

## Page 24

1  A.   No.
2  Q.   Were you ever party to any discussions about
3  timing of payments under that promissory note?
4  A.   No.
5  Q.   Did Barry ever tell you that he was not obligated
6  to make payments under that note?
7  A.   No.
8  Q.   You're an officer of the Point Loma Fishing
9  Company; is that right?
10  A.   Part owner.  Half, yes.
11  Q.   As a half owner of that company, are you aware of
12  any agreements by the company that it would not need to make
13  payments on the promissory note?
14  A.   Can you repeat that question?
15  Q.   As a part owner of that company, half owner of
16  the company, are you aware of any agreements that the
17  company had with Del Mar that it would not have to make
18  payments on the note?
19  A.   No.
20  Q.   As a half owner of that company, are you aware of
21  any agreements between the company and Del Mar, that
22  interest would not accrue on that note?
23  A.   No.
24  Q.   As a half owner of the company, are you aware of
25  any agreements between your company and Del Mar, that

Deposition of CHRISTENE COHEN     DBA XMAX(7/7)     January 11, 2008

### Page 25

1 monthly payments were not owed on that note?

2    A.   I have no knowledge.

3    Q.   Michael and Leonard Cohen are your stepchildren;

4 is that correct?

5    A.   Yes.

6    Q.   They've never been legally adopted by you?

7    A.   No.

8    Q.   Are you aware of any assignments between Barry

9 and Del Mar Seafoods of interest in the Del Mar Seafoods,

10 Inc. Old Port Fisheries division?

11    A.   Can you clarify that?

12    Q.   Sure. You're aware that there was an operating

13 Joint Venture Agreement between Barry Cohen and Del Mar to

14 operate the business at Avila Beach; is that right?

15    A.   Yes.

16    Q.   In this litigation, it's kind of been shorthanded

17 as the Avila Beach joint venture.

18    Do you understand what I'm referring to by that?

19    A.   No.

20    Q.   The agreement for Barry -- between Barry and Del

21 Mar to operate that business that you worked for in Avila

22 Beach has been known as the Avila Beach joint venture; okay?

23    A.   Okay.

24    Q.   I'll define that term for you; okay. So when you

25 were employed down there in Avila Beach by Del Mar Seafoods,

### Page 26

1 Inc./Old Port Fisheries division, that was what the parties

2 have generally referred to here as the joint venture, the

3 Avila Beach joint venture; okay?

4    A.   When we worked there?

5    Q.   Yes.

6    A.   It was Old Port Fisheries -- it was worded

7 differently, but, yes, it was a joint venture.

8    Q.   What was it worded as?

9    A.   Old Port Fisheries/Del Mar.

10    Q.   Okay. As the bookkeeper -- well you weren't

11 quite the bookkeeper. You said you were employed as hiring

12 for employees.

13    Who did you hire them for?

14    A.   Old Port Fisheries/Del Mar Seafoods.

15    Q.   Okay. When you bought supplies, who do you buy

16 those for?

17    A.   Old Port Fisheries/Del Mar.

18    Q.   When you made deposits, what account did you

19 make deposits into?

20    A.   A Wells Fargo account.

21    Q.   Were you aware -- is that an account that Barry

22 had signing authority on?

23    A.   I believe so; yes.

24    Q.   Did you do anything in terms of reviewing checks

25 that Barry wrote on that account?

### Page 27

1    A.   No, No.

2    Q.   Were you aware of any sales -- well, what was the

3 business that you understood of Old Port Fisheries/Del Mar?

4    A.   They bought and sold seafood.

5    Q.   Did they sell seafood to Michael Cohen?

6    A.   I believe so; yes.

7    Q.   And did they sell seafood to Leonard Cohen or his

8 business, Old Port, Inc.?

9    A.   Yes.

10    Q.   And were those sales done on an account basis?

11 In other words, their debts for their inventory that was

12 sold to them was put on an account they maintained with Old

13 Port Fisheries/Del Mar?

14    A.   An invoice, yes.

15    Q.   When the operation between -- of Old Port

16 Fisheries/Del Mar ended, were there still balances owed by

17 Michael and Leonard?

18    A.   I do not know. No, I don't know.

19    Q.   Did Barry ever tell you that he had agreed to be

20 responsible for payment of those balances owed to Del Mar

21 from Michael and Leonard?

22    A.   No.

23    Q.   Did you ever hear that from Michael or Leonard,

24 that Barry had said he would be responsible for those debts?

25    A.   No.

### Page 28

1    MR. POULOS:   Let's take a break and see if

2 that fax has come in.

3    (Whereupon there was a brief recess from

4 11:11) a.m. until 11:17 a.m.)

5    (Exhibit 1 was marked.)

6 BY MR. POULOS:

7    Q.   Would you please take a look at Exhibit 1 and

8 tell me if you recognize this document.

9    A.   Yes.

10    Q.   And can you tell us what this document is?

11    A.   A promissory note.

12    Q.   Have you seen it before?

13    A.   Yes.

14    Q.   Is this the promissory note that you signed in

15 favor of Del Mar Seafoods, Inc. for the loan of $215,000.00?

16    A.   Yes.

17    Q.   And do you see that it says that interest will be

18 at 7 percent per annum? That's in the first paragraph.

19    A.   Yes.

20    Q.   Are you aware of any agreements to alter that

21 term of this promissory note?

22    A.   I don't know.

23    Q.   Well, are you aware or not?

24    A.   No.

25    Q.   Okay. Is that your signature on the third page?

DBA XMAX(8/9)

Deposition of CHRISTENE COHEN                                    January 11, 2008

## Page 29

1   A.   Yes,
2   Q.   Are you aware of -- other than the payment of the
3   $175,000.00 that you mentioned earlier, are you aware of any
4   other payments on this promissory note?
5   A.   No.  I just know that he was making payments.
6   That's all I know.
7   Q.   All right.  And you're not aware of any
8   agreements for forbearance of his obligation to make
9   payments?
10  A.   I don't know what that word means.
11  Q.   Do you see that it says in that first paragraph,
12  "Monthly payments of $3,000.00 or 15 percent of the gross
13  landing receipts of each and every landing of seafood
14  product"?
15  A.   Yes.
16  Q.   Are you aware of any agreement to alter that term
17  of the promissory note?
18  A.   I don't know.
19  Q.   You're not aware of any?
20  A.   No, No,   *82*
21       (Exhibit-1 was marked.)
22  Q.   Do you recognize this document?
23  A.   Yes,
24  Q.   Have you seen it before?
25  A.   Yes,

## Page 30

1   Q.   Is that your signature on Page 2?
2   A.   Yes,
3   Q.   All right.  And did you sign it on or around 18
4   December, 2007?
5   A.   Yes,
6   Q.   Although this copy doesn't have the preferred
7   mortgage attached, when you signed this declaration, the
8   preferred mortgage was attached to it?  It says it was in
9   Paragraph 5, the promissory note was attached,
10       Was the attached promissory note the one we just
11  looked at?
12  A.   I believe so; yes.
13  Q.   Do you maintain a copy of that promissory note
14  yourself?
15  A.   No,
16  Q.   Do you keep a copy of the preferred mortgage
17  that's referred to in Paragraph?
18  A.   No,
19  Q.   Where were you, if you can remember, in January
20  of 2007?  Were you living in Aptos?
21  A.   Yes,
22       MR. POULOS:   Let me have this marked as
23  Exhibit-5. *40*
24       (Exhibit-1 was marked.)
25

## Page 31

1   BY MR. POULOS:
2   Q.   Have you had a chance to look at Exhibit-3?
3   A.   Yes,
4   Q.   Do you see at the beginning -- well, do you
5   recognize that document?
6   A.   No.
7   Q.   All right.  You see at the bottom it refers to
8   Fishman Cohen as an America Online E-mail address?
9   A.   Yes,
10  Q.   That is Barry's E-mail address?
11  A.   Yes,
12  Q.   And Barry sometimes types up E-mails, and then
13  just prints them out and mails them out; doesn't he?  In
14  other words, sends them by E-mail?  He types it in the
15  E-mail program, and then prints it and sends it?
16  A.   I probably don't know.
17  Q.   Do you see the balance owed in his reference in
18  the first paragraph?
19  A.   Uh-huh.
20  Q.   Yes?
21  A.   Yes.
22  Q.   134 something?
23  A.   139.
24  Q.   139 and how much?
25  A.   139,749.79.

## Page 32

1   Q.   Do you have any reason to disagree with that
2   figure as the balance owed as of January 30th, 2007, under
3   the promissory note?
4        MS. FANGER:   Objection.  That assumes facts
5   not in evidence.
6        THE WITNESS:   I don't know.
7   BY MR. POULOS:
8   Q.   You don't have any basis to agree or disagree
9   with that figure?
10  A.   None,
11  Q.   Were you aware of any agreements to include
12  additional amounts of debt under the promissory note?
13  A.   No,
14  Q.   At the end of the Old Port Fisheries/Del Mar
15  Seafoods operating in Avila Beach, there was inventory still
16  left over; wasn't there?
17  A.   I don't know,
18  Q.   Were you still working at the -- for that entity
19  at the time that the entity shut down its operations?
20  A.   Yes,
21  Q.   Do you recall when that occurred?
22  A.   No,
23  Q.   Do you recall it being -- what month it occurred
24  in?
25  A.   No.

Deposition of CHRISTENE COHEN                    BSA XMAX(0/0)                    January 11, 2008

**Page 33**

1  Q.   Can you give me a year that that occurred?
2  A.   No.
3  Q.   In this initial Disclosure, and we're going to
4  make this an exhibit, it says that you are knowledgeable
5  about quote, plaintiff, and I'll say the plaintiff is Del
6  Mar, my client, "Plaintiff's breach of the promissory note
7  and ship mortgage."
8       What knowledge do you have of Del Mar's alleged
9  breach of the promissory note and ship mortgage?
10 A.   Just that the vehicle was arrested unlawfully.
11 Q.   Why do you say it was arrested unlawfully?
12 What's your knowledge?
13      MS. FANGER:   Objection. That's asking for
14 privileged -- attorney/client privileged information.
15      MR. POULOS:   You disclosed her as
16 knowledgeable about discoverable facts. I'm asking what
17 discoverable facts she has, those are clearly outside of
18 non-discoverable attorney/client communications.
19 BY MR. POULOS:
20 Q.   So apart from privileged communications from your
21 lawyer, what knowledge do you have of the alleged breach of
22 the promissory note and ship mortgage?
23 A.   I wasn't notified.
24 Q.   Of what?
25 A.   That there was a problem of any kind.

**Page 34**

1  Q.   Okay. From whom?
2  A.   Either Del Mar or Barry Cohen.
3  Q.   Okay. Apart from not being notified of a
4  problem, what do you mean by that?
5  A.   I wasn't aware that anything was wrong and going
6
7  Q.   How much money have you received from -- let's
8  say in 2007, from the fishing vessel, Point Loma,
9  operations?
10 A.   Zero.
11 Q.   How much did you receive in 2006 from the Point
12 Loma fishing vessel operations?
13 A.   I think $5,000.00.
14 Q.   All right. That was your half or was that the
15 full income to the corporation?
16      That was when I left the marriage.
17 Q.   And how did you end up with $5,000.00? What was
18 that for?
19 A.   I was leaving the marriage and I needed some
20 money.
21 Q.   Okay. And so did you understand that that was
22 income from the Point Loma fishing vessel's operations?
23 A.   Yes.
24 Q.   And why do you say that? Did it come from a
25 special account?

**Page 35**

1  A.   Yes, the one from the bank account checkbook.
2  Q.   Okay. How much income did you receive in 2005
3  from the Point Loma fishing vessel operations?
4  A.   I don't know. Zero.
5  Q.   Did the vessel not make money in 2005?
6  A.   I do not know.
7  Q.   Who is the current captain of the Point Loma?
8  A.   I do not know. It's Dave Kablak (sic.) or
9  something like that. David, but I've never met him.
10 Q.   Have you spoken with him?
11 A.   No.
12 Q.   What's the basis for your knowledge?
13 A.   Just the documents I've read.
14 Q.   In this litigation?
15 A.   Yes.
16 Q.   What documents have you reviewed in this
17 litigation and in preparation for your deposition?
18      MS. FANGER:   Objection. It's work product
19 and attorney/client privilege information.
20      MR. POULOS:   Not in preparation for a
21 deposition, counsel.
22      MS. FANGER:   Documents that we've discussed
23 with her, shown her, are --
24      MR. POULOS:   If she's reviewed anything in
25 preparation for her deposition, it is discoverable.

**Page 36**

1  BY MR. POULOS:
2  Q.   What have you reviewed in preparation for your
3  deposition?
4  A.   Just the lawsuit in general.
5  Q.   Well, what does that mean?
6      MS. FANGER:   Objection. You're asking for
7  attorney/client privileged information about our
8  discussions.
9      MR. POULOS:   No, I'm not. I'm not asking
10 about discussions at all.
11 BY MR. POULOS:
12 Q.   I'm asking about what documentation you have
13 reviewed in preparation for a deposition in this case.
14 A.   What was filed with the Court on the lawsuit.
15 Q.   Have you reviewed the Complaint?
16 A.   Yes.
17 Q.   And have you reviewed the Answer to the
18 Complaint?
19 A.   Yes.
20 Q.   Have you reviewed a Cross-Complaint?
21 A.   Yes.
22 Q.   Have you reviewed discovery responses?
23 A.   No.
24 Q.   Have you reviewed the document -- we'll have
25 marked as Exhibit-4, the Defendants' Initial Disclosures.

Deposition of CHRISTENE COHEN                    OSA XMAX(11/11)                    January 11, 2008

**Page 41**

made effective as of the 22nd day of October, 2004"; do you
see that?

3  A.  Yes.

4  Q.  Does that refresh your recollection as to the
5  time period when the Old Port Fisheries/Del Mar joint
6  venture operation at Avila Beach ended?

7  A.  I don't know.

8  Q.  Did you understand that it was -- you were an
9  employee up to the end; right?

10  A.  Yes.

11  Q.  And you don't recall when you -- even the year
12  you stopped operating or stopped employment with that Old
13  Port Fisheries/Del Mar?

14  A.  I would have to look at a record, like a check
15  stub or something like that, you know. A payroll stub.

16  Q.  How soon after you stopped that employment did
17  you move to Aptos?

18  A.  Very soon.

19  Q.  And when did you move to Aptos?

20  A.  I don't remember.

21  Q.  Again, I'm entitled to your best estimate.

22  A.  Okay. Probably the end of October, and that's a
23  guess.

24  Q.  Of '04?

25  A.  Yes.

**Page 42**

1  Q.  You recall it was in the fall or winter of '04,
2  that you made that move?

3  A.  I think it was fall.

4  Q.  What we often do, and you're not unique in this,
5  and I'm not trying to, you know, put words in your mouth.
6  We often try with witnesses -- recalling dates and times is
7  a difficult thing, so I understand that, but what I do with
8  all witnesses, is try to help you remember things. If you
9  can put it as you've just done in a season; if you can sort
10  of remember, well, I know I spent Christmas of this year in
11  this year in a certain house or someplace, those are the
12  sorts of things that can sometimes trigger a memory of,
13  yeah, well, I ended my employment some time around that time
14  period.

15  I want you to understand, I'm not trying to
16  harass you here. I'm trying to help you in terms of memory,
17  in terms of remembering something here; okay?

18  A.  Yes.

19  Q.  Is it fair to say, then, that you recall starting
20  your move or making the move from Avila Beach and moving up
21  to Aptos in the -- some time in the fall of 2004?

22  A.  Yes.

23  Q.  And you recall that that was very shortly after
24  the operation of Old Port Fisheries/Del Mar Seafoods'
25  business at Avila Beach ended?

**Page 43**

1  A.  Yes.

2  Q.  Do you think it was within that same month that
3  you made that move?

4  A.  I don't recall.

5  Q.  October of '04 -- big event in October is always
6  Halloween.

7  Do you remember where you spent Halloween -- when
8  your first Halloween was up in Aptos?

9  A.  No.

10  Q.  Did you move into an apartment or a house up
11  there?

12  A.  A house.

13  Q.  Had you purchased that or were you renting?

14  A.  We purchased it.

15  Q.  Okay. Do you remember going up and looking for
16  houses in advance?

17  A.  Yes.

18  Q.  All right. Do you remember when that was?

19  A.  No.

20  Q.  When is your birthday?

21  A.  January.

22  Q.  Do you have any reason to believe that the joint
23  venture -- well, the Old Port Fisheries/Del Mar Seafoods
24  operations did not end on or around this day of October
25  22nd, 2004?

**Page 44**

1  A.  I don't know.

2  Q.  Is it roughly in that time period, consistent
3  with your memory?

4  A.  It's the best guess.

5  Q.  I always hate that word, "guess."

6  A.  I know, I'm sorry, but that's the best I can do,
7  I don't know.

8  Q.  Is it an estimate or a pure guess?

9  A.  It's an estimate.

10  Q.  Okay. Your best estimate of the time that that
11  operation, Old Port Fisheries/Del Mar Seafoods ended its
12  operations in Avila Beach was around this date in October of
13  '04? That's your best estimate?

14  A.  Yes.

15  Q.  Okay. Did you have any discussions with Barry
16  about the assignment of the joint venture interest?

17  A.  No.

18  Q.  Do you have any knowledge about how the
19  assignment came about?

20  A.  No.

21  Q.  Did you read the promissory note before you
22  signed it?

23  A.  Yes.

24  Q.  Have you made any payments on this promissory
25  note, separate and apart from payments from Barry?

Deposition of CHRISTENE COHEN                    BBA XMAX(12/12)                    January 11, 2008

**Page 46**

1  A.  No.
2  ~~Q.  This is a bad copy, but it was the one that was~~
3  ~~attached to the Initial Disclosures. I'm showing you~~
4  ~~Exhibit 4 and a document with Bates numbers Cohen00009.~~
5  ~~Have you ever seen that document before?~~
6  A.  No.
7  ~~Q.  Have you ever discussed with Barry a schedule of~~
8  ~~payments that he was given by Joe Roggio?~~
9  ~~A.  No.~~
10  Q.  How well do you know Joe Roggio? You worked --
11  A.  Pretty well. I like him a lot.
12  Q.  Do you think -- do you have any reason to believe
13  that Joe Roggio has any malice or ill-will towards you?
14  A.  No.
15  Q.  Do you have any reason to believe that he has any
16  malice or ill-will towards Barry?
17  A.  I don't know.
18  Q.  Do you think he -- from your knowledge and
19  experience working with him, do you think he's an honest
20  guy?
21  A.  Pretty much.
22  ~~Q.  That's a little equivocal.~~
23  ~~Do you have any reason to believe he would be~~
24  ~~dishonest in any of his representations in this case?~~
25  ~~A.  I don't know.~~

**Page 46**

1  ~~Q.  Do you have any reason to believe that?~~
2  ~~A.  I don't know.~~
3  Q.  As you sit here today, can you think of any
4  occasion where he's been dishonest with you?
5  A.  No.
6  ~~Q.  Let me show you a better copy of that schedule of~~
7  payments. I found one. The one I'm going to show you was
8  marked as an exhibit to Barry's deposition in the Avila
9  Beach litigation.
10  (Exhibit-6 was marked.)
11  That's, I believe, just a better copy of that
12  schedule of payments.
13  Does that help you in terms of whether you've
14  ever seen that before?
15  A.  No.
16  Q.  You still have never seen it?
17  A.  I have never seen it.
18  Q.  In your employment with Old Port Fisheries/Del
19  Mar, were not the person responsible for keeping track
20  of the debts of Michael or Leonard to that entity, were you?
21  A.  No.
22  Q.  Who was?
23  A.  I don't know.
24  Q.  Does the name -- I think it's Harriett Shields?
25  A.  The bookkeeper was Harriett Shields and Dean

**Page 47**

1  Smith.
2  Q.  Okay. Do you know if they were the people who
3  would track those?
4  A.  Yes.
5  (Exhibit-7 was marked.)
6  ~~Q.  Have you ever seen Exhibit-7 before?~~
7  ~~A.  No.~~
8  Q.  How well do you know Joe Cappuccio?
9  A.  Pretty well.
10  Q.  All right. Do you have any reason to believe
11  that Joe Cappuccio has any malice or ill-will toward you or
12  Barry?
13  A.  Not towards me, but I'm sure with Barry.
14  Q.  And why are you sure with Barry?
15  A.  They're in a lawsuit.
16  Q.  Okay. Other than the fact that they're in a
17  lawsuit. I mean, he never made any statements to you --
18  A.  No.
19  Q.  -- that he was angry at Barry or --
20  A.  Never.
21  Q.  Okay. And he had never done anything to you that
22  made you think that he was not -- that he had some personal
23  reason to try to cause any harm to you or Barry?
24  A.  Not to me.
25  Q.  Anything with respect to Barry other than this

**Page 48**

1  lawsuit?
2  A.  Nothing comes to mind.
3  Q.  Did you feel you were treated fairly as an
4  employee?
5  A.  Yes.
6  ~~Q.  Are you aware of any claim being filed on your~~
7  ~~behalf with the United States Marshal Service arising from~~
8  ~~the loss of that fishing net?~~
9  A.  No.
10  Q.  How much was the net worth?
11  A.  They're usually around $30,000 a net.
12  Q.  Do you know what size net this was?
13  A.  No.
14  Q.  Do you know when it had been purchased?
15  A.  No.
16  Q.  Looking at Exhibit-6 or 7, did Barry ever discuss
17  with you the addition of amounts beyond the $215,000.00 to
18  the promissory note?
19  A.  No.
20  Q.  Where did you get the $175,000.00 that was used
21  to make the payment on the note?
22  A.  A second mortgage on our house.
23  Q.  Was that mortgage taken out solely for that
24  purpose, or was it for some other purposes?
25  A.  It was taken out for that purpose, and also -- I

BBA XMAX(13/13)

Deposition of CHRISTENE COHEN                                          January 11, 2008

### Page 49

1 think he was going to make payments to Miller Star.
2    Q.   All right. The mortgage was for more than
3 175,000?
4    A.   I think so; yes.
5    Q.   Do you recall how much it was?
6    A.   No.
7    Q.   Did you ever receive copies of the invoices from
8 Miller Star?
9    A.   No.
10    Q.   Do you know if Barry did?
11    A.   Oh, I'm sure.
12    Q.   Where were the records of the Old Port
13 Fisheries/Del Mar Seafoods operation kept? Where did you
14 keep all your records?
15    A.   Upstairs in the office.
16    Q.   How were they organized?
17    A.   The bookkeepers always organized them.
18    Q.   You had to work with some of them, I assume, from
19 employment, hiring, buying of supplies, making -- you know,
20 banking and payroll deposits.
21       So you had some work with the records; is that
22 right?
23    A.   I worked with the bookkeepers. I mean, I gave
24 them receipts.
25    Q.   Okay. Were those generally kept well organized?

