1  James P. Walsh, CSB. No. 184620
2  Gwen Fanger, CSB No. 191161
   DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone:  (415) 276-6500
   Facsimile:    (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8

9                    UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12  DEL MAR SEAFOODS, INC.,            ) No. C-07-2952-WHA
                                       )
13              Plaintiff,             )
                                       )
14      v.                             ) **DEFENDANTS' DESIGNATION OF**
                                       ) **WITNESS EVIDENCE BY**
15  BARRY COHEN, CHRIS COHEN (aka      ) **DEPOSITION AND PLAINTIFF'S**
    CHRISTENE COHEN), *in personam* and, ) **OBJECTIONS TO DESIGNATIONS**
16  F/V POINT LOMA, Official Number    )
    515298, a 1968 steel-hulled, 126-gross ton, )
17  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
18  Does 1-10,                         ) **Trial Date:    May 20, 2008**
                                       ) **Time:          7:30 a.m.**
19              Defendants.            ) **Place:         Courtroom 9, 19th Floor**
                                       )
20  _____ )

21      Pursuant to the Court's Guidelines for Trial and Final Pretrial Conference in Civil Bench

22  Cases Before the Honorable William Alsup, Defendants Barry Cohen, Chris Cohen, F/V Point

23  Loma, and Counterclaimant, F/V Point Loma Fishing Company, Inc. (collectively, "Defendants"),

24  attach the following designations of witness testimony for witnesses that it intends to call by

25  deposition at trial for:

26      1.      Christene Cohen (Attachment A)

27      2.      Dave Cantrell (Attachment B, C)

28

DAVIS WRIGHT TREMAINE LLP

1    Defendants accept Plaintiff's, Del Mar Seafoods, Inc.'s, insertions for the testimony of

2  both Christene Cohen and Dave Cantrell on the basis of completeness.

3    Rulings are needed only as to each of the Fed. R. Evid 802 and 602 objections asserted by

4  Plaintiff, Del Mar Seafoods, for the testimony of Dave Cantrell.  The portions of the Dave Cantrell

5  testimony objected to by Plaintiff as hearsay fall within the hearsay exception under Fed. R. Evid.

6  804(b)(1) because the designations are from the deposition of Dave Cantrell, Mr. Cohen's

7  accountant, *taken by Plaintiff* in the present case in which Plaintiff had the opportunity to develop

8  Mr. Cantrell's testimony directly.  In addition, Mr. Cantrell lives more than 100 miles from the

9  jurisdiction of this Court in Arroyo Grande, California and is therefore unavailable to testify at

10  trial.  Plaintiff also mistakenly objects on the basis of lack of personal knowledge because Mr.

11  Cantrell is testifying as to his understanding or belief as to Mr. Cohen's statements to him

12  regarding the incorrect allocations of payments on the schedule of payments that Mr. Cohen gave

13  to him in connection with the preparation of a tax return.  Defendants have inserted the relevant

14  portions of Mr. Cantrell's testimony in <u>Attachment C</u> as rebuttal to lay the foundation for Mr.

15  Cantrell's personal knowledge.

16

17  DATED this 20th day of May, 2008.

18

19                                             Respectfully submitted,

20                                             DAVIS WRIGHT TREMAINE LLP

21                                             By:   */s/ Gwen Fanger*
22                                                   James P. Walsh
                                                     Gwen Fanger

23                                             Attorneys for Defendants
24                                             BARRY COHEN, CHRIS COHEN (aka
                                               CHRISTENE COHEN), the F/V POINT
25                                             LOMA and Claimant, F/V POINT LOMA
                                               FISHING COMPANY, INC

26

27

28

DAVIS WRIGHT TREMAINE LLP

Attachment A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

DEL MAR SEAFOODS, INC.,                    )
                                           )
                          Plaintiff,       )
                                           )
vs.                                        )
                                           ) No. CV 07-02952 WHA
BARRY COHEN, CHRIS COHEN (aka              )
CHRISTENE COHEN), in personam              )
and F/V POINT LOMA, Official               )
Number 515298, a 1968                      )
steel-hulled, 126-gross ton,               )
70.8-foot long fishing vessel,             )
her engines, tackle,                       )
furniture, apparel, etc., in               )
rem, and Does 1-10,                        )
                                           )
                          Defendants.      )
                                           )

DEPOSITION OF CHRISTENE COHEN

Scottsdale, Arizona
Friday, January 11, 2008
10:00 a.m.

REPORTED BY RANDI J. FRIEDMAN, Arizona CSR No. 50585

CERTIFIED
COPY

 

**A.A. NICHOLS CERTIFIED COURT REPORTERS**
1-800-227-0577 · 480-990-8869
FAX 480-990-7955 · website: nicholsreporters.com
Scottsdale    · 2607 North Hayden Road · Scottsdale, Arizona 85257
San Diego    · 110 West "C" Street, Suite 1300 · San Diego, California 92101
La Jolla    · 7825 Fay Avenue, Suite 200 · La Jolla, California 92037
Los Angeles  · 1800 Century Park East, Suite 600 · Los Angeles, California 90067

Christene Cohen - 01/11/08

```
1                    Scottsdale, Arizona
2                  Friday, January 11, 2008
3                       10:00 a.m.
4
5                    CHRISTENE COHEN,
6    a witness herein, after having been first duly sworn,
7    testified as follows:
8                         * * *
9
10                      EXAMINATION
11   BY MR. POULOS:
12       Q.    Good morning, Ms. Cohen.  Could you state your
13   full name for the record.
14       A.    Christene, spelled e-n-e.  Christene Layne,
15   L-a-y-n-e, Cohen, C-o-h-e-n.
16       Q.    Ms. Cohen, have you ever had your deposition
17   taken before?
18       A.    No.
19       Q.    You're currently separated from your husband,
20   Barry Cohen; is that right?
21       A.    Yes.
22       Q.    And how long have you been separated?
23       A.    Since December 28th of '07.
24       Q.    When did you file for divorce?
25       A.    The exact date, I'm not - I don't know.
```

Christene Cohen - 01/11/08

1    ~~biobolistics?~~

2        ~~A.        No.~~

3        Q.    Are you aware of any debt that you owe to Del Mar

4    Seafoods?

5        A.    Yes.

6        Q.    All right.  Do you know how much that debt is?

7        A.    No.

8        Q.    What is the debt for?

9        A.    An agreement between Joe Cappuccio and Barry

10   Cohen.

11       Q.    For what?

12       A.    I'm not sure.

13       Q.    What is your understanding of it?

14       A.    A business that -- an agreement that the two of

15   them had.

16       Q.    What was that business agreement for?

17       A.    The boat.  It had to do with the Point Loma.

18       Q.    Do you know what it had to do with the Point

19   Loma?

20       A.    No.

21       ~~Q.    Have you ever seen a document titled Initial~~

22   ~~Disclosure in this case?~~

23       A.    I don't know.

24       Q.    Have you seen any pleadings in this case?

25       ~~A.    Yes.~~

NICHOLS CERTIFIED COURT REPORTERS

12

Christene Cohen - 01/11/08

1    A.    Yes.

2    Q.    Who did you report to?

3    A.    Joe Reggio and Barry Cohen.

4    Q.    Are you aware that at the beginning of this

5    litigation, the vessel, the Point Loma, was arrested in the

6    Northern District of California?

7    A.    Yes.

8    Q.    When did you become aware of that?

9    A.    The day my attorney Dennis Caspe was served or

10   notified.

11   Q.    Your attorneys in this case have served a

12   document titled Defendants' Initial Disclosures Pursuant to

13   F.R.C.P., that's Federal Rules of Civil Procedure, 26(a)(1),

14   and it lists you as being knowledgeable on a number of

15   topics.  I want to know if you are or are not knowledgeable

16   in these topics.

