**COX, WOOTTON, GRIFFIN,
HANSEN & POULOS LLP**
Gregory W. Poulos (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

**LAW OFFICES OF RICHARD P. WAGNER**
Richard P. Wagner (SBN 166792)
700 Oceangate, Suite 700
Long Beach, CA 90802
Telephone: (562) 216-2946
Facsimile: (562) 216-2960

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC. ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> BARRY COHEN, CHRIS COHEN (aka ) <br> CHRISTENE COHEN), *in personam* and ) <br> F/V POINT LOMA, Official Number ) <br> 515298, a 1968 steel-hulled, 126-gross ton, ) <br> 70.8- foot long fishing vessel, her engines, ) <br> tackle, furniture, apparel, etc., *in rem*, and ) <br> Does 1-10, ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> And Related Counterclaims ) <br> ) | Case No.: CV 07-02952 WHA <br><br> **DEPOSITION EXCERPTS OF BARRY COHEN READ INTO EVIDENCE AT TRIAL, MAY 22, 2008, AND REFERENCED EXHIBITS** |

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

| | | |
|---|---|---|
| DEL MAR SEAFOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C-07-2952-WHA |
| | ) | |
| BARRY COHEN, CHRIS COHEN (aka | ) | |
| CHRISTENE COHEN), in personam | ) | |
| and, F/V POINT LOMA, Official | ) | |
| Number 515298, a 1968 | ) | |
| steel-hulled, 126-gross ton, | ) | |
| 70.8 foot long fishing vessel, | ) | |
| her engines, tackle, furniture | ) | |
| apparel, etc., in rem, and | ) | |
| Does 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF

BARRY ALLEN COHEN

January 9, 2008

REPORTED BY: RITA R. LERNER, CSR #3179    (2001-404170)

1

Merrill Legal Solutions
(800) 869-9132

BARRY ALLEN COHEN        January 9, 2008

**Page 58**

1   Do you see that?
2   A. Yes.
3   Q. Do you agree with all of that?
4   A. Yes.
5   Q. Then it said, "The amount owed as of December
6   2001 for these advances was $16,394.75."
7   Do you see that?
8   A. Yes.
9   Q. Do you agree with that?
10  A. I don't disagree with it.
11  Q. "Therefore the total owed to Cappuccio was
12  $78,398.75," which is "($62,004, plus $16,394.75)."
13  Do you see that?
14  A. Yes.
15  Q. Do you agree with that?
16  A. Sitting here today, I do not disagree with it.
17  Q. "According to Barry's" -- it continues,
18  "According to Barry's records, Joe advanced
19  $111,715.78 cents for boat improvements."
20  Do you see that?
21  A. I see that.
22  Q. Do you disagree with it or agree with it?
23  A. I don't disagree with it. I don't understand
24  it at this moment.
25  Q. Okay. Does that refresh your recollection that

**Page 59**

1   you actually had and maintained records showing the
2   expenditures for boat improvements?
3   A. Oh, I never said I didn't.
4   Q. Do you have them still?
5   A. I'm sure we do. I did not dispose of any.
6   Q. Do you know if you have produced them in this
7   case?
8   A. I have.
9   MR. WALSH: Yes, we made them available to you.
10  They're sitting waiting for you to investigate. They're
11  part of the records that were available that we tried to
12  arrange for Max to see last week. They're all there for
13  you to see.
14  MR. POULOS: Q. How are those arranged down in
15  Avila Beach?
16  A. On two pallets and one full file cabinet four
17  drawers high.
18  Q. Do you have a file for boat improvements that
19  were made and paid for?
20  A. I doubt it.
21  Q. So in order to get those records, we've got to
22  go through two pallets and a file cabinet worth of
23  documents?
24  A. Well, I think if you go through two pallets and
25  the file cabinet, you're going to get all the things you

**Page 60**

1   asked for. It's in there. I didn't take anything out.
2   Q. Is it true, then, that the amount secured by
3   the preferred mortgage -- or the amount under the
4   promissory note and secured by the preferred mortgage
5   relates not just to boat improvements, but to personal
6   loans and fishermen advances that you owed to Del Mar?
7   A. Without saying the amounts of anything, I would
8   say that's probably true. However, I don't think we
9   need to go exactly by these titles, because there's
10  going to be some mixed up things in there.
11  MR. POULOS: It's noon. Let's take, say, a
12  40-minute lunch break.
13  (Lunch recess from 12:02 to 12:48;
14  Present: Mr. Poulos, Mr. Walsh, and the
15  witness)
16  MR. POULOS: Q. When we took a break for
17  lunch, we were talking about the source of the $215,000
18  in debt that is under the promissory note. Do you
19  remember that?
20  A. Mm-hmm, yes.
21  Q. And if you take a look at Mr. Cantrell's
22  memorandum, Exhibit 2, on page 2 we were looking at the
23  bullet points there; correct? On page 2 there's bullet
24  points "Mexican fishing permit," "boat improvements,"
25  "personal loans"?

