1  James P. Walsh, CSB. No. 184620
2  Gwen Fanger, CSB No. 191161
   DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone: (415) 276-6500
   Facsimile:   (415) 276-6599
5  budwalsh@dwt.com

6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8

9              UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12  DEL MAR SEAFOODS, INC.,              )  No. C-07-2952-WHA
                                         )
13                   Plaintiff,          )
                                         )
14        v.                             )  **DEFENDANTS' POST TRIAL**
                                         )  **PROPOSED FINDINGS OF FACT AND**
15  BARRY COHEN, CHRIS COHEN (aka        )  **CONCLUSIONS OF LAW**
    CHRISTENE COHEN), *in personam* and, )
16  F/V POINT LOMA, Official Number      )
    515298, a 1968 steel-hulled, 126-gross ton, )
17  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
18  Does 1-10,                           )
                                         )
19  _____Defendants._____    )

20        Pursuant to this Court's Order Regarding Format of Proposed Findings of Fact and

21  Conclusions of Law After Bench Trial, Defendants Barry Cohen, Chris Cohen, the F/V Point

22  Loma, *in rem*, and Counterclaimant F/V Point Loma Fishing Company, Inc. submit these Post

23  Trial Proposed Findings of Fact and Conclusions of Law.

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

## I.    FINDINGS OF FACT

### The Parties

1.    The Plaintiff, Del Mar Seafoods, Inc., is engaged in the business of fish processing and distributing frozen fish.  [Roggio Trial Transcript ("TT") 41:7-8]  The company is located in Watsonville, California.  [Pretrial Order, Stipulated Fact ("Stip.") #6]  Plaintiff's president is Joseph Cappuccio.  [Cappuccio TT 320:12-13]  Its controller is Joseph Roggio.  [Roggio TT 39:23-40:1]

2.    Defendants Barry and Christene Cohen are a marital community and, although they are currently separated, they are still legally married.  [Pretrial Order, Stip. #2]  In this case, Plaintiff sued Barry and Christene Cohen individually, based on a Promissory Note ("Note") and Ship Mortgage (both dated  October 22, 2003) signed by them in favor of Plaintiff, seeking to foreclose on the Ship Mortgage and to recover amounts alleged to be due on the Note.

3.    At the time it was arrested on June 7, 2007, pursuant to process filed by Plaintiff in this case, the F/V Point Loma (the "Vessel") was owned by the F/V Point Loma Fishing Company, Inc. ("PLFC"), a California subchapter S corporation.  [Pretrial Order, Stip. #3]  Barry and Christene Cohen owned the Vessel individually at the time they entered into the Note and the Ship Mortgage.  In 2004, the Cohens, who had owned and operated the vessel since at least 2000, transferred ownership of the Vessel to PLFC.  [Pretrial Order, Stip. #5; Ex. 5]  Mr. Cohen testified at trial that Plaintiff knew of this transfer and authorized the Bill of Sale to be recorded with the U.S. Coast Guard.  [Cohen TT 427:24-428:7]  Defendants stipulated that the Vessel is subject to the Ship Mortgage originally signed by Barry and Christene Cohen.  Barry Cohen is the President and manager of PLFC and he and Christene each own a one-half interest in PLFC.  [Cohen TT 254:15-19; Pretrial Order Stip. #3]  Plaintiff sued the Vessel in rem in this case.  PLFC filed its claim to the Vessel on June 25, 2007 and joined as a Defendant.

4.    The Vessel engages in fishing activities off the coast of Northern California.  in the groundfish fisheries located outside the State of California and in the U.S. Exclusive Economic Zone ("EEZ") (from three to 200 nautical miles) and is licensed to land its catch only in the State of California.  The Vessel's home port is Port San Luis, California.  The Vessel holds licenses

DAVIS WRIGHT TREMAINE LLP

1  from the State of California and a permit to engage in the groundfish fisheries issued by a Federal

2  agency, the National Marine Fisheries Service.  The Federal permit is issued to PLFC and may be

3  used by the Vessel, but may also be transferred to another fishing vessel.  [Cohen TT 422:7-425:8;

4  Ex. 4]  The Vessel is not licensed to fish unload fish in any state other than California.  *Id.*

5              **History of Dealings Between and Among the Parties**

6      5.      Plaintiff and Mr. Cohen have a history of business dealings together, beginning in

7  1999.  [Cohen TT 432:22-433:2]  In that year, Plaintiff and Mr. Cohen entered into a verbal joint

8  venture to engage in the business of buying and selling fish at a facility leased by Mr. Cohen on

9  the Port San Luis pier at Avila Beach, California ( "Avila Beach Joint Venture").  [Cappuccio

10 346:7-9; Cohen TT 433:9-11; Pretrial Order, Stip. #7]  In addition, Mr. Cappuccio had agreed to

11 buy a one-half interest in the Vessel, which would be used in another joint venture in Mexico

12 ("Mexico Joint Venture").  [Cohen TT 438:4-9]  The fish caught in that Mexico Joint Venture was

13 to be sold to the Avila Beach Joint Venture.  [Cohen TT 437:21-438:3]  Mr. Cohen was also an

14 employee of Plaintiff from 1999 to 2006.  [Pretrial Order, Stip. #6]

15     6.      In the Avila Beach Joint Venture,  Plaintiff and Mr. Cohen agreed to a 50/50 split

16 of profits and losses.  [Cohen TT 433:5-8]  Mr. Cohen managed the day to day operations of the

17 Avila Beach Joint Venture, which purchased fish from various fishing vessels, processed the fish,

18 and sold it to wholesale and retail customers.  [Cohen TT 433:9-434:7; Cappuccio TT 346:10-12]

19 Plaintiff agreed to finance the Avila Beach Joint Venture.  [Cohen TT 434:10-17; Cappuccio TT

20 346:10-12]  The books of the Avila Beach Joint Venture were reviewed by both Mr. Roggio and

21 Mr. Cappuccio on a regular basis, at least every thirty days.  [Cohen TT 439:9-10; Cappuccio TT

22 346:15-18; Roggio TT 152:22-153:6]  Plaintiff filed annual tax consolidated returns that included

23 the financial results of its share of the Avila Beach Joint Venture.  [Roggio TT 153:7-15]  The

24 Avila Beach Joint Venture itself did not sign a tax return.  [Cohen TT 346:1]

25     7.      During the course of the Avila Beach Joint Venture, Mr. Cohen had authority to

26 write checks, make advances to vessels that sold fish to the Avila Beach Joint Venture, and

27 otherwise make arrangements for conducting the business of the Avila Beach Joint Venture.

