**COX, WOOTTON, GRIFFIN,**
**HANSEN & POULOS LLP**
Gregory W. Poulos  (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA  94105
Telephone No.: 415-438-4600
Facsimile No.:  415-438-4601

**LAW OFFICES OF RICHARD P. WAGNER**
Richard P. Wagner (SBN 166792)
700 Oceangate, Suite 700
Long Beach, CA 90802
Telephone: (562) 216-2946
Facsimile:  (562) 216-2960

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |  |
|---|---|---|
| DEL MAR SEAFOODS, INC. | ) | Case No.: CV 07-02952 WHA |
| Plaintiff, | ) ) | **PLAINTIFF DEL MAR SEAFOODS,** |
| vs. | ) ) ) | **INC.'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8- foot long fishing vessel, her engines, tackle, furniture, apparel, etc., *in rem*, and Does 1-10, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |
| And Related Counterclaims | ) ) ) | |

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/Seafoods/2504

Plaintiff DEL MAR SEAFOODS, INC. ("Del Mar") submits the following amended proposed findings of fact and conclusions of law to correct typographical and formatting errors. Paragraph 23 has a citation added and Paragraph 85 is corrected from $2,000 to $1,500 to conform to evidence.

I.     **FINDINGS OF FACT:**

1.     Del Mar Seafoods, Inc. is a fish processor and distributor of frozen fish.

> Roggio at RT 41:7-8

2.     Barry Cohen is a businessman who, together with his wife Christene Cohen, owned several California Corporations including The Point Loma Fishing Company, Inc., Olde Port Fisheries, Inc., Olde Port Fish Company, Inc., Artemis, Inc. and a corporation in Mexico.

> Cohen at RT 254:15 – 255:3; RT 256:18 – 20;  RT 257:6 - 12

3.     Through these corporate entities Barry and Christene Cohen operated a restaurant, fish market and fish wholesale business.

> Cohen at RT 255:4 - 12

4.     Although currently separated, at all material times Barry Cohen was authorized to speak on behalf of Christene Cohen regarding the matters at issue.

> TE 79, ¶ 6

5.     Del Mar and Barry Cohen entered into an oral joint venture in 1999 pursuant to which Del Mar was to supply the financial backing for a fish processing business in Avila Beach, California, and Barry Cohen was to manage the joint venture.

> Cohen at RT 263:9 – 20

6.     Del Mar and Barry Cohen also had an oral joint venture to operate a fishing business in Mexico.

> Roggio at RT 52:24 – 55:5

7.     Del Mar advanced funds to Barry Cohen for "boat improvements, personal loans and fishing loans."

> Roggio at RT 54:22 – 55:5
> Cohen at RT 277:21 – 278:21

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

8.  These advances were memorialized in a promissory note and preferred ship mortgage executed by Barry Cohen and Chris Cohen on October 31, 2003.
    Cohen at RT 277:21 – 278:21
    TE 7 & 8.

9.  The promissory note and preferred mortgage each incorporated the terms of the other document in their entirety.

    TE 7 & 8

10. The promissory note provides for interest at 7.0 %.

    TE 7.

11. The Preferred Mortgage provides:
    "This mortgage is executed for the purpose of securing not only the payment of the above described note but also to secure all future advances made by the holder of said note to the mortgagor, and said mortgage shall remain in full force and effect to secure all future advances and all renewals or extensions of the above described note."

    TE 8, Article IV

12. The Preferred Mortgage also provides that in the event of any default under the Mortgage, the mortgagor may:
    (c ) Retake the vessel without legal process at any time wherever the same may be, and without being responsible for loss or damage, hold and in Mortgagee's or in Owner's name lease, charter, operate or otherwise use the vessel for such time and on such terms as Mortgagee may deem advisable, being accountable for net profits, if any, and with the right to dock the vessel free of charge at the Owner's premises or elsewhere at Owner's expense, and / or sell the vessel, free from any claim by Owner of any nature whatsoever, in the manner provided by the law, to the extent permitted by law, such sale may be public or private, without notice, without having the vessel present, and / or Mortgagee may become the purchaser.

    TE 8, Article II, ¶1(b)(c)

13. Default in the punctual payment of the principal or any installment is an act of default under the mortgage.

    TE 8, Article II, ¶1(a).

14. The mortgage also provides that "No delay or omission by Mortgagee shall impair any right, power, or remedy, and no waiver of any default shall waive any other default.

    TE 8, Article II, ¶3

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2594

15. The promissory note provides that the "maker"

"...hereby waivers (sic) (a) presentment, demand, protest, notice of dishonor and/or protest, and notice of non-payment; (b) the right, if any, to the benefit of, or to direct the application of, any security hypothecated to holder until all indebtedness of maker to holder, however, arising, shall have been paid; and (c) the right to require holder to proceed against any party to this note, or to pursue any other remedy in holder (sic) power."

