1  James P. Walsh, CSB. No. 184620
   Gwen Fanger, CSB No. 191161
2  DAVIS WRIGHT TREMAINE LLP
3  505 Montgomery Street, Suite 800
   San Francisco, California 94111-3611
4  Telephone:  (415) 276-6500
   Facsimile:   (415) 276-6599 budwalsh@dwt.com
5
6  Attorneys for Defendants and Claimant
   BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
7  Claimant, F/V POINT LOMA Fishing Company, Inc.

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11  DEL MAR SEAFOODS, INC.,            )  No. C-07-2952-WHA
                                       )
12              Plaintiff,             )
                                       )  **DEFENDANTS' RESPONSES TO**
13       v.                            )  **PLAINTIFF'S AMENDED PROPOSED**
                                       )  **FINDINGS OF FACT AND**
14  BARRY COHEN, CHRIS COHEN (aka      )  **CONCLUSIONS OF LAW**
    CHRISTENE COHEN), *in personam* and, )
15  F/V POINT LOMA, Official Number    )
    515298, a 1968 steel-hulled, 126-gross ton, )
16  70.8 foot long fishing vessel, her engines, )
    tackle, furniture apparel, etc., *in rem*, and )
17  Does 1-10,                         )
                                       )
18 _____Defendants._____ )

19

20       Defendants Barry Cohen, Chris Cohen, the F/V Point Loma, *in rem*, and Counterclaimant

21  F/V Point Loma Fishing Company, Inc. submit the following responses (in **bold**) to Plaintiff Del

22  Mar Seafoods, Inc.'s Amended Proposed Findings of Fact and Conclusions of Law.

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

1

**I.    FINDINGS OF FACT**

2

1.    Del Mar Seafoods, Inc. is a fish processor and distributor of frozen fish.

3

Roggio at RT 41 :7-8

4

**Agree.**

5

2.    Barry Cohen is a businessman who, together with his wife Christene Cohen, owned several

6

California Corporations including the Point Loma Fishing Company, Inc., Olde Port Fisheries,

7

Inc., Olde Port Fish Company, Inc., Artemis, Inc. and a corporation in Mexico.

Cohen at RT 254:15 -255:3; RT 256:18 - 20; 257:6 – 12

8

**Agree that Barry and Christene Cohen owned the Point Loma Fishing Company, Inc.**

9

**and Olde Port Fisheries Inc., but object on the basis of lack of support that she owned Olde**

10

**Port Fish Company, Inc., Artemis, Inc., and a corporation in Mexico.**

11

**Cohen at RT 254:15-255:3, 256:18-257:5, 257:8-12**

12

3.    Through these corporate entities Barry and Christene Cohen operated a restaurant, fish

13

market and fish wholesale business.

14

Cohen at RT 255:4 – 12

15

**Agree that Barry Cohen operated a restaurant through Olde Port Fish Company,**

16

**Inc. and Barry and Christene Cohen operated a fish market and fish wholesale business**

17

**through Olde Port Fisheries, Inc. but object on the basis of lack of support that Christene**

18

**Cohen operated a restaurant because she was only an owner in Point Loma Fishing**

19

**Company, Inc. and Olde Port Fisheries, Inc.**

20

**Cohen at RT 254:15-255:8, 256:18-257:5, 257:8-12**

21

4.    Although currently separated, at all material times Barry Cohen was authorized to speak on

22

behalf of Christene Cohen regarding the matters at issue.

23

TE 79, ¶ 6

24

**Agree but that Barry Cohen represented himself, the boat and the Point Loma**

25

**Fishing Company, Inc. at trial.**

26

**Cohen at RT 502:3-15**

27

28

DEFS.' RESPONSES TO PL.'S AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. C-07-2952-WHA

DWT 11196012v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

5.      Del Mar and Barry Cohen entered into an oral joint venture in 1999 pursuant to which Del Mar was to supply the financial backing for a fish processing business in Avila Beach, California, and Barry Cohen was to manage the joint venture.

            Cohen at RT 263:9 – 20

      **Agree.**

6.      Del Mar and Barry Cohen also had an oral joint venture to operate a fishing business in Mexico.

            Roggio at RT 52:24 - 55:5

      **Defendants object on the basis of contrary evidence.  Barry Cohen testified that he and Joe Cappuccio formed a corporation to fish in Mexico.  There was an oral agreement between Barry and Joe Cappuccio for Joe Cappuccio to buy a 50% interest in the vessel.**

            **Cohen at RT 256:18-257:12; 437:21-438:9**
            **Joint Pretrial Order Stipulated Fact #9**

7.      Del Mar advanced funds to Barry Cohen for "boat improvements, personal loans and fishing loans."

            Roggio at RT 54:22 - 55:5
            Cohen at RT 277:21 - 278:21

      **Agree that Del Mar advanced funds to Barry Cohen for "boat improvements, personal loans, and fishing loans" but that these funds comprised the $215,000 balance of the Note and were advanced with the understanding that Joe Cappuccio was going to purchase a 50% interest in the vessel, Point Loma.**

            **Cohen at RT 438:10-439:3**

8.      These advances were memorialized in a promissory note and preferred ship mortgage executed by Barry Cohen and Chris Cohen on October 31, 2003

            Cohen at RT 277:21 - 278:21
            TE 7 & 8.

      **Agree.**

9.      The promissory note and preferred mortgage each incorporated terms of the other document in their entirety.

            TE 7 & 8

2

1   Agree.

2   10.    The promissory note provides for interest at 7.0%.

3          TE 7.

4          **Agree that the promissory note provides for interest at 7.0% but that the parties**

5   **waived interest in exchange for Defendants' payment of $175,000 on the Note when Joe**

6   **Roggio told Barry Cohen that he would see to it that the loan was "interest free" if Barry**

7   **made a large payment and Plaintiff kept no interest accrual on its books and never asked**

8   **Defendants to pay interest or invoiced them for it.**

9          **Cohen at RT 457:1-21; 457:23-458:6**
10         **Roggio at RT 235:4-15; 170:19-23**

11  11.    The Preferred Mortgage provides:

12         "This mortgage is executed for the purpose of securing not only the
           payment of the above described note but also to secure all future
13         advances made by the holder of said note to the mortgagor, and said
           mortgage shall remain in full force and effect to secure all future
14         advances and all renewals or extensions of the above described
           note."

15         TE 8, Article IV

16         **Agree but that Plaintiff prepared the Note and Mortgage and the Note does not**

17  **contain a future advances clause or any language regarding automatic renewals or**

18  **extensions and thus requires a written amendment to make such future advances, renewals,**

19  **or extensions.  Also, the provision only secures "future advances made by the holder of said**

20  **note [Del Mar] to the mortgagor [Barry and Christene Cohen]" and does not secure**

21  **advances made by the Joint Venture or the accounts receivable owed to the Joint Venture.**

22         **Roggio at RT 45:20-46:10; 47:15-48:3; 139:11-16; 140: 25-1412; 145:13-14**
           **Cohen at RT 280:4-15; 281:23-282:4**
23         **TE 7 and 8**

24  12.    The Preferred Mortgage also provides that in the event of any default under the Mortgage,

25  the mortgagor may:

26         (c ) Retake the vessel without legal process at any time wherever the
           same may be, and without being responsible for loss or damage,
27         hold and in Mortgagee's or in Owner's name lease, charter, operate
           or otherwise use the vessel for such time and on such terms as
28         Mortgagee may deem advisable, being accountable for net profits, if
           any, and with the right to dock the vessel free of charge at the

DAVIS WRIGHT TREMAINE LLP

3

Owner's premises or elsewhere at Owner's expense, and/or sell the vessel, free from any claim by Owner of any nature whatsoever, in the manner provided by the law, to the extent permitted by law, such sale may be public or private, without notice, without having the vessel present, and I or Mortgagee may become the purchaser.

TE 8, Article II, ¶1(b)(c)

**Defendants object on the basis of lack of support.  The terms of the Note and Mortgage provide that Plaintiff could only arrest the vessel in the event of a material breach.**

**Cohen at RT 294:9-11**
**TE 8  (Mortgage, Art. II)**

13.    Default in the punctual payment of the principal or any installment is an act of default under the mortgage.

TE 8, Article II, ¶1(a).

**Agree but that there was no default in the payment because Defendants made a large payment in the amount of $175,000 on the Note as requested by Cappuccio.**

**Cohen at RT 294:9-11**
**TE 29**

14.    The mortgage also provides that "No delay or omission by Mortgagee shall impair any right, power, or remedy, and no waiver of any default shall waive any other default.

TE 8, Article II, ¶3

**Agree.**

15.    The promissory note provides that the "maker"

"...hereby waivers (sic) (a) presentment, demand, protest, notice of dishonor and/or protest, and notice of non-payment; (b) the right, if any, to the benefit of, or to direct the application of, any security hypothecated to holder until all indebtedness of maker to holder, however, arising, shall have been paid; and (c) the right to require holder to proceed against any party to this note, or to pursue any other remedy in holder (sic) power."

TE 7, ¶6.

**Agree.**

16.    The original balance on the promissory note was $215,000.

Roggio at RT 48:19-21
Cohen at RT 278:24 - 279:1

**Agree but that Barry and Christene Cohen never agreed to add anything to the Note.**

4

DAVIS WRIGHT TREMAINE LLP

1

2

**Cohen at RT 279:10-20; 470:10-471:1**
**Roggio at RT 179:10-15**
**TE 7**

3

17.    The promissory note secured both the original balance ($215,000) and "future advances."

4

5

Roggio at RT 50:21 -51:16
TE 8, Article IV

6

**Disagree but that the Mortgage and not the Note secured the original balance**

7

**($215,000) and future advances but the Mortgage only secured future advances made by the**

8

**holder of the note (Del Mar) to the mortgagor (Barry and Christene Cohen) and it secured**

**only "future advances and all renewals or extensions" of the Note.**

9

10

**Roggio at RT 139:11-16; 145:13-14**
**Cohen at RT 280:9-15; 281:23-25; 282:1-4**
**TE 8 (Art. IV)**

11

12

18.    The original balance of $215,000 was a "low guess" or "low estimate" as to how much

money Barry Cohen had borrowed from Del Mar.

