1  **COX, WOOTTON, GRIFFIN,**
   **HANSEN & POULOS LLP**
2  Gregory W. Poulos  (SBN 131428)
   Max L. Kelley (SBN 205943)
3  190 The Embarcadero
   San Francisco, CA  94105
4  Telephone No.: 415-438-4600
   Facsimile No.:  415-438-4601
5
   **LAW OFFICES OF RICHARD P. WAGNER**
6  Richard P. Wagner (SBN 166792)
   700 Oceangate, Suite 700
7  Long Beach, CA 90802
   Telephone: (562) 216-2946
8  Facsimile:  (562) 216-2960
9  Attorneys for Plaintiff
   DEL MAR SEAFOODS, INC.
10

11             UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15  DEL MAR SEAFOODS, INC.                )  Case No.: CV 07-02952 WHA
                                          )
16           Plaintiff,                   )  **PLAINTIFF DEL MAR SEAFOODS,**
                                          )  **INC.'S RESPONSE TO**
17      vs.                               )  **DEFENDANTS' PROPOSED**
                                          )  **FINDINGS OF FACT AND**
18  BARRY COHEN, CHRIS COHEN (aka         )  **CONCLUSIONS OF LAW**
    CHRISTENE COHEN), *in personam* and   )
19  F/V POINT LOMA, Official Number       )
    515298, a 1968 steel-hulled, 126-gross ton, )
20  70.8- foot long fishing vessel, her engines, )
    tackle, furniture, apparel, etc., *in rem,* and )
21  Does 1-10,                            )
                                          )
22           Defendants.                  )
                                          )
23                                        )
                                          )
24  ─────────────────────────────────    )
                                          )
25  And Related Counterclaims             )
                                          )
26

27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DMSMarSeafoodv2504

1      Plaintiff DEL MAR SEAFOODS, INC. ("Del Mar") submits the following response

2 to defendants' proposed findings of fact and conclusions of law

3 **I.    FINDINGS OF FACT:**

4 **The Parties**

5

6 1.   The Plaintiff, Del Mar Seafoods, Inc., is engaged in the business of fish processing

7 and distributing frozen fish. [Roggio Trial Transcript ("TT") 41:7-8] The company is located

8 in Watsonville, California. [Pretrial Order, Stipulated Fact ("Stip.") #6] Plaintiff's president

9 is Joseph Cappuccio. [Cappuccio TT 320:12-13] Its controller is Joseph Roggio. [Roggio TT

10 39:23-40:1]

11          **No dispute.**

12 2.   Defendants Barry and Christene Cohen are a marital community and, although they

13 are currently separated, they are still legally married. [Pretrial Order, Stip. #2] In this case,

14 Plaintiff sued Barry and Christene Cohen individually, based on a Promissory Note ("Note")

15 and Ship Mortgage (both dated October 22, 2003) signed by them in favor of Plaintiff,

16 seeking to foreclose on the Ship Mortgage and to recover amounts alleged to be due on the

17 Note.

18          **No dispute except that the Promissory Note and Mortgage were signed on**
**October 31, 2003 not October 22. [TE 7 & 8].**

19

20 3.   At the time it was arrested on June 7, 2007, pursuant to process filed by Plaintiff in

21 this case, the F/V Point Loma (the "Vessel") was owned by the F/V Point Loma Fishing

22 Company, Inc. ("PLFC"), a California subchapter S corporation. [Pretrial Order, Stip. #3]

23 Barry and Christene Cohen owned the Vessel individually at the time they entered into the

24 Note and the Ship Mortgage. In 2004, the Cohens, who had owned and operated the vessel

25 since at least 2000, transferred ownership of the Vessel to PLFC. [Pretrial Order, Stip. #5;

26 Ex. 5]

27          **No dispute.**

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

Response to Defendants' Proposed Findings of Fact        1        Case No.: CV 07-02952 WHA

1    Mr. Cohen testified at trial that Plaintiff knew of this transfer and authorized the Bill of Sale

2    to be recorded with the U.S. Coast Guard. [Cohen TT 427:24-428:7]

3              **Disputed. The citation does not support the assertion that Del Mar knew
               of the transfer and authorized the Bill of Sale to be recorded with the U.S.
4              Coast Guard. In fact what Mr. Cohen testified to is that he is *almost
               positive that I had to bring the application to Del Mar Seafoods for Joe*
5              Cappuccio to sign…"**

6              **Cohen at RT 427:24 – 428:7 (emphasis added)**

7

8    Defendants stipulated that the Vessel is subject to the Ship Mortgage originally signed by

     Barry and Christene Cohen. Barry Cohen is the President and manager of PLFC and he and
9
     Christene each own a one-half interest in PLFC. [Cohen TT 254:15-19; Pretrial Order Stip.
10
     #3] Plaintiff sued the Vessel in rem in this case. PLFC filed its claim to the Vessel on June
11
     25, 2007 and joined as a Defendant.
12
              **No dispute.**
13

14   4.   The Vessel engages in fishing activities off the coast of Northern California. in the

15   groundfish fisheries located outside the State of California and in the U.S. Exclusive

16   Economic Zone ("EEZ") (from three to 200 nautical miles) and is licensed to land its catch

17   only in the State of California.

18
              **There is no evidence in the record that the vessel is only licensed to land
19            its catch in California.**

20   The Vessel's home port is Port San Luis, California.

21            **There is no evidence in the record that this is true.**

22
     The Vessel holds licenses from the State of California and a permit to engage in the
23
     groundfish fisheries issued by a Federal agency, the National Marine Fisheries Service.
24
              **There is no evidence in the record that this is true.**
25

26   The Federal permit is issued to PLFC and may be used by the Vessel, but may also be

27   transferred to another fishing vessel. [Cohen TT 422:7-425:8;Ex. 4]

28            **No dispute.**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

1    The Vessel is not licensed to fish unload fish in any state other than California. *Id.*

2

3               **The citation does not support this statement.**

4    **History of Dealings Between and Among the Parties**

5    5.   Plaintiff and Mr. Cohen have a history of business dealings together, beginning in

6    1999. [Cohen TT 432:22-433:2] In that year, Plaintiff and Mr. Cohen entered into a verbal

7    joint venture to engage in the business of buying and selling fish at a facility leased by Mr.

8    Cohen on the Port San Luis pier at Avila Beach, California ( "Avila Beach Joint Venture").

9    [Cappuccio 346:7-9; Cohen TT 433:9-11; Pretrial Order, Stip. #7]

10               **No dispute.**

11

12   In addition, Mr. Cappuccio had agreed to buy a one-half interest in the Vessel, which would

     be used in another joint venture in Mexico ("Mexico Joint Venture"). [Cohen TT 438:4-9]

13
                    **Mr. Cappuccio denied agreeing to buy a one-half interest in the Point**
14                  **Loma.**
                    **Cappuccio at RT 341:12 - 16**
15

16   The fish caught in that Mexico Joint Venture was to be sold to the Avila Beach Joint

17   Venture. [Cohen TT 437:21-438:3] Mr. Cohen was also an employee of Plaintiff from 1999

18   to 2006. [Pretrial Order, Stip. #6]

19               **No dispute.**

20

21   6.   In the Avila Beach Joint Venture, Plaintiff and Mr. Cohen agreed to a 50/50 split

22   of profits and losses. [Cohen TT 433:5-8] Mr. Cohen managed the day to day operations of

23   the Avila Beach Joint Venture, which purchased fish from various fishing vessels, processed

24   the fish, and sold it to wholesale and retail customers. [Cohen TT 433:9-434:7; Cappuccio

     TT 346:10-12]
25

26               **No dispute.**

27   Plaintiff agreed to finance the Avila Beach Joint Venture. [Cohen TT 434:10-17; Cappuccio

28   TT346:10-12]

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DxlMnSeafoodx2504

1   **No dispute, but the citation to Mr. Cappuccio's testimony does not
        support this fact.**

2

3   The books of the Avila Beach Joint Venture were reviewed by both Mr. Roggio and Mr.

4   Cappuccio on a regular basis, at least every thirty days. [Cohen TT 439:9-10; Cappuccio TT

5   346:15-18; Roggio TT 152:22-153:6] Plaintiff filed annual tax consolidated returns that

6   included the financial results of its share of the Avila Beach Joint Venture. [Roggio TT

7   153:7-15]

8           **No dispute.**

9   The Avila Beach Joint Venture itself did not sign a tax return. [Cohen TT 346:1]

10          **No dispute, but the citation is incomplete and does not support the
            assertion.**

11

12  7.  During the course of the Avila Beach Joint Venture, Mr. Cohen had authority to

13  write checks, make advances to vessels that sold fish to the Avila Beach Joint Venture, and

14  otherwise make arrangements for conducting the business of the Avila Beach Joint Venture.

15  [Cohen TT 435:9-10, 436:22-437:4]

16          **No dispute that Mr. Cohen had authority to sign checks on one of the
            bank accounts.  The citation does not, however, support the proposition
            that Mr. Cohen had authority to make advances to vessels.**

17

18          **Cohen at RT 436:22 – 437:4**

19  The fish was purchased by the Avila Beach Joint Venture from about 14 trawlers, and a

20  myriad of different fishermen, including gill netters, salmon trollers, and hook and line

21  fishermen. [Cohen 433:16-18].

22          **No dispute.**

23

24  The Avila Beach Joint Venture also purchased squid from Plaintiff to sell. *Id.* the fish was

25  sold through a retail market to the public and sold to restaurants and distributors. *Id.*

26          **There is no evidence of this in the record and the citations do not support
            it.**

27  8.  In 2001, Mr. Cohen and Mr. Cappuccio decided on a new business deal, one

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1    involving taking the Vessel to fish in Mexico. [Cohen TT 437:18-438:3; Pretrial Order, Stip.

2    # 9]

3                **No dispute.**

4    Mr. Roggio stated during his testimony that Joe Cappuccio and Barry had discussions about

5    Joe buying a fifty percent interest in the Vessel. [Roggio TT 54:2-4]

6                **This was hearsay as Mr. Roggio testified that he "guessed" they had
7                discussions. Del Mar does not dispute, however, that there were such
                discusions.**

8                **Roggio at RT 54:2 – 4.**

9

10   Mr. Cohen also testified that there was an agreement that Joe Cappuccio would buy a half

11   interest in the Vessel because they both thought they would catch a lot of fish in Mexico.

12   [Cohen TT 438:1-9]

13                **No dispute that this is what Mr. Cohen testified.  Mr. Cappuccio denied
                that a final agreement was reached for him to buy a half interest in the
                vessel.**

14                **Cappuccio at RT 340:25–314:1**

15

16   Based on that discussion, Mr. Cohen started taking advances of funds for the vessel. [Cohen

     438:6-18] During cross-examination, Mr. Roggio stated that "Joe [Cappuccio] had let
17
     everybody know that he was going to buy a 50 percent interest." [Roggio TT 135:19-23.].
18
     Although Mr. Cappuccio testified at trial that he "was never going to buy a fifty percent
19
     interest in the POINT LOMA" [Cappuccio TT 340:25–314:1]
20
                **No dispute.**
21
22   The weight of the evidence supports the conclusion he had made a promise to buy a one-half

23   interest in the Vessel.

24                **Del Mar disputes that the weight of the evidence supports the conclusion.
                Joe Cappuccio denied reaching an actual agreement to buy a 50%
25                interest in the Point Loma.  This is not in conflict with Joe Roggio's
                testimony that Joe Cappuccio planned to buy a 50% interest.  What a**
26                **person plans to do, and what is actually completed, are two different
                things.  Del Mar contends that the statement regarding the "weight of the**
27                **evidence" is argument. Ultimately, this "fact" is immaterial as Mr. Cohen
                admits advancing himself funds to fix up the vessel and that these, and**
28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafood/2501

1      **his other personal loans and fisherman loans were the genesis of the**
       **promissory note and mortgage.**
2      **Cohen at RT 278:12 - 22**

3      9.   On the basis of their agreement, Mr. Cohen began taking advances to upgrade the

4      Vessel, such as to add a hydraulic crane and rebuild the engine in preparation to fish in

5      Mexico. [Cohen TT 438:10-25]. According to Mr. Cohen, the Vessel was tied up for a long

6      time so he needed funds to pay for insurance and moorage. *Id.* All these expenditures were

7      recorded on the books of the Avila Beach Joint Venture. [Cohen TT 439:4-8]

8              **No dispute.**

9
       10.   Eventually, Mr. Cappuccio decided not to purchase a one-half interest in the
10
       Vessel, after he learned from Mr. Cohen that another vessel and permit were available.
11
       [Cohen 439:11-22]. Later, Mr. Cohen was asked to provide security for the funds that were
12
       used for upgrading the Vessel and he agreed to provide the security. [Cohen TT 440:1-12]
13
14             **No dispute.**

15     11.   Mr. Roggio then drew up the Note and the Ship Mortgage, using forms he had used

16     previously. [Roggio TT 46:7-10, 47:20-48:3] He and Mr. Cohen then negotiated the amount

17     to be secured by the Note, and eventually arrived at the sum of $215,000, based on advances

18     Mr. Cohen had received with respect to the Vessel. [Cohen 441: 6-19]

19             **Incomplete.  Mr. Cohen testified that the $215,000 was a "low estimate"**
               **of what he borrowed.  Mr. Cohen also testified that Del Mar didn't know**
20             **exactly how much he had advanced to himself and that he owed money**
               **"over and above the $215,000."**
21             **Cohen at RT 282:7 – 22; 285:12 – 286:8; 441:6 - 19**

22     Mr. Roggio testified that the amount encompassed advances that Barry Cohen had taken to

23     make repairs, personal loans that Barry had taken, then some fuel and ice charges towards the

24     fishing vessel prior to the fishing vessel going fishing. [Roggio TT 48:25–49:1-6]

25             **No dispute, but this is confirmed by Barry Cohen's own testimony as**
COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP
26     **well.**
               **Cohen at RT 278:12 – 22**
190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601
27

28
DelMarSeafood/2504

1    Mr. Roggio also testified that the amount of the Note looked back at debts incurred prior to

2    the date of the Note. [Roggio 131:9-18]

3            **No dispute, but incomplete. The question and answer make it clear that**
         **Mr. Roggio is testifying regarding the original "facial amount" of**
4        **$215,000, not the subsequent additional advances taken by Mr. Cohen**
         **that increased the balance due under the note and mortgage.**
5        **Roggio at RT 131: 9 – 18.**

6
7    12.   Barry Cohen and Christene Cohen then signed the Note and the Ship Mortgage, as

8    of October 31, 2003 in the amount of $215,000. [Exs. 7 and 8] Neither agreement is signed

9    by Plaintiff or its representatives. [Roggio TT 139:11-16, 145:13-14] The Ship Mortgage was

     then recorded with the United States Coast Guard. [Roggio TT 145:1-5]

10
11           **No dispute.**

12   **The Parties' Dealings With Regard to the Note and Mortgage**

13   13.   The original terms of the Note required that Defendants would make monthly

14   payments in the amount of $3,000 or fifteen percent of the gross landing receipts of the

15   Vessel's seafood production. [Ex. 7 (Introduction)] However, the evidence at trial indicates

16   that Plaintiff never calculated or demanded any payment based on the fifteen percent

17   provision. [Cohen TT 478:16-19; Roggio TT 206:11-13]

18           **Del Mar objects to the use of the term "original" as it suggests that there**
         **was a change in the terms of the note. There is no evidence of any oral or**
19       **written modification of the terms of the note regarding the 15%**
         **provision.**
20
         **Del Mar notes that there is no requirement under the note and mortgage**
21       **for Del Mar to perform the calculation of what constitutes 15% of the**
         **gross landings. Rather, it is up to the debtor to make the proper**
22       **payment.**

23       **TE 7 & 8**

24       **There is no evidence that Del Mar was given the information necessary to**
         **calculate the 15% of gross landings that the Cohens were obligated to**
25       **pay.**

26       **Further, since the note and mortgage clearly provide that waiver of one**
         **provision does not waive future obligations, the fact that Del Mar did not**
27       **demand payment under the 15% provision did not excuse the Cohen's**
         **failure to honor it.**
28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/Seafood/2504

1

2

> **TE 206 (COHEN 699-700, 705, 710) shows that the Cohens failed to make their proper monthly payments in the period from January – June, 2007 immediately prior to the vessel's arrest.**

3

4

In fact, Plaintiff never sent a written demand at any time to Defendants for payments of any

kind under the Note. [Roggio TT 143:23-144:7]

5

6

> **No dispute that there was no "written" demand, but the cited testimony establishes that an oral request was made. This was also confirmed by Mr. Cohen in his testimony.**

7

8

> **Cohen at RT 458:22 – 459:12 [Roggio called and left message asking Barry to make payments]**

9

10

> **Moreover, the argument that no written demand was made ignores the fact that the note and mortgage specifically provide that the debtor (Cohen) waived demand or presentment.**

11

> **TE 7, pg. 2, ¶ 6.**

12

14.  The first payment under the Note was a $5,000 payment drawn on the checking

13

account for the Vessel, dated December 22, 2004. [Ex. 25]

14

> **No dispute.**

15

16

15.  Subsequently, Joe Cappuccio asked Mr. Cohen to make a large payment on the

Note. [Cohen; 453:18-25, 454:1-14; Christene Cohen 308:4-13] Joe Cappuccio testified that

17

18

he told Barry Cohen to get a loan from a bank and make payments to the bank instead of to

Del Mar Seafoods. [Cappuccio TT 323:19-25] Barry Cohen testified that Joe Cappuccio told

19

20

him that Plaintiff's bank had raised the issue of the size of the Note, because it had been

funded by the line of credit from the bank. [Cohen TT 453:21-454:14] Mr. Cohen told Mr.

21

22

Cappuccio that "he would see what he could do." [*Id.* at 454:7-11] After taking out a second

mortgage on their home, Defendants then made a large, lump sum payment in the amount of

23

24

$175,000 by personal check dated November 9, 2005. [Ex. 29; Cohen TT 452:12-18]

> **No dispute.**

25

26

16.  The Note clearly bares an interest term for seven percent (7%) per year. [Ex. 7,

27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

1  (Introduction)] However, prior to delivery of the $175,000 payment, Plaintiff had never billed

2  for, demanded, or carried on its books, any interest relating to the Note. [Roggio TT 170:11-

3  23]

4            **No dispute although the citation does not fully support the assertion. Mr.**
          **Roggio explained in the cited testimony that for income tax purposes the**

5            **interest is calculated when received not when it is "accrued."**

6            **Roggio at RT 170:17 – 23.**

7            **The suggestion that the interest was not "accruing" because it wasn't**
          **tracked on the books is not correct.**

8

9      In previous testimony in the Avila Beach case, Mr. Roggio testified that Mr. Cohen

10  was never asked to pay interest or invoiced for it and the purpose of the Note was "just to

11  have something on paper" and formalize it in case something happened to Mr. Cohen.

12  [Roggio TT 234:25-235:15]

13            **No dispute but misleading use of quotations. Mr. Roggio included in his**
          **answer that the note was to "formalize it" (referring to the interest)**

14            **which is stated above but left out of the quotations. This is consistent**

15            **with his testimony that the interest was provided for and "formalized"**
          **but not demanded because it would be collected at the end of the note and**

16            **therefore not tracked for income tax purposes.**

17  None of Plaintiff's own accounting documents showed any accrued interest. [Roggio TT

18  235:13- 23]

19            **This is not disputed, but the citation does not support the assertion.**

20  He also testified in the Avila Beach litigation that Mr. Cohen was never asked to pay interest

21  nor was he ever invoiced for any interest. [Roggio TT 235:6-9] Plaintiff kept no record of any

22  accrued interest on its books. [Roggio TT 170:19-23] The only document showing accrued

23  interest was prepared by Plaintiff's counsel and submitted to the Court as an exhibit to the

24  Declaration of Joe Cappuccio in support of Plaintiff's opposition to Defendants' motion to

25  vacate the order of arrest. [Roggio 177:3-13; Ex. D to Ex. 221]

26            **No dispute but see response above.**

27

28  17.  Mr. Cohen testified that sometime prior to making the $175,000 payment as

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DebMie/Seafood/2504

1   requested by Mr. Cappuccio, he had a conversation with Mr. Roggio who told him that if Mr.

2   Cohen made a large payment, he would see to it the Note was interest free. [Cohen 457:1-21;

3   458:1-6] Mr. Roggio testified that he did not have any conversations with Mr. Cohen about

4   interest. [Roggio TT 89:7-11]

5   **Incomplete. While Cohen testified as noted above, he also testified in the
    Avila Beach case regarding payment of interest. His testimony in that
6   case, given on November 16, 2005 – one week after he made the $175,000
    payment – was that he did not know why no interest was being charged.**
7

8   **Cohen at RT 292:10 –20**

9   **This obviously calls into substantial doubt Mr. Cohen's testimony in this
    case that he made the $175,000 payment specifically on the promise that
10  the note would become interest free. As noted above, Joe Roggio denied
    having any such conversation.**

11

12  18.   Shortly after writing the check, Mr. Cohen delivered the $175,000 check to Mr.

13  Cappuccio in his office. [Cohen 455:21 – 456: 12] Mr. Cohen stated that he handed Mr.

14  Cappuccio the check and said "I will get you the rest as soon as I can." *Id.* Mr. Cohen

15  testified that Mr. Cappuccio then said that he was not worried about it, not concerned about it

16  anymore, that it was such a small amount. *Id.*

17  **Not disputed, but incomplete. Mr. Cohen admitted that this was the
    "total conversation."**

18  **Cohen at RT 456:9 – 10.**

19  **In this "total conversation" there is no reference to waiver of monthly
20  payments, waiver of the 15% requirement, waiver of the interest or any
    other waiver.**

21  Mr. Cappuccio, in his testimony, said that all he told Mr. Cohen was to give the check to Joe

22  Roggio. [Cappuccio 324:9-16]. However, in his deposition testimony read at trial, Mr.

23  Cappuccio said that he didn't really remember if he had any other conversation with Mr.

24  Cohen after he handed him the check and told him to give it to Mr. Roggio. [Cappuccio 342:

25  7-13].

COX, WOOTTON,
26  GRIFFIN, HANSEN
    & POULOS LLP

27  190 THE EMBARCADERO
    SAN FRANCISCO, CA
    94105
    TEL 415-438-4600
    FAX 415-438-4601

28  DelMar Sea foods/2304

    **Disputed. The citation does not support the asserted fact. Mr.
26  Cappuccio testified that he "never" had such a conversation with Mr.
27  Cohen. Cappuccio also testified that the "whole conversation" consisted**

1    of him thanking Mr. Cohen and asking him to give the check to Joe
     Roggio.
2    Cappuccio at RT 324:9-16; 342: 7 - 13

3

4    Mr. Cohen testified that he made this payment as a prepayment and it was to be applied to

     pay down the Note. [Cohen TT 294:9-11]
5
              **Disputed. There is no testimony that the payment was a "prepayment."**
6             **Mr. Cohen testified that the payment was made simply to "pay down the**
              **note as Joe Cappuccio asked me to."**
7

8    19. A few days after the $175,000 check was delivered, Mr. Roggio gave Mr. Cohen an

9    accounting document containing a summary of various accounting entries. [Ex. 37]

10            **Disputed. The date that Ex. 37 was created was not specified, but was**
              **placed by the witnesses as either the day of the payment (November 10,**
11            **2005) or shortly thereafter, and before November 15, 2005 when Barry**
              **Cohen faxed it to his attorney for use in his November 16, 2005**
12            **deposition.**

13
     Mr. Roggio said that Mr. Cohen asked him to prepare a schedule of what encompassed his
14
     loan balance so he would know what he would need to collect from each of his sons. [Roggio
15
     TT 58: 9-11] Mr. Cohen testified that he asked Mr. Roggio to let him know what his sons
16
     owed. [Cohen 523:15-24]
17
              **No dispute but incomplete. Mr. Cohen testified that he "took**
18            **responsibility for the debts of Michael Cohen" and Leonard Cohen**
              **[Cohen at RT 286:20 – 287:7; 523:15 – 23]. He also testified that he "took**
19            **the responsibility for these amounts [encompassed within the $295,429**
              **balance shown on Ex. 37 and 38] and just put it on mine."**
20

21   The schedule of payments did not show any interest. [Roggio TT 192:16-19; Exs. 37, 38]

22            **Not disputed but incomplete. Mr. Roggio's complete answer at 192:16 –**
              **19 includes the explanation that "Again, the purpose of this schedule was**
23            **never to show interest." See also Roggio at RT 170:17-23.**

24
     20. This schedule included amounts carried as receivables on the Avila Beach Joint
25
     Venture books as well as amounts Plaintiff claimed Barry and Christene Cohen owed under
26
     the Note. [Roggio TT 58:7-11]
27
              **The citation does not support the proposed finding. What the citation**
28            **does show is Mr. Roggio's testimony that "Barry asked me if I could**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

199 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DefMotSeaTools/2304

1  prepare a schedule of what encompassed his loan balance so he knew
2  what he would need to collect from each of his sons."

   **Del Mar also disputes that the schedule "included amounts carried as**
3  **receivables on the Avila Beach Joint Venture books…" The evidence is**
   **that the schedule was prepared between November 10 – 15, 2005 by**
4  **which time all of the amounts had been transferred to the books of Del**
   **Mar Seafoods.**
5  **See Roggio at 84:5 – 85:1; 106:6 – 17 & TE 30.**

6      The schedule that Mr. Roggio gave to Mr. Cohen contained headings for amounts

7  relating to: Michael Cohen, Olde Port Inn, Inventory, Point Loma, and Barry. [Exs. 37, 38]

8  The Michael Cohen heading showed an amount of $13,920.40 and was for fish that he

9  purchased from the Avila Beach Joint Venture and was taken from the accounting records of

10 the Avila Beach Joint Venture. [Roggio TT 60:10-19] The Old Port Inn heading showed an

11 amount of $18,069.10 and was for invoices or sales made to Barry Cohen's other son,

12 Leonard Cohen, for fish purchased from the Avila Beach Joint Venture. [Roggio TT 63:5-11]

13      **No dispute.**
14

15 The Inventory heading showed an amount of $10,383.24 and was for inventory left over from

16 the Avila Beach Joint Venture that was kept by Mr. Cohen. [Roggio TT 65:25-66:15]

17      **No dispute but incomplete. The citation to 65:25 – 66:15 should include**
        **the statement that Barry Cohen instructed Del Mar to add the amount to**
18      **his balance. 65:16 – 18. See also, Cohen at RT 468:11 – 469:12**
        **[questioning by the Court].**
19

20 The Point Loma heading for $16,021.31 related to fuel, ice, and other advances to the Point

21 Loma from the Avila Beach Joint Venture. [Roggio TT 70:2-10; Ex. 18] Lastly, Mr. Roggio

22 testified that the Barry heading for $237,035.48 included the original balance of $215,000

23 from the Note and additional advances for repairs to the Point Loma after the Note was

24 signed. [Roggio TT 76:5-17]

25      **Del Mar also notes however that Barry Cohen also testified that the**
        **$237,000 figure was for advances.**
26      **Cohen at RT:289:10 – 25**

27 21.  The schedule also showed how Mr. Roggio was allocating the $175,000 payment.

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1   [Roggio TT 167:13-15] Mr. Roggio testified that Barry Cohen had no objection to how the

2   funds were being applied. [Roggio TT 82:20-83:2] Mr. Cohen testified that Mr. Roggio gave

3   him the schedule and they had a very short conversation about it. [Cohen TT 464 :3-20]. Mr.

4   Cohen said that "This doesn't look right to me" and that, in reply, Mr. Roggio said "I'm just

5   trying to clean up the books." *Id.* Christene Cohen testified in her deposition that she never

6   saw the schedule of payments. [Christene Cohen TT 418:23-419:13]

7           **Disputed.  Mr. Roggio also testified that Barry Cohen never said that the**
            **scheduled didn't look right to him.**
8           **Roggio at RT 178:23 – 179:3**

9
    22.  Mr. Roggio testified that Mr. Cohen had agreed to add each of the amounts on the
10
    spreadsheet to his "balance." [Roggio TT 67:25-68:23 (sons' debts); 72:13-21 (inventory);
11
    74:6-12 (Point Loma advances); and 86:019-87:3 (attorneys' fees)]
12
            **No dispute but incomplete.  Barry Cohen also confirmed that he**
13          **instructed Del Mar to add all of these balances to "mine."**
            **Cohen at RT 285:12 – 286:19.**
14

15   Mr. Roggio kept only one balance or account for Mr. Cohen on his books. [Roggio TT 87:6-

16   9; 219:7-10]

17          **This is not a correct statement of the testimony.  The testimony from Mr.**
            **Roggio is that Del Mar had only one balance with Barry Cohen and that**
18          **was the balance under the promissory note.  [Roggio at RT 87:6-9]  The**
            **testimony of Barry Cohen also supports a finding that that there was only**
19          **one balance. [Cohen at RT 285:12-286:19 (use of singular); 507:21-511:2]**

20
    The spreadsheet provided by Mr. Roggio showed separate columns for each of the amounts
21
    in Mr. Cohen's "balance." [Exs. 37, 38]
22
            **No dispute.**
23

24   Mr. Cohen testified that he did not agree to add these amounts to the Note and Mortgage.

25   [Cohen TT 279: 13-20, 470:10-471:1]

26          **Disputed.  Barry Cohen also testified that he did.**
            **Cohen at RT 285:12 – 286:19; 507:21 – 511:2.**
27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar\Seafoods\2504

1   Mr. Roggio testified that there was no written document signed by Mr. Cohen agreeing to add

2   the specific debts to the Note. [Roggio TT 55:17-25]

3           **Disputed.  The citation confirms that Mr. Roggio testified that the "future**
            **advances" clause of the note and mortgage applies to these debts.**
4

5   Mr. Roggio testified that he "assumed" that Mr. Cohen meant to add Michael and the Old

6   Port Inn debts to the Note because Mr. Roggio unilaterally decided to maintain only a single

7   balance on his books for Mr. Cohen. [Roggio TT 179:6-13]

8           **Disputed.  There is no testimony that Mr. Roggio "unilaterally" decided**
            **this. Mr. Roggio acted on Barry Cohens instructions to add the amounts**
9           **"to his balance." Barry Cohen admitted that he told Mr. Roggio that he**
            **would "be responsible" for the debts and Mr. Cohen admitted that he**
10          **said to "add them to mine."**
            **Roggio at RT 170: 6 – 13;**
11          **Cohen at RT 285:12 – 286:19; 507:21 – 511:2**

12   Mr. Roggio testified that he never discussed the addition of the other amounts to the Note

13   with Christene Cohen. [Roggio TT 179:10-15]

14          **No dispute but limit to TT 170:14 – 15**

15   23.   The Mortgage provides for Future Advances as follows:

16          FUTURE ADVANCES: This mortgage is executed for the purpose of securing not
            only the payment of the above described note but also to secure all future advances
17          made by the holder of said note to the mortgagor; and said mortgage shall remain in
            full force and effect to secure all future advances and all renewals or extensions of the
18          above described note.
            [Ex. 8, Art. IV]
19
            **No dispute.**
20

21   24.   Mr. Cohen testified that the additional amounts were not included in the Note and

22   Mortgage because they were not related to the Note and Mortgage. [Cohen TT 281:23-282:4]

23          **Disputed.  The citation is incomplete and does not support the assertion.**
            **The complete citation is Cohen at RT 280:4 – 282:4 [questioning by**
24          **Court].**

25   He stated that the amounts were not part of the "future advances" provision because they

26   were not specific to the Note and Mortgage. [Cohen TT 280:4-15]

27          **Disputed.  Cohen also testified in the Avila Beach case that he agreed that**
            **all of these items were added to the promissory note.**
28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafood/2504

1

2

3

**Cohen at RT 287:8 – 17 [the promissory note "and a list of payments I made on that note."]; RT 286:12 – 19; RT 510:18 – 512:1 [explaining how he "equivocated" when he testified in the Avila Beach case.]**

4

5

6

7

25.  Mr. Roggio also testified that Mr. Cohen had agreed to pay Plaintiff's attorneys' fees in the Avila Beach litigation and that Mr. Cohen agreed that these fees should be added to his "balance." [Roggio TT 86:19-87:3] Mr. Roggio added the Plaintiff's attorneys' fees to the only balance he kept. [Roggio TT 87:6-9]

8

9

**Not disputed but incomplete. Mr. Roggio testified that he added the amount to the balance under the promissory note. Roggio at RT 87:6-9.**

10

11

12

13

Mr. Cohen testified that he agreed to pay for "reasonable" attorneys' fees and in his mind, this meant only $2,000 to $3,000 and not the $21,000 put on his "balance" by Mr. Roggio. [Cohen TT 467:1-22, 526:10-21] He testified that he did not agree to put these fees on the Note. [Cohen TT 468:7-9]

14

15

**No dispute, but contradicted by Joe Roggio at RT 85:15-87:9.**

16

17

18

19

20

26.  Subsequently, Defendants made additional payments on the Note in January ($2,000), February ($3,000), and April ($3,000) of 2007, each drawn on the checking account for the Vessel. [Exs. 34, 35, 36] In total, Defendants paid Plaintiff $188,000 on the Note up to the date of the arrest of the Vessel, June 7, 2007. The last check was dated April 23, 2007. [Ex. 36]

21

**No dispute.**

22

**Wind-Up of the Avila Beach Joint Venture**

23

24

25

26

27

27.  Mr. Cohen testified that the Avila Beach Joint Venture was having difficulties getting truck access onto the pier so that product could be delivered to Los Angeles. [Cohen TT 444:16-25 and 445:1-15]. The dispute over access resulted in litigation with the Port, with the court eventually finding that the Port had breached the leases. [Cohen TT 445: 16-18] Mr.

28

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DxMxnSxnSxxJv2504

1    Cohen stated that, because of these problems, the Avila Beach Joint Venture began losing

2    money each month. [Cohen TT 446:16-22].

3         **No dispute.**

4

5    28. In September 2004, Mr. Cappuccio sent an email to Mr. Cohen saying that Plaintiff

6    wanted to get out of the Avila Beach Joint Venture and put Mr. Roggio in charge of ending

7    the Avila Beach Joint Venture. [Cohen TT 447:1-12].

8         **Disputed in part. What Mr. Cappuccio really said was that Del Mar was "out of the joint venture. "I'm out of Avila" and "Friday is the last day that I'm involved…"**

9         **Cohen at RT 446:23 – 447:12; TE 86**

10    29. The Avila Beach Joint Venture carried its assets on its books, reviewed by Joe

11    Roggio, through the end of 2004. [Roggio TT 152:24-153:6; 210:3-14; Ex. 225] These assets

12    included inventory sold by the Avila Beach Joint Venture to Barry Cohen [Roggio TT

13    210:11-14], cash assets of the Avila Beach Joint Venture [Roggio TT 209:4-14], and

14    accounts receivable of the Avila Beach Joint Venture, including those owed by Barry

15    Cohen's sons, Michael Cohen and the Old Port Inn [Roggio 209:15-210:2]. The inventory of

16    the Avila Beach Joint Venture was carried on the books of the Avila Beach Joint Venture at

17    least until October 28, 2004. [Roggio TT 182:6- 9; Ex. 24] Mr. Cohen testified that this was

18    the inventory taken over from the Avila Beach Joint Venture on October 28, 2004. [Cohen

19    TT 448:7-19] The accounts receivable owed by Michael Cohen and the Old Port Inn as well

20    as the inventory were all transactions that occurred within the Avila Beach Joint Venture.

21    [Roggio TT 222:22-223:4] The advances to the Point Loma were also part of the Avila Beach

22    Joint Venture. [Roggio TT 223:5-8].

23         **Disputed. Roggio and Cohen both testified that the JV ended at the end of September, 2004. [Roggio at RT 42:19-43:2; 105:9-11] Cohen was credited with his 50% interest in the JV. [Roggio at RT 106:6-107:11]**

24

25    **The Assignment of Joint Venture Interest**

26    30. The parties signed an Assignment of Joint Venture Interest ("Assignment")

27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DdMr/Seafood/2504

1  effective October 22, 2004. [Roggio TT 104:3-15] Attorneys for both Plaintiff and

2  Defendants participated in the preparation of the Assignment in March 2006 that reverted

3  back to October 22, 2004. [Roggio TT 127:9-11; Cohen TT 446:5-9, 474:16-20]

**No dispute that the parties signed the Assignment. [TE 47]. Del Mar disputes that the evidence at trial establishes that attorneys for both parties participated in the preparation of the Assignment in March 2006. The cite to Roggio TT 127:9-11 does not support that fact. Joe Roggio testified that Cohen's attorney drafted the assigment [Roggio 226:14-227:2] and that Del Mar's attorney, Rich Wagner only looked at it. [Roggio 227:3-11].**

8  31.  Joe Cappuccio testified that he wanted nothing to do with the litigation brought by

9  Mr. Cohen on behalf of the Avila Beach Joint Venture. [Cappuccio TT 357:3-8] He wanted

10  to protect Del Mar Seafoods. [Cappuccio TT 358:4-6] Mr. Cappuccio testified that he had

11  signed a letter in December 2005 to release Del Mar Seafoods from participating in the Avila

12  Beach litigation. [Ex. 40; Cappuccio TT 332:8-10, 332:20-333:1] He was concerned the

13  letter would not adequately protect Del Mar Seafoods from the Avila Beach litigation.

14  [Cappuccio TT 358:10-13] The formal Assignment was signed to create more distance

15  between the Avila Beach Joint Venture lawsuit and Del Mar Seafoods. [Cappuccio TT 359:2-

16  7].

**No dispute that Cappuccio wanted nothing to do with Cohen's litigation against the Port San Luis Harbor District. Cohen's lawsuit, however, was not brought on behalf of the Avila Beach Joint Venture and there is no support in defendants' citation or the record for that proposition. The lawsuit was brought by plaintiffs Barry Cohen and Leonard Cohen, personally, as well as by Olde Port Inn, Inc. and Olde Port Fisheries, Inc. [Cohen TT 262:1-6; 265:13-17; *TE 49*; FRE 201(f) (judicial notice): San Luis Obispo Co. Superior Court No. CV 040897, *Barry A. Cohen; Leonard A. Cohen; Olde Port Inn, Inc. and Olde Port Fisheries, Inc. v. Port San Luis Harbor District*]**

**No dispute that Cappuccio wanted to protect Del Mar.**

**No dispute that Cappuccio signed TE 40 in December 2005 to release Del Mar from participating in the Port San Luis Harbor District litigation.**

**No dispute that Cappuccio was concerned the letter would not adequately protect Del mar from the Port San Luis Harbor District litigation or that the formal Assignment was signed to create more distance between the Port San Luis Harbor District lawsuit and Del Mar Seafoods.**

28  32.  The Assignment signed by both Joe Roggio and Barry Cohen was made effective

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL 415-438-4600 FAX 415-438-4601

DelMarSeafoods/2504

1    October 22, 2004. [Ex. 47] It gave all of the rights to the Avila Beach Joint Venture to Barry

2    Cohen, specifically providing that:

3    Assignor hereby confirms and reaffirms it prior assignment and transfers to Assignee, to

4    the fullest extent possible and without restriction, all of Assignor's entire interest in the

5    Joint Venture, including, but not limited to, the Joint Venture's claims, if any, against the

6    District, and including, without limitation all rights, entitlements and/or interests in and to

7    any claims, rights of action, causes of action, recoveries, damages, or other legal recourse

8    owned or held by the Joint Venture." [Ex. 47, ¶ 2]

9    **No dispute. Roggio, however, testified that when the JV ended, there was**
     **a *loss* and the other debts of the JV had already been transferred to Del**
10   **Mar's books. [Roggio 106:6-108:8]**

11   **Arrest of the Point Loma**

12   33. Plaintiff arrested the Point Loma on June 7, 2007. Plaintiff had become concerned

13   about its security in the Point Loma based on Joe Roggio's and Joe Cappuccio's assumptions

14   about the effect of Mr. Cohen's divorce and potential liability for attorneys' fees in the Avila

15   Beach litigation on his financial position. [Cappuccio TT 326:25-327:8, 327:23-328:7] Joe

16   Roggio and Joe Cappuccio discussed these concerns after receiving the $3,000 payment from

17   Mr. Cohen in April 2007. [Roggio TT 228:11-229:17] Joe Cappuccio testified at trial that he

18   did not recollect knowing about the $3,000 payment in April 2007. [Cappuccio TT 354:1-15]

19   However, Joe Roggio testified at trial that he told Joe Cappuccio about the payments that

20   Barry Cohen had made. [Roggio TT 148:2-8]

21   **No dispute the vessel was arrested on June 7, 2007.**

22   **Cappuccio was also concerned about Cohen's statement under oath that**
     **he may be forced to declare bankruptcy. [Cappuccio 327:3-21; TE 49, ¶**
23   **22]**

24   **No dispute Roggio discussed concerns with Cappuccio after $3,000**
     **payment.**

25
     **No dispute that Cappuccio didn't recollect knowing about the $3,000**
26   **payment in April 2007.**

27   **No dispute Roggio told Cappuccio about payments Cohen had made.**

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/Seafoods/2504

34.  Joe Roggio and Joe Cappuccio discussed seizing the Point Loma. [Roggio TT 148:14-15] Joe Cappuccio testified that when he spoke to his attorney about his concerns, the attorney never told him to send a demand letter for payment to Barry Cohen before the arrest. [Cappuccio TT 355:23-256:3] He also testified that the attorney never discussed lien priority with him. [Cappuccio TT 351:5-18] Joe Cappuccio testified at trial that the attorney told him that his only option was to arrest the vessel. [Cappuccio TT 356:5-8] In his deposition, Joe Cappuccio testified that he told the attorney to collect his money and secure the vessel and the attorney "did what he was supposed to do." [Cappuccio TT 355:16-21]

**No dispute Roggio and Cappuccio discussed seizing the vessel.**

**Cappuccio did not testify that when he spoke to his attorney about his concerns regarding Cohen's financial situation his attorney never told him to send a demand letter to Cohen before arresting the vessel. Cappuccio testified that when he spoke to his attorney, his attorney did not mention that he had the *option* of sending a demand letter, or that he *suggested* that he do so. [Cappuccio TT 355:23-356:5]**

**No dispute Cappuccio did not discuss lien priorities with his attorney.**

**Cappuccio testified that his attorney told him arresting the vessel was his "*best and only option*." [Cappuccio 356:5-8]**

**Cappuccio testified in his deposition that he *asked* his attorney to collect the money and secure the *money*. No dispute that he testified that his attorney did what he was supposed to.**

35.  Prior to the arrest, Joe Roggio had no personal knowledge that the vessel had failed in its fishing activities, declared bankruptcy in any proceeding, or that any writ of execution, garnishment, or attachment or other legal process had been issued against the vessel. [Roggio TT 141:9-13, 142:12-20] He also had no knowledge that any writ of execution, garnishment, attachment or other legal process had been issued against either Barry or Christene Cohen. [Roggio TT 142:21-6] Barry Cohen testified that he has never declared bankruptcy [Cohen TT 478:23-25] and is in the process of challenging potential claims for attorneys' fees from the Avila Beach litigation. [Cohen TT 479:1-11] Mr. Cohen also testified that no other lien holders had attempted to foreclose against the Point Loma. [Cohen TT 432:16-21]

**Cohen testified that he will be suing his former law firm over attorneys fees they believe he owes. [Cohen 479:1-11]**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL: 415-438-4600
FAX 415-438-4601

DxIMm\Seafood\2501

1    36.  Joe Roggio never called Barry Cohen with regard to the business activities of the

2    Point Loma and never sent a written demand for payment prior to the arrest. [Roggio TT

3    143:19-144:7] Mr. Cohen was never warned that Del Mar was going to arrest the vessel. [*Id.*;

4    Cohen TT 432:14-18] Plaintiff based its decision to arrest the Point Loma on its concerns

5    about collecting its money and wanted to make sure its security position was safe. [Roggio

6    TT 147:25-148:1; Cappuccio TT 351:5-15]

7    **No dispute that Joe Roggio never called Barry Cohen with regard to the business activities of the Point Loma, however, he testified that he tried to make such a demand by calling him before Cohen's $2,000 payment (at the end of Jan '07). [Roggio 143:23-144:2; TE 34]**

8

9    **No dispute that Cohen was never warned that Del Mar was going to arrest the vessel, but it was not required to. [TE 7, pg. 2, ¶ 6]**

10

11    **No dispute that Del Mar based its decision to arrest the Point Loma, *in part*, on its concerns about collecting its money and wanted to make sure its security position was safe. Del Mar was concerned about collecting its money when they learned about Cohen's financial position: the possibility he might have to declare bankruptcy and his divorce. [Roggio at RT 109:17-21; 110:16-24; Cappuccio at RT 327:3- 328:19] Del Mar also based its decision to arrest the vessel after apprising its attorneys of the situation and requesting legal advice. [Roggio at RT 112:19 – 113:24; 230:4 – 25]**

12

13

14

15

16    37.  Joe Cappuccio testified that he and Barry Cohen were friends. [Cappuccio TT

17    323:19] He testified in the Avila Beach litigation that Barry Cohen was "honest." [Cappuccio

18    TT 334:21-24] However, he also alleged that Barry Cohen had embezzled funds from the

19    Avila Beach Joint Venture in his deposition testimony in the present case. [Cappuccio TT

20    335:16-18] However, Joe Roggio testified that he knew about the advances and they were

21    authorized. [Roggio TT 116:25-117:7]

22    **No dispute that Cappuccio testified that he and Cohen were friends.**

23    **No dispute he testified in the Avila Beach litigation that Cohen was honest.**

24

25    **No dispute that he testified in his deposition in this case that Cohen embezzled funds, but the citation does not support that, and he also testified that it occurred many years ago and played no role in the decision to arrest the vessel. [Cappuccio 330:7-14] Since those events the parties became good friends, they went to the gym together for lunch every day, Cappuccio got Cohen hooked on working out and Cohen taught Cappuccio to fly fish in Oregon. [*Id.* 330:15-18]**

26

27

28

COX, WOOTTON, GRIFFIN, HANSIN & POULOS LLP

190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL 415-438-4600 FAX 415-438-4601

DelMarSeafood/2304

1

**No dispute that Roggio testified he knew about Cohen's advances and they were authorized.**

2

38.  Plaintiff did not disclose the $175,000 payment to the Court when it sought the ex

3

parte order of arrest. [Plaintiff's Complaint] Plaintiff also claimed that Defendants had not

4

paid interest that they owed under the terms of the Note and Mortgage. However, Plaintiff

5

has no accounting of any accrued interest that it had prepared itself. [Roggio TT 170:13-23]

6

Plaintiff submitted a document containing accrued interest that was prepared by one of its

7

attorneys with Joe Cappuccio's declaration in support of its opposition to vacate the order of

8

arrest. [Ex. 221 (Ex. D)). Although Joe Roggio testified at trial that Plaintiff's attorney, Rich

9

Wagner, prepared this document containing accrued interest, Joe Cappuccio testified that he

10

believed that Joe Roggio prepared it. [Roggio TT 177:3-13; Cappuccio TT 361:13-17] Joe

11

Roggio further testified that despite his statements in his declaration submitted to this Court

12

in support of Plaintiff's opposition to Defendants' motion to vacate the arrest that he had

13

applied part of the $175,000 payment to accrued interest prior to the arrest, he testified at trial

14

that he did not keep accrued interest on Del Mar Seafoods' books prior to the arrest. [Roggio

15

TT 172:21-24, 174:19-175:5]

16

**No dispute the $175,000 payment was not included in the Complaint.**

17

18

**Del Mar disputes that it has no accounting of any accrued interest that it prepared itself. The citation does not support that proposition. Instead, Roggio testified that Del Mar's normal procedure is to not accrue interest *on its books* until its actually collected, for income tax purposes.  [Roggio 170:17-23]**

19

20

21

**No dispute that Del Mar submitted a document containing accrued interest that was prepared by one of its attorneys with Joe Cappuccio's declaration in support of its opposition to vacate the order of arrest, although the citation does not support that fact.**

22

23

**No dispute that Joe Roggio testified at trial that Del Mar's attorney, Rich Wagner, prepared the document containing accrued interest, or that Joe Cappuccio testified that he believed that Joe Roggio prepared it.**

24

25

**No dispute that Roggio stated in his declaration in support of Del Mar's opposition to Defendants' motion to vacate the arrest that he had applied part of the $175,000 payment to accrued interest prior to the arrest, or that he testified at trial that he did not keep accrued interest on Del Mar Seafoods' books prior to the arrest.**

26

27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

**Defendants' Damages**

39.    The Point Loma was arrested on June 7, 2007. [Kobak TT 369:25-370:1] The Point Loma was actively fishing at the time of the arrest. [Kobak TT 370:17-19] Plaintiff's president, Joe Cappuccio, testified that he knew that the Point Loma was fishing at the time of the arrest. [Cappuccio TT 349:23-25] At the time of the arrest, the Point Loma was selling its catch to Caito Fisheries, a fish dealer or wholesaler. [Kobak TT 375:8-20] Caito Fisheries is a well known fish dealer. [Kobak TT 375:16-17; Cappuccio TT 350:9-10]

> **No dispute the vessel was arrested on June 7, 2007.**

> **No dispute the vessel was actively fishing at the time of the arrest.**

> **Disputed.  Cappuccio also testified he "*assumed* it was fishing."** **[Cappuccio 330:22-25]**

> **No dispute that at the time of the arrest, the Point Loma was selling its catch to Caito Fisheries, a fish dealer.  The citation does not support the proposition that Caito is a fish *wholesaler*.**

> **No dispute that Kobak testified Caito is a fairly well-known fish dealer.**

40.    The Court ordered the arrest vacated on August 17, 2007. The Point Loma began fishing again on August 31, 2007. [Kobak TT 371:25-372:1] During the time of the arrest, the Point Loma had no fish to sell. [Kobak TT 387:3-5] It also had no fishing income during that time. [Kobak TT 387:6-8]

> **No dispute that the Court ordered the arrest vacated on August 17, 2007, or that the vessel resumed fishing on August 31, 2007.**

> **No dispute that during the arrest the vessel had no fish to sell or that it had no fishing income.**

41.    The arrest prevented the Point Loma from fishing for over two months. [Cohen TT 529:17-24] Based on the weather during the time of the arrest, the captain of the Point Loma determined that the arrest caused Defendants to miss opportunities for at least 14 fishing trips. [Kobak TT 382:6-9]

> **Del Mar does not dispute that the vessel was under arrest for more that two months and, as a result, could not fish.**

> **Del Mar disputes that Kobak testified that, based on the weather, the vessel missed at least 14 fishing trips.  Kobak testified that the vessel**

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL 415-438-4600 FAX 415-438-4601

DelMarSeafoods/2504

1    **could have made at most "13, *possibly* 14 trips during the time the vessel
2    was under arrest. [Kobak 382:6-11]**

**Kobak also testified that there were other reasons the vessel might not
3    catch fish, or catch an average amount of fish, for example, break downs,
     or just not catching fish. [Kobak 394:2-395:18]**
4

5    42.    Defendants calculated the average income per trip for all fishing trips taken in 2007

6    before and after the arrest of the Point Loma. [Cohen TT 483:11-14] To approximate the

7    average of the missed trips, Defendants used the same year, 2007, that the trips were missed

8    with the same captain and the same conditions. [Cohen TT 483:13-17]

9    **No dispute that this is what defendants have done, but Del Mar disputes
     that it is a proper methodology. The defendants' method assumes that
10   the vessel *would have* made 13 or 14 trips in the just over two months it
     was under arrest. The vessel, however, had a history of making that
11   many trips over 3½ and 5 months. [Cohen 529:10-16; 534:13-535:3]
     Furthermore, the average monthly income for this same vessel with this
12   same captain over the same period in 2006 was just $2,753. [TR. EX.s 53,
     84, 206;Cohen at RT 530:25 – 533:15]**
13

14   43.    Mr. Cohen hired Captain Dave Kobak in April 2006 to serve as the captain of the

15   Point Loma. [Kobak TT 369:1-4, 13-15] Mr. Cohen paid the captain 25% of the gross catch

16   after deducting fuel and ice. [Kobak TT 385:18-386:1] The Point Loma also had two crew

17   members at the time of the arrest who were each paid 12.5% of the gross catch after

18   deducting fuel and ice as compensation. [Kobak TT 386:18-25]

19   **No disputes.**

20   44.    Defendants calculated lost income based on each trip of the Point Loma in 2007 by
21
     taking the gross amount of fish sold and subtracting fuel, ice, and the captain and crew share.
22
     [Cohen TT 484:22-24, 485:2-6] Defendants then calculated that their average income per trip
23
     for trips taken prior to the arrest was $4,508.45. [Cohen TT 494:10-12] Defendants also
24
     calculated their average income per trip for trips taken after the arrest through the end of
25
     2007 was $4,116.99. [Cohen TT 493:2-6]

26   **No dispute that defendants calculated lost income in this way, however,
     Del Mar disputes that this is a correct methodology. *See* previous
27   response to ¶ 42, above.**

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1   45.  Defendants also suffered damages in the amount of $8,000 that Mr. Cohen paid to

2   the captain and crew while the Point Loma was under arrest. [Cohen TT 500:20-25; Ex. 211]

3   Mr. Cohen paid the captain $5,000 while the Point Loma was under arrest. [Kobak TT

4   387:12-16] He also paid the crew members $1,500 each during the time of the arrest. [Cohen

5   TT 500:20-25; Trial Exhibit 211] Mr. Cohen testified that he could not afford to have a boat

6   without a captain and a crew. [Cohen TT 499:13-14] Captain Kobak testified that generally

7   he could find crew members to crew the vessel. [Kobak TT 396:14-16] Barry Cohen testified

8   that he made a business decision to send the crew money and asked them to "stick around" so

9   that they could resume fishing when the Point Loma was released. [Cohen TT 499:17-20,

10  500:12-19] Mr. Cohen made the business decision to pay the captain and crew because it

11  would be difficult to find a good replacement captain and crew. [Cohen TT 499:19-500:22]

12  Mr. Cohen testified that the captain of the vessel is primary to the results of the fishing

13  operation and Captain Kobak was at least three times a better captain than those Mr. Cohen

14  had in the past. [Cohen TT 483:25-484:6]

15  **Del Mar disputes that Defendants suffered damages of $8,000 for
    payment to the captain and crew during the arrest. Del Mar does not
16  dispute that Cohen paid the captain $5,000 and each crew member $1,500
    during the arrest.**

17
18  **No dispute that Captain Kobak testified he could generally find crew
    members to crew the boat.**

19  **Disputed that Cohen ever testified he made a "business decision" to pay
    the captain and crew during the arrest. Not disputed that he testified he
20  paid them to stick around so they could resume working on the vessel
    once it was released.**

21
22  **Again, disputed that Cohen ever testified he made a "business decision."
    Not disputed that he testified its hard to find a good captain and that "I
    think its difficult find a good crew, also." [Cohen 499:17-24]**

23
24  **No dispute that Cohen testified that the captain of the vessel is primary to
    the results of the fishing operation and Captain Kobak was at least three
25  times a better captain than those Mr. Cohen had in the past. This,
    however, is speculation and hyperbole without expert foundation.**

26  ## II. CONCLUSIONS OF LAW

27  **Jurisdiction**

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

46. This Court has subject matter jurisdiction over this case in admiralty. The Ship Mortgage provides this Court with admiralty jurisdiction, based on the Federal Ship Mortgage Act. 46 U.S.C. §§ 31322, 31325, and 31329; Schoenbaum, Admiralty and Maritime Law, 4th Ed., Vol. 1, § 3-10, 130-139 (2007).

**No dispute.**

**Applicable Law**

47. This is a case of federal admiralty and maritime law and therefore substantive admiralty law must be applied. Schoenbaum, Admiralty and Maritime Law, 4th ed., Vol. I, § 4-1, 157 (2007). Because admiralty law is not all encompassing, the court may look to various appropriate sources, including admiralty case precedent as well as state statutory law and common law which is then borrowed and applied as the applicable federal law. Id., at § 4-2, 164-166.

> **Substantive federal maritime law must be applied, but it has a long history of recognition of oral contracts. State rules related to statute of frauds are not applicable.** *Union Fish Company v. Erickson,* **248 U.S. 308 (1919) ("the uniformity of rules governing [maritime contracts] may be destroyed by perhaps conflicting rules of the States");** *The Lottawanna,* **88 U.S. 558 (1875) ("it certainly could not have been the intention to place the rule and limits of maritime law under the disposal and regulation of the several states.")**

48. Admiralty has well-established rules that apply to the issue of wrongful arrest. *Stevens v. Bonnie Doon,* 655 F.2d 206, 209 (9th Cir. 1981) (damages recoverable for detention of vessel in bad faith); *Frontera Fruit Co. v. Dowling,* 91 F.3d 293, 297 (5th Cir. 1937) ("gravamen" of right to recover is "bad faith, malice or gross negligence of the offending party"); *Coastal Barge Corp. v. M/V Maritime Prosperity*, 901 F. Supp. 325, 326-327 (M.D. Fla. 1994) (failure to disclose "pertinent fact" amounts to bad faith and a "reckless disregard for the truth"). Because of the need for uniformity, the Court will apply these admiralty precedents to the issue of wrongful arrest.

> **Agreed, but the citation to *Coastal Barge* is distinguishable. In that case the plaintiff failed to disclose that the vessel had already been arrested and released on the giving of security. There is no case holding that failure to provide the Court with a complete accounting or to reference a**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DxMerSeafoods/2504

1    **particular payment is a basis for finding of bad faith, malice or gross-
     negligence.**

2    49.    With respect to interpretation of obligations under the Promissory Note and Ship

3    Mortgage, there appears to be no overriding admiralty rule, given that these are common

4    contractual undertakings where local concerns predominate, particularly here where all

5    parties are residents of the State of California. *Ham Marine, Inc. v. Dresser Industries, Inc.*,

6    72 F.3d 454, 459 (5th Cir. 1995) (to the extent non inconsistent with admiralty principles,

7    state contract law may be applied to maritime contracts. In fact, maritime mortgages were

8    only accorded maritime lien status after Congress enacted the Ship Mortgage Act of 1920.

9    *The Thomas Barlum*, 293 U.S. 21, 33 (1934) (prior to enactment of the Ship Mortgage Act of

10   1920, admiralty had no jurisdiction over a suit to foreclose a mortgage on a ship). This

11   approach would not be appropriate with respect to an issue of interpreting a bill of lading (*see*

12   *Norfolk Southern Railway Co. v. James Kirby, Pty, Ltd.*, 543 U.S. 14 (2004)) or an oral

13   agreement to serve as master of a vessel (*see Union Fish Co. v. Erickson*, 248 U.S. 308, 311

14   (1919)). In such cases, the principle of uniformity would predominate. Because the issue of

15   "default" is one relating to a contract between residents of the State of California and there is

16   no overriding principle of admiralty to be applied, the Court will apply principles of

17   California contract law to interpretation of the Note and Ship Mortgage.

18              **Disputed.  See paragraph 47 and plaintiff's trial brief on application of
                State statute of frauds.  The decision in *Ham Marine* is completely
19              irrelevant as the case involves a contract for shipyard work and in no
                way discusses the need for uniformity in application of contract law to
20              preferred ship mortgages.  The need for uniformity in this arena
                precludes application of state contract law.**

21

22   **Breach of the Promissory Note and Mortgage**

23   50.    The sole issue for the Court to decide, with respect to the Note and Ship Mortgage,

24   is whether the Cohens are in default for failure to make the required monthly payments under

25   the terms of the Note. Ex. 7. On its face, the Note requires "monthly payments of $3,000 or

26   fifteen (15) percent of the gross landing receipts of each and every landing of seafood product

27   by the fishing vessel POINT LOMA, whichever is greater, commencing on January '04 and

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar\Seafood\2504

1   on the 15th of each succeeding month until principal and interest are fully paid." [Ex. 7] The

2   face amount of the Note is $215,000.

3   **No dispute that the Court should decide whether the Cohens were in
    default for failure to make the required monthly payments and that the
4   note terms require payments of $3,000 per month or 15% of the gross
    landing receipts for each and every landing of seafood product by the
5   fishing vessel POINT LOMA *whichever is greater..*

6   51.   At trial, it was established that the Cohens made six payments on the Note. This

7   first was by check dated December 22, 2004 in the amount of $5,000. [Ex. 25] Another large

8   payment of $175,000 was made by check dated November 9, 2005. [Ex. 29] Mr. Cohen

9   testified that he made this large payment after being requested to reduce the size of the Note

10  by Mr. Cappuccio. [Findings of Fact "FF" ¶15] Mr. Cohen also testified that, before he

11  delivered the check, Mr. Roggio told him that, if Mr. Cohen made a large payment, Mr.

12  Roggio would see to it that the Note was interest free. [FF ¶17] Mr. Roggio denied he made

13  this comment. [ ] In January 2007, Mr. Cohen made another payment of $2,000, another in

14  February ($3,000) and the final one before the arrest by check dated April 23, 2007 ($3,000).

15  [FF ¶26] In all, the Cohens made $188,000 in payments on the $215,000 Note, representing

16  over 62 monthly payments at the rate of $3,000 per month.

17  **The Court should find that Mr. Cohen's testimony regarding waiver of
    interest is not credible.  One week after he made the $175,000 payment,
18  Mr. Cohen testified in the Avila Beach case that he did not know why he
    wasn't being charged interest.  This completely discredits his testimony in
19  this case that the payment was made on the specific promise to waive
    interest in return for his lump sum payment, and it calls into question
20  Mr. Cohen's credibility on all other matters at issue.  [Cohen at RT
    291:17-292:20]**

21

22  **No dispute that the Cohens have made a total of $188,000 in payments,
    but the Court should not find that it represents "62 monthly payments."
23  The payment of $175,000 was made to "pay down the note" and there
    was no evidence presented at trial that there was any agreement to treat
24  the payment as future monthly payments.  In fact the evidence was
    exactly the opposite.  The fact that Mr. Cohen also made future payments
25  after the $175,000 and sent his note agreeing to continue doing so (TE 40)
    is strong evidence that there was no agreement to treat the lump sum
    payment as anything other than a pay down of principal.**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

26

27  52.   It appears that Plaintiff never sent notices or made demands in writing with respect

28

to payments on the Note. Moreover, it appears that Plaintiff kept no accounting records showing accrued interest as being due and owing prior to the arrest of the Vessel. [FF ¶16] Finally, neither party ever made a calculation or kept records of calculations showing what might be fifteen percent of each of the fishing vessel's landing. [FF 13] No such records or calculations were admitted as evidence at trial.

> **Consistent with the party's long history of business dealings, Del Mar made its requests for payment orally, and Mr. Cohen admitted that he received Joe Roggio's telephone message asking that he begin making his monthly payments, and Mr. Cohen confirmed that he would by making sporadic payments in January, March and April, 2007 (TE 40, 34-36).**

> **There is no evidence that there was a waiver of the 15% provision, and it was the Cohens who had the relevant information.**

53.   Based on the dealings of the parties and the significant advance payment, which was not required under the terms of the Note, I conclude that the Cohens are not in material breach of the Note or Mortgage. *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal.App.3d 1032, 1051 (1987) (the law recognizes that although every instance of noncompliance with contract's terms constitutes a breach, not every breach justifies treating the contract as terminated... California courts allow termination only if the breach can be classified as 'material,' 'substantial,' or 'total'). Applying this basic principle in this case will create no havoc with admiralty law. I also find Mr. Cohen's testimony credible when, after fulfilling Mr. Cappuccio's request for a large payment by delivering the $175,000 check, Mr. Cappuccio said he was not worried about when additional payments would be made. [FF ¶18] Applying all the payments to the Note based on my conclusion that the parties only followed the monthly $3,000 payment provision not the fifteen percent provision, even if sporadically, the Cohens are paid up through February 2009. No evidence was presented with respect to the landings of the Vessel that would alter this conclusion.

> **The obligation to make timely and proper payments under a preferred mortgage cannot be an immaterial term. It is the fundamental obligation under the promissory note and mortgage. There is no evidence that this obligation was ever waived, and in fact Mr. Cohen acknowledged his obligation to make the payments in his note of January 30, 2007 (TE 40). See response to paragraph 51 above.**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

**The Amount Remaining on the Note**

54. Plaintiff has alleged that additional obligations were added to the Note by oral

agreement. Plaintiff also alleges that interest of seven percent, as set forth on the face of the

Note, is also due and owing.

> **No dispute, except that the note provides for "Future Advances" to be added to the note. See paragraph 55 below for quote.**

55. With respect to the additional obligations, there was no written agreement signed

by the parties that enlarged the size of the principal to be repaid under the Note. The Note

itself, which was not signed by Plaintiff, does not contain any mutual agreement to make or

accept "future advances." Both documents were drafted by Mr. Roggio for Plaintiff.

However, the Mortgage, which was signed only by the Cohens, contains the following sundry

provision:

> FUTURE ADVANCES: This mortgage is executed for the purpose of securing not only the payment of the above described Note but also to secure all future advances made by the holder of the Note to the mortgagor; and said mortgage shall remain in full force and effect to secure all future advances and all renewals or extensions of the above described note.

> **The note and mortgage is itself a written agreement enlarging the size of the principal. Future advances clauses are common terms in preferred mortgages and serve an important function. See, e.g., Conard v. Atlantic Ins. Co. (1828) 26 U.S. 386, 1828 U.S. LEXIS 416, \*32; 46 USCS § 31321 (b)(3); H.R. Rep. No. 100-918, reprinted in 1988 U.S. Code & Cong. News at 6111 (definition of § 31321(b)(3) intended to included future financing); Southland Financial Corp. v. Oil Screw Mary Evelyn, 248 F. Supp. 520, 522 (E.D. La. 1965) (use of mortgage to secure future advances is a widely accepted commercial practice; regarding validity of future advances clause in Louisiana mortgage, instructive to look to state law); Union Bank v. Wendland (1976) 54 Cal.App.3d 393, 398 (future advance clauses valid in California); Oaks v. Weingartner (1951) 105 Cal.App.2d 598, 602 (if mortgage provides for future advances, the amounts need not be stated).**

56. Plaintiff claims that numerous receivables and other obligations relating to the

Avila Beach Joint Venture were added to the Note under this future advances clause. [FF

¶22] Plaintiff also claims that Mr. Cohen agreed to add certain legal fees incurred by Plaintiff

during the Avila Beach litigation to the balance of the Note. [FF ¶25] The Cohens deny that

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1    they ever agreed to add any amounts after the date of the Note to the balance of the Note. [FF

2    ¶¶22, 25]

3    　　　　**The evidence at trial was that Barry Cohen repeatedly told Del Mar that**
　　　　**he would be "responsible" for the debts and that they should be added to**
4    　　　　**his "balance." Mr. Cohen also confirmed this in his testimony in the**
　　　　**Avila Beach case where he agreed that the balance due on his note was**
5    　　　　**consistent with the original $295,489 amount ("Because I took the**
　　　　**responsibility for these amounts owed and just put it on mine." [Cohen**
6    　　　　**at RT 286:9-19])**

7    57.   Defendants also argue that the future advances clause in the Ship Mortgage is to be

8    effective if in fact the Note is amended in writing to add additional amounts, or to renew or

9    extend the Note. The purpose of this clause is to assure that any such advances, renewals or

10   extensions from a lender, even if later in time, would have the lien priority of the original

11   Ship Mortgage filing date. However, I need not reach this issue. It is clear from the Ship

12   Mortgage that only "future advances" to the Cohens individually would come under this

13   provision.

14   　　　　**The parties specifically agreed to treat the additional payments as**
　　　　**advances and to add them to the note.  The Court should find that,**
15   　　　　**consistent with maritime law allowing oral modifications, that Mr.**
　　　　**Cohen's request to add the amounts to his balance modified the terms to**
16   　　　　**effectuate the agreement.**

17   58.   All the debt items that Plaintiff claims were "added to the Note" are in fact assets or

18   receivables owed to or owned by the Avila Beach Joint Venture, as a separate legal business

19   entity, not the Cohens individually. For certain, the alleged receivables from Michael and

20   Leonard Cohen, the Olde Port Inn, and the Joint Venture's inventory are definitely not

21   "future advances" under the Ship Mortgage since they are transactions from the Avila Beach

22   Joint Venture. [FF ¶29]

23   　　　　**The evidence established that Del Mar funded all of the financial**
　　　　**requirements of the joint venture, and that there was a complete**
24   　　　　**accounting at the conclusion of the joint venture in which Mr. Cohen was**
　　　　**credited with all of his interest and the remaining accounts receivables**
25   　　　　**were transferred to Del Mar's books.  The debts were transferred to, and**
　　　　**became a right of Del Mar, which Mr. Cohen agreed to pay when he**
26   　　　　**asked that the amounts be added to his balance.**

27   59.   Plaintiff has attempted to establish that "advances" to Mr. Cohen that predated the

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods#2504

Response to Defendants' Proposed Findings of Fact          30          Case No.: CV 07-02952 WHA

1    Note were in fact treated as "future advances" under the Note. I hereby rule that no such

2    amounts can be added to the balance of the Note, based on the parol evidence rule.

**There were no such advances added to the balance. The evidence is that the amounts added were incurred after October 31, 2003.**

5    60.  The items carried on the books of the Joint Venture attributable to the Point Loma

6    present a more difficult issue. However, any such obligations for funds advanced to pay for

7    fuel and ice and other "necessaries" for the Vessel were in fact obligations owing to, and held

8    by, the Avila Beach Joint Venture, never by Plaintiff individually. Thus, this particular debt

9    item is also not covered by the future advances clause of the Ship Mortgage.

**See response to paragraph 58.**

11
12   61.  I also find that the Cohens did not agree to add to the Note any obligation to pay
     the legal fees of Plaintiff in the Avila Beach litigation.
13

**Mr. Cohen agreed to be responsible for these fees and to have them added to his balance. [Roggio at RT 85:15-89:9; Cohen at RT 467:1-10]**

15   62.  Finally, with respect to all obligations listed on Plaintiff's schedule of payments,

16   either Exs. 37, 38, or 39, that are assets of, or amounts owed to, the Avila Beach Joint

17   Venture, I find that Plaintiff assigned all causes of action for recovery of such amounts to

18   Barry Cohen in the Assignment effective as of October 22, 2004. [Ex. 47] Each party was

19   represented by counsel in the preparation of this Assignment and its language is broad and

20   sweeping. Plaintiff was relieved of all liabilities, and assigned all assets to Mr. Cohen, under

21   the plain terms and meaning of the Assignment. Thus, they could not be part of the "balance"

22   owed under the Note.

**The assignment was drafted by Cohen's attorneys for the specific purpose of releasing Del Mar from any obligations in the lawsuit between the Cohens and the Port San Luis Harbor District. It was drafted in 2005 and backdated to October 22, 2004, a date by which all parties testified that the joint venture had ended and the amounts at issue were transferred to Del Mar's books. Barry Cohen testified in his deposition in November, 2005 that he owed the amounts to Del Mar despite the fact that this testimony was after the assignment was entered into, and he also confirmed his obligation in the January 30, 2007 note (TE 40), again without reference to the assignment. The Court should find that the assignment was not effective to amend Barry Cohen's obligations under**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar\Sea\facts\2504

**the promissory note and mortgage and his agreement to have the various debts added to his balance.**

63.  The Note bears interest at seven percent. Defendants claim that the parties never intended that interest be charged or collected. [FF ¶¶16, 17] Moreover, no accounting documents contained accrued interest and Mr. Roggio never gave the Cohens any accounting or made any demand for the payment of interest prior to the arrest of the Vessel. [FF 16] Mr. Cohen testified that, prior to making the $175,000 payment, Mr. Roggio said that, if the Cohens made such a large payment, he would see to it that the Note was interest free. [FF ¶17] I therefore find that it was reasonable for the Cohens to treat Mr. Roggio's statement as a waiver of the interest provision of the Note, as consideration for making a large prepayment under the Note of benefit to Plaintiff.  Here the parties executed a new arrangement that varied from the terms of the original Note, with consideration, and therefore amended it. Cal. Civ. Code § 1698(b) (written contract may be amended by an oral agreement to the extent the oral agreement is performed by the parties); Cal. Civ. Code § 1698(c) (written contract may be amended by oral agreement provided it is supported by consideration). Applying these state contract principles to this dispute will not interfere with any uniformity policies under admiralty law. Thus, there is no interest to add to the Note.

> **There was never any agreement to waive interest. Cohen's effort to manufacture an oral agreement to waive interest is revealed by his testimony in the Avila Beach case where he testified that he did not know why there was no interest being charged.  It is particularly telling that this testimony came just one week after Mr. Cohen made the $175,000 payment.  Cohen at RT 292:10 –20**

64.  I therefore find that, although the Cohens are not in material breach, they owe Plaintiff the balance of $27,000 under the Note, to be paid as they agree with Plaintiff or by monthly payments of $3,000 a month beginning in February 2009.

> **The Court should find that the principal balance due under the promissory note and mortgage is $128,749.79, plus interest at 7.0%.**

**The Wrongful Arrest of the Vessel**

65.  Requesting that this Court exercise its powers of ex parte arrest is matter of

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1   considerable legal significance, of constitutional proportions. Schoenbaum, Admiralty and

2   Maritime Law, 4th Ed., Vol. 2, § 21-3, 402 (2007) (maritime arrest, like maritime

3   attachment, is a powerful procedural tool in the hands of the plaintiff). In this case, I find that

4   Plaintiff caused the wrongful arrest of the Vessel, interrupting its fishing activity and causing

5   damage to Defendants.

6   **Not disputed that ex parte proceedings are of considerable legal**
7   **significance. Maritime arrest under Supplemental Rules for Certain**
    **Admiralty and Maritime Claims, Rule C, however, is unquestionably**
8   **constitutional, *see, e.g., Merchants Nat'l Bank v. Dredge General G. L.***
    ***Gillespie*, 663 F.2d 1338, 1340 (5th Cir. La. 1981), and Plaintiff was well**
9   **within its rights in arresting the vessel under the circumstances.**
    **Therefore, it is disputed that the arrest was wrongful or that the**
10  **defendants were damages as a result.**

11  66.  Plaintiff claims that it arrested the Vessel on the basis of the advice of its counsel.

12  [FF ¶34] But Plaintiff also admitted that, prior to the arrest, it was aware of no information to

13  conclude that the business of the Vessel was in any financial jeopardy or in bankruptcy. Mr.

14  Cohen testified that no maritime lienholder had sought foreclosure or that the Vessel was in

15  any financial difficulty. [FF ¶35] In fact, it would appear, because of the current captain, the

16  Vessel was being quite productive. Plaintiff never sought to determine these basis facts

17  through a phone call to Mr. Cohen or a demand letter. [FF ¶36] Moreover, Plaintiff was

18  apparently never given any advice as to the priority of its maritime lien claim in a foreclosure

19  vis-à-vis any general obligations of the Cohens themselves, either due to the divorce or any

20  other lawsuit obligations. [FF ¶34] Thus, I find that Plaintiff, before asking me to arrest the

21  Vessel, did not undertake even the most basic due diligence regarding their security interest

22  under the Mortgage.

23  **Disputed. Before deciding to arrest the vessel, Del Mar was aware that**
    **Cohen was in financial difficulty: he had stated under oath that he would**
24  **possibly file for bankruptcy if he lost his motion for attorneys' fees, he**
    **was going through a divorce, and he was unemployed. [Roggio 109:17-**
25  **19; 109:20-110:21; Cappuccio 327:3-8; 352:7-12, 18-22; Chris Cohen**
    **318:9-18] Furthermore, his monthly payments in 2007 had been**
26  **sporadic. [TE 34-36] Del Mar disputes that the vessel was "quite**
    **productive." Not only had the vessel only earned total income of $8,128**
27  **for all of 2006 [TE 84], but Del Mar had no idea where the vessel was**
    **landing or selling its fish. [Cappuccio 331:1-18] While it is undisputed**
28  **that Del Mar never called Cohen prior to the arrest, they were under no**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMar/SeaSeeds/2504

Response to Defendants' Proposed Findings of Fact          33          Case No.: CV 07-02952 WHA

1    **legal obligation to do so and in fact by contract Cohen had waived any demand or presentment prior to arrest. [TE 7, pg. 2, ¶ 6] Plaintiff disputes it did not undertake any due diligence. Upon learning of Cohen's financial troubles, Del Mar apprised its attorneys of the situation, including the history of Cohen's payments, and then sought their advice. [Roggio 112:19-113:24; 230:4-25]**

67.   The primary allegation supporting the arrest was the failure to make monthly payments. [Plaintiff's Complaint] Yet Plaintiff failed to inform me of all pertinent facts with respect to the payments actually made by Defendants (especially the $175,000 payment), the interest that accrued (if any), the actual likelihood that Mr. Cohen would take the Vessel out of the jurisdiction of the Court, and the close and complex relationships between and among the parties that might bear upon the issue of "default."

**Under Rule C of the Supplemental Federal Rules for Certain Admiralty and Maritime Claims, the complaint must be (1) verified, and (2) "describe with reasonable particularity the property that is the subject of the action." Even under Rule E(2)(a)'s heightened pleadings standard, plaintiff's Complaint states sufficient facts regarding how Del Mar's claims arose to allow defendants to begin their investigation and frame a responsive pleading. There is no requirement that the Complaint state the actual likelihood that the vessel would leave the jurisdiction, even if such a probability could be determined. Nor does the Complaint need to describe the "close and complex" relationship between the parties. The Complaint was sufficient and defendants have cited no authority otherwise.**

68.   Of equal concern is that I have now learned that an accounting document presented as part of Mr. Cappuccio's Declaration In Opposition to the Motion to Vacate the Arrest [Ex. D to Ex 221] was in fact prepared by one of Plaintiff's lawyers, Mr. Rich Wagner, not by Mr. Roggio. [FF ¶38] Not even Mr. Cappuccio was informed of this fact. [FF ¶38] This document was used to support the amounts claimed to be owing, including interest, which the company never accrued on its books or charged Defendants in any written document.

**There is nothing sinister or underhanded about Del Mar relying on a document that was prepared by its attorney, Rich Wagner. Roggio testified that he discussed the document with Wagner [Roggio 177:14-17], so it was not prepared in a vacuum.**

69.   Finally, there is the testimony of Mr. Cappuccio in this deposition in which he

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1   made a baseless allegation that the amounts covered by the Note included moneys embezzled

2   from Plaintiff. [FF ¶37] However, Mr. Roggio testified that he knew about the checks written

3   by Mr. Cohen. *Id.* Finally, Mr. Cappuccio was not really concerned about the status of his

4   security interest; he was solely concerned about collecting the money: "I asked my attorney to

5   collect the money and secure – make sure the money was secure. And he did what he was

6   supposed to do." [Cappuccio at TT 355: 19-21].

> **The comments Cappuccio made during his deposition in this case in
> *December 2007* characterizing Cohen's advances to himself as
> embezzlement can hardly be construed as inferring bad faith on Del
> Mar's part leading up to the arrest *six months before*. As Cappuccio
> testified, his initial disapproval of Cohen's advances were many, many
> years before the arrest, and he and Cohen had since grown to become
> friends. He even hired Cohen to work at Del Mar. Cappuccio stated
> those early concerns had nothing to do with Del Mar's decision to arrest
> the vessel. [Cappuccio 329:22-330:21]**

12   70.   Following Mr. Cappuccio's instructions, Plaintiff's lawyers were not fully candid

13   with the Court and omitted from their arrest request material facts relating to the issue of

14   default, especially the $175,000 payment. Plaintiff's lawyers also presented lawyer-made

15   documents that appeared to be company accounting records. Finally, Mr. Cappuccio was

16   motivated by bad faith in pursing the recovery of "his money" based on a baseless charge of

17   embezzlement.

> **Disputed. See Plaintiff's responses to the preceding paragraphs 67, 68,
> and 69.**

19   71.   Taking together, all these factors amount to bad faith, and/or gross negligence, and

20   I find that the arrest of the Vessel was wrongful. The Court need not reach Defendants'

21   counterclaims for intentional and negligent interference with prospective economic

22   advantage under California law having found that the arrest was wrongful.

> **Disputed. It is defendants' burden to show that Del Mar acted with bad
> faith, malice, or gross negligence when it decided to arrest the vessel. *See,
> e.g., John W. Stone Oil Distributor, Inc. v. M/V Miss Bern*, 663 F. Supp.
> 773, 778 (S.D. Ala. 1987). There is no such evidence in the record. The
> evidence is that Del Mar had good faith concerns over Cohen's financial
> integrity and sought the advice of its attorneys. The Mortgage expressly
> provided that Del Mar's conclusion, in good faith, that Cohen's financial
> situation was going to be impaired, there was a default and it was
> justified in taking legal action. [TE 8, pg. 4, Art. II ("Default"), ¶ 1.(b))
> In seeking legal advice, Del Mar apprised its attorneys of the facts**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafood/2504

1      **surrounding Cohen's loan history, including his payments, and provided
       the relevant documents to its attorneys. [Roggio 112:19-113:24; 230:4-25]**

2    **Damages**

3    72.  The Court finds that Defendants missed opportunities for 14 fishing trips because

4    of the wrongful arrest. Defendants were unable to go fishing again until August 31, 2007.

5    The Court therefore finds that Plaintiff should pay Defendants the average lost income based

6    on the 14 trips taken by the Point Loma prior to the arrest because this represents the

7    estimated loss to the Point Loma prior to the interruption in its fishing activities. Defendants'

8    average income (gross catch less fuel, ice, and crew share) for the 14 trips prior to the arrest

9    was $4,508.45. Accordingly, the Court finds that Plaintiff should pay Defendants a total of

10   $63,118.30 in lost income.

11       **Disputed that defendants missed 14 trips as a result of the arrest. In 2007 the
         vessel made 14 trips prior to the arrest *over a five month period, January to June.*
12       [Cohen 529:6-13] After the arrest, the vessel made 13 over a *three and a half
         month period,* September to mid-December. [Cohen 534:13-535:5]
13       Furthermore, during the same period in 2006, with the same captain, the vessel
         only made *six* trips.**

14
         **Kobak also testified that there were other reasons the vessel might not catch fish,
15       or catch an average amount of fish, for example, break downs, or just not
         catching fish. [Kobak 394:2-395:18]**

16
         **In 2004, Cohen's net loss from the vessel's fishing operations was -$6,859.
17       Adding back in depreciation, his net income was $30,122 for the entire year, or
         $2,510 per month. [TE 51; Cohen 296:4-297:19] In 2005, Cohen netted a loss of
18       $32,007. Adding back in depreciation of $35,862, his net income after taxes was
         $3,855 for the entire year, or only $321 per month. [TE 51; Cohen 297:20-298:5].
19       In 2006, Cohen had net income from the vessel's fishing operations of $8,128.
         Adding back in depreciation, his total after-tax income was $43,095, or $3,591
20       per month. [TE 84, Cohen 299:11-300:24] The three year average monthly
         earnings for the vessel equals $2,141. I weight it towards the higher monthly
21       average for 2006 when Cohen hired Captain Kobak whom he testified was a
         better captain than he had previously, and I find that the defendants are entitled
22       to damages for lost fishing profits averaging $3,000 per month for the two
         months and one week the vessel was under arrest. Therefore, defendants are
23       entitled to $6,750 for lost fishing profits.**

24   73.  The Court also finds that Defendants made a reasonable business decision to pay

25   the captain and crew a total of $8,000 during the time of the arrest to mitigate their business

26   losses when the Point Loma could begin fishing again. [FF ¶45] The Court also awards

27   Defendants damages for payments made to the captain and crew in the amount of $8,000.

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1
2
3
4
5
6

> **Disputed. Cohen testified that he paid the crew to make sure they were available to work on the vessel once it was released, but Captain Kobak testified he could have hired another crew. There is no evidence that Cohen's payment was reasonable under the circumstances, especially in light of Captain Kobak's testimony that he could have hired another crew had the current crew members left. Nor is there any evidence that Cohen's decision to pay the captain and crew were reasonable business decisions under the circumstances. There was no evidence he even *asked* the captain or crew if they were going to leave if he didn't pay them, nor is there any evidence he made *any inquiry* as to the availability of a replacement captain or crew.**

7
8
9
10
11
12

74. The Court also finds that Plaintiff should pay Defendants prejudgment interest for their claim of wrongful arrest. Prejudgment interest may be granted in cases in admiralty unless "peculiar circumstances justify its denial." *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 795 (9th Cir. 1986) (internal citations omitted). Prejudgment interest is appropriate to "compensate the wronged party for being deprived of the monetary value of the loss from the time of the loss to the payment of judgment." *Id.*

13
14
15

> **Prejudgment interest should only be awarded where the amount of the claim is readily discernable at the time of the wrongful act. In this case the lost fishing profits were not capable of being readily determined. Moreover, Del Mar disputes that the arrest was wrongful.**

16
17
18
19
20

75. Prejudgment interest is calculated at an appropriate rate that will compensate Defendants for their losses. *Dishman v. UNUM Life Insur. Co. of America*, 269 F.3d 974, 988 (9th Cir. 2001). The average interest rate for June, July, and August of 2007, the period during which Defendants were prevented from using their Vessel and would therefore have had to borrow money, is 4.80% based on the interest rates for U.S. Securities-Treasury constant maturities nominal – 1 year as used in post judgment awards.

21
22

> **Not disputed that this would be a reasonable interest rate.**

23
24

76. The Court determines that Defendants should be paid prejudgment interest from the date of the arrest, June 7, 2007, until the date this judgment has been entered.

25

> **See ¶ 74.**

26
27

77. The Court finds that Defendants should also be paid post judgment interest from the date of decision at the appropriate interest rate.

28

> **See ¶ 74.**

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP

190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL 415-438-4600 FAX 415-438-4601

DelMarSeafoods\2501

1

2    78.   Defendants are the prevailing party on the dispute over the Note. Defendants are

3    directed to file a motion for attorneys' fees within 30 days of the Court's ruling.

4        **Disputed that defendants are the prevailing party and entitled to
         attorneys fees.   *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d**

5        **461, 474 (5th Cir. Tex. 1984) ("In order to collect fees, the plaintiff must
         prove that the party seizing the vessel acted in bad faith, with malice, or**

6        **with wanton disregard for the rights of his opponent.")**

7

8
     Dated:   June 2, 2008                     COX, WOOTTON, GRIFFIN,
9                                              HANSEN & POULOS
                                               Attorneys for Plaintiff
10                                             DEL MAR SEAFOODS, INC.

11

12                                    By: _____/s/_____
13                                              Gregory W. Poulos

14

15

16

17

18

19

20

21

22

23

24

25

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2501

26

27

28