James P. Walsh, CSB. No. 184620
Gwen Fanger, CSB No. 191161
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-3611
Telephone: (415) 276-6500
Facsimile: (415) 276-6599 budwalsh@dwt.com

Attorneys for Defendants and Claimant
BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), the F/V POINT LOMA and
Claimant, F/V POINT LOMA Fishing Company, Inc.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and, F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8 foot long fishing vessel, her engines, tackle, furniture apparel, etc., *in rem*, and Does 1-10,<br><br>                    Defendants. | No. C-07-2952-WHA<br><br>**DEFENDANTS' POST TRIAL BRIEF RE QUESTIONS FOR ORAL ARGUMENT** |

Defendants Barry Cohen, Chris Cohen, the F/V Point Loma, *in rem*, and Counterclaimant

F/V Point Loma Fishing Company, Inc. submit this brief addressing issues raised by the Court on

June 3 and June 9 as possible questions for oral argument and with the understanding that the

Court may rule without such argument.

DAVIS WRIGHT TREMAINE LLP

1.      **Evidence against Plaintiff's proposed finding No. 27**

Del Mar Seafoods unilaterally put the total amount of all the receivables it claims are owed to the Avila Beach Joint Venture on Barry Cohen's "balance." Roggio at RT 221:10-17; 60:10-19, 106:6-13 (Michael Cohen); 63:5-11, 106:6-13 (Leonard Cohen/Olde Port Inn); 65:23-66:15 (Inventory); 70:2-10 (Point Loma); 221:15-17. The "Michael Cohen" debt was kept on the Avila Beach Joint Venture's books through end of 2004 as part of accounts receivable. Roggio at RT 209:15-210:7; TE 225; TE 22. The "Leonard Cohen/Olde Port Inn" debt was similarly included on Avila Beach Joint Venture's books through the end of 2004 as an account receivable. Roggio at RT 209:15-210:7; TE 225; TE 23. The "Inventory" debt was kept on books of Joint Venture through end of 2004. Roggio at RT 210:8-14; TE 225. The "Point Loma" debt for ice and fuel advances were kept on books of Joint Venture until the entire receivable was transferred to Del Mar. Roggio at RT 183:17-184:3.

Activity on the Joint Venture's books continued until after September 30, 2004. Roggio at RT 156:2-20. There was no wind up agreement prepared. Roggio at RT 156:6-20; 185:6-16.

2.      **Evidence against whether additional advances were made personally to Barry Cohen after the Note was signed**

None of the alleged debts identified on the spreadsheet, TE 37 or 38, were made personally to Barry Cohen based on the following evidence at trial:

The "Michael Cohen" debt was incurred by Michael Cohen for fish purchased by Michael Cohen from the Avila Beach Joint Venture. Roggio at RT 60:7-16; Roggio at RT 106:6-9; TE 22. He purchased it for a restaurant distribution business that he had set up by himself. 240:2-22.

The "Leonard Cohen/Olde Port Inn" debt was incurred by Leonard Cohen for fish purchased by Leonard Cohen for the Olde Port Inn from the Avila Beach Joint Venture. Roggio at RT 63:5-9; Roggio at RT 65:16-19; Roggio at RT 106:6-9; TE 22 and 23. Leonard Cohen is the sole owner of the Olde Port Inn, Inc., a company he formed to run the Olde Port Inn. Leonard Cohen at RT 246:9-14; Cohen at RT 259:3-6.

DWT 11275266v1 0084289-000001

DAVIS WRIGHT TREMAINE LLP

The "<u>Inventory</u>" debt was for the balance of fish inventory left in the Joint Venture that was on the Avila Beach Joint Venture's books as of October 28, 2004. Roggio at RT 65:23-66:18; Cohen at RT 468:20-469:12; TE 24.

The "<u>Point Loma</u>" debt was for fuel, ice, and other advances made to the Point Loma against future fish deliveries by the vessel and incurred within the context of the Avila Beach Joint Venture. Roggio at RT 70:2-10; Roggio at RT 73:1-7; Roggio at RT 184:5-13; Roggio at RT 183:17-184:3; TE 18.

The "<u>Barry</u>" debt included the $215,000 of the original Note and advances for "additional charges" for repairs to the vessel. Roggio at RT 76:15-17; Cohen at RT 438:4-439:3. When Joe Cappuccio decided not to purchase 50% of the F/V Point Loma, the money he had advanced towards the purchase of the 50% interest was converted into the Note. Cohen at RT 438:10-440:12.

The "<u>Fees for Olde Port Case</u>" debt was for attorney's fees incurred by Del Mar in connection with the case against the Port San Luis Harbor District, including fees incurred during the time of Joe Roggio's and Joe Cappuccio's depositions in that case. Roggio at RT 85:15-86:17.

**3.    On the facts of our case, the law on whether the $175,000 payment should be treated as prepayment of installments into 2009**

The monthly payment terms of the Note and Mortgage were effectively modified by the parties' course of conduct. Where the subsequent conduct of the parties is "inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied." *Diamond Woodworks, Inc. v. Argonaut Insur.* (2003) 109 Cal. App. 4th 1020, 1038 (copy attached). Here, Del Mar and the Cohens "mutually dispensed with the subject requirements of the contract by quid pro quo conduct antithetical to the written terms of the contract," *i.e.*, Del Mar dispensed with the monthly payment terms when it accepted the payment of the $175,000 from the Cohens that they were not required to make under the terms of the Note and Mortgage. *Id.* at 1038-1039. The express terms of the Note provided for modification of the Note by permitting Del Mar to "accept any installment in advance." TE 7, para. 4. Del Mar's failure to send a written notice demanding monthly payments or payments

DAVIS WRIGHT TREMAINE LLP

1 under the 15% landing provision is consistent with the parties' modification of the agreement.

2 Cohen at RT 458:10-13; 460:25-461:12; *see id.* at 1038 (written contract may be modified by

3 conduct inducing reliance thereon by the other party)(citations omitted).

4          Alternatively, the $175,000 may be deemed a prepayment of monthly installments. *Los*

5 *Angeles Investment Co. v. Wilson* (1919) 181 Cal. 616 (copy attached). The Note and Mortgage

6 did not require the payment of any sum greater than $3,000 or 15% of the gross landing per month

7 and therefore the payment of a greater amount was optional with the Cohens. *Id.* at 619. Again,

8 the Note itself permitted Del Mar to "accept any installment in advance." TE 7, para. 4. Thus, the

9 payment of $175,000 must be credited against future, monthly installments.

10 **4.      F/V Point Loma's role in the joint venture that ended in 2004**

11          The F/V Point Loma fished for the Joint Venture. Roggio at RT 214:7-9. The F/V Point

12 Loma had the option to fish for other markets and deliver fish wherever it wanted. Roggio at

13 214:10-23. The Joint Venture also purchased fish from at least 14 other fishing vessels. Cohen at

14 RT 433:9-18.

15 **5.      The role of any other Barry Cohen restaurants and fish markets vis-à-vis the joint**
16 **venture**

17          Barry Cohen continued to own and operate a retail market at Avila Beach after the Joint

18 Venture ended. Roggio at RT 182:10-17. The Olde Port Inn, a restaurant, was a dba for Barry

19 Cohen's company, Olde Port Fish Company, Inc. Cohen at 255:4-15. Leonard Cohen owned

20 Olde Port Inn, Inc., the company that operated the Olde Port Inn restaurant. Leonard Cohen at RT

21 246:9-14; Cohen at RT 259:3-6. Leonard Cohen/Olde Port Inn, Inc. purchased fish from the Joint

22 Venture for the restaurant. TE 22, 23.

23 **6.      Barry Cohen's station and employee status**

24          Barry Cohen was hired by Del Mar to manage the Joint Venture in Avila Beach which

25 began in 1999. Roggio at RT 42:19-25; 44:1-7. He was also a Joint Venture partner. Cohen

26 263:9-20. After September 2004, Barry Cohen was employed by Del Mar in its corporate offices

27 in Watsonville to run and manage the sales of Del Mar's bottom fish operations. Roggio at RT

28 44:11-45:1; Cohen at RT 450:5-19. Barry Cohen was an employee of Del Mar Seafoods since

DAVIS WRIGHT TREMAINE LLP

1    1999 and all of his paychecks were issued by Del Mar from 1999 until he was let go in October

2    2006.  Roggio at RT 224:19-21; Cohen at RT 450:10-13.

3    7.        **Under applicable law, the attorney's fees clause must be deemed reciprocal**

4          Unilateral attorneys' fee provisions in contracts must be applied reciprocally.  California

5    Civil Code 1717(a) provides that:

6                  In any action on a contract, where the contract specifically provides that
                   attorney's fees and costs, which are incurred to enforce that contract, shall
7                  be awarded either to one of the parties or to the prevailing party, then the
                   party who is determined to be the party prevailing on the contract, whether
8                  he or she is the party specified in the contract or not, shall be entitled to
                   reasonable attorney's fees in addition to other costs.
9

10   Thus, contracts with unilateral attorney's fees provisions must be interpreted as awarding

11   attorneys' fees to either party to the contract, whichever is the prevailing party.  *See e.g., Santisas*

12   *v. Goodin* (1998) 17 Cal. 4th 599, 614 (section 1717 applies to contracts containing reciprocal as

13   well as unilateral attorney fee provisions); *Sears v. Baccaglio* (1998) 60 Cal. App. 4th 1136, 1149

14   (holding that section 1717 permits fees and costs to be awarded in contract actions where the

15   contract provides for an award to the prevailing party, as well as in cases where the contract

16   purports to permit fees only to a specified party).  Where, as here, the Note and Mortgage

17   specifically provide for attorney's fees to be awarded only to Del Mar in an action to enforce its

18   rights under the Note and Mortgage, the award of such attorney's fees must equally apply to the

19   Cohens.

20        DATED this 11th day of June, 2008.

21

22                                          Respectfully submitted,

23                                          DAVIS WRIGHT TREMAINE LLP

24                                          By:        /s/ James P. Walsh
25                                                 James P. Walsh
                                                   Gwen Fanger
26                                          Attorneys for Defendants and Claimant
27                                          BARRY COHEN, CHRIS COHEN (aka
                                            CHRISTENE COHEN), the F/V POINT
28                                          LOMA and Claimant, F/V POINT LOMA
                                            FISHING COMPANY, INC.

DAVIS WRIGHT TREMAINE LLP

LEXSEE 109 CAL APP 4TH 1020

**DIAMOND WOODWORKS, INC., et al., Plaintiffs and Appellants, v. ARGONAUT
INSURANCE COMPANY, Defendant and Appellant.**

**No. G027949.**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT,
DIVISION THREE**

*109 Cal. App. 4th 1020; 135 Cal. Rptr. 2d 736; 2003 Cal. App. LEXIS 872; 68 Cal.
Comp. Cas 868; 2003 Cal. Daily Op. Service 5092; 2003 Daily Journal DAR 6480*

**June 13, 2003, Decided
June 13, 2003, Filed**

**SUBSEQUENT HISTORY:**    [***1]
Request denied by *Diamond Woodworks v. Argonaut Ins.
Co., 2004 Cal. LEXIS 44 (Cal., Jan. 14, 2004)*

**PRIOR HISTORY:**    Appeals from a judgment of the
Superior Court of Orange County. Super. Ct. No.
790462. Richard M. Aronson, Judge.

**DISPOSITION:**    The judgment is affirmed, except as
to the compensatory damages award for fraud and the
punitive damages award. With respect to those damages
only, the judgment is reversed and the case remanded for
new trial, unless, before the decision is final under rule
24(b), Diamond consents to a remittitur of the fraud
damages to $ 258,570 and the punitive damages to $ 1
million, and timely serves and files notice of such con-
sent pursuant to the procedures specified in rule 24(d). If
Diamond timely consents to the remittitur, the judgment
is affirmed as modified by the remittitur. Each party shall
recover its own costs on appeal. (Rule 27(a)(3) & (4).)

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

   The client of an employee leasing company brought
against the company and the company's workers' com-
pensation insurer for breach of contract, bad faith, and
fraud after the insurer denied benefits to a leased em-
ployee who was injured during his first day of employ-
ment with plaintiff. The jury awarded compensatory
damages, along with $ 14 million in punitive damages
based on fraud. The trial court denied the insurer's mo-
tion for judgment notwithstanding the verdict, but condi-
tionally granted its motion for new trial dependent on
plaintiff's acceptance of a remittitur of fraud compensa-

tory damages to $ 404,270 and a reduction of punitive
damages to $ 5.5 million. (Superior Court of Orange
County, No. 790462, Richard M. Aronson, Temporary
Judge.*)

   \*  Pursuant to *California Constitution, article VI,
   section 21.*

   The Court of Appeal affirmed the judgment, except
as to the compensatory damages award for fraud and the
punitive damages award. With respect to those damages
only, the judgment was reversed and the case was re-
manded for a new trial, unless plaintiff consented to a
remittitur of the fraud damages to $ 258,570 and the pu-
nitive damages to $ 1 million. With regard to the breach
of contract claim, the court held that the trial court's
breach of contract verdict was amply supported by the
evidence. The court also held that plaintiff was a third
party beneficiary of the company's workers' compensa-
tion policy. Thus, plaintiff had a right to the insurer's
prompt payment of benefits owed to the company's in-
jured employee who had been leased to plaintiff. As to
the bad faith claim, the court held that plaintiff, as a third
party beneficiary of the company's workers' compensa-
tion policy, was entitled to bring an action for bad faith
against the insurer after the insurer failed to investigate
the injured worker's claim. With regard to the fraud ac-
tion, the court held that plaintiff was able to establish the
elements of fraud as against the company, with the sup-
porting ground for fraud liability being false promise.
The court also held that plaintiff was able to establish the
elements of fraud as against the insurer based on princi-
ples of agency. The court further held that it was neces-
sary to remit the fraud award of compensatory damages.
The court held that the punitive damages award of $ 5.5
million was impermissible and had to be reduced to
comport with constitutional due process. Although the

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

evidence demonstrated that the insurer engaged in repre-
hensible conduct sufficient to support an award of puni-
tive damages in some amount, with regard to the ratio of
punitive damages to compensatory damages, any award
exceeding a four-to-one ratio of punitive damages to
compensatory damages would not comport with due
process. (Opinion by Ikola, J., with Sills, P.l., and
Moore, J., concurring.)

## HEADNOTES

## CALIFORNIA OFFICIAL REPORTS HEAD-NOTES
Classified to California Digest of Official Reports

**(1) Appellate Review § 126--Scope of Review--
Function of Appellate Court--Breach of Contract
Claim.** --After a jury verdict on a breach of contract
claim, the appellate court views the evidence in the light
most favorable to the respondent, affording that party
every reasonable inference and resolving conflicts in his
or her favor. The appellate court's power begins and ends
with a determination as to whether there is any substan-
tial evidence to support the judgment.

**(2) Contracts § 37--Modification--Employee Leasing
Contract--Implied Modification Based on Course of
Conduct Inconsistent with Contract Provisions.** --In
an action by the client of an employee leasing company
against the company and the company's workers' com-
pensation insurer for breach of contract, arising after the
insurer denied benefits to a leased employee who was
injured during his first day of employment with plaintiff,
the trial court's breach of contract verdict was amply
supported by the evidence. With respect to the contract
between the employee leasing company and plaintiff, the
parties had agreed that the employee leasing company
would employ no one until written approval was given
by the employee leasing company for that person to be
hired. However, the parties not only abandoned or ig-
nored the provisions dealing with the processing of new
employees, but, postagreement, substituted a course of
conduct wholly incompatible with those provisions.
Thus, the case involved modification by conduct. Where
the subsequent conduct of parties is inconsistent with and
clearly contrary to provisions of the written agreement,
the parties' modification setting aside the written provi-
sions will be implied. In light of the evidence and the
instructions, the jury was permitted to find the contract
was modified so as to result in the injured employee be-
coming an employee of the employee leasing company
as soon as plaintiff hired him and he began working at
the jobsite. The parties mutually dispensed with the sub-
ject requirements of the contract by quid pro quo conduct

antithetical to the written terms of the contract. No addi-
tional consideration was needed.

**(3) Contracts § 46--Actions--Contract for Benefit of
Third Party.** --The legal definition of third party bene-
ficiary, based on *Civ. Code, § 1559*, and interpretive
cases, is set forth in *BAJI No. 10.59*. That instruction
states that a contract made expressly for the benefit of a
third person, may be enforced by a party to the contract
or the third person at any time before the parties to the
contract rescind it. If a contract is not made expressly for
the benefit of a particular third person, that person cannot
enforce the contract even though he or she would receive
some benefit from the performance of the contract. It is
not necessary that the contract identify or refer to the
beneficiary by name. The beneficiary may recover if he
or she can show that he or she is one of a class of persons
for whose benefit the contract was made.

**(4) Contracts § 46--Actions--Contract for Benefit of
Third Party--Workers' Compensation Policy--
Purchased by Employee Leasing Company for Bene-
fit of Clients: Workers' Compensation § 25--Persons
Entitled to Compensation.** --In an action by the client
of an employee leasing company against the company
and the company's workers' compensation insurer for
breach of contract, arising after the insurer denied bene-
fits to a leased employee who was injured during his first
day of employment with plaintiff, plaintiff was a third
party beneficiary of the company's worker's compensa-
tion policy. Thus, plaintiff had a right to the insurer's
prompt payment of benefits owed to the company's in-
jured employee who had been leased to plaintiff. The
contract between the company and plaintiff provided that
the company would carry workers' compensation insur-
ance and deliver to plaintiff a certificate evidencing such
insurance. The company purchased the policy for the
very purpose of fulfilling its promise to plaintiff to obtain
workers' compensation insurance for the leased employ-
ees; the cost of the premiums was included in the fees
plaintiff paid to the company. The insurance policy pro-
vided the promised coverage, thereby securing not only
for the company but for plaintiff the protection of *Lab.
Code, § 3602, subd. (d)*, which states the Legislature's
clear intent of providing the protection of workers' com-
pensation insurance for the leasing employer and the
client employer alike. This was not an incidental benefit
to plaintiff. It was at the very heart of the employee leas-
ing contract and the insurance policy. Moreover, the sole
purpose of the certificate of insurance issued by the in-
surer to plaintiff was to prove plaintiff's compliance with
the provisions of *Lab. Code, § 3602, subd. (d)*.

**(5a) (5b) Workers' Compensation § 25--Persons Enti-
tled to Compensation--Third Party Beneficiary of**

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

**Policy--Client of Employee Leasing Company--Bad Faith Claim.** --In an action by the client of an employee leasing company against the company and the company's workers' compensation insurer for breach of contract, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, plaintiff, as a third party beneficiary of the company's workers' compensation policy, was entitled to bring an action for bad faith against the insurer after the insurer failed to investigate the injured worker's claim. *Lab. Code, § 3602, subd. (d)*, affords protection for leasing employers and client employers alike, providing by law that when the leasing company has fulfilled its promise to obtain workers' compensation insurance, the leasing company and the client company both have secured the payment of workers' compensation, and so long as such coverage remains in effect, both companies enjoy protection from civil, criminal, or other penalties for failure to provide workers' compensation coverage. Plaintiff secured the payment of workers' compensation by contracting with the leasing company, and the insurer issued the policy that provided that protection. As long as the policy was in effect, and as long as the injured worker was a leased employee, then the leasing company and plaintiff, by statute, stood in the same shoes with regard to workers' compensation coverage and the insurer's duty to pay. Based on that duty, the implied covenant and its duties ran not only to the leasing company, but to plaintiff, the third party beneficiary.

**(6) Insurance Contracts and Coverage § 140--Actions--By Injured Person Against Insurer--Third Party Beneficiary Status--As Basis for Tort Recovery.** --A third party should not be permitted to enforce covenants made not for his or her benefit in an insurance contract, but rather for others. However, this rule tacitly acknowledges there are situations in which covenants are made for the third party's benefit, that is, the insurer's obligations run in favor of both the named insured and a third party beneficiary. In such cases, the insurer's bad faith in respect to those obligations creates a proper basis for tort recovery by the third party beneficiary.

**(7) Insurance Contracts and Coverage § 146--Actions--By Injured Person Against Insurer--Damages--Costs--Based on Testimony of Single Witness.** --In an action by the client of an employee leasing company against the company's workers' compensation insurer for breach of contract, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, plaintiff did not fail to meet its burden of segregating the amount of attorney fees it incurred with respect to its claim for bad faith. The jury awarded $ 229,209.30 in attorney fees and costs on this claim. Plaintiff's attorney

testified that he did segregate numerous specified items from his billing statements and claim for attorney fees. The testimony of a single witness, even a party, may be sufficient. The jury apparently found the witness credible, and such matters are not reassessed on appeal.

**(8a) (8b) (8c) Fraud and Deceit § 28--Actions--Evidence--Promises Made Without Intent to Perform--Employee Leasing Company's Implied Promise of Employee Status and Insurance Coverage.** --In an action for fraud by the client of an employee leasing company against the company and the company's workers' compensation insurer for breach of contract, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, plaintiff was able to establish the elements of fraud as against the leasing company, with the supporting ground for fraud liability being false promise. The evidence was unequivocal and uncontradicted that the leasing company and plaintiff dispensed with the contract requirements regarding hiring procedures, pre-hiring paperwork, and employment approval. The leasing company paid leased employees from the first day on the job, without regard to whether paperwork had been completed and approval given. In this routine practice modifying the terms of the written contract, the leasing company impliedly promised plaintiff and caused it to reasonably believe to its clear detriment that all of its new hires were leasing company employees from day one and thus covered under the workers' compensation policy. A false promise can as easily be implied from conduct as from language. The leasing company's unhesitating rejection of the worker's claim for lack of the employment packet in the face of its prior conduct constituted substantial evidence for the jury to find that the leasing company never intended to fulfill its implied promise of legitimate employment status and workers' compensation insurance to all leased employees, but rather, intended to deny insurance coverage to any person such as the worker, who was injured on the job prior to completion of the paperwork.

**(9) Fraud and Deceit § 36--Actions--Appellate Review.** --On appeal from a fraud action in which plaintiff has sought recovery on several bases, the appellate court, in order to affirm the jury's general verdict, needs to find only one proper supporting ground.

**(10) Fraud and Deceit § 5--False Representations--Implied Misrepresentation of Fact.** --A promise to do something necessarily implies the intention to perform, and, where such an intention is absent, it is an implied misrepresentation of fact, which is actionable fraud.

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

**(11) Fraud and Deceit § 35--Actions--Trial--Fraudulent Intent.** --Fraudulent intent is an issue for the trier of fact to decide.

**(12) Fraud and Deceit § 28--Actions--Evidence--Promises Made Without Intent to Perform--Employee Leasing Company's Implied Promise of Employee Status and Insurance Coverage--Insurer's Agency Liability.** --In an action for fraud by the client of an employee leasing company against the company and the company's workers' compensation insurer for breach of contract, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, plaintiff was able to establish the elements of fraud as against the insurer based on principles of agency. The record contained substantial evidence that the insurer gave the leasing company authority to bind insurance, i.e., to enter into a legally binding insurance contract on behalf of the insurer. The jury considered a letter from the insurer's underwriting manager to the leasing company's chief executive officer to that effect. Plaintiff's expert witnesses agreed the letter was the insurer's agency authorization. Also, the insurer relied entirely on the leasing company's investigation of the injured worker's claim when it denied coverage. This evidence standing alone provided a firm foundation for a finding of actual agency. Thus, the factfinder had an appropriate basis for holding the insurer, the principal, liable for the fraud of its agent, the leasing company.

**(13) Fraud and Deceit § 33--Actions--Damages--Measure of Damages--Remittitur of Compensatory Damages.** --In an action for fraud by the client of an employee leasing company against the company and the company's workers' compensation insurer for breach of contract, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, it was necessary to remit the fraud award of compensatory damages. A tort victim is not limited to his or her out-of-pocket losses; rather, he or she is entitled to compensatory damages for any actual loss. Insofar as the award gave back to plaintiff the fees it paid to the leasing company to cover the cost of premiums for workers' compensation insurance, it could not stand. There was no substantial evidence that plaintiff paid something for nothing. The only reasonable inference from the evidence was that the leased workers were covered by the workers' compensation policy from the first day because they were the leasing company's employees from the first day. There was no substantial evidence proving a difference between the actual value of that with which plaintiff parted and the actual value of that which it received. The remitted compensatory damages award was impermissible in part, and it could not be

affirmed unless it was remitted to an amount representing lost profits and prejudgment interest only. Affirmance was thus conditioned on plaintiff s consent to the remittitur. Accordingly, it was necessary to reverse the fraud compensatory damages award and remand for a new trial as to that issue unless plaintiff consented to the decreased amount and complied with the procedures set forth in *Cal. Rules of Court, rule 24(d)*.

**(14a) (14b) (14c) (14d) (14e) Damages § 22--Punitive Damages--Factors--Reprehensibility of Defendant's Conduct--Punitive to Compensatory Damages Ratio--Insurer's Denial of Workers' Compensation Coverage to Injured Employee.** --In a fraud action by the client of an employee leasing company against the company's workers' compensation insurer, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, a punitive damages award of $ 5.5 million was impermissible and had to be reduced to comport with constitutional due process. Although the evidence demonstrated that the insurer engaged in reprehensible conduct sufficient to support an award of punitive damages in some amount, with regard to the ratio of punitive damages to compensatory damages, any award exceeding a four-to-one ratio of punitive damages to compensatory damages would not comport with due process. Compared to that portion of the compensatory damages based on fraud, as remitted by the trial court to $ 404,270, the punitive damages were more than 13 times greater. As remitted by the appellate court, the punitive damages were more than 21 times greater. Such disproportionality was impermissible under the facts in this case. In the usual case, the outer constitutional limit on the amount of punitive damages is approximately four times the amount of compensatory damages. Taking into account the jury's determination, the ratio should approximate that outer limit. Such a reasonable and proportionate award well serves the state's interest in retribution and deterrence.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1373 et seq.]

**(15) Damages § 22--Punitive Damages--Evidence--Sufficiency.** --In a fraud action by the client of an employee leasing company against the company's workers' compensation insurer, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, the evidence, which was essentially without contradiction, was sufficient to support an award of punitive damages. Such damages are allowed where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice (*Civ. Code, § 3294, subd. (a)*). In light of the leasing company's and the insurer's near reflexive denial of the severely maimed employee's

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

employment status and entitlement to workers' compensation benefits, along with their subsequent longterm refusal to budge from that position, the evidence was consistent with intentional fraud, and not consistent with mistake, honest error, negligence. An absolute unwillingness even to attempt performance gives rise to an inference of fraudulent intent. Moreover, there was clear and convincing evidence that the insurer intended to deprive plaintiff of property or legal rights or otherwise cause plaintiff injury, for purposes of proving fraud under *Civ. Code, § 3294, subd. (c)(3)*.

**(16) Damages § 22--Punitive Damages--Factors.** --The United States Supreme Court has provided a framework for determining whether a punitive damages award has served the state's legitimate interests in punishment and deterrence, or whether instead it has imposed a constitutionally prohibited grossly excessive punishment on a tort feasor. Given that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him or her to punishment, but also of the severity of the penalty that a state may impose, the court must evaluate excessiveness in light of (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of the punitive damages to the compensatory damages, and (3) comparison of the punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct.

**(17a) (17b) Damages § 22--Punitive Damages--Factors--Reprehensibility of Defendant's Conduct--Insurer's Denial of Workers' Compensation Coverage to Injured Employee.** --In a fraud action by the client of an employee leasing company against the company's workers' compensation insurer, arising after the insurer denied benefits to a leased employee who was injured during his first day of employment with plaintiff, the evidence demonstrated that the insurer engaged in reprehensible conduct sufficient to support an award of punitive damages. It was necessary to measure the reprehensibility of the insurer's conduct as directed at plaintiff alone, rather than toward the world at large. In this case, the harm to plaintiff from the insurer's fraud was economic, not physical. However, the insurer demonstrated absolute indifference to the health and safety of the maimed employee, and that indifference directly and adversely impacted plaintiff. Moreover, the target of the insurer's conduct was financially vulnerable. Due to its exposure to a potential seven-figure award in the employee's personal injury case, it could not risk investing in a $ 300,000 automated piece of equipment, even though the machine would have increased its profits by some $ 3,000 per month. The jury awarded plaintiff those lost profits as fraud damages. Additionally, the

insurer's conduct was not an isolated incident; the insurer persisted in its denial of a defense for plaintiff and its denial of coverage for the employee for 18 months. Finally, the degree of reprehensibility is underscored by the jury's finding of fraud.

**(18) Damages § 22--Punitive Damages--Factors--Reprehensibility of Defendant's Conduct.** --In determining the degree of reprehensibility of the defendant's conduct for purposes of assessing whether an award of punitive damages violates a defendant's right to due process, the court considers whether: the harm caused was physical as opposed to economic; the defendant's tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit; or mere accident.

**(19) Damages § 27--Punitive Damages--Review.** --The appellate court's de novo review of a punitive damage award is necessary to insure the jury's determination does not offend due process concerns, not to make a wholly independent determination.

**COUNSEL:** Stevens & Carlberg, Daniel P. Stevens; Rizio & Nelson and R. Shawn Nelson for Plaintiffs and Appellants.

Horvitz & Levy, Peter Abrahams, Julie L. Woods; Murtaugh, Miller, Meyer & Nelson and Lawrence J. DiPinto for Defendant and Appellant.

**JUDGES:** (Opinion by Ikola, J., with Sills, P. J., and Moore, J., concurring.)

**OPINION BY:** IKOLA

**OPINION**

[**740]  [*1028]  **IKOLA, J.--**

Before us are an appeal and a cross-appeal from a judgment awarding $ 658,000 in compensatory damages for fraud, breach of contract [*1029] and insurance bad faith and $ 5.5 million in punitive damages. Briefly, defendant Argonaut Insurance Company (Argonaut) issued a workers' compensation insurance policy to Builders Staff Corporation (BSC), a now-defunct employee leasing company. [1] Plaintiff Diamond Woodworks, Inc. (Diamond), a client of BSC, transferred all of its employees to BSC, [***2] and BSC leased the employees back to Diamond. Argonaut issued certificates of insurance listing Diamond as the insured, with the caveat that the certificate did not alter or amend the policy and that

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

only BSC's employees working at the jobsite were covered under the policy. Argonaut, BSC, and Argonaut's registered agent, Arthur Gallagher and Company (Gallagher) understood Diamond was not insured. Under the BSC/Diamond employee leasing contract, coverage of new hires was dependent upon Diamond's timely submission and BSC's approval of employment application packets for each employee. In practice, the provision was never enforced.

1    BSC filed for bankruptcy in 1998 or early 1999.

Diamond hired an employee whose BSC employment application packet had not yet been submitted to BSC when, on his first day of work, he cut off four fingers in a woodcutting accident. BSC contended the injured worker was not a BSC employee under the contract, and Argonaut denied the workers' compensation claim on that ground. The employee [***3] sought to recover workers' compensation benefits from Diamond, and also sued Diamond in a separate civil action for tort damages based on Diamond's alleged failure to obtain workers' compensation insurance for its employees. Diamond tendered its defense to Argonaut, but the insurer refused to provide a defense in either proceeding. Eventually, 18 months into the litigation, Argonaut negotiated a global settlement with the employee, disposing of all of his claims.

Diamond then sued Argonaut and BSC, contending the insurer should have defended and alleging Diamond was insured under Argonaut's policy or, if not, it had suffered detriment from Argonaut's deceit leading it to believe it was, in fact, insured. BSC was dismissed before trial. The jury's three separate general verdicts were in favor of Diamond on its claims for breach of contract, insurance bad faith and fraud. Awarding damages for each cause of action, respectively for $ 24,780.75, $ 229,209.30, and $ 424,100, the jury found Argonaut did not act with malice or oppression as statutorily defined (Civ. Code, § 3294), but assessed $ 14 million in punitive damages based on fraud. The trial court denied Argonaut's motion for [***4] judgment notwithstanding the verdict (JNOV), but conditionally granted its motion for new trial dependent upon Diamond's acceptance of a nominal remittitur of fraud compensatory damages to $ 404,270 and a significant reduction of punitive damages to $ 5.5 million. Diamond agreed.

[**741]    [*1030]    Argonaut appeals, contending plaintiff did not prove any cause of action, but even if liability exists, the insurance bad faith, fraud and punitive damages awards should be reversed or further reduced for a plethora of reasons. Argonaut also seeks a new trial, asserting the jury's verdicts are irreconcilably inconsistent. In its cross-appeal, Diamond argues the

court erred in remitting the punitive damages. Robert Erdtsieck (Erdtsieck), Diamond's founder, against whom Argonaut obtained a summary judgment prior to trial, presents no argument on his own behalf.

For the reasons we discuss, *post*, we affirm the judgment on the breach of contract and bad faith claims. We also affirm the finding of liability for fraud, but the compensatory damages based on fraud must be further remitted. So must the punitive damages award, which, under the United States Supreme Court's recent decision, [***5] *State Farm Mut. Auto. Ins. Co. v. Campbell (2003),* 538 U.S. 408 [155 L. Ed. 2d 585, 123 S. Ct. 1513] *(Campbell),* does not comport with due process. Thus, we reverse and remand for new trial only on compensatory and punitive damages for fraud unless Diamond consents to a remittitur of the fraud damages to $ 258,570 and the punitive damages to $ 1 million (approximately 3.8 times the compensatory damages). (*Cal. Rules of Court, rule 26(d)*.)

Facts

In the factual recitation, we cull from the voluminous record only those facts necessary to an overview. Additional facts will be set forth in the legal discussion, as germane to the specific issues on appeal.

*Employee Leasing*

BSC was an employee leasing company. Such an enterprise contracts with client companies to provide leased labor and labor-related services, i.e., payroll, safety and tax services and employment benefits, including workers' compensation insurance. In a typical arrangement, the employee leasing company does not bring employees to the client company. Rather, the client company already has the personnel, and it selects which of its workers will become employees of the leasing company and [***6] which, if any, will be maintained as the client company's direct employees. For example, in a construction context, the client company might choose to retain direct employment of its white-collar workers, but place its work crews in the leaseback program.

Because an employee leasing company becomes the employer of the workers leased to the client company, it must "secure the payment of [*1031] compensation" by obtaining workers' compensation insurance or a certificate of self-insurance for those workers. (See *Lab. Code, § 3700.*) An employee leasing company may have thousands of employees working at several hundred client companies. [2] Therefore, it can purchase workers' compensation insurance at a more favorable rate than would be paid directly by the respective client companies themselves. The latter thus obtain an economic benefit since the fee they pay the employee leasing company covers

Case 3:07-cv-02952-WHA    Document 193    Filed 06/11/2008    Page 12 of 29

Page 7

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

the cost of the workers' compensation premiums. As long as the employee leasing company obtains such coverage for the leased workers, the client company has also "secured the payment of compensation" and cannot be sued for tort damages by a leased worker who is injured while working for [***7] the client company. (*Lab. Code, § 3602, subd. (d)*; 1 Herlick, Cal. Workers' Compensation Law (6th ed. 2000) § 3.31, p. 3-43.) However, the client company needs to obtain workers' compensation insurance for those workers who are not leased from the employee leasing company. [3] [**742] Additionally, for about $ 200 per year, client companies without employees of their own can purchase an "if-any" policy covering any worker who might be deemed an employee of the client company.

> 2   At its peak, BSC had 8,000 employees and 700 client companies.
> 3   Client companies often retain administrative and management personnel as their own employees. The workers' compensation insurance costs for these employees are much lower than the costs for laborers.

*BSC and the Argonaut Policy*

BSC's clients were primarily construction companies. Beginning in 1994 and for approximately four more years, Argonaut provided workers' compensation insurance to BSC, the first employee leasing account it had ever written. [***8] The policy identified Argonaut as the insurer and BSC as the named insured. It was a retrospective premium policy, under which the leasing company pays an initial up front premium to the insurer and, if the losses are less than the premium, the insurer refunds the balance after deducting certain expenses. If losses exceed the premium, the leasing company owes an additional premium up to a maximum amount. The insurer pays for losses over that amount.

Part of BSC's leasing charge to its client companies was the cost of BSC's workers' compensation premiums. BSC did not pass along to the client companies any premium refund it received at the end of the policy period, nor did BSC charge additional fees if it was assessed additional premiums. During the period Argonaut insured BSC, BSC paid Argonaut more than $ 10 million in premiums, and Argonaut paid BSC claims totaling $ 6.4 million.

[*1032] *Certificates of Insurance*

When a contractor such as Diamond wants to obtain a building permit, it must show the city or municipality it "[has] and will maintain workers' compensation insurance, as required by *Section 3700 of the Labor Code*, for the performance of the work for which [***9] [the] permit is issued." (*Health & Saf. Code, § 19825, subd.*

*(a)*; see also *Lab. Code, § 3800*.) The mandate is intended to make sure employees injured on construction projects are covered by workers' compensation insurance. [4] ( *Morris v. County of Marin (1977) 18 Cal.3d 901, 917 [136 Cal. Rptr. 251, 559 P.2d 606]*.) Client companies often asked BSC for certificates of insurance, which BSC promised to provide, its contract stating, "BSC shall carry worker's compensation insurance and shall deliver to Contracted Company a certificate evidencing such insurance." Ordinarily, Argonaut's agent, Gallagher, would issue the certificate of insurance. Argonaut received no additional fees when the certificates were issued.

> 4   General contractors in construction typically require subcontractors to provide certificates of insurance because, if the subcontractor does not have workers' compensation insurance covering workers at the jobsite, an injury would expose the general contractor to statutory liability.

[***10] The certificate of insurance routinely used in the construction industry is the Acord certificate, a single-page standardized form, expressly stating it "does not amend, extend or alter the coverage afforded by the [referenced] policies." The Acord certificate, with its boxed categories of information, is not easily adapted to explaining employee leasing, i.e., that the client company--the construction company submitting the certificate for a building permit--has "secure[d] ... payment of compensation" under *Labor Code section 3700* by leasing employees from a company with a workers' compensation insurance policy.

Originally, and for about six months, the Acord certificates BSC issued for client companies identified BSC in the box entitled [**743] "insured." The client company was listed at the bottom of the form in a general information box entitled "DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS," used to set forth pertinent details for which no other specific boxes applied. The form generated confusion for general contractors and municipalities unaccustomed to employee leasing arrangements [5] because the client company, i.e., the construction company performing [***11] the work or seeking the permit was not listed as the insured. As a result, many of BSC's client companies, when presenting certificates of insurance [*1033] naming BSC as the insured, encountered difficulties in obtaining permits or contracts.

> 5   For example, one of Diamond's witnesses, a permit supervisor for the City of Santa Ana's planning and building agency, testified she did not know what an employee leasing company was.

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

To eliminate the problem, BSC's founder Russ Ferry, Gallagher agent Robert Haukom, and Argonaut underwriter David Corser decided to substitute the client company's name instead of BSC's in the certificate of insurance's "insured" box. In the general information box referred to, *ante*, the following language was inserted: "ONLY EMPLOYEES OF [BSC] WORKING ON CONSTRUCTION LOCATION ARE INUSRED [sic] UNDER EVIDENC[E] OF COVERAGE PROVIDED." Ferry, Haukom and Corser intended to describe the leasing context in which the certificate was issued; they agreed Argonaut was insuring only [***12] BSC's employees, not the client companies.

### Relationship Between BSC and Diamond

Diamond is a cabinet and woodworking business founded in 1995 by Erdtsieck. Before starting the company, Erdtsieck spent about a year observing operations at San Marino Plastering, a company owned by his brother, Fred Erdtsieck. San Marino Plastering was a BSC client company that leased some of its employees and retained others whom it insured under a separate workers' compensation policy.

Based on his brother's recommendation, Erdtsieck entered into a contract with BSC effective in August 1995. Under the leasing arrangement, which lasted until BSC declared bankruptcy (see fn. 1, *ante*), all of Diamond's employees were transferred to BSC, who became their employer. The contract provided, "It is specifically intended and agreed and understood between the parties that BSC is the employer of any BSC employees utilized by [Diamond] under this Contract."

In January 1997, more than one year into the contract, Diamond asked for a certificate of insurance. BSC provided the Acord certificate described, *ante*, listing Diamond in the box entitled "insured." In pertinent part, the certificate [***13] proclaimed, in large, bold, uppercase type in the upper right corner, "THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND, OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW." In the description of operations, it stated: "ONLY EMPLOYEES OF BUILDERS STAFF CORPORATION AS LONG AS THEY ARE PERFORMING WORK WITHIN THE NATURE & SCOPE OF THEIR CONSTRUCTION EMPLOYMENT ARE INSURED UNDER EVIDENCE OF COVERAGE [*1034] PROVIDED." The certificate listed the policy number of the Argonaut policy issued to BSC, identified Argonaut as the insurer, and stated it was a "house certificate."

Erdtsieck testified that when he reviewed the certificate, he understood *Diamond* [**744] was the insured

because Diamond's name was in the "insured" box. [6] He sent a copy of the certificate to the client who had requested it and filed the certificate away. Erdtsieck believed that if the certificate had not identified Diamond as the named insured, Diamond could not have gotten contracts because it would appear Diamond had no workers' compensation insurance; the customers would know that without such [***14] insurance, Diamond would be operating illegally.

> 6    In his deposition, Erdtsieck's testimony was otherwise. He said he had not reviewed the certificate to see if Diamond was an insured.

### The Accident and Ensuing Events

Theoretically, an employee leasing enterprise can be the target of workers' compensation fraud by client companies who might conceal workers from the leasing company to avoid a leasing charge for that person, pay the worker in cash, and then, if the worker is injured, submit to the employment leasing company an employment application along with the injury claim. [7] To mitigate that hypothetical risk, BSC's standardized contract with client companies, including Diamond, contained a provision that no one would be a BSC employee until (1) the person completed and signed all pages of a hiring packet, and (2) BSC gave written approval for that person to be hired. The contract further provided BSC would "train an on-site supervisor to represent BSC, and that person [would] be able to approve [***15] new hires." BSC was to have "sole responsibility for the management and supervision for said employees, including the hiring, training and termination."

> 7    We find no evidence in the record of a factual history in this regard, thus we use the term "[t]heoretically" advisedly.

There was uncontradicted evidence that neither the provisions relating to the hiring prerequisites nor those pertaining to BSC's personnel management responsibilities were ever implemented. In particular, BSC's duties relating to hiring, training and supervision were performed, from start to finish, by Diamond, not BSC.

Diamond hired Damion Wilcox (Wilcox), who began work on February 25, 1997. It was Diamond's regular practice to submit the application packet at the time the employee's first payroll was issued; BSC always paid wages from the first day of employment, regardless of the lack of a timely [*1035] employment application or BSC's preapproval of the employment. Consistent with the new employee practice, and before Wilcox was [***16] presented with an application packet, Diamond gave him a brief training session in woodcutting and put him on the job. Later that day, while operating a pneu-

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

matic whirlwind saw, Wilcox severed four fingers. After the employee was transported to the hospital, his supervisor completed and signed Wilcox's name on a BSC employment application which it faxed to BSC that evening, together with an injury report.

BSC, assertedly suspicious of the claim because the employment application had not been completed before the injury, hired a private investigator who interviewed Wilcox in the hospital. Wilcox said he had not completed or signed the application, some of the information on it was incorrect, he had never heard of BSC, he had not been told he would be a BSC employee, and he was under the impression he was a Diamond employee. [8] BSC reported Wilcox's claim to Argonaut. Kathy Justyn (Justyn), BSC's director of claims, advised the insurer that BSC did not believe Wilcox was an employee and [**745] therefore he should be denied coverage under the workers' compensation policy. Justyn gave Argonaut a copy of the investigator's report. Argonaut performed no further investigation. Based [***17] on the information in BSC's report and the fact that Diamond had submitted Wilcox's employment application after his accident, Argonaut denied the claim, contending Wilcox was not a BSC employee and therefore was not covered under the BSC policy.

    8    Wilcox confirmed this information at his deposition.

Wilcox contested the denial of his claim. He also filed for workers' compensation benefits against the Uninsured Employers Fund and Diamond, and sued Diamond for tort damages in a civil action, alleging Diamond had failed to secure workers' compensation coverage. Diamond had to provide its own defense against Wilcox's claims, Argonaut steadfastly holding to its position denying coverage.

After 18 months of litigation, Argonaut reached a settlement with Wilcox for $ 110,000, with employment in dispute, i.e., the payment was predicated on the fact that BSC continued to dispute Wilcox was its employee. Argonaut also paid medical liens totaling $ 130,000. Under the terms of the settlement, the action against the Uninsured [***18] Employers Fund and Wilcox's civil claims against Diamond were dismissed. The workers' compensation judge approved the settlement.

*The Underlying Lawsuit*

Diamond and Erdtsieck sued Argonaut. At the time of trial, the operative pleadings were an amended complaint alleging breach of contract, insurance [*1036] bad faith, fraud and violation of *Business and Professions Code section 17200,* [9] and Argonaut's cross-complaint seeking, inter alia, declaratory relief as to whether Diamond was an insured and, if so, recovery of

unpaid premiums. Diamond's common law claims were tried to a jury; the court heard Diamond's business practices claim and Argonaut's cross-complaint.

    9    Before trial, Argonaut obtained summary judgment against Erdtsieck, and Diamond dismissed its action against BSC.

*The Verdict and Subsequent Proceedings*

The jury returned separate general verdicts in Diamond's favor, awarding $ 24,780.75 for breach of contract, $ 229,209.30 for breach of the implied covenant of good faith [***19] and fair dealing, and $ 424,100 for fraud. Taking into consideration the parties' stipulation as to Argonaut's $ 519 million financial net worth, the jury further awarded $ 14 million punitive damages for fraud. Diamond dismissed its claim under the Business and Professions Code. On Argonaut's cross-complaint, the court ruled that declaratory relief was inappropriate and found Diamond was not a named insured under the Argonaut/BSC policy and therefore did not owe unpaid premiums. Thereafter, the court denied Argonaut's motion for judgment notwithstanding the verdict (JNOV), but granted a new trial unless Diamond accepted a remittitur of fraud damages to $ 404,270 compensatory and $ 5.5 million punitive. Diamond accepted. Argonaut appeals from the judgment and from the order denying its motion for JNOV; Diamond and Erdtsieck cross-appeal from the judgment "as amended by [Diamond's] consent to remittitur." Additional facts will be discussed as pertinent to the legal issues, *post.*

DISCUSSIONiscussion

*I. Breach of Contract*

**(1)** Argonaut challenges the sufficiency of the evidence to support the jury's verdict in favor of Diamond on the breach of contract [**746] claim. The standard [***20] for our review is well established: We view the evidence in the light most favorable to the respondent, affording that party every reasonable inference and resolving conflicts in his or her favor. ( *Orange County Employees Assn. v. County of Orange (1988) 205 Cal. App. 3d 1289, 1293 [253 Cal. Rptr. 584].*) "[O]ur power begins and ends with a determination as to whether there is *any* substantial evidence to support [the judgment.]" ( *Overton v. Vita-Food Corp. (1949) 94 Cal. App. 2d 367, 370 [210 P.2d 757].*) **(2)** Having examined the entire record, we are satisfied the breach of contract verdict is amply supported by the evidence.

[*1037] This case involves *two* contracts--the employee leasing contract between BSC and Diamond, and the insurance policy between Argonaut and BSC. The former contract obligated BSC to purchase workers' compensation insurance for all of its employees working

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

at the jobsites of the client companies. The latter obligated Argonaut to provide workers' compensation insurance for all of those employees. The jury was not instructed to separate the two contracts or make special findings with regard to them. In fact, [***21] the two contracts are interrelated, and Argonaut's performance cannot be analyzed outside the context in which its duty arose, i.e., in relation to the BSC-Diamond contract. For clarity's sake, we discuss the two contracts separately.

*The BSC-Diamond Employee Leasing Contract*

The BSC-Diamond contract specified BSC would "employ no one until 1) they have filled out and signed all pages of the employee hiring packet, and 2) written approval has been given by BSC for that person to be hired." Nonetheless, there is uncontradicted evidence BSC invariably employed the workers hired by client companies, including Diamond, from the day they started on the job, regardless of whether the paperwork had been submitted or BSC's prior approval of the worker's employment had been obtained. [10] The contract also provided that BSC would "train an on-site supervisor to represent BSC," and that BSC would "have the sole responsibility for the management and supervision for [all new hires], including the hiring, training and termination." But there is uncontradicted evidence Diamond, not BSC, took on those duties of hiring, training, and supervising the employees working on Diamond's jobsites. [***22]

[10] Although there was much testimony on the issue, two examples of documentary evidence should suffice: (1) Rigoberto Valencia started work the same day as Wilcox, February 25, 1997, without submitting an application packet or receiving BSC's approval of his employment. On payday for the period ending February 28, Valencia received a gross paycheck of $ 160 for 32 hours of work (four days) at $ 5 per hour. (2) In circumstances essentially indistinguishable from Wilcox's, the Workers' Compensation Appeals Board (WCAB) found a worker injured on the job before completing the BSC employment packet *was* a BSC employee covered by the Argonaut policy. A copy of the WCAB's decision and findings of fact in *Bly v. Weber* (Apr. 7, 1997) SDO 0216943 (*Bly*), was admitted into evidence as an exhibit at trial. Briefly, as here, BSC had leased employees to a construction company under the same employee leasing contract. Bly was injured on the job before completing the employee packet. Argonaut denied coverage, pointing to the contract clause stating no one would be considered a BSC employee prior to completion of the packet and BSC's approval. BSC had consistently ignored that clause, paying

noninjured employees from the moment they began working. Moreover, as here, BSC had ignored its contractual duty to train and place on site a supervisor to hire and train employees. The WCAB judge had no difficulty finding the contract had been modified and the construction company's owner acted as BSC's agent, thereby rendering Bly a BSC employee entitled to workers' compensation benefits under the Argonaut policy.

[***23] [**747] [*1038] In short, the parties to the contract not only abandoned or ignored the provisions dealing with the processing of new employees, but, postagreement, substituted a course of conduct wholly incompatible with those provisions. This is a textbook case of modification by conduct. As our Supreme Court has held, where the subsequent conduct of parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied. ( *Garrison v. Edward Brown & Sons (1944) 25 Cal.2d 473, 479 [154 P.2d 377]* ["Before a contract modifying a written contract can be implied, the conduct of the parties according to the findings of the trial court must be inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify the written contract"]; see also *Wagner v. Glendale Adventist Medical Center (1989) 216 Cal. App. 3d 1379, 1388 [265 Cal. Rptr. 412]* [a written contract may be modified by contrary oral representations or conduct inducing reliance thereon by the other party].)

The jury was instructed, inter alia: "A [***24] contract is an agreement between two or more persons to do or not to do a certain thing or things." "A contract may be express or implied in fact. [¶] ... [¶] In an implied in fact contract, the existence and terms of the contract are inferred from the conduct of the parties. [¶] The distinction between an express and an implied in fact contract relates only to the manner in which the agreement is shown. Both types are based upon the express or apparent intention of the parties." "A modification of a contract is a change in an obligation by a modifying agreement. To be effective the modifying agreement requires mutual consent. In addition, the modifying agreement must be supported by additional consideration." [11]

[11] The modification jury instruction is based on *Civil Code section 1698, subdivision (c)*, providing in relevant part, "*Unless the contract otherwise expressly provides*, a contract in writing may be modified by an oral agreement supported by new consideration." (Italics added.) The BSC-Diamond contract *does* "otherwise expressly provide[]," stating, "This contract may be altered or

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

amended only by written amendment signed by both parties." The jury instruction was thus an incomplete statement of the law. However, Argonaut neither requested a proper instruction nor objected, which may explain why the instruction is not challenged on appeal. In any event, the issue has been waived. ( *In re Marriage of Hinman (1997) 55 Cal.App.4th 988, 1002 [64 Cal. Rptr. 2d 383]* [theory of implied waiver based on lack of objection or other appropriate procedure in trial court].)

[***25]  In light of the evidence and the instructions, the jury was permitted to find the BSC-Diamond contract was modified so as to result in Wilcox becoming a BSC employee as soon as Diamond hired him and he began working at the jobsite. Argonaut argues modification does not apply because Diamond failed to prove consideration. We disagree. The parties *mutually* dispensed with the subject requirements of the contract by quid pro quo conduct [*1039] antithetical to the written terms of the contract, i.e., BSC dispensed with the requirements regarding prehiring paperwork and approval, and in turn Diamond performed the specified duties with regard to new hires that were BSC's obligation under the contract. No additional consideration was needed. [12]

> 12  The jury had a proper basis to decide Wilcox was a BSC employee on an additional ground. The jury was instructed on agency theories under which, considering the parties' customary new-employee conduct, it could have reasoned Diamond was BSC's agent when BSC allowed Diamond to hire and train new employees, including Wilcox, and put them on the job, i.e., to perform BSC's functions. (See *Civ. Code, § 2316; Associated Creditors' Agency v. Haley Land Co. (1966) 239 Cal. App. 2d 610, 614 [49 Cal. Rptr. 1]* [existence of agency is a question of fact].) BSC would thus be bound by Diamond's conduct. Our disposition on the basis of modification obviates any need for further discussion of this issue.

[***26]  [**748]  *The Argonaut-BSC Insurance Policy*

Beginning in 1994, Argonaut provided workers' compensation insurance to BSC. The policy identified BSC as the named insured. Argonaut concedes, as it must, that when BSC contracted with a client company, all of the workers transferred from the client company to BSC were covered under the policy. We have determined Wilcox was among those employees, thus he was entitled to workers' compensation benefits under the Argonaut policy. The remaining question is whether *Diamond* had any rights under the policy.

Argonaut attacks the theory of rights arising under the contract on every front. [13] It argues Diamond was not a named insured under the policy; Diamond did not plead the requisite allegations of oral or implied contract; BSC had no power to effect coverage for Diamond because BSC was not Argonaut's agent for purposes of insuring Diamond; [14] Argonaut and BSC were not in a joint venture so as to create liability; and Diamond was not a third party beneficiary. For our purposes, we pass the first four arguments, proceed directly to the fifth, and conclude, contrary to Argonaut's contention, that the record establishes Diamond's [***27] third party beneficiary status.

> 13  The parties, given leave to file overlength briefs, abandoned themselves to copious discourse. Argonaut's opening brief is 74 pages; Diamond requested permission to submit 120 pages for response, but when denied, settled for 86; Argonaut, not to be outdone, filed an 88-page reply. Supplemental briefs add another 20-odd pages.

> 14  We note in passing that the trial court found BSC *was* Argonaut's agent. The assessment is irrelevant to our analysis of the third party beneficiary issue. However, a finding of agency is critical to our determination of Argonaut's liability for fraud, *post.*

*Third Party Beneficiary*

(3)  The legal definition of third party beneficiary, based on *Civil Code section 1559* and interpretive cases, is set forth in *BAJI No. 10.59.* That [*1040] instruction, which was given to the jury, states: "A contract made expressly [15] for the benefit of a third person, may be enforced by a party to the contract or the third person at [***28] any time before the parties to the contract rescind it. [¶] [If a contract is not made expressly for the benefit of a particular third person, that person cannot enforce the contract even though he or she would receive some benefit from the performance of the contract.] [¶] [It is not necessary that the contract identify or refer to the beneficiary by name. The beneficiary may recover if [he] [or] [she] can show that [he] [or] [she] is one of a class of persons for whose benefit the contract was made.]" (*BAJI No. 10.59.*)

> 15  " '[E]xpressly' simply means 'in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.' " ( *Shell v. Schmidt (1954) 126 Cal. App. 2d 279, 290 [272 P.2d 82].*)

(4)  Applying this instruction to the evidence, the jury had a proper basis for concluding Diamond was a third party beneficiary of the Argonaut-BSC insurance policy. Indeed, such a conclusion is inescapable.

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

*Labor Code section 3602, subdivision (d)* [***29] , acknowledges the existence of employee leasing arrangements and provides protection for the leasing employer and the client employer alike. It provides, in relevant part: "For the purposes of this division ... , an employer may secure the payment of compensation on employees provided to it by agreement by another [**749] employer by entering into a valid and enforceable agreement with that other employer under which the other employer agrees to obtain, and has, in fact, obtained workers' compensation coverage for those employees. In those cases, *both employers* shall be considered to have secured the payment of compensation within the meaning of this section ... if there is a valid and enforceable agreement between the employers to obtain that coverage, and that coverage, as [statutorily] specified ... has been in fact obtained, and the coverage remains in effect for the duration of the employment providing legally sufficient coverage to the employee or employees who form the subject matter of the coverage. ... [¶] *Employers who have complied with this subdivision shall not be subject to civil, criminal, or other penalties for failure to provide workers' compensation* [***30] *coverage or tort liability in the event of employee injury, but may, in the absence of compliance, be subject to all three.*" (Italics added.)

The BSC-Diamond contract provided: "BSC shall carry worker's [*sic*] compensation insurance and shall deliver to [Diamond] a certificate evidencing such insurance." BSC purchased the Argonaut policy for the very purpose of fulfilling its promise to Diamond to obtain workers' compensation insurance for the leased employees; the cost of the premiums was [*1041] included in the fees Diamond paid to BSC. The Argonaut insurance policy provided the promised coverage, thereby securing not only for BSC but for Diamond the protection of *Labor Code section 3602, subdivision (d)*. This was not an incidental benefit to Diamond; it was at the very heart of the employee leasing contract and the insurance policy.

*Shell v. Schmidt, supra, 126 Cal. App. 2d 279* is instructive. There, 12 veterans and their wives who had purchased homes from a builder, Max Schmidt, sued him for fraud and breach of contract, both claims arising out of the same set of facts. As pertinent here, in the breach of contract claim, the plaintiff alleged "that [***31] Schmidt contracted and agreed with the F.H.A. to build the homes in conformity with the plans and specifications submitted by him in applying for the priority permits; that plaintiffs, as veterans, [were] third party beneficiaries of that contract; that Schmidt violated the contract by not building in conformity with the plans and specifications in exactly the same respects alleged in the fraud counts; [and] that plaintiffs were damaged in pre-

cisely the same respects and amounts as set forth in those counts." ( *Id. at pp. 281-282.*)

The *Shell* court observed, "[The] count is based on two premises. First, that the application for a permit and its granting subject to conditions resulted in a contract between [Schmidt] and the United States to the effect that [Schmidt] contracted and agreed to build the houses in conformity with the plans and specifications in exchange for a permit to secure priority for building materials then otherwise unobtainable. The second premise is that respondents, as veterans, who purchased the homes so built, were third party beneficiaries of this contract. Both premises are sound." ( *Shell v. Schmidt, supra, 126 Cal. App. 2d at p. 289* [***32] .) More significantly, after determining the relevant statute did, in fact, create a contract between Schmidt and the government, the court stated, "Once it is established that the relationship between the contractor and the government is contractual, it follows that veterans purchasing homes, that is, the class intended to be protected by that contract, are third party beneficiaries of that contract. As already pointed out, the statute and the regulations passed thereunder resulting in the contract were passed to aid and assist veterans and for [**750] their benefit. Purchasing veterans constitute the class intended to be benefited, and the contract must therefore be for their benefit." ( *Id. at p. 290.*) So it is here, where *Labor Code section 3602, subdivision (d)*, states the Legislature's clear intent of providing the protection of workers' compensation insurance for the leasing employer and the client employer alike.

Moreover, the sole purpose of the certificate of insurance issued by Argonaut to Diamond was to prove Diamond's compliance with the provisions of *Labor Code section 3602, subdivision (d)*. And because the [*1042] certificate with BSC named [***33] in the "insured" box had created confusion for municipalities and general contractors intending to do business with client companies, Argonaut took BSC's name out of the insured box and replaced it with the respective client company's name. That is the way Diamond's certificate was written. It enabled Diamond to show it had satisfied the requirements of the workers' compensation law. Additionally, Argonaut issued waiver of subrogation endorsements to the client companies, identifying them as "insured" and promising not to enforce Argonaut's right to recover liability payments against anyone named in the schedule so long as the client company was performing work under a written contract requiring it to obtain the waiver agreement.

We would be hard put to find a more obvious case of a third party beneficiary. Diamond fits precisely into the definition, i.e., one of the class--client companies--of persons for whose benefit the contract was expressly made. [16] (*BAJI No. 10.59.*) As the third party beneficiary

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

to the Argonaut insurance policy, Diamond had a right, inter alia, to the insurer's prompt payment of benefits owed to Wilcox as a BSC employee. [17] The jury's verdict on breach [***34] of contract is unimpeachable. [18]

16   Argonaut contends that imposing a third party relationship creates a conflict of interest for the insurer and greatly expands its potential liability. The short answer is *Labor Code section 3602, subdivision (d)*, confers a third party beneficiary status as a matter of law on client companies such as Diamond whose leased employees are injured at work. Argonaut's policy argument should be addressed to the Legislature.

17   Further support for Diamond's third party beneficiary status under the policy is found in *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal.App.4th 847 [93 Cal. Rptr. 2d 364]*, a decision to which Argonaut gives no more than a dismissive nod. There, Shade Foods, Inc. (Shade), a wholesale food manufacturer, contracted with an almond processor, IPS, for the supply of processed almonds to incorporate into nut clusters Shade sold to General Mills for breakfast cereal. ( *Id. at p. 861.*) Wood slivers were found in the nut clusters, necessarily resulting in destruction of the entire stock of cereal product valued at approximately $ 1 million. When the involved insurers failed to settle General Mills's claim, Shade paid the full amount and calculated its own total losses at nearly $ 2.5 million. ( *Id. at p. 862.*) Shade sued IPS for negligence, breach of contract and breach of warranty, and IPS's insurer, Northbrook National Insurance Company (Northbrook), for breach of contract and breach of the implied covenant of good faith and fair dealing. The evidence at trial established that at Shade's insistence, IPS had obtained first party coverage from Northbrook for "[IPS's] potential liability to Shade for almonds delivered to [IPS's] plant for processing." ( *Id. at p. 875.*) The court found this evidence supported the jury's finding that Shade was a third party beneficiary, and, as such, it was entitled to maintain an action against Northbrook to enforce the terms that were intended to benefit it. ( *Ibid.*; see *Civ. Code, § 1559* ["A contract, made expressly for the benefit of a third person, may be enforced by him [or her] at any time before the parties thereto rescind it"].)

[***35]

18   Argonaut does not challenge the amount of the jury's damages award for breach of contract.

[**751]   [*1043]   II. *Bad Faith*

(5a) Argonaut does not contend its conduct in failing to investigate Wilcox's claim does not constitute breach of the implied covenant of good faith and fair dealing. Rather, citing *Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 35 [44 Cal. Rptr. 2d 370, 900 P.2d 619]*, it argues a party cannot recover damages for such a breach without proving it is a party to the contract. While ordinarily this is true, Argonaut's characterization of the law is overly broad. *Waller* requires " 'contractual underpinnings' " to support "the covenant ... implied as a supplement to the express contractual covenants" ( *id. at p. 36*), but the case does not mean the " 'contractual underpinnings' " are present only in the relationship between the insurer and its named insured. *Waller* presents no bar to third party beneficiary bad faith tort claims.

(6) [***36] We recognize the rule that " ' "[a] third party should not be permitted to enforce covenants made not for his [or her] benefit, but rather for others." ' " ( *Jones v. Aetna Casualty & Surety Co. (1994) 26 Cal.App.4th 1717, 1724 [33 Cal. Rptr. 2d 291]*.) But the rule tacitly acknowledges there are situations in which covenants *are* made for the third party's benefit, that is, the insurer's obligations run in favor of both the named insured and a third party beneficiary. In such cases, the insurer's bad faith in respect to those obligations creates a proper basis for tort recovery by the third party beneficiary. *Hand v. Farmers Ins. Exchange (1994) 23 Cal.App.4th 1847 [29 Cal. Rptr. 2d 258]* (*Hand*), illustrates the point.

In *Hand*, the plaintiff was injured in a vehicle collision with Farmers' insured. When the plaintiff's attempts to settle with Farmers proved futile, she went to trial against the insured and obtained a judgment of more than $ 200,000. ( *Hand, supra, 23 Cal.App.4th at p. 1852.*) After the judgment became final, Farmers refused to pay it. The plaintiff sued the insurer, seeking under *Insurance Code section 11580* [***37] [19] to recover the amount owing on the judgment, and asserting a tort cause of action for " 'Bad Faith Deprivation of a [Statutorily] Protected Property Interest.' " (*Hand, at p. 1852.*) Reversing a summary adjudication in favor of the insurer on the bad [*1044] faith claim, the Court of Appeal found, "just as is the case with other, insureds' bad faith causes of action against insurers, the present cause of action for bad faith nonpayment of a finally adjudicated claim may sound in tort as well as contract." ( *Id. at p. 1860.*) It reasoned an insurer's "unreasonable, bad faith refusal to pay a judgment creditor claimant the entire amount of the judgment, after it becomes final, implicates [a] recognizable duty of good faith by the insurer under its policy, which was intended to benefit such a third party beneficiary." ( *Id. at p. 1857.*)

Case 3:07-cv-02952-WHA    Document 193    Filed 06/11/2008    Page 19 of 29

Page 14

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

19  "*Insurance Code section 11580, subdivision (b)(2)*, ... requires that all California automobile liability insurance policies, among other policies, provide, and be construed to provide, 'that whenever judgment is secured against the insured or the executor or administrator of a deceased insured in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment.' " ( *Hand, supra,* 23 Cal.App.4th at pp. 1850-1851, fn. 1.)

[***38] In reaching that conclusion, the *Hand* court expressed "due regard, indeed concern, for the widespread general understanding that bad faith claims against insurers are not assertable by 'third party claimants.' " ( *Hand, supra,* 23 Cal.App.4th at p. 1860.) However, [**752] it noted, the leading authority for that proposition, *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937 [132 Cal. Rptr. 424, 553 P.2d 584], had been misconstrued. ( *Hand, at p.* 1856.) As the *Hand* court explained, "*Murphy* validates the principle ... that a third party beneficiary ... may enforce implied contractual covenants, including the covenant of good faith, to the extent that those covenants or their duties run in its favor. Conversely, *Murphy* disallows such a beneficiary from claiming the benefits of a duty under the implied covenant that was not implied or posited to protect its interests under the contract." ( *Id. at p.* 1857.) Under that rationale, *Murphy*'s plaintiff, a third party beneficiary, could *not* assert the tort bad faith cause of action based on the insurer's failure to settle, but *could* enforce covenants arising from the [***39] insurer's duty to pay the finally adjudicated claim: The latter covenants were, without doubt, predicated on " 'the [insurer's] usual [policy] promise to pay "on behalf of the insured ... all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage. ..." ' " (*Ibid.*) Under *Murphy*, said the *Hand* court, "the insurer's policy duty to pay adjudicated liabilities is in place as much to protect adjudicated injured parties from uncompensated loss as to protect the insured from personal financial disaster." ( *Id. at p.* 1858.) The *Hand* court concluded, "To this end, once having secured a final judgment for damages, the plaintiff becomes a third party beneficiary of the policy, entitled to recover on the judgment on the policy. At that point the insurer's duty to pay runs contractually to the plaintiff as well as the insured. And the plaintiff having also become a beneficiary of the covenant of good faith [citation], the duty to exercise good faith in not withholding adjudicated damages necessarily is owing to the plaintiff also." (*Ibid.*)[20]

20  The *Hand* court alluded to other third party beneficiary-bad faith cases. In the first, *North-*

*western Mut. Ins. Co. v. Farmers' Ins. Group* (1978) 76 Cal. App. 3d 1031 [143 Cal. Rptr. 415], it noted, "[A] permissive user of a truck, not a party to the policy, was held to have possessed a bad faith claim against the owner's insurer for failure to settle, because he had been an insured under the terms of the policy, and therefore was an express third party beneficiary, entitled to enforce the contract (*Civ. Code, § 1559*), including the implied covenant insofar as it ran for his benefit. Because he stood in the same relationship with the insurer under the policy as the named insured, and would be benefited by performance of the duty to settle, he was entitled to sue for its breach." ( *Hand, supra,* 23 Cal.App.4th at p. 1855.) With regard to the second case, *Cancino v. Farmers Ins. Group* (1978) 80 Cal. App. 3d 335 [145 Cal. Rptr. 503], the *Hand* court observed the injured plaintiff was a nonparty insured under an auto policy's uninsured motorist coverage, who was allowed to maintain a cause of action based on the insurer's failure to attempt to settle his injury claim. The *Hand* court pointed out, "Once again, the plaintiff's status as a nonparty to the contract did not avert his enjoyment, as an insured, of a duty arising from the covenant of good faith." ( *Hand, supra,* 23 Cal.App.4th at p. 1855, fn. 4.) These, and other cases, debunk Argonaut's generalization that only a party to the contract can recover for bad faith.

[***40] **(5b)** We find Diamond is among those third party beneficiaries entitled to assert a bad faith claim. As we have discussed, *ante,* [*1045] *Labor Code section 3602, subdivision (d)* affords protection for leasing employers and client employers alike, providing by law that when the leasing company has fulfilled its promise to obtain workers' compensation insurance, the leasing company and the client company *both* have "secured the payment of [workers'] compensation," and so long as such coverage remains in effect, *both* companies enjoy protection from civil, criminal, or other penalties for failure to provide workers' [**753] compensation coverage. Diamond secured the payment of workers' compensation by contracting with BSC, and Argonaut issued the policy that provided that protection. As long as the Argonaut policy was in effect, and as long as Wilcox was a BSC leased employee, as we have found he was at the time of the incident, BSC and Diamond, by statute, stood in the same shoes with regard to workers' compensation coverage and the insurer's duty to pay. Based on that duty, under the rationale of *Hand* and in keeping with the other cases discussed, [***41] *ante,* the implied covenant and its duties ran not only to BSC, but to Diamond, the third party beneficiary.

Case 3:07-cv-02952-WHA     Document 193     Filed 06/11/2008     Page 20 of 29

Page 15

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

**(7)** Having concluded Diamond was entitled to a tort recovery based on Argonaut's bad faith denial of coverage, we turn to the amount of damages. The jury awarded $ 229,209.30 in attorney fees and costs on this claim. Citing *Brandt v. Superior Court (1985) 37 Cal.3d 813, 817 [210 Cal. Rptr. 211, 693 P.2d 796]*, Argonaut unconvincingly asserts Diamond failed to meet its burden of segregating the amount of attorney fees it incurred to obtain policy benefits. This argument ignores Diamond's attorney's testimony that he did, in fact, segregate numerous specified items from his billing statements and claim for attorney fees. When asked, "Are all of these [remaining] services that you have listed here related to obtaining the benefits of the insurance contract on behalf of Diamond Woodworks?" the attorney responded, "All of them are related, yes." And when asked, "And all of them are reasonable and necessary?" the attorney answered, "Yes." The testimony of a single witness, even a party, may be sufficient. ( *In re Marriage of Slivka (1986) 183 Cal. App. 3d 159, 163 [228 Cal. Rptr. 76] [***42]* .) The jury apparently found the witness credible; we do not reassess such matters.

[*1046] III. *Fraud*

**(8a)** Argonaut argues Diamond failed to prove the elements of fraud. We disagree. **(9)** Diamond sought recovery on several bases, but in order to affirm the jury's general verdict, we need find only one proper supporting ground. ( *Western Mutual Ins. Co. v. Yamamoto (1994) 29 Cal.App.4th 1474, 1481 [35 Cal. Rptr. 2d 698]* [judgment will be affirmed if correct on any theory of law applicable to the case].) **(8b)** Here, the proper supporting ground for fraud liability is false promise. [21]

> 21  Were we to reach the issue of fraud regarding the certificates of insurance, we would agree with the trial court's finding that Erdtsieck, who negotiated the contract with BSC, could not reasonably have expected from reading the certificate that Diamond was a named insured under Argonaut's policy. We, too, would conclude the evidence of Erdtsieck's subjective understanding does not provide substantial proof of this element of the tort. (See, e.g., *Roddenberry v. Roddenberry (1996) 44 Cal.App.4th 634, 652 [51 Cal. Rptr. 2d 907]*; *Toyota Motor Sales U.S.A., Inc. v. Superior Court (1990) 220 Cal. App. 3d 864, 871 [269 Cal. Rptr. 647]*.)

[***43] False promise is defined by statute as "[a] promise, made without any intention of performing it." (*Civ. Code, § 1710, subd. (4)*.) **(10)** As stated by the court in *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co. (1977) 66 Cal. App. 3d 101, 133 [135 Cal. Rptr. 802]*, " ' "A promise to do something necessarily implies *the intention to perform*, and, where

such an intention is absent, it is an implied misrepresentation of fact, which is actionable fraud." ' " **(11)** Fraudulent intent is an issue for the trier of fact to decide. ( *Locke v. Warner Bros., Inc. (1997) 57 Cal.App.4th 354, 368 [66 Cal. Rptr. 2d 921]*.)

**(8c)** The jury was instructed on false promise and had a sufficient evidentiary basis for finding fraud. As we have seen, the evidence [**754] is unequivocal and uncontradicted that BSC and Diamond dispensed with the contract requirements regarding hiring procedures, prehiring paperwork and employment approval: BSC paid leased employees from the first day on the job, without regard to whether paperwork had been completed and approval given. In this routine practice modifying the terms of the written contract, [***44] BSC impliedly promised Diamond and caused it to reasonably believe to its clear detriment that *all* of its new hires were BSC employees from day one and thus covered under the workers' compensation policy. A false promise can as easily, perhaps more easily, be implied from conduct as from language; indeed, as the well-worn maxim goes, actions speak louder than words. BSC's unhesitating rejection of Wilcox's claim for lack of the employment packet in the face of its prior conduct constituted substantial [*1047] evidence for the jury to find BSC never intended to fulfill its implied promise of legitimate employment status and workers' compensation insurance to *all* leased employees. Rather, BSC intended to deny insurance coverage to any person such as Wilcox, injured on the job prior to completion of the paperwork. ( *Locke v. Warner Bros., Inc., supra, 57 Cal.App.4th at p. 368* [fraudulent intent "may be 'inferred from such circumstances as defendant's ... failure even to attempt performance ... .' "].)

**(12)** BSC's liability is more readily apparent than Argonaut's, whose liability depends upon agency. Argonaut contends there is insufficient evidence [***45] of agency, but it misses the mark in two respects: (1) Instead of focusing on actual agency, which is the real issue, it concentrates on an essentially academic argument regarding ostensible agency, a marginal theory at best under the facts of this case; and (2) it argues at length about how the jury *should* have interpreted facts, assessed credibility and weighed evidence. That challenge is doomed: We do not secondguess such matters. ( *Orange County Employees Assn. v. County of Orange (1988) 205 Cal. App. 3d 1289, 1293 [253 Cal. Rptr. 584]*.)

The record contains substantial evidence Argonaut gave BSC authority to bind insurance, i.e., to enter into a legally binding insurance contract on behalf of the insurer. Indeed, the jury considered a letter from Argonaut's underwriting manager to BSC's chief executive officer, Russ Ferry, unequivocally stating, "We have

Case 3:07-cv-02952-WHA    Document 193    Filed 06/11/2008    Page 21 of 29

Page 16

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

given [BSC] the freedom to bind coverage on client companies ... ." Diamond's expert witnesses agreed the letter was Argonaut's agency authorization, that is, Argonaut gave BSC express permission to sign up client companies for Argonaut coverage. Of course, Argonaut relied entirely on BSC's investigation [***46] of the Wilcox claim when it denied coverage. Other examples abound, but this evidence standing alone provides a firm foundation for a finding of actual agency. [22] (See *BAJI No. 13.00.*) Thus, the fact finder had an appropriate basis for holding Argonaut, the principal, liable for the fraud of its agent, BSC.

> 22   Argonaut argues its own conduct, apart from BSC's, "is entirely inconsistent" with fraud in that, prior to the Wilcox incident, the insurer "emphatically insisted that [BSC] require client companies to adhere to the written requirements in the [BSC] contract and threatened to cancel the policy if it did not do so." If at trial Argonaut produced any documentary evidence, e.g., letters, notes, memoranda to BSC, such exhibits are neither alluded to in the briefs nor included in the record on appeal. There were only a few sentences of testimony, and we do not find that evidence necessarily "inconsistent" with fraud. In any event, it appears the jury was not persuaded.

[*1048]  *Compensatory* [***47] *Damages Based on Fraud*

**(13)** Argonaut contests the fraud award of compensatory damages as remitted, [**755] asserting there is insufficient evidence to support certain components or amounts. We agree the award must be further remitted for reasons we now explain.

The jury was instructed it could award fraud damages as follows: "1. The difference, if any, between the actual value of that with which the plaintiff parted and the actual value of that which was received. ... [¶] 2. In addition ... plaintiff is entitled to recover any additional damage arising from the particular transaction, including any of the following: [¶] (A) Amounts actually and reasonably expended or lost in reliance upon the transaction. [¶] If you find that plaintiff is entitled to a verdict against the defendant, you must then award plaintiff damages in an amount that will reasonably compensate for all the loss suffered by plaintiff and caused by the fraud upon which you base your finding of liability." As stated in *Romo v. Stewart Title of California (1995) 35 Cal.App.4th 1609, 1619 [42 Cal. Rptr. 2d 414]*, "A tort victim is not limited to his or her 'out-of-pocket' losses; rather, [***48] he or she is entitled to compensatory damages for any actual loss ... ."

The jury awarded Diamond fraud damages of $ 424,100, consisting of $ 124,000 in fees Diamond paid BSC under the employee leasing contract from August 21, 1995, to December 31, 1997; [23] $ 234,000 in lost profits because, while Wilcox's actions against Diamond were pending, Diamond could not afford to purchase a piece of equipment it needed to be competitive in the industry; [24] and prejudgment interest at 10 percent. [25] The court set the principal amounts undisturbed, but finding 7 percent to be the proper rate of interest, reduced the total to $ 404,270. The remitted award, separated into its component parts, is: $ 124,000 for return of fees plus prejudgment interest of $ 21,700, and $ 234,000 for lost profits plus prejudgment interest of $ 24,570.

> 23   Diamond's recovery was predicated upon reimbursement of 22.3 percent of a weekly $ 4,500 payroll from August 21, 1995, through December 31, 1997.
> 24   Erdtsieck testified Diamond had intended to buy a "CNC router," a $ 250,000 to $ 300,000 automated, programmed machine, but could not do so because "we were faced with [Wilcox's] personal injury case and understanding from the lawyers that that could have been into at least a couple hundred thousand dollars, if not more, sometimes a million." After the Wilcox matter settled, Diamond made the purchase and realized increased profits of about $ 3,000 per week. It sought to recover profits in that amount lost during the 18-month delay.

[***49]
> 25   Diamond asked for and received prejudgment interest for 30 months on the fees paid to BSC and interest for 18 months on the lost profits.

[*1049]  Argonaut presents no argument regarding the lost profits segment of the fraud damages, thereby conceding the correctness of that part of the award. [26] We agree the lost profits damages are supported by substantial evidence and allowable under the law. However, insofar as the award gives back to Diamond the fees it paid to BSC to cover the cost of premiums for workers' compensation insurance, it cannot stand. There is no substantial evidence Diamond paid something for nothing. Quite the contrary, Diamond itself argues BSC *always* paid wages from the first day of a new worker's employment, regardless [**756] of lack of paperwork. The only reasonable inference is that those workers were covered by the Argonaut policy from the first day because they were BSC's employees from the first day. With regard to Wilcox, BSC denied he was an employee, thus he was never on BSC's payroll and no premium was ever due for him. We find no substantial [***50] evidence proving a difference between the actual value of

Case 3:07-cv-02952-WHA    Document 193    Filed 06/11/2008    Page 22 of 29

Page 17

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

that with which Diamond parted and the actual value of that which it received. [27]

    26    Argonaut's failure to contest the lost profits damages reveals the flaw in its contention the judgment must be reversed for inconsistent verdicts, i.e., recovery for breach of contract *and* fraud. Causes of action for contract and tort recovery based on the same set of facts are not mutually exclusive (see *Shell v. Schmidt, supra, 126 Cal. App. 2d 279, passim*); they give rise to different remedies, and here there is no duplicative award.

    27    We reject Diamond's argument that the company itself, distinct and apart from its leased workers, was insured under the Argonaut policy and that the return of premiums represented monies Diamond paid for its own insurance, as opposed to workers' compensation coverage for the leased employees. Simply stated, there is no evidence upon which the jury could have so found. (See fn. 16, *ante*.)

The remitted [***51] compensatory damages award is impermissible in part. The award cannot be affirmed unless it is remitted to $ 258,570, representing lost profits and prejudgment interest only. Our affirmance is thus conditioned on Diamond's consent to the remittitur. *California Rules of Court, rule 24(d)* [28] sets forth the procedure to be followed in this circumstance: It provides, "If a Court of Appeal decision conditions the affirmance of a money judgment on a party's consent to an increase or decrease in the amount, the judgment is reversed unless, before the decision is final under [*rule 24*] (b), the party serves and files two copies of a consent in the Court of Appeal. If a consent is filed, the finality period runs from the filing date of the consent." Accordingly, we reverse the fraud compensatory damages award and remand for a new trial as to that issue unless Diamond consents to the decreased amount of $ 258,570 and complies with the procedures set forth in *rule 24(d)*.

    28    All further references to rules are to the California Rules of Court.

[***52] IV. *Punitive Damages*

**(14a)** Argonaut challenges the punitive damages award, contending punitive damages are not recoverable at all in this case, but if they are, the [*1050] award must be reduced for numerous reasons. As we will discuss, we reject the first contention, but agree the award must be further remitted. While this appeal was pending, the United States Supreme Court decided *Campbell, supra, 538 U.S. 408 [123 S. Ct. 1513]*, further explaining the *Gore* [29] standard for assessing whether an award of punitive damages constitutes a grossly excessive pun-

ishment or arbitrary deprivation of property so as to violate the *due process clause of the Fourteenth Amendment to the United States Constitution*. We invited the parties to submit supplemental letter briefs addressing the impact of *Campbell* on this case. Having considered the responses, and after conducting a de novo review to determine whether the award is constitutionally excessive ( *Cooper Industries, Inc. v. Leatherman Tool Group, Inc. (2001) 532 U.S. 424, 435-436 [149 L. Ed. 2d 674, 121 S. Ct. 1678]*), we agree with Argonaut the $ 5.5 million remitted award is impermissible. [***53] It must be significantly reduced to comport with constitutional due process.

    29    *BMW of North America, Inc. v. Gore (1996) 517 U.S. 559, [134 L. Ed. 2d 809, 116 S. Ct. 1589] (Gore).*

*Sufficiency of Evidence*

**(15)** Before turning to the constitutional issue, we disabuse Argonaut of the notion the jury had no proper basis for awarding punitive damages. Such damages are allowed "where it is proven by [**757] clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice . . . ." (*Civ. Code, § 3294, subd. (a).*) Challenging the "clear and convincing" nature of the evidence, Argonaut cites *Weiner v. Fleischman (1991) 54 Cal.3d 476 [286 Cal. Rptr. 40, 816 P.2d 892]* which states: "When there is sharply conflicting evidence ... it is very difficult for a party to meet this high [clear and convincing] standard." ( *Id. at p. 490.*) Here, there is no sharply conflicting evidence; quite to the contrary, the evidence [***54] is essentially without contradiction.

Argonaut argues that under *Tomaselli v. Transamerica Ins. Co. (1994) 25 Cal.App.4th 1269 [31 Cal. Rptr. 2d 433]* (*Tomaselli*), punitive damages should not be allowed where the offending conduct is not inconsistent with " 'a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.' " ( *Id. at p. 1288*, fn. 14.) The rule is inapt to our facts. In light of BSC's and Argonaut's near reflexive denial of the severely maimed Wilcox's employment status and entitlement to workers' compensation benefits, not to mention their subsequent long-term refusal to budge from that position, the evidence was *consistent* with intentional fraud, and *not* consistent with mistake, honest error, negligence, and the other innocuous examples listed in *Tomaselli*. As [*1051] we have previously noted, an absolute unwillingness " 'even to attempt performance' " gives rise to an inference of fraudulent intent. ( *Locke v. Warner Bros., Inc., supra, 57 Cal.App.4th at p. 368.*) [30]

    30    Our determination of this issue disposes of Argonaut's assertion the court erred in refusing to

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

instruct the jury under *Tomaselli* from which the proposed instruction was taken regarding conduct resulting from mistake, honest error, etc. (See *Tomaselli, supra, 25 Cal.App.4th at p. 1288,* fn. 14.)

[***55] Argonaut further asserts there is no clear and convincing evidence it intended to deprive Diamond of property or legal rights or otherwise cause Diamond injury, a requirement that must be met to prove fraud under *Civil Code section 3294, subdivision (c)(3).* Once again, we disagree. The intent is sufficiently demonstrated by, for example, (1) the conduct of Argonaut's agent, BSC, in its immediate negative response to Wilcox who, according to BSC's prior practice, would have been acknowledged as a BSC employee but for his injury, and (2) Argonaut's unhesitating and persistent affirmance of that decision without further inquiry, despite its knowledge of the judge's findings of fact and ruling in favor of Bly in the WCAB case discussed in footnote 10, *ante.* [31]

> 31    *Civil Code section 3294, subdivision (b),* states, in relevant part, "With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." The jury was instructed accordingly. Argonaut does not argue lack of evidence proving ratification by a corporate managing agent; we deem the issue waived and pass it without consideration. (See, e.g., *Mansell v. Board of Administration (1994) 30 Cal.App.4th 539, 545, 546 [35 Cal. Rptr. 2d 574].*)

[***56]    *Due Process Proportionality Under Campbell*

(14b) In *Campbell,* despite concluding its insured, Campbell, was at fault in an accident resulting in the death of one person and permanent disability of another, State Farm contested liability in ensuing wrongful death and tort actions, refused to settle the claims within policy limits, ignored the advice of one of its investigators, and proceeded to trial, all the while assuring the [**758] Campbells their assets were safe and they did not need to retain their own independent counsel. ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1518].*) The jury, finding Campbell 100 percent at fault, awarded damages far in excess of policy limits and prior settlement demands. (*Ibid.*) Rather than paying the excess liability, State Farm suggested the Campbells should put their house up for sale to satisfy that portion of the judgment. The insurer also refused to post a supersedeas bond to facilitate the insureds' appeal. The Campbells hired their own attorney to file the appeal; the plaintiffs agreed not

to execute on the judgment in exchange for the Campbells' pursuit of a bad faith case against State [***57] Farm and 90 percent of the proceeds. When the judgment was affirmed on appeal, State Farm paid it in full, including the amount in excess of policy limits. (*Ibid.*)

[*1052] In the bad faith action, the jury first found State Farm's decision not to settle unreasonable because of the substantial likelihood of an award of damages exceeding the policy limits. In the second phase of the trial to determine liability for fraud and intentional infliction of emotional distress and to assess compensatory and punitive damages, the jury heard evidence that, in accordance with policy, State Farm had taken the case to trial as part of " 'a national scheme to meet corporate fiscal goals by capping payouts on claims company wide.' " ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1518].*) [32] In accordance with that scheme, in the Campbells case, State Farm had altered company records to make its insured seem less culpable ( *id. at p. ___ [p. 1521]*), written notes in the claims file falsely disparaging the character of the deceased victim, told the adjuster to change his report which had indicated Campbell was likely at fault and the settlement value was high, and [***58] failed to produce in discovery its claim-handling practice manuals for the years in which it handled the claim against Campbell. ( *Id. at p. ___ [123 S.Ct at pp. 1528-1529* (dis. opn. of Ginsburg, J.).)

> 32    The Campbells showed the insurer's program included falsification or withholding of evidence in claims files; unfair attacks on the claimant's character, reputation and credibility by prejudicial handwritten notations in claims files that might be seen by the jury; pressure on claims adjusters to pay far less than fair value for claims; padding files with self-serving statements and omitting critical items; making " 'systematic' efforts to destroy internal company documents that might reveal its scheme" by, for instance, instructing claims personnel " 'to search their offices and destroy a wide range of material of the sort that had proved damaging in bad-faith litigation in the past' "; and going to great efforts to " 'stop damaging documents from being created in the first place.' " ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1528-1529]* (dis. opn. of Ginsburg, J.).)

[***59] The jury awarded the Campbells $ 2.6 million in compensatory damages and $ 145 million in punitive damages. ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1515].*) The trial court reduced the compensatory damages to $ 1 million and the punitive damages to $ 25 million; the Utah Supreme Court reinstated the $ 145 million punitive damages award. (*Ibid.*)

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

The United States Supreme Court held the award, "neither reasonable nor proportionate to the wrong committed, ... was an irrational and arbitrary deprivation of the property of the defendant," thus violative of the *due process clause of the Fourteenth Amendment.* ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1526].*) Remanding for redetermination of the punitive award, the court instructed that "[a]n application of the *Gore* guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive [**759] damages award at or near the amount of compensatory damages." (*Ibid.*)

**(16)** [***60] The *Gore* factors to which *Campbell* alludes provide a framework for determining whether a punitive damages award has served the state's [*1053] legitimate interests in punishment and deterrence, or whether instead it has imposed a constitutionally prohibited " ' "grossly excessive" ' " punishment on a tortfeasor." ( *Gore, supra, 517 U.S. 559, 562 [716 S.Ct. 1589, 1592].*) Noting that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him [or her] to punishment, but also of the severity of the penalty that a State may impose" ( *id. at p. 574 [116 S.Ct. at p. 1598]*), *Gore* requires the court to evaluate excessiveness in light of (1) the degree of reprehensibility of the defendant's conduct ( *id. at p. 575 [116 S.Ct. at p. 1599]*), (2) the ratio of the punitive damages to the compensatory damages ( *id. at p. 580 [116 S.Ct. at p. 1601]*), and (3) comparison of the punitive damages award with "the civil or criminal penalties that could be imposed for comparable misconduct ... ." ( *Id. at p. 583 [116 S.Ct. at p. 1603].*) ³³**(14c)** [***61] Accordingly, we independently review the record here ( *Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra, 532 U.S. at pp. 435--436 [121 S.Ct. at p. 1685]*), applying the first two *Gore* guideposts to decide as a matter of law whether under *Campbell,* the $ 5.5 million punitive damage award violates the federal *due process clause.*

³³ Like the *Campbell* court, "we need not dwell long on [the third *Gore*] guidepost." ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1526].*) The parties agree there are only marginally analogous statutes: *Business and Professions Code section 17206, subdivision (a)* (fraudulent business act or practice punishable by a civil penalty not to exceed $ 2,500 per violation), and *Penal Code sections 17-19, 487, subdivision (a), 532, subdivision (a), and 672* (criminal fraud punishable by fine not exceeding $ 1,000 or $ 10,000, depending whether conviction is for misdemeanor or felony). We find these statutes not

particularly helpful, and the other *Gore* guideposts are sufficient for purposes of our analysis.

[***62] *Reprehensibility*

**(17a)** We first examine the degree of reprehensibility of Argonaut's conduct, " '[t]he most important indicium of the reasonableness of a punitive damages award ... .' " ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1521].*) **(18)** In determining reprehensibility, *Campbell* instructs us to "CONSIDER[] WHETHER: the harm caused was physical as opposed to economic; the [defendant's] tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*Ibid.*)

**(17b)** In our examination of the components of reprehensibility, we reject Diamond's contention that reprehensibility should be measured by Argonaut's conduct toward the world at large, rather than as directed at Diamond alone. Diamond argues Argonaut lied to government agencies [*1054] including the state's Workers' Compensation Insurance Bureau; it used unlicensed agents (BSC personnel) to write insurance [***63] in violation of state law; it denied other claims, i.e., the *Bly* claim (see fn. 10, *ante*) in the same way it denied Wilcox's (and Diamond's); it treated all client companies as one insured under the policy; and it engaged in conduct that was part and parcel of "the exact transaction and circumstances of fraud perpetrated on the plaintiff."

[**760] The problem with the argument is that *Campbell* makes clear such matters cannot provide a legitimate basis for the plaintiff's punitive damages award. The court notes: "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis ... ." ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1523].*) The *Campbell* court further states, "The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance ... ." ( *Id. at p. ___ [123 S.Ct. at p. 1524 [***64] .*) ³⁴

³⁴ Diamond suggests that under *Campbell,* Argonaut may be punished for conduct similar or bearing a relationship to that which injured Diamond. We agree that under *Campbell,* the jury in assessing punitive damages could consider evidence of such conduct. However, here, as in *Campbell,* the plaintiffs "identified scant evi-

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

dence of repeated misconduct of the sort that injured them." ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1523].*) Indeed, the *Bly* incident provides the *only* other instance of conduct of the sort that ultimately injured Diamond, i.e., denial of the injured worker's BSC employment status.

We turn to an analysis of the reprehensibility factors concerning Argonaut's conduct vis-a-vis Diamond. Here, as in *Gore*, the harm to Diamond from the insurer's fraud was economic, not physical. ( *Gore, supra, 517 U.S. 559, 576 [116 S.Ct. 1589, 1599].*) However, Argonaut demonstrated absolute indifference to the health and safety of the maimed employee, Wilcox, [***65] and that indifference directly and adversely impacted Diamond. Moreover, the target of Argonaut's conduct was financially vulnerable: Diamond was not General Motors. Due to its exposure to a potential seven-figure award in Wilcox's personal injury case, it could not risk investing in a $ 300,000 piece of automated equipment, even though the machine would have increased its profits by some $ 3,000 per month. The jury awarded Diamond those lost profits as fraud damages.

Additionally, Argonaut's conduct was not an isolated incident; rather, the insurer persisted in its denial of a defense for Diamond and its denial of coverage for Wilcox for a period of 18 months. Even in the face of the *Bly* decision, dealing with a claim arising in circumstances virtually identical to [*1055] those of the Wilcox claim, Argonaut did not back away from its wrongful denial of a defense to Diamond. (See, e.g., *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 889 [221 Cal. Rptr. 509, 710 P.2d 309] ["The entire pattern of conduct shows a clear attempt by [the insurer] to avoid responsibility ..."].) Finally, the degree of reprehensibility is underscored by the jury's [***66] finding of fraud, i.e., that the harm suffered by Diamond was no mere accident.

In *Campbell*, the court cautioned that "existence of any one of these [reprehensibility] factors ... may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1521].*) In this instance, the presence of *four* of the factors, as discussed above, demonstrates Argonaut engaged in reprehensible conduct sufficient to support an award of punitive damages in *some* amount under *Campbell's* first test.

*Punitive-to-compensatory Damages Ratio*

**(14d)** With regard to the ratio of punitive damages to compensatory damages, however, we have no doubt that anything exceeding four to one would not comport [**761] with due process under *Campbell*. We shall explain.

The *Campbell* court did not "impose a bright-line ratio which a punitive damages award cannot exceed." ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1524].*) Observing that grossly excessive awards "further[] no legitimate purpose and constitute[] an arbitrary deprivation [***67] of property" ( *id. at p. ___ [123 S.Ct. at p. 1520]*), the court concluded, "Our jurisprudence and the principles it has now established demonstrate ... that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." ( *Id. at p. ___ [123 S.Ct. at p. 1524].*) Alluding to *Pacific Mut. Life Ins. Co. v. Haslip* (1991) 499 U.S. 1 [113 L. Ed. 2d 1, 111 S. Ct. 1032], and a 700-year legislative history "providing for sanctions of double, treble, or quadruple damages to deter and punish," the *Campbell* court reiterated "that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1524].*)

Further explicating guidelines for due process proportionality, the court noted facts and circumstances may call for a ratio either exceeding or falling below the norm. ( *Campbell, supra, 538 U.S. 408, ___[123 S. Ct. 1513, 1524].*) It suggested a ratio "perhaps only equal to compensatory damages" might "reach the outermost limit of the due [***68] process guarantee" [*1056] "[w]hen compensatory damages are substantial." (*Ibid.*) Additionally observing "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award" ( *id. at p. ___ [123 S.Ct. at p. 1525]*), the *Campbell* court cautioned the courts of the need to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." ( *Id. at p. ___ [123 S.Ct. at p. 1524].*)

*Application of Campbell*

Doing our best to understand the proportionality requirements of the *due process clause*, as revealed by the *Campbell* court, we conclude the $ 5.5 million punitive damages award does not comport with due process. Compared to that portion of the compensatory damages based on fraud, [35] as remitted by the trial court to $ 404,270, the punitive damages are more than 13 times greater. Compared to the fraud compensatory damages, as remitted by *this* court, the punitive damages are more than 21 times greater. We do not read *Campbell* as allowing such disproportionality under the facts and circumstances of this case. Accordingly, Diamond's cross-appeal [***69] of the trial court's remittitur is doomed.

35    Fraud is the only cause of action providing a basis for punitive damages in this case. With regard to insurance bad faith, the jury found no

109 Cal. App. 4th 1020, *; 135 Cal. Rptr. 2d 736, **;
2003 Cal. App. LEXIS 872, ***; 68 Cal. Comp. Cas 868

malice or oppression, thus punitive damages are not allowable. Furthermore, breach of contract claims do not support punitive damages. (*Civ. Code, § 3294*.)

Nevertheless, we are compelled to observe that a jury did, in fact, determine Argonaut's conduct to be fraudulent and reprehensible and deserving of significant punitive damages. Neither the Constitution nor the *Campbell* court's interpretation of the *due process clause* requires us wholly to ignore the determination of the jury--individuals who brought the sense of the community to the decision making process and who diligently sat and listened to all of the evidence before rendering their collective judgment. Were we to give no credence to the jury's determination, we would, in effect, deny plaintiff its "inviolate right" to "trial by jury" guaranteed by our state's [***70] Constitution. (*Cal. Const., art. I, § 16*.) **(19)** Our de novo review [**762] of the punitive damage award is necessary to ensure the jury's determination does not offend due process concerns, not to make a wholly independent determination. ( *Campbell, supra, 538 U.S. 408, ___ [123 S. Ct. 1513, 1520-1521* ["Exacting appellate review ensures that an award of punitive damages is based upon an ' "application of law, rather than a decisionmaker's caprice." ' "].) **(14e)** We conclude, therefore, that the remittitur we order must comply with the requirements of due process, but yet accord due consideration of the jury's determination.

[*1057] *Campbell, Gore* and *Haslip* all suggest that in the usual case, i.e., a case in which the compensa-tory damages are neither exceptionally high nor low, and in which the defendant's conduct is neither exceptionally extreme nor trivial, the outer constitutional limit on the amount of punitive damages is approximately four times the amount of compensatory damages. Taking into account the jury's determination in this case, we conclude that the ratio should approximate that outer limit. Such a reasonable [***71] and proportionate award well serves the state's interest in retribution and deterrence. We therefore reverse the punitive damages award and remand for a new trial as to that issue unless Diamond consents to the decreased amount of $ 1 million (approximately 3.8 times the fraud compensatory damages of $ 258,570, as remitted by this court), and complies with the procedures set forth in *rule 24(d)*.

Disposition

The judgment is affirmed, except as to the compensatory damages award for fraud and the punitive damages award. With respect to those damages only, the judgment is reversed and the case remanded for new trial, unless, before the decision is final under *rule 24(b)*, Diamond consents to a remittitur of the fraud damages to $ 258,570 and the punitive damages to $ 1 million, and timely serves and files notice of such consent pursuant to the procedures specified in *rule 24(d)*. If Diamond timely consents to the remittitur, the judgment is affirmed as modified by the remittitur. Each party shall recover its own costs on appeal. (Rule 27(a)(3) & (4) [***72] .)

Sills, P. J., and Moore, J., concurred.

LEXSEE 181 CAL 616

**LOS ANGELES INVESTMENT COMPANY (a Corporation), Respondent, v. EDWARD A. WILSON et al., Appellants**

**L. A. No. 5273**

**Supreme Court of California, Department Two**

*181 Cal. 616; 185 P. 853; 1919 Cal. LEXIS 403*

**December 1, 1919**

**SUBSEQUENT HISTORY:**    [***1] Hearing In Bank Denied.  All the Justices Except Angellotti, C. J., Concurred.

**PRIOR HISTORY:**    APPEAL from a judgment of the Superior Court of Los Angeles County.  John M. York, Judge.

**DISPOSITION:**    Reversed.

**HEADNOTES**

**CALIFORNIA   OFFICIAL   REPORTS   HEADNOTES**

(1) **Lease--Privilege of Purchase--Action to Terminate--Default in Payments--Finding Without Support.** --In an action to terminate a written instrument, called a lease with the privilege of purchase, based upon alleged default in the payment of monthly installments, the finding that the purchaser or lessee was in default at the commencement of the action is without support, where the instrument provided for the payment of a rental of $ 36 per month and no more for the term of one hundred and twenty months, and the payments made by the purchaser or lessee, if applied to the debt, showed an average of more than $ 36 for each month that the instrument had been in existence.

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** F. M. Shepard and H. E. Gleason, for Appellants.

Flint & Jutten, Flint and Mackay, L. W. Jutten, H. S. Mackay, Jr., Ed. R. Brainerd, Jr., William R. Flint and J. H. Schenck, for Respondent.

**JUDGES:** Melvin, J.  Wilbur, J., and Lennon, J., concurred.

**OPINION BY:** MELVIN

**OPINION**

[*617]  [**853] Defendants appeal from a judgment in favor of plaintiff in an action to terminate an agreement in writing by which Jennie B. Wilson entered into a contract with plaintiff to lease certain property with the privilege of purchase.  Edward A. Wilson is made a party to the action because he is the husband of said Jennie B. Wilson.

The instrument on which the action was founded is called a "Lease with Privilege of Purchase." It relates to lot thirty-seven, tract No. 1798, as per map recorded in book 21, page 40 of maps, records of the county of Los Angeles.   The term is for one hundred and twenty months, commencing [**854] on the first day of March, [***2] 1913.  The rental is $ 36, payable in advance on or before the first day of each month.  It was agreed that if any default should be made in payment of rent or any other covenant or covenants the landlord might re-enter the premises and that the rights of the tenant should thereupon cease and that the agreement of sale should immediately terminate. The tenant was given the right to purchase the lot for $ 3,550 plus taxes, insurance, and assessments, and interest at seven per cent per annum. And it was further provided that "any amounts paid as rent shall apply, first to the payment of interest due, second to the payment of taxes, insurance, and assessments, and the balance shall be applied to the payment of the principal." It was agreed that when the vendee should have paid forty per cent of the purchase price and interest the vendor would execute a deed to the property and take a mortgage.

181 Cal. 616, *; 185 P. 853, **;
1919 Cal. LEXIS 403, ***

Plaintiff's action was based upon alleged default in the payment of monthly installments. Defendants denied any such default, and in a cross-complaint alleged that on March 25, 1913, and during the faithful performance by her of the contract Mrs. Wilson elected to and did purchase [*618] [***3] the premises by payment to plaintiff of three hundred dollars, and the further sum of $ 36 per month until April 3, 1916, when, it is alleged, the Los Angeles Investment Company abandoned the agreement and refused further performance, after receipt of $ 1,446 under the contract.

The court found that $ 1,446 had been paid by defendant and cross-complainant -- three hundred dollars in March, 1913, and various other sums each of $ 36 or double that amount irregularly paid up to November, 17, 1915; that the sum of $ 30 was received February 5, 1916, and that "no payments, pursuant to the terms of said agreement, have been offered or received subsequent to January 1, 1916." It was also found that subsequent to that time and up to the commencement of the action $ 180 became due in installments of $ 36 per month, and that on January 1, 1917, there was due the further sum of $ 288 (or $ 468 altogether). The court found, also, that at all times since the date of the agreement plaintiff was ready and willing to perform all the covenants of the agreement by it to be performed, and that at all times since the date of said contract Jennie B. Wilson was ready and able and willing to keep and perform [***4] all the conditions and terms thereof. As conclusions of law, it was determined that plaintiff should have its title quieted, the premises restored, and

that defendants should take nothing unless within thirty days of judgment they should pay $ 468 to plaintiff, whereupon Jennie B. Wilson should be restored to her former rights. The findings of fact and conclusions of law were dated January 30, 1917, and under date of March 5, 1917, a decree and judgment were given quieting plaintiff's title to the premises and declaring the contract canceled and of no effect.

Appellants insist that Mrs. Wilson was not in default at the time of the commencement of the action. This is true if the contract did not require the payment of at least $ 36 every month beyond any sums that might have been credited on the purchase price, because the sum of three hundred dollars, made up of two payments during the first month of the life of the agreement (March, 1913), if added to the amounts paid at irregular intervals averaging $ 36 a month up to January 1, 1916, would bring the average up to $ 36 a month for a much longer period. In other words, Mrs. [*619] Wilson's counsel contend that (1) the agreement, [***5] while termed a "lease with privilege of purchase," was really a conditional sale of the property for $ 3,550, payable in installments of $ 36 or more monthly; (2) that the vendee was not in default so long as her credit, if applied to the debt, showed an average of more than $ 36 for each month that the agreement had been in existence, and (3) since her credit at the date of the institution of the suit was sufficient to show an average of more than $ 36 a month, the suit was premature, as no breach of the contract had been made at that time. Stated in figures, the position of defendants is as follows:

| | | |
|---|---|---|
| Total amount paid by defendants, under | | |
| terms of the contract, as shown by | | |
| plaintiff's evidence, and admitted by | | |
| the pleadings | | $ 1,446 |
| Total number of monthly payments, from | | |
| May 1, 1913, the date of the agreement, | | |
| to May 18, 1916, the date of the commencement | | |
| of the action, 37 months at | | |
| $ 36 per month | $ 1,332 | |
| Balance to credit of defendants on date of | | |
| commencement of action | 114 | |
| | | $ 1,446 |

(1)  We see no escape from this conclusion. The agreement did not require the payment of any sum greater [***6] than $ 36 a month for one hundred and twenty months. Payment of a greater sum was optional

with Mrs. Wilson. If she chose to pay more than $ 36 at any one time (as she did) such payment must be considered as having been made "on or before" any date on which she failed to make payment of $ 36. The finding that Mrs. Wilson was in default at the commencement of

181 Cal. 616, *; 185 P. 853, **;
1919 Cal. LEXIS 403, ***

this action was, therefore, without support.  The action    The judgment is reversed.
was prematurely commenced.