### Page 50

1    A.   Yes.
2    Q.   They weren't just miscellaneous documents in
3 boxes?
4    A.   No.
5    Q.   Were there files specific to a particular bank
6 account, so if you wanted to obtain bank statements, you had
7 a specific file you could go to, to get statements from that
8 account?
9    A.   I don't know.
10    Q.   What about payroll? You were working in payroll.
11       If you made payroll payments, those were kept in
12 a particular file, right?
13    A.   I gave them to the bookkeeper, and I don't know
14 what she did with them. I believe they were sent over to
15 Del Mar. We had copies at Old Port, and she weekly sent
16 stuff over to Del Mar.
17    Q.   At the close of that business -- 'cause you were
18 an employee right up to the end; is that right?
19    A.   Yes.
20    Q.   At the time that it closed, are you aware of a
21 transfer so that some of the accounts went on to the -- were
22 transferred over to Del Mar's books from the Old Port
23 Fisheries/Del Mar's books?
24    A.   I don't know.
25    Q.   When you agreed to -- you signed a promissory

### Page 51

1 note and a mortgage on the Point Loma in favor of Del Mar;
2 correct?
3    A.   Yes.
4    Q.   And you're aware that a vessel needs a fishing
5 permit to operate; correct?
6    A.   Yes.
7    Q.   And you're aware it needs nets?
8    A.   Yes.
9    Q.   You're aware it needs certain machinery on the
10 vessel?
11    A.   Right, yes.
12    Q.   Was it your understanding when you executed the
13 promissory note and mortgage, that all of those things were
14 part of the vessel that was being mortgaged to Del Mar?
15    A.   No.
16    Q.   What was your belief as to what was being
17 mortgaged to Del Mar?
18    A.   I just thought that it was a loan and it was
19 being paid back. That's what I know.
20    Q.   You didn't think anything more about it in terms
21 of what was actually -- what the full amount of the security
22 was?
23    A.   No.
24    Q.   Did you have any involvement in efforts to use
25 the Point Loma for fishing in Mexico?

### Page 52

1    A.   Yes.
2    Q.   And what involvement did you have in that?
3    A.   Just that I knew that it was going to Mexico with
4 one of Joe Cappuccio's boats, and my stepson, Michael, would
5 be running the vessel down there.
6    Q.   Did he, in fact, run the vessel down there?
7    A.   Yes, he did.
8    Q.   During that time period?
9    A.   I'm not sure of the dates, but, yes, he was down
10 there for quite some time.
11    Q.   Did you ever have any discussions with Barry
12 prior to the divorce about your moving the corporation down
13 to Mexico?
14    A.   No.
15    Q.   Have you discussed at all with Barry in the last
16 year and a half or since the separation, about moving to --
17 his moving to Mexico?
18    A.   No. Is he moving to Mexico? I'm sorry.
19    Q.   You'll have to ask Barry.
20    A.   Well, you all seem to know more than me.
21    Q.   Are you planning to attend the trial in this
22 case?
23    A.   I don't know.
24    Q.   Have you discussed that at all with Barry?
25    A.   No.

## Page 53

1    Q.  What firm is Dennis Caspe with?

2    A.  You know, I don't know. I think he works for

3 himself.

4    Q.  Who is Barry's lawyer in the divorce?

5    A.  Vicki Perry.

6    Q.  How do you spell that?

7    A.  V-i-c-k-i, P-e-r-r-y.

8    Q.  And you have not been deposed in that

9 divorce? You haven't had a deposition taken in that case?

10   A.  No.

11   Q.  What is the last document that you're aware of

12 being filed in that case?

13   A.  In our divorce?

14   Q.  Yes.

15   A.  An extension.

16   Q.  Of what?

17   A.  I believe he got an extension 'til July 2nd on

18 the divorce.

19   Q.  What do you mean, "on the divorce"?

20   A.  Our next court date.

21   Q.  On a court date?

22   A.  Uh-huh.

23   Q.  Are you receiving spousal support?

24   A.  No.

25   Q.  Do you know why you're not receiving spousal

## Page 54

1 support?

2       MS. FANGER:  Objection. Attorney/client

3 privileged information.

4       MR. POULOS:  It may be. It may not.

5 BY MR. POULOS:

6    Q.  To the extent it purely comes from your lawyer,

7 you don't have to answer that, but if you have some

8 knowledge, for example, financial affairs that relate to

9 your receipt of spousal support, then that's not privileged.

10   A.  I don't know. You'll have to say that again.

11   Q.  What is the reason, to your knowledge, that

12 you're not receiving spousal support?

13   A.  A disagreement.

14   Q.  Over?

15   A.  Property.

16   Q.  Is there any element of Barry claiming that he

17 does not have the funds to pay spousal support?

18   A.  He would like me to pay him spousal support.

19   Q.  Okay. What are Barry's current sources of

20 income, if you know?

21   A.  I do not know.

22   Q.  What has he alleged are his current sources of

23 income?

24   A.  The Point Loma, the fishing vessel. And the fish

25 processing company, Old Port. And Social Security, I think.

## Page 55

1 I don't know.

2    Q.  Are you aware of how much income he has alleged

3 he receives on a monthly or annual basis from those sources?

4   A.  No.

5   Q.  Have you made any allegation of how much income

6 you have from any of those sources?

7   A.  Zero.

8   Q.  You receive no income from the Point Loma Fishing

9 Company?

10   A.  No.

11   Q.  Have you been told that the Point Loma Fishing

12 Company doesn't generate any income?

13   A.  Yes.

14   Q.  And who has told you that?

15   A.  Barry's attorney.

16   Q.  Barry's attorney?

17   A.  Divorce attorney.

18   Q.  His divorce attorney has told you that?

19   A.  She told my attorney; yes.

20   Q.  Has she told your -- have you learned that it, in

21 fact, operates at a loss?

22   A.  Yes.

23   Q.  Have you been told how much that loss is?

24   A.  No.

25   Q.  Are you aware of a motion for -- that was filed

## Page 56

1 in your divorce proceedings in which Barry asked for spousal

2 support?

3   A.  Yes.

4   Q.  And did he file a declaration in that action?

5   A.  I believe so; yes.

6   Q.  Did you ever call Del Mar around the time of your

7 divorce, and tell Del Mar that you were getting a divorce?

8   A.  Yes.

9   Q.  Who did you speak with?

10   A.  Joe Roggio.

11   Q.  And what did you tell Joe?

12   A.  That we were going to get a divorce.

13   Q.  Do you recall anything else?

14   A.  Just being upset, scared.

15   Q.  Why did you call Joe?

16   A.  I don't remember if I needed information about

17 something. I don't remember.

18   Q.  I don't want to pry into all the aspects of your

19 marriage and the divorce, but it is important for me to

20 confirm a couple of facts, so I apologize. I have to ask

21 this.

22       I want to take a break now.

23   Q.  Okay.

24       (Whereupon there was a brief recess from

25 (12:12) p.m. until 12:28 p.m.)

Page 57

1 BY MR. POULOS:
2  Q.  We were just starting to talk about that
3 conversation you had with Joe Roggio, and I had just a few
4 questions about that.
5      Is that the only conversation you had with anyone
6 from Del Mar about your divorce?
7  A.  Yes.
8  Q.  Okay. Did you tell Joe Roggio in that
9 conversation that Barry had beat you, or words to that
10 effect?
11  A.  Yes.
12  Q.  Do you recall anything else that you told him
13 about the underlying circumstances that were causing you to
14 get a divorce?
15  A.  No.
16  Q.  Did you tell him that you thought it would be a
17 difficult divorce, one that was going to be expensive and
18 messy, for lack of a better term?
19  A.  I don't recall.
20  Q.  You mentioned that you had been told that the
21 Point Loma Fishing Company and vessel operates at a loss;
22 yes?
23  A.  Yes.
24  Q.  Have you heard that also at other times from
25 Barry?

Page 58

1  A.  Yes.
2  Q.  It was your understanding that the vessel, even
3 when it's fishing, is not making a profit?
4  A.  I don't know.
5  Q.  But that's what Barry told you?
6  A.  No. There were some months where the weather was
7 bad; the boat couldn't go out, so it wouldn't make as much
8 as other months.
9  Q.  Right. But overall in the course of a year, it
10 operated at a loss?
11  A.  What year are you talking about?
12  Q.  Say 2005.
13  A.  I don't know.
14  Q.  2006?
15  A.  I don't know.
16  Q.  2007?
17  A.  I don't know.
18  Q.  All right. What did Barry tell you?
19  A.  He doesn't tell me.
20  Q.  But he has told you before that the vessel
21 operated at a loss?
22  A.  If it was windy and the boat couldn't go out,
23 yes. He would -- yes, it was bad.
24  Q.  In the divorce, you've been told the position is
25 that the vessel operates at a loss?

Page 59

1  A.  Yes.
2  Q.  And is your understanding that that's on an
3 annual basis, isn't it?
4  A.  I don't know.
5  Q.  Have you ever seen the Requests for Production
6 that were served in this case?
7  A.  Yes.
8  Q.  And Request for Production No. 44 was "All
9 documents prepared in furtherance of your divorce
10 proceedings that evidence and/or relate to your assets and
11 liabilities."
12      Have you compiled those documents?
13  A.  I don't have those documents.
14  Q.  You don't have any of the documents in your
15 divorce proceedings?
16  A.  No.
17  Q.  Does your lawyer have those?
18  A.  Some.
19  Q.  Okay. And what documents does your lawyer have?
20  A.  I do not know.
21  Q.  Have you asked your lawyer to provide you with
22 those, so you can provide them in this case?
23  A.  I know he would if -- if asked.
24  Q.  If you asked him?
25  A.  Yes.

Page 60

1  Q.  And you haven't asked him?
2  A.  No.
3  Q.  Okay.
4  A.  I don't know what to ask him for.
5  Q.  Did you send him this Request for Production for
6 all documents prepared in furtherance of your divorce
7 proceedings?
8  A.  No.
9      MR. POULOS:     I'll have this marked as
10 Exhibit-8.
11      (Exhibit-8 was marked.)
12 BY MR. POULOS:
13  Q.  Have you ever authorized Barry to act as your
14 agent --
15  A.  No.
16  Q.  -- in this case?
17  A.  No.
18  Q.  Have you ever authorized Barry to act on behalf
19 of the marital community in this case?
20  A.  No.
21  Q.  No?
22  A.  No.
23  Q.  When did you review the Request for Production of
24 Documents?
25  A.  A few days ago.

## DEPONENT'S CHANGES OR CORRECTION

NOTE:    If you are adding to your testimony, print the exact words you want to add.
If you are deleting from your testimony, print the exact words you want
to delete.  Specify with "ADD" or "DELETE" then sign and date this form.

| PAGE | LINE | CHANGE / ADD / DELETE |
|------|------|------------------------|
| 57 | 8 | I did not tell Joe Roggio that Barry beat me (delete). (Add) I said that Barry and I had fought and he had pushed me around. |
| 57 | 11 | delete |
| 57 | 19 | (Add) - Yes |
| 59 | 1 | No |

Signature: _Christine Cohen_    Date: 2-25-08

CERTIFIED COPY

LEONARD CHOEN                                    January 10, 2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

\* \* \*

DEL MAR SEAFOODS, INC.,           )
                                  )
          PLAINTIFF,              )
                                  )
     VS.                          )   CASE NO.. CV 07-02952 WHA
                                  )
BARRY COHEN, CHRIS COHEN,         )
(AKA CHRISTENE COHEN) IN          )
PERSONAM AND F/V POINT LOMA,      )
OFFICIAL NUMBER 515298, A         )
1968 STEEL-HULLED, 126-GROSS      )
TON, 70.8-FOOT LONG FISHING       )
VESSEL, HER ENGINES, TACKLE,      )
FURNITURE, APPAREL, ETC.,         )
IN REM, AND DOES 1-10,            )
                                  )
          DEFENDANTS.             )
                                  )
_____  )
                                  )
AND RELATED COUNTERCLAIMS.        )
_____  )

DEPOSITION OF LEONARD COHEN
SAN LUIS OBISPO, CALIFORNIA
THURSDAY, JANUARY 10, 2008
11:06 A.M. - 11:40 A.M.

REPORTED BY CINDY D. GRIFFITH
CSR #7281

LEONARD COHEN                                      January 10, 2008

**Page 2**

```
 1        THE DEPOSITION OF LEONARD COHEN
 2   WAS TAKEN AT THE OFFICES OF MCDANIEL SHORTHAND
 3   REPORTERS, 1302 OSOS STREET, SAN LUIS OBISPO,
 4   CALIFORNIA, BEFORE CINDY D. GRIFFITH, A CERTIFIED
 5   SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA,
 6   ON THURSDAY, JANUARY 10, 2008, COMMENCING AT THE HOUR OF
 7   11:06 A.M.
 8
 9   APPEARANCES OF COUNSEL:
10   FOR PLAINTIFF:
            COX, WOOTTON, GRIFFIN, HANSEN &
11          POULOS, LLP
            190 THE EMBARCADERO
12          SAN FRANCISCO, CA 94105
            BY: GREGORY W. POULOS
13          (415) 438-4600
            (TELEPHONICALLY)
14          GPOULOS@CWGHP.COM
15   FOR DEFENDANT BARRY COHEN:
16          DAVIS, WRIGHT, TREMAINE LLP
            ATTORNEYS AT LAW
17          SUITE 800, 505 MONTGOMERY STREET
            SAN FRANCISCO, CA 94111-6533
18          BY: JAMES P. WALSH
            (415) 276-6556
19          (TELEPHONICALLY)
            BUDWALSH@DWT.COM
20
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2   WITNESS        EXAMINATION BY      PAGE
 3   LEONARD COHEN   MR. POULOS          4
 4
 5           E X H I B I T S
 6   FOR THE PLAINTIFF:              PAGE
 7   1 DEL MAR SEAFOODS, INC. INVOICE         15
 8   2 DEL MAR SEAFOODS, INC. SCHEDULE OF PAYMENTS   23
 9   3 OLDE PORT FISHERIES, DIVISION ACCOUNTS       22
        RECEIVABLE TRIAL BALANCE REPORT ALL OPEN
10      INVOICES
11   4 LETTER TO "JOE"                       21
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                LEONARD COHEN,
 2   HAVING BEEN FIRST DULY SWORN, WAS
 3   EXAMINED AND TESTIFIED AS FOLLOWS:
 4
 5           EXAMINATION
 6
 7   BY MR. POULOS:
 8   Q   CAN YOU PLEASE STATE YOUR FULL NAME?
 9   A   LEONARD ALLEN, A-L-L-E-N, COHEN, C-O-H-E-N,
10   Q   AND BARRY COHEN IS YOUR FATHER?
11   A   CORRECT.
12   Q   YOU ARE AN OWNER OF OLDE PORT INN, INC.; IS
13   THAT RIGHT?
14   A   CORRECT.
15   Q   AND ARE YOU THE SOLE OWNER OF THAT BUSINESS?
16   A   CORRECT.
17   Q   HOW LONG HAVE YOU HAD THAT BUSINESS?
18   A   OCTOBER 16TH, 1991.
19   Q   AND DID YOU ACQUIRE ANY PART OF THAT BUSINESS
20   FROM YOUR FATHER?
21   A   YES.
22   Q   WHAT PART OF THAT BUSINESS DID YOU ACQUIRE FROM
23   YOUR FATHER?
24   A   LET ME RESTATE.  I FORMED MY OWN CORPORATION,
25   AND PURCHASED SOME OF HIS ASSETS AND SOME OF HIS
```

**Page 5**

```
 1   LIABILITIES.
 2   Q   WHEN DID YOU PURCHASE SOME OF HIS ASSETS AND
 3   SOME OF HIS LIABILITIES?
 4   A   THE ESCROW CLOSED, I THINK, OCTOBER 16TH OF
 5   1991.
 6   Q   HAVE YOU EVER HAD YOUR DEPOSITION TAKEN BEFORE,
 7   LEONARD?
 8   A   YES.
 9   Q   HOW MANY TIMES?
10   A   THREE, APPROXIMATELY.
11   Q   ONE OF THOSE DEPOSITIONS WAS IN THE SAN LUIS
12   OBISPO HARBOR DISTRICT LITIGATION THAT YOU AND YOUR
13   FATHER, BARRY COHEN, OLDE PORT INN AND OLDE PORT
14   FISHERIES, INC. HAD; IS THAT RIGHT?
15   A   THAT'S ONE OF THEM, CORRECT.
16   Q   WHAT WERE THE OTHER TWO?
17   A   THERE WAS AN EARLIER LAWSUIT WITH THE PORT IN,
18   I WANT TO SAY 1995 OR '96 HAVING TO DO WITH RENT, AND I
19   THINK I WAS DEPOSED THEN.
20       I WAS DEPOSED IN 1990 -- SOMEWHERE BETWEEN
21   1991 AND 1992 WITH THE CANOPY ISSUE WITH THE PORT, WHICH
22   HAS TO DO WITH THE COVERING AT THE END OF THE PIER.
23       AND I WAS DEPOSED IN A CASE WHERE A LADY BROKE
24   HER HIP ON OUR STAIRS AT THE RESTAURANT.  AND THAT WAS,
25   I THINK, IN THE LATE EIGHTIES.
```

2 (Pages 2 to 5)

LEONARD CHOEN                                          January 10, 2008

Page 10

1  COULD RECOVER FUNDS FROM YOU IN CONNECTION WITH THE
2  TRANSACTIONS WE'RE GOING TO DISCUSS. DO YOU UNDERSTAND
3  THAT?
4        THE WITNESS: OKAY.
5        (DISCUSSION HELD OFF THE RECORD.)
6        MR. POULOS: LET'S GET GOING. HOPEFULLY THIS
7  WON'T TAKE TOO LONG.
8     Q  MR. COHEN, WITH RESPECT TO THE AVILA BEACH
9  LITIGATION, THAT WAS THE LITIGATION, I USE THAT
10 SHORTHAND, BUT I'M REFERRING TO THE LITIGATION THAT WAS
11 BETWEEN YOUR FATHER, YOURSELF, OLDE PORT INN AND OLDE
12 PORT FISHERIES, INC. AGAINST THE PORT SAN LUIS HARBOR
13 DISTRICT. DO YOU KNOW THAT LITIGATION?
14    A  YES.
15    Q  OKAY. AND IN THAT LITIGATION, YOU AND YOUR
16 FATHER RETAINED THE LAW FIRM OF MILLER, STAR, RIGALLI;
17 IS THAT RIGHT?
18    A  THAT IS CORRECT.
19    Q  AND YOU RECEIVED INVOICES FROM THAT LAW FIRM
20 FOR THEIR SERVICES; IS THAT CORRECT?
21    A  THAT IS CORRECT.
22    Q  BY AND LARGE, YOU PAID FOR MUCH OF THOSE
23 LEGAL FEES; IS THAT CORRECT?
24    A  THAT IS CORRECT.
25    Q  BUT THEY WERE SENT TO BOTH YOU AND YOUR FATHER

Page 11

1  BEING JOINTLY LIABLE FOR THOSE FEES?
2     A  THAT WOULD BE MY UNDERSTANDING.
3     Q  ALL RIGHT. IS THERE AN AMOUNT OF THOSE FEES
4  THAT HAS NOT BEEN PAID?
5     A  YES.
6     Q  AND CAN YOU TELL US HOW MUCH OF THE FEES ARE
7  OUTSTANDING THAT HAVE NOT BEEN PAID?
8     A  THIS IS JUST AN APPROXIMATION.
9     Q  YES.
10    A  ABOUT A MILLION TWO.
11    Q  OKAY. AND HOW MUCH -- IN ADDITION TO THAT
12 OUTSTANDING AMOUNT, HOW MUCH IS -- WAS PAID?
13    A  A LITTLE OVER A MILLION DOLLARS.
14    Q  SO THE TOTAL FEES, UNDERSTANDING THIS IS AN
15 ESTIMATE, IS SOMEWHERE AROUND 2.2 MILLION?
16    A  ON OUR SIDE, CORRECT.
17    Q  IN -- WITH RESPECT TO THOSE FEES, IS THERE ANY
18 AGREEMENT BETWEEN YOU AND YOUR FATHER REGARDING WHICH OF
19 YOU WILL BE RESPONSIBLE FOR PAYING THOSE FEES ULTIMATELY
20 IF -- IF THEY ARE OWED?
21    A  THE ONLY AGREEMENT THAT I'M AWARE OF BETWEEN MY
22 FATHER AND I WAS WHEN WE FILED THE LAWSUIT, WE BOTH
23 AGREED THAT WE WOULD BE 50-50, AS FAR AS RESPONSIBILITY
24 FOR -- WE DIDN'T EVEN KNOW WHAT WAS COMING UP. JUST
25 RESPONSIBLE FOR WHATEVER.

Page 12

1     Q  OKAY. THE -- IN THAT LITIGATION, THERE WAS A
2  MOTION FOR RECOVERY OF ATTORNEYS FEES BY YOU AND YOUR
3  FATHER AND YOUR RESPECTIVE COMPANIES CONTENDING YOU WERE
4  THE PREVAILING PARTIES; IS THAT RIGHT?
5     A  I BELIEVE SO.
6     Q  AND YOU RECALL THAT THE COURT DID NOT AWARD YOU
7  THE FEES ON THAT MOTION?
8     A  I AGREE.
9     Q  IN THAT LITIGATION, YOUR FATHER FILED A
10 DECLARATION, BARRY COHEN FILED A DECLARATION SAYING THAT
11 IF HE DID NOT RECOVER THE ATTORNEYS' FEES ON THAT
12 MOTION, THAT HE MIGHT HAVE TO FILE -- OR IN THAT
13 LITIGATION, HE MIGHT HAVE TO FILE FOR BANKRUPTCY. ARE
14 YOU AWARE OF THAT DECLARATION?
15    A  POSSIBLY. YOU KNOW, I DON'T RECALL EVERY --
16 EVERY DECLARATION IN THE 1,700 PAGES THAT WERE -- THAT
17 WERE PRODUCED, JUST IN THAT ASPECT, BUT --
18    Q  IS IT -- DID YOU EVER DISCUSS WITH YOUR FATHER
19 THE POSSIBILITY THAT HE WOULD DECLARE BANKRUPTCY IF HE
20 DID NOT RECOVER THE ATTORNEYS' FEES?
21    A  I HAVE NOT DISCUSSED -- I DO NOT RECALL HIM
22 MENTIONING TO ME FILING BANKRUPTCY IN RELATIONSHIP TO
23 THIS LEGAL ACTION, BECAUSE THIS LEGAL ACTION ISN'T OVER
24 YET.
25    Q  THE LEGAL ACTION AGAINST THE HARBOR DISTRICT?

Page 13

1     A  CORRECT.
2     Q  HAS HE MENTIONED TO YOU THE POTENTIAL FOR HIS
3  FILING OF BANKRUPTCY IN ANY OTHER CONTEXT?
4     A  I DO NOT RECALL HIM MENTIONING TO ME ANYTHING
5  TO DO WITH BANKRUPTCY.
6     Q  THE OLDE PORT INN OPERATES AT A FACILITY IN --
7  ON THE PIER AT AVILA BEACH; IS THAT CORRECT?
8     A  YOU MIGHT HAVE TO HELP ME OUT ON "FACILITY."
9  YOU MEAN ON A LEASE, LEASED AREA?
10    Q  YEAH. YOU SHARE A COMMON LEASED AREA FOR OLDE
11 PORT INN AND OLDE PORT FISHERIES, INC.; IS THAT RIGHT?
12    A  IT COULD BE DESCRIBED THAT WAY.
13    Q  AND THAT'S ON THE PIER AT THE PORT THERE IN --
14 IN AVILA BEACH?
15    A  CORRECT.
16    Q  THE -- WITH RESPECT TO OLDE PORT INN, THAT IS A
17 RESTAURANT BUSINESS; IS THAT CORRECT?
18    A  CORRECT.
19    Q  AND WHERE DO YOU GET THE FISH INVENTORY THAT
20 YOU SELL AT THE RESTAURANT?
21    A  PLEASE DESCRIBE A TIME PERIOD.
22    Q  OKAY. DURING THE TIME PERIOD, SAY, OF 1999 TO
23 2004.
24    A  I WOULD SAY CENTRAL COAST SEAFOODS IS ONE
25 PURVEYOR. JORDANOS WAS ANOTHER SEAFOOD PURVEYOR FOR

4 (Pages 10 to 13)

LEONARD CHOEN                                                    January 10, 2008

**Page 14**

1  FROZEN. AND I WOULD SAY DEL MAR -- WELL, THE JOINT
2  VENTURE BETWEEN MY FATHER AND DEL MAR.
3  Q  OKAY.
4  A  THOSE WOULD BE THE THREE.
5  Q  YOU WERE AWARE OF A JOINT VENTURE KNOWN AS
6  DEL MAR SEAFOODS, INC., OLDE PORT FISHERIES DIVISION?
7  A  I LEARNED MUCH MORE THROUGH THE LAWSUIT THAN
8  ANY AT THE INITIAL TIME, BUT, YES.
9  Q  WHICH LAWSUIT?
10  A  THE -- AGAINST THE PORT.
11  Q  OKAY. DID YOU -- DID THE RESTAURANT, OLDE PORT
12  INN, RECEIVE FISH FROM THE OLDE PORT FISHERIES DIVISION
13  OF DEL MAR, FOR USE AT THE RESTAURANT, IN THE TIME
14  PERIOD OF, SAY, '99 THROUGH 2004?
15  A  IF THE FISHERY IS THE JOINT VENTURE, THEN, YES,
16  I PURCHASED FISH FROM MY FATHER AND DEL MAR.
17  Q  AND WHEN YOU PURCHASED THAT FISH, HOW -- HOW
18  WAS THE PURCHASE DONE? WAS IT DONE ON AN INVOICE BASIS
19  OR ON A RUNNING ACCOUNT BASIS?
20  A  IT WOULD BE EVERY TIME THAT WE ORDERED
21  SOMETHING, WE WOULD GET AN INVOICE FOR IT.
22  Q  AND WAS THERE A BALANCE OWED TO THE -- TO THE
23  OLDE PORT FISHERIES DIVISION IN 2004?
24  A  I WOULD SAY WE ALWAYS HAD A BALANCE OWED TO
25  DEL MAR. YOU HAVE TO BE TIME -- YOU'D HAVE TO BE TIME

**Page 15**

1  SPECIFIC.
2  (PLAINTIFF'S EXHIBIT 1 WAS MARKED
3  FOR IDENTIFICATION.)
4  BY MR. POULOS:
5  Q  WELL, TAKE A MUCH HEAVY LOOK AT EXHIBIT 1,
6  PLEASE. DO YOU SEE ON -- HAVE YOU EVER SEEN EXHIBIT 1
7  BEFORE?
8  A  I BELIEVE SO.
9  Q  AND DO YOU RECALL WHEN YOU SAW IT BEFORE?
10  A  IN DEPOSITIONS.
11  Q  IN THE AVILA BEACH LITIGATION?
12  A  POSSIBLY, YES.
13  Q  WAS THAT THE FIRST TIME THAT YOU HAD SEEN THIS?
14  A  YES.
15  Q  DO YOU RECALL WHETHER -- WELL, DO YOU SEE ON
16  THERE IT SAYS "OLDE PORT INN"?
17  A  UM, YES.
18  Q  AND DO YOU HAVE AN UNDERSTANDING THAT NUMBER,
19  WHICH IS HARD TO READ THERE, IS $18,069.10?
20  A  IS THE QUESTION: DO I KNOW WHAT THAT NUMBER
21  IS?
22  Q  YEAH. DO YOU KNOW WHAT THAT NUMBER REFERS TO?
23  A  I HAVE AN EDUCATED GUESS.
24  Q  AND WHAT'S YOUR EDUCATED GUESS?
25  A  THAT WOULD BE THE AMOUNT OF INVOICES ON OUR

**Page 16**

1  ACCOUNTS PAYABLE TO MY FATHER AND DEL MAR.
2  Q  DID YOU EVER DISCUSS THAT BALANCE WITH YOUR
3  FATHER?
4  A  YES.
5  Q  AND WHEN DID YOU DISCUSS THAT BALANCE WITH YOUR
6  FATHER?
7  A  DURING THE COURSE OF INCURRING IT.
8  Q  ALL RIGHT. DID YOU EVER DISCUSS THE FINAL
9  BALANCE OF THAT $18,000 FIGURE WITH YOUR FATHER?
10  A  NO, I DIDN'T. DIDN'T CONCERN MYSELF WITH IT.
11  Q  WHY DID YOU NOT CONCERN YOURSELF WITH IT?
12  A  BECAUSE MY FATHER SAID THAT HE WOULD JUST TAKE
13  CARE OF IT, AND I DIDN'T HAVE TO WORRY ABOUT IT, SO I
14  DIDN'T WORRY ABOUT IT.
15  Q  WHEN DID YOUR FATHER TELL YOU THAT HE WOULD
16  TAKE CARE OF IT, AND YOU DIDN'T HAVE TO WORRY ABOUT IT?
17  A  PROBABLY BEFORE I INCURRED ANY OF THE -- ANY OF
18  THE CHARGES, OR ANY OF THE PURCHASE OF FISH.
19  Q  WAS IT YOUR UNDERSTANDING, THEN, THAT INCURRING
20  THE FISH BALANCES, THAT YOU WERE NEVER GOING TO HAVE TO
21  PAY THEM?
22  A  HE TOLD ME HE WOULD TAKE CARE OF IT, THAT I
23  DIDN'T HAVE TO WORRY ABOUT IT.
24  Q  DID HE TELL YOU THAT BEFORE OR AFTER 2004, OR
25  DURING 2004, IF YOU CAN RECALL?

**Page 17**

1  A  HE TOLD ME DURING 2004.
2  Q  DURING 2004?
3  A  CORRECT.
4  Q  DID HE EVER TELL YOU THAT SUBSEQUENT TO 2004?
5  A  I DON'T KNOW IF THERE WAS A NEED TO TELL ME.
6  SUBSEQUENT, POSSIBLY, BUT I DON'T RECALL IT COMING UP.
7  Q  DID HE EVER TELL YOU THAT HE ACTUALLY HAD TAKEN
8  CARE OF OR PAID IT?
9  A  I DON'T RECALL THOSE EXACT WORDS. AGAIN, HE
10  SAID HE WOULD TAKE CARE OF IT. I DON'T KNOW EXACTLY
11  WHAT HE WAS GOING TO DO WITH IT, BUT I WASN'T WORRIED
12  ABOUT IT.
13  Q  HOLD ON JUST A SECOND. SORRY ABOUT THAT.
14  SOMEBODY JUST WALKED INTO MY OFFICE.
15  WHEN YOU SAID THERE WASN'T A NEED TO TALK ABOUT
16  IT, I UNDERSTAND THE BASIS FOR THAT STATEMENT, OR AT
17  LEAST I THINK I DO, BUT MY QUESTION IS A LITTLE MORE
18  SPECIFIC. DO YOU REMEMBER HIM DISCUSSING THAT BALANCE
19  WITH YOU AT ANY TIME IN, SAY, 2005, OR AFTER THAT?
20  A  I THINK HE MENTIONED, YOU KNOW, SOMETHING TO DO
21  WITH THE -- YOU KNOW, SOME OF THE BALANCES OWED, BUT I
22  DON'T RECALL IN WHAT CONTENTS. I MEAN, I CAN'T BE MORE
23  SPECIFIC.
24  YES, HE DID MENTION SOMETHING TO DO WITH MONEY
25  THAT HE -- OR THAT WE OWED. BUT AGAIN, YOU KNOW, HE

LEONARD CHOEN                                          January 10, 2008

Page 18

1  PRETTY MUCH SUMMED IT ALL UP EACH TIME WITH, "DON'T
2  WORRY ABOUT IT. I'LL TAKE CARE OF IT," OR "IT'S TAKEN
3  CARE OF." SO HE JUST TOLD ME, "DON'T WORRY ABOUT IT."
4  Q  YOU DON'T DENY THAT YOU -- THAT THAT BALANCE
5  OWED WAS FOR PRODUCT DELIVERED TO YOU BY DEL MAR
6  SEAFOODS, OLDE PORT FISHERIES DIVISION?
7  A  I -- IF YOU'RE SAYING, DO I AGREE THAT I
8  PURCHASED THE SEAFOOD FROM THAT JOINT VENTURE, YES, I
9  DID.
10  Q  AND DID YOU EVER PAY FOR ANY OF THE SEAFOOD
11  THAT YOU GOT FROM THE JOINT VENTURE?
12  A  YES, FOR YEARS.
13  Q  BUT THEN, AT THE END, THERE WAS A BALANCE, AND
14  THAT WAS WHEN YOUR DAD SAID HE WOULD TAKE CARE OF IT?
15  A  NO, THERE WAS A POINT IN WHICH HE SAID THAT --
16  THAT FROM NOW ON, HE'LL TAKE CARE OF WHATEVER SEAFOOD I
17  PURCHASE FROM DEL MAR OR FROM HIM. YOU KNOW, I ALWAYS
18  LOOKED AT IT AS HIM, BUT IT WAS A JOINT VENTURE.
19  Q  OKAY. AND YOU RECALL WHAT -- WHEN THAT
20  PARTICULAR CONVERSATION OCCURRED?
21  A  APPROXIMATELY THE MIDDLE OF THE SUMMER OF '04.
22  Q  DO YOU RECALL YOUR DAD EVER DISCUSSING WITH YOU
23  THAT HE HAD MADE A PAYMENT OF $175,000 ON AN ACCOUNT?
24  A  NO.
25  Q  DID YOUR FATHER EVER MENTION TO YOU ANY

Page 19

1  AGREEMENT THAT HE HAD WITH DEL MAR REGARDING PAYMENT OF
2  HIS DEBT?
3  A  YES, RECENTLY, BUT I DON'T KNOW, YOU KNOW,
4  THAT'S PART OF THIS LAWSUIT, SO I DON'T KNOW WHAT THE
5  LEGAL -- YOU KNOW, IF IT'S -- I DON'T KNOW WHAT -- IF
6  WHAT HE TELLS ME OR HE TELLS THE ATTORNEYS -- I'D HAVE A
7  GRAY AREA THERE, BUT HE DID TELL ME WHAT WAS GOING ON,
8  SOME BACKGROUND ON HIS PAYMENT IN REGARDS TO THIS
9  LAWSUIT.
10  Q  AND WHAT DID HE TELL YOU?
11  THE WITNESS: THE OTHER ATTORNEY, IS IT OKAY IF
12  I SAY THAT TO HIM? I MEAN --
13  MR. WALSH: IF IT'S A CONVERSATION BETWEEN YOU
14  AND YOUR FATHER NOT IN THE PRESENCE OF A LAWYER AND NOT
15  WITH RESPECT TO GETTING LEGAL ADVICE, HE MAY INQUIRE.
16  THE WITNESS: OKAY. I'M SORRY, SIR, IF YOU
17  COULD REASK THE QUESTION.
18  BY MR. POULOS:
19  Q  SURE. YOU WERE JUST SAYING THAT YOUR FATHER
20  HAD DISCUSSED THIS LITIGATION WITH YOU. WHAT DID HE
21  TELL YOU?
22  A  HE TOLD ME THAT HIS BOAT GOT SEIZED AND THAT IT
23  WAS RIDICULOUS, THAT HE PAID A LARGE SUM OF MONEY TO
24  DEL MAR, AND THAT IT WAS WAY -- HE WAS WAY AHEAD ON
25  PAYMENTS, AND WHY THEY TOOK THE BOAT DIDN'T MAKE ANY

Page 20

1  SENSE. THAT'S SUMMING IT UP.
2  Q  DID HE SAY ANYTHING IN PARTICULAR ABOUT HIS
3  LIABILITY FOR WHAT THE DEBTS WERE: THAT HE WAS LIABLE
4  FOR?
5  A  NO, HE DIDN'T GO REALLY INTO DETAIL.
6  Q  HAVE YOU EVER DISCUSSED WITH YOUR FATHER THE --
7  HIS TAKING OUT A LOAN AGAINST HIS PERSONAL RESIDENCE?
8  Q  DID I DISCUSS WITH HIM?
9  Q  YEAH.
10  A  TAKING OUT A LOAN, A SECOND ON HIS HOUSE, FOR
11  WHAT?
12  Q  WELL, I DIDN'T MENTION A SECOND, BUT FOR ANY
13  PURPOSE?
14  A  I ASKED HIM ONE TIME IF HE COULD TAKE OUT A
15  SECOND ON HIS HOME TO HELP ME, AS FAR AS PAYING FOR SOME
16  OF THE LEGAL COSTS. THAT WAS THE ONLY TIME I TALKED TO
17  HIM ABOUT ANYTHING TO DO WITH HIS HOME OR...
18  Q  DID HE, IN FACT, TAKE OUT A SECOND TO HELP PAY
19  SOME OF THE LEGAL COSTS IN THAT CASE?
20  A  NO.
21  Q  IN THE AVILA BEACH CASE?
22  A  NO.
23  Q  I'M SORRY, YOUR ANSWER?
24  A  NO. NO, HE DID NOT.
25  Q  ARE YOU FAMILIAR WITH -- DO YOU COMMUNICATE

Page 21

1  WITH YOUR FATHER AT ALL BY E-MAIL?
2  A  YES.
3  Q  AND WHAT IS HIS E-MAIL ADDRESS?
4  A  I THINK IT'S FISHERMAN COHEN, OR FISHMAN
5  COHEN, BUT I'M NOT 100 PERCENT, BECAUSE IT'S PROGRAMMED
6  IN THE COMPUTER.
7  Q  AND IS THAT AN AOL ACCOUNT?
8  A  POSSIBLY.
9  (DEFENDANTS' EXHIBIT 4 WAS MARKED FOR
10  IDENTIFICATION.)
11  BY MR. POULOS:
12  Q  COULD YOU LOOK AT EXHIBIT 4?
13  A  (WITNESS COMPLIES.)
14  Q  HAVE YOU EVER SEEN THIS BEFORE?
15  A  I HAVE NEVER SEEN THIS.
16  Q  OKAY. DO YOU SEE THIS COMES FROM, OR READS AT
17  THE BOTTOM, "AMERICA ONLINE," COLON, "FISHMAN COHEN"?
18  A  I DO READ THAT, YES.
19  Q  ALL RIGHT. AND DOES THAT HELP YOU RECALL YOUR
20  FATHER'S E-MAIL ADDRESS IS, IN FACT,
21  FISHMANCOHEN@AOL.COM?
22  A  THAT WOULD BE A GOOD GUESS.
23  Q  DOES YOUR FATHER EVER PRINT OUT THINGS ON --
24  THAT ARE DRAFTED ON E-MAIL, AND THEN SEND THEM TO YOU
25  JUST BY REGULAR MAIL OR HAND DELIVERY?

LEONARD CHOEN                                                          January 10, 2008

**Page 22**

1    A    NO.
2    (DEFENDANTS' EXHIBIT 22 WAS MARKED FOR
3    IDENTIFICATION.)
4    BY MR. POULOS:
5    Q    COULD YOU TAKE A LOOK AT EXHIBIT 3, PLEASE?
6    A    OKAY.
7    Q    DO YOU SEE DOWN THERE IT SHOWS THE BOTTOM
8    PORTION, OLDE PORT INN, INC.?
9    A    YES.
10    Q    AND DO YOU HAVE ANY UNDERSTANDING OF WHAT THOSE
11    CHARGES WOULD HAVE BEEN FOR AS SHOWN ON THIS
12    SPREADSHEET?
13    A    PROBABLY FISH INVOICES THAT WERE PURCHASED FROM
14    OLDE PORT FISHERIES DIVISION.  AND IT SAYS, "ALL OPEN
15    INVOICES," SO THAT WOULD MEAN THAT THESE ARE STILL
16    OPEN.
17    Q    OKAY.  DID -- HAS YOUR FATHER EVER ASKED YOU TO
18    PAY HIM FOR THE INVENTORY THAT YOU GOT FROM THE JOINT
19    VENTURE THAT YOU DIDN'T MAKE PAYMENT FOR?
20    A    NO.
21    Q    WHEN WERE YOU DEPOSED IN THE AVILA BEACH
22    LITIGATION?
23    A    APPROXIMATELY FROM JUNE OF '05 THROUGH NOVEMBER
24    OF '05.
25    Q    AND IN THAT DEPOSITION YOU TESTIFIED

**Page 24**

1    Q    COULD YOU TAKE A LOOK AT EXHIBIT 2?
2    A    (WITNESS COMPLIES.)
3    Q    IT IS LARGELY THE SAME DOCUMENT AS EXHIBIT 1,
4    BUT IT CONTINUES ON BEYOND THAT LAST $175,000 PAYMENT.
5    DO YOU SEE THAT?
6    A    YES.
7    Q    OKAY.  HAVE YOU EVER SEEN THIS COPY OF THE
8    SCHEDULE OF PAYMENTS BEFORE?
9    A    NOT THAT I RECALL.
10    Q    DID THE SCHEDULE OF PAYMENTS THAT YOU SAW
11    REFLECT THE $175,000 PAYMENT?
12    A    I BELIEVE SO.
13    Q    AND WAS IT AROUND THAT SAME TIME THAT YOU
14    DISCUSSED WITH YOUR FATHER THE BALANCE OWED ON THE OLDE
15    PORT INN DATA?
16    A    NOT THAT I RECALL.
17    Q    HOW WAS IT THAT YOU CAME TO BE SHOWN A COPY OF
18    THIS THEN?
19    A    DURING MY FATHER'S DEPOSITION.
20    Q    ARE YOU -- HAS YOUR FATHER EVER TOLD YOU OR
21    SOMEONE ELSE THAT HE WAS NO LONGER RESPONSIBLE FOR THAT
22    DEBT?
23    A    HE'S NEVER SAID ANYTHING TO ME ABOUT WHAT YOU
24    JUST SAID.
25    Q    OKAY.  SO HE'S NEVER TOLD YOU THAT HE DIDN'T

**Page 23**

1    TRUTHFULLY?
2    A    YES.
3    Q    AND IF YOU WERE TESTIFYING IN THIS CASE WITH
4    RESPECT TO THE ISSUES RAISED IN THAT DEPOSITION, YOU'D
5    GIVE THE SAME TESTIMONY?
6    A    WELL, YES.
7    Q    ARE YOU PARTNERS WITH YOUR FATHER-IN ANY OF HIS
8    CURRENT BUSINESSES?
9    A    NO.  BUT LET ME ADD, WE ARE ON A LEASE
10    TOGETHER.
11    Q    RIGHT.  YOU BOTH LEASE THAT PROPERTY ON THE
12    PIER?
13    A    THAT ONE LEASE, THERE'S ONE SPECIFIC LEASE THAT
14    WE ARE BOTH LISTED ON.
15    Q    HAVE YOU DISCUSSED WITH -- WELL, WITHDRAW,
16    DO YOU KNOW WHO DAVID CANTRELL IS?
17    A    YES.
18    Q    AND IS HE ALSO YOUR ACCOUNTANT CPA?
19    A    YES.
20    Q    HAVE YOU DISCUSSED WITH MR. CANTRELL THE DEBTS
21    REFLECTED ON EXHIBIT 1?
22    A    NOT TO MY KNOWLEDGE.
23    (DEFENDANTS' EXHIBIT 2 WAS MARKED FOR
24    IDENTIFICATION.)
25    BY MR. POULOS:

**Page 25**

1    HAVE TO PAY THAT DEBT TO DEL MAR?
2    A    RIGHT.  I DON'T RECALL HIM SAYING WHAT YOU JUST
3    SAID.
4    Q    WELL, OR ANY WORDS TO THAT EFFECT?
5    A    LIKE, I DON'T RECALL HIM SAYING ANYTHING HAVING
6    TO DO WITH HIS RESPONSIBILITIES TO DEL MAR, TO ME,
7    HAVING TO DO WITH WHAT YOU JUST SAID.
8    Q    DID YOU SIT THROUGH YOUR FATHER'S DEPOSITION IN
9    THE AVILA BEACH CASE?
10    A    YES.
11    Q    AND DID HE SIT THROUGH YOURS?
12    A    PREDOMINATELY, YES.
13    Q    AND DID YOU AGREE -- WHEN YOU SAT THROUGH YOUR
14    FATHER'S DEPOSITION, DID YOU AGREE WITH HIS TESTIMONY?
15    A    YES.
16    MR. POULOS:  I DON'T HAVE ANYTHING FURTHER.
17    MR. WALSH:  NO QUESTIONS FOR ME.  THANK YOU
18    VERY MUCH FOR YOUR TIME, LEONARD.
19    THE WITNESS:  SURE.
20    MR. POULOS:  THANK YOU, LEONARD.
21    THE REPORTER:  COULD I GET YOUR INFORMATION,
22    COUNSEL?
23    MR. WALSH:  MY NAME IS JAMES WALSH, W-A-L-S-H,
24    AND I'M A PARTNER WITH DAVIS, WRIGHT, TREMAINE LLP,
25    SUITE 800, 505 MONTGOMERY STREET, SAN FRANCISCO.  AND I

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DEL MAR SEAFOODS, INC.,            )
                                   )
          Plaintiff,               )
                                   )
                                   )
     vs.                           ) CASE NO. CV 07-02952-WHA
                                   )
                                   )
BARRY COHEN, et al.,               )
                                   )
          Defendants.              )
                                   )
                                   )
_____    )
                                   )
AND RELATED COUNTERCLAIMS.         )


DEPOSITION OF MICHAEL COHEN

SAN LUIS OBISPO, CALIFORNIA

TUESDAY, JANUARY 8, 2008

2:10 p.m. - 2:50 p.m.


Reported by Linda Turney, CSR #2435

MICHAEL COHEN                                                    January 8, 2008

Page 2

```
 1           Deposition of MICHAEL COHEN
 2    was taken at the offices of McDaniel Shorthand Reporters,
 3    1302 Osos Street, San Luis Obispo, California, before
 4    Linda Turney, RPR, CM, CSR #2435, a Certified Shorthand
 5    Reporter for the State of California, on Tuesday,
 6    January 8, 2008, commencing at the hour of 2:10 p.m.
 7
 8
 9
10    APPEARANCES OF COUNSEL:
11
12    FOR PLAINTIFFS:
13    (APPEARING BY TELEPHONE)
      COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP
14    BY: MAX L. KELLEY
      190 The Embarcadero
15    San Francisco, California 94105
      (415) 438-4600
16
17    (APPEARING BY TELEPHONE)
      DAVIS, WRIGHT, TREMAINE LLP
18    BY: GWEN FANGER
      505 Montgomery Street
19    San Francisco, California 94111-6533
      (415) 276-6500
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3                I N D E X
 4
 5              EXAMINATION
 6
 7    WITNESS        EXAMINED BY:        PAGE
 8    MICHAEL COHEN    MR. KELLEY          4
 9
10
11
12
13
14           EXHIBIT INDEX
15
      Plaintiff's
16
      1   Schedule of payments        11
17
      2   Financial data             16
18
      3   Typewritten note           15
19
20
21
22
23
24
25
```

Page 4

```
 1               MICHAEL COHEN
 2    A defendant herein, having been first duly
 3         sworn, testified as follows:
 4
 5               EXAMINATION
 6    BY MR. KELLEY:
 7    Q.   Could you please state your full name for the
 8    record?
 9    A.   Michael Allen Cohen.
10    Q.   Michael, how old are you?
11    A.   Twenty-nine.
12    Q.   And who are you currently employed by?
13    A.   Olde Port Fisheries, Incorporated.
14    Q.   So if we say Olde Port Fisheries, Inc., that is
15    the company that employs you?
16    A.   Correct.
17    Q.   That is a California corporation?
18    A.   Sure.
19    Q.   Are you a partner in that or a shareholder in
20    that corporation?
21    A.   I am not.
22    Q.   All right. Who -- is that the corporation that
23    is owned by your father?
24    A.   Correct.
25    Q.   Okay. And that is Barry Cohen, right?
```

Page 5

```
 1    A.   Correct.
 2    Q.   Who is the other -- are there any other
 3    shareholders of that corporation?
 4    A.   The shareholder, I'm not sure how all that works
 5    out. I don't know what the paperwork says, or I don't
 6    know much about that.
 7    Q.   Okay. Is it your understanding that Christine
 8    Cohen is the other shareholder in the corporation?
 9    A.   I'm not sure about that. I don't know anything
10    about that, really.
11    Q.   You don't own any of the shares?
12    A.   No.
13    Q.   Have you ever had your deposition taken before?
14    A.   I have.
15    Q.   How many times?
16    A.   Once.
17    Q.   And was that in the Avila Beach litigation?
18    A.   Yes.
19    Q.   That was the litigation by Barry Cohen and Olde
20    Port Fisheries, Inc., against the city of Avila Beach?
21    A.   I believe it was the harbor district.
22    Q.   The harbor district, again. Did you ever review
23    that deposition transcript?
24    A.   I did.
25    Q.   Did you have to make any corrections to it or was
```

McDaniel Shorthand Reporters                                    805-544-3363

MICHAEL COHEN                                    January 8, 2008

Page 6

1   all of your testimony in that case true and correct?
2       A.   From what I remember, it was true and correct.
3       Q.   All right.
4       A.   It's been a while, but I'm pretty sure it's
5   pretty true. It is what it is.
6       Q.   With respect to a deposition, you understand --
7   the main thing I want you to understand is you are under
8   oath and testifying as though you were in a court of law.
9   You understand that?
10      A.   Yes, I do.
11      Q.   What capacity are you currently employed by Olde
12  Port Fisheries, Inc.?
13      A.   "Capacity" meaning full time?
14      Q.   Well, that's a starting place. Are you full
15  time?
16      A.   I am.
17      Q.   What is your job title, if you have one?
18      A.   General manager.
19      Q.   How long have you been the general manager of
20  Olde Port Fisheries, Inc.?
21      A.   I believe since 2004.
22      Q.   What are your responsibilities as a general
23  manager?
24      A.   Well, I do many things. I purchase seafood. I
25  sell seafood. I make sure employees are doing what they

Page 7

1   are supposed to be doing. Solve problems. I mean,
2   basically, do what the business needs.
3       Q.   You are the top guy, is that right, or is there
4   someone else above you?
5       A.   Well, Barry is above me.
6       Q.   What does Barry do for Olde Port Fisheries, Inc.,
7   on a daily basis, if anything?
8       A.   He does -- he works with the bookkeeper, handles
9   accounts payables, accounts receivables, stuff like that.
10      Q.   By the way, is there anyone else present down
11  there with you in the conference room?
12      A.   No.
13      Q.   What did you do to prepare for this deposition?
14  Did you meet with anybody?
15      A.   No.
16      Q.   Have you discussed your deposition with Barry?
17      A.   Briefly. He just told me tell the truth. I
18  mean, there's nothing really to prepare for.
19      Q.   Okay. When did you talk to him about your
20  deposition?
21      A.   Well, I talked to him last night. He just was
22  confirming the time and place and all that stuff. And
23  he's just been telling me that I'm going to be deposed,
24  and he was telling me when I was going to be deposed.
25  Then it got canceled, and just basically about times and

Page 8

1   places and when it was going to happen and stuff like
2   that.
3       Q.   Have you talked to Leonard Cohen at all about
4   your deposition or his?
5       A.   No.
6       Q.   And have you talked to Christine Cohen at all --
7       A.   No.
8       Q.   about your deposition?
9       A.   No.
10      Q.   Or hers?
11      A.   No.
12      Q.   How long have you been employed by Olde Port
13  Fisheries, Inc.?
14      A.   I believe since 2004.
15      Q.   Before that were you employed by Del Mar?
16      A.   I got my checks from Del Mar but I worked under
17  Barry.
18      Q.   Okay. During what time period did you receive
19  checks from Del Mar?
20      A.   2003, I believe, is around the time.
21      Q.   What were you doing for Del Mar that you received
22  checks from Del Mar?
23      A.   I was working at the plant down there in Avila
24  Beach processing the fish for -- with Olde Port.
25      Q.   When you say processing fish, I'm assuming you

Page 9

1   weren't on the processing line.
2       A.   Oh, no, no. I was -- actually, I was when I
3   first started, and then I moved into the retail part of
4   it, and then I moved into management after that, but that
5   was shortly before Del Mar left.
6       Q.   Was it your understanding that before 2004 you
7   were working for Del Mar Seafoods through its Olde Port
8   Fisheries Division?
9       A.   None of that was really clear to me. I never
10  even questioned it. All I know is I was working for my
11  dad, and I got my checks from Del Mar, and they were
12  working together somehow. I never even thought about it.
13  So I'm not even quite sure what that was all about.
14      Q.   Okay. What is the business of Olde Port
15  Fisheries, Inc.?
16      A.   We do retail, we do some restaurant delivery, and
17  that's about it.
18      Q.   The retail, where is that conducted out of?
19      A.   That's conducted out of -- at the end of the pier.
20  In our building there.
21      Q.   And --
22      A.   And then we also do some Farmers markets in the
23  area. And we do some little bit of business from our web
24  site. That's about it.
25      Q.   What is the web site?

MICHAEL COHEN

January 8, 2008

Page 10

1    A.   What do you mean?
2    Q.   What is the address?
3    A.   It's oldeportfish.com.
4    Q.   Is that with an E on the end of "olde"?
5    A.   Correct.
6    Q.   Was that the same kind of a retail business that
7    was going on in 2004?
8    A.   Correct.
9    Q.   Did you start in management in early 2004?
10   A.   I don't remember if it was early 2004 or late
11   2003.
12   Q.   For the retail end of things, when Olde Port
13   Fisheries, Inc., was buying fish that it was going to sell
14   at retail, who did it buy those fish from in 2003-2004?
15   A.   It sold fish from when we were processing it from
16   the boats. And it sold fish from -- we bought some stuff
17   from Pacific Seafoods, Faciola Meats, and possibly a
18   couple wholesalers in LA. I'm not too sure what time we
19   started doing that.
20   Q.   Was Del Mar a company that Olde Port Fisheries,
21   Inc., bought fish from to sell retail?
22   A.   Yeah, a little bit. Are you talking before, like
23   when Del Mar was working with Olde Port or when they left
24   or when --
25   Q.   Let's look at each time period and maybe we can

Page 11

1    speed this up a little bit. Take a look at Exhibit 1,
2    would you please?
3         (Exhibit 1 marked for identification.)
4    A.   Okay.
5    Q.   And you see in the first column it says "Michael
6    Cohen"?
7    A.   Yes.
8    Q.   Beginning balance of $13,920.40. Do you see
9    that?
10   A.   Yes.
11   Q.   Do you have an understanding of what that debt
12   was from?
13   A.   I believe -- I know some of it. I don't remember
14   13,000, but I remember some of it.
15   Q.   What do you remember of it?
16   A.   Well, I remember when I was working for Barry out
17   there when they were working with Del Mar I needed some
18   extra income, so I started a restaurant distribution just
19   by myself, and I was purchasing from them, and after a
20   while I asked to borrow some money for -- to build a web
21   site against my payables, and I'm pretty sure that's where
22   it came from. But I don't remember it being 13,000.
23   Q.   Whether you remember it being --
24   A.   I believe somewhere around like 6,000.
25   Q.   Did you ever pay that money back? Well, when you

Page 12

1    say you asked for advances, who did you get those from?
2    A.   I talked to Barry about it.
3    Q.   Did that come from the Del Mar/Olde Port
4    Fisheries Division?
5    A.   I thought it was coming from Barry.
6    Q.   Have you ever paid Barry back?
7    A.   No, I didn't pay him back. When I became the
8    manager of Olde Port Fisheries, Incorporated, I pretty
9    much gave the business, the web site, instead of paying
10   him back.
11   Q.   Who did you give the web site to?
12   A.   Olde Port Fisheries, Incorporated.
13   Q.   To Barry?
14   A.   To the business, yeah.
15   Q.   Who did you get the inventory from when you
16   started your restaurant distribution business?
17   A.   I bought it from Olde Port Fisheries, I believe.
18   Q.   Was that Olde Port Fisheries the division of Del
19   Mar or Olde Port Fisheries, Incorporated?
20   A.   It was before Olde Port Fisheries was
21   incorporated.
22   Q.   So it was from the Del Mar Seafoods/Olde Port
23   Fisheries Division?
24   A.   It was, yeah, from Barry. I mean --
25   Q.   Barry was the manager of that division, right?

Page 13

1    A.   I don't know. I thought he was the owner. But I
2    didn't know -- I mean, like I said I never questioned what
3    was going on. Barry is just, I mean, he's just my dad.
4    I've always worked for him so I never questioned what he
5    does.
6    Q.   So was this in 2003 that you started this
7    restaurant distribution business?
8    A.   I believe so.
9    Q.   And what about the web site?
10   A.   I believe it was around the same time.
11   Q.   And did you understand that you had an obligation
12   to pay that money back?
13   A.   Of course.
14   Q.   And have you ever paid that money back to Del
15   Mar?
16   A.   No.
17   Q.   Have you ever paid that money back to the Del Mar
18   Seafoods, Inc., Olde Port division?
19   A.   No.
20   Q.   Have you ever paid that money back to Barry?
21   A.   I gave his business the web site I built with it.
22   Q.   What about for the inventory, did you ever pay
23   any of that back?
24   A.   Oh, of course.
25   Q.   When did you pay back the inventory?

4 (Pages 10 to 13)

McDaniel Shorthand Reporters

805-544-3363

MICHAEL COHEN                                                January 8, 2008

**Page 14**

1    A.  As I bought it, I paid it back.  I'd buy some,
2    I'd sell some, I'd pay, you know, just like a normal
3    business.
4    Q.  Did Barry ever tell you that the debt was
5    forgiven?
6    A.  He told me he would take care of it, because I
7    gave the business the web site.
8    Q.  When did Barry tell you that he would take care
9    of that debt?
10    A.  That I don't know for sure.
11    Q.  Can you give me your best estimate?
12    A.  I would say 2004.  I mean, I don't remember for
13    sure.
14    Q.  I should tell you that if you don't remember
15    something, that is a really good answer.
16    A.  Correct.
17    Q.  You're free to say you don't remember if that is
18    true.  Okay?
19    A.  Correct.
20    Q.  I will sometimes come back and try and help you
21    remember dates and times if I have something that might
22    assist you in that, but I don't want you to guess or
23    speculate, okay?
24    A.  Sure.
25    Q.  All right.  Why don't you take a quick look at

**Page 15**

1    Exhibit 3, please.  And take a minute to read it.
2         (Exhibit 3 marked for identification.)
3    A.  Okay.
4    Q.  Have you ever seen this before?
5    A.  I have not.
6    Q.  If you notice at the bottom it says January 30,
7    2007; do you see that?
8    A.  Correct.
9    Q.  And it refers to America Online Fisherman Cohen;
10    do you see that?
11    A.  Yes.
12    Q.  Do you recognize who Fisherman Cohen is?
13    A.  Yes.
14    Q.  Who is Fisherman Cohen?
15    A.  That's Barry.
16    Q.  That's his American Online address?
17    A.  Yes.
18    Q.  I'm sorry, it's "FishmanCohen."
19    A.  I understand what you're saying.
20    Q.  "FishmanCohen" is Barry's web address?
21    A.  Correct.
22    Q.  Do you get e-mails from him?
23    A.  No.
24    Q.  Okay.  Do you send him e-mails?
25    A.  No.  We haven't e-mailed each other in a long

**Page 16**

1    time.
2    Q.  How do you know that is his e-mail address?
3    A.  Well, it used to be.
4    Q.  Okay.
5    A.  I don't know if it is today, but that is what it
6    used to be.  I remember FishmanCohen@AOL.com.
7    Q.  Okay.  This case, well, in January of '07 a year
8    ago approximately now, January 30, do you remember your
9    dad being sick?
10    A.  I do not.
11    Q.  Do you remember him telling you that he was
12    agreeing to be responsible for those debts, for your debts
13    in order to make Olde Port better?
14    A.  No.
15    Q.  But do you remember him saying that he would take
16    care of it?
17    A.  Correct.
18    Q.  And after Barry told you that he would take care
19    of it, did Del Mar ever approach you to try and get
20    payment from you?
21    A.  For the $13,900?
22    Q.  Yes.
23    A.  No, I don't believe so.
24    Q.  Could you take a look at Exhibit 2, please.
25         (Exhibit 2 marked for identification.)

**Page 17**

1    Q.  Do you see up at the top it says "Michael Cohen"?
2    A.  Yes.
3    Q.  And then it shows a date of 3/18/04?
4    A.  Yes.
5    Q.  Invoice amount of $14,353?
6    A.  Yes.
7    Q.  And then it shows a balance, looks like there was
8    some sort of payment or credit leaving that balance of
9    $13,920.40, right?
10    A.  Correct.
11    Q.  Does this refresh your recollection as to an
12    invoice from -- if you notice up at the top it's Olde Port
13    Fisheries Division, meaning it's got to be from Del Mar
14    Seafoods/Olde Port Fisheries Division, does that ring a
15    bell now or refresh your recollection as to a debt that
16    you had to Del Mar Seafood/Olde Port Fisheries Division?
17    A.  I remember having some debt.  I mean I don't
18    remember having 13,000 debt.  At certain points I did but
19    I always paid them.  When I got paid, I always paid them.
20    So at this particular time I don't remember what that was,
21    you know, what that entailed or what was going on.
22    Q.  Did your debts that you carried -- I take it the
23    way this business worked was that if you needed some fish
24    for either your restaurant supply business or your web
25    business or the retail business, you got that fish from

5 (Pages 14 to 17)

McDaniel Shorthand Reporters                                        805-544-3363

MICHAEL COHEN                                                    January 8, 2008

Page 18

1  Barry?
2     A.  Correct.
3     Q.  And you're not sure where Barry got that fish
4  from, whether he got it, you know, from Del Mar or from
5  another fisherman or, you know, what; you just got your
6  fish from Barry?
7     A.  Correct.
8     Q.  And then you expected Barry, whether it was as
9  the Olde Port Fisheries Division or Olde Port Fisheries,
10  Inc., basically kept a tab?
11    A.  Correct, I got invoiced.
12    Q.  And did those invoices, if you didn't pay them
13  within a certain time, carry any interest rate on them?
14    A.  That I don't remember. I'm not sure.
15    Q.  Do you recall having a discussion with David
16  Cantrell about this, the payment schedule shown on Exhibit
17  1?
18    A.  I do not.
19    Q.  I don't have Mr. Cantrell's deposition with me,
20  but my recollection is that he testified that he had a
21  discussion with you about the debt listed under "Michael
22  Cohen," and that you told him that Barry said he would
23  take care of that debt.
24    A.  Okay. I don't remember that at all.
25    Q.  You do know who David Cantrell is?

Page 19

1     A.  Of course.
2     Q.  And he is the bookkeeper for Olde Port Fisheries,
3  Inc., right?
4     A.  He's the CPA.
5     Q.  CPA, okay.
6     A.  I don't remember it. We may have, but I don't
7  remember it.
8     Q.  Do you have any relationship to Olde Port Inn?
9     A.  I do not. The only relationship I have to them
10  is we sell them seafood.
11    Q.  Olde Port Inn is a business owned by your
12  brother, isn't it?
13    A.  Correct.
14    Q.  And that's Leonard?
15    A.  Correct.
16    Q.  Did Leonard's business, Olde Port Inn, buy fish
17  from Del Mar Seafoods, Inc., Olde Port Fisheries Division?
18    A.  I'm pretty sure -- well, they've always bought
19  fish from us next door. I don't know -- I wasn't part of
20  that. I would just give them the fish and whoever made
21  the invoices did that.
22    Q.  Just so we can get a clear picture here, your
23  business and Olde Port Fisheries, Inc., business, the
24  web site, the retail and the Olde Port Inn all operate on
25  the same pier and, frankly, out of the same structure down

Page 20

1  in Avila Beach; is that right?
2     A.  Correct.
3     Q.  So you, your brother and your dad are all working
4  together and you have these various businesses, right?
5     A.  Correct.
6     Q.  And Barry just -- If you needed fish you went to
7  Barry, right?
8     A.  Correct.
9     Q.  And if your brother needed fish, he went to
10  Barry, right?
11    A.  Correct.
12    Q.  And then Barry was -- would just take care of the
13  accounting on his end of things; is that right?
14    A.  Correct.
15    Q.  So there were books but you guys didn't pay a
16  whole lot of attention to them; am I right about that?
17    A.  Correct. I paid a lot more attention after 2004
18  or during 2004 and after.
19    Q.  Once you basically took over as the manager you
20  started paying more attention?
21    A.  Correct.
22    Q.  But any debts that were incurred before that were
23  debts that you basically thought Barry was going to take
24  care of?
25    A.  Not at the time. But later, correct.

Page 21

1     Q.  Okay. And later when he said he would take care
2  of them?
3     A.  Correct.
4     Q.  And did he tell the same thing to Leonard, that
5  he would basically take care of those debts for Olde Port
6  Inn?
7     A.  I have no idea.
8     Q.  Have you ever discussed that with Leonard?
9     A.  Well, let's see, I discussed at one point during
10  the lawsuit that we were going to provide Leonard with
11  seafood, like, I don't know, discounted rate or something
12  to help with the lawsuit. I don't know the extent of that
13  whole deal. But I talked to him briefly about something
14  along the lines of we would help him, like extend him more
15  credit time or something like this. I don't remember
16  correctly.
17    Q.  Okay. You were a party to that lawsuit with the
18  harbor district down there, weren't you?
19    A.  I was not.
20    Q.  Was that just Leonard?
21    A.  That was Leonard and Barry, I believe, only.
22    Q.  Okay. Do you ever have any discussions with your
23  dad about maybe Olde Port Fisheries, Inc., declaring
24  bankruptcy?
25    A.  No.

6 (Pages 18 to 21)

DAVID ALAN KOBAK     January 8, 2008

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

DEL MAR SEAFOODS, INC.,              )
                                     )
            Plaintiff,               )
                                     )
    vs.                              )    NO. C-07-2952-WHA
                                     )
BARRY COHEN, CHRIS COHEN (aka        )
CHRISTENE COHEN), in personam        )
and, F/V POINT LOMA, Official        )
Number 515298, a 1968               )
steel-hulled, 126-gross ton,         )
70.8 foot long fishing vessel,       )
her engines, tackle, furniture       )
apparel, etc., in rem, and           )
Does 1-10,                           )
                                     )
            Defendants.              )
_____)

DEPOSITION OF

DAVID ALAN KOBAK

_____

January 8, 2008

REPORTED BY: RITA R. LERNER, CSR #3179     (2001-404169)

DAVID ALAN KOBAK    January 8, 2008

---

**Page 2**

INDEX OF EXAMINATIONS
Page

1
2
3  Examination by Mr. Poulos ............................ 4
4  Examination by Ms. Fanger ........................... 75
5  Further examination by Mr. Poulos ................. 81
6

7  EXHIBITS MARKED FOR IDENTIFICATION

No.    Description                    Page
8
Exhibit 1  Document titled "Trips By The Month"   . 20
9          and attached Settlement Sheets, 43 pp.
10 Exhibit 2  Color photograph, Bates No. DMSI 0066 ... 33
11 Exhibit 3  Color photograph, Bates No. DMSI 0067 ... 42
12 Exhibit 4  Color photograph, Bates No. DMSI 0068 ... 42
13 Exhibit 5  Color photograph, Bates No. DMSI 0065 ... 44
14 Exhibit 6  Document titled "Reportee          . 45
           Follow-up" (front and back side) on
15         a single exhibit page
16 Exhibit 7  Declaration of Dave Kobak, with black  . 45
           and red ink annotations and
17         interlineations, 4 pp. (includes back
           side of page 3)
18
   Exhibit 8  San Francisco Police Department     . 50
19         Incident Report, 3 pp.
20 Exhibit 9  Declaration of Dave Kobak, with black  . 57
           ink corrections and yellow
21         highlighting, 3 pp.
22 Exhibit 10  Witness's signature on a blank sheet   61
            of lined paper
23
   Exhibit 11  National Liquidators document titled   . 61
24          "Vessel Detailed Condition Report" and
            inventory list, Bates Nos. DMSI 0085
25          through DMSI 0095, 11 pp. total

---

**Page 3**

1         --oOo--
2         Deposition of DAVID ALAN KOBAK, taken by the
3  Plaintiff, at 190 The Embarcadero, San Francisco,
4  California 94105, commencing at 10:02 a.m., on
5  January 8, 2008, before RITA M. LERNER, CSR, pursuant to
6  Notice.
7         --oOo--
8         A P P E A R A N C E S
9

   FOR THE PLAINTIFF:
10
       COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
11     190 The Embarcadero
       San Francisco, California 94105
12     (415) 438-4600
       By: GREGORY W. POULOS, Attorney at Law
13
14
   FOR THE DEFENDANTS and CLAIMANT:
15
       DAVIS WRIGHT TREMAINE LLP
16     505 Montgomery Street, Suite 800
       San Francisco, California 94111-6533
17     (415) 276-6567
       By: GWEN L. FANGER, Attorney at Law
18
19
20
21
22
23
24
25

---

**Page 4**

1  SAN FRANCISCO, CALIFORNIA    Tuesday, January 8, 2008
2         10:02 a.m.
3         --oOo--
4         DAVID ALAN KOBAK
5
6  called as a witness, who, having been first duly sworn,
7  was examined and testified as follows:
8         EXAMINATION BY MR. POULOS
9         MR. POULOS: Q. Let's start with your full
10 name for the record, please.
11    A. David Alan Kobak.
12    Q. How do you spell Kobak?
13    A. K-o-b-a-k, Alan, with one "l."
14    Q. Captain, have you ever had your deposition
15 taken before?
16    A. Well, this little thing up there at your
17 office, I guess, was that a deposition where this
18 report was filled out? No. This is a declaration, I
19 guess, not a deposition. No, I never have.
20    Q. You signed a declaration before?
21    A. Yes.
22    Q. But you've never sat in a room --
23    A. No.
24    Q. -- and had your testimony taken by a court
25 reporter?

---

**Page 5**

1    A. No.
2    Q. Let me go through, then, what this process is
3  so that you can understand what we're doing today and
4  some of the general ground rules that apply.
5         Okay. The most important one is that you are
6  testifying today just as though you were sitting in a
7  courtroom with a judge and a jury. Do you understand
8  that?
9    A. Uh-huh.
10    Q. Yes?
11    A. Yes, uh-huh.
12    Q. The second most important one is that you have
13 to give me audible verbal responses, no nods of the
14 head, or "uh-huh" or "huh-uh," that require the court
15 reporter to interpret, she can't take down, so we need
16 you to say "yes," "no," or a verbal response. Okay?
17    A. Yes, sir.
18    Q. Excellent. Because it is as though you were
19 testifying in court with a judge and a jury, it carries
20 with it -- the testimony carries with it the same
21 penalty of perjury, the same obligation to tell the
22 truth that you would have if you were taking a stand in
23 a courtroom. Do you understand that?
24    A. I understand, yes.
25    Q. I just want you to understand that I want

---

2 (Pages 2 to 5)

DAVID ALAN KOBAK    January 8, 2008

**6**

1  you -- even though we're here in my office, kind of a
2  casual setting, I want you to really treat this with the
3  solemnity that it is due as a court proceeding. Okay?
4      A.  Right.
5      Q.  Good.  The court reporter -- there are ground
6  rules, she can only take down one of us talking at a
7  time, because she's typing furiously away, and if we
8  both talk at once, it's very difficult for her.  So if
9  you'll let me finish my questions before you start to
10  answer, that will help her and it will help me.  Okay?
11      A.  Okay.  I understand.
12      Q.  When we ask for your testimony, we are asking
13  for what you know or remember or can give us a good
14  estimate of, but we don't want you to guess or to
15  speculate about things.  If you don't know something,
16  tell me you don't know.
17      A.  Okay.
18      Q.  I may delve into it a little bit more to see if
19  I have some facts that might help refresh your
20  recollection, or some documents that might help you
21  remember things.  But if you're just guessing, don't do
22  that.  Okay?
23      A.  Okay.
24      Q.  The proceeding is not intended to be a long
25  drawn-out affair or in any way an imposition on you.  So

**7**

1  if you need to take a break at some time, let me know.
2  Okay?
3      A.  Okay.
4      Q.  Are you currently employed?
5      A.  Yes, sir.
6      Q.  And who are you employed by?
7      A.  By Barry Cohen and the Fishing Vessel Point
8  Loma.
9      Q.  How long have you been employed by Barry Cohen
10  and the Fishing Vessel Point Loma?
11      A.  Since April of 2006, the middle of April.
12      Q.  And in what capacity are you employed?
13      A.  I'm the skipper of the Fishing Vessel Point
14  Loma.
15      Q.  What type of a license do you have to be the
16  skipper or captain of the Point Loma?
17      A.  Just a regular fishing license.  I don't need
18  captain-type papers, anything like that, to do it.
19      Q.  Do you have any sort of a seaman's license?
20      A.  No, sir.
21      Q.  Have you received any training in terms of
22  operating vessels?
23      A.  No, but I've been doing it most of my life.
24  I've owned several vessels.
25      Q.  Are you familiar with a fishing permit for the

**8**

1  Fishing Vessel Point Loma?
2      A.  Yes, sir.
3      Q.  Is that maintained on the vessel?
4      A.  Yes.
5      Q.  Is it currently on the vessel?
6      A.  Well, we better rephrase that, too.  There's a
7  copy of the fishing permit on the boat.  That's all
8  we're required to have.  I'm sure Barry has the
9  original.
10      Q.  Are you aware that the vessel is subject to a
11  preferred ship mortgage?
12      A.  I guess.  I'm not real aware of it.  There was
13  something there on his papers that were on the vessel
14  when they arrested it -- mortgage with Del Mar.
15      Q.  Is there any posting of the preferred mortgage
16  anywhere on the bridge of the vessel?
17      A.  No, sir.
18      Q.  Have you ever informed anyone supplying
19  equipment to the vessel that the vessel is subject to a
20  preferred ship mortgage?
21      A.  No.
22      Q.  The vessel, from time to time, obtains things
23  known as "necessaries."  That would be things necessary
24  for the operation of the vessel, like fuel, different
25  types of ships equipment, perhaps fishing nets, bait,

**9**

1  vessel fishing supplies; is that correct?
2      A.  Yes.
3      Q.  And as the captain of the vessel, from time to
4  time you have been responsible for obtaining those
5  necessaries for the vessel; haven't you?
6      A.  Yes, sir.
7      Q.  When you have obtained those necessaries, have
8  you informed the supplier that the vessel was subject to
9  a preferred ship mortgage?
10      A.  No, I never did anything about that part.
11      Q.  What was your fishing experience prior to April
12  of 2006?
13      A.  I had a salmon boat for a year or so, and I've
14  ran numerous vessels, and owned a drag boat before, a
15  trawler.  I've been doing this since 1972 or '3,
16  somewhere in there.
17      Q.  In this time period that you've been the
18  skipper of the Point Loma, have you had any other
19  employment?
20      A.  No, sir.
21      Q.  So since April of 2006, your sole employment
22  has been as skipper of the Point Loma?
23      A.  Yes.
24      Q.  As skipper of the Point Loma, how are you
25  compensated?

3  (Pages 6 to 9)

DAVID ALAN KOBAK    January 8, 2008

**10**

1    A.  We get a percentage of the net from the catch
2    after fuel and ice are taken out.
3        Q.  What is your percentage as the captain?
4        A.  25 percent.
5        Q.  Has that been the same throughout the period
6    that you've worked on the vessel?
7        A.  Yes.
8        Q.  So you take a percentage of the catch after
9    fuel and ice are taken out?
10       A.  Yes, sir.
11       Q.  When you say "percentage," are you telling me a
12   percentage of the gross sales or the net sales?
13       A.  Well, it would be the net, after that.  They
14   start out with the gross and then we subtract ice and
15   fuel from it, from that.
16       Q.  So your percentage is 25 percent of the net
17   after deducting fuel and ice?
18       A.  Yes, sir.
19       Q.  And, then, are there other crew members on the
20   vessel?
21       A.  There's two other crew members, yes.
22       Q.  How are they compensated?
23       A.  The same way.  They both get twelve and a half
24   percent a piece.
25       Q.  That adds up to 50 percent, in my poor

**11**

1    mathematical estimation.
2        A.  It's real close, yes.
3        Q.  Who gets the other 50 percent?
4        A.  Barry.  It goes to Barry.
5        Q.  There are other expenses to operate and
6    maintain that vessel besides the ice and the fish -- I'm
7    sorry -- the ice and the fuel; correct?
8        A.  Yes, correct.
9        Q.  What are those other typical expenses?
10       A.  Well, there's breakdowns or things like that.
11   As you can see, the boat is not real well kept up, but
12   it's been that way when I got on it.
13           I take care of everything that maybe breaks
14   down or needs to be fixed as we go along.  We got a new
15   marine toilet there a while back.  Stuff like that --
16   all that stuff is paid for out of the boat.
17       Q.  So that Barry's responsible for all of the
18   maintenance of the vessel out of his 50 percent?
19       A.  Yes.
20       Q.  The vessel has to tie up when it's in port;
21   right?
22       A.  Yes, sir.
23       Q.  How much is the berthing fee for that vessel?
24       A.  I don't rightly remember.  I was thinking it
25   might be $300 a month, but I'm not sure.  Somewhere in

**12**

1    that area, but I'm not sure.  I don't rightly remember
2    exactly what it was, because I haven't seen it since I
3    moved the boat there.  I'm not real sure.
4        Q.  This is one of those areas where I'm
5    entitled -- if you don't remember specifically, you've
6    done a great job of telling me that.  I am entitled to
7    your best estimate, if you have one.  Again, don't
8    guess.  Is it your --
9        A.  That would be a guess.
10       Q.  Well, that was going to be a question.  Is your
11   estimate that it's around 300, or do you have any basis
12   for that?
13       A.  For some reason, that 3-something sticks in my
14   mind.  I could call the dock and find it out.  Other
15   than that, I'm not going to say.  I would have to say I
16   don't really know, to tell you the truth.  I might be
17   wrong.
18       Q.  How big is that vessel?
19       A.  Its total length from one end to the other is
20   76 foot.  Its registered length is a different length:
21   70 feet maybe.  They measure a different area.
22       Q.  The vessel is typically docked at the Hyde
23   Street Pier?
24       A.  Yes, sir.
25       Q.  In the time you have served aboard the vessel

**13**

1    since April of 2006, has it used any other dock?
2        A.  When I first got on the vessel, it was at Del
3    Mar Seafoods in Moss Landing, and I worked there for --
4    I don't remember exactly; I would have to look into
5    that, too.  When they moved out of there, they took the
6    fishing operation up to Astoria, and they wanted me to
7    go back there.  And I didn't want to, so I got a job at
8    Caito Tide Fisheries and moved the boat back here.
9        Q.  When, approximately, did you move the vessel
10   here to San Francisco?
11       A.  I don't know the exact date.
12       Q.  Do you have a month?
13       A.  No, I really don't.  It's just kind of a blank
14   spot.  I don't remember.
15       Q.  Was it in 2006 or '7?
16       A.  2007.
17       Q.  2007?  Okay.  So, sometime in 2007 the vessel
18   moved up to San Francisco to the Hyde Street Pier, and
19   it's been home-ported, basically, in San Francisco
20   since?
21       A.  Yes, sir.
22       Q.  What type of fishery does the Point Loma engage
23   in?
24       A.  It's a trawl vessel.
25       Q.  Trawl vessel for what fishery?

4 (Pages 10 to 13)

DAVID ALAN KOBAK    January 8, 2008

## 14

1    A.  Well, when it's trawling, it's dragging a net
2  on the bottom, and we fish for deep water fish or
3  whatever we can fish.
4    Q.  Generally, because it's a bottom trawler, then,
5  you're fishing for different species of groundfish?
6    A.  Yes, sir.
7    Q.  It's fair to say, then, that you engage in the
8  groundfish fishery?
9    A.  Yes.
10    Q.  That's a managed fishery; is it not?
11    A.  Yes, it is.
12    Q.  And that's managed by the Pacific Coast
13  Groundfish Fishery Management Plan?
14    A.  Yes, that and the state and the fish plant that
15  I sell my fish to.  They manage it to a point.  They set
16  limits for me, too.
17    Q.  What limits are applicable to, or were
18  applicable, to the Point Loma in 2007?
19    A.  What limits?
20    Q.  Yes.  How does that -- in some respects you're
21  the expert sitting here to inform the court what you can
22  and do with the vessel in terms of its fishery.
23    Q.  Are there restrictions on when the vessel
24  fishes and how much it fishes and what types of fish it
25  catches, that sort of thing?

## 15

1    A.  There's limits on the type of fish you catch
2  and where you can fish a lot of times.  Different
3  depths -- you have to have different nets for different
4  depths sometimes for the inshore and offshore.  There's
5  monthly quotas; there's limits set by the government,
6  and they change and they go by a two-month period.  And
7  I'm not going to remember the exact figures right now
8  because the new stuff isn't out yet for this year.  I
9  haven't seen it yet.
10    Like you can catch 40,000 pounds of one variety
11  in two months, then 10,000 pounds of some other variety
12  in two months.  It's all listed on the big sheet that
13  they put out every year for you.
14    Q.  Do you have that sheet for 2007?
15    A.  I don't have it with me.  It's on the boat.
16    Q.  Okay.  On the boat, is there a list for 2007?
17    A.  Yes, there is.  Yes, sir.
18    Q.  Okay.  Do you remember what the two-month
19  periods are?
20    A.  Starting January-February, and you go on all
21  the way through the twelve months.
22    Q.  So January-February is the first period?
23    A.  Yes, sir.
24    Q.  March-April is the second period?
25    A.  Uh-huh.  The limits are increased like in

## 16

1  January and February.  Then for maybe six months they go
2  down on some things.  Then they come back up at the end
3  of the year for the last two-month period on certain
4  fish.
5    Q.  So is it true that the May and June fall
6  together as one permit period?
7    A.  I guess if that's how it works out, yeah.
8    Q.  And in July-August, you start up a new period?
9    A.  Right.
10    Q.  And is it true that generally, then, because
11  you're allowed a certain amount or quota of fish during
12  each period, that your catches tend to be higher at the
13  beginning of that period, and then towards the end, you
14  have to be careful that you don't catch too much and go
15  beyond your permit amount?
16    A.  Well, there's two ways of looking at it.  I'm
17  not really worried about catching these quotas so much,
18  especially deep water stuff.  There are petrale sole
19  that are spawning right now that I'm after in 2006.
20  Then it changed in 2007.  It was 70,000 pounds for the
21  last two months, December and January.  Now it's 50,000
22  pounds.  But I go fishing for those and try to get that
23  50,000 pounds, which is a $1.10 a pound.  The other
24  stuff -- I just go fishing, you know, and get what I
25  can.  If it's getting close to one of the quotas, I have

## 17

1  to watch it, but I very seldom get that close to all of
2  them.  We just catch what we can and deliver it.
3    I'm not out to get -- some of the quotas are
4  fairly big enough to where you're not going to catch
5  them all, anyway.  Plus the plants -- like I said
6  earlier, the plant doesn't want 100,000 pounds of
7  something; they want 10,000 pounds of it.  You can bring
8  in 12, something like that, maybe, but you can't just go
9  crazy.  They can only take so much.
10    Q.  What was the quota like between 2006 and 2007?
11  Did the limit stay about the same?
12    A.  They did stay about the same, except that the
13  petrale sole went from 70,000 down to 50,000 on the
14  first two months and the last two months of the period.
15    Q.  So, January-December you're referring to?
16    A.  November and December and then January and
17  February the next year.
18    Q.  Okay.  But the fish quotas that you were
19  allowed to catch, say, in the time period of June to
20  August of 2006 were similar to what you were allowed to
21  take in June to August of 2007?
22    A.  Oh, yeah.  Everything stayed the same there
23  pretty much.  It wouldn't have mattered too much.  There
24  wasn't a lot of changes.
25    Q.  What about in the price of fish?  Did you

5  (Pages 14 to 17)

DAVID ALAN KOBAK    January 8, 2008

**18**

1  feel -- in your experience, was there much of a change
2  in the price of fish during that time?
3      A.  We got just a teenie bit of a raise this last
4  year for 2007, but not a lot; just a few cents here and
5  there.
6      Q.  If you had been -- the vessel was arrested on
7  June 7th of 2007 and was released on August 17th of
8  2007.  Is that consistent with your recollection?
9      A.  Yes.
10      Q.  Had you been able to fish in that time period,
11  is it your feeling that you would have caught roughly
12  the same amount of fish that you had caught in 2006?
13      A.  I imagine, yes.  I don't know, though, for
14  sure, because up here there's different quotas and
15  stuff.  But where I fish at, things change, so I
16  couldn't really go by anything there.
17      ~~She has taken the stuff, but I guess you probably~~
18  have seen it, too.  But I have kept a very good track of
19  the weather all the time the boat was tied up, and I
20  figured out all the trips that I could have fished when
21  the weather was good or when the weather was bad, and I
22  came up with that we could have fished 13 trips.  So I
23  took the last 13 trips prior to that and added them up
24  to a gross, and they come up to $150,000.  I've taken
25  the last 13 trips since we got the boat back and come up

**19**

1  with like $140,000 that the boat would have grossed.
2      Q.  So doing this again, you figured out you could
3  have fished 13 trips?
4      A.  Yes.
5      Q.  And you figured out that in that 13 trips, you
6  could have grossed how much?
7      A.  Somewhere in that area.
8      Q.  140 to 160?
9      A.  Sure.
10      Q.  Okay.  And by "gross," you mean gross sales
11  before deductions of fuel and ice?
12      A.  Yes.
13      Q.  And what did you -- how did you reach that
14  calculation?
15      A.  I just added up all the grosses from the fish
16  in the 13 trips before and the 13 trips afterwards.
17      Q.  So you looked at the 13 trips immediately
18  preceding the arrest of the vessel?
19      A.  Uh-huh.
20      Q.  Yes?
21      A.  I did both:  Before and after.
22      Q.  Right.  And then you looked at the 13 trips
23  after?
24      A.  Yes.
25      Q.  Okay.  Do you historically have higher catches

**20**

1  ~~in the preceding months before June than you do in that~~
2  ~~time period between June and August?~~
3      A.  I'd have to look back at my records to prove
4  any of this to let you know for sure.  Fishing is pretty
5  much the same year-round for me, except you have some
6  glorious days like when we catch this petrale, and
7  sometimes the dover are spawning, but I haven't run
8  across much of that recently.
9      Q.  Let me show you what Barry Cohen has produced
10  to us.  These are not yet Bates-numbered, but these were
11  handed to me at the deposition of David Cantrell
12  recently.  We'll have this package marked as Exhibit 1.
13          (Whereupon, Exhibit 1 was
14          marked for identification.)    TRIAL
15          MR. POULOS:  Q.  Taking a look at Exhibit 1,    X-52
16  can I see this for a second?  Can you look on with him?
17          If you look at the period from June 2006 to
18  August of 2006, you see the gross catch listed there is
19  17,846.99; 27,572.37; and then 12,142.75.  Do you see
20  that?
21      A.  Yes.
22      Q.  You see that that is a significant drop down
23  from the gross for the periods of March, April and May
24  of 2006; right?
25      A.  Okay.

**21**

1      Q.  Do you see that?
2      A.  Uh-huh.
3      Q.  Yes?
4      A.  Yes.
5      Q.  And you see that it's actually also much lower
6  than the catch totals for September, August -- or
7  September, October and November of 2006; right?
8      A.  Yes.
9      Q.  Do you have an explanation for why in the --
10  well, first of all, do you know if these figures are
11  accurate?
12      A.  I hope they are.  I don't know for sure.  If
13  you have records of them back here from these pink
14  things, I see something there -- whether or not those
15  are accurate, if that's where you got these, these
16  settlement sheets -- the totals.
17      Q.  Let's assume, because these have been produced
18  by Barry Cohen, that they are accurate.  Do you have an
19  explanation for why the catch was lower in 2006 for the
20  months of June, July and August?
21      A.  Well, not really, no.  Only a couple of things.
22  Sometimes you go fishing and you don't catch much;
23  sometimes you go fishing and you break down.  I'd have
24  to look at all of my records, and they're not with me,
25  to see if I went out and tried real hard and didn't

6 (Pages 18 to 21)

---

**22**

1  catch anything, or if I broke down and I had to go in
2  early or something, or if the weather got bad and I had
3  to come back in early or something.
4      Q.  In June, July or August, the weather is usually
5  not that bad; is it?
6      A.  Well, you get some northwest wind. It's windy,
7  yeah.
8      Q.  Is there some reason why -- well, me ask, what
9  records would you need to look at to determine whether
10  the time period of June, July and August of 2006 -- if
11  there had been any significant breakdown?
12      A.  I've got all that stuff on a calendar, or I
13  keep a running notebook of all the trips I make and what
14  time I leave, what time I do my tows and what time I get
15  in, reasons why I would come in early or something.
16  It's kind of like the old saying. It's called
17  "fishing," but if it was catching, they would call it
18  "catching." I don't know about that part of it.
19          Sometimes you do not catch fish. I don't care
20  what's going on. You can't count on maintaining an
21  average of something, you know.
22      Q.  You testified earlier that you believe that for
23  the time period of June, July and August of 2006, you
24  would have had similar catches for the time period of
25  June, July and August of 2007?

---

**23**

1      A.  There's a possibility. Maybe not. I don't
2  know.
3      Q.  It could have been more or it could have been
4  less?
5      A.  It could have been either way; yes, sir.
6      Q.  Do you see for June of 2007, Barry reported a
7  catch with a gross value of 11,790.84 for the first
8  trip. Do you see that?
9      A.  Where is that?
10     Q.  In 2007, June.
11     A.  11,000. Okay.
12     Q.  Do you see that?
13     A.  Uh-huh.
14     Q.  Do you recall that trip and whether you had any
15  problems on that trip?
16     A.  No, sir.
17     Q.  Is that a fairly typical trip for you?
18     A.  I don't really know. They come and go, as I
19  said.
20     Q.  If you flip towards the back, it looks like
21  about eight pages in, on the bottom, it shows the total
22  of -- that total of 11,790.84. Flip all the way to the
23  back.
24     A.  From the back?
25     Q.  Yes, and then go eight pages in.

---

**24**

1      A.  What date?
2      Q.  Well, this is dated June 4 of '07 as the
3  delivery date, but on the bottom it shows that total,
4  11,000. That's what you're looking for.
5      A.  6-04? Is that what you said?
6      Q.  Yes.
7      A.  11,790?
8      Q.  Yes. Can you take a look at that page and tell
9  me if that refreshes your recollection at all in terms
10  of how the fishing was going in June of 2007.
11     A.  I would suppose -- this is probably a guess,
12  also -- that maybe they only wanted 10,000 pounds of
13  dover, to start with, and they did have 12,000, which
14  was a hair over that. I'm not sure how many tows I
15  made.
16     Q.  What is the groundfish buyback?
17     A.  Well, years back, they bought -- I don't
18  remember how many years ago -- the government bought
19  back a bunch of trawlers, but the stipulation was they
20  would buy these boats back and put them out of business
21  and take the permits; but the existing boats would have
22  to pay back this loan that they borrowed from the
23  government to put these people out of business. So it's
24  five percent, or whatever it is, they take off your
25  gross every delivery on the West Coast for every boat

---

**25**

1  that's left.
2      Q.  Is the net after that, as well, then?
3      A.  Yes. The fish plant takes that off.
4      Q.  So when we talked about the compensation being
5  paid to you is the net of ice and fuel, it's also net of
6  the groundfish buyback?
7      A.  Yes. The amount right here is always that,
8  with that taken out of it (indicating).
9      Q.  Right. Who were the crew members that you had
10  on the vessel in June of 2007?
11     A.  June of 2007? Probably -- I don't remember now
12  for sure. It could have been Guido and Gino. Pete
13  Kellogg and Gene Harding, I believe, but I could be
14  wrong.
15         Do you have a list there somewhere?
16     A.  Yes. There's a -- it looks like in May, Gene
17  and Peter?
18     A.  Gene and Pete. That's the guys.
19     Q.  Gene who?
20     A.  Gene Harding and Pete Kellogg.
21     Q.  Pete Kellogg. And the month before that, there
22  was a Gene and a Kenny.
23     A.  Kenny is another guy who fills in for one of
24  the guys occasionally, if someone takes a trip off or
25  whatever.

---

DAVID ALAN KOBAK    January 8, 2008

**26**

1    Q. During the period that the vessel was under
2  arrest, were you paid at all?
3    A. Barry compensated us some, yes.
4    Q. How much did Barry compensate you personally?
5    A. He gave me checks for $5,000.
6    Q. Total?
7    A. Total.
8    Q. I just want to be clear on this. So, for the
9  time period that the vessel was under arrest, from June
10  7th to August 17th of 2007, Barry paid you a total of
11  $5,000 for that time period?
12    A. Yes, sir.
13    Q. How did he calculate that sum?
14    A. He just sent us some money occasionally. He
15  sent the crew men some money, too. They were sent to
16  stay in a hotel, because they live on the boat. They're
17  like vagrants, or whatever you want to call them. They
18  wander around with the fisheries.
19    Q. How much did Barry pay them?
20    A. I think he gave them 2,000 a piece.
21    Q. Total?
22    A. Total.
23    Q. When did he pay that money to you?
24    A. Just sent me a check occasionally.
25    Q. Was it during that time period that the vessel

**27**

1  was under arrest, or did he send it to you later?
2    A. No. During that time period. That goes back
3  to where we had a problem with trying to get my stuff
4  off the boat. One of your attorneys here said to make
5  it simple handwritten, barely descriptive or whatever.
6  I didn't realize I had to go to her and have her print
7  something out for me.
8         I just said, dirty clothes in a hamper. I
9  don't know what more you'd need to know. Red-striped
10  socks. The boat doesn't own any of that stuff; it's our
11  stuff.
12         I could have went somewhere else, but the guys
13  had a sack or little bag of dirty clothes. They went to
14  a laundromat to wash their clothes that day, and they
15  came back to the boat and it was locked up. I didn't
16  see them. That's all they had with them. All of their
17  stuff, their fishing licenses; one of them had a
18  passport. Just their personal stuff is on that vessel
19  locked up, and they can't get to it.
20         They had no fishing license. They could have
21  got a copy, if they had to, or they could have gone to
22  the secondhand store somewhere and got some clothing and
23  some rain gear, but it was kind of a bad situation for
24  all of us at the time.
25    Q. Move to strike as nonresponsive. No question

**28**

1  pending.
2         Occasionally, we'll put things on the record
3  for a judge to rule on later. Unless for some reason
4  you're instructed not to answer a question, you don't
5  have to worry too much about that.
6         Let's talk about when the vessel was arrested.
7  At the time of the arrest, the vessel was at the Hyde
8  Street Pier; correct?
9    A. Yes, sir. Right where you boarded it
10  yesterday.
11    Q. The vessel -- at the time of the arrest, you
12  were not on board the vessel; is that right?
13    A. Not at all.
14    Q. No, you were not on board the vessel?
15    A. No, I wasn't. If you want to know more, I came
16  to the boat that day, though, and left some groceries.
17  I left and came back later.
18    Q. Right. I'll get to that later. At the time of
19  the vessel's arrest, there was a fishing net on board
20  the vessel; correct?
21    A. Yes, sir.
22    Q. What type of fishing net was that?
23    A. It's a big four-seam 120-foot footrope. I
24  can't think of the name of it now. 15-inch (inaudible
25  word) footrope on it. It's a big net.

**29**

1    Q. And that's used for fishing where it's over 150
2  fathoms or something?
3    A. Yes, sir.
4    Q. So it's fishing in the EEZ, the Exclusive
5  Economic Zone?
6    A. I guess.
7    Q. Is that more than three miles offshore?
8    A. Well, you've got to be outside of 150 fathoms,
9  whether it's three miles or 20 miles.
10    Q. Where does the vessel generally fish?
11    A. I usually fish off of Pigeon Point a lot, and
12  sometimes down to Point Sur. Back and forth in those
13  areas.
14    Q. And how far out?
15    A. Point Sur, I fish right in to three and a half
16  miles out to 15 miles. Up here, I fish mostly 20 miles
17  offshore when I've got that net, that big net.
18    Q. Generally speaking, you're more than three
19  miles offshore?
20    A. Yes, sir.
21    Q. And less than 200 miles offshore; right?
22    A. Yes.
23    Q. How frequently in 2007, before the vessel was
24  arrested, did the vessel fish inside of three miles?
25    A. Actually, I hadn't done any fishing inside of

8 (Pages 26 to 29)

**30**

1  three miles, but I was getting ready to when the vessel
2  was arrested. The net was tied up on the deck, stacked
3  up so I could pick it up and get it off the boat and put
4  the other net back on. We were going to go make a trip
5  the next day or two after the vessel was arrested,
6  whenever the weather was good.
7      Q. So in the time period of the arrest, the big
8  net was on the deck of the vessel, ready to be
9  off-loaded?
10     A. Yes, sir.
11     Q. So it was off the spool?
12     A. Yes.
13     Q. There was another, smaller net that you would
14  use for fishing inside of three miles or in the
15  shallower water?
16     A. Well, that other net is what they call a
17  "selective flatfish trawl," and if you fish inside of
18  100 fathoms, it has to have an 8-inch roller thing on
19  the footrope. You have to have that net to fish inside
20  of 100 fathoms  150, actually, but the RCA covers from
21  150 in to 100, so you can't fish there anyway. But I
22  can fish from the three-mile line to the 100-fathom
23  curve with that small net. I can use that small net
24  outside when I know I'm fishing for petrale. That's one
25  of the reasons we got the net. I got 70,000 pounds of

**31**

1  petrale with that new net when we first got it.
2      Q. When did you get that net?
3      A. That's a date I don't know, either. We got it
4  October, probably, of 2007, I would guess.
5      Q. So the net that was --
6      A. No. Actually, it was 2006; wasn't it?
7      Q. Okay.
8      A. Yeah.
9      Q. So how many times had you fished with this
10  smaller net before the vessel was arrested?
11     A. I used it for most of November and most of
12  December, and I took it off somewhere in there, but I'm
13  not real sure what dates. I have all that stuff on the
14  boat. I didn't realize I needed it; otherwise, I would
15  have brought it. So I don't know. Sorry.
16     Q. Where was -- the smaller net is the one that
17  has been alleged went missing at some time around the
18  time of the arrest?
19     A. Yes.
20     Q. So if we refer to that as the smaller net,
21  you'll understand what I'm referring to?
22     A. Yes, sir.
23     Q. So that smaller net you think was purchased or
24  obtained sometime in around October of '06?
25     A. Somewhere in that area. I'd have to look it up

**32**

1  to get you the exact dates, if you need them.
2      Q. Okay. Where was the smaller net when the
3  vessel was arrested?
4      A. It was on Pier 45, and there's a reason for
5  this, I'll have to tell you it's going to be a little
6  long.
7      The boat's big, as you notice, and the net that
8  I have on the boat is huge. To get that net off, I have
9  to lift it with a hook line, a hook line where the rope
10  is. I have to lift it up into the air, put the rope
11  under that, and take my truck there and pull it off on
12  Pier 45. And there's only one spot I can do that. The
13  hoist on Pier 45 will not lift that net, and it's too
14  big to put in my truck; it's huge. So I put one on
15  there and take the other one off in that same area like
16  that between the two buildings on that side of Pier 45
17  there.
18     Q. Okay. Pier 45 is not where the Point Loma was
19  berthed at the time of the arrest?
20     A. No, it's just right across from it, though.
21     Q. It's across the water?
22     A. That's right. Across the bay there, the water.
23     Q. Right. So the smaller fishing net was on a
24  dock across the water from where the Point Loma was
25  berthed?

**33**

1      A. Yes, sir.
2      Q. The Hyde Street Pier is essentially -- is that
3  like Pier 49, then?
4      A. I don't know. Hyde Street Pier -- that's where
5  the old boats are there. But the fish dock -- I don't
6  know. The Hyde Street Pier is where the commercial
7  fishing vessels dock down.
8      MR. POULOS: Let me have marked as Exhibit 2
9  this photograph.
10     (Whereupon, Exhibit 2 was
11     marked for identification.)
12     MR. POULOS: Q. Exhibit 2 has Bates number
13  DMSI-00066. That's the number in the lower right-hand
14  corner, for your reference. This photograph shows the
15  Point Loma; correct?
16     A. Yes, sir.
17     Q. And it shows it tied up at the Hyde Street
18  Pier; is that correct?
19     A. Yes, sir.
20     Q. And in the distance, behind the vessel, across
21  the water there is Pier 45; is that right?
22     A. Yes, sir.
23     Q. So the net, the smaller net, was not even at
24  the same pier structure as the Point Loma?
25     A. No.

9 (Pages 30 to 33)

DAVID ALAN KOBAK    January 8, 2008

**38**

1  anything, actually ultimately was not returned to you?
2  A. I had guns on the boat, but those came back to
3  me. But there was a pair of binoculars upstairs, pretty
4  nice binoculars, which we never did find. I had to buy
5  a new pair, because we had to have binoculars.
6  Q. How much were the binoculars?
7  A. It's in there, right there.
8  Q. In the declaration?
9  A. Yes. I wrote the price down there somewhere.
10  Q. You handed me a declaration, and then on this
11  declaration -- looks like it's original with your
12  signature?
13  A. It was, yes.
14  Q. And then you have a bunch of handwritten notes
15  on it.
16  A. I just wrote down some stuff that came to mine
17  as I'm reading it and thinking about coming here.
18  Q. When did you make these notes?
19  A. I made some today, in fact, on the back there.
20  Q. The ones in red on the back?
21  A. Uh-huh.
22  Q. What about the interlineations on the
23  declaration itself?
24  A. That's something I put on it immediately when I
25  got back, because whoever wrote it out there -- it says

**39**

1  8-foot or 8-inch or something -- didn't get it quite
2  straight. I added little comments where it's in writing
3  of what it should be.
4  Q. Who owns the area where you were storing the
5  smaller net?
6  A. The harbor.
7  Q. And who had given you permission to store it
8  over there?
9  A. Hedley Prince, the harbormaster there, which I
10  found out later he shouldn't have, I guess. But I tried
11  to talk to a lady called "Claudia Davison," and she got
12  mad at me, wasn't very nice at all; wasn't receptive to
13  the fact that it is a working fishing dock and that's a
14  fishing vessel. And like I said, you can't take the net
15  off anywhere else unless you like a crane and put it on
16  a flatbed truck. I'm not equipped to do all that stuff.
17  I don't want to go that far. But he said it was all
18  right if I set it there.
19  Q. You don't have any reason to believe that
20  Del Mar took the smaller fishing net, do you?
21  A. It could have been just anybody, couldn't it?
22  Q. You don't know?
23  A. Do you believe that Joe Cappuccio would come up
24  and take his net that he thought was his? What do you
25  think?

**40**

1  I went down many trails trying to find that net
2  and I spent a lot of time doing it. I've been to part
3  of Bodega Bay and wandered around other places, looking,
4  and right up here, Pier 26, looking around in places,
5  and I've never seen hide nor hair of it. Nobody knows
6  anything about it. I've talked to everybody out on the
7  dock out there at one time or the other. I get little
8  leads here and there and I pulled them out, but none of
9  them helped me.
10  Q. How would you describe the condition of the
11  Point Loma now?
12  A. What do you think? It's a mess. It's been
13  that way since I've been on it. It's too much for me to
14  want to fix up. If it was my boat, I might have
15  attacked it, but you can't expect me to get my crew to
16  do that kind of work on that boat five or six days a
17  week just to get it cleaned up. It would take a long
18  time. It's sad that it's gotten in that shape.
19  Q. Would you agree with me that it is in an
20  advanced state of deterioration?
21  A. Pretty much so, yes, sir. It still works -- is
22  what my comment would be. It still works and everything
23  works on it, and it's productive when we go fishing.
24  Q. Is it true that there is no routine
25  maintenance, but if something breaks, you fix it?

**41**

1  A. We do a certain amount of routine maintenance
2  to keep stuff from falling apart, to a point. Like the
3  rust you see and the damage that has already been done,
4  and there's not much you can do about a lot of it. You
5  work around it, and if stuff breaks, you have to fix it.
6  Q. I noticed on the port's railing near the stern,
7  there's a major chunk of metal missing from the railing
8  area there.
9  A. Yeah.
10  Q. Is that pretty symptomatic of the condition of
11  the vessel overall?
12  A. I hope it's not that way everywhere, like the
13  part under the water.
14  Q. Right. It floats?
15  A. It floats, yes. Haven't had any problems
16  anywhere, but we keep our survival suits or life jackets
17  available.
18  Q. Let's take a break for just a few seconds so I
19  can go ahead and make copies of these and attach them to
20  the record.
21  MS. FANGER: I haven't seen those yet. Can I
22  take a look at these?
23  MR. POULOS: Sure. While we're doing that,
24  let's just jump ahead a minute. We'll mark that, then,
25  as Exhibit 3.

DAVID ALAN KOBAK    January 8, 2008

---

**42**

1        (Whereupon, Exhibit 3 was
2        marked for identification.)
3        THE WITNESS: The vessel has been that way for
4   a long, long time, you know.    TRIAL
5        MR. POULOS: Q. This photograph, Exhibit 2
6   that shows the area on the railing that we were just
7   discussing where major rust has eaten through the metal;
8   correct?
9        A. Yes, sir.
10       Q. And that's been like that for a long time;
11  right?
12       A. It doesn't happen overnight. It was like that
13  when I got on the boat, sir. Not a whole lot I can do
14  about it.
15       Q. Right.
16       Let me just have marked as Exhibit 4 another
17  photograph.
18       (Whereupon, Exhibit 4 was
19       marked for identification.)
20       MR. POULOS: Q. Does Exhibit 4 show the
21  general condition of the Point Loma?
22       A. From what you can see of it there, yes.
23       Q. The net sitting on that, on the deck there --
24  that's the larger fishing net?
25       A. That would be the large net; yes, sir.

---

**43**

1        Q. Then the spool is what's right behind that,
2   that it normally would roll on?
3        A. The net rail, yes.
4        Q. Does this appear to you to be the Point Loma at
5   the time that the vessel was arrested with the big net
6   on the deck?
7        A. It would look like that at that time. Yes,
8   that's where the net was when the boat was towed away.
9        Q. It's my understanding this photograph was taken
10  at the time of the arrest?
11       A. Okay.
12       Q. And, generally, what you see here is, then,
13  consistent with that?
14       A. Yes, sir.
15       Q. Okay. Again, showing in the background there
16  is the Pier 45 across the water, where the net was
17  stored?
18       A. Right.
19       Q. Could you tell me about your discussions with
20  anyone about loading that smaller net on the vessel
21  after the vessel was arrested?
22       A. I didn't discuss it with anybody, because I
23  couldn't. I just left it there, you know. I didn't
24  know how long this was going to take. Like I say, the
25  guy never served us with papers, to start with, until we

---

**44**

1   know what was going on. It took a while to get anything
2   going, to find out what's happening. Then, finally,
3   they towed the boat away, so I couldn't do anything with
4   the net.
5        Nets are so big, even that small net, that it's
6   almost too big do put in your pickup and drive it
7   around. It takes a lift truck to lift it. There's a
8   hoist over there that's not strong enough. They're
9   pretty funny around that area down there. They don't
10  like fishermen, I guess, very much, because they don't
11  provide you with much.
12       MR. POULOS: Let's mark another photograph. I
13  guess we're up to 5.
14       (Whereupon, Exhibit 5 was
15       marked for identification.)    TRIAL
16       MR. POULOS: Q. Does Exhibit 5 show the Point
17  Loma taken from the starboard side?
18       A. Yes, sir.
19       Q. Let's take that break so I can mark these
20  other --
21       MS. FANGER: Actually, I have some follow-up
22  questions on this. Want me to ask them now?
23       MR. POULOS: No. You can ask them at the end.
24       MS. FANGER: Okay. Well, actually I think we
25  have to disclose these to you separately in the

---

**45**

1   deposition.
2        MR. POULOS: Well, you can do a disclosure of
3   them, but I'm still going to mark them and attach them
4   as an exhibit.
5        MS. FANGER: But you didn't ask for documents
6   for this deposition.
7        MR. POULOS: He's reviewed them and brought
8   them with him, so they are clearly something
9   discoverable.
10       MS. FANGER: Then I'll have questions.
11       MR. POULOS: Sure. Absolutely. Let's take a
12  ten-minute break.
13       THE WITNESS: Okay.
14       (Recess from 10:58 to 11:13 a.m.)
15       MR. POULOS: Let's mark this as Exhibit 6 and
16  this as Exhibit 7.
17       (Whereupon, Exhibits 6 and 7 were
18       marked for identification.)
19       MR. POULOS: Q. Could you take a look at
20  Exhibit 6, please, and can you tell us -- that's one
21  page behind there --
22       A. Uh-huh.
23       Q. That's a true and correct copy of the page that
24  you were given by the harbor police when you made your
25  report --

---

12 (Pages 42 to 45)

DAVID ALAN KOBAK    January 8, 2008

---

62

1  Q. Is it your understanding that they did an
2  inventory of the vessel at the time?
3  A. I knew nothing of any of this situation
4  whatsoever.
5  Q. Let's go through this. I'll represent to you
6  this is a copy of their survey that they did. At the
7  time that they arrested the vessel, they prepared --
8  they did a brief survey of the vessel and an inventory.
9  Do you see on the first page where it says
10 "Hull", "Hull Condition Starboard"?
11 A. Okay.
12 Q. It's got box number 1 checked?
13 A. Right.
14 Q. Above that it says, "General Hull Condition:
15 Extremely poor"?
16 A. Yes.
17 Q. Then above that, it has condition codes. 5 is
18 excellent; 4, above average; 3 is average; 2 is below
19 average, and 1 is salvage.
20 Do you see that?
21 A. I see that.
22 Q. First of all, it says, "General Hull Condition:
23 Extremely poor." Do you agree with that?
24 A. Yes, sir.
25 Q. "Hull Condition Starboard." Box 1 is checked.

---

63

1  Do you agree with that?
2  A. I guess, from what you can see above the water.
3  That's all I can go by.
4  Q. For hull condition on the port, box 1 is
5  checked. Do you agree with that?
6  A. Yes.
7  Q. "Deck Condition," box 1 is checked. Do you
8  agree with that?
9  A. Yes.
10 Q. "Bottom Condition." Nothing is checked. Then
11 it says, "The waterline does not have much growth, but
12 we were unable to see the very bottom."
13 You would agree with that?
14 A. Yes.
15 Q. Under "Engine," the "Engine Condition" says
16 that it is -- box 2 is checked for below average. Would
17 you agree with that?
18 A. Which engine is that?
19 Q. It looks like it's a CAT Model 3412. I assume
20 that's the main engine.
21 A. Box 3.
22 Q. Actually, I think the boxes are to the left of
23 the number.
24 A. I see. Okay. The engine runs fine, you know.
25 Q. In terms of its maintenance, is it -- when was

---

64

1  the last time the engine had major work done on it?
2  A. It hasn't since I've been on it. I've changed
3  the oil about every 5- or 600 hours.
4  Q. Do you agree with the description that the
5  motor looked very old and tired, that there is lots of
6  oil leaking out into the bilge, and it doesn't look like
7  the motor has been properly maintained?
8  A. It looks fine. There's a little seepage of oil
9  that you can't fix hardly -- like all diesel engines you
10 have on old boats.
11 Q. Do you agree with this general description?
12 A. Not necessarily, because I take good care of
13 the engine. That's what gets me in and out, and it does
14 run fine.
15 Q. When was the last time that vessel was
16 drydocked, if you know?
17 A. I really don't know. I mentioned that to Barry
18 the other day, and he didn't tell me any different, so I
19 don't know.
20 Q. In terms of the cabin, box 1 is checked for the
21 general condition. Do you agree with that?
22 A. Well, it's not the best. It could be a little
23 bit better than 1, I believe.
24 Q. Not much?
25 A. Not too much, no.

---

65

1  You saw it. In fact, I remember your comment
2  when you got on it. You looked at the hatch and you
3  said something about "That looks like the only good
4  piece of metal on the boat." Had you not said that you
5  were an attorney, I would have laid some comment on you
6  right then about that.
7  Excuse me. You were probably right. I'm
8  sorry.
9  Q. I didn't think you were within hearing distance
10 at the time.
11 Just for the record, we had an inspection of
12 the vessel yesterday by Ken Moore, and I went out to
13 observe the vessel during that inspection, and that's
14 what the witness is referring to.
15 Could you look at the equipment listing on page
16 4 of 7. Just go through this. You don't need to say it
17 out loud, but if there is something you disagree with
18 that they reported here, could you just let us know. It
19 might speed things up.
20 Do the same thing just going through the
21 following pages. If you read it over and there's
22 something missing or incorrect, please tell me.
23 A. I don't know about this electric anchor winch.
24 They have it marked in the "P," which is "Present."
25 There is no electric anchor winch.

---

17 (Pages 62 to 65)

DAVID ALAN KOBAK    January 8, 2008

**66**

1   It looks okay on the equipment, except for the
2   batteries. I imagine they were burnt up. Well, they
3   were good when they got on the boat, but this is taken
4   immediately at the time they stepped on the vessel.
5       When I went back there a week later or so,
6   Myles asked me if I could get him some water for the
7   battery. It had been boiling the water out of it or
8   something. A 12-volt battery to run the electronics.
9   He went ahead and turned it up, gave it some juice. It
10  melted the wire -- the end of it.
11      I was kind of wondering why all my stuff on the
12  vessel was disturbed. Now I see why on their list of
13  inventory. They had to dig through everything to find
14  out what was there -- the personal stuff.
15  Q.  Right.
16  A.  I don't see anything where it says anything
17  about a pair of binoculars, though, here. Maybe I
18  missed it. I don't see anything about my guns so far.
19  I think the marshals took them, then, didn't they,
20  maybe?
21  Q.  Okay. Anything else?
22  A.  Not that I know of. As I say, I got my guns
23  back after I had to make a second trip over to Richmond
24  to get them from Sugar Dock.
25  Q.  How much were the binoculars you purchased?

**67**

1   A.  Whatever I wrote down. Did I write it down on
2   this thing? I forget. In that declaration that I
3   filled out, does it say something about them in there?
4   I think I penciled in a price, maybe. I don't remember.
5       Not that one (pointing to an exhibit).
6   Q.  I don't see it.
7   A.  Anyway, I paid 200 some dollars for them. I'm
8   not sure exactly.
9   Q.  Did you submit a bill for that to Barry?
10  A.  I sent it to him, yes.
11  Q.  Did he pay you back?
12  A.  I believe so, yes.
13  Q.  You testified at the beginning of the
14  deposition that you looked at the 13 fishing trips
15  before and after, and you estimated that you could have
16  had a gross of 140 to 160 -- $140,000 to $160,000 in
17  that time period for 13 trips?
18  A.  Yes. That's what we had to go on -- is all,
19  you know.
20  Q.  Now, that is before fuel and ice, right?
21  A.  That gross is before fuel and ice, but I also
22  added up all the fuel and ice that was used in those
23  periods and subtracted that from the figure.
24  Q.  What did you come up with then?
25  A.  I don't know if I have it with me. Here we go

**68**

1   again. You have the one from the first trips prior
2   to --
3   Q.  Okay. Okay. I see on the back you used 32,000
4   worth of fuel and 5,880 worth of ice on one estimate,
5   and 26,271.95 in fuel and 6,180 for ice on the other.
6   A.  Right. That would be it, but I got -- you have
7   some of those papers from the fish plant that showed how
8   much we made. I gave him the ice tickets and I gave him
9   the fuel tickets for all those months' trips, for the 13
10  prior. I didn't do it with the ones afterwards, but I
11  can.
12  Q.  So, when did you give them that documentation?
13  A.  I went back to the office one time and gave it
14  to them. I don't remember exactly when it was. I
15  talked to Barry and I told him I could do it as easy as
16  he could, whatever it was, so I dug them out, took them
17  down there. They should have them in their office.
18  Q.  How far back did you go?
19  A.  Just 13 trips, and the same way coming this
20  way.
21  Q.  Has anybody told you that Barry was asked to
22  produce several years' worth of fish tickets and vessel
23  records?
24  A.  No, never heard that.
25  Q.  Nobody had approached you to provide that

**69**

1   documentation?
2   A.  No, huh-uh.
3   Q.  Did Barry ever discuss with you anything about
4   payments that he made on a promissory note to Del Mar?
5   A.  Never a word.
6   Q.  Has he ever discussed with you his relationship
7   with Del Mar?
8   A.  No. And I never asked.
9   Q.  Have you ever had any difficulty finding crew
10  members for this vessel?
11  A.  Not really, but there aren't any crew members
12  around -- is another problem. You have difficulties on
13  any vessel, finding them. But this has been a pretty
14  cushy job for anybody that's been working on it. Like I
15  say, there's not any maintenance work to do per se on
16  the vessel, like painting every six months or something
17  like that. It's beyond that, so --
18  Q.  If you had let the crew members go that were on
19  board the vessel at the time -- well, withdrawn.
20      When the vessel came back from arrest in
21  August, who were the crew members you hired then?
22  A.  I had the same guys as when it was arrested.
23  Like I say, Barry gave them a little bit of money, and I
24  loaned them some money personally. That kept them going
25  here in town so they could get through.

18  (Pages 66 to 69)

DAVID ALAN KOBAK    January 8, 2008

---

70

1  Q.  If they had not been available, do you have any
2  reason to believe you would have had difficulty finding
3  someone to crew the vessel?
4  A.  Not at all.  I've got several guys that want a
5  job, and they would quit whatever job they have now to
6  come with me if I called upon them.
7  Q.  So, you could have crewed this vessel
8  regardless?
9  A.  Sure.  It might take a day or two now and then,
10  because sometimes there aren't any.  But I have a few
11  people who want a job.
12  (Court reporter interruption)
13  THE WITNESS:  A few.
14  MR. POULOS:  Q.  During the time that you've
15  been employed on the vessel, has it ever fished outside
16  of California or EEZ waters?
17  A.  No, sir.
18  Q.  Did Barry ever discuss with you the possibility
19  of taking the vessel down to Mexico?
20  A.  No, sir.
21  Q.  Do you know if the vessel has a Mexico fishing
22  permit?
23  A.  It did have one at one time, maybe.  I'm not
24  sure if it's valid now or if it was just a short period
25  thing.  It was down there at one time, but -- it was on

---

71

1  the boat, I believe.
2  Q.  Has Barry ever discussed with you the
3  possibility of declaring bankruptcy?
4  A.  No, sir.
5  Q.  Have you always, since you've been aboard the
6  vessel, sold your catch to the same company?
7  A.  Well, I sold -- when I first got on the vessel,
8  it was at Del Mar, when we were fishing for Joe, in the
9  period I was working for Joe, which wasn't the best
10  situation, either.  But, then, when they decided to move
11  the operation up to Astoria, I went and got a job with
12  Caito Fisheries.
13  Q.  Caito is C-a-i-t-o.
14  When you say you got a job with Caito, what
15  does that mean?
16  A.  Well, I had to go ask them for a job, if I
17  could sell fish to them, if they needed another boat.
18  They have a plant up in Eureka and a plant in Fort
19  Bragg.
20  Q.  So, in other words, the catch from the Point
21  Loma is already agreed to be purchased by Caito
22  Fisheries?
23  A.  Yes, sir.
24  Q.  And that started up sometime after you joined
25  the vessel?

---

72

1  A.  It was a lot later.  I was down in Moss Landing
2  for a while.
3  Q.  Are you still doing your fishing for Caito?
4  A.  Yes, sir.
5  Q.  Do you sell fish to anyone else?
6  A.  No.
7  Q.  Once the vessel was released from arrest and
8  started fishing again, did you feel you have any ongoing
9  losses as a result of the arrest of the vessel in terms
10  of inability to fish?
11  A.  Not after we got the vessel back, no.
12  Everything was all right then.  We had to get another
13  net, though.
14  Q.  Right.
15  A.  Another thing about that net -- I'll just
16  explain one more thing about that, too, that isn't in
17  any of this stuff.  It's an 8-inch footrope, which you
18  have to have to use inside of 100 fathoms.  If you go
19  inside of 100 fathoms with that net on the boat, you
20  can't have the other net on the boat; nothing bigger
21  than 8-inch.  So you have to take the net off and leave
22  it somewhere.  Like in the deeper water, I can have both
23  nets on the boat with no problem.  So that's why it was
24  on the deck.
25  Q.  Do you have a vessel monitoring system on board

---

73

1  the vessel?
2  A.  What do you mean?  Like a camera or things?
3  Q.  No.  I understand that there's a system that
4  they put like a transponder on.
5  A.  Oh, excuse me.  VMS.  I wasn't paying
6  attention.  We do have that, yes.
7  Q.  So who tracks that?
8  A.  There's an office -- it's a National Marine
9  Fisheries office in Seattle.  I call them up faithfully
10  every day when I leave the port to make sure it's
11  working, because I had some trouble with them.
12  Occasionally, they call me now and tell me it's not
13  working at the dock.  So then I call the people that
14  made it back in Maryland, and they tell me it is
15  working.  So when I leave, I make sure it's working.
16  Q.  So as far as you're aware, they know where you
17  are at all times?
18  A.  Yes, sir.
19  Q.  Is the vessel currently insured?
20  A.  I wouldn't know.  There's some papers on the
21  boat that were from last year, I believe.  I don't know.
22  Q.  Do you know if it was insured in 2006?
23  A.  I don't know for sure.
24  Q.  Have you had any crew injuries or anything
25  where someone made a claim?

---

Merrill Legal Solutions
(800) 869-9132

1  James P. Walsh, CSB. No. 184620
2  Gwen Fanger, CSB No. 191161
   DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone:  (415) 276-6500
   Facsimile:  (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8              UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11  DEL MAR SEAFOODS, INC.,                    )
                                              )
12              Plaintiff,                     )    No. C-07-2952-WHA
                                              )
13        v.                                   )    **DEFENDANTS BARRY COHEN,**
                                              )    **CHRIS COHEN'S (aka CHRISTENE**
14  BARRY COHEN, CHRIS COHEN (aka              )    **COHEN) RESPONSE TO**
    CHRISTENE COHEN), *in personam* and,        )    **PLAINTIFF'S FIRST SET OF**
15  F/V POINT LOMA, Official Number            )    **REQUESTS FOR ADMISSIONS**
    515298, a 1968 steel-hulled, 126-gross ton, )
16  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
17  Does 1-10,                                 )
                                              )
18              Defendants.                    )
                                              )
19

20  PROPOUNDING PARTY:    PLAINTIFF DEL MAR SEAFOODS, INC.

21  RESPONDING PARTY:     DEFENDANTS BARRY and CHRISTINE COHEN

22  SET NO.:              ONE

23       Defendants and Responding Parties, BARRY and CHRISTENE COHEN ("Responding

24  Parties"), respond and object to Plaintiff's First Set of Requests for Admissions as follows.

25                    **PRELIMINARY STATEMENT**

26       These responses are made solely for the purposes of this action and are subject to all

27  objections as to competence, relevance, materiality, propriety, and admissibility and any other

28  objections or grounds that would require the exclusion of any statement made herein if such

                                      1                            12/21/07

DAVIS WRIGHT TREMAINE LLP

1    statement were made by a witness present and testifying in Court, all of which objections and

2    grounds are reserved and may be interposed at the time of trial.

3          No incidental or implied admissions are intended by these responses. The fact that

4    Responding Parties respond or object to any of the request for admissions should not be taken as

5    an admission that Responding Parties accept or admit the existence of any facts assumed by such

6    request for admissions, or that such response or objection constitutes admissible evidence as to

7    any such assumed facts. The fact that Responding Parties respond to part or all of any request for

8    admission is not intended to and shall not be construed to be a waiver by Responding Parties of

9    any objection to any request for admission. Furthermore, Responding Parties' responses herein

10   are made without waiving, and expressly reserving, the right: (a) to object to any effort to use any

11   responses in any step or proceeding in this action or any other action, and (b) to object on any

12   ground to other discovery requests regarding the subject matter of any request herein.

13         This action is still in the discovery phase and Responding Parties have not yet completed

14   investigation of the facts related to the action; have not yet completed discovery in this action; and

15   have not yet completed preparation for trial. Responding Parties' responses herein are based on,

16   and reflect the current state of their knowledge. Responding Parties expressly reserve the right to

17   supplement these responses at a later time should they deem such supplementation necessary or

18   appropriate, but assume no obligation to do so.

19                        **RESPONSE TO REQUESTS FOR ADMISSIONS**

20

21   <u>**REQUEST FOR ADMISSION NO. 1:**</u>

22         Admit that you are acting in this case as the agent for the interests of your marital

23   community.

24   <u>**RESPONSE TO REQUEST NO 1:**</u>

25         Responding Parties object to the term "you" as vague and ambiguous as to which

26   responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also

27   object to the terms "acting" and "agent" as vague and ambiguous. Without waiving these

28

DAVIS WRIGHT TREMAINE LLP

objections, admit that Barry and Christene Cohen are each the agent of each other in their marital community.

**REQUEST FOR ADMISSION NO. 2:**

Admit that in 2004 you transferred the ownership of the F/V POINT LOMA (the "Vessel") to the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO. 2:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, admit that Barry and Christene Cohen jointly transferred the ownership of the F/V Point Loma to the F/V Point Loma Fishing Company, Inc.

**REQUEST FOR ADMISSION NO. 3:**

Admit that you are the manager of the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO. 3:**

Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, admit that Barry Cohen is the manager of the F/V Point Loma Fishing Company, Inc.

**REQUEST FOR ADMISSION NO. 4:**

Admit that you and your wife each own 50% of the shares of the F/V Point Loma Fishing Company, Inc.

**RESPONSE TO REQUEST NO. 4:**

Responding Parties object to the use of the term "you" and "your" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection, admit that Barry and Christene Cohen each own 50% of the shares of the F/V Point Loma Fishing Company, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

1  **REQUEST FOR ADMISSION NO. 5:**

2       Admit that in this case you are acting as the agent for the owner of the Vessel, the F/V

3  Point Loma Fishing Company, Inc.

4  **RESPONSE TO REQUEST NO 5:**

5       ~~Responding Parties object to the use of the term "you" as vague and ambiguous as to~~

6  ~~which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties~~

7  ~~also object to the use of the term "agent" as vague and ambiguous. Without waiving these~~

8  ~~objections,~~ admit that Barry Cohen is acting as the agent to the extent he is acting as manager of

9  the F/V Point Fishing Company, Inc.

10  **REQUEST FOR ADMISSION NO. 6:**

11       Admit that you have never used the Vessel to fish anywhere other than in the Exclusive

12  Economic Zone off of California.

13  **RESPONSE TO REQUEST NO 6:**

14       ~~Responding Parties object to the use of the term "you" as vague and ambiguous as to~~

15  ~~which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties~~

16  ~~also object to the use of the term "fish" as vague and ambiguous to the extent Responding Parties~~

17  ~~make a distinction between "fishing" (catching fish) and "shrimping" (catching shrimp) activities.~~

18  ~~Without waiving these objections,~~ admit that Barry Cohen has never used the Vessel to fish

19  anywhere other than in the Exclusive Economic Zone off of California although he used the

20  Vessel only one time off the coast of Oregon approximately 8-10 years ago for shrimping

21  activities and not for fishing.

22  **REQUEST FOR ADMISSION NO. 7:**

23       Admit that at the end of 2005, in a meeting with both Joe Cappuccio and Joe Roggio, they

24  told you that Del Mar's bank that provided credit to Del Mar, had expressed its concern to Del

25  Mar about the size of Del Mar's loan to you for the Vessel.

26  **RESPONSE TO REQUEST NO 7:**

27       ~~Responding Parties object to the use of the term "you" as vague and ambiguous as to~~

28  ~~which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this~~

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

1   ~~objection and without waiving it,~~ deny that there was such a meeting with both Joe Cappuccio and

2   Joe Roggio to the extent Barry Cohen can not recollect for certainty that Joe Roggio was also at

3   the meeting.

4   **REQUEST FOR ADMISSION NO. 8:**

5       Admit that at the meeting with Joe Roggio and Joe Cappuccio at the end of 2005 Joe

6   Cappuccio asked you to make a large payment on the loan evidenced by the Note and Mortgage.

7   **RESPONSE TO REQUEST NO 8:**

8       ~~Responding Parties object to the use of the term "you" as vague and ambiguous as to~~

9   ~~which responding party, Barry or Christene Cohen, the request is directed at. Without waiving~~

10  ~~this objection,~~ Barry Cohen responds that he can not recollect with certainty that both Joe Roggio

11  and Joe Cappuccio were at the meeting; but admit that at a meeting with at least Joe Cappuccio at

12  the end of 2005, Joe Cappuccio asked Barry Cohen to make a large payment on the loan evidenced

13  by the Note and Mortgage.

14  **REQUEST FOR ADMISSION NO. 9:**

15      Admit that you agreed with Del Mar that you would be responsible for the debts of your

16  sons, Michael and Leonard, to Del Mar arising from amounts they owed the Avila Beach joint

17  venture.

18  **RESPONSE TO REQUEST NO 9:**

19      Responding Parties object to the use of the term "you" as vague and ambiguous as to

20  which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this

21  objection and without waiving it, Barry Cohen denies this request.

22  **REQUEST FOR ADMISSION NO. 10:**

23      Admit that when you made the $175,000 payment to Del Mar, you told Joe Cappuccio you

24  would pay Del Mar the remaining balance owed to Del Mar.

25  **RESPONSE TO REQUEST NO 10:**

26      Responding Parties object to the use of the term "you" as vague and ambiguous as to

27  which responding party, Barry or Christene Cohen, the request is directed at. Without waiving

28

DAVIS WRIGHT TREMAINE LLP

1   REQUEST FOR ADMISSION NO. 18:

2       Admit that on or about January 30, 2007 that you authored the document DMSI 0078.

3   RESPONSE TO REQUEST NO 18:

4       Responding Parties object to the use of the term "you" as vague and ambiguous as to

5   which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this

6   objection and without waiving it, Barry Cohen responds that after a diligent search of his records

7   he has no recollection of whether he authored the document DMSI 0078 and therefore denies this

8   request.

9   REQUEST FOR ADMISSION NO. 19:

10      Admit that in approximately January 2007 Joe Roggio asked you to make payments on the

11  amounts you owed Del Mar.

12  RESPONSE TO REQUEST NO 19:

13      Responding Parties object to the use of the term "you" as vague and ambiguous as to

14  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

15  also object to the use of the phrase "the amounts you owe Del Mar" as vague and ambiguous as to

16  what specific amounts are being referred to. Without waiving this objection, Barry Cohen admits

17  that Joe Roggio asked him to make payments but Joe Roggio did not say what the payments would

18  be for or state the amount that the payments should be.

19  REQUEST FOR ADMISSION NO. 20:

20      Admit that Del Mar has a valid maritime lien on the Vessel.

21  RESPONSE TO REQUEST NO 20:

22      Responding Parties object to this request on the grounds that it calls for a legal conclusion

23  as to what constitutes a valid maritime lien. Without waiving this objection, admit that if Del Mar

24  has a valid Preferred Ship Mortgage, then it has a security interest in the Vessel in the form of a

25  maritime lien.

26  REQUEST FOR ADMISSION NO. 21:

27      Admit that under the terms of the Mortgage that you signed (DMSI 0101 - DMSI 0110)

28  Del Mar is not, and was not, required to give you notice before foreclosing on the Mortgage.

9

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

OBJECTION. FED. R. EVID. 403 (NEEDLESS CUMULATIVE EVID.). PARTIES HAVE STIPULATED IN PRETRIAL ORDER STIP. FACT #5 THAT DEL MAR HAS VALID PREFERRED SHIP MORTGAGE ON THE VESSEL.

**REQUEST FOR ADMISSION NO. 24:**

Admit that from January 1, 2004 until December 22, 2004 you failed to make a single payment to Del Mar towards your obligations under the Note and Mortgage.

**RESPONSE TO REQUEST NO 24:**

~~Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Without waiving this objection,~~ Barry Cohen admits this request.

**REQUEST FOR ADMISSION NO. 25:**

Admit that after your $5,000 payment dated December 22, 2004 you did not make another payment until November 9, 2005.

**RESPONSE TO REQUEST NO 25:**

~~Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the term "payment" as to what type of payments this request is referring. Without waiving these objections,~~ Barry Cohen admits that he did not make another payment by check until November 9, 2005, when the Cohens made a lump sum payment on the Note in the amount of $175,000, although plaintiff's spreadsheet labeled DMSI 0001 shows other "payments" credited against the amount Barry Cohen allegedly owes them during the time period from December 22, 2004 to November 9, 2005.

**REQUEST FOR ADMISSION NO. 26:**

Admit that your last payment to Del Mar was on April 23, 2007.

**RESPONSE TO REQUEST NO 26:**

~~Responding Parties object to the use of the term "you" as vague and ambiguous as to which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties also object to the use of the term "payment" as to what type of payments this request is referring. Without waiving these objections,~~ Barry Cohen admits that his last direct payment by check was April 23, 2007, although by virtue of his lump sum advance payment in the amount of $175,000,

*DAVIS WRIGHT TREMAINE LLP*

1  he continues to make payments and is current under the Note and Mortgage through at least

2  February 2009.

3  **REQUEST FOR ADMISSION NO. 27:**

4      If your response to the previous Request was to admit it, also admit that after your last

5  payment on April 23, 2007 there was an outstanding balance due under the Note and Mortgage.

6  **RESPONSE TO REQUEST NO 27:**

7      ~~Responding Parties object to the use of the term "you" as vague and ambiguous as to~~

8  ~~which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties~~

9  ~~also object to the use of the term "payment" as to what type of payments this request is referring.~~

10  ~~Without waiving these objections,~~ Barry Cohen admits that there is an outstanding balance

11  remaining under the Note and Mortgage in the amount of $27,000 although no payments are

12  currently due until at least February 2009.

13  **REQUEST FOR ADMISSION NO. 28:**

14      If your response to Request No. 26 was anything other than an unqualified "admit," admit

15  that you currently owe money to Del Mar under the Note and Mortgage.

16  **RESPONSE TO REQUEST NO 28:**

17      ~~Responding Parties object to the use of the term "you" as vague and ambiguous as to~~

18  ~~which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties~~

19  ~~also object to the use of the term "payment" as to what type of payments this request is referring.~~

20  ~~Without waiving these objections,~~ Barry Cohen admits that there is an outstanding balance

21  remaining under the Note and Mortgage in the amount of $27,000 although no payments are

22  currently due until at least February 2009.

23  **REQUEST FOR ADMISSION NO. 29:**

24      Admit that the Vessel is your only source of income, other than Social Security.

25  **RESPONSE TO REQUEST NO 29:**

26      Responding Parties object to the use of the term "your" as vague and ambiguous as to

27  which responding party, Barry or Christene Cohen, the request is directed at. Responding Parties

28

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

1    RESPONSE TO REQUEST NO. 32:

2         Responding Parties object to the use of the term "you" as vague and ambiguous as to

3    which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this

4    objection and without waiving it, Barry Cohen cannot admit or deny this request because he lacks

5    sufficient information to identify the account number of one of plaintiff's own checking accounts.

6    Barry Cohen further denies that there was a joint venture involving Old Port Fisheries.

7    **REQUEST FOR ADMISSION NO. 33:**

8         Admit that you agreed to pay Del Mar for its attorneys fees it incurred in the Avila Beach

9    litigation you instituted against the Port of Avila Beach.

10    **RESPONSE TO REQUEST NO 33:**

11         Responding Parties object to the use of the term "you" as vague and ambiguous as to

12    which responding party, Barry or Christene Cohen, the request is directed at. Notwithstanding this

13    objection and without waiving it, Barry Cohen admits that in a meeting with Joe Roggio, he

14    tentatively and orally agreed to pay the legal fees; however, he received no consideration, felt

15    pressure to make such an agreement as he was an employee of Del Mar at the time, never received

16    an accounting as to the amount of the fees, and never agreed, orally or otherwise, to add these fees

17    to the Note.

18

19         DATED this 21st day of December, 2007.

20

21                                        Respectfully submitted,

22                                        DAVIS WRIGHT TREMAINE LLP

23

24                                        By

25                                            James P. Walsh
                                             Gwen Fanger
26                                        Attorneys for DEFENDANTS and
                                         CLAIMANT BARRY COHEN, CHRIS
27                                        COHEN (aka CHRISTENE COHEN), the F/V
                                         POINT LOMA and Claimant, F/V POINT
28                                        LOMA FISHING COMPANY, INC.

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

1

## PROOF OF SERVICE

2

I, the undersigned, declare under penalty of perjury under the laws of the United States of

3

America that the following is true and correct:

4

I am employed in the City and County of San Francisco, State of California, in the office

5

of a member of the bar of this court, at whose direction the service was made. I am over the age of

6

eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee

7

of DAVIS WRIGHT TREMAINE LLP, and my business address is 505 Montgomery Street, Suite

8

800, San Francisco, California 94111.

9

10  I caused to be served the foregoing **DEFENDANTS BARRY COHEN, CHRIS COHEN'S
    (aka CHRISTENE COHEN) RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS**
11  **FOR ADMISSIONS** on the parties indicated below by the following means:

12      **I enclosed a true and correct copy of said document in an envelope and placed it for
    collection and mailing with the United States Post Office on December 21, 2007, following**
13  **the ordinary business practice to the following:**

14
        Gregory W. Poulos
15      Max L. Kelley
        Cox, Wootton, Griffin,
16      Hansen & Poulos LLP
        190 The Embarcadero
17      San Francisco, CA  94105

18
        Richard P. Wagner
19      The Law Offices of Richard P. Wagner
        400 Oceangate, Suite 700
20      Long Beach, CA 90802

21      I am readily familiar with my firm's practice for collection and processing of
    correspondence for delivery in the manner indicated above, to wit, that correspondence will be
22  deposited for collection in the above-described manner this same day in the ordinary course of
23  business.

24      Executed on December 21, 2007, at San Francisco, California.

25

26                                    _Robin B. Huey_

27                                    Robin D. Huey

28

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSIONS

SFO 400232v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

1  James P. Walsh, CSB. No. 184620
   Gwen Fanger, CSB No. 191161
2  DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone: (415) 276-6500
   Facsimile: (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11  DEL MAR SEAFOODS, INC.,                      )
                                                 )
12                     Plaintiff,                )  No. C-07-2952-WHA
                                                 )
13          v.                                   )  **DEFENDANTS BARRY COHEN,**
                                                 )  **CHRIS COHEN'S (aka CHRISTENE**
14  BARRY COHEN, CHRIS COHEN (aka               )  **COHEN) SECOND SUPPLEMENTAL**
    CHRISTENE COHEN), *in personam* and,        )  **RESPONSE TO PLAINTIFF'S FIRST**
15  F/V POINT LOMA, Official Number             )  **SET OF INTERROGATORIES**
    515298, a 1968 steel-hulled, 126-gross ton, )
16  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
17  Does 1-10,                                   )
                                                 )
18                     ' Defendants.             )
                                                 )

19  PROPOUNDING PARTY:    PLAINTIFF DEL MAR SEAFOODS, INC.

20  RESPONDING PARTY:     DEFENDANTS BARRY and CHRISTENE COHEN

21  SET NO.:              ONE

22
23      Barry and Christene Cohen ("Responding Parties") hereby submit the following Second

24  Supplemental Response to Plaintiff's First Set of Interrogatories (the "Interrogatories"),

25  propounded by Plaintiff, Del Mar Seafoods, Inc. ("Del Mar").

26
27
28

DAVIS WRIGHT TREMAINE LLP

1  ~~on the grounds that the definitions of "YOU," "YOUR," "defendants" and "YOURSELF" are~~

2  ~~overbroad, unduly burdensome and oppressive.~~

3      ~~Responding Parties adopt the terms defined by the Plaintiff solely for convenience in~~

4  ~~responding to the requests herein. Responding Parties do not accept or concede that any of the~~

5  ~~terms or definitions is appropriate, descriptive or accurate. The above general objections are~~

6  ~~incorporated into each response below.~~

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 12:**

State what YOUR gross earnings were for each voyage of the Vessel between October 31, 2001 and the present.

**RESPONSE TO INTERROGATORY NO. 12:**

~~Responding Parties renew their object to this interrogatory on the grounds that it is overly broad and unduly burdensome as it requests gross earnings for *each* voyage of the Vessel back to 2001, well before the timing of the underlying issues in this case. Responding Parties further object on the grounds that it requests confidential, competitive information and is irrelevant to the underlying issues in this case, namely the amount of the debt remaining under the Note (signed in 2003) and the wrongful arrest of the Vessel. Without waiving these objections~~, Responding Parties respond as follows with respect to the gross receipts of the Vessel's fishing operations:

| | |
|---|---|
| 2003: | $33,750 |
| 2004: | $291,882 |
| 2005: | $222,875 |
| 2006: | $330,804 |
| 2007: | Not yet determined |

**INTERROGATORY NO. 13:**

State what YOUR net earnings (gross earnings less expenses) were for each voyage of the Vessel between October 31, 2001 and the present.

DAVIS WRIGHT TREMAINE LLP

3

DEFENDANTS' SECOND SUPP. RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES     SFO 401445v1 0084289-000001
Case No. C-07-2952-WHA

**RESPONSE TO INTERROGATORY NO. 13:**

~~Responding Parties renew their objections to this interrogatory on the grounds that it is~~ overly broad and unduly burdensome as it requests gross earnings for *each* voyage of the Vessel back to 2001, well before the timing of the underlying issues in this case. Responding Parties further object on the grounds that it requests confidential, competitive information and is irrelevant to the underlying issues in this case, namely the amount of the debt remaining under the Note ~~(signed in 2003) and the wrongful arrest of the Vessel. Without waiving these objections,~~ Responding Parties respond as follows with respect to the annual operating income of the vessel (gross receipts minus operating expenses, together with a listing of expenses for each year):

    2003:  $22,154

      Expenses:  $898 (supplies); $8,959 (interest expense); $96 (permits and fees); $621 (taxes and licenses); $1,022 (port fees and similar items). Total operating expenses: $11,596.

    2004:  $24,109

      Expenses:  $100,732 (crew costs); $76,501 (fuel & ice); $24,203 (repairs); $18,542 (supplies); $31,265 (insurance); $8,491 (interest expense); $2,020 (legal and professional fees); $2,193 (taxes and licenses); $3,172 (port fees and similar items); $654 (other operating expenses). Total operating expenses: $267,773.

    2005:  $5,978

      Expenses:  $81,926 (crew costs); $58,222 (fuel & ice); $28,574 (repairs); $13,226 (supplies); $18,566 (insurance); $7,716 (interest expense); $478 (permits and fees); $1,966 (taxes and licenses); $3,490 (port fees and similar items); $2,733 (other operating expenses). Total operating expenses: $216,897.

    2006:  $49,925

DAVIS WRIGHT TREMAINE LLP

4

DEFENDANTS' SECOND SUPP. RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES    SFO 401445v1 0084289-000001
Case No. C-07-2952-WHA

1

Expenses:  $124,925 (crew costs); $83,963 (fuel & ice); $24,349

2

(repairs); $3,499 (supplies); $31,168 (insurance);

3

$4,500 (interest expense(est.); $2,444 (legal and

4

professional fees); $565 (permits and fees); $1,230

5

(taxes and licenses); $2,441 (port fees and similar

6

items); $1,795 (other operating expenses).  Total

7

operating expenses:  $280,879.

8

2007:          Not yet determined

9

10

Dated: January 11th, 2008.

11

12

DAVIS WRIGHT TREMAINE LLP

13

14

By: _____

15

James P. Walsh

Gwen Fanger

16

Attorneys for DEFENDANTS and

CLAIMANT BARRY COHEN, CHRIS

COHEN (aka CHRISTENE COHEN), the F/V

17

POINT LOMA and Claimant, F/V POINT

LOMA FISHING COMPANY, INC.

18

19

20

21

22

23

24

25

26

27

28

5

DEFENDANTS' SECOND SUPP. RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES   SFO 401445v1 0084289-000001
Case No. C-07-2952-WHA

## VERIFICATION

I, Barry A. Cohen, declare:

I am authorized to sign this Verification on behalf of Responding Parties. I have read the foregoing Second Supplemental Responses to Plaintiffs First Set of Interrogatories to Defendants Barry and Christene Cohen and know the contents thereof, and based on information and belief, I believe the responses to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this __11__ day of January, 2008 at _PALA BEACH_, California.

_Barry A. Cohen_

DAVIS WRIGHT TREMAINE LLP

**PROOF OF SERVICE**

1

2    I, the undersigned, declare under penalty of perjury under the laws of the United States of

3 America that the following is true and correct:

4    I am employed in the City and County of San Francisco, State of California, in the office

5 of a member of the bar of this court, at whose direction the service was made. I am over the age of

6 eighteen (18) years, and not a party to or interested in the within-entitled action. I am an employee

7 of DAVIS WRIGHT TREMAINE LLP, and my business address is 505 Montgomery Street, Suite

8 800, San Francisco, California 94111.

9

10    I caused to be served the foregoing **DEFENDANTS BARRY COHEN, CHRIS COHEN'S (aka CHRISTENE COHEN) SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** on the parties indicated below by the following means:

11

12    **I enclosed a true and correct copy of said document in an envelope, and consigned it for hand delivery by messenger on January 11, 2008, following ordinary business practice to the following:**

13

14    Gregory W. Poulos
   Max L. Kelley
15    Cox, Wootton, Griffin,
   Hansen & Poulos LLP
16    190 The Embarcardero
   San Francisco, CA 94105
17

18    Richard P. Wagner
   The Law Offices of Richard P. Wagner
19    400 Oceangate, Suite 700
   Long Beach, CA 90802
20

21    I am readily familiar with my firm's practice for collection and processing of
   correspondence for delivery in the manner indicated above, to wit, that correspondence will be
22 deposited for collection in the above-described manner this same day in the ordinary course of
23 business.

24    Executed on January 18, 2008, at San Francisco, California.

25

26                                    Robin D. Huey

27

28

DAVIS WRIGHT TREMAINE LLP