17         Facts pertinent to the fishing business and

18   activities of defendants; that would be yourself, Barry and

19   the F/V Point Loma.

20         Are you knowledgeable about the facts pertinent

21   to the fishing business?

22   A.    Can you clarify time?

23   Q.    Sure.  The time period of, say, 2004 through

24   2007.

25         MS. FANGER:  I'm going to object.  The term

Christene Cohen - 01/11/08

1    "facts" is awfully vague in that, so maybe you'll need to go

2    through specifics.

3              MR. POULOS.  It's your document, counsel.  If

4    you think it's vague, you can explain that to the Court.

5              THE WITNESS:  I would say I was knowledgeable

6    up until 2005.

7    BY MR. POULOS:

8        Q.    The end of 2005?

9        A.    Uh-huh.

10       Q.    That's yes?

11       A.    Yes.

12       Q.    Why the end of 2005?

13       A.    It depends on the knowledgeable -- what you mean

14   by "knowledgeable."  I had more contact with the boat, the

15   captains, the crew, and then I didn't have.

16       Q.    After 2005?

17       A.    About that time period; yes.

18       Q.    What was your contact with the captains of the

19   fishing vessel, Point Loma, before the end of 2005?

20       A.    They would call the house.  They would want to

21   talk to Barry.  If they had a problem, what have you, they

22   called the home.

23       Q.    Did you talk to them about their fishing

24   operation?

25       A.    More so about their safety.  You know, if it was

Christene Cohen - 01/11/08

1    windy, da-dee-dee-da.  Oh, I'm sorry.  If they were at home

2    port or, you know, where they were.

3         Q.    Did you talk to captains at all about their catch

4    and how the vessel was doing?

5         A.    Yes.

6         Q.    Yes?

7         A.    Yes.

8         Q.    All right.  And that was -- were you -- since you

9    were doing payroll, were you also doing payroll for the

10   fishing vessel, Point Loma?

11        A.    No.

12        Q.    Who was doing that?

13        A.    Barry Cohen.

14        Q.    Do you know what the earnings were for the Point

15   Loma in, say, between 2004 and 2007?

16        A.    No.

17        Q.    Do you have any information at all about the

18   profits and loss of the vessel during any period of that

19   time?

20        A.    No.

21        Q.    The fishing vessel is controlled through a Sub

22   S-Corporation; isn't it?

23        A.    Clarify.  I don't know.

24        Q.    It's owned by you, but then you transferred title

25   to the Point Loma Fishing Company, Inc.; is that right?

Christene Cohen - 01/11/08

1      A.    I don't know.

2      Q.    You don't know what the current ownership is of

3  the fishing vessel?

4      A.    No.

5      Q.    You said you're a half owner of it.  You say you

6  do not know how it's owned?

7      A.    I do not.

8      Q.    Did you participate in setting up a California

9  Sub S-Corporation?

10     A.    There was a meeting, and I don't know the

11 specifics about it.

12     Q.    When you say there was a meeting, what meeting

13 are you referring to?

14     A.    Some kind of meeting.  Barry told me that we

15 needed protection in case a crew person got injured on the

16 boat or something like that.

17     Q.    Did he tell you, you needed protection in case --

18 well, you're aware of a lawsuit filed against the Port St.

19 Louis Harbor District; is that right?

20     A.    Yes.

21     Q.    Did Barry tell you, you needed protection against

22 the possible loss of that lawsuit?

23     A.    No.

24     Q.    Was the vessel transferred into the Sub

25 S Corporation in order to protect it in case you needed to

                                                              18

NICHOLS CERTIFIED COURT REPORTERS

Christene Cohen - 01/11/08

1    A.    I don't know.

2    Q.    Do you have any knowledge of the damages that are

3    alleged to have been sustained by the fishing vessel as a

4    result of the arrest?

5    A.    Just what I have read.

6    Q.    What have you read?

7    A.    What was in the lawsuit.   The papers from the

8    lawsuit.

9    Q.    Okay.   But independent of just papers in the

10   lawsuit --

11   A.    No.

12   Q.    -- you actually don't have any knowledge of that?

13   A.    No.

14   Q.    All right.   Do you have any knowledge of what the

15   earnings have been of the fishing vessel in 2007?

16   A.    No.

17   Q.    Do you have any knowledge of the amount of the

18   mortgage owed on the vessel?

19   A.    No.

20   Q.    Do you have any knowledge of the amount of money

21   owed under a promissory note to Del Mar?

22   A.    No.

23   Q.    Did you have knowledge of the amount owed on a

24   promissory note at the time that you signed that note?

25   A.    Could you repeat that?

Christene Cohen - 01/11/08

Completeness

```
 1    Q.    And what did he tell you?

 2    A.    He didn't know.

 3    Q.    You're aware that in the lawsuit against the Port

 4    St. Louis Harbor District, there was a request for

 5    attorneys' fees; is that right?

 6    A.    Yes.

 7    Q.    And you're aware that the request by Barry to

 8    receive his attorneys' fees was denied by the Court?

 9    A.    Yes.

10    Q.    And you're aware that the attorneys' fees in that

11    case owed to the Miller Star firm that represented Barry are

12    somewhere in the range of 2.2 million dollars; is that

13    right?

14    A.    I don't know.

15    Q.    You know it's in the million-dollar plus range?

16    A.    Yes.

17    Q.    Do you know it's in the 2 million dollar plus

18    range?

19    A.    No.

20    Q.    What was your understanding of the amount?

21    A.    At the time the trial ended, I believed it was

22    over a million dollars.

23    Q.    In that litigation, I'll represent to you that

24    Barry filed a declaration with the Court in which he said

25    that if it did not recover his attorneys' fees, he might
```

NICHOLS CERTIFIED COURT REPORTERS

22

Christene Cohen - 01/11/08

1    have to declare bankruptcy; were you aware of that?

2        A.    No.

3        Q.    Did Barry ever discuss with you the prospect that

4    he might have to declare bankruptcy?

5        A.    No.

6        Q.    Has that come up in your divorce proceedings?

7        A.    No.

8        Q.    What payments, if any, are you aware of under the

9    promissory note?

10       A.    Only the 175,000-dollar one.

11       Q.    When was that payment made?

12       A.    When we lived in Aptos.  The exact date, I don't

13   know.

14       Q.    Do you have an understanding why that payment was

15   made?

16       A.    Joe Roggio and Joe Cappuccio wanted a payment.  A

17   big payment.

18       Q.    Were you ever party to any discussions about what

19   would happen if a big payment was made?

20       A.    No.

21       Q.    Were you party to any discussions about the

22   accrual of interest on the promissory note?

23       A.    No.

24       Q.    Were you ever party to any discussions about the

25   forgiveness of any debt in return for payment?

23

NICHOLS CERTIFIED COURT REPORTERS

Christene Cohen - 01/11/08

1      A.    No.

2      Q.    Were you ever party to any discussions about

3  timing of payments under that promissory note?

4      A.    No.

5      Q.    Did Barry ever tell you that he was not obligated

6  to make payments under that note?

7      A.    No.

8      Q.    You're an officer of the Point Loma Fishing

9  Company; is that right?

10     A.    Part owner.  Half, yes.

11     Q.    As a half owner of that company, are you aware of

12  any agreements by the company that it would not need to make

13  payments on the promissory note?

14     A.    Can you repeat that question?

15     Q.    As a part owner of that company, half owner of

16  the company, are you aware of any agreements that the

17  company had with Del Mar that it would not have to make

18  payments on the note?

19     A.    No.

20     Q.    As a half owner of that company, are you aware of

21  any agreements between the company and Del Mar, that

22  interest would not accrue on that note?

23     A.    No.

24     Q.    As a half owner of the company, are you aware of

25  any agreements between your company and Del Mar, that

24

Christene Cohen - 01/11/08

1      A.    No.  No.

2      Q.    Were you aware of any sales -- well, what was the

3  business that you understood of Old Port Fisheries/Del Mar?

4      A.    They bought and sold seafood.

5      Q.    Did they sell seafood to Michael Cohen?

6      A.    I believe so; yes.

7      Q.    And did they sell seafood to Leonard Cohen or his

8  business, Old Port, Inc.?

9      A.    Yes.

10     Q.    And were those sales done on an account basis?

11 In other words, their debts for their inventory that was

12 sold to them was put on an account they maintained with Old

13 Port Fisheries/Del Mar?

14     A.    An invoice, yes.

15     Q.    When the operation between -- of Old Port

16 Fisheries/Del Mar ended, were there still balances owed by

17 Michael and Leonard?

18     A.    I do not know.  No.  I don't know.

19     Q.    Did Barry ever tell you that he had agreed to be

20 responsible for payment of those balances owed to Del Mar

21 from Michael and Leonard?

22     A.    No.

23     Q.    Did you ever hear that from Michael or Leonard,

24 that Barry had said he would be responsible for those debts?

25     A.    No.

Christene Cohen - 01/11/08

1    Q.    Do you have any reason to disagree with that

2  figure as the balance owed as of January 30th, 2007, under

3  the promissory note?

4                MS. FANGER:  Objection.  That assumes facts

5  not in evidence.

6                THE WITNESS:  I don't know.

7  BY MR. POULOS:

8    Q.    You don't have any basis to agree or disagree

9  with that figure?

10    A.    None.

11    Q.    Were you aware of any agreements to include

12  additional amounts of debt under the promissory note?

13    A.    No.

14    Q.    At the end of the Old Port Fisheries/Del Mar

15  Seafoods operation in Avila Beach, there was inventory still

16  left over; wasn't there?

17    A.    I don't know.

18    Q.    Were you still working at the -- for that entity

19  at the time that the entity shut down its operations?

20    A.    Yes.

21    Q.    Do you recall when that occurred?

22    A.    No.

23    Q.    Do you recall it being -- what month it occurred

24  in?

25    A.    No.

Christene Cohen - 01/11/08

1    Q.    Can you give me a year that that occurred?

2    A.    No.

3    Q.    In this Initial Disclosure, and we're going to

4  make this an exhibit, it says that you are knowledgeable

5  about quote, plaintiff, and I'll say the plaintiff is Del

6  Mar, my client.  "Plaintiff's breach of the promissory note

7  and ship mortgage."

8         What knowledge do you have of Del Mar's alleged

9  breach of the promissory note and ship mortgage?

10   A.    Just that the vehicle was arrested unlawfully.

11   Q.    Why do you say it was arrested unlawfully?

12 What's your knowledge?

13        MS. FANGER:  Objection.  That's asking for

14 privileged -- attorney/client privileged information.

15        MR. POULOS:  You disclosed her as

16 knowledgeable about discoverable facts.  I'm asking what

17 discoverable facts she has.  Those are clearly outside of

18 non-discoverable attorney/client communications.

19 BY MR. POULOS:

20   Q.    So apart from privileged communications from your

21 lawyer, what knowledge do you have of the alleged breach of

22 the promissory note and ship mortgage?

23   A.    I wasn't notified.

24   Q.    Of what?

25   A.    That there was a problem of any kind.

33

NICHOLS CERTIFIED COURT REPORTERS

Christene Cohen - 01/11/08

1      Q.    Okay.  From whom?

2      A.    Either Del Mar or Barry Cohen.

3      Q.    Okay.  Apart from not being notified of a

4   problem, what do you mean by that?

5      A.    I wasn't aware that anything was wrong and going

6   on.

7      Q.    How much money have you received from -- let's

8   say in 2007, from the fishing vessel, Point Loma,

9   operations?

10     A.    Zero.

11     Q.    How much did you receive in 2006 from the Point

12  Loma fishing vessel operations?

13     A.    I think $5,000.00.

14     Q.    All right.  That was your half, or was that the

15  full income to the corporation?

16     A.    That was when I left the marriage.

17     Q.    And how did you end up with $5,000.00?  What was

18  that for?

19     A.    I was leaving the marriage and I needed some

20  money.

21     Q.    Okay.  And so did you understand that that was

22  income from the Point Loma fishing vessel's operations?

23     A.    Yes.

24     Q.    And why do you say that?  Did it come from a

25  special account?

34

NICHOLS CERTIFIED COURT REPORTERS

Christene Cohen - 01/11/08

1    Q.    Do you have any reason to believe that?

2    A.    I don't know.

3    Q.    As you sit here today, can you think of any

4    occasion where he's been dishonest with you?

5    A.    No.

6    Q.    Let me show you a better copy of that schedule of

7    payments.  I found one.  The one I'm going to show you was

8    marked as an exhibit to Barry's deposition in the Avila

9    Beach litigation.

                     [TRIAL EX. 37]
10                   (Exhibit-6 was marked.)

11         That's, I believe, just a better copy of that

12    schedule of payments.

13         Does that help you in terms of whether you've

14    ever seen that before?

15    A.    No.

16    Q.    You still have never seen it?

17    A.    I have never seen it.

18    Q.    In your employment with Old Port Fisheries/Del

19    Mar, you were not the person responsible for keeping track

20    of the debts of Michael or Leonard to that entity; were you?

21    A.    No.

22    Q.    Who was?

23    A.    I don't know.

24    Q.    Does the name -- I think it's Harriett Shields?

25    A.    The bookkeeper was Harriett Shields and Dean

NICHOLS CERTIFIED COURT REPORTERS

46

Christene Cohen - 01/11/08

```
1    Smith.

2         Q.    Okay.  Do you know if they were the people who

3    would track those?

4         A.    Yes.
                         [TRIAL EX. 39]
5               (Exhibit-7 was marked.)
                                    [TRIAL EX. 39]
6         Q.    Have you ever seen Exhibit-7 before?

7         A.    No.

8         Q.    How well do you know Joe Cappuccio?

9         A.    Pretty well.

10        Q.    All right.  Do you have any reason to believe

11   that Joe Cappuccio has any malice or ill-will toward you or

12   Barry?

13        A.    Not towards me, but I'm sure with Barry.

14        Q.    And why are you sure with Barry?

15        A.    They're in a lawsuit.

16        Q.    Okay.  Other than the fact that they're in a

17   lawsuit.  I mean, he never made any statements to you --

18        A.    No.

19        Q.    -- that he was angry at Barry or --

20        A.    Never.

21        Q.    Okay.  And he had never done anything to you that

22   made you think that he was not -- that he had some personal

23   reason to try to cause any harm to you or Barry?

24        A.    Not to me.

25        Q.    Anything with respect to Barry other than this?
```

Christene Cohen - 01/11/08

1   lawsuit?

2      A.   Nothing comes to mind.

3      Q.   Did you feel you were treated fairly as an

4   employee?

5      A.   Yes.

6      Q.   Are you aware of any claim being filed on your

7   behalf with the United States Marshal Service arising from

8   the loss of that fishing net?

9      A.   No.

10     Q.   How much was the net worth?

11     A.   They're usually around $30,000.00 a net.

12     Q.   Do you know what size net this was?

13     A.   No.

14     Q.   Do you know when it had been purchased?

15     A.   No.

                    [TRIAL EX. 37 OR 39]

16     Q.   Looking at ^Exhibit-6 or 7, did Barry ever discuss

17  with you the addition of amounts beyond the $215,000.00 to

18  the promissory note?

19     A.   No.

20     Q.   Where did you get the $175,000.00 that was used

21  to make the payment on the note?

22     A.   A second mortgage on our house.

23     Q.   Was that mortgage taken out solely for that

24  purpose, or was it for some other purposes?

25     A.   It was taken out for that purpose, and also   I

                                                            48

NICHOLS CERTIFIED COURT REPORTERS

Christene Cohen - 01/11/08

1    A.    Yes.

2    Q.    They weren't just miscellaneous documents in

3    boxes?

4    A.    No.

5    Q.    Were there files specific to a particular bank

6    account, so if you wanted to obtain bank statements, you had

7    a specific file you could go to, to get statements from that

8    account?

9    A.    I don't know.

10    Q.    What about payroll?  You were working in payroll.

11        If you made payroll payments, those were kept in

12    a particular file; right?

13    A.    I gave them to the bookkeeper, and I don't know

14    what she did with them.  I believe they were sent over to

15    Del Mar.  We had copies at Old Port, and she weekly sent

16    stuff over to Del Mar.

17    Q.    At the close of that business -- 'cause you were

18    an employee right up to the end; is that right?

19    A.    Yes.

20    Q.    At the time that it closed, are you aware of a

21    transfer so that some of the accounts went on to the -- were

22    transferred over to Del Mar's books from the Old Port

23    Fisheries/Del Mar's books?

24    A.    I don't know.

25    Q.    When you agreed to -- you signed a promissory

50

NICHOLS CERTIFIED COURT REPORTERS

08:55AM    FROM-DEL MAR SEAFOODS INC Om                                          T-131   P.002/006   F-239

eafoods, Inc.
e of Payments

|                          | Michael Cohen | Olde Port Inn | Inventory  | Point Loma | Barry        | Total        |
|--------------------------|---------------|---------------|------------|------------|--------------|--------------|
| Beginning Balance        | 13,520.40     | 18,050.10     | 10,383.24  | 16,021.51  | 237,035.48   | 295,429.59   |
| 2004 Barry Paymt         |               |               |            |            | (5,000.00)   | (5,000.00)   |
| 2005 American Payment    |               |               | (1,474.75) |            |              | (1,474.75)   |
| 2005 Olde Port PYMT      |               |               | (1,000.00) |            |              | (1,000.00)   |
| 2005 Inv. Adj            |               |               | (1,900.00) |            |              | (1,900.00)   |
| 2005 Payment from Barry  | (13,520.40)   | (18,050.10)   | (8,908.49) | (16,021.51)| (120,350.70) | (175,000.00) |
| Ending Balance           |               |               |            |            | 171,684.78   | 171,684.78   |

[ TRIAL EX. 37]

EXHIBIT
6

( 1 pg.)
Δ π-EXHIBIT 39B
Deponent B. Cohen
Date 1/16/05  Rptr. JS
WWW.DEPOBOOK.COM

SWISS 0001

Del Mar Seafoods, Inc.
Schedule of Payments

| | Michael Cohen | Olde Port Fisheries | Olde Port Int | Inventory | Point Loma | Barry | Total |
|---|---|---|---|---|---|---|---|
| Beginning Balance | 13,920.40 | | 18,069.10 | 10,383.24 | 16,021.31 | 237,035.48 | 295,429.53 |
| 12/22/2004 Barry Paymt | | | | | | (5,000.00) | (5,000.00) |
| 5/24/2005 American Payment | | | | (1,474.75) | | | (1,474.75) |
| 9/14/2005 Olde Port PYMT | | | | (1,000.00) | | | (1,000.00) |
| | | | | (1,300.00) | | | (1,300.00) |
| 11/10/2005 Inv. Adj | (13,920.40) | | (18,069.10) | (9,808.49) | (16,021.31) | (120,380.70) | (175,000.00) |
| 11/10/2005 Payment from Barry | | 7,417.67 | | | | | 7,417.67 |
| 12/5/2006 Olde Port Balance (see attached) | | | | | 1,368.82 | | 1,368.82 |
| 12/5/2006 Point Loma Balance (see attached) | | | | | | 21,308.52 | 21,308.52 |
| Fees for Olde Port Case | | | | | | | |
| 2/5/2007 Payment | | | | | | (2,000.00) | (2,000.00) |
| 2/20/2007 Payment | | | | | | (3,000.00) | (3,000.00) |
| 4/25/2007 Payment | | | | | | (3,000.00) | (3,000.00) |
| Ending Balance | | 7,417.67 | | | 1,368.82 | 124,963.30 | 133,749.79 |

6/27/2007

Barry Balance.xls

[TRIAL EX. 39]

EXHIBIT
SWISS 0001

Attachment B

CERTIFIED COPY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

\* \* \*

DEL MAR SEAFOODS, INC.,                       )
                                              )
                    PLAINTIFF,                )
                                              )
          VS.                                 )   NO. C-0702952-WHA
                                              )
BARRY COHEN, CHRIS COHEN                      )
(CHRISTENE COHEN) *IN PERSONAM*               )
AND, F/V POINT LOMA, OFFICIAL                 )
NUMBER 515298, A 1968 STEEL-HULLED,)
126-GROSS TON, 70.8 FOOT LONG                 )
FISHING VESSEL, HER ENGINES,                  )
TACKLE, FURNITURE APPAREL, ETC.,              )
*IN REM*, AND DOES 1-10,                      )
                                              )
                    DEFENDANTS.               )
                                              )

DEPOSITION OF DAVID PAUL CANTRELL

SAN LUIS OBISPO, CALIFORNIA

THURSDAY, DECEMBER 27, 2007

12:55 P.M. - 3:36 P.M.

REPORTED BY KAREN L. GRENCIK

CSR NO. 7038, RPR

*McDaniel*

SHORTHAND REPORTERS

*A Professional Corporation*

1302 Osos Street
San Luis Obispo, CA 93401

106 E. Boone, Suite D
Santa Maria, CA 93454

E-mail:mcdanielslo@charter.net          805•544•3363   FAX 805•544•7427          www.mcdanielreporting.com

DAVID PAUL CANTRELL                                    December 27, 2007

Page 4

```
 1                    DAVID PAUL CANTRELL

 2              HAVING BEEN FIRST DULY SWORN, WAS

 3              EXAMINED AND TESTIFIED AS FOLLOWS:

 4

 5                        EXAMINATION

 6

 7   BY MR. POULOS:

 8        Q    COULD YOU STATE YOUR FULL NAME FOR THE RECORD,

 9   PLEASE?

10        A    DAVID PAUL CANTRELL.

11        Q    ALL RIGHT.  MR. CANTRELL, BEFORE WE GET STARTED

12   WITH YOUR DEPOSITION, I'D LIKE TO GO AHEAD AND PUT A

13   COUPLE OF ITEMS ON THE RECORD.

14             YOU'RE THE ACCOUNTANT FOR BARRY COHEN; IS THAT

15   CORRECT?

16        A    CORRECT.

17        Q    AND SOME OF HIS BUSINESS DEALINGS?

18        A    CORRECT.

19        Q    OKAY.  WITH THAT, COUNSEL FOR MR. COHEN AND I

20   HAVE HAD A DISCUSSION OFF THE RECORD REGARDING OUR

21   REQUEST FOR CERTAIN TAX RETURN INFORMATION.  NOT THE FULL

22   RETURNS THEMSELVES, BUT INFORMATION RELATING TO THE

23   PROFITS AND LOSSES FROM DIFFERENT -- FROM MR. COHEN'S

24   FISHING OPERATIONS.

25             THERE IS AN UNDERSTANDING, COUNSEL HAS PROVIDED
```

DAVID PAUL CANTRELL                                    December 27, 2007

Page 60

1   TO SECURE SOME KIND OF DEBT, AND THAT THEY CLAIM -- YOU

2   KNOW, TOOK THE BOAT TO TRY TO SETTLE THE DEBTS.

3        Q    DID YOU HAVE ANY DISCUSSIONS AS TO WHAT THE

4   GENESIS OF THAT DEBT WAS?

5        A    NOT IN -- NOT SPECIFICALLY IN REGARD TO THIS

6   ARREST, OR ANYTHING LIKE THAT.  I JUST BELIEVE IT WAS THE

7   FUNDS THAT -- THE LOAN THAT WAS $215,000 ORIGINALLY, AS

8   STIPULATED, I BELIEVE IT RELATED TO THAT, BUT I REALLY

9   DON'T KNOW.

10       Q    WERE YOU EVER -- DID YOU EVER HAVE ANY

11  DISCUSSIONS WITH MR. COHEN ABOUT WHETHER THE PRINCIPAL

12  BALANCE OF THAT $215,000 ON THE NOTE HAD INCREASED OR

13  DECREASED OVER TIME?

14       A    I BELIEVE THAT MR. COHEN HAD PROVIDED ME A

15  SCHEDULE THAT TRIED TO ACCOUNT FOR HOW HE HAD MADE

16  PAYMENTS AGAINST THE LOAN.  OR POSSIBLY THE SCHEDULE

17  WAS -- WAS ALLOCATING HOW DEL MAR RECORDED PAYMENTS

18  AGAINST THE LOAN.  I REALLY DON'T RECALL EXACTLY.  BUT MY

19  RECOLLECTION IS THERE WAS A SCHEDULE THAT WAS -- APPEARED

20  TO BE PREPARED ON AN EXCEL SPREADSHEET THAT SHOWED

21  VARIOUS PAYMENTS BEING APPLIED AGAINST THAT DEBT.

22       Q    DO YOU RECALL HOW THAT CAME TO YOU?  WAS THAT --

23  DID MR. COHEN BRING IT TO YOU PERSONALLY?  FAX IT?

24  E-MAIL IT?

25       A    I BELIEVE HE MAY HAVE HANDED ME A COPY OF IT,

DAVID PAUL CANTRELL                                    December 27, 2007

                                                            Page 61

1   BUT -- I BELIEVE HE HANDED ME A COPY.  THAT'S ALL I CAN

2   SAY.

3        Q   DO YOU RECALL WHAT HE -- WHAT, IF ANYTHING, HE

4   SAID WHEN HE GAVE IT TO YOU?

5        A   YEAH, I THINK THIS WAS AN ACCOUNTING THAT WAS --

6   I BELIEVE IT WAS PREPARED BY DEL MAR --

7        Q   OKAY.

8        A   -- AS TO HOW THEY HAD APPLIED VARIOUS PAYMENTS.

9        Q   DID HE SAY WHETHER IT WAS ACCURATE, INACCURATE,

10  WHAT HE WANTED YOU TO DO WITH IT, WHAT HIS UNDERSTANDING

11  WAS OF IT, ANYTHING?

12       A   WELL, IT CAME TO -- IT CAME INTO MY POSSESSION

13  IN CONNECTION WITH THE PREPARATION OF A TAX RETURN FOR A

14  DIFFERENT ENTITY.

15       Q   OKAY.  WHAT ENTITY WAS THAT?

16       A   OLD PORTE FISHERIES, INC.

17       Q   OKAY.

18       A   I DO BELIEVE THAT MR. COHEN CONSIDERED IT AN

19  INCORRECT ALLOCATION OF THE EXPENSES, THE WAY IT WAS

20  DESCRIBED TO ME.  INCORRECT ALLOCATION OF THE PAYMENTS.

21  I'M SORRY.  I MISSPOKE.

22       Q   AND DO YOU RECALL IN WHAT WAY HE CONSIDERED IT

23  AN INCORRECT ALLOCATION?

24       A   AGAIN, I BELIEVE IT WAS THAT HE HAD MADE -- IN

25  HIS MIND, HE HAD MADE PAYMENTS AGAINST THE DEBT ON THE

*[Handwritten margin note:] Objection FRE 802 Hearsay FRE 602 witness lacks personal knowledge*

*[Handwritten margin note:] Objection FRE 802 Hearsay FRE 602 witness lacks personal knowledge*

DAVID PAUL CANTRELL                                    December 27, 2007

Page 62

1    BOAT, THAT DEL MAR UNILATERALLY APPLIED AGAINST

2    RECEIVABLES THAT DEL MAR HAD ON THEIR BOOKS FROM ENTITIES

3    OTHER THAN MR. COHEN AS AN INDIVIDUAL.

4         Q    DID HE EVER -- DID YOU HAVE ANY DISCUSSION WITH

5    MR. COHEN ABOUT WHO THOSE INDIVIDUALS WERE?  OR WHAT

6    THOSE NOTES WERE?

7         A    WELL, I DON'T BELIEVE THERE WERE NOTES.  I

8    BELIEVE THEY WERE TRADE RECEIVABLES RELATED TO THE OLD

9    PORTE FISHERIES, INC.  I BELIEVE THERE WAS SOME -- AGAIN,

10   ON THE SCHEDULE, I -- THIS IS JUST THE SCHEDULE PRESENTED

11   TO ME, SO I DON'T REALLY KNOW WHO ARRIVED AT THESE

12   NUMBERS -- BUT THERE WAS ALSO LISTED OLD PORTE INN.  THE

13   RESTAURANT BUSINESS WAS LISTED ON THERE.  AND I BELIEVE

14   THAT IT SHOWED THAT AMOUNTS WERE OWED BY THOSE ENTITIES

15   TO DEL MAR FOR SOME REASON, AND THAT PAYMENTS MADE BY

16   MR. COHEN HAD BEEN APPLIED AGAINST THOSE CORPORATE DEBTS

17   AS OPPOSED TO AGAINST HIS LOAN ON THE BOAT.

18        Q    OKAY.  AND HE BROUGHT THOSE TO YOUR ATTENTION?

19        A    HE DID.

20        Q    AND HOW -- DID HE EVER TELL YOU THAT HE HAD

21   ASSUMED RESPONSIBILITY FOR THOSE -- WELL, BACK UP.

22             DID YOU UNDERSTAND THAT THOSE WERE DEBTS -- OR

23   LIABILITIES INCURRED BY MR. COHEN'S SONS, MICHAEL AND

24   LEONARD?

25        MR. WALSH:  OBJECTION, LACK OF FOUNDATION, CALLS FOR

*Objection (see next page)*

**DAVID PAUL CANTRELL**                                    December 27, 2007

Page 63

1    SPECULATION.

2    BY MR. POULOS:

3        Q    I'M JUST ASKING IF YOU HAD ANY -- HAD HEARD THAT

4    OR UNDERSTOOD IT IN SOME WAY?

5        A    HONESTLY, I UNDERSTOOD THEM TO BE CORPORATE

6    DEBTS, AND THEY WEREN'T PERSONAL OBLIGATIONS.

7        Q    CORPORATE DEBTS INCURRED BY BUSINESSES IN WHICH

8    THOSE SONS HAD AN INTEREST?

9        A    WELL, WITH REGARD TO OLD PORTE INN, MR. LEONARD

10   COHEN HAS AN INTEREST.  WITH REGARD TO OLD PORTE

11   FISHERIES, I DON'T KNOW THAT MIKE COHEN HAS AN INTEREST..

12       Q    OKAY.  WITH RESPECT TO THOSE SUMS, DID MR. COHEN

13   EVER RELATE TO YOU -- MR. BARRY COHEN -- THAT HE HAD AN

14   AGREEMENT THAT THOSE SUMS WOULD BE ADDED TO HIS BALANCE

15   UNDER THE NOTE?

16       A    NO.  MY RECOLLECTION IS THAT HE SPECIFICALLY DID

17   NOT THINK THEY WERE ADDED TO THE NOTE.  BUT I'M GOING

18   FROM RECOLLECTION ONLY.  THERE'S NO --

19       Q    DO YOU HAVE NOTES OF THAT CONVERSATION?

20       A    I DON'T BELIEVE SO, NO.

21       Q    HOW WERE THOSE -- YOU SAID THOSE CAME TO YOU IN

22   TERMS OF PREPARATION OF A TAX RETURN FOR THE OLD PORTE

23   FISHERIES, INC.?

24       A    CORRECT.

25       Q    HOW WERE THOSE SUMS, IF YOU CAN TELL ME,

Page 70

1    ~~MR. POULOS:   OKAY.   LET'S TAKE A SHORT BREAK~~

2    BECAUSE I THINK I KNOW THE SCHEDULE, AND I'LL SEE IF

3    THAT'S THE SCHEDULE THAT YOU'RE REFERRING TO.

4         ~~THE WITNESS:   SURE.~~

5                    (RECESS TAKEN.)

6         MR. POULOS:   BACK ON THE RECORD.

7         Q    DO YOU RECALL ANY DISCUSSIONS WITH -- WELL,

8    WITHDRAWN.            [TRIAL EX. 38]

9              LET'S MARK AS EXHIBIT 3 A PAGE THAT WAS, I

10   BELIEVE, EXHIBIT 21 TO THE DEPOSITION OF JOE ROGGIO.

11             (PLAINTIFF'S EXHIBIT 3 WAS MARKED

12             FOR IDENTIFICATION.)

13   BY MR. POULOS:

14        Q    ~~AND I'LL REPRESENT ON THE RECORD THE HANDWRITING~~

15   IN THE LOWER RIGHT-HAND CORNER, WHERE IT SAYS, "EX 21,"

16   IS MY HANDWRITING, BUT IT'S THE ONLY COPY I BROUGHT WITH

17   ME.

18        MR. WALSH:   WE CAN MAKE ANOTHER COPY.

19        MR. POULOS:   I MEAN, WE COULD BLANK OUT THE "EX" --

20        MR. WALSH:   I DON'T CARE.

21        ~~MR. POULOS:      BUT I DON'T THINK IT'S NECESSARY.~~

22        Q    IF YOU COULD TAKE A LOOK AT WHAT IS NOW

23   EXHIBIT 3 TO YOUR DEPOSITION.  AND THIS, FOR THE RECORD,
     [TRIAL EX. 38]

24   IS DMSI -- BATES NUMBER DMSI 0111.  DO YOU RECOGNIZE THIS

25   DOCUMENT?

Page 71

1      A    YES.

2      Q    AND IS THIS THE SPREADSHEET THAT YOU WERE

3  REFERRING TO EARLIER THAT MR. BARRY COHEN PROVIDED TO

4  YOU?

5      A    IT APPEARS TO BE.

6      Q    OKAY.  THAT'S NOT IN -- IN THE FILE RELATED --

7  THAT YOU BROUGHT WITH YOU PURSUANT TO THE SUBPENA.  DO

8  YOU KNOW IF YOU HAVE A COPY OF THIS SOMEWHERE IN YOUR

9  OTHER RECORDS?

10     A    I DO.

11     Q    AND WHICH RECORDS ARE THOSE IN?

12     A    THE TAX RECORDS FOR OLD PORTE FISHERIES.

13     Q    OKAY.  SO THOSE RECORDS WOULD SHOW HOW THESE

14  ITEMS, IF THEY WERE TREATED ON TAX RETURNS, WERE TREATED,

15  I TAKE IT?

16     A    I DON'T THINK YOU CAN SAY THAT.

17     Q    OKAY.  DO YOU RECALL WHEN MR. COHEN BROUGHT THIS

18  SCHEDULE TO YOU?

19     A    I BELIEVE I RECEIVED IT IN THE YEAR 2007, BUT I

20  DO NOT RECALL WHEN.

21     Q    OKAY.  DO YOU RECALL WHAT ITEMS, IF ANY ON HERE,

22  MR. COHEN FELT WERE NOT HIS DEBTS, THAT SHOULD HAVE

23  BEEN -- OR WERE NOT PROPERLY ALLOCATED TO HIS PAYMENT?

24     A    MY RECOLLECTION IS THAT MR. COHEN TOLD ME THAT

25  THIS REPRESENTED WHAT DEL MAR DID WITH HIS PAYMENTS, BUT

DAVID PAUL CANTRELL

December 27, 2007

Page 72

1    THAT, IN HIS OPINION, THE PAYMENTS SHOULD HAVE BEEN

2    APPLIED TO HIS BOAT LOAN.  THAT'S THE WAY I UNDERSTOOD

3    IT.

4        Q    OKAY.  WHICH PAYMENTS DID HE -- DID HE FEEL WERE

5    NOT PROPERLY ALLOCATED, IF YOU CAN RECALL?

6        MR. WALSH:  I BELIEVE HE'S ANSWERED THAT GENERALLY.

7        THE WITNESS:  YEAH, I REALLY CAN'T RECALL THE

8    SPECIFIC DOLLAR AMOUNT THAT HE OBJECTED TO OR DIDN'T

9    OBJECT TO.  IT JUST -- THAT WAS MY GENERAL UNDERSTANDING

10   OF IT.

11   BY MR. POULOS:

12       Q    ALL RIGHT.  LET'S GO THROUGH THESE IN ORDER.

13            THERE IS A COLUMN THAT SAYS, "MICHAEL COHEN";

14   CORRECT?

15       A    CORRECT.

16       Q    AND YOU UNDERSTAND THAT TO BE MICHAEL COHEN,

17   BARRY COHEN'S SON?

18       A    I DO UNDERSTAND IT TO BE THAT.

19       Q    OKAY.  AND WHAT IS -- WHAT BUSINESS DOES MICHAEL

20   COHEN HAVE, THAT YOU ARE AWARE OF?

21       A    MICHAEL COHEN IS AN EMPLOYEE OF OLD PORTE

22   FISHERIES, INC.

23       Q    OKAY.  THERE IS A PAYMENT SHOWN OF 13,920 --

24   WELL, A BEGINNING BALANCE OF 13,920.40, AND THEN A

25   PAYMENT DATED 11/10/2005 FROM BARRY FOR THAT AMOUNT.  DO

DAVID PAUL CANTRELL                                    December 27, 2007

Page 75

1    THIS A FIGURE THAT IS SOMEHOW ACCOUNTED FOR SOMEWHERE IN

2    MR. COHEN'S RETURNS?  SO THAT IF HE DOESN'T HAVE THE

3    INFORMATION, WE KNOW WE CAN COME BACK TO YOU.

4         MR. WALSH:  YOU CAN'T ANSWER THAT QUESTION BECAUSE

5    IT CALLS FOR SPECULATION ABOUT MICHAEL COHEN, AND SO --

6    IT SEEMS TO ME THAT YOU'RE ASKING HIM A QUESTION ABOUT

7    WHAT MIGHT BE IN MICHAEL COHEN'S TAX RETURNS.

8         MR. POULOS:  NO, ONLY IN BARRY'S.  IF IT'S A FIGURE

9    THAT'S ACCOUNTED FOR SOMEWHERE IN BARRY'S RETURNS, NOT

10   MICHAEL'S

11        MR. WALSH:  $13,000?

12        MR. POULOS:  RIGHT.

13        MR. WALSH:  OKAY.

14        THE WITNESS:  I -- I BELIEVE IT IS A FIGURE THAT'S

15   ACCOUNTED FOR IN -- IN A CORPORATE ENTITY.

16   BY MR. POULOS:

17        Q    OKAY.  THE NEXT COLUMN OVER, IN TERMS OF THAT

18   PAYMENT FROM BARRY ON 11/10/2005, THAT'S THE $175,000

19   PAYMENT; RIGHT?

20        A    CORRECT.

21        Q    AND THIS IS THE ONE THAT BARRY -- THAT ONE

22   PAYMENT IS THE ONE IN THE ALLOCATION THAT BARRY TOLD YOU

23   HE DISPUTED THE ALLOCATION; IS THAT RIGHT?

24        A    WELL, HE DID DISPUTE THAT ALLOCATION, YES.

25        Q    RIGHT.  OKAY.  DID HE DISPUTE, TO YOUR

*[Handwritten margin note:]* Objection FRE 802 Hearsay FRE 602 witness lacks personal knowledge

DAVID PAUL CANTRELL                                    December 27, 2007

Page 76

1    UNDERSTANDING -- OR DID HE TELL YOU THAT HE DISPUTED THE

2    ALLOCATION OF $18,069.10 TO OLD PORTE INN DEBT?

3        A    YES, I BELIEVE HE FELT THAT WAS INCORRECT.

4        Q    AND THE SAME SORT OF FOUNDATIONAL QUESTION:  IS

5    THAT FIGURE SOMEWHERE DEALT WITH ON EITHER BARRY'S

6    PERSONAL OR A CORPORATE RETURN?

7             AGAIN, NOT HOW IT'S ATTRIBUTED OR TREATED.  JUST

8    IS IT SOMEWHERE ATTRIBUTED?

9        A    I DON'T -- YOU KNOW, I REALLY CAN'T ANSWER THAT,

10    BECAUSE OLD PORTE INN, INC., IS AN UNRELATED CLIENT, AND

11    THIS WAS APPARENTLY A DEBT FROM OLD PORTE INN, INC., TO

12    DEL MAR.

13        Q    OKAY.  THAT OLD PORTE INN, INC., IS THE SUB-S

14    CORPORATION WE WERE JUST TALKING ABOUT?

15        A    NO.

16        Q    OKAY.  OLD PORTE INN, INC., IS A SEPARATE ENTITY

17    FROM OLD PORTE FISHERIES, INC.?

18        A    CORRECT.

19        Q    OKAY.  OLD PORTE INN, INC., IS THAT LEONARD'S --

20        A    CORRECT.

21        Q    -- COMPANY?

22        A    YES.  I'M SORRY.

23        Q    OKAY.  TOO MANY OLD PORTES.

24        MR. COHEN:  NOT ENOUGH AS FAR AS I'M CONCERNED.

25        MR. WALSH:  YOU'VE GOT TO COME UP WITH A NEW ONE,

*[handwritten margin note: Objection Hearsay FRE 802 + FRE 602 witness lacks personal knowledge]*

DAVID PAUL CANTRELL                                         December 27, 2007

Page 80

1    THAT IS BARRY COHEN'S SUB-S CORPORATION?

2        A    CORRECT.

3        Q    OKAY.  DID HE EVER TELL YOU -- WITHDRAWN.

4             DID BARRY COHEN EVER TELL YOU THAT THE

5    CORPORATION, HIS SUB-S CORPORATION, DID NOT OWE THAT

6    MONEY?

7        A    NO, I DON'T BELIEVE HE EVER SAID THAT.

8        Q    OKAY.  DID HE DISPUTE THIS PARTICULAR PORTION OF

9    THE ALLOCATION OF THE $175,000?

10       MR. WALSH:    ASKED AND ANSWERED.  HE'S ALREADY SAID

11   THAT HE DID DISPUTE IT.

12   BY MR. POULOS:

13       Q    GO AHEAD AND ANSWER AGAIN.

14       A    I BELIEVE HE DISPUTED EACH ONE OF THESE FIGURES

15   BEING ALLOCATED AGAINST THE AMOUNTS SHOWN AT THE TOP.  I

16   BELIEVE -- MY UNDERSTANDING WAS THAT HE THOUGHT THE

17   $175,000 PAYMENT SHOULD HAVE BEEN APPLIED TO THE BOAT

18   LOAN SOLELY, AND NO PART SHOULD HAVE BEEN APPLIED TO

19   THESE OTHER THINGS.  THAT'S HOW I UNDERSTOOD IT.

20       Q    THE BOAT LOAN, IS THAT THE    WHAT DID    WELL

21   LET'S FINISH THIS PROCESS.  I'LL WITHDRAW ALL THAT.

22             LOOKING AT THE NEXT COLUMN, "POINT LOMA," AN

23   ALLOCATION FROM THAT 175 OF 16,021.31, WHAT WAS YOUR

24   UNDERSTANDING OF WHAT THAT REFERENCE WAS TO?

25       A    I BELIEVE "POINT LOMA" REFERS TO THE FISHING

*[handwritten margin note: Objection FRE 802 Hearsay FRE 602 calls for speculation]*

Del Mar Seafoods, Inc.
Schedule of P...nts

| | Michael Cohen | Olde Port Fisheries | Olde Port Inn | Inventory | Point Loma | Barry | Total |
|---|---|---|---|---|---|---|---|
| Beginning Balance | 13,920.40 | | 18,068.10 | 10,383.24 | 16,021.31 | 2,382,035.48 / 237,436.48 | 2,382,035.48 / 2,440,139.-- |
| 12/22/2004 Barry Pymt | | | | | | (5,000.00) | (5,000.00) |
| 8/24/2005 American Payment | | | | (1,474.75) | | | (1,474.75) |
| 9/14/2005 Olde Port PYMT | | | | (1,000.00) | | | (1,000.00) |
| 11/10/2006 Inv. Adj | | | | (1,300.00) | | | (1,300.00) |
| 11/10/2005 Payment from Barry | (13,920.40) | | (18,068.10) | (6,508.49) | (18,021.31) | (120,380.70) | (175,000.00) |
| 12/6/2006 Olde Port Balance (see attached) | | 7,417.67 | | | | | 7,417.67 |
| 12/5/2006 Point Loma Balance (see attached) | | | | | 1,368.82 | | 1,368. |
| Fees for Olde Port Case | | | | | | 21,308.52 | 21,308. |
| 2/5/2007 Payment | | | | | | (2,000.00) | (2,000.00) |
| 2/20/2007 Payment | | | | | | (3,000.00) | (3,000.00) |
| 4/25/2007 Payment | | | | | | (3,000.00) | (3,000.00) |
| Ending Balance | | 7,417.67 | | | 1,360.62 | 124,068.00 / 119,963.20 | 193,749.- / 128,777.7 |

[ TRIAL EX. 38 ]



DEFENDANT'S
EXHIBIT
3
D. CANTRELL

DMSI 0111

Barry Balance.xls

4/30/2007

Ex. 21

Attachment C

DEFENDANTS #2 RE [...] FOUNDATION / PERSONAL KNOWLEDGE

**DAVID PAUL CANTRELL**                                    **December 27, 2007**

Page 62

1  BOAT, THAT DEL MAR UNILATERALLY APPLIED AGAINST
2  RECEIVABLES THAT DEL MAR HAD ON THEIR BOOKS FROM ENTITIES
3  OTHER THAN MR. COHEN AS AN INDIVIDUAL.
4      Q  DID HE EVER -- DID YOU HAVE ANY DISCUSSION WITH
5  MR. COHEN ABOUT WHO THOSE INDIVIDUALS WERE? OR WHAT
6  THOSE NOTES WERE?
7      A  WELL, I DON'T BELIEVE THERE WERE NOTES. I
8  BELIEVE THEY WERE TRADE RECEIVABLES RELATED TO THE OLD
9  PORTE FISHERIES, INC. I BELIEVE THERE WAS SOME -- AGAIN,
10  ON THE SCHEDULE, I -- THIS IS JUST THE SCHEDULE PRESENTED
11  TO ME, SO I DON'T REALLY KNOW WHO ARRIVED AT THESE
12  NUMBERS -- BUT THERE WAS ALSO LISTED OLD PORTE INN. THE
13  RESTAURANT BUSINESS WAS LISTED ON THERE. AND I BELIEVE
14  THAT IT SHOWED THAT AMOUNTS WERE OWED TO THOSE ENTITIES
15  TO DEL MAR FOR SOME REASON, AND THAT PAYMENTS MADE BY
16  MR. COHEN HAD BEEN APPLIED AGAINST THOSE CORPORATE DEBTS
17  AS OPPOSED TO AGAINST HIS LOAN ON THE BOAT.
18      Q  OKAY. AND HE BROUGHT THOSE TO YOUR ATTENTION?
19      A  HE DID.
20      Q  AND HOW -- DID HE EVER TELL YOU THAT HE HAD
21  ASSUMED RESPONSIBILITY FOR THOSE -- WELL, BACK UP.
22          DID YOU UNDERSTAND THAT THERE WERE DEBTS -- OR
23  LIABILITIES INCURRED BY MR. COHEN'S SONS, MICHAEL AND
24  LEONARD?
25          MR. WALSH: OBJECTION; LACK OF FOUNDATION, CALLS FOR

Page 63

1  SPECULATION.
2  BY MR. POULOS:
3      Q  I'M JUST ASKING IF YOU HAD ANY -- HAD HEARD THAT
4  OR UNDERSTOOD IT IN SOME WAY?
5      A  HONESTLY, I UNDERSTOOD THEM TO BE CORPORATE
6  DEBTS, AND THEY WEREN'T PERSONAL OBLIGATIONS.
7      Q  CORPORATE DEBTS INCURRED BY BUSINESSES IN WHICH
8  THOSE SONS HAD AN INTEREST?
9      A  WELL, WITH REGARD TO OLD PORTE INN, MR. LEONARD
10  COHEN HAS AN INTEREST. WITH REGARD TO OLD PORTE
11  FISHERIES, I DON'T KNOW THAT MIKE COHEN HAS AN INTEREST.
12      Q  OKAY. WITH RESPECT TO THOSE SUMS, DID MR. COHEN
13  EVER RELATE TO YOU -- MR. BARRY COHEN -- THAT HE HAD AN
14  AGREEMENT THAT THOSE SUMS WOULD BE ADDED TO HIS BALANCE
15  UNDER THE NOTE?
16      A  NO. MY RECOLLECTION IS THAT HE SPECIFICALLY DID
17  NOT THINK THEY WERE ADDED TO THE NOTE. BUT I'M GOING
18  FROM RECOLLECTION ONLY. THERE'S NO --
19      Q  DO YOU HAVE NOTES OF THAT CONVERSATION?
20      A  I DON'T BELIEVE SO, NO.
21      Q  HOW WERE THOSE -- YOU SAID THOSE CAME TO YOU IN
22  TERMS OF PREPARATION OF A TAX RETURN FOR THE OLD PORTE
23  FISHERIES, INC.?
24      A  CORRECT.
25      Q  HOW WERE THOSE SUMS, IF YOU CAN TELL ME,

Page 64

1  ALLOCATED -- HOW DID THOSE SUMS RELATE TO YOUR
2  PREPARATION OF A TAX RETURN FOR THE OLD PORTE FISHERIES?
3      A  BECAUSE IN ORDER TO PREPARE THE TAX RETURN, THE
4  CORPORATION ALSO HAS TO REFLECT ITS RECEIVABLES AND
5  PAYABLES AND OBLIGATIONS THAT THE CORPORATION HAS,
6  REALLY. AND IT CAME TO MY ATTENTION, IN THE PREPARATION
7  OF THE RETURN, THAT THESE DEBTS HAD BEEN, QUOTE, PAID,
8  AND THAT THEY WERE NO LONGER ACTUALLY OWED TO DEL MAR, AT
9  LEAST BY DEL MAR'S CALCULATION. AND, THEREFORE, THE
10  CORPORATION, OLD PORTE FISHERIES, WOULD BE OBLIGATED TO
11  REPAY MR. COHEN FOR THE SETTLEMENT OF THOSE CORPORATE
12  DEBTS. AND THAT'S WHY IT BECAME AN ISSUE FOR ME AS TO
13  HOW TO PROPERLY ALLOCATE THE LIABILITIES.
14      Q  CAN YOU TELL US HOW THEY WERE ALLOCATED, THEN,
15  IN THE PREPARATION OF THAT RETURN? WERE THEY -- DID THE
16  CORPORATION THEN DO AS YOU SAID, TREAT THEM AS HAVING
17  BEEN PAID OFF, AND THEN THE CORPORATION ASSUMED A DEBT TO
18  MR. COHEN?
19      A  WELL, ULTIMATELY, I DON'T THINK THAT'S HOW THE
20  RETURN WAS FINALIZED, BUT I REALLY THINK WE'RE CROSSING
21  THE LINE HERE FROM JUST GENERAL KNOWLEDGE AND IT'S MORE
22  ABOUT TAX PREPARATION AT THIS TIME.
23      Q  WE'RE CERTAINLY ON THE EDGE, AND I DON'T
24  NECESSARILY WANT TO CROSS OVER IT. I WANT TO BE
25  SENSITIVE TO THAT. BUT AT ISSUE HERE -- AND I'M NOT

Page 65

1  SURE, COUNSEL, HOW WE CAN DEAL WITH THIS -- AT ISSUE IS
2  OBVIOUSLY, IF THE -- IF THE TAX RETURNS -- IF A CREDIT IS
3  BEING CLAIMED ON SOME TAX RETURNS RELATED TO THIS, AND
4  THEN AN OPPOSITE POSITION IS BEING TAKEN HERE IN TERMS OF
5  WHETHER OR NOT THOSE DEBTS WERE SATISFIED OR THE
6  ALLOCATION WAS PROPER, WE NEED TO KNOW THAT. AND IT'S A
7  SEPARATE ENTITY FROM MR. COHEN.
8          IT'S A -- IT'S A CALIFORNIA CORPORATION?
9      A  YES.
10          MR. WALSH: WELL, IT'S NOT A PARTY, AND, YOU KNOW, I
11  THINK IT'S TOO COMPLICATED FOR ME TO RESPOND TO, BECAUSE
12  THEY'RE NOT A PARTY. YOU DON'T ADD THEM AS A PARTY. SO
13  I THINK IT WOULD BE IMPROPER FOR HIM TO RESPOND. AND I
14  DON'T EVEN NEED TO GIVE HIM AN INSTRUCTION.
15          YOU CAN JUST REFUSE TO, IF HE'S GETTING INTO
16  THAT.
17          OBVIOUSLY, THOSE QUESTIONS, YOU KNOW, YOU'RE
18  GOING TO HAVE TO ASK OF SOMEBODY ELSE WHO CAN ANSWER
19  THEM, AND -- I MEAN, I JUST DON'T THINK HE CAN ANSWER.
20          AND SINCE HE -- THIS IS NOT PERSONAL TO
21  MR. COHEN, OBVIOUSLY. HE CAN'T TELL HIM TO DO SOMETHING
22  THAT HAS TO DO WITH HIS CORPORATE RESPONSIBILITIES. AND
23  THE LAW IS PRETTY CLEAR THAT, UNLESS HE HAS WRITTEN
24  PERMISSION, HE'S -- HE'S FACING A MISDEMEANOR, SO HE
25  CAN'T REALLY TALK ABOUT THAT. AND I CAN'T SAY ANYTHING

17 (Pages 62 to 65)