**Page 61**

1   A. Yes.
2   Q. And "fishing loans."
3   In terms of the boat improvements, it then says
4   in the memo that your records showed that you had --
5   that Joe Cappuccio had advanced $111,715.78 for boat
6   improvements; correct?
7   A. That's what this says.
8   Q. And you don't have any reason to dispute that,
9   do you?
10  A. I don't have a reason to dispute it.
11  Q. Now, in terms of the personal loans to Barry
12  Cohen, is it your testimony that any portion of those
13  personal loans were in fact paid to -- used for
14  improvements of the Point Loma?
15  A. I don't think so.
16  Q. What were those personal loans used for?
17  A. I can't tell you today. I don't know.
18  Q. You had signing authority on a bank account for
19  the Olde Port Fisheries Division of Del Mar; right?
20  A. For the joint venture?
21  Q. Yes.
22  A. Yes.
23  Q. On a Wells Fargo account; right?
24  A. Yes.
25  Q. And you wrote checks for the funds used to

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN LUIS OBISPO

BARRY A. COHEN; LEONARD A. COHEN; )
OLDE PORT INN, INC.; and )
OLDE PORT FISHERIES, INC., )
)
      Plaintiffs, )
)
vs. )
)
PORT SAN LUIS HARBOR DISTRICT; and )
DOES 1 to 50, inclusive, )
)
      Defendants. )
_____ )
)
AND RELATED CROSS-ACTION. )
_____ )

**VOLUME III**
Pages 340-523



Case No. CV 040897

# DEPOSITION OF BARRY A. COHEN

San Luis Obispo, California

Wednesday, November 16, 2005

10:05 a.m. – 5:23 p.m.

Reported By:     Lora L. Shoffstall, RPR, CSR 9271
                   File No. 206759



Jeri Cain, CSRs, Inc.
A Professional Corporation
MeritReporting™ & Video
Earning Your Trust Since 1974
San Luis Obispo · Santa Maria · Santa Barbara

1151 Leff Street · San Luis Obispo, CA 93406-1039  (805) 541-0333
P.O. Box 1871 · Santa Maria, CA 93465  (805) 928-7554
FAX (805) 541-2136 · www.MeritReporting.com   800-549-3376

**Page 348**

1  copies of.
2  BY MR. MOROSKI:
3  Q.  Specifically what documents did you search
4  for? And I'm focusing now on the time period between
5  the last session of your deposition, which was
6  October 14, 2005, and today.
7  A.  Anything that I might have missed in your list
8  of document requests.
9  Q.  Can you give me specific for instances? Or
10 would it be more helpful for you to go over the
11 specific document requests set forth in the deposition
12 notice?
13 A.  No. I read these and looked to try to find
14 them, if there were any, that I did not previously send
15 to you.
16 Q.  Okay. With respect to the one document that
17 you found at home, what was that document?
18 A.  That was a 1099 from the cable committee for
19 wages other than fishing or joint venture. It was paid
20 from the cable committee.
21 Q.  Okay. And what are the documents that you
22 were -- that were provided to you by Mr. Roggio?
23 A.  A copy of the promissory note and a list of
24 payments I made on that note.
25 Q.  Did you search for any other documents?

**Page 349**

1  A.  I explained I searched for all the documents.
2  Those are the ones I found.
3  Q.  Okay. Have you made any requests of
4  Mr. Roggio or anyone else at Del Mar Seafoods for
5  copies of the checks to you that relate to the forms
6  1099 that have been produced now?
7  A.  Those checks were available at the discovery
8  of the 400 boxes in Avila Beach.
9  Q.  How do you know that?
10 A.  Because that's where they were kept.
11 Q.  In which of the 400 boxes?
12 A.  I don't know how to answer that. Which box?
13 Q.  Yeah.
14 A.  I can't describe it. I wouldn't know.
15 Q.  Well, I don't know --
16 A.  I would have to look through all 400 boxes and
17 try and find it.
18 Q.  You mean there's no name or coding on any of
19 the boxes?
20 A.  Well, there probably is.
21 Q.  Do you know whether there is?
22 A.  I can't think of any boxes that we did not
23 label at the time of discovery.
24 MR. COON: Would looking at an index help?
25 THE WITNESS: I don't know where the location

**Page 350**

1  of each individual box may be at this moment.
2  BY MR. MOROSKI:
3  Q.  And what I'm trying to get to, Mr. Cohen --
4  and again, you testified with some emphasis, degree of
5  certainty that the checks backing up the forms 1099
6  from Del Mar were included in the 400 boxes of
7  documents that were made available for my law firm's
8  inspection. And what I'm trying to find out now is how
9  you can say for sure that those checks were included in
10 the boxes.
11 A.  That's what I believe.
12 Q.  But you don't know for sure, do you?
13 A.  Unless somebody removed them, they would be
14 there.
15 Q.  Now, we'll get to the actual form 1099s in a
16 few moments, but there are two different -- I'll
17 describe them as different forms 1099: Those forms
18 1099 which designate as the payor Del Mar Seafoods,
19 Inc., Olde Port Fishery Division, and there are also
20 forms 1099 which designates Del Mar Seafoods, Inc.
21 without reference to Olde Port Fisheries Division.
22 Sitting here today, do you understand what, if any,
23 difference exists between those two types of forms
24 1099?
25 MR. COON: Objection. Vague and ambiguous.

**Page 351**

1  THE WITNESS: Sitting here listening to what
2  you say, I can't answer that question.
3  BY MR. MOROSKI:
4  Q.  Well, we'll take a look at the documents, and
5  maybe the documents will refresh your recollection.
6  With respect to the forms 1099, do you recall
7  sitting here today whether the checks that were paid to
8  you that are reflected in the totals on the forms 1099
9  were checks that were written and signed at Del Mar's
10 offices in Salinas as opposed to checks written and
11 signed in Avila?
12 MR. COON: Objection. Vague and ambiguous.
13 Assumes facts.
14 THE WITNESS: I can't be sure where the checks
15 were issued.
16 BY MR. MOROSKI:
17 Q.  Did you at any period of time or at any point
18 in time during the time frame February 1999 through
19 December 2004 write checks to yourself on accounts
20 established in the name of Del Mar Seafoods, Inc. or
21 Del Mar Seafoods, Inc., Olde Port Fisheries Division?
22 A.  You're asking if I ever wrote checks to
23 myself --
24 Q.  Correct.
25 A.  -- from Del Mar's account?

## Page 508

1  that's currently operating the Point Loma. Correct?
2    A. Correct. And it would be last year's income.
3    Q. Who keeps the books for the Point Loma?
4    A. I do.
5    Q. With assistance from anyone?
6    A. For the end of the year? The end-of-the-year
7  tax returns I don't do.
8    Q. That's Mr. Cantrell?
9    A. Yes.
10   Q. Mr. Coon has shown you a document. Do you
11 want to --
12   A. He wants --
13      MR. COON: This was that document that was
14 faxed by Joe Roggio during the break that Mr. Cohen
15 requested. I think we should make some copies of it
16 and give you a copy.
17      MR. MOROSKI: Sure. Can I take a look at it,
18 please?
19      Why don't we make a copy of this real quick.
20 Thanks, Jay.
21      MR. COON: Can we make two of those, Jay, so
22 we can have one for us, one for the court reporter and
23 one for you guys?
24      MR. ELDER: Okay.
25      MR. MOROSKI: Exhibits 397 and 398. Thanks,

## Page 509

1  Jay. Do you want to mark this next? That's 401.
2      THE WITNESS: Do you want --
3      MR. MOROSKI: Not yet. That --
4      THE WITNESS: Okay.
5      MR. MOROSKI: We'll get to that in a second.
6      (Exhibits 397-398 and 401 were marked for
7       identification.)
8  BY MR. MOROSKI:
9    Q. Can you identify Exhibit 397 for the record,
10 please?
11   A. A copy of the promissory note payable to Del
12 Mar Seafoods that I had sent to you a couple days ago
13 I received this from requesting it from Joe Roggio.
14   Q. And the date or the effective date, I should
15 say, of this note is what?
16   A. You mean the preferred mortgage date or the
17 date signed we it?
18   Q. What is the effective date of --
19   A. It's the same date.
20   Q. Which is what?
21   A. 10/31/03.
22   Q. And directing your attention to the last page,
23 the third page of the note. Is that your signature
24 above the line "Barry Cohen"?
25   A. Yes.

## Page 510

1    Q. And is that Chris Cohen's signature?
2    A. Yes.
3    Q. Okay. Why was it that you were being asked to
4  sign a promissory note on October 31, 2003?
5    A. I don't know.
6    Q. Were you assessed interest under the terms of
7  this promissory note?
8    A. No.
9    Q. Why not?
10   A. I don't know.
11   Q. And with respect to the balance, principal
12 balance recited in the first paragraph of the notice,
13 $215,000, how was that figure arrived at?
14   A. I think it was a low guess.
15   Q. A low guess?
16   A. A guess.
17   Q. Of what?
18   A. Of the money that I borrowed for the boat from
19 Del Mar. But I don't think they knew exactly how much
20 everything was.
21   Q. Directing your attention to Exhibit 398. Can
22 you identify that document for the record?
23   A. Yes.
24   Q. Would you do so?
25   A. It's a Del Mar Seafoods, Inc. schedule of

## Page 511

1  payments.
2    Q. And what does the schedule of payments relate
3  to?
4    A. What I paid, what the boat owed, what
5  inventory was owed for Avila, receivable on Olde Port
6  Inn and on Michael Cohen.
7    Q. So this document, Exhibit 398, does not relate
8  to the promissory note?
9    A. Yes.
10   Q. It does?
11   A. Yes.
12   Q. Okay. How do you account for the different
13 balances?
14   A. We don't account for it.
15   Q. Okay. Can you explain to me why the principal
16 balance owed under the terms of the promissory note,
17 Exhibit 397, dated effective October 31, 2003, is
18 $215,000, and the beginning balance reflected on this
19 schedule of payments documents is $295,429?
20   A. Because I took the responsibility for these
21 amounts owed and just put it on mine.
22   Q. Okay. So the beginning balance does not
23 relate to the promissory note balance. Correct?
24   A. No, but it -- it relates to the promissory
25 note.

**Page 512**

1  Q. Well, I'm looking at all of these figures,
2  Mr. Cohen, and let's start with Barry, the column
3  Barry, $237,035.48. That's the beginning balance.
4  That doesn't tie with the $215,000 principal balance
5  owed pursuant to the terms of the promissory note.
6  A. Right.
7  Q. Okay. How does it -- how does that total
8  relate to the promissory note obligation?
9  A. I just told you that the $215,000 was a low
10 estimate.
11 Q. Okay.
12 A. So --
13 Q. You owed money over and above the $215,000?
14 A. Right. But we didn't know how much. This was
15 just prepared a few days ago. This -- a lot of this
16 was not known until a few days ago.
17 Q. And "this," you're referring to Exhibit 398?
18 A. Yes.
19 Q. The Michael Cohen beginning balance, what does
20 that relate to?
21 A. Money that Michael Cohen owes.
22 Q. For what?
23 A. For purchases that he made.
24 Q. Purchases of what?
25 A. Of seafood from Del Mar.

**Page 513**

1  Q. Okay. Olde Port Inn, what does that --
2  A. Purchases.
3  Q. Of fish?
4  A. Yes.
5  Q. Okay. Inventory, what does that relate to?
6  A. Fish and supplies.
7  Q. Point Loma, what does that refer to?
8  A. I think that was an advance or advances.
9  Q. And the Barry column, what does that beginning
10 balance number refer to?
11 A. That was probably the beginning balance of
12 where I was at the time of this promissory note.
13 Q. And the total amount, $237,035, what does that
14 total include?
15 A. I couldn't tell you offhand.
16 Q. Advances?
17 A. At the time they were not advances, but they
18 turned into advances. This is what Joe Roggio was
19 talking about when we were going to go partners in the
20 boat, and we did a lot of work on the boat to get ready
21 for Mexico. That was going to be Joe's contribution to
22 the 50/50.
23 Q. Joe Cappuccio?
24 A. Yes.
25 Q. Okay. Now, regarding the schedule of

**Page 514**

1  payments, you've got a Barry payment on December 22nd,
2  2004, of $5,000.
3  A. Right.
4  Q. The next payment, I can't read the date, but
5  the 24th of some month in 2005, American payment, what
6  is that?
7  A. A check they received from a fish company
8  paying them by mistake.
9  Q. Okay. Olde Port payment on 9/14/05.
10 A. That's just what it says.
11 Q. Olde Port Inn?
12 A. No.
13 Q. Okay.
14 A. Olde Port Fisheries.
15 Q. Okay. And November 10, 2005, payment from
16 Barry, $175,000.
17 A. Yeah.
18 Q. Okay. You paid Del Mar $175,000 last week?
19 A. Last week or the week before.
20 Q. Okay. And what was the source of the funds
21 you used to make that payment?
22 A. Got a second on my house.
23 Q. What lender did you use?
24 A. Citibank.
25 Q. What was the amount of that financing?

**Page 515**

1     MR. COON: Objection. Irrelevant.
2     THE WITNESS: I believe 250.
3  BY MR. MOROSKI:
4  Q. Did you submit a written application for that
5  second?
6  A. I did not.
7  Q. Did someone submit an application on your
8  behalf?
9  A. Yes.
10 Q. Who?
11 A. John Husten.
12 Q. And John Husten, at the time he submitted that
13 loan application on your behalf, was working for Weger?
14 A. I don't know.
15 Q. When was the application submitted?
16 A. I don't know.
17 Q. When did the transaction close? I'm talking
18 about this $250,000.
19 A. Yeah. I would say a couple weeks ago or so,
20 two or three weeks ago.
21 Q. Were you approved for that financing before
22 the transaction closed, before the loan funded?
23 A. That's my understanding.
24 Q. And do you know the exact name of the lender?
25 You say Citibank. Citibank has a lot of different

Del Mar Seafoods, Inc.
Schedule of Payments

|              | Michael Cohen | Olde Port Inn | Inventory | Point Loma | Barry | Total |
|---|---|---|---|---|---|---|
| Beginning Balance | 19,920.40 | 18,089.10 | 10,383.24 | 16,021.81 | 237,035.48 | 305,430.03 |
| 12/22/2004 Barry Paymt |  |  |  |  | (5,000.00) | (5,000.00) |
| 0/24/2005 Amulcon Payment |  |  | (1,474.75) |  |  | (1,474.75) |
| 9/14/2005 Olde Port PYMT |  |  | (1,000.00) |  |  | (1,000.00) |
| 11/10/2005 Inv. Adj |  |  | (1,900.00) |  |  | (1,900.00) |
| 11/10/2005 Payment from Barry | (19,920.40) | (18,089.10) | (6,008.49) | (16,021.81) | (120,360.70) | (175,000.00) |
| Ending Balance |  |  |  |  | 111,654.78 | 131,054.70 |




UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF CALIFORNIA
TRIAL EXHIBIT 37
CASE NO. CV-07-02952 WHA
DATE ENTERED _____
BY_____
DEPUTY CLERK

Dolphin Seafoods, Inc.
Schedule of Payments

| Date | | Michael Cohen | Olde Port Fisheries | Olde Port Inn | Inventory | Point Loma | Barry | Total |
|---|---|---|---|---|---|---|---|---|
| | Beginning Balance | 13,920.40 | | 18,069.10 | 10,338.24 | 18,021.31 | 237,685.48 | 282,035.48 252,425 |
| 12/22/2004 | Barry Pymt | | | | | | (5,000.00) | (5,000.00) |
| 8/24/2005 | American Payment | | | | (1,474.75) | | | (1,474.75) |
| 8/14/2005 | Olde Port PYMT | | | | (1,000.00) | | | (1,000.00) |
| 11/1/2005 | Inv. Adj | | | | (1,300.00) | | | (1,300.00) |
| 11/19/2005 | Payment from Barry | (13,920.40) | | (18,059.10) | (6,608.49) | (16,021.31) | (120,380.70) | (175,000.00) |
| 12/5/2005 | Olde Port Balance (see attached) | | 7,417.67 | | | | | 7,417.67 |
| 12/5/2006 | Point Loma Balance (see attached) | | | | | 1,368.82 | | 1,368.82 |
| | Fees for Olde Port Case | | | | | | 21,308.52 | 21,308.52 |
| 2/25/2007 | Payment | | | | | | (2,000.00) | (2,000.00) |
| 2/20/2007 | Payment | | | | | | (3,000.00) | (3,000.00) |
| 4/25/2007 | Payment | | | | | | (3,000.00) | (3,000.00) |
| 4/30/2007 | Ending Balance | | 7,417.67 | | | 1,368.82 | 124,052.50 119,762.30 | 155,749.10 128,775 |

Barry Balance
61.21

[TRIAL EX. 38]

DEFENDANT'S EXHIBIT 3

DMSI 0111