28 [Cohen TT 435:9-10, 436:22-437:4]  The fish was purchased by the Avila Beach Joint Venture

DAVIS WRIGHT TREMAINE LLP

from about 14 trawlers, and a myriad of different fishermen, including gill netters, salmon trollers, and hook and line fishermen. [Cohen 433:16-18]. The Avila Beach Joint Venture also purchased squid from Plaintiff to sell. *Id.* the fish was sold through a retail market to the public and sold to restaurants and distributors. *Id.*

8.      In 2001, Mr. Cohen and Mr. Cappuccio decided on a new business deal, one involving taking the Vessel to fish in Mexico. [Cohen TT 437:18-438:3; Pretrial Order, Stip. # 9] Mr. Roggio stated during his testimony that Joe Cappuccio and Barry had discussions about Joe buying a fifty percent interest in the Vessel. [Roggio TT 54:2-4] Mr. Cohen also testified that there was an agreement that Joe Cappuccio would buy a half interest in the Vessel because they both thought they would catch a lot of fish in Mexico. [Cohen TT 438:1-9] Based on that discussion, Mr. Cohen started taking advances of funds for the vessel. [Cohen 438:6-18] During cross-examination, Mr. Roggio stated that "Joe [Cappuccio] had let everybody know that he was going to buy a 50 percent interest." [Roggio TT 135:19-23.]. Although Mr. Cappuccio testified at trial that he "was never going to buy a fifty percent interest in the POINT LOMA" [Cappuccio TT 340:25–314:1], the weight of the evidence supports the conclusion he had made a promise to buy a one-half interest in the Vessel.

9.      On the basis of their agreement, Mr. Cohen began taking advances to upgrade the Vessel, such as to add a hydraulic crane and rebuild the engine in preparation to fish in Mexico. [Cohen TT 438:10-25]. According to Mr. Cohen, the Vessel was tied up for a long time so he needed funds to pay for insurance and moorage. *Id.* All these expenditures were recorded on the books of the Avila Beach Joint Venture. [Cohen TT 439:4-8]

10.     Eventually, Mr. Cappuccio decided not to purchase a one-half interest in the Vessel, after he learned from Mr. Cohen that another vessel and permit were available. [Cohen 439:11-22]. Later, Mr. Cohen was asked to provide security for the funds that were used for upgrading the Vessel and he agreed to provide the security. [Cohen TT 440:1-12]

11.     Mr. Roggio then drew up the Note and the Ship Mortgage, using forms he had used previously. [Roggio TT 46:7-10, 47:20-48:3] He and Mr. Cohen then negotiated the amount to be secured by the Note, and eventually arrived at the sum of $215,000, based on advances Mr. Cohen

DAVIS WRIGHT TREMAINE LLP

had received with respect to the Vessel. [Cohen 441: 6-19] Mr. Roggio testified that the amount encompassed advances that Barry Cohen had taken to make repairs, personal loans that Barry had taken, then some fuel and ice charges towards the fishing vessel prior to the fishing vessel going fishing. [Roggio TT 48:25–49:1-6] Mr. Roggio also testified that the amount of the Note looked back at debts incurred prior to the date of the Note. [Roggio 131:9-18]

12.     Barry Cohen and Christene Cohen then signed the Note and the Ship Mortgage, as of October 31, 2003 in the amount of $215,000. [Exs. 7 and 8] Neither agreement is signed by Plaintiff or its representatives. [Roggio TT 139:11-16, 145:13-14] The Ship Mortgage was then recorded with the United States Coast Guard. [Roggio TT 145:1-5]

**The Parties' Dealings With Regard to the Note and Mortgage**

13.     The original terms of the Note required that Defendants would make monthly payments in the amount of $3,000 or fifteen percent of the gross landing receipts of the Vessel's seafood production. [Ex. 7 (Introduction)] However, the evidence at trial indicates that Plaintiff never calculated or demanded any payment based on the fifteen percent provision. [Cohen TT 478:16-19; Roggio TT 206:11-13] In fact, Plaintiff never sent a written demand at any time to Defendants for payments of any kind under the Note. [Roggio TT 143:23-144:7]

14.     The first payment under the Note was a $5,000 payment drawn on the checking account for the Vessel, dated December 22, 2004. [Ex. 25]

15.     Subsequently, Joe Cappuccio asked Mr. Cohen to make a large payment on the Note. [Cohen; 453:18-25, 454:1-14; Christene Cohen 308:4-13] Joe Cappuccio testified that he told Barry Cohen to get a loan from a bank and make payments to the bank instead of to Del Mar Seafoods. [Cappuccio TT 323:19-25] Barry Cohen testified that Joe Cappuccio told him that Plaintiff's bank had raised the issue of the size of the Note, because it had been funded by the line of credit from the bank. [Cohen TT 453:21-454:14] Mr. Cohen told Mr. Cappuccio that "he would see what he could do." [*Id*. at 454:7-11] After taking out a second mortgage on their home, Defendants then made a large, lump sum payment in the amount of $175,000 by personal check dated November 9, 2005. [Ex. 29; Cohen TT 452:12-18]

DAVIS WRIGHT TREMAINE LLP

4

16.     The Note clearly bares an interest term for seven percent (7%) per year.  [Ex. 7, (Introduction)]  However, prior to delivery of the $175,000 payment, Plaintiff had never billed for, demanded, or carried on its books, any interest relating to the Note.  [Roggio TT 170:11-23]  In previous testimony in the Avila Beach case, Mr. Roggio testified that Mr. Cohen was never asked to pay interest or invoiced for it and the purpose of the Note was "just to have something on paper" and formalize it in case something happened to Mr. Cohen.  [Roggio TT 234:25-235:15]  None of Plaintiff's own accounting documents showed any accrued interest.  [Roggio TT 235:13-23]  He also testified in the Avila Beach litigation that Mr. Cohen was never asked to pay interest nor was he ever invoiced for any interest.  [Roggio TT 235:6-9]  Plaintiff kept no record of any accrued interest on its books.  [Roggio TT 170:19-23]  The only document showing accrued interest was prepared by Plaintiff's counsel and submitted to the Court as an exhibit to the Declaration of Joe Cappuccio in support of Plaintiff's opposition to Defendants' motion to vacate the order of arrest.  [Roggio 177:3-13; Ex. D to Ex. 221]

17.     Mr. Cohen testified that sometime prior to making the $175,000 payment as requested by Mr. Cappuccio, he had a conversation with Mr. Roggio who told him that if Mr. Cohen made a large payment, he would see to it the Note was interest free.  [Cohen 457:1-21; 458:1-6]  Mr. Roggio testified that he did not have any conversations with Mr. Cohen about interest.  [Roggio TT 89:7-11]

18.     Shortly after writing the check, Mr. Cohen delivered the $175,000 check to Mr. Cappuccio in his office.  [Cohen 455:21 – 456: 12]  Mr. Cohen stated that he handed Mr. Cappuccio the check and said "I will get you the rest as soon as I can."  *Id*.  Mr. Cohen testified that Mr. Cappuccio then said that he was not worried about it, not concerned about it anymore, that it was such a small amount.  *Id*.  Mr. Cappuccio, in his testimony, said that all he told Mr. Cohen was to give the check to Joe Roggio.  [Cappuccio 324:9-16].  However, in his deposition testimony read at trial, Mr. Cappuccio said that he didn't really remember if he had any other conversation with Mr. Cohen after he handed him the check and told him to give it to Mr. Roggio.  [Cappuccio 342: 7-13].  Mr. Cohen testified that he made this payment as a prepayment and it was to be applied to pay down the Note.  [Cohen TT 294:9-11]

DAVIS WRIGHT TREMAINE LLP

19.     A few days after the $175,000 check was delivered, Mr. Roggio gave Mr. Cohen an accounting document containing a summary of various accounting entries.  [Ex. 37]  Mr. Roggio said that Mr. Cohen asked him to prepare a schedule of what encompassed his loan balance so he would know what he would need to collect from each of his sons. [Roggio TT 58: 9-11]  Mr. Cohen testified that he asked Mr. Roggio to let him know what his sons owed.  [Cohen 523:15-24]  The schedule of payments did not show any interest.  [Roggio TT 192:16-19; Exs. 37, 38]

20.     This schedule included amounts carried as receivables on the Avila Beach Joint Venture books as well as amounts Plaintiff claimed Barry and Christene Cohen owed under the Note.  [Roggio TT 58:7-11]  The schedule that Mr. Roggio gave to Mr. Cohen contained headings for amounts relating to:  Michael Cohen, Olde Port Inn, Inventory, Point Loma, and Barry.  [Exs. 37, 38]  The Michael Cohen heading showed an amount of $13,920.40 and was for fish that he purchased from the Avila Beach Joint Venture and was taken from the accounting records of the Avila Beach Joint Venture.  [Roggio TT 60:10-19]  The Old Port Inn heading showed an amount of $18,069.10 and was for invoices or sales made to Barry Cohen's other son, Leonard Cohen, for fish purchased from the Avila Beach Joint Venture.  [Roggio TT 63:5-11]  The Inventory heading showed an amount of $10,383.24 and was for inventory left over from the Avila Beach Joint Venture that was kept by Mr. Cohen.  [Roggio TT 65:25-66:15]  The Point Loma heading for $16,021.31 related to fuel, ice, and other advances to the Point Loma from the Avila Beach Joint Venture.  [Roggio TT 70:2-10; Ex. 18]  Lastly, Mr. Roggio testified that the Barry heading for $237,035.48 included the original balance of $215,000 from the Note and additional advances for repairs to the Point Loma after the Note was signed.  [Roggio TT 76:5-17]

21.     The schedule also showed how Mr. Roggio was allocating the $175,000 payment.  [Roggio TT 167:13-15]  Mr. Roggio testified that Barry Cohen had no objection to how the funds were being applied.  [Roggio TT 82:20-83:2]  Mr. Cohen testified that Mr. Roggio gave him the schedule and they had a very short conversation about it.  [Cohen TT 464 :3-20].  Mr. Cohen said that "This doesn't look right to me" and that, in reply, Mr. Roggio said "I'm just trying to clean up the books."  *Id.*  Christene Cohen testified in her deposition that she never saw the schedule of payments.  [Christene Cohen TT 418:23-419:13]

DAVIS WRIGHT TREMAINE LLP

22.    Mr. Roggio testified that Mr. Cohen had agreed to add each of the amounts on the spreadsheet to his "balance." [Roggio TT 67:25-68:23 (sons' debts); 72:13-21 (inventory); 74:6-12 (Point Loma advances); and 86:019-87:3 (attorneys' fees)]  Mr. Roggio kept only one balance or account for Mr. Cohen on his books. [Roggio TT 87:6-9; 219:7-10]  The spreadsheet provided by Mr. Roggio showed separate columns for each of the amounts in Mr. Cohen's "balance." [Exs. 37, 38]  Mr. Cohen testified that he did not agree to add these amounts to the Note and Mortgage. [Cohen TT 279: 13-20, 470:10-471:1]  Mr. Roggio testified that there was no written document signed by Mr. Cohen agreeing to add the specific debts to the Note. [Roggio TT 55:17-25]  Mr. Roggio testified that he "assumed" that Mr. Cohen meant to add Michael and the Old Port Inn debts to the Note because Mr. Roggio unilaterally decided to maintain only a single balance on his books for Mr. Cohen. [Roggio TT 179:6-13]  Mr. Roggio testified that he never discussed the addition of the other amounts to the Note with Christene Cohen. [Roggio TT 179:10-15]

23.    The Mortgage provides for Future Advances as follows:

FUTURE ADVANCES:  This mortgage is executed for the purpose of securing not only the payment of the above described note but also to secure all future advances made by the holder of said note to the mortgagor; and said mortgage shall remain in full force and effect to secure all future advances and all renewals or extensions of the above described note. [Ex. 8, Art. IV]

24.    Mr. Cohen testified that the additional amounts were not included in the Note and Mortgage because they were not related to the Note and Mortgage. [Cohen TT 281:23-282:4]  He stated that the amounts were not part of the "future advances" provision because they were not specific to the Note and Mortgage. [Cohen TT 280:4-15]

25.    Mr. Roggio also testified that Mr. Cohen had agreed to pay Plaintiff's attorneys' fees in the Avila Beach litigation and that Mr. Cohen agreed that these fees should be added to his "balance." [Roggio TT 86:19-87:3]  Mr. Roggio added the Plaintiff's attorneys' fees to the only balance he kept. [Roggio TT 87:6-9]  Mr. Cohen testified that he agreed to pay for "reasonable" attorneys' fees and in his mind, this meant only $2,000 to $3,000 and not the $21,000 put on his "balance" by Mr. Roggio. [Cohen TT 467:1-22, 526:10-21]  He testified that he did not agree to put these fees on the Note. [Cohen TT 468:7-9]

DAVIS WRIGHT TREMAINE LLP

7

26.    Subsequently, Defendants made additional payments on the Note in January ($2,000), February ($3,000), and April ($3,000) of 2007, each drawn on the checking account for the Vessel.  [Exs. 34, 35, 36]  In total, Defendants paid Plaintiff $188,000 on the Note up to the date of the arrest of the Vessel, June 7, 2007.  The last check was dated April 23, 2007.  [Ex. 36]

**Wind-Up of the Avila Beach Joint Venture**

27.    Mr. Cohen testified that the Avila Beach Joint Venture was having difficulties getting truck access onto the pier so that product could be delivered to Los Angeles.  [Cohen TT 444: 16-25 and 445:1-15].  The dispute over access resulted in litigation with the Port, with the court eventually finding that the Port had breached the leases.  [Cohen TT 445: 16-18]  Mr. Cohen stated that, because of these problems, the Avila Beach Joint Venture began losing money each month.  [Cohen TT 446:16-22].

28.    In September 2004, Mr. Cappuccio sent an email to Mr. Cohen saying that Plaintiff wanted to get out of the Avila Beach Joint Venture and put Mr. Roggio in charge of ending the Avila Beach Joint Venture. [Cohen TT 447:1-12].

29.    The Avila Beach Joint Venture carried its assets on its books, reviewed by Joe Roggio, through the end of 2004.  [Roggio TT 152:24-153:6; 210:3-14; Ex. 225]  These assets included inventory sold by the Avila Beach Joint Venture to Barry Cohen [Roggio TT 210:11-14], cash assets of the Avila Beach Joint Venture [Roggio TT 209:4-14], and accounts receivable of the Avila Beach Joint Venture, including those owed by Barry Cohen's sons, Michael Cohen and the Old Port Inn [Roggio 209:15-210:2].  The inventory of the Avila Beach Joint Venture was carried on the books of the Avila Beach Joint Venture at least until October 28, 2004.  [Roggio TT 182:6-9; Ex. 24]  Mr. Cohen testified that this was the inventory taken over from the Avila Beach Joint Venture on October 28, 2004.  [Cohen TT 448:7-19]  The accounts receivable owed by Michael Cohen and the Old Port Inn as well as the inventory were all transactions that occurred within the Avila Beach Joint Venture.  [Roggio TT 222:22-223:4]  The advances to the Point Loma were also part of the Avila Beach Joint Venture.  [Roggio TT 223:5-8].

**The Assignment of Joint Venture Interest**

30.    The parties signed an Assignment of Joint Venture Interest ("Assignment")

8

DAVIS WRIGHT TREMAINE LLP

effective October 22, 2004. [Roggio TT 104:3-15] Attorneys for both Plaintiff and Defendants participated in the preparation of the Assignment in March 2006 that reverted back to October 22, 2004. [Roggio TT 127:9-11; Cohen TT 446:5-9, 474:16-20]

31.    Joe Cappuccio testified that he wanted nothing to do with the litigation brought by Mr. Cohen on behalf of the Avila Beach Joint Venture. [Cappuccio TT 357:3-8] He wanted to protect Del Mar Seafoods. [Cappuccio TT 358:4-6] Mr. Cappuccio testified that he had signed a letter in December 2005 to release Del Mar Seafoods from participating in the Avila Beach litigation. [Ex. 40; Cappuccio TT 332:8-10, 332:20-333:1] He was concerned the letter would not adequately protect Del Mar Seafoods from the Avila Beach litigation. [Cappuccio TT 358:10-13] The formal Assignment was signed to create more distance between the Avila Beach Joint Venture lawsuit and Del Mar Seafoods. [Cappuccio TT 359:2-7]

32.    The Assignment signed by both Joe Roggio and Barry Cohen was made effective October 22, 2004. [Ex. 47] It gave all of the rights to the Avila Beach Joint Venture to Barry Cohen, specifically providing that:

> Assignor hereby confirms and reaffirms it prior assignment and transfers to Assignee, to the fullest extent possible and without restriction, all of Assignor's entire interest in the Joint Venture, including, but not limited to, the Joint Venture's claims, if any, against the District, and including, without limitation all rights, entitlements and/or interests in and to any claims, rights of action, causes of action, recoveries, damages, or other legal recourse owned or held by the Joint Venture." [Ex. 47, ¶ 2]

**Arrest of the Point Loma**

33.    Plaintiff arrested the Point Loma on June 7, 2007. Plaintiff had become concerned about its security in the Point Loma based on Joe Roggio's and Joe Cappuccio's assumptions about the effect of Mr. Cohen's divorce and potential liability for attorneys' fees in the Avila Beach litigation on his financial position. [Cappuccio TT 326:25-327:8, 327:23-328:7] Joe Roggio and Joe Cappuccio discussed these concerns after receiving the $3,000 payment from Mr. Cohen in April 2007. [Roggio TT 228:11-229:17] Joe Cappuccio testified at trial that he did not recollect knowing about the $3,000 payment in April 2007. [Cappuccio TT 354:1-15] However, Joe Roggio testified at trial that he told Joe Cappuccio about the payments that Barry Cohen had made. [Roggio TT 148:2-8]

DAVIS WRIGHT TREMAINE LLP

9

34.    Joe Roggio and Joe Cappuccio discussed seizing the Point Loma. [Roggio TT 148:14-15] Joe Cappuccio testified that when he spoke to his attorney about his concerns, the attorney never told him to send a demand letter for payment to Barry Cohen before the arrest. [Cappuccio TT 355:23-256:3] He also testified that the attorney never discussed lien priority with him. [Cappuccio TT 351:5-18] Joe Cappuccio testified at trial that the attorney told him that his only option was to arrest the vessel. [Cappuccio TT 356:5-8] In his deposition, Joe Cappuccio testified that he told the attorney to collect his money and secure the vessel and the attorney "did what he was supposed to do." [Cappuccio TT 355:16-21]

35.    Prior to the arrest, Joe Roggio had no personal knowledge that the vessel had failed in its fishing activities, declared bankruptcy in any proceeding, or that any writ of execution, garnishment, or attachment or other legal process had been issued against the vessel. [Roggio TT 141:9-13, 142:12-20] He also had no knowledge that any writ of execution, garnishment, attachment or other legal process had been issued against either Barry or Christene Cohen. [Roggio TT 142:21-6] Barry Cohen testified that he has never declared bankruptcy [Cohen TT 478:23-25] and is in the process of challenging potential claims for attorneys' fees from the Avila Beach litigation. [Cohen TT 479:1-11] Mr. Cohen also testified that no other lien holders had attempted to foreclose against the Point Loma. [Cohen TT 432:16-21]

36.    Joe Roggio never called Barry Cohen with regard to the business activities of the Point Loma and never sent a written demand for payment prior to the arrest. [Roggio TT 143:19-144:7] Mr. Cohen was never warned that Del Mar was going to arrest the vessel. [*Id.*; Cohen TT 432:14-18] Plaintiff based its decision to arrest the Point Loma on its concerns about collecting its money and wanted to make sure its security position was safe. [Roggio TT 147:25-148:1; Cappuccio TT 351:5-15]

37.    Joe Cappuccio testified that he and Barry Cohen were friends. [Cappuccio TT 323:19] He testified in the Avila Beach litigation that Barry Cohen was "honest." [Cappuccio TT 334:21-24] However, he also alleged that Barry Cohen had embezzled funds from the Avila Beach Joint Venture in his deposition testimony in the present case. [Cappuccio TT 335:16-18] However, Joe Roggio testified that he knew about the advances and they were authorized.

DAVIS WRIGHT TREMAINE LLP

1    [Roggio TT 116:25-117:7]

2         38.    Plaintiff did not disclose the $175,000 payment to the Court when it sought the ex

3    parte order of arrest. [Plaintiff's Complaint]  Plaintiff also claimed that Defendants had not paid

4    interest that they owed under the terms of the Note and Mortgage.  However, Plaintiff has no

5    accounting of any accrued interest that it had prepared itself. [Roggio TT 170:13-23]  Plaintiff

6    submitted a document containing accrued interest that was prepared by one of its attorneys with

7    Joe Cappuccio's declaration in support of its opposition to vacate the order of arrest. [Ex. 221

8    (Ex. D)).  Although Joe Roggio testified at trial that Plaintiff's attorney, Rich Wagner, prepared

9    this document containing accrued interest, Joe Cappuccio testified that he believed that Joe Roggio

10   prepared it. [Roggio TT 177:3-13; Cappuccio TT 361:13-17]  Joe Roggio further testified that

11   despite his statements in his declaration submitted to this Court in support of Plaintiff's opposition

12   to Defendants' motion to vacate the arrest that he had applied part of the $175,000 payment to

13   accrued interest prior to the arrest, he testified at trial that he did not keep accrued interest on Del

14   Mar Seafoods' books prior to the arrest. [Roggio TT 172:21-24, 174:19-175:5]

15        **Defendants' Damages**

16        39.    The Point Loma was arrested on June 7, 2007. [Kobak TT 369:25-370:1]  The

17   Point Loma was actively fishing at the time of the arrest. [Kobak TT 370:17-19]  Plaintiff's

18   president, Joe Cappuccio, testified that he knew that the Point Loma was fishing at the time of the

19   arrest. [Cappuccio TT 349:23-25]  At the time of the arrest, the Point Loma was selling its catch

20   to Caito Fisheries, a fish dealer or wholesaler. [Kobak TT 375:8-20]  Caito Fisheries is a well

21   known fish dealer. [Kobak TT 375:16-17; Cappuccio TT 350:9-10]

22        40.    The Court ordered the arrest vacated on August 17, 2007.  The Point Loma began

23   fishing again on August 31, 2007. [Kobak TT 371:25-372:1]  During the time of the arrest, the

24   Point Loma had no fish to sell. [Kobak TT 387:3-5]  It also had no fishing income during that

25   time. [Kobak TT 387:6-8]

26        41.    The arrest prevented the Point Loma from fishing for over two months. [Cohen TT

27   529:17-24]  Based on the weather during the time of the arrest, the captain of the Point Loma

28   determined that the arrest caused Defendants to miss opportunities for at least 14 fishing trips.

DAVIS WRIGHT TREMAINE LLP

1    [Kobak TT 382:6-9]

2        42.    Defendants calculated the average income per trip for all fishing trips taken in 2007

3    before and after the arrest of the Point Loma.  [Cohen TT 483:11-14]  To approximate the average

4    of the missed trips, Defendants used the same year, 2007, that the trips were missed with the same

5    captain and the same conditions.  [Cohen TT 483:13-17]

6        43.    Mr. Cohen hired Captain Dave Kobak in April 2006 to serve as the captain of the

7    Point Loma.  [Kobak TT 369:1-4, 13-15]  Mr. Cohen paid the captain 25% of the gross catch after

8    deducting fuel and ice.  [Kobak TT 385:18-386:1]  The Point Loma also had two crew members at

9    the time of the arrest who were each paid 12.5% of the gross catch after deducting fuel and ice as

10   compensation.  [Kobak TT 386:18-25]

11       44.    Defendants calculated lost income based on each trip of the Point Loma in 2007 by

12   taking the gross amount of fish sold and subtracting fuel, ice, and the captain and crew share.

13   [Cohen TT 484:22-24, 485:2-6]  Defendants then calculated that their average income per trip for

14   trips taken prior to the arrest was $4,508.45.  [Cohen TT 494:10-12]  Defendants also calculated

15   their average income per trip for trips taken after the arrest through the end of 2007 was $4,116.99.

16   [Cohen TT 493:2-6]

17       45.    Defendants also suffered damages in the amount of $8,000 that Mr. Cohen paid to

18   the captain and crew while the Point Loma was under arrest.  [Cohen TT 500:20-25; Ex. 211]  Mr.

19   Cohen paid the captain $5,000 while the Point Loma was under arrest.  [Kobak TT 387:12-16]  He

20   also paid the crew members $1,500 each during the time of the arrest.  [Cohen TT 500:20-25;

21   Trial Exhibit 211]  Mr. Cohen testified that he could not afford to have a boat without a captain

22   and a crew.  [Cohen TT 499:13-14]  Captain Kobak testified that generally he could find crew

23   members to crew the vessel.  [Kobak TT 396:14-16]  Barry Cohen testified that he made a

24   business decision to send the crew money and asked them to "stick around" so that they could

25   resume fishing when the Point Loma was released.  [Cohen TT 499:17-20, 500:12-19]  Mr. Cohen

26   made the business decision to pay the captain and crew because it would be difficult to find a good

27   replacement captain and crew.  [Cohen TT 499:19-500:22]  Mr. Cohen testified that the captain of

28   the vessel is primary to the results of the fishing operation and Captain Kobak was at least three

DAVIS WRIGHT TREMAINE LLP

12

1    times a better captain than those Mr. Cohen had in the past.  [Cohen TT 483:25-484:6]

2    **II.    CONCLUSIONS OF LAW**

3            **Jurisdiction**

4            46.    This Court has subject matter jurisdiction over this case in admiralty.  The Ship

5    Mortgage provides this Court with admiralty jurisdiction, based on the Federal Ship Mortgage

6    Act.  46 U.S.C. §§ 31322, 31325, and 31329; Schoenbaum, Admiralty and Maritime Law, 4th Ed.,

7    Vol. 1, § 3-10, 130-139 (2007).

8            **Applicable Law**

9            47.    This is a case of federal admiralty and maritime law and therefore substantive

10   admiralty law must be applied.  Schoenbaum, Admiralty and Maritime Law, 4th ed., Vol. I, § 4-1,

11   157 (2007).  Because admiralty law is not all encompassing, the court may look to various

12   appropriate sources, including admiralty case precedent as well as state statutory law and common

13   law which is then borrowed and applied as the applicable federal law.  Id., at § 4-2, 164-166.

14           48.    Admiralty has well-established rules that apply to the issue of wrongful arrest.

15   *Stevens v. Bonnie Doon,* 655 F.2d 206, 209 (9th Cir. 1981) (damages recoverable for detention of

16   vessel in bad faith); *Frontera Fruit Co. v. Dowling*, 91 F.3d 293, 297 (5th Cir. 1937) ("gravamen"

17   of right to recover is "bad faith, malice or gross negligence of the offending party"); *Coastal*

18   *Barge Corp. v. M/V Maritime Prosperity*, 901 F. Supp. 325, 326-327 (M.D. Fla. 1994) (failure to

19   disclose "pertinent fact" amounts to bad faith and a "reckless disregard for the truth").  Because of

20   the need for uniformity, the Court will apply these admiralty precedents to the issue of wrongful

21   arrest.

22           49.    With respect to interpretation of obligations under the Promissory Note and Ship

23   Mortgage, there appears to be no overriding admiralty rule, given that these are common

24   contractual undertakings where local concerns predominate, particularly here where all parties are

25   residents of the State of California.  *Ham Marine, Inc. v. Dresser Industries, Inc.*, 72 F.3d 454,

26   459 (5th Cir. 1995) (to the extent non inconsistent with admiralty principles, state contract law may

27   be applied to maritime contracts.  In fact, maritime mortgages were only accorded maritime lien

28   status after Congress enacted the Ship Mortgage Act of 1920. *The Thomas Barlum*, 293 U.S. 21,

DAVIS WRIGHT TREMAINE LLP

1    33 (1934) (prior to enactment of the Ship Mortgage Act of 1920, admiralty had no jurisdiction

2    over a suit to foreclose a mortgage on a ship).  This approach would not be appropriate with

3    respect to an issue of interpreting a bill of lading (*see Norfolk Southern Railway Co. v. James*

4    *Kirby, Pty, Ltd.*, 543 U.S. 14 (2004)) or an oral agreement to serve as master of a vessel (*see*

5    *Union Fish Co. v. Erickson*, 248 U.S. 308, 311 (1919)). In such cases, the principle of uniformity

6    would predominate.  Because the issue of "default" is one relating to a contract between residents

7    of the State of California and there is no overriding principle of admiralty to be applied, the Court

8    will apply principles of California contract law to interpretation of the Note and Ship Mortgage.

9    **Breach of the Promissory Note and Mortgage**

10    50.    The sole issue for the Court to decide, with respect to the Note and Ship Mortgage,

11    is whether the Cohens are in default for failure to make the required monthly payments under the

12    terms of the Note.  Ex. 7.  On its face, the Note requires "monthly payments of $3,000 or fifteen

13    (15) percent of the gross landing receipts of each and every landing of seafood product by the

14    fishing vessel POINT LOMA, whichever is greater, commencing on January '04 and on the 15th of

15    each succeeding month until principal and interest are fully paid." [Ex. 7]  The face amount of the

16    Note is $215,000.

17    51.    At trial, it was established that the Cohens made six payments on the Note. This

18    first was by check dated December 22, 2004 in the amount of $5,000.  [Ex. 25]  Another large

19    payment of $175,000 was made by check dated  November 9, 2005.  [Ex. 29]  Mr. Cohen testified

20    that he made this large payment after being requested to reduce the size of the Note by Mr.

21    Cappuccio.  [Findings of Fact "FF" ¶15]  Mr. Cohen also testified that, before he delivered the

22    check, Mr. Roggio told him that, if Mr. Cohen made a large payment, Mr. Roggio would see to it

23    that the Note was interest free.  [FF ¶17]  Mr. Roggio denied he made this comment.  [     ]  In

24    January 2007, Mr. Cohen made another payment of $2,000, another in February ($3,000) and the

25    final one before the arrest by check dated April 23, 2007 ($3,000).  [FF ¶26]  In all, the Cohens

26    made $188,000 in payments on the $215,000 Note, representing over 62 monthly payments at the

27    rate of $3,000 per month.

28

DAVIS WRIGHT TREMAINE LLP

52.    It appears that Plaintiff never sent notices or made demands in writing with respect to payments on the Note.  Moreover, it appears that Plaintiff kept no accounting records showing accrued interest as being due and owing prior to the arrest of the Vessel.  [FF ¶16]  Finally, neither party ever made a calculation or kept records of calculations showing what might be fifteen percent of each of the fishing vessel's landing.  [FF 13]  No such records or calculations were admitted as evidence at trial.

53.    Based on the dealings of the parties and the significant advance payment, which was not required under the terms of the Note, I conclude that the Cohens are not in material breach of the Note or Mortgage.  *Superior Motels, Inc. v. Rinn Motor Hotels, Inc*., 195 Cal.App.3d 1032, 1051 (1987) (the law recognizes that although every instance of noncompliance with contract's terms constitutes a breach, not every breach justifies treating the contract as terminated… California courts allow termination only if the breach can be classified as 'material,' 'substantial,' or 'total').  Applying this basic principle in this case will create no havoc with admiralty law.   I also find Mr. Cohen's testimony credible when, after fulfilling Mr. Cappuccio's request for a large payment by delivering the $175,000 check, Mr. Cappuccio said he was not worried about when additional payments would be made.  [FF ¶18]  Applying all the payments to the Note based on my conclusion that the parties only followed the monthly $3,000 payment provision not the fifteen percent provision, even if sporadically, the Cohens are paid up through February 2009.  No evidence was presented with respect to the landings of the Vessel that would alter this conclusion.

**The Amount Remaining on the Note**

54.    Plaintiff has alleged that additional obligations were added to the Note by oral agreement.  Plaintiff also alleges that interest of seven percent, as set forth on the face of the Note, is also due and owing.

55.    With respect to the additional obligations, there was no written agreement signed by the parties that enlarged the size of the principal to be repaid under the Note.  The Note itself, which was not signed by Plaintiff, does not contain any mutual agreement to make or accept "future advances."  Both documents were drafted by Mr. Roggio for Plaintiff.  However, the Mortgage, which was signed only by the Cohens, contains the following sundry provision:

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

FUTURE ADVANCES:  This mortgage is executed for the purpose of securing not only the payment of the above described Note but also to secure all future advances made by the holder of the Note to the mortgagor; and said mortgage shall remain in full force and effect to secure all future advances and all renewals or extensions of the above described note.

56.    Plaintiff claims that numerous receivables and other obligations relating to the Avila Beach Joint Venture were added to the Note under this future advances clause.  [FF ¶22]  Plaintiff also claims that Mr. Cohen agreed to add certain legal fees incurred by Plaintiff during the Avila Beach litigation to the balance of the Note.  [FF ¶25]  The Cohens deny that they ever agreed to add any amounts after the date of the Note to the balance of the Note.  [FF ¶¶22, 25]

57.    Defendants also argue that the future advances clause in the Ship Mortgage is to be effective if in fact the Note is amended in writing to add additional amounts, or to renew or extend the Note.  The purpose of this clause is to assure that any such advances, renewals or extensions from a lender, even if later in time, would have the lien priority of the original Ship Mortgage filing date.  However, I need not reach this issue.  It is clear from the Ship Mortgage that only "future advances" to the Cohens individually would come under this provision.

58.    All the debt items that Plaintiff claims were "added to the Note" are in fact assets or receivables owed to or owned by the Avila Beach Joint Venture, as a separate legal business entity, not the Cohens individually.  For certain, the alleged receivables from Michael and Leonard Cohen, the Olde Port Inn, and the Joint Venture's inventory are definitely not "future advances" under the Ship Mortgage since they are transactions from the Avila Beach Joint Venture.  [FF ¶29]

59.    Plaintiff has attempted to establish that "advances" to Mr. Cohen that predated the Note were in fact treated as "future advances" under the Note.  I hereby rule that no such amounts can be added to the balance of the Note, based on the parol evidence rule.

60.    The items carried on the books of the Joint Venture attributable to the Point Loma present a more difficult issue.  However, any such obligations for funds advanced to pay for fuel and ice and other "necessaries" for the Vessel were in fact obligations owing to, and held by, the Avila Beach Joint Venture, never by Plaintiff individually.  Thus, this particular debt item is also not covered by the future advances clause of the Ship Mortgage.

61.    I also find that the Cohens did not agree to add to the Note any obligation to pay the legal fees of Plaintiff in the Avila Beach litigation.

62.    Finally, with respect to all obligations listed on Plaintiff's schedule of payments, either Exs. 37, 38, or 39, that are assets of, or amounts owed to, the Avila Beach Joint Venture, I find that Plaintiff assigned all causes of action for recovery of such amounts to Barry Cohen in the Assignment effective as of October 22, 2004.  [Ex. 47]  Each party was represented by counsel in the preparation of this Assignment and its language is broad and sweeping.  Plaintiff was relieved of all liabilities, and assigned all assets to Mr. Cohen, under the plain terms and meaning of the Assignment.  Thus, they could not be part of the "balance" owed under the Note.

63.    The Note bears interest at seven percent.  Defendants claim that the parties never intended that interest be charged or collected.  [FF ¶¶16, 17]  Moreover, no accounting documents contained accrued interest and Mr. Roggio never gave the Cohens any accounting or made any demand for the payment of interest prior to the arrest of the Vessel. [FF 16]  Mr. Cohen testified that, prior to making the $175,000 payment, Mr. Roggio said that, if the Cohens made such a large payment, he would see to it that the Note was interest free.  [FF ¶17]  I therefore find that it was reasonable for the Cohens to treat Mr. Roggio's statement as a waiver of the interest provision of the Note, as consideration for making a large prepayment under the Note of benefit to Plaintiff. Here the parties executed a new arrangement that varied from the terms of the original Note, with consideration, and therefore amended it.  Cal. Civ. Code § 1698(b) (written contract may be amended by an oral agreement to the extent the oral agreement is performed by the parties); Cal. Civ. Code § 1698(c) (written contract may be amended by oral agreement provided it is supported by consideration).  Applying these state contract principles to this dispute will not interfere with any uniformity policies under admiralty law.  Thus, there is no interest to add to the Note.

64.    I therefore find that, although the Cohens are not in material breach, they owe Plaintiff the balance of $27,000 under the Note, to be paid as they agree with Plaintiff or by monthly payments of $3,000 a month beginning in February 2009.

DAVIS WRIGHT TREMAINE LLP

**The Wrongful Arrest of the Vessel**

65.    Requesting that this Court exercise its powers of ex parte arrest is matter of considerable legal significance, of constitutional proportions.  Schoenbaum, Admiralty and Maritime Law, 4th Ed., Vol. 2, § 21-3, 402 (2007) (maritime arrest, like maritime attachment, is a powerful procedural tool in the hands of the plaintiff).  In this case, I find that Plaintiff caused the wrongful arrest of the Vessel, interrupting its fishing activity and causing damage to Defendants.

66.    Plaintiff claims that it arrested the Vessel on the basis of the advice of its counsel. [FF ¶34]  But Plaintiff also admitted that, prior to the arrest, it was aware of no information to conclude that the business of the Vessel was in any financial jeopardy or in bankruptcy.  Mr. Cohen testified that no maritime lienholder had sought foreclosure or that the Vessel was in any financial difficulty.  [FF ¶35]  In fact, it would appear, because of the current captain, the Vessel was being quite productive.  Plaintiff never sought to determine these basis facts through a phone call to Mr. Cohen or a demand letter.  [FF ¶36]  Moreover, Plaintiff was apparently never given any advice as to the priority of its maritime lien claim in a foreclosure vis-à-vis any general obligations of the Cohens themselves, either due to the divorce or any other lawsuit obligations. [FF ¶34]  Thus, I find that Plaintiff, before asking me to arrest the Vessel, did not undertake even the most basic due diligence regarding their security interest under the Mortgage.

67.    The primary allegation supporting the arrest was the failure to make monthly payments.  [Plaintiff's Complaint]  Yet Plaintiff failed to inform me of all pertinent facts with respect to the payments actually made by Defendants (especially the $175,000 payment), the interest that accrued (if any), the actual likelihood that Mr. Cohen would take the Vessel out of the jurisdiction of the Court, and the close and complex relationships between and among the parties that might bear upon the issue of "default."

68.    Of equal concern is that I have now learned that an accounting document presented as part of Mr. Cappuccio's Declaration In Opposition to the Motion to Vacate the Arrest [Ex. D to Ex 221] was in fact prepared by one of Plaintiff's lawyers, Mr. Rich Wagner, not by Mr. Roggio. [FF ¶38]  Not even Mr. Cappuccio was informed of this fact. [FF ¶38]  This document was used to

18

1    support the amounts claimed to be owing, including interest, which the company never accrued on

2    its books or charged Defendants in any written document.

3        69.    Finally, there is the testimony of Mr. Cappuccio in this deposition in which he

4    made a baseless allegation that the amounts covered by the Note included moneys embezzled from

5    Plaintiff.  [FF ¶37]  However, Mr. Roggio testified that he knew about the checks written by Mr.

6    Cohen.  *Id*.  Finally, Mr. Cappuccio was not really concerned about the status of his security

7    interest; he was solely concerned about collecting the money:  "I asked my attorney to collect the

8    money and secure – make sure the money was secure.  And he did what he was supposed to do."

9    [Cappuccio at TT 355: 19-21].

10       70.    Following Mr. Cappuccio's instructions, Plaintiff's lawyers were not fully candid

11   with the Court and omitted from their arrest request material facts relating to the issue of default,

12   especially the $175,000 payment.  Plaintiff's lawyers also presented lawyer-made documents that

13   appeared to be company accounting records.  Finally, Mr. Cappuccio was motivated by bad faith

14   in pursing the recovery of "his money" based on a baseless charge of embezzlement.

15       71.    Taking together, all these factors amount to bad faith, and/or gross negligence, and

16   I find that the arrest of the Vessel was wrongful.  The Court need not reach Defendants'

17   counterclaims for intentional and negligent interference with prospective economic advantage

18   under California law having found that the arrest was wrongful.

19       **Damages**

20       72.    The Court finds that Defendants missed opportunities for 14 fishing trips because

21   of the wrongful arrest.  Defendants were unable to go fishing again until August 31, 2007.  The

22   Court therefore finds that Plaintiff should pay Defendants the average lost income based on the 14

23   trips taken by the Point Loma prior to the arrest because this represents the estimated loss to the

24   Point Loma prior to the interruption in its fishing activities.  Defendants' average income (gross

25   catch less fuel, ice, and crew share) for the 14 trips prior to the arrest was $4,508.45.  Accordingly,

26   the Court finds that Plaintiff should pay Defendants a total of $63,118.30 in lost income.

27       73.    The Court also finds that Defendants made a reasonable business decision to pay

28   the captain and crew a total of $8,000 during the time of the arrest to mitigate their business losses

DAVIS WRIGHT TREMAINE LLP

19

1    when the Point Loma could begin fishing again.  [FF ¶45]  The Court also awards Defendants

2    damages for payments made to the captain and crew in the amount of $8,000.

3        74.    The Court also finds that Plaintiff should pay Defendants prejudgment interest for

4    their claim of wrongful arrest.  Prejudgment interest may be granted in cases in admiralty unless

5    "peculiar circumstances justify its denial."  *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d

6    790, 795 (9th Cir. 1986) (internal citations omitted).  Prejudgment interest is appropriate to

7    "compensate the wronged party for being deprived of the monetary value of the loss from the time

8    of the loss to the payment of judgment."  *Id*.

9        75.    Prejudgment interest is calculated at an appropriate rate that will compensate

10   Defendants for their losses.  *Dishman v. UNUM Life Insur. Co. of America*, 269 F.3d 974, 988 (9th

11   Cir. 2001).  The average interest rate for June, July, and August of 2007, the period during which

12   Defendants were prevented from using their Vessel and would therefore have had to borrow

13   money, is 4.80% based on the interest rates for U.S. Securities-Treasury constant maturities

14   nominal[10] – 1 year as used in post judgment awards.

15       76.    The Court determines that Defendants should be paid prejudgment interest from the

16   date of the arrest, June 7, 2007, until the date this judgment has been entered.

17       77.    The Court finds that Defendants should also be paid post judgment interest from

18   the date of decision at the appropriate interest rate.

19       78.    Defendants are the prevailing party on the dispute over the Note.  Defendants are

20   directed to file a motion for attorneys' fees within 30 days of the Court's ruling.

21   DATED this 27th day of May, 2008.

22                                Respectfully submitted,

23                                DAVIS WRIGHT TREMAINE LLP

24
25          By:    _____/s/ James P. Walsh_____
                   James P. Walsh
26                 Gwen Fanger
                   Attorneys for Defendants and Claimant BARRY
27                 COHEN, CHRIS COHEN (aka CHRISTENE
                   COHEN), the F/V POINT LOMA and Claimant, F/V
28                 POINT LOMA FISHING COMPANY, INC.

20

DAVIS WRIGHT TREMAINE LLP