TE 7, ¶6.

16. The original balance on the promissory note was $215,000.
Roggio at RT 48:19 – 21
Cohen at RT 278:24 – 279:1

17. The promissory note secured both the original balance ($215,000) and "future advances."
Roggio at RT 50:21 – 51:16
TE 8, Article IV

18. The original balance of $215,000 was a "low guess" or "low estimate" as to how much money Barry Cohen had borrowed from Del Mar.
Roggio at RT 49:7 – 17
Cohen at RT 282:10 – 22;
Cohen at RT 285:12 – 286:8
TE 37

19. Barry Cohen owed Del Mar more than the original loan balance shown on the promissory note.
Cohen at RT 288:2 - 14

20. There were advances after the date of the original note.
Cohen at RT 279:10 – 14
Cohen at RT 289:15 - 25
TE 37

21. Additional advances taken by Barry Cohen brought his loan balance to $237,035.48
Roggio at RT 77:9 – 10
Cohen at RT 289:10 – 25
TE 37

22. Barry Cohen also obtained advances for the Point Loma totaling $16,021.33.
Cohen at RT 289:6 – 9
TE 37

23. While Del Mar and Barry Cohen operated the Avila Beach joint venture, Barry allowed his two sons, Michael and Leonard Cohen, to purchase fish products from the

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

1      joint venture on account.

2          Cohen at RT 264:15-25

3  24.  The joint venture was terminated by Del Mar effective September 30, 2004.
4          Roggio at RT 42:19 – 43:2
           Roggio at RT 105:9 - 11

5  25.  At the time that the joint venture was terminated, Michael Cohen was indebted to the

6      Avila Beach joint venture for $13,920.40.
7          Roggio at RT 61:17 – 62:13
           TE 22
8          TE 37

9  26.  At the time that the joint venture was terminated, Leonard Cohen / Olde Port Inn was

10     indebted to the Avila Beach joint venture for $18,069.10.
           Roggio at RT 62:15 – 63:24
11         TE 22
           TE 23
12         TE 37

13 27.  When the Avila Beach joint venture ended, Barry Cohen was credited with 50% of all

14     accounts receivables and then they were transferred over to the books of Del Mar

15     Seafoods.

16         Roggio at RT 106:6 – 107:11

17 28.  Leonard Cohen's debt to the Avila Beach joint venture was for seafood sold to the

18     Olde Port Inn.

19         Roggio at RT 65:16 - 19

20 29.  After the Avila Beach joint venture was ended, Barry Cohen told Del Mar that he

21     would "be responsible" for paying the debts of Michael and Leonard Cohen, and he

22     directed Del Mar to "add them to [his] balance."

23         Roggio at RT 67:10 – 22; 68:14 – 23.

24 30.  Joe Roggio agreed to add the debts of Michael and Leonard Cohen to Barry's balance.

25         Roggio at RT 69:5 - 9

26 31.  Barry Cohen also told his son Michael that he would take care of Michael's debts

27     owed to the joint venture.

28         Michael Cohen at RT 242:8 - 11

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

32.   Barry Cohen also told his son Leonard that he would take care of Leonard Cohen's debts owed to the joint venture.

       Leonard Cohen at RT 250:2 - 20

33.   Barry Cohen told Joe Roggio of Del Mar that he would "be responsible for" Michael Cohen's debts.

       Barry Cohen at RT 286:20 - 22

34.   Barry Cohen told Joe Roggio of Del Mar that he would "be responsible for" Leonard Cohen's debts.

       Barry Cohen at RT 286:25 – 287:3

35.   When Barry Cohen told Joe Roggio that he would "be responsible for" Michael and Leonard Cohen's debts, he asked that they be added to his balance.

       Roggio at RT 67:14 – 68:9; 68:14 - 23

36.   Del Mar agreed to add the Michael and Leonard Cohen debts to Barry Cohen's balance.

       Roggio at RT 69:5- 9

37.   Del Mar maintained only a single balance for Barry Cohen and this was the promissory note balance.
       Roggio at RT 77:13 – 22
       Roggio at RT 152:1 - 3

38.   When the Avila Beach joint venture ended, the joint venture still had some inventory on hand. Barry Cohen asked Joe Roggio if he could keep that inventory for use in his retail market, and add the value to his balance. Del Mar agreed.
       Roggio at RT 65:23 – 66:18
       TE 37 & 38.

39.   The value of the inventory taken by Barry Cohen was $10,283.24.
       Roggio at RT 66:10 – 15
       Barry Cohen at RT 448: 7 – 14; 468:16 – 469:12
       TE 24

40.   The promissory note required Barry and Chris Cohen to make "Monthly payments of either $3,000 or fifteen (15) percent of the gross landing receipts of each and every landing of seafood product made by the fishing vessel POINT LOMA, whichever is

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

greater, commencing on January '04 and on the 15th day of each succeeding month until principal and interest are fully paid."

> TE 7

41. The F/V POINT LOMA was arrested by Del Mar on June 8, 2007.

> Court's Order dated June 8, 2007.

42. On December 22, 2004 Barry Cohen made a payment for $5,000 "on account."
> Roggio at RT 76:21 – 77:22
> TE 25

43. On November 10, 2005 Barry Cohen made a payment of $175,000.
> Roggio at RT 81:7 – 15
> Cohen at RT 283:16 - 18
> TE 29
> TE 37

44. When Barry Cohen made the payment of $175,000 he did so by personally delivering the check to Del Mar.

> Cohen at RT 454:15 – 17.

45. When Barry Cohen delivered the $175,000 check to Del Mar he spoke with Del Mar's President, Joe Cappuccio. The "total conversation" according to Barry Cohen was as follows:

> "Joe, I have the check that you asked for. And I handed him the check. And he said "thank you so much. I really appreciate this." And I said: "I will get you the rest as soon as I can, pay it off." And he said: "I'm not worried about it. I'm not concerned anymore. It's such a small amount now.. It's good."

> Barry Cohen at RT 455:21 – 456:7

46. Joe Cappuccio never said that Barry Cohen did not have to pay interest on the note.
> Cappuccio at RT 325:9 – 13
> Barry Cohen at RT 455:21 – 456:7 (the "total conversation")

47. Joe Cappuccio never said that Barry Cohen did not have to make his monthly payments.
> Cappuccio at RT 325:25 – 326:2
> Barry Cohen at RT 455:21 – 456:7 (the "total conversation")
> Barry Cohen at RT 456: 11 - 12

48. Joe Cappuccio never said that Barry Cohen did not have to pay Del Mar all of the money that he owed.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

1
        Cappuccio at RT 326:3 - 5
2
        Barry Cohen at RT 455:21 – 456:7 (the "total conversation")

3
49.    Del Mar has never forgiven any of Barry Cohen's debts under the promissory note

4
and mortgage.
        Cappuccio at RT 326:6 – 8
5
        Barry Cohen at RT 455:21 – 456:7 (the "total conversation")

6
50.    After speaking with Joe Cappuccio, Barry Cohen delivered the $175,000 check to Del
7
Mar's controller, Joe Roggio.
8
        Roggio at RT 81:18 - 20

9
51.    Barry Cohen and Joe Roggio discussed how the $175,000 check was to be applied to
10
his account.
11
        Roggio at RT 81:7 - 23

12
52.    Barry Cohen and Joe Roggio agreed on the allocation of the $175,000 check against
13
his account by allocating it against different categories of debts.
        Roggio at RT 82:4 – 20
14
        TE 37 & 38

15
53.    The purpose of the $175,000 payment was to "pay down" the note.
16
        Barry Cohen at RT 294:9 - 11

17
54.    Barry Cohen admits that TE 37 is a "list of payments I made on that note."
18
        Barry Cohen at RT 287:13 – 17

19
55.    The "Schedule of Payments" spreadsheet (TE 37) was prepared by Joe Roggio
20
between November 10, 2005 and November 15, 2005.
        TE 37 (showing last payment on November 10 and Fax date of November 15,
21
        2005)

22
56.    On November 15, 2005 Barry Cohen faxed the schedule to his attorneys at Miller,
23
Starr.
        Barry Cohen at RT 283:21 – 284:3
24
        TE 37 (note fax information at the top)

25
57.    On November 16, 2005 Barry Cohen was deposed in the Avila Beach litigation as
26
both an individual and as the joint venture's Person Most Knowledgeable.
27
        Barry Cohen at RT 264: 4 – 8; 509:8 – 12;

28
58.    During his November 16, 2005 deposition, Barry Cohen was questioned about each of

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/SeaFoods/2591

the entries on the Schedule of Payments (TE 37) which was marked as an exhibit to his deposition.

> Barry Cohen at RT 284:4 - 8

59. During his deposition in the Avila Beach case Barry Cohen produced the promissory note and the Schedule of Payments as "a list of payments I made on that note."

> Barry Cohen at RT 287:8 - 17

60. Between October 2005 and October 2006 Barry Cohen was employed by Del Mar in its home office in Watsonville, California. In that year no payments were made on the promissory note because Barry Cohen was an employee and friend.

> Roggio at RT 88:22 – 89:3

61. In October 2006 Barry Cohen was laid off by Del Mar.

> Barry Cohen at RT 465: 12 – 14.

62. In December, 2006 Del Mar's controller, Joe Roggio, tried calling Barry Cohen to ask him to begin making payments on the account. As he did not reach Barry Cohen, Joe Roggio left a message requesting that Barry Cohen begin making his monthly payments.

> Roggio at RT 88:13 – 21.

63. On January 30, 2007 Barry Cohen made a payment of $2,000.
> Roggio at RT 87:23 – 88:6
> TE 34

64. The January 30, 2007 payment was mailed to Del Mar together with a note from Barry Cohen that read:

> Joe,
> Please credit my account. With this payment, if your analysis was correct, the new balance should be $139,749.79.
> I will try to send you at least $2,000/month, sometimes $3,000.
> I'm sick right now and if I try to talk I start coughing, so instead, you get this note.
> I'm still unemployed, but this gives me a chance to help Michael make Olde Port better.
> I hope things are going good for you and your family. Please give Yvonne my regards. Too bad our families never got the chance to become better friends. Oh, well things usually happen for a reason. Well, take care of yourself. Barry

> TE 40

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL 415-438-4600 FAX 415-438-4601

DelMarSeafoods/2501

65.  The figure of $139,749.79 was taken by Barry Cohen from the accounting spreadsheet prepared by Del Mar and is consistent with the figures provided in that exhibit.
        Cohen at RT 527:16 – 528:13
        TE 37 & 38

66.  A further payment was made for $3,000 by Barry Cohen on February 15, 2007.
        Roggio at RT 92:19 – 24
        TE 35 and 38

67.  The final payment was made for $3,000 by Barry Cohen on April 23, 2007.
        Roggio at RT 92:25 – 93:2
        TE 36 and 38

68.  Barry Cohen never made any of his payments based on the 15% of gross landings figure.

        Barry Cohen at RT 478:20 – 22.

69.  Had Barry Cohen made payments under the 15% of gross landings figure he was required by the terms of the promissory note to have paid $2995.66 in January 2007, $5284.97 in February 2007, $4070.49 in March 2007,  $1829.82 in April 2007 and $4911.88  in May 2007.
        Barry Cohen at RT 487:16 – 488:6
        TE 203

70.  Barry Cohen admits a balance due of $27,000 following his last payment.
        Barry Cohen Responses to Requests for Admissions, at RT 519:20 – 520:6
        TE 26

71.  On June 7, 2007 Del Mar filed its complaint and sought the arrest of the F/V POINT LOMA for breach of the promissory note and to foreclose on the preferred mortgage.

        Joint Final Pre Trial Order Stipulated Fact ¶ 17

72.  In 2004 the F/V POINT LOMA's average monthly pre-tax earnings, exclusive of depreciation, were $2,500.
        Barry Cohen at RT 296:9 – 297:19
        TE 51

73.  In 2005 the F/V POINT LOMA's average monthly pre-tax earnings, exclusive of depreciation, were $321.25.
        Barry Cohen at RT 297:20 – 298:5
        TE 51

74.  2004 the F/V POINT LOMA's average monthly pre-tax earnings, exclusive of

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1    depreciation, were $3,591.25.

2           Barry Cohen at RT 300:18 – 24
       TE 84

3    75.    Barry Cohen and his son Leonard Cohen were involved in a lawsuit against the Port

4    San Luis Harbor District relating to some complaints about their business operations

5    on the Hartford Pier.

6           Barry Cohen at RT 444:16 – 446:15

7    76.    Del Mar Seafoods did not want to have anything to do with the lawsuit between the

8    Cohens and the Port San Luis Harbor District.

9           Cappuccio at RT 357:6 – 8
       Barry Cohen at RT 445:21 – 445:25

10

11   77.    On December 15, 2005 Barry Cohen wrote a letter for Mr. Cappuccio's signature

12   regarding Del Mar's interest in the lawsuit. The letter reads:

       Dear Barry:

13          By this letter, Del Mar Seafoods, Inc. (Del Mar) acknowledges that you have full
       authority to recover in any action brought in your own name all damages suffered

14          by the wholesale processing fish business which you formally operated on the
       Hartford pier in Avila Beach pursuant to the oral joint venture agreement between

15          yourself and Del Mar.  You may share this letter setting forth Del Mar's position in
       this matter with any concerned party.

16          Sincerely, Del Mar Seafoods, Inc., Joe Cappuccio, Its President.

17          Cappuccio at RT: 332:8 – 333:15
       TE 46

18

19   78.    In March 2006 Del Mar reaffirmed its assignment of joint venture interests effective

20   October 22, 2004.

21          Cohen at RT: 473:4 – 477:17

22   79.    The reaffirmation of the assignment was drafted by Barry Cohen's attorneys.

23          Roggio at RT 225:9 – 20; 226:22 – 227:2

24   80.    Del Mar's attorney, Richard Wagner, looked at it before it was signed.

25          Roggio at RT 227: 3 – 11

26   81.    In the litigation between Barry Cohen and the Port San Luis Harbor District, Del Mar

27   Seafoods incurred legal fees of $27,000.

28          Roggio at RT 85:15 – 21
       TE 38

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

82. Barry Cohen told Joe Roggio that he would pay those legal fees and asked that they be added to his balance.

      Roggio at RT 86:10 – 87:3

83. Barry Cohen admits that regarding these legal fees he agreed to "be responsible for something reasonable, a reasonable amount."

      Barry Cohen at RT 467:1 – 10

84. During the period that the vessel was under arrest, Barry Cohen advanced $5,000 to the vessel's Captain, Dave Kobak.

      Kobak at RT 387:12 - 16

85. During the period that the vessel was under arrest, Barry Cohen advanced $1,500 to each of the two crew members.
      Barry Cohen at RT 500:20 – 500:25
      TE 211

86. Had the two crew members not been available for fishing after the vessel was released from arrest, Captain Kobak could have replaced them and crewed the vessel.
      Kobak at RT 391:12 – 15; 396:14 – 16
      Kobak at RT 398:12 – 16

87. In the period of time that the vessel was under arrest, Captain Kobak "guessed" that he could have caught about the same amount of fish that he caught in the prior year fishing during the same time period.

      Kobak at RT 393:24 – 394:1

88. In 2006, between the months of June and August, the vessel's gross landings were $57562.11.

      TE 52

89. From that figure, the crew is paid one half of the value after fuel and ice are deducted, leaving Barry Cohen with a gross income of $17,075.16 from which his expenses must be deducted.

      TE 52 & 53

90. Before the vessel was arrested, it was selling its catch to Caito Fisheries.

      Kobak at RT 375:3 - 20

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DstMurSexifood2/2504

91. The vessel's arrest did not affect the relationship with Caito Fisheries.

>   Kobak at RT 400:18 - 22

92. The current principal balance due under the promissory note and mortgage is $128,749.79.

>   Roggio at RT 93:13 - 15

93. Through December 31, 2007 interest on the outstanding balance under the promissory note at 7.0% interest was $49,207 and some change.

>   Roggio at RT 94:24 – 95:3

94. The Preferred Ship Mortgage expressly provides which specific acts constitute default. One such act of default occurs when the "Mortgagee's conclusion in good faith at any time that, through actual or prospective impairment of Owner's net current asset position, net worth, asset-liability ratio, or earning, or through prospective violation of any provision of this Mortgage, Mortgagee is in danger of losing said debt, or any part thereof, by delaying collecting thereof until the time above limited for the payment thereof . . ."

>   TE 8, pg. 4, Art. II ("Default"), ¶ 1.(b).

95. Joe Cappuccio found out from Joe Roggio that Barry had been writing checks to himself on one of the Joint Venture's checking accounts that he thought had been closed. This upset him.

>   Cappuccio at RT 329:25 – 330:6

96. Since finding out about the checks, Cappuccio hired Cohen to work at Del Mar's headquarters in Watsonville and he and Cohen developed a friendship.

>   Cappuccio at RT 330:7 – 21; 347:22 – 348:5

97. Prior to the arrest Joe Cappuccio and Joe Roggio discussed defendant Barry Cohen's financial situation and personal life and how they might affect his ability to meet his obligations on the Note.

>   Roggio at RT 109:10 – 16
>   Cappuccio at RT 326:13 – 327:2

98. They discussed Barry's recent declaration filed in the Port San Luis Harbor District case in which he stated that the denial of his "total lawsuit expenses may actually cause [him] to be forced out of business totally and into bankruptcy . . ." and that he

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

had lost his motion for attorneys fees. Cappuccio believed Cohen would be liable for attorneys fees exceeding one million dollars.

> Roggio at RT 109:17 – 19
> Cappuccio at RT 327:3 – 8; 352:7 – 12, 18 – 22

99.    They also discussed Barry's on-going divorce from Christene and that, in a phone call to Joe Roggio, she had explained that the divorce was going to be "expensive and messy."

> Roggio at RT 109:20 – 110:21
> Christene Cohen at RT 318:9 – 18

100.    In that phone call, Christene told Joe Roggio that she was staying at her sister's house and that both Chris and Barry had also moved out of the home they both had shared in Aptos. As a result, he believed that the Cohens were no longer able to meet their financial obligations on their home.

> Roggio at RT 110:4-18

101.    Joe Cappuccio believed the Cohen's divorce was going to be a financial burden on Barry and might impair Del Mar's security interest in the vessel.

> Cappuccio at RT J328:4 – 10

102.    After their discussion, they concluded they needed expert legal advice so Joe Cappuccio and Joe Roggio both called Del Mar's corporate attorney, Richard Wagner, to seek advice on how Del Mar could best protect its security interest in the Note.

> Roggio at RT 110:22-24; 112:2-6
> Cappuccio at RT 328:11-14; 350:21 – 24

103.    After discussing the situation with Roggio and Cappuccio, Wagner recommended that they seek advice from a maritime attorney, Mark Holmes.

> Roggio at RT 112:7 – 13
> Cappuccio at RT 350:21 – 351:1

104.    Joe Roggio explained to Holmes Del Mar's concerns regarding the advances to Barry and Barry's personal situation. Roggio also told him all of the relevant facts, including all of the payments Barry had made on the Note up to that time. Roggio

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafood/2501

1    forwarded the relevant documents to Wagner, including the Schedule of Payments,

2    the backup for each of the different debts comprising the overall balance, and copies

3    of the checks.

4        Roggio at RT 112:19 – 113:24; 230:4 – 25

5    105.  Cappuccio also told Holmes his concerns about Barry's possible bankruptcy and that

6        he was afraid the vessel might sink or burn or go to Mexico.  Holmes told him that

7        arresting the vessel was Del Mar's best and only option and recommended that it do

8        so.

9            Roggio at RT 113:6 – 17
             Cappuccio at RT 328:11 – 19; 328:24 – 329:6; 351:11 – 18; 356:4 – 8

10   106.  Acting on his attorney's advice, Cappuccio instructed Holmes to arrest the vessel.

11           Cappuccio at RT 329:9 – 10
12           Roggio at RT 231:1 – 10

13   107.  Prior to the arrest, Del Mar never called Cohen to try to resolve the issue of his

14       payments on the Note, nor did they send him any demand letter.

15           Cappuccio at RT 352:23 – 353:25; 355:23 – 356:3

16   108.  Both Roggio and Cappuccio testified that they bore nor malice towards Cohen, which

17       was confirmed by Chris Cohen.
18           Roggio at RT 114:1 – 10
             Cappuccio at RT 329:17 - 21
             Chris Cohen at RT 313:23 – 315:14
19
     109.  The Order of Arrest was signed by the Court on June 7, 2007, and the Vessel was
20
         arrested by the U.S. Marshal the same day.
21
             Joint Final Pretrial Order, Stipulated Fact No. 17; TR. EX. 42.
22
     110.  The Order Vacating the Arrest and releasing the Vessel was signed by the Court on
23
         August 17, 2007.
24
25           Joint Final Pretrial Order, Stipulated Fact No. 18
             Defendants' Claim For Damages Resulting From The Alleged Wrongful
             Arrest
26   111.  In 2004, the Point Loma had a net loss of $6,859.  Adding back in depreciation, the

27       average monthly income for the vessel was approximately $2,500.

28           TR. EX. 51

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeaGoods/2501

1          Cohen at RT 297:4 – 19

2    112.   In 2005, the Point Loma had a net loss of $32,007. Adding back in depreciation, the

3          average monthly income for the vessel was approximately $321.25.

4               TR. EX. 51
                Cohen at RT 297:20 – 298:5

5    113.   In 2006, the Point Loma had net income of $8,128. Adding back in depreciation of

6          $34,967, the average monthly income for the vessel was approximately $3,591.25.

7               TR. EX. 84
                Cohen at RT 299:11 – 300:24

8    114.   In 2006, the vessel made a total of 31 trips.

9               TR. EX. 206

10   115.   Cohen's share of the vessel's catch is determined by taking the amount paid to the

11         vessel for its fish (gross), then subtracting the cost of the fuel and ice for the trip (net),

12         then dividing the net by 2, and then subtracting his fixed costs.

13              Cohen at RT 300:25 – 302:5

14   116.   During the year previous to the arrest, 2006, over the comparable time period in June,

15         July and August, the vessel made six trips.

16              TR. EX. 53, 206

17   117.   The average net income to Cohen for each those trips was $2,654.13. (Total net

18         income for the six trips = $31,849.46; divided by 2 (Cohen's 50% share); divided by

19         total number of trips (6). This figure, however, does not take into account

20         defendants' fixed expenses, which, for 2006, were $72,557 (without depreciation) or

21         an average monthly expense of $6,046.42 (or a per trip expense of $2,340.55). In

22         2006, therefore, his net profit per trip, according to his own records, after expenses

23         was $313.58.

24              TR. EX.s 53, 84, 206
                Cohen at RT 530:25 – 533:15

25

26   118.   In 2007 the vessel made a total of 14 trips in the five months prior to the arrest.

27              Cohen at RT 529:10 – 16

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

119. In the time period from September through December 2007, after the vessel was released, the vessel made 13 trips.

   Cohen at RT 534:13 – 535:3

120. While the vessel was under arrest, Cohen paid the crew $3,000 and the captain $5,000 even though the vessel was not operating.
   TR. EX. 211
   Cohen 499:11 – 500:19

121. Captain Kobak would have been able to hire sufficient crew to man the vessel even if Cohen hadn't paid the crew.

   Kobak at RT 391:12 – 15

122. There is no evidence that Cohen ever asked Captain Kobak if he would be available after the arrest to resume his duties without the need for payment, nor that he inquired during the arrest as to the availability of qualified captains he could have hired after the vessel was released if Captain Kobak was not available.

123. There is no evidence that Del Mar had the vessel arrested in order to interfere with defendants' prospective economic advantage.  Rather, both Roggio and Cappuccio testified that the decision to arrest the vessel was based on Del Mar's need to protect its security interest in the vessel.

   Roggio at RT 109:10 – 111:1
   Cappuccio at RT 328:20 – 329:21

124. In 2007 was not participating in the same groundfish fishery as the Point Loma, and wasn't monitoring that fishery. Del Mar was not buying fish from the vessel, nor did Del Mar know where the vessel was landing or selling its fish.

   Cappuccio at RT 331:1 – 18

## II.  CONCLUSIONS OF LAW

125. The Mortgage is a valid preferred ship mortgage under 46 U.S.C. § 31321 *et seq.*
Joint Final Pretrial Order, Stipulated Fact No. 5.

126. In this action for breach of a promissory note secured by a Preferred Mortgage on a vessel.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

127.    The rights of the parties are governed by federal maritime law. *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (maritime law controls the substantive law of maritime seizures); Ship Mortgage Act (46 U.S.C. §§ 31301-31343).

128.    The defendants' claims for wrongful arrest are governed by federal maritime law (*Id.*)

129.    California Statute of Frauds does not apply to maritime contracts. *Union Fish Company v. Erickson*, 248 U.S. 308 (1919).

130.    Federal maritime law recognizes oral contracts. *Kossick v. United Fruit Co.*, (1961) 365 U.S. 731

131.    "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 22–23 (2004).

132.    Under the Ship Mortgage Act, 46 U.S.C. §31321, et. seq., on default of any term of the preferred mortgage, the mortgagee may enforce the preferred mortgage in *an in rem* action for a documented vessel.  46 U.S.C. §31325

133.    Any indebtedness secured by a preferred mortgage may have any rate of interest to which the parties agree. 46 U.S.C. §31322(b)

134.    Under the terms of the mortgage and promissory note, the Cohens were required to make monthly payments of either $3,000 or 15% of the gross landings for each and every landing of seafood product *whichever was greater*.

135.    The Cohens have admitted that they did not make these payments either as the $3,000 per month, and never based on the 15% of the gross landings.

136.    Had the Cohens made payments based on the 15% of the gross landings their payments would have been higher than the $3,000 per month.

137.    The Cohens have also admitted that even after making all of the payments totaling $188,000 they are still indebted to Del Mar for at least $27,000.

138.    The Court finds that the promissory note and mortgage provide for future advances to be covered by the note and mortgage, and that future advances were made bringing the total amount owed by the Cohens to $290,035.48.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

139.    After crediting the Cohens with all payments made, there is a balance due under the note and mortgage of $128,749.79.

140.    The Court finds that there was no agreement to waive interest, and that interest accrued at the rate of 7.0%. As of December 31, 2007 interest had accrued in the amount of $49,207. Del Mar is entitled to further interest at the rate of 7.0% from January 1, 2008 until the date of the judgment in this case and thereafter at the federal rate for post judgment interest.

141.    In order prevail on their counterclaim for wrongful arrest, defendants must prove that Del Mar acted with malice, bad faith, or gross negligence. *Stevens v. F/V BONNIEDOON*, 655 F.2d 206, 209 (9th Cir. 1981); *Frontera Fruit Co., Inc. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937).

142.    Although Del Mar never called Cohen to discuss the situation, or sent him a demand letter requesting payment, and it might have been the more prudent business practice to do so, those omissions do not amount to malice or bad faith. The Note that Cohen signed expressly provided that he waived his right to notice.

143.    Cappuccio's accusations of embezzlement by Cohen occurred and resulted from events that took place long before this dispute, and since then, Del Mar and Cohen seemed to have mended their fences, as Del Mar hired Cohen and he and Cappuccio became friends. During this lawsuit, Cappuccio in his deposition recounted those charges of embezzlement, but that was long after the arrest and in the heat of litigation. Cappuccio's belief and statements that Cohen had embezzled funds from Del Mar are not enough to carry defendants' burden of showing Del Mar acted with malice or bad faith in arresting the vessel.

144.    Del Mar had several discussions with its attorneys who had the benefit of the spreadsheet and backup documentation evidencing the history of Cohen's loan. With the knowledge that Cohen had made several payment, including the lump sum payment of $175,000 in November 2005, and based on legitimate concerns regarding Cohen's deteriorating financial and economic situation, Del Mar's attorney recommended they arrest the vessel. Although the Verified Complaint did not state the fact that Cohen had made

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

1    $188,000 in payments up to that time, Del Mar had probable cause to believe Cohen was in

2    default and acted upon the good faith advice of its attorneys and the arrest was therefore not

3    grossly negligent.  Defendants have failed to meet their burden to show the arrest was

4    wrongful.

5    145.    Lost profits due to wrongful detention of a vessel are recoverable as an element of

6    damages. *The Conqueror,* 166 U.S. 110 at 125 (1896).  Lost profits, however, must be able

7    to be calculated with reasonable certainty.  *Id.*  "In dealing with lost fishing profits, courts

8    have recognized the impossibility of mathematical precision in calculating such an award."

9    *Williams v. Eckert,* 643 P.2d 991 at 996 (1982).  "While what constitutes "reasonable

10   certainty" is out of necessity a fact-intensive inquiry in which the issue of evidentiary

11   sufficiency can only be determined on a case-by-case basis, it has been said that this process

12   usually involves "a showing in commercial cases that the vessel ' has been engaged, or was

13   capable of being engaged in a profitable commerce." *Yarmouth Sea Products Limited v.*

14   *David Scully*, 131 F. 2d 389 at 395 (1997).  There must be a reasonable basis upon which to

15   compute an award of lost profits in fishing cases.  *Williams,* 643 P.2d 991 at 996 quoting *City*

16   *of Whittier v. Whittier Fuel & Marine Corp.* 577 P. 2d 216 , 222 (Alaska 1978).  The

17   calculation of lost profits in a fishing case is properly based upon the catches during the

18   period preceding loss, the catches subsequent to the period of loss, as well as the records of

19   catches of similar fishing vessels in the area during the period of loss.  *Williams, supra,* at

20   996.

21   146.    Here, defendants claim damages for the lost fishing profits during the period of time

22   the vessel was under arrest, approximately 9 weeks.  Based on Captain Kobak's testimony,

23   defendants claim the vessel missed 13 or 14 trips as a result of the arrest.  During the

24   previous year, however, during the same time period, the vessel made only six trips.

25   Additionally, prior to the arrest, it took the vessel five months to complete 14 trips, and

26   following the arrest, it took the vessel more than five months to complete 13 trips.

27   Reasonably, the vessel could have been expected to make 5 – 6 trips during the time it was

28   under arrest.

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/Seafoods/2501

147.    According to Cohen, his average profit for each of the 14 trips prior to the arrest was $4,508. That figure, however, does not take into account his fixed expenses for insurance, dockage, insurance and the like. According to his 2006 tax returns for the vessel, he only averaged $3,591.25 in net taxable income per month, or approximately 2-3 trips per month and an average of $ 1,390.17 per trip (taxable income, plus depreciation, of $43,095 divided by 31 total trips). According to his own records he netted only $313.58 after expenses for each of the six trips the vessel made during the comparable arrest period in 2006. Defendants presented no expert testimony on their lost profits claim. I find defendants are entitled to recover damages for six lost fishing trips at an average of $1,000 per trip for a total of $6,000.

148.    Cohen testified that he paid the crew to make sure they were available to work on the vessel once it was released, but Captain Kobak testified he could have hired another crew. Cohen is not entitled to those damages of $1,500 that he paid the crew during the arrest.

149.    Cohen is entitled to reasonable business expenses a person of ordinary prudence in his circumstances would expend. *Brandon v. Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.App.3d 442, 466 (1990). He presented no evidence, however, of what such a person might expend for the retention of a qualified captain, nor did he present any evidence of what steps he took to ensure that his payments to the captain were reasonable under the circumstances. Therefore, he failed to meet his burden in proving those damages and cannot recover the $5,000 he paid to the captain.

150.    Defendants have presented no evidence that Del Mar interfered with the defendants' relationship with Caito Fisheries.

151.    There is no evidence that Del Mar was aware of any economic relationship defendants had with any third party. Therefore, defendants' have failed to meet their burden of proving that necessary element for intentional or negligent interference with their prospective economic advantage.

///

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1 | Dated:   May 27, 2008                COX, WOOTTON, GRIFFIN, HANSEN & POULOS

2 |                                       Attorneys for Plaintiff
                                          DEL MAR SEAFOODS, INC.

3 |

4 |                                       By: _____/s/_____
                                                   Gregory W. Poulos

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP          26 |

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105                 27 |
TEL 415-438-4600
FAX 415-438-4601

28 |
DelMar/Seafoods/2504