13

14

Roggio at RT 49:7 - 17
Cohen at RT 282:10 – 22; 285:12-286:8
TE 37

15

16

**Defendants object on the basis of contrary evidence and the parol evidence rule.**

17

**Barry Cohen testified that after signing the Note, he later calculated based on numbers**

18

**provided by Joe Roggio that the amount he originally owed to Del Mar was approximately**

**$204,000 and Joe Roggio testified that at the time the Note was signed, the amount was in the**

19

20

**$197,000 range.  Barry and Christene Cohen also never agreed to add anything else to the**

**Note.**

21

22

**Cohen at RT 442:2-12, 505:4-14; 279:10-20; 470:10-471:1**
**Roggio at RT 213:16-18; 179:10-18;**

23

19.    Barry Cohen owed Del Mar more than the original loan balance shown on the promissory

24

note.

25

Cohen at RT 288:2 – 14

26

27

**Defendants object on the basis of contrary evidence and the parol evidence rule.  *See***

**Response to No. 18 above.**

28

DAVIS WRIGHT TREMAINE LLP

5

20.    These were advances after the date of the original note.

> Cohen at RT 279:l0 - 14
> Cohen at RT 289:15 – 25
> TE 37

**Defendants object on the basis of contrary evidence.  After the Note was signed, the parties thought that the amount of money advanced towards Joe Cappuccio's purchase of the 50% interest in the vessel was $237,000 and not $215,000.  However, the parties had already agreed that the Note would be for $215,000.  The parties later learned that money advanced towards the purchase of 50% of the vessel was less than $215,000.**

> **Cohen at RT 279:22-280:1; 289:10-25**

21.    Additional advances taken by Barry Cohen brought his loan balance to $237,035.48.

> Roggio at RT 77:9 – 10
> Cohen at RT 289: 10 – 25
> TE 37

**Defendants object on the basis of contrary evidence.  Barry Cohen testified in his deposition in the Avila Beach litigation that the $237,000 in the "Barry" column on Joe Roggio's spreadsheet was what he thought was the amount owed at the time of the Note.  However, at time, the parties had agreed that the Note was for $215,000.  The parties later learned that the amount of the loan was actually less than $215,000.**

> **Cohen at RT 289:10-25; 442:2-12; 505:4-14**
> **TE 38**

22.    Barry Cohen also obtained advances for the Point Loma totaling $16,021.33.

> Cohen at RT 289:6 – 9
> TE 37

**Agree that there were advances to the Point Loma for $16,021.33 but that these were advanced to the vessel for fuel and ice, not Barry Cohen personally, by the Avila Beach Joint Venture and were carried on the Joint Venture's books through October 2004.**

> **Roggio at RT 70:2-10; 223:5-8**
> **TE 19**

23.    While Del Mar and Barry Cohen operated the Avila Beach joint venture, Barry allowed his two sons, Michael and Leonard Cohen, to purchase fish products from the joint venture account.

> Cohen at RT 264: 15-25

DAVIS WRIGHT TREMAINE LLP

6

1     **Defendants object on the basis of lack of support.  While Del Mar and Barry Cohen**

2  **operated the Avila Beach Joint Venture, Barry, as manager of the Joint Venture, was aware**

3  **that Michael and Leonard bought product from the Avila Beach Joint Venture.**

4           **Cohen at RT 264:15-25**

5  24.     The joint venture was terminated by Del Mar effective September 30, 2004.

6              Roggio at RT 42:19 - 43:2
               Roggio at RT 105:9 – 11

7      **Defendants object on the basis of contrary evidence and credibility as to when the**

8  **Avila Beach Joint Venture terminated.  The Avila Beach Joint Venture carried assets on its**

9  **books at least through the end of October 2004.  Joe Roggio also testified in his deposition in**

10 **this case that the Joint Venture dissolved as of October 2004 and at trial testified that it was**

11 **not wrapped up on September 30.  It continued at least until October 28, 2004 when the final**

12 **Joint Venture inventory was taken.  Cappuccio testified that when the Assignment of Joint**

13 **Venture Interest was signed (in 2006) it ended the Avila Beach Joint Venture.**

14          **Roggio at RT 154:24-155:4; 156:16-20; 158:14-159:18; 209:4-14**
           **Cohen at RT 448:7-19; 474:13-17**

15         **Cappuccio at RT 359:2-10**
           **TE 24**

16         **TE 225**

17

18 25.     At the time that the joint venture was terminated, Michael Cohen was indebted to the Avila

19 Beach joint venture for $13,920.40.

20              Roggio at RT 61:17 – 62:13
               TE 22
               TE 37

21      **Agree that at the time that the Avila Beach Joint Venture was terminated, Michael**

22 **Cohen was indebted to the Avila Beach Joint Venture for $13,920.40 but that the Joint**

23 **Venture was not terminated until at least October 28, 2004 when the final Joint Venture**

24 **inventory was taken.  The accounts receivable for Michael Cohen was carried on the Avila**

25 **Beach Joint Venture's books at least until the end of October.**

26

27         **Cohen at RT 448:7-19**
           **Roggio at RT 209:15-210:7**

28         **TE 225**

7

DAVIS WRIGHT TREMAINE LLP

26.    At the time that the joint venture was terminated, Leonard Cohen/Olde Port Inn was indebted to the Avila Beach joint venture for $18,069.10.

> Roggio at RT 62:15 – 63:24
> TE 22
> TE 23
> TE 37

**Agree that at the time that the Avila Beach Joint Venture was terminated, Leonard Cohen/Olde Port Inn was indebted to the Joint Venture for $18,069.10 but that the Joint Venture continued at least until October 28, 2004, when the final joint venture inventory was taken and it was carried as part of the joint venture's receivables at least to end of October. The accounts receivable for Leonard Cohen were carried on the Joint Venture's books at least until the end of October.**

> **Cohen at RT 448:7-19**
> **Roggio at RT 209:15-210:7**
> **TE 225**

27.    When the Avila Beach joint venture ended, Barry Cohen was credited with 50% of all accounts receivables and then they were transferred over to the books of Del Mar Seafoods.

> Roggio at RT 106:6 - 107:11

**Defendants object on the basis of contrary evidence.  Plaintiff unilaterally put the total amount of all the receivables it claims are owed to the Joint Venture on Cohen's balance.**

> **Roggio at RT 58:7-11; 60:10-19 (Michael); 63:5-11 (Leonard/Old Port Inn); 65:25-66:15 (Inventory); 70:2-10 (Point Loma); 221:15-17**
> **TE 18 (Point Loma), 22 (Michael), 23 (Leonard/Old Port Inn), 24 (inventory)**

28.    Leonard Cohen's debt to the Avila Beach joint venture was for seafood sold to the Olde Port Inn.

> Roggio at RT 65:16 – 19

**Agree.**

29.    After the Avila Beach joint venture was ended, Barry Cohen told Del Mar that he would "be responsible" for paying the debts of Michael and Leonard Cohen, and he directed Del Mar to "add them to [his] balance."

> Roggio at RT 67:10 – 22; 68:14 - 23.

DAVIS WRIGHT TREMAINE LLP

1       **Defendants object on the basis of contrary evidence as to directing Del Mar to add the**

2 **debts of Michael and Leonard to his balances.  Barry Cohen testified that he did not ask Del**

3 **Mar to add the debts of Michael and Leonard Cohen, which were accounts receivable owed**

4 **to the Avila Beach Joint Venture, to the Note.  Joe Roggio testified that he never discussed**

5 **adding any other debts to the Note with Christene Cohen.**

6       **Roggio at RT 209:15-210:2; 222:22-223:4; 179:6-15**

7       **Cohen at RT 470:10-20**

8 30.     Joe Roggio agreed to add the debts of Michael and Leonard Cohen to Barry's balance.

      Roggio at RT 69:5 – 9

9       **Defendants object on the basis of contrary evidence.  *See* Response to No. 29 above.**

10 31.     Barry Cohen also told his son Michael that he would take care of Michael's debts owed to

11 the joint venture.

12       Michael Cohen at RT 242:9 – 11

13       **Agree.**

14 32.     Barry Cohen also told his son Leonard that he would take care of Leonard Cohen's debts

15 owed to the joint venture.

16       Leonard Cohen at RT 250:2 – 20

17       **Agree.**

18 33.     Barry Cohen told Joe Roggio of Del Mar that he would "be responsible for" Michael

19 Cohen's debts.

20       Barry Cohen at RT 286:20 – 22

21       **Agree that Barry Cohen told Joe Roggio of Del Mar that he would "be responsible**

22 **for" Michael Cohen's debts but that he told Joe Roggio this while he was an employee of Del**

23 **Mar and that Michael Cohen's debts were assigned to Barry Cohen under the Assignment of**

24 **Joint Venture interest effective October 22, 2004.**

25       **Cohen at RT 469:21-470:7; 470:2-15; 471:2-15**

26 34.     Barry Cohen told Joe Roggio of Del Mar that he would "be responsible for" Leonard

27 Cohen's debts.

28       Barry Cohen at RT 286:25 - 287:3

DAVIS WRIGHT TREMAINE LLP

**Agree that Barry Cohen told Joe Roggio of Del Mar that he would "be responsible for" Leonard Cohen's debts but that he told Joe Roggio this while he was an employee of Del Mar and that Leonard Cohen's debts were assigned to Barry Cohen under the Assignment of Joint Venture interest effective October 22, 2004.**

**Cohen at RT 469:21-470:7; 470:18-20; 471:2-15**

35.    When Barry Cohen told Joe Roggio that he would "be responsible for" Michael and Leonard Cohen's debts, he asked that they be added to his balance.

Roggio at RT 67:14 – 68:9; 68:14 – 23

**Defendants object on the basis of contrary evidence. *See* response to No. 30 above.**

36.    Del Mar agreed to add the Michael and Leonard Cohen debts to Barry Cohen's balance.

Roggio at RT 69:5 – 9

**Defendants object on the basis of contrary evidence. *See* response to No. 30 above.**

37.    Del Mar maintained only a single balance for Barry Cohen and this was the promissory note balance.

Roggio at RT 77:13 - 22
Roggio at RT 152:1 – 3

**Defendants object on the basis of contrary evidence and credibility. Spreadsheets prepared by Joe Roggio show separate balances for each debt. Joe Roggio also stated that he unilaterally decided to maintain a single balance on Del Mar's books and "assumed" Barry meant to add certain debts to the Note. Christene Cohen never saw the spreadsheet.**

**Roggio at RT 179:6-13**
**Christene Cohen at RT 418:23-419:13**
**TE 37, 38**

38.    When the Avila Beach joint venture ended, the joint venture still had some inventory on hand. Barry Cohen asked Joe Roggio if he could keep that inventory for use in his retail market, and add the value to his balance. Del Mar agreed.

Roggio at RT 65:23 - 66:18
TE 37 & 38

**Agree but that the Joint Venture inventory was taken on October 28, 2004 and not added to the Note.**

DAVIS WRIGHT TREMAINE LLP

1  **Cohen at RT 468:20-469:5**

2  39.    The value of the inventory taken by Barry Cohen was $10,283.24.

3  Roggio at RT 66:10 – 15
Barry Cohen at RT 448:7 - 14; 468:l6 - 469:12

4  **Agree but that Defendants do not owe this amount to Del Mar after the Assignment**

5  **of Joint Venture Interest that was made effective October 22, 2004.**

6  **Cohen at RT 469:10-16**

7  40.    The promissory note required Barry and Chris Cohen to make "Monthly payments of

8  either $3,000 or fifteen (15) percent of the gross landing receipts of each and every landing of

9  seafood product made by the fishing vessel POINT LOMA, whichever is greater, commencing on

10  January '04 and on the 15th day of each succeeding month until principal and interest are fully

11  paid."

12  TE 7

13  **Agree but that it was not the practice of Plaintiff to enforce this provision or demand**

14  **monthly payments and Defendants were current on their monthly payments by virtue of the**

15  **$175,000 payment.**

16  Roggio at RT 88:22-89:3; 143:23-144:7
Cohen at RT 519:7-14

17
18  41.    The F/V POINT LOMA was arrested by Del Mar on June 8, 2007.

Court's Order dated June 8, 2007.

19  **Defendants object on the basis of contrary evidence.  Plaintiff arrested the F/V Point**

20  **Loma on June 7, 2007, pursuant to the Court's Order dated June 7, 2007.**

21  Court's Order dated June 7, 2007
Joint Pretrial Order Stipulated Fact #17

22  TE 42

23
24  42.    On December 22, 2004 Barry Cohen made a payment for $5,000 "on account."

Roggio at RT 76:21 - 77:22
25  TE 25

26  **Agree that on December 22, 2004 Cohen made a payment of $5,000 on the Note.**

TE 25
27
28  43.    On November 10, 2005 Barry Cohen made a payment of $175,000.

DAVIS WRIGHT TREMAINE LLP

11

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Roggio at RT 81:7 – 15
Cohen at RT 283:16 - 18
TE 29
TE 37

**Agree but this payment was to help Joe Cappuccio address the concerns of his bank and was a prepayment of payments that otherwise would have been paid in the future.**

**Cappuccio at RT 323:17-25**
**Cohen at RT 519:7-14**

44.    When Barry Cohen made the payment of $175,000 he did so by personally delivering the check to Del Mar.

Cohen at RT 454:15 – 17

**Agree that when Barry Cohen made the payment of $175,000 he did so personally but by delivering the check to Joe Cappuccio.**

**Cohen at RT 454:15 – 17; 283:19-20**
**Cappuccio at RT 324:11-14**

45.    When Barry Cohen delivered the $175,000 check to Del Mar he spoke with Del Mar's President, Joe Cappuccio.  The "total conversation" according to Barry Cohen was as follows:

"Joe, I have the check that you asked for.  And I handed him the check.  And he said "thank you so much.  I really appreciate this."  And I said:  "I will get you the rest as soon as I can, pay it off."  And he said: "I'm not worried about it.  I'm not concerned anymore.  It's such a small amount now.  It's good."

Barry Cohen at RT 455:21 - 456:7

**Agree but that the supporting cite is Cohen RT 455:21-456:10.**

46.    Joe Cappuccio never said that Barry Cohen did not have to pay interest on the note.

Cappuccio at RT 325:9 – 13
Barry Cohen at RT 455:21 - 456:7 (the "total conversation")

**Defendants object on the basis of contrary evidence as to Cohen's obligations to pay interest under the Note.  Barry Cohen did not have a conversation with Joe Cappuccio about interest.  However, prior to making the $175,000 payment, Joe Roggio told him that if he made the large payment, he would see to it that the Note would be interest free.**

**Cohen 456:24-457:21; 457:23-458:6**

47.    Joe Cappuccio never said that Barry Cohen did not have to make his monthly payments.

1

Cappuccio at RT 325:25 – 326:2
Barry Cohen at RT 455:21 - 456:7 (the "total conversation")
Barry Cohen at RT 456:11 – 12

2

3    **Defendants object on the basis of lack of support and contrary evidence.  Evidence**

4    **presented at trial shows that it was the practice of the parties that monthly payments were**

5    **not required:  Joe Roggio did not enforce the monthly payment provisions between**

6    **November 2005 and January 2007 because Barry was "an employee and a friend;" Plaintiff**

7    **never sent any written demand for payments of any kind under the Note; Joe Cappuccio**

8    **asked Barry Cohen to make the large payment; and after Barry Cohen gave Joe Cappuccio**

9    **the $175,000 payment, Barry told Joe Cappuccio that he would pay the rest as soon as he**

10   **could and Joe Cappuccio replied that he was not worried or concerned about it.**

11

Roggio at RT 88:22-89:3; 143:23-144:7
Cohen at RT 453:21-454:17; 455:21-456:7

12

13   48.    Joe Cappuccio never said that Barry Cohen did not have to pay Del Mar all of the money

that he owed.

14

Cappuccio at RT 326:3 – 5
Barry Cohen at RT 455:21 - 456:7 (the "total conversation")

15

16   **Agree that Joe Cappuccio never said that Barry Cohen did not have to pay Del Mar**

17   **all of the money that he owed but that the only amount left on the Note is $27,000; Barry**

18   **Cohen never agreed to pay all of Del Mar's attorneys fees, relating to the Avila Beach**

19   **litigation; and all other accounts receivable or advances made to the Point Loma as part of**

20   **the Avila Beach Joint Venture were assigned to Barry Cohen under the Assignment of Joint**

21   **Venture interest, made effective October 22, 2004 and signed by Joe Roggio.**

22

Cohen at RT 520:3-6; 467:1-22; 526:10-21
Roggio at RT 104:3-15
TE 47

23

24   49.    Del Mar has never forgiven any of Barry Cohen's debts under the promissory note and

25   mortgage.

26

Cappuccio at RT 326:6 - 8
Barry Cohen at RT 455:21 -456:7 (the "total conversation")

27   **Agree but that the only debt remaining under the Note and Mortgage is $27,000 after**

28   **Defendants paid $188,000 to Del Mar on the $215,000 Note.**

DAVIS WRIGHT TREMAINE LLP

13

1    **Cohen at RT 520:3-6**

2    50.    After speaking with Joe Cappuccio, Barry Cohen delivered the $175,000 check to Del

3    Mar's controller, Joe Roggio.

4            Roggio at RT 81:18 – 20

5    **Agree but after Cohen brought the check to Cappuccio and at Cappuccio's request.**

6            **Cappuccio at RT 324:11-14**

7    51.    Barry Cohen and Joe Roggio discussed how the $175,000 check was to be applied to his

8    account.

9            Roggio at RT 81:7 – 23

10   **Defendants object on the basis of contrary evidence.  Barry Cohen testified that he**

11   **made the $175,000 payment only to pay down the Note as requested by Joe Cappuccio.  Joe**

12   **Roggio prepared the spreadsheet after Barry asked what his sons owed.  When Joe Roggio**

13   **gave Barry the spreadsheet, Barry told him that it did not look right and Joe Roggio**

14   **responded that he was only "cleaning up the books."**

15           **Cappuccio at RT 323:19-25**
             **Cohen at RT 294:9-11; 453:18-454:14; 463:3-20; 523:15-23**
16           **Christene Cohen at RT 308:4-13**

17   52.    Barry Cohen and Joe Roggio agreed on the allocation of the $175,000 check against his

18   account by allocating it against different categories of debts.

19           Roggio at RT 82:4 - 20
             TE 37 & 38
20

21   **Defendants object on the basis of contrary evidence.  See response to No. 51 above.**

22   53.    The purpose of the $175,000 payment was to "pay down" the note.

             Barry Cohen at RT 294:9 – 11

23   **Agree but no payments are due until February 2009 because of $175,000 payment.**

24           **Cohen at RT 519:7-14**

25   54.    Barry Cohen admits that TE 37 is a "list of payments made on that note."

26           Barry Cohen at RT 287:13 - 1 7

27   **Agree, but that Barry Cohen disagreed with the allocation of the payments and told**

28   **Joe Roggio when he gave the list to Barry that it did not look right.**

14

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1

**Cohen at RT 463:3-20**

2   55.    The "Schedule of Payments" spreadsheet (TE 37) was prepared by Joe Roggio between

3   November 10, 2005 and November 15, 2005.

4              TE 37 (showing last payment on November 10 and Fax date of November 15,
               2005)

5

6   **Agree.**

7   56.    On November 15, 2005 Barry Cohen faxed the schedule to his attorneys at Miller, Starr.

8              Barry Cohen at RT 283:21 - 284:3
               TE 37 (note fax information at the top)

9   **Agree.**

10  57.    On November 16, 2005 Barry Cohen was deposed in the Avila Beach litigation as both an

11  individual and as the joint venture's Person Most Knowledgeable.

12             Barry Cohen at RT 264:4 - 8; 509:8 – 12

13  **Agree.**

14  58.    During his November 16, 2005 deposition, Barry Cohen was questioned about each of the

15  entries the Schedule of Payments (TE 37) which was marked as an exhibit to his deposition.

16             Barry Cohen at RT 284:4 – 8

17  **Defendants object on the basis of lack of support.  The above testimony says that**

18  **Barry Cohen testified about the document but not that he was questioned about each of the**

19  **entries.  He testified that each of these entries were balances for purchases made by Michael**

20  **and Leonard Cohen, inventory, and advances to the Point Loma.**

21             **Cohen at RT 288:15-289:9**

22  59.    During his deposition in the Avila Beach case Barry Cohen produced the promissory note

23  and the Schedule of Payments as "a list of payments made on that note."

24             Barry Cohen at RT 287:8 – 17

25             **Agree, but that Barry Cohen disagreed with the allocation of the payments and told**

26  **Joe Roggio when he gave the list to Barry that it did not look right.**

27             **Cohen at RT 463:3-20**

28

---

15

60.     Between October 2005 and October 2006 Barry Cohen was employed by Del Mar in its home office in Watsonville, California.  In that year no payments were made on the promissory note because Barry Cohen was an employee and friend.

Roggio at RT 88:22 - 89:3

**Defendants object on the basis of contrary evidence.  The evidence shows that a large payment was made during this time period, in the amount of $175,000 on November 10, 2005, by personal check dated November 9, 2005.**

**Roggio at RT 81:7-15**
**TE 29**

61.     In October 2006 Barry Cohen was laid off by Del Mar.

Barry Cohen at RT 465:12 – 14

**Agree.**

62.     In December, 2006 Del Mar's controller, Joe Roggio, tried calling Barry Cohen to ask him to begin making payments on the account.  As he did not reach Barry Cohen, Joe Roggio left a message requesting that Barry Cohen begin making his monthly payments.

Roggio at RT 88:13 -21.

**Defendants object on the basis of lack of support as to the month when Joe Roggio tried to call Barry and whether Roggio requested that Barry make monthly payments.**

63.     On January 30, 2007 Barry Cohen made a payment of $2,000.

Roggio at RT 87:23 – 88:6
TE 34

**Agree, but even though the payment was for $2,000 and not $3,000 as stated in the terms of the Note, Joe Roggio testified that he considered it a payment on the Note but did not call Barry Cohen after receiving it.**

**Roggio at RT 228:2-8.**

64.     The January 30, 2007 payment was mailed to Del Mar together with a note from Barry Cohen that read:

Joe,

Please credit my account.  With this payment, if your analysis was correct, the new balance should be $139,749.79.

I will try to send you at least $2,000/month, sometimes $3,000.

16

DAVIS WRIGHT TREMAINE LLP

1    I'm sick right now and if I try to talk I start coughing, so instead, you get this note.

2    I'm still unemployed, but this gives me a chance to help Michael make Olde Port better.

3

4    I hope things are going good for you and your family.  Please give Yvonne my regards.  Too bad our families never got the chance to become better friends.  Oh, well things usually happen for a reason. Well, take care of yourself.  Barry

5

6    TE 40

7    **Agree.**

8    65.    The figure was taken by Barry Cohen from the accounting spreadsheet prepared by Del

9    Mar and is consistent with the figures provided in that exhibit.

10        Cohen at RT 527:16 - 528:13
           TE 37 & 38

11    **Agree but that Barry Cohen had done no analysis of his own as to whether the figure**

12    **was correct because he was sick at the time he sent the $2,000 to reduce the balance on the**

13    **Note further.  He had doubts about the figure which is why he said "if your analysis is**

14    **correct."  At that time, neither Barry Cohen nor Joe Roggio considered the Assignment of**

15    **Joint Venture Interest on the amounts owed by Barry Cohen.  Barry Cohen later**

16    **determined the figure was incorrect based on the application of the Assignment of Joint**

17    **Venture Interest to any debts owed to the Avila Beach Joint Venture and inconsistencies in**

18    **Roggio's accounting.**

19        **Cohen at RT 476:10-477:19; 526:23-529:5**
           **TE 47 (Assignment)**

20

21    66.    A further payment was made for $3,000 by Barry Cohen on February 15, 2007.

22        Roggio at RT 92:19 - 24
           TE 35 and 38

23    **Agree.**

24    67.    The final payment was made for $3,000 by Barry Cohen on April 23, 2007.

25        Roggio at RT 92:25 – 93:2

26    **Agree.**

27    68.    Barry Cohen never made any of his payments based on the 15% of gross landings figure.

28        Barry Cohen at RT 478:20 – 22.

DAVIS WRIGHT TREMAINE LLP

17

1        **Agree but that Plaintiff never calculated or demanded any payment based on the**

2 **fifteen percent provision even though the Point Loma was selling fish.**

3                **Cohen at RT 478:16-19**
               **Roggio at RT 206:11-13**

4                **Cappuccio at RT 349:23-25**

5 69.       Had Barry Cohen made payments under the 15% of gross landings figure he was required

6 by the terms of the promissory note to have paid $2995.66 in January $5284.97 in February 2007,

7 $4070.49 in March 2007, $1829.82 in April 2007 and $4911.88 in May 2007.

8                Barry Cohen at RT 487:16 – 488:6
               TE 51

9

10        **Defendants object on the basis of contrary evidence that any payments under the**

11 **15% gross landings provision were required because Plaintiff never demanded or calculated**

12 **that payments be made under this provisions and even if they were required, Del Mar was**

13 **paid in advance by virtue of the $175,000 payment.**

14                **Cohen at RT 478:16-19; 514:21-515:9; 519:7-14**
               **Roggio at RT 206:11-13**

15 70.       Barry Cohen admits a balance due of $27,000 following his last payment.

16                Barry Cohen Responses to Requests for Admissions, at RT 519:20-20:6
               TE 26

17        **Agree but that he admits there is an outstanding balance remaining (but not**

18 **currently due) under the Note and Mortgage in the amount of $27,000 although no payments**

19 **are currently due until at least February 2009.  TE 26 does not support this finding.**

20                **Cohen at RT 520:3-6**

21 71.       On June 7, 2007 Del Mar filed its complaint and sought the arrest of the F/V POINT

22 LOMA for breach of the promissory note and to foreclose on the preferred mortgage.

23                Joint Final Pre Trial Order Stipulated Fact ¶ 17

24      **Agree.**

25 72.       In 2004 the F/V POINT LOMA's average monthly pre-tax earnings, exclusive of

26 depreciation, were $2,500.

27                Barry Cohen at RT 296:9 - 297:19
               TE 51

28

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1    **Agree but should be income not earnings.**

2    73.    In 2005 the F/V POINT LOMA's average monthly pre-tax earnings, exclusive of

3    depreciation, were $321.25.

4        Barry Cohen at RT 297:20 – 298:5
         TE 51

5    **Agree but should be income not earnings.**

6    74.    2004 the F/V POINT LOMA's average monthly pre-tax earnings, exclusive of

7    depreciation, were $3,591.25.

8        Barry Cohen at RT 300:18 – 24
         TE 84

9    **Agree but should be income not earnings.**

10   75.    Barry Cohen and his son Leonard Cohen were involved in a lawsuit against the Port San

11   Luis Harbor District relating to some complaints about their business operations on the Hartford

12   Pier.

13       Barry Cohen at RT 444:16 – 446:15

14       **Defendants object on the basis of contrary evidence.  Barry Cohen testified that the**

15   **lawsuit was related to restrictions imposed on the Avila Beach Joint Venture by the Harbor**

16   **District that limited the joint venture's access to the pier in violation of Barry Cohen's lease**

17   **with the Harbor District.  Barry Cohen brought suit against the Harbor District on behalf of**

18   **the Avila Beach Joint Venture to require them to honor the lease and the jury found that the**

19   **Harbor District had breached the lease.**

20       **Cohen at RT 444:16-445:20**

21   76.    Del Mar Seafoods did not want to have anything to do with the lawsuit between the

22   Cohens and the Port San Luis Harbor District.

23       Cappuccio at RT 357:5 – 8
         Barry Cohen at RT 445:21 - 445:25

24   **Agree but that the lawsuit, although brought by Barry Cohen, was in part between**

25   **the Avila Beach Joint Venture and the Port San Luis Harbor District.**

26       **Cohen at RT 444:16-445:20**

27

28

77.     On December 15, 2005 Barry Cohen wrote a letter for Mr. Cappuccio's signature regarding Del Mar's interest in the lawsuit.  The letter reads:

> Dear Barry:
>
> By this letter, Del Mar Seafoods, Inc. (Del Mar) acknowledges that you have full authority to recover in any action brought in your own name all damages suffered by the wholesale processing fish business which you formally operated on the Hartford pier in Avila Beach pursuant to the oral joint venture agreement between yourself and Del Mar.  You may share this letter setting forth Del Mar's position in this matter with any concerned party.
>
> Sincerely, Del Mar Seafoods, Inc., Joe Cappuccio, Its President.
>
> Cappuccio at RT: 332:8 - 333:15
> TE 46

**Agree but Plaintiff wanted to protect itself from all liability from the Joint Venture.**

**Cappuccio at RT 357:9-11; 359:3-10**

78.     In March 2006 Del Mar reaffirmed its assignment of joint venture interests effective October 22, 2004.

> Cohen at RT: 473:4 - 477:17

**Agree but that to avoid liability, Del Mar transferred to Barry Cohen "to the fullest extent possible and without restriction" all of Del Mar's "entire interest in the Joint Venture, including but not limited to the Joint Venture's claims, if any, against the District, and including without limitation all rights, entitlements and/or interest in and to any claims, rights of action, causes of action, recoveries, damages or other legal recourse owned or held by the Joint Venture," which includes debts owed to the Avila Beach Joint Venture.**

> **TE 47, ¶2**
> **Cappuccio at RT 357:9-11; 359:3-10**

79.     The reaffirmation of the assignment was drafted by Barry Cohen's attorneys.

> Roggio at RT 225:9 – 20; 226:22 – 227:2

**Defendants object on the basis of contrary evidence.  Attorneys for both sides participated in the preparation of the Assignment of Joint Venture Interest and Barry Cohen testified that both sides' attorneys prepared it.**

> **Cohen at RT 474:13-17**
> **Roggio at RT 227:3-11**

80.     Del Mar's attorney, Richard Wagner, looked at it before it was signed.

20

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1    Roggio at RT 227:3 – 11

2    **Agree.**

3    81.    In the litigation between Barry Cohen and the Port San Luis Harbor District, Del Mar

4    Seafoods incurred legal fees of $27,000.

5    Roggio at RT 85:15 -21
     TE 38

6    **Defendants object on the basis of lack of support and credibility.  Although**

7    **Defendants object that they owe Del Mar for any of its attorneys' fees related to the Avila**

8    **Beach litigation, the above citations do not support Del Mar's claim that they incurred**

9    **$27,000 in legal fees (TE 38 shows legal fees as $21,308.52).  Barry Cohen also testified that**

10    **he never saw any legal bills from Del Mar or otherwise discussed them with Joe Roggio.**

11    **Cohen at RT 468:1-9**

12    82.    Barry Cohen told Joe Roggio that he would pay those legal fees and asked that they be

13    added to his balance.

14    Roggio at RT 86:10 - 87:3

15    **Defendants object on the basis of contrary evidence.  Cohen testified that he agreed to**

16    **pay a "reasonable" amount of attorneys' fees, while employed by Del Mar, and in his mind,**

17    **this meant only $2,000 to $3,000 and not $21,000.  He could not recall ever seeing a full and**

18    **complete listing of the legal bills.  He also testified that he did not agree to put any attorneys'**

19    **fees on the Note.**

20    **Cohen at RT :467:1-25; 526:10-22; 468:1-9**

21    83.    Barry Cohen admits that regarding these legal fees he agreed to "be responsible for

22    something reasonable, a reasonable amount."

23    Barry Cohen at RT 467:l – 10

24    **Agree but that he meant $2,000 to $3,000 and not all of Del Mar's attorneys' fees, nor**

25    **did he agree to pay $21,000 in attorneys' fees or to put any on the Note.**

26    **Cohen at RT 467:1-25; 526:10-22; 468:7-9**

27    84.    During the period that the vessel was under arrest, Barry Cohen advanced $5,000 to the

28    vessel's Captain, Dave Kobak.

21

1         Kobak at RT 387:12 – 16

2      **Agree.**

3    85.  During the period that the vessel was under arrest, Barry Cohen advanced $1,500 to each

4    of the two crew members.

5         Barry Cohen at RT 500:20 - 500:25
     TE 211

6      **Agree.**

7    86.  Had the two crew members not been available for fishing after the vessel was released

8    from arrest, Captain Kobak could have replaced them and crewed the vessel.

9         Kobak at RT 391:12 - 15; 396:14 - 16
     Kobak at RT 398:12 – 16

10

11     **Agree but that Barry Cohen made the business decision to pay them to "stick**

12   **around" so that they vessel could resume fishing as soon as it was released from arrest.**

    **Cohen at RT 499:13-20; 500:12-19**

13   87.  In the period of time that the vessel was under arrest, Captain Kobak "guessed" that he

14   could have caught about the same amount of fish that he caught in the prior year fishing during the

15   same time period.

16        Kobak at RT 393:24 - 394:1

17     **Agree but that the best estimate of the lost catch was to measure against trips in 2007**

18   **– the same year and with the same captain that the vessel was arrested.**

19       **Cohen at RT 483:13-17**

20   88.  In 2006, between the months or June and August, the vessel's gross landings were

21   $57562.11.

22        TE 52

23     **Agree.**

24   89.  From that figure, the crew is paid one half of the value after fuel and ice are deducted,

25   leaving Barry Cohen with a gross income of $17,075.16 from which his expenses must be

26   deducted.

27        TE 52 & 53

28

*DAVIS WRIGHT TREMAINE LLP*

1    **Agree that the crew is paid one half of the value after fuel and ice are deducted from**

2    **gross landings, but that leaves the vessel, and not Barry Cohen, with net income before fixed**

3    **expenses, such as insurance and moorage, are deducted.  Fixed expenses must be paid**

4    **regardless of whether the vessel goes fishing.**

5    **Cohen at RT 484:14-486:20**

6    90.    Before the vessel was arrested, it was selling its catch to Caito Fisheries.

7    Kobak at RT 375:3 – 20

8    **Agree.**

9    91.    The vessel's arrest did not affect the relationship with Caito Fisheries.

10    Kobak at RT 400:18 – 22

11    **Defendants object on the basis of contrary evidence.  The vessel had no fish to sell to**

12    **Caito Fisheries for more than two months because of the arrest.**

13    **Kobak at RT 375:8-20; 387:3-5**

14    92.    The current principal balance due under the promissory note and mortgage is $128,749.79.

Roggio at RT 93:13 – 15

15    **Defendants object on the basis of contrary evidence and credibility.  The only amount**

16    **secured by the Mortgage under the Note is $215,000 of which Defendants have paid $188,000**

17    **which leaves a principal balance of $27,000.  The future advances provision of the Mortgage**

18    **only applies to advances paid directly and personally to Barry and Christene Cohen.  There**

19    **was no agreement by Barry or Christene Cohen to add additional amounts to the Note**

20    **principal.  Plaintiff's calculations and accounting also lack credibility.  Plaintiff claims below**

21    **in its conclusions that Defendants owe a total balance on the Note of $290,429.53 (TE 38).**

22    **While Defendants dispute that they owe anything other than $215,000 under the Note (with**

23    **only $27,000 remaining), according to Plaintiff's own numbers, the current principal**

24    **amount remaining should be $102,035.38 and not $128,749.79 if Defendants' total payments**

25    **for $188,000 are subtracted from the total balance that is alleged by Plaintiff.**

26    **Cohen at RT 279:13-20; 470:10-471:1; 520:3-6**

27    **Roggio at RT 179:10-15**
    **TE 7, 8, 25, 29, 34, 35, and 36**

28

*DAVIS WRIGHT TREMAINE LLP*

23

93. Through December 31, 2007 interest on the outstanding balance under the promissory note at 7.0% interest was $49,207 and some change.

> Roggio at RT 94:24 - 95:3

**Defendants object on the basis of contrary evidence and credibility as to the calculation of interest. Plaintiff waived interest when Joe Roggio told Barry Cohen that he would see to it that the loan was "interest free" in exchange for the $175,000 payment and Plaintiff kept no interest accrual on its books and never asked Defendants to pay interest or invoiced them for it. Joe Roggio also testified that he did not accrue interest on his books despite submitting a sworn declaration to the Court in support of Plaintiff's motion to vacate the order of the arrest stating that he had applied certain payments from Defendants to interest only and not to reduce the principal.**

> **Cohen at RT 457:1-458:6**
> **Roggio at RT 235:4-23; 170:19-23; 174:19-175:17**

94. The Preferred Ship Mortgage expressly provides which specific acts constitute default. One such act of default occurs when the

> "Mortgagee's conclusion in good faith at any time that, though actual or prospective impairment of Owner's net current asset position, net worth, asset-liability ratio, or earning, or through prospective violation of any provision of this Mortgage, Mortgagee is in danger of losing said debt, or any part thereof, by delaying collecting thereof until the time above limited for the payment thereof. . ."
>
> TE 8, pg. 4, Art. II ("Default"), ¶ 1.(b).

**Agree.**

95. Joe Cappuccio found out from Joe Roggio that Barry had been writing checks to himself on one of the Joint Venture's checking accounts that he thought had been closed. This upset him.

> Cappuccio at RT 329:25 - 330:6

**Defendants object on the basis of credibility. Roggio testified that he knew that Barry was writing checks and that they were authorized. Cappuccio testified that he received financial statements from the Joint Venture at least monthly. Barry Cohen testified that he was authorized to write the checks on the account that Joe Roggio reviewed monthly.**

> **Roggio at RT 116:25-117:9**

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

**Cappuccio at RT 322:12-16; 346:13-18**
**Cohen at RT 435:9-20; 436:2-14**

96.    Since finding out about the checks, Cappuccio hired Cohen to work at Del Mar's

headquarters in Watsonville and he and Cohen developed a friendship.

Cappuccio at RT 330:7 - 21; 347:22 - 348:5

**Agree but that Cappuccio accused Barry of embezzlement in the present litigation.**

**Cappuccio at 335:14-346:18**

97.    Prior to the arrest Joe Cappuccio and Joe Roggio discussed defendant Barry Cohen's

financial situation and personal life and how they might affect his ability to meet his obligations

on the Note.

Roggio at RT 109:l0 – 16
Cappuccio at RT 326:13 - 327:2

**Agree that they discussed Barry Cohen's financial situation and personal life but only**

**as to his potential liability for legal fees in the Avila Beach litigation and divorce and not as**

**to any missed or delinquent payments.**

**Roggio at RT 147:5-148:15**

98.    They discussed Barry's recent declaration filed in the Port San Luis Harbor District case in

which he stated that the denial of his "total lawsuit expenses may actually cause [him] to be forced

out of business totally and into bankruptcy . . ."and that he had lost his motion for attorney's fees.

Cappuccio believed Cohen would be liable for attorney's fees exceeding one million dollars.

Roggio at RT 109:17- 19
Cappuccio at RT 327:3 - 8; 352:7 - 12, 18 -22

**Defendants object on the basis of lack of support cited above for the specific finding**

**of the statement in Mr. Cohen's declaration.  Defendants object on the basis of credibility as**

**to Plaintiff's belief that Mr. Cohen intended to file for bankruptcy because Roggio and**

**Cappuccio testified that they had had no personal knowledge that the vessel itself was in**

**trouble or that any bankruptcy was filed prior to the arrest nor did they discuss any missed**

**or delinquent payments.  Mr. Cohen testified that he has never filed for bankruptcy.**

**Defendants object further on the basis of credibility of Mr. Cappuccio's belief that Barry**

**Cohen would be liable for attorneys fees exceeding one million dollars because he testified**

25

1   that while he imagined that the fees would be due and payable, he did not know if Cohen had

2   been required by any court order to pay the legal fees and had no "detailed knowledge of his

3   relationship with his attorney" where he did not contact Barry Cohen to find out.

> **Roggio at RT 141:9-13, 142:12-20**
> **Cappuccio at RT 351:19-352:8; 352:9-353:25**
> **Cohen at RT 478:23-25**

99.     They also discussed Barry's on-going divorce from Christene and that, in a phone call to

Joe Roggio, she had explained that the divorce was going to be "expensive and messy."

> Roggio at RT 109:20 - 110:21
> Christene Cohen at RT 318:9 – 18

**Agree**.

100.    In that phone call, Christene told Joe Roggio that she was staying at her sister's house and

that both Chris and Barry had also moved out of the home they both had shared in Aptos.  As a

result, he believed that the Cohens were no longer able to meet their financial obligations on their

home.

> Roggio at RT 110:4-18

**Agree that Joe Roggio testified that Christene told Joe Roggio that she was staying at**

**her sister's house and that both Chris and Barry had also moved out of the home they both**

**had shared in Aptos but Defendants object that Roggio testified he "believed that the Cohens**

**were no longer able to meet their financial obligations on their home" based on her**

**statement that they had "left the house."  Roggio admitted that he knew that Barry had**

**made a $3,000 payment as of April 23, 2007, just prior to the arrest on June 7, 2007.**

> **Roggio at RT 110:4-18; 87:10-12**
> **TE 36**

101.    Joe Cappuccio believed the Cohens divorce was going to be a financial burden on Barry

and might impair Del Mar's security interest in the vessel.

> Cappuccio at RT J328:4 – 10

**Defendants object on the basis of credibility as to Mr. Cappuccio's belief that the**

**Cohens' divorce was going to be a financial burden on Barry and might impair Del Mar's**

**security interest in the vessel.  Mr. Cappuccio had no personal knowledge as to the financial**

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1  **burden on Barry because he never contacted Barry, his "friend," to inquire about the**

2  **financial situation of the vessel or about any missed payments.  He also testified that he knew**

3  **the vessel was fishing and that it was unencumbered by any other loans.**

4            **Cappuccio at RT 323:19-324:1; 352:23-353:3; 349:23-25; 339:23-25**

5  102.    After their discussion, they concluded they needed expert legal advice so Joe Cappuccio

6  and Joe Roggio both called Del Mar's corporate attorney, Richard Wagner, to seek advice on how

7  Del Mar could best protect its security interest in the Note.

8            Roggio at RT 110:22-24; 112:2-6
          Cappuccio at RT 328:11-14; 350:21 – 24

9       **Agree that Cappuccio and Roggio testified that they both called Del Mar's corporate**

10  **attorney, Rich Wagner, but they sought advice on how to "further secure" their interest in**

11  **the Note, which was already secured by the Mortgage and not subject to any other**

12  **encumbrances.**

13            **Roggio at RT 110:22-111:1**

14            **TE 8 (Mortgage on the Note)**
          **Cappuccio at RT 339:23-25**

15  103.    After discussing the situation with Roggio and Cappuccio, Wagner recommended that they

16  seek advice from a maritime attorney, Mark Holmes.

17            Roggio at RT 112:7 - 13

18            Cappuccio at RT 350:21 - 351:1

19       **Agree.**

20  104.    Joe Roggio explained to Holmes Del Mar's concerns regarding the advances to Barry and

21  Barry's personal situation.  Roggio also told him all of the relevant facts, including all of the

22  payments Barry had made on the Note up to that time.  Roggio forwarded the relevant documents

23  to Wagner, including the Schedule of Payments, the backup for each of the different debts

24  comprising the overall balance, and copies of the checks.

          Roggio at RT 112:19 -- 113:24; 230:4 – 25

25       **Defendants object on the basis of lack of support that Roggio told Holmes all of the**

26  **relevant facts, including all of the payments Barry had made on the Note up to that time.**

27  **Defendants also object on the basis of lack of support and credibility that Roggio forwarded**

28

1  **the relevant documents to Wagner, including the Schedule of Payments, the backup for each**

2  **of the different debts comprising the overall balance, and copies of the checks.  Mr. Roggio**

3  **did not specifically state or recall that he in fact sent all of these documents to Holmes when**

4  **he testified that he "probably" sent them.**

5                **Roggio at RT 113:18-24; 230:4-25**

6  105.    Cappuccio also told Holmes his concerns about Barry's possible bankruptcy and that he

7  was afraid the vessel might sink or burn or go to Mexico.  Holmes told him that arresting the

8  vessel was Del Mar's best and only option and recommended that it do so.

9           Roggio at 113:6- 17
          Cappuccio at RT 328:11 - 19; 328:24 – 329:6; 351:11 - 18; 356:4- 8

10      **Defendants object on the basis of contrary evidence.  Joe Cappuccio told Holmes to**

11  **arrest the vessel to get his money and Holmes "did what he was supposed to do."**

12                **Cappuccio at RT 355:11-21**

13  106.    Acting on his attorney's advice, Cappuccio instructed Holmes to arrest the vessel.

14           Cappuccio at RT 329:9 – 10
          Roggio at RT 231:1 – 10

15      **Agree.**

16  107.    Prior to the arrest, Del Mar never called Cohen to try to resolve the issue of his payments

17  on the Note, nor did they send him any demand letter.

18           Cappuccio at RT 352:23 - 353:25; 355:23 - 356:3

19      **Agree.**

20  108.    Both Roggio and Cappuccio testified that they bore no malice towards Cohen, which was

21  confirmed by Chris Cohen.

22           Roggio at RT 114:l -10
          Cappuccio at RT 329:17 – 21

23       Chris Cohen at RT 313:23 -315:14

24      **Defendants object on the basis of credibility of Joe Cappuccio and contrary evidence.**

25  **Contrary to Joe Cappuccio's testimony at trial that he bore no malice towards Cohen, he**

26  **testified in his deposition that the statement he made under oath in his declaration that Del**

27  **Mar advanced funds to the Avila Beach Joint Venture in 1999 and 2003 was incorrect and**

28  **rather Barry Cohen had "embezzled" money from Del Mar by writing himself checks for**

*DAVIS WRIGHT TREMAINE LLP*

28

unauthorized funds when in fact Del Mar was aware of the checks and had authorized Barry to make such advances. Christene Cohen testified that she thought Cappuccio had malice or ill will towards Barry because they are in this lawsuit.

> Cappuccio at RT 335:19-336:18
> Roggio at RT 116:25-117:7
> Christene Cohen at RT 314:17-22

109.    The Order of Arrest was signed by the Court on June 7, 2007, and the Vessel way arrested by the U.S. Marshal the same day.

> Joint Final Pretrial Order, Stipulated Fact No. 17; TR. EX. 42.

**Agree.**

110.    The Order Vacating the Arrest and releasing the Vessel was signed by the Court on August 17, 2007.

> Joint Final Pretrial Order. Stipulated Fact No. 18
> Defendants' Claim For Damages Resulting From The Alleged
> Wrongful Arrest

**Agree.**

111.    In 2004, the Point Loma had a net loss of $6,859. Adding back in depreciation, the average monthly income for the vessel was approximately $2,500.

> TR. EX. 51
> Cohen at RT 297:4 – 19

**Agree.**

112.    In 2005, the Point Loma had a net loss of $32,007. Adding back in depreciation, the average monthly income for the vessel was approximately $321.25.

> TR. EX. 51
> Cohen at RT 297:20 - 298:5

**Agree.**

113.    In 2006, the Point Loma had net income of $8,128. Adding back in depreciation of $34,967, the average monthly income for the vessel was approximately $3,591.25.

> TR. EX. 84
> Cohen at RT 299:11 - 300:24

**Agree.**

114.    In 2006, the vessel made a total of 31 trips.

> TR. EX. 206

DAVIS WRIGHT TREMAINE LLP

1    **Agree.**

2    115.    Cohen's share of the vessel's catch is determined by taking the amount paid to the vessel

3    for its fish (gross), then subtracting the cost of the fuel and ice for the trip (net), then dividing the

4    net by 2, and then subtracting his fixed costs.

5              Cohen at RT 300:25 - 302:5

6              **Agree that Cohen's share of the vessel's catch is determined by taking the amount**

7    **paid to the vessel for its fish (gross), then subtracting the cost of the fuel and ice for the trip**

8    **(net), then dividing the net by 2 and then subtracting his fixed costs but that fixed costs are**

9    **not subtracted to calculate the <u>income</u> to the vessel which is what the vessel lost before**

10   **subtracting fixed expenses that must be paid whether or not the vessel goes fishing.**

11             **Cohen at RT 485:25-486:20**

12   116.    During the year previous to the arrest, 2006, over the comparable time period in June, July

13   and August, the vessel made six trips.

14             TR. EX. 53, 206

15             **Defendants object on the basis of contrary evidence.  The arrest caused the vessel to**

16   **miss fishing trips between June 7 and August 31 and during this period of time in 2006, the**

     **vessel made seven trips.**

17             **Kobak at RT 369:25-370:1; 371:25-372:1**
18             **TE 206**

19   117.    The average net income to Cohen for each those trips was $2,654.13.  (Total net income

20   for the six trips = $31,849.46; divided by 2 (Cohen's 50% share); divided by total number of trips

21   (6).  This figure, however, does not take into account defendants' fixed expenses, which, for 2006,

22   were $72,557 (without depreciation) or an average monthly expense of $6,046.42 (or a per trip

23   expense of $2,340.55).  In 2006, therefore, his net profit per trip, according to his own records,

24   after expenses was $313.58.

25             TR. EX.s 53, 84, 206
              Cohen at RT 530:25 - 533:15

26             **Defendants object on the basis of contrary evidence as to the vessel's lost income from**

27   **the arrest.  The vessel lost average income in the range of $4116.99 to $4508.45 based on**

28   **trips taken in 2007, the year in which the arrest occurred and the trips were missed.  The**

DAVIS WRIGHT TREMAINE LLP

30

**vessel was prevented from making income because of the arrest.  The income lost was**

**necessary to pay the fixed costs, such as insurance and moorage fees, which were incurred**

**regardless of whether the vessel went fishing and should not be deducted from lost income.**

> Cohen at RT 483:13-17; 485:16-24
> TE 84

118.    In 2007 the vessel made a total of 14 trips in the five months prior to the arrest.

> Cohen at RT 529:10 – 16

**Agree.**

119.    In the time period from September through December 2007, after the vessel was released,

the vessel made 13 trips.

> Cohen at RT 534:13 - 535:3

**Agree.**

120.    While the vessel was under arrest, Cohen paid the crew $3,000 and the captain $5,000 even

though the vessel was not operating.

> TR. Ex. 211
> Cohen 499:11 – 500:19

**Agree.**

121.    Captain Kobak would have been able to hire sufficient crew to man the vessel even if

Cohen hadn't paid the crew.

> Kobak at RT 391:12 – 15

**Agree but that Barry Cohen made a business decision to pay the crew to "stick**

**around" so that the vessel could resume fishing as soon as it was released.**

> **Cohen at RT 499:13-20; 500:12-19**

122.    There is no evidence that Cohen ever asked Captain Kobak if he would be available after

the arrest to resume his duties without the need for payment, nor that he inquired during the arrest

as to the availability of qualified captains he could have hired after the vessel was released if

Captain Kobak was not available.

**Defendants object on the basis of contrary evidence.  Barry Cohen testified that he**

**could not afford to have a boat without a captain and a crew and that he made a business**

**decision to send the crew money to "stick around" so that they could resume fishing when**

DAVIS WRIGHT TREMAINE LLP

**the Point Loma was released. Mr. Cohen made this decision because it would be difficult to find a good replacement captain and crew and that the captain of the vessel is primary to the results of the fishing operation and Captain Kobak was at least three times a better captain than those Mr. Cohen had employed in the past.**

> **Cohen at RT 499:13-20; 500:12-19; 499:19-500:22; 483:25-484:13**

123.     There is no evidence that Del Mar had the vessel arrested in order to interfere with defendants' prospective economic advantage. Rather, both Roggio and Cappuccio testified that the decision to arrest the vessel was based on Del Mar's need to protect its security interest in the vessel.

> Roggio at RT 109:l0 - 111:l
> Cappuccio at RT 328:20 - 329:21

**Defendants object on the basis of contrary evidence. Joe Cappuccio testified that he knew the vessel was fishing at the time of the arrest and that he knew that if the vessel was not fishing, there would be no income from the vessel.**

> **Cappuccio at RT 349:23-25; 350:14-20; 340:4-11**

124.     In 2007 was not participating in the same groundfish fishery as the Point Loma, and wasn't monitoring that fishery. Del Mar was not buying fish from the vessel, nor did Del Mar know where the vessel was landing or selling its fish.

> Cappuccio at RT 331:1 – 18

**Agree but that Plaintiff knew the effect of the arrest on the vessel, which it knew to be fishing at the time, would be to make no income during the time of the arrest.**

> **Cappuccio at 349:23-350:20**

## II.     CONCLUSIONS OF LAW

125.     The Mortgage is a valid preferred ship mortgage under 46 U.S.C. § 31321 *et seq*.
Joint Final Pretrial Order, Stipulated Fact No. 5.

**Agree.**

126.     In this action for breach of a promissory note secured by a Preferred Mortgage on a vessel.

**Agree.**

*DAVIS WRIGHT TREMAINE LLP*

127.    The rights of the parties are governed by federal maritime law.  *Marastro Compania Naviera, SA. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (maritime law controls the substantive law of maritime seizures); Ship Mortgage Act (46 U.S.C. §§ 31301-31343).

**Agree that rights of parties governed by federal maritime law as to wrongful arrest.**

128.    The defendants' claims for wrongful arrest are governed by federal maritime law (*Id.*)

**Agree.**

129.    California's Statute of Frauds does not apply to maritime contracts.  *Union Fish Company v. Erickson*, 248 U.S. 308 (1919).

**Disagree because the loan agreement set forth in the Note does not involve inherently maritime issues and is not one of a "maritime character."  *Union Fish Co.*, 248 U.S. at 312 (maritime contract for services performed primarily at sea).  The alleged promise to pay the debts of Mr. Cohen's sons does not involve any maritime interests or services that necessitate the application of maritime law to address concerns of uniformity.  *See e.g.*, *Ham Marine, Inc. v. Dresser Industries, Inc*., 72 F.3d 454, 459 (5th Cir. 1995) (to the extent not inconsistent with admiralty principles, state contract law may be applied to maritime contracts).  Thus, the repayment of the debts is local in nature and the Court may therefore borrow from state law and apply California's statute of frauds.**

130.    Federal maritime law recognizes oral contracts.  *Kossick v. United Fruit Co.*, (1961) 365 U.S. 731.

**Agree but that California contract law may be applied as appropriate.  *See generally*, Schoenbaum, Admiralty and Maritime Law, 4th Ed., Vol. 1, § 4-1, 157-158 and §4-2, 164-166 (2007) (one of the sources of admiralty law is state law, "insofar as appropriate in the admiralty context" and because admiralty law is not all-encompassing, the Court may fashion a rule by looking to various appropriate sources, including state statutory law and common law which is then borrowed and applied as the applicable federal rule).**

DAVIS WRIGHT TREMAINE LLP

DEFS.' RESPONSES TO PL.'S AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. C-07-2952-WHA

DWT 11196012v1 0084289-000001

131.    "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."  *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 22-23 (2004).

**Agree but the court looks at the nature and character of the contract to see if it has "reference to maritime service or maritime transactions" to evaluate whether it is truly a maritime contract.  *Id*. at 24 (internal citations omitted).  The Note is not inherently maritime in nature because it represents a loan agreement between two California parties and involves only conditions of repayment and thus, the Court may apply California law.**

132.    Under the Ship Mortgage Act, 46 U.S.C. 531321, *et seq.*, on default of any term of the preferred mortgage, the mortgagee may enforce the preferred mortgage in an *in rem* action for a documented vessel.  46 U.S.C. § 31325.

**Agree.**

133.    Any indebtedness secured by a preferred mortgage may have any rate of interest to which the parties agree.  46 U.S.C. § 31322(b).

**Agree.**

134.    Under the terms of the mortgage and promissory note, the Cohens were required to make monthly payments of either $3,000 or 15% of the gross landings for each and every landing of seafood product *whichever was greater*.

**Disagree on the basis that the findings do not support this conclusion because it was the practice of Plaintiff not to enforce either payment provision or otherwise demand such payments.  *See* Defendants' Response to Findings above ("Defs. Resps.") Nos. 40 and 68.**

135.    The Cohens have admitted that they did not make these payments either as the $3,000 per month, and never based on the 15% of the gross landings.

**Disagree on the basis that the findings do not support this conclusion because Defendants admitted that they are current on their monthly payments under either provision by virtue of $175,000 payment.  *See* Defs. Resps. Nos. 53 and 68.**

136.    Had the Cohens made payments based on the 15% of the gross landings their payments would have been higher than the $3,000 per month.

DAVIS WRIGHT TREMAINE LLP

34

1    **Disagree on the basis that the findings do not support this conclusion because there is**

2    **no finding as to what 15% of the gross landings for each and every month that Plaintiff**

3    **alleges that such payments were due.  *See* Defs. Resps. No. 69.**

4        137.    The Cohens have also admitted that even after making all of the payments totaling

5    $188,000 they are still indebted to Del Mar for at least $27,000.

6    **Agree but that Defendants admitted they are still indebted to Del Mar for *only***

7    **$27,000 under the Note.  *See* Defs. Resps. No. 70.**

8        138.    The Court finds that the promissory note and mortgage provide for future advances

9    to be covered by the note and mortgage, and that future advances were made bringing the total

10    amount owed by the Cohens to $290,035.48.

11    **Disagree on the basis of lack of findings to support the conclusion that this is the total**

12    **amount owed and that debts arising from and owed to the Avila Beach Joint Venture and**

13    **Del Mar's attorneys fees were ever added to the Note.  *See* Defs. Resps. Nos. 11, 92.**

14        139.    After crediting the Cohens with all payments there is a balance due under the note

15    and mortgage of $128,749.79.

16    **Disagree on the basis that the findings do not support this conclusion because by**

17    **Plaintiff's own accounting, Defendants would owe only $102,035.48 and not $128,749.79**

18    **($290,035.48 less $188,000 (Defendants' total payments)).  Defendants do not admit that they**

19    **owe anything other than $27,000 remaining on the balance.  *See* Defs. Resps.  No. 92.**

20        140.    The Court finds that there was no agreement to waive interest, and that interest

21    accrued at the rate of 7.0%.  As of December 31, 2007 interest had accrued in the amount of

22    $49,207.  Del Mar is entitled to further interest at the rate of 7.0% from January 1, 2008 until the

23    date of the judgment in this case and thereafter at the federal rate for post judgment interest.

24    **Disagree on the basis that the findings do not support this conclusion because there is**

25    **evidence that Plaintiff waived interest when Joe Roggio told Barry Cohen that he would see**

26    **to it that the loan was interest free if Barry made the $175,000 payment on the Note.  *See***

27    **Defs. Resps. Nos. 10 and 93.**

28

DAVIS WRIGHT TREMAINE LLP

141.    In order prevail on their counterclaim for wrongful arrest, defendants must prove that Del Mar acted with malice, bad faith, or gross negligence. *Steven v. F/V BONNIEDOON*, 655 P.2d 206,209 (9th Cir. 1981); *Frontera Fruit Co., Inc. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937).

**Agree but that wrongful arrest may be found where the failure to disclose pertinent facts to the court (ie the $175,000 payment) reflects a "reckless disregard for the truth" and supports a finding that a party did not in fact act in good faith. *Coastal Barge Corp. v. M/V Maritime Prosperity*, 901 F. Supp. 325, 329 (M.D. Fla. 1994).**

142.    Although Del Mar never called Cohen to discuss the situation, or sent him a demand letter requesting payment, and it might have been the more prudent business practice to do so, those omissions do not amount to malice or bad faith. The Note that Cohen signed expressly provided that he waived his right to notice.

**Disagree on the basis of lack of findings to support conclusion that there was no obligation under the Note and Mortgage to contact Defendants and resolve questions of payment in light of the $175,000 lump sum payment that Defendants were not required to make, the close relationship of the parties, and Plaintiff's duty of good faith and fair dealing under the express terms of the Note to not arrest the vessel absent a material breach. *See* Defs. Resps. Nos. 40, 47, 94, 100-102, 104, and 108.**

143.    Cappuccio's accusations of embezzlement by Cohen occurred and resulted from events that took place long before this dispute, and since then, Del Mar and Cohen seemed to have mended their fences, as Del Mar hired Cohen and he and Cappuccio became friends. During this lawsuit, Cappuccio in his deposition recounted those charges of embezzlement, but that was long after the arrest and in the heat of litigation. Cappuccio's belief and statements that Cohen had embezzled funds from Del Mar are not enough to carry defendants' burden of showing Del Mar acted with malice or bad faith in arresting the vessel.

**Disagree on the basis of lack of findings in support of this conclusion. Cappuccio's testimony containing false accusations of a crime in the context of the present lawsuit**

DAVIS WRIGHT TREMAINE LLP

DEFS.' RESPONSES TO PL.'S AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. C-07-2952-WHA

DWT 11196012v1 0084289-000001

1  reflected his motivation to arrest the vessel and support a finding of bad faith.  *See* Defs.

2  Resps. Nos. 95-96, and 108.

3          144.    Del Mar had several discussions with its attorneys who had the benefit of the

4  spreadsheet and backup documentation evidencing the history of Cohen's loan.  With the

5  knowledge that Cohen had made several payment, including the lump sum payment of $175,000

6  in November 2005, and based on legitimate concerns regarding Cohen's deteriorating financial

7  and economic situation, Del Mar's attorney recommended they arrest the vessel.  Although the

8  Verified Complaint did not state the fact that Cohen had made $188,000 in payments up to that

9  time, Del Mar had probable cause to believe Cohen was in default and acted upon the good faith

10  advice of its attorneys and the arrest was therefore not grossly negligent.  Defendants have failed

11  to meet their burden to show the arrest was wrongful.

12          **Disagree on the basis of lack of findings that Plaintiff's concerns were legitimate and**

13  **it acted in good faith in arresting the vessel.  Plaintiff's concerns were based on**

14  **unsubstantiated rumors as to Barry Cohen's financial condition (not the financial condition**

15  **of the fishing vessel or Point Loma Fishing Company, Inc. as the owner of the vessel) and not**

16  **their ability to make payments.  There was no material breach of the Note.  Plaintiff's failure**

17  **to disclose the $175,000 payment, the relationship and practice of the parties with respect to**

18  **payments under the Note, the security of their interest, and Cappuccio's unfounded**

19  **accusations of embezzlement in the context of the present lawsuit which reflected his**

20  **motivation to arrest the vessel all support a finding that the arrest was done with bad faith,**

21  **malice or gross negligence.  *See* Defs. Resps. Nos. 96, 97-105, and 108.**

22          145.    Lost profits due to wrongful detention of a vessel are recoverable as an element of

23  damages.  *The Conqueror*, 166 U.S. 110 at 125 (1896).  Lost profits, however, must be able to be

24  calculated with reasonable certainty. *Id.* "In dealing with lost fishing profits, courts have

25  recognized the impossibility of mathematical precision in calculating such an award." *Williams v.*

26  *Eckert*, 643 P.2d 991 at 996 (1982).  "While what constitutes "reasonable certainty" is out of

27  necessity a fact-intensive inquiry in which the issue of evidentiary sufficiency can only be

28  determined on a case-by-case basis, it has been said that that process usually involves "a showing

in commercial cases that the vessel 'has been engaged, or was capable of being engaged in a profitable commerce." *Yarmouth Sea Products Limited v. David Scully*, 131 F. 2d 389 at 395 (1997). There must be a reasonable basis upon which to compute an award of lost profits in fishing cases. *Williams*, 643 P.2d 991 at 996 quoting *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P. 2d 216 ,222 (Alaska 1978). The calculation of lost profits in a fishing case is properly based upon the catches during the period preceding loss, the catches subsequent to the period of loss, as well as the records of catches of similar fishing vessels in the area during the period of loss. *Williams, supra*, at 996.

**Agree but evidence of other catches during the same time period as the lost fishing time are not required and there need only be a "reasonable basis" to compute the losses. *Williams*, 643 P.2d at 996.**

146. Here, defendants claim damages for the lost fishing profits during the period of time the vessel was under arrest, approximately 9 weeks. Based on Captain Kobak's testimony, defendants claim the vessel missed 13 or 14 trips as a result of the arrest. During the previous year, however, during the same time period, the vessel made only six trips. Additionally, prior to the arrest, it took the vessel five months to complete 14 trips, and following the arrest, it took the vessel more than five months to complete 13 trips. Reasonably, the vessel could have been expected to make 5 - 6 trips during the time it was under arrest.

**Disagree on the basis of the lack of findings to support this conclusion. Defendants missed the opportunity for 14 trips calculated by the vessel's captain based on the weather during the time of the arrest. *See* Defs. Resps. Nos. 87, 116.**

147. According to Cohen, his average profit for each of the 14 trips prior to the arrest was $4,508. That figure, however, does not take into account his fixed expenses for insurance, dockage, insurance and the like. According to his 2006 tax returns for the vessel, he only averaged $3,591.25 in net taxable income per month, or approximately 2-3 trips per month and an average of $1,390.17 per trip (taxable income, plus depreciation, of $43,095 divided by 31 total trips). According to his own records he netted only $313.58 after expenses for each of the six trips the vessel made during the comparable arrest period in 2006. Defendants presented no expert

DAVIS WRIGHT TREMAINE LLP

1    testimony on their lost profits claim.  I find defendants are entitled to recover damages for six lost

2    fishing trips at an average of $1,000 per trip for a total of $6,000.

3        **Disagree on the basis of contrary authority as to the deduction of fixed expenses in**

4    **calculating lost income.  Fixed expenses or "overhead" need not be deducted when**

5    **calculating lost income if such overhead is not in fact reduced.** *See e.g., Edwin K. Williams &*

6    *Co., Inc. v. Edwin K. Williams & Co.-East***, 542 F.2d 1053, 1062 (9th Cir. 1976) (damages may**

7    **be awarded on basis of gross profits when breach does not significantly reduce overhead).**

8    **Disagree further as to lack of findings to support the conclusion that Defendants were**

9    **damaged only in the amount of $6,000.  Defendants should be compensated for their lost**

10   **income for missed fishing trips for 14 trips because of the wrongful arrest where vessel lost**

11   **an average income of $4116.99 to $4508.45 based on a trips taken in 2007, the year in which**

12   **the loss occurred.** *See* **Defs. Resps. No. 117.**

13       148.    Cohen testified that he paid the crew to make sure they were available to work on

14   the vessel once it was released, but Captain Kobak testified he could have hired another crew.

15   Cohen is not entitled to those damages of $1,500 that he paid the crew during the arrest.

16       **Disagree on the basis of lack of authority that Barry Cohen is not entitled to recover**

17   **for the money he paid to the crew.  He is entitled to reasonable business expenses that he**

18   **incurred through ordinary care to mitigate damages to the business caused by the wrongful**

19   **arrest.** *Brandon v. Tibbs v. George Kevorkian Accountancy Corp.***, 226 Cal.App.3d 442, 466**

20   **(1990).  Efforts to minimize damages are determined by "the rules of common sense, good**

21   **faith and fair dealing."** *Id***.  The crew did not receive any income from fishing while the**

22   **vessel was under arrest.  Cohen testified that he made a business decision to pay the crew to**

23   **stick around so that he would not lose any additional fishing time once the vessel was**

24   **released from arrest.** *See* **Defs. Resps. Nos. 120, 121.**

25       149.    Cohen is entitled to reasonable business expenses a person of ordinary prudence in

26   his circumstances would expend.  *Brandon v. Tibbs v. George Kevorkian Accountancy Corp.*, 226

27   Cal.App.3d 442, 466 (1990).  He presented no evidence, however, of what such a person might

28   expend for the retention of a qualified captain, nor did he present any evidence of what steps he

DAVIS WRIGHT TREMAINE LLP

1    took to ensure that his payments to the captain were reasonable under the circumstances.

2    Therefore, he failed to meet his burden in proving those damages and cannot recover the $5,000 he

3    paid to the captain.

4         **Disagree on the basis of lack of support as to what evidence was required to show**

5    **Cohen acted reasonably in paying the captain.  Cohen's decision to pay the captain during**

6    **the time that the captain earned no fishing income while the vessel was under arrest was**

7    **"reasonable" and "expended in good faith for purposes of mitigating the losses inflicted."**

8    ***Brandon*, 226 Cal. App. 3d at 466.  Cohen paid the captain in to be available when the vessel**

9    **resumed its fishing activities because he believed that he would not be able to replace him**

10    **with the same caliber of captain.  *See* Defs. Resps. No. 122.**

11         150.    Defendants have presented no evidence that Del Mar interfered with the

12    defendants' relationship with Caito Fisheries.

13         **Disagree on the basis of lack of findings.  The vessel was unable to fish while it was**

14    **under arrest and therefore had no fish to sell to Caito Fisheries.  *See* Defs. Resps. Nos. 90-91.**

15         151.    There is no evidence that Del Mar was aware of any economic relationship

16    defendants had with any third party.  Therefore, defendants' have failed to meet their burden of

17    proving that necessary element for intentional or negligent interference with their prospective

18    economic advantage.

19         **Disagree on the basis of lack of findings to support this conclusion.  Plaintiff testified**

20    **that it knew the vessel was fishing at the time of the arrest and therefore, necessarily was**

21    **selling fish.  *See* Defs. Resps. Nos. 123, 124.**

22         DATED this 2nd day of June, 2008.

23                              Respectfully submitted,

                           DAVIS WRIGHT TREMAINE LLP

24

25                               By:         */s/ James P. Walsh*
                                 James P. Walsh

26                                     Gwen Fanger

27                               Attorneys for Defendants and Claimant
                           BARRY COHEN, CHRIS COHEN (aka
                           CHRISTENE COHEN), the F/V POINT

28                               LOMA and Claimant, F/V POINT LOMA
                           FISHING COMPANY, INC.

*DAVIS WRIGHT TREMAINE LLP*

DEFS.' RESPONSES TO PL.'S AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. C-07-2952-WHA

DWT 11196012v1 0084289-000001