**COX, WOOTTON, GRIFFIN,
HANSEN & POULOS LLP**
Gregory W. Poulos (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

**LAW OFFICES OF RICHARD P. WAGNER**
Richard P. Wagner (SBN 166792)
700 Oceangate, Suite 700
Long Beach, CA 90802
Telephone: (562) 216-2946
Facsimile: (562) 216-2960

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC. | Case No.: CV 07-02952 WHA |
| Plaintiff, | **PLAINTIFF'S SUPPLEMENTAL POST-TRIAL BRIEF RE QUESTIONS FOR ORAL ARGUMENT** |
| vs. | |
| BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8- foot long fishing vessel, her engines, tackle, furniture, apparel, etc., *in rem*, and Does 1-10, | |
| Defendants. | |
| _____ | Hearing Date: June 16, 2008 |
| And Related Counterclaims | Time: 3:00 p.m. Courtroom 9, 19th Floor Hon. William H. Alsup |

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

In response to the Court's Further Questions for Oral Argument, Plaintiff Del Mar

Seafoods, Inc. hereby submits this brief addressing the additional issues raised by the Court.

PLAINTIFF'S SUPPLEMENTAL POST-TRIAL BRIEF RE QUESTIONS FOR ORAL ARGUMENT

1.  **Clarify the specific role of the F/V Point Loma in the joint venture that ended in 2004.**

   The F/V Point Loma fished for the Joint Venture.  Roggio at RT 214:7-9.  The F/V Point Loma had the option to fish other markets and deliver its fish where it wished. *Id.* at RT 214:10-23.  The joint venture purchased fish from at least 14 different vessels.  Cohen at RT 433:9-18.

2.  **Clarify the role of any other Barry Cohen restaurants and fish markets vis-à-vis the joint venture.**

   Olde Port Fish Company, Inc.: This company was owned by Barry and Chris Cohen and was a fish market, fish wholesaler and restaurant.  Barry Cohen at RT 254:25 – 255:15.  Barry and Michael ran the retail market together.  Roggio at RT 66:10 - 18; 72:12 – 16; 160:17 – 161:8.

   Olde Port Inn: This was a dba for Olde Port Fish Company, Inc. (see above)  Barry Cohen at RT 255:4 – 15.  Barry supplied fish to the restaurant.  M. Cohen at 240:6 – 241:5; 244:9 – 18.

   Olde Port Fish Market: This was another dba for Olde Port Fish Company, Inc..  Barry Cohen at RT 255:13 – 25.

   Olde Port Inn, Inc.: This was the restaurant management company owned by Leonard Cohen.  L. Cohen at RT 246:9 – 14; B. Cohen at RT 259:3 – 6.

   Olde Port Fisheries, Inc.: This company is owned by Barry Cohen and Chris Cohen.  Barry Cohen at RT 254:15 – 24.  Olde Port Fisheries, Inc. employs Michael Cohen.  M. Cohen at RT 237:10 – 11.  The company sells seafood through retail, restaurant distribution, a farmer's market and through a web site.  M. Cohen at 239:4 - 11.

   Michael Cohen Fish Distribution Business: When Michael Cohen started his own restaurant distribution business, he bought inventory from his father, Barry.  M. Cohen at RT 240:6 – 241:5; 244:9 – 18..

3.  **When the joint venture was operational, where was Barry Cohen stationed?  Was he an employee of Del Mar (or only of the joint venture)?**

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

190 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

1   Barry, Michael and Leonard Cohen ran their businesses from the same building in

2   Avila Beach. Michael Cohen at RT 244:2-12.

3   In addition to his joint venturer share of the profits/losses, Barry also received a salary

4   from Del Mar while he managed the joint venture. Roggio at RT 51:24-52:10.

5   **4.      Under the applicable law, must the attorneys' fees clause be deemed reciprocal?**

6   The Note and Mortgage are maritime contracts, therefore, this case is governed by the

7   general maritime law. State law will apply only where there is no well-entrenched applicable

8   maritime rule, and no need to create one. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*

9   (1955) 348 U.S. 310. Regarding attorneys' fees provisions, there is a well-established

10  maritime law providing that contractual provisions for attorneys fees are to be strictly

11  enforced, ***even if unilateral, and state statutes to the contrary are inapplicable***. *Crowley*

12  *American Transport, Inc. v. Richard Sewing Machine Co.*, 173 F.3d 781, 785-786 (11th Cir.

13  1999) (unilateral contractual provision for attorneys' fees enforced); *Golden Pisces, Inc. v.*

14  *OneBeacon America Ins. Co.*, 495 F.3d 1078 1081, 1083-1084 (9th Cir. 2007) (refusing to

15  adopt a new rule of reciprocity of attorneys' fees in a maritime contract where no such rule

16  exists); *Sosebee v. Rath*, 893 F.2d 54, 56-57 (3d Cir. 1990) (refusing to apply a state statute

17  awarding attorneys' fees in a case governed by federal maritime law); *Texas A&M Research*

18  *Foundation v. Versus Magna Transp., Inc.*, 338 F.3d 394, 405-406, (5th Cir. 2003) (same);

19  *Garan, Inc. v. M/V Aivik*, 907 F.Supp. 397, 400-401 (S.D.Fla. 1995) (same); *see also, Nissan*

20  *Fire & Marine Ins. Co., Ltd v. BAX Global Inc.*, 2006 U.S.Dist.LEXIS 30555, 16-19 (in case

21  governed by federal law, refusing to apply Cal. Civ. Code § 1717 to a unilateral contractual

22  provision for attorneys' fees).

23

24  Dated: June 13, 2008                    COX, WOOTTON, GRIFFIN,
                                            HANSEN & POULOS, LLP
25                                          Attorneys for Plaintiff
                                            DEL MAR SEAFOODS, INC.

26

27

28  By: _____
                Gregory W. Poulos

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS LLP

199 THE EMBARCADERO
SAN FRANCISCO, CA
94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

LEXSEE 172 F.3D 781



Positive
As of: Jun 11, 2008

**CROWLEY AMERICAN TRANSPORT, INC., Plaintiff-Appellee, v. RICHARD SEWING MACHINE CO., Defendant-Appellant.**

**Nos. 97-4011, 97-5390.**

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

*172 F.3d 781; 1999 U.S. App. LEXIS 7188; 1999 AMC 1723; 12 Fla. L. Weekly Fed. C 720*

**April 14, 1999, Decided**

**PRIOR HISTORY:** [**1] Appeals from the United States District Court for the Southern District of Florida. (No. 95-2343-CIV-UNGARO-BENAGES). Ursula Ungaro-Benages, Judge.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** FOR APPELLANT(S) (97-4011): Bernard C. Pestcoe, ATKINSON DINER STONE & MANKUTA, P.A. R. Lawrence Bonner, HOMER & BONNER, P.A., Miami, FL.

FOR APPELLEE(S) (97-4011): Daniel Warren Raab, RAAB & STRADER, P.A., Miami, FL. George W. Chesrow, GEORGE W. CHESROW, P.A., Coral Gables, FL.

FOR APPELLANT(S) (97-5390): Bernard C. Pestcoe, ATKINSON DINER STONE & MANKUTA, P.A., Miami, FL.

FOR APPELLEE(S) (97-5390): Daniel Warren Raab, Miami, FL. George W. Chesrow, GEORGE W. CHESROW, P.A., Coral Gables, FL.

**JUDGES:** Before TJOFLAT and DUBINA, Circuit Judges, and SMITH *, Senior Circuit Judge.

> \* Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

**OPINION BY:** TJOFLAT

**OPINION**

[*783] TJOFLAT, Circuit Judge:

The appellant, Richard Sewing Machine Co., entered into a contract with the appellee, Crowley American Transport, Inc., to transport certain cargo [1] from Miami, Florida, to the "Free Trade Zone" in Managua, Nicaragua. Once there, the contract provided that [**2] Crowley would notify both Industrias Sama & Cia, Ltda. ("Sama"), and a Nicaraguan bank regarding the cargo's arrival.

> 1 The cargo consisted of two forty-foot containers containing sewing machines and textiles.

Crowley delivered the cargo to the Free Trade Zone as promised, and notified Sama--but not the bank--of its arrival. The cargo was then entrusted to the Nicaraguan customs authorities, who were expected to release the cargo upon presentation of the original bills of lading. [2] Richard had given the original bills of lading to the Nicaraguan bank, with instructions to tender them to Sama at such time as Sama executed time drafts in Richard's favor totaling $ 473,704. Sama went to the bank after the cargo arrived, but refused to execute the required time drafts. Consequently, the bank refused to release the bills of lading, and ultimately returned them to Richard.

> 2 A "bill of lading" is the contractual agreement between a shipper and a carrier; it also serves as a negotiable document of title. *See Evergreen Ma-*

172 F.3d 781, *; 1999 U.S. App. LEXIS 7188, **;
1999 AMC 1723; 12 Fla. L. Weekly Fed. C 720

*rine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 92 n. 1 (1st Cir.1993).* Thus, the "bill of lading" and the "contract" are the same document; for purposes of clarity, however, we refer to the document as the "bill of lading" in its title capacity and as the "contract" in its contractual capacity. There were two bills of lading in this case (one for each container of cargo); each bill of lading had the same contractual terms.

[**3]  Richard, upon learning that the cargo remained unclaimed, contracted with Crowley for the return of the cargo from Nicaragua. Crowley, however, learned that Sama had obtained the cargo from the Nicaraguan customs authorities despite failing to present the original bills of lading. [3] Crowley obtained a Nicaraguan court order demanding return of the cargo; Sama then gave the cargo to Crowley, who shipped it back to Miami. According [*784] to Richard, the cargo sustained substantial damage while in Sama's possession.

> 3  The means by which Sama obtained the cargo are unknown.

Richard refused to pay for the transportation to and from Nicaragua, and Crowley brought suit for breach of contract in the United States District Court for the Southern District of Florida to collect the amounts due. [4] Richard defended on the ground that Crowley had failed to perform its obligations under the initial contract by (1) failing to notify the bank when the cargo arrived in Nicaragua, and (2) failing to protect the cargo [**4] from misappropriation. Richard also counterclaimed for the damage to the cargo on breach of contract and negligence theories.

> 4  The district court had jurisdiction pursuant to its maritime jurisdiction. *See 28 U.S.C. § 1333(1) (1994); Richard Bertram & Co. v. Yacht, Wanda, 447 F.2d 966, 967 (5th Cir.1971)* ("A maritime contract is one which concerns transportation by sea, relates to navigable waters and concerns maritime employment.").

Both parties moved for summary judgment on all claims. The district court granted Crowley's motion in full, granting summary judgment for Crowley on its breach of contract claims and on Richard's counterclaims. Crowley then filed a motion for summary judgment on the issue of damages, including a request for attorneys' fees; the district court granted the motion. Richard now appeals, on the same grounds (failure to notify the bank and failure to protect the cargo from misappropriation) upon which it relied in the district court.

I.

[**5]  We begin by addressing the notification issue. It is clear that Crowley had a contractual duty to notify the bank upon arrival in Nicaragua: The contract has a section in which the shipper designates parties to be notified upon arrival of the cargo; Richard designated the bank and Sama. Furthermore, it is undisputed that Crowley did not notify the bank upon the cargo's arrival. Consequently, there can be no dispute that Crowley breached the contract.

Establishing that Crowley breached the contract, however, is not sufficient to excuse nonperformance by Richard; Richard must also establish that the breach was material. *See 17A Am.Jur.2d Contracts § 701* (1991) ("Where the nonperformance of one party to a contract is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance, the breaching party has substantially performed its obligations and the non-breaching party is not excused from its responsibility under the contract."). In this case, Crowley performed its obligation of delivering the cargo to the Free Trade Zone. The only apparent purpose of the notification provision was to let the bank and Sama know that it was time to commence [**6] the exchange of the bills of lading for the bank drafts. This goal was accomplished by providing notification to Sama, which then went to the bank to discuss the documentary transaction. [5] There is no evidence to indicate that, had Crowley given the bank immediate notification of the cargo's arrival, the bank would have prevented Sama's misappropriation of the cargo. Therefore, the breach alleged by Richard was immaterial, and did not excuse Richard's nonperformance.

> 5  It is clear from the record that the bank was in fact notified of the cargo's arrival; the alleged breach is based only on the ground that the bank was not notified by Crowley.

For this same reason, Richard's counterclaim of breach of contract fails. A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach. *See 5 Arthur Linton Corbin, Corbin on Contracts § 997* (1964). Because there is no evidence that the bank would have prevented the misappropriation (and the [**7] consequent damage to the cargo) had Crowley notified it of the cargo's arrival, [*785] Richard has shown no damages that were proximately caused by Crowley's breach. Consequently, whatever damages Richard may have suffered from Sama's treatment of the cargo, Richard cannot recover those damages from Crowley solely on the basis of Crowley's failure to notify the bank.

Next, we address the question whether Crowley had a contractual duty to prevent Sama's misappropriation of the cargo. Richard alleges that Crowley was responsible

172 F.3d 781, *; 1999 U.S. App. LEXIS 7188, **;
1999 AMC 1723; 12 Fla. L. Weekly Fed. C 720

for delivering the cargo to Sama upon Sama's presentation of the original bills of lading; because Crowley relinquished possession of the cargo without receiving the original bills of lading, it failed to comply with its contractual duty of delivery. The contract, however, stated only that Crowley was to deliver the cargo to the Free Trade Zone and to notify Sama of its arrival. It established no duty on Crowley's part for continued oversight of the cargo until such time as Sama presented the original bills of lading. Richard has presented no evidence of a separate agreement for delivery directly to Sama, nor has it presented parol evidence regarding an [**8] ambiguity in the contract that would suggest that the contract required delivery directly to Sama. Thus, the misappropriation of the cargo by Sama after delivery to the Free Trade Zone cannot be considered a breach of the contract and does not excuse Richard's nonperformance. For the same reason, Richard's counterclaim for breach of contract on this ground also fails.

Finally, we address Richard's counterclaim for negligence. Pursuant to section 1 of the Harter Act, *46 U.S.C.App. § 190 (1994)*, a carrier has a non-waivable duty, independent of any contractual duties, to effect a "proper delivery" of cargo entrusted to it. [6] *See Metropolitan Wholesale Supply, Inc., v. M/V Royal Rainbow, 12 F.3d 58, 61 (5th Cir.1994); English Elec. Valve Co. v. M/V Hoegh Mallard, 814 F.2d 84, 87 (2d Cir.1987)*. Whether there has been a proper delivery is determined by what is customary at the port of delivery. *See Allstate Ins. Co. v. Imparca Lines, 646 F.2d 166, 168 (5th Cir. Unit B May 1981)*. [7] Crowley presented unrebutted evidence that, in Nicaragua, all shipments are given to the customs authorities, who in turn are expected [**9] to give the cargo to the intended recipient upon presentation of an original bill of lading. Consequently, Crowley cannot be considered negligent in regard to its statutory duty under the Harter Act.

> 6  The Carriage of Goods by Sea Act, *46 U.S.C.App. § 1303(6) (1994)*, governs a carrier's duty from the time of loading to the time of discharge; the Harter Act governs a carrier's duty from the time of discharge to the time of delivery. *See English Elec. Valve Co. v. M/V Hoegh Mallard, 814 F.2d 84, 87 (2d Cir.1987)*.
>
> 7  In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

II.

Richard argues that because Crowley never properly delivered the cargo, Crowley must bear the cost of returning the cargo to Miami. Having concluded in the previous section that Crowley's delivery was proper, Richard's argument fails. [**10] Thus, Richard is liable for payment of shipping fees for the return of the damaged cargo.

III.

Finally, we address the issue of attorneys' fees. Under the American Rule, attorneys' fees are unavailable to a prevailing party in the absence of certain common law and statutory exceptions or a contractual provision. See *Woodard v. STP Corp., 170 F.3d 1043 n.3, 1999 U.S. App. LEXIS 4867 (11th Cir.1999)* [1999]. Crowley relied on the following contractual provision in its successful motion for attorneys' fees:

Freight, demurrage, and other charges shall be paid to Carrier in United States [*786] currency, without discount or setoff of any kind, including any claim for loss or damage to the goods, at such place and in such manner as the Carrier may direct. Such charges shall be paid in full regardless of any claim by Shipper that a tariff applies other than that under which the Carrier has assessed charges, or that the charges are unreasonable or unlawful under applicable law. Any such claim shall instead be pursued by a separate action before the Federal Maritime Commission, or other agency where the tariff sought to be applied by Carrier has been filed. Carrier [**11] shall be entitled to recover all costs of collection, including reasonable attorneys' fees and expenses.

Richard argues that Crowley's right to recover attorneys' fees, as expressed in the final sentence of the above paragraph, applies only to actions before the Federal Maritime Commission or similar agency. A plain reading of the provision suggests that this interpretation is untenable. The provision relates to the topic of the collection of charges--precisely the issue involved in this suit. It states that a shipper may not deduct any claims against Crowley from those charges, but must instead pursue those claims in an administrative proceeding. Finally, it states that Crowley is entitled to any costs incurred in collecting the charges. The provision in no way implies that Crowley must pursue its claims in administrative proceedings, nor does it limit the collection of attorneys' fees to those incurred in administrative actions. Therefore, the district court correctly included attorneys' fees in Crowley's damages award.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.



Cited
As of: Jun 10, 2008

**GOLDEN PISCES, INC., an Oregon business corporation; ONEBEACON AMERICA INSURANCE COMPANY, a Massachusetts insurance company, Plaintiffs-Appellants, v. FRED WAHL MARINE CONSTRUCTION, INC., Defendant-Appellee.**

**No. 05-35477**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*495 F.3d 1078; 2007 U.S. App. LEXIS 17527; 2007 AMC 1982*

**March 6, 2007, Submitted \*, Portland, Oregon**

\* This panel unanimously finds this case suitable for decision without oral argument. See *Fed. R. App. P. 34(a)(2)*.

**July 24, 2007, Filed**

**PRIOR HISTORY: [\*\*1]**
Appeal from the United States District Court for the District of Oregon. D.C. No. CV-04-06064-TMC. Thomas M. Coffin, Magistrate Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** Dennis M. Moran, Seattle, Washington, for the appellants.

Daniel F. Knox and Mario J. Madden, Portland, Oregon, for the appellee.

**JUDGES:** Before: Ronald M. Gould, Richard A. Paez, and Johnnie B. Rawlinson, Circuit Judges. Opinion by Judge Paez.

**OPINION BY:** Richard A. Paez

**OPINION**
[\*1079]

PAEZ, Circuit Judge:

Golden Pisces, Inc. ("Golden Pisces") and OneBeacon America Insurance Group ("OneBeacon") appeal the district court order denying their motion for attorneys' fees following their successful suit for breach of contract

against Fred Wahl Marine Construction, Inc. ("Fred Wahl"). Under the American Rule, which applies in federal litigation, including maritime litigation, Golden Pisces and OneBeacon are not entitled to attorneys' fees absent statutory authorization, an enforceable contractual provision, or an equitable exception to the rule. *F. D. Rich Co. v. United States, 417 U.S. 116, 126, 129-30, 94 S. Ct. 2157, 40 L. Ed. 2d 703 (1974)*. Because no statute authorizes attorneys' fees for this maritime cause of action, because the parties' contract was void, and because no recognized equitable exception [\*\*2] applies, we affirm the district court's order denying attorneys' fees.

I.

Golden Pisces owns the F/V Golden Pisces, which at the time this action arose was based in Newport, Oregon. In the fall of 2001, Golden Pisces and Fred Wahl, a shipyard in Reedsport, Oregon, entered into an oral agreement whereby Fred Wahl would make repairs on the F/V Golden Pisces, with Golden Pisces paying standard shipyard rates and costs for work performed. After the parties entered into the oral agreement, Fred Wahl presented the F/V Golden Pisces' captain with a form contract that purported to limit Fred Wahl's liability through a warranty disclaimer. The form contract also contained a clause providing for attorneys' fees in favor of the prevailing party "[i]n any litigation to enforce or interpret this agreement." Although the captain signed the form con-

495 F.3d 1078, *; 2007 U.S. App. LEXIS 17527, **;
2007 AMC 1982

tract, it was never signed by the ship's manager; nor was it signed by a representative of Fred Wahl.

Fred Wahl completed the repairs in December 2001. The F/V Golden Pisces departed for Alaska for the "A" cod fishing season at the beginning of January, 2002. In February, in the midst of fishing operations, the F/V Golden Pisces suffered problems due to misalignment [**3] of the propeller shaft that Fred Wahl had installed. It returned to the fishing grounds after undergoing repairs in Dutch Harbor, Alaska, only to break down again at the beginning of March. It was towed back to Dutch Harbor and missed the remainder of the fishing season. Golden Pisces' insurer, OneBeacon, paid $ 114,583 in repairs.

Golden Pisces and OneBeacon brought suit against Fred Wahl in district court, alleging negligence, breach of contract, breach of warranty, and breach of the implied warranty of workmanlike performance, and claiming consequential losses and lost profits. Fred Wahl raised the affirmative defenses that Golden Pisces [*1080] was comparatively negligent; that Golden Pisces "impliedly warranted [the] suitability" of a propeller it provided to Fred Wahl for installation; that the owner accepted the repairs following sea trials; and that the work order and attached form contract created an enforceable agreement so as to disclaim Fred Wahl of any liability for "all consequential, indirect or special damages," pursuant to the terms of the contractual warranty disclaimer. Fred Wahl also counterclaimed for unpaid repair bills. The parties stipulated to several facts but disputed [**4] whether Golden Pisces was comparatively negligent and whether the terms of the form contract controlled.

After a trial, the district court found for Golden Pisces and OneBeacon on the issue of liability. It further found "that there was no written contract between the parties which would operate to limit plaintiffs' remedies against defendant." The court concluded that the work order and form contract did not create an enforceable contract:

> The document fails to set forth essential terms of the agreement, such as a complete description of the work to be performed, the amount to be charged for the repair work and the payment terms. The document further contains an integration clause which precluded referencing prior or subsequent oral agreements to supply the missing terms . . . . [T]here are no written modifications. The document is not even signed by a representative of Wahl.

The court thus held that the terms of the parties' oral agreement--which did not include an implied warranty disclaimer or an attorneys' fees provision--controlled. The court awarded Golden Pisces $ 25,000 for damage to the vessel and $ 315,000 in lost profits and awarded OneBeacon $ 114,583. It awarded Fred Wahl [**5] $ 36,412.24 on its counterclaim against Golden Pisces for outstanding bills.

Golden Pisces and OneBeacon then moved for attorneys' fees and costs. Because no federal statute provides for attorneys' fees in suits arising in admiralty, Golden Pisces and OneBeacon invoked the following provision from the form contract on which Fred Wahl had unsuccessfully relied in defending against the complaint:

> In any litigation to enforce or interpret this agreement, the losing party agrees to pay the prevailing party's reasonable attorney fees including costs of depositions and experts.

The district court granted Golden Pisces and OneBeacon's motion for costs but denied the motion for attorneys' fees, holding "there was no written contract between the parties" and that consequently "the purported attorney fees clause was null and void, and not enforceable against either party in this action, regardless of the outcome. *See, e.g., Perry v. O'Donnell, 759 F.2d 702 (9th Cir. 1985).*"

Golden Pisces and OneBeacon timely appealed.

II.

The district court had original jurisdiction over this maritime action pursuant to *28 U.S.C. § 1333*; our appellate jurisdiction arises under *28 U.S.C. § 1291*. We review de novo conclusions [**6] of law, including interpretations of the American Rule, by a district court sitting in admiralty. *Madeja v. Olympic Packers, LLC, 310 F.3d 628, 635 (9th Cir. 2002); Perry, 759 F.2d at 704.* When the district court correctly interprets the American Rule, however, we review its decision whether to award or deny attorneys' fees for abuse of discretion. *Perry, 759 F.2d at 704.*

III.

Because Golden Pisces and OneBeacon's breach-of-contract claim arose in [*1081] admiralty, federal law governs this appeal. *See Royal Ins. Co. of Am. v. Pier 39 Ltd., 738 F.2d 1035, 1036 (9th Cir. 1984).* In federal litigation, the American Rule generally precludes an

award of attorneys' fees absent statutory authorization or an enforceable contractual fees provision. *Alyeska Pipe-line Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975); see also F.D. Rich Co., 417 U.S. at 126; Perry, 759 F.2d at 704.* However, federal courts have created a limited set of equitable exceptions to the American Rule and will award attorneys' fees even in the absence of an applicable statutory or contractual provision when, for example, the losing party acted in bad faith or willfully disobeyed a court order. *See Alyeska, 421 U.S. at 258-59.* [**7] "These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations." *Id. at 259.* [1]

> 1 *See also Reiser v. Del Monte Props. Co., 605 F.2d 1135, 1137 (9th Cir. 1979)* (recognizing " 'common benefit' " exception); *Perry, 759 F.2d at 704* (interpreting Alyeska as allowing three equitable exceptions to the American rule: "(1) when a litigant preserves or recovers a fund for the benefit of others; (2) when a losing party acts in bad faith; or (3) in a contempt action for willful disobedience of a court order").

Golden Pisces and OneBeacon do not argue that a statute or enforceable contract authorizes an attorneys' fees award here. Nor do they argue that a previously recognized equitable exception to the American Rule applies in this set of circumstances. Instead, Golden Pisces and OneBeacon ask this court to recognize a new equitable exception to the American Rule by announcing a "uniform maritime rule" of "true reciprocity of contractual attorney fees provisions" so as to enforce a contractual attorneys' fees provision in favor of a party who prevailed in a breach of contract action by showing that the underlying contract was void. [**8] Golden Pisces and OneBeacon have not pointed us to a single federal or state court decision that so held in the absence of a governing reciprocity statute; nor have they demonstrated the existence of a compelling policy rationale to create this new exception. [2] We therefore decline their invitation and affirm the district court's denial of fees.

> 2 *Cf. Reiser, 605 F.2d at 1137* ("[E]xceptions to the rule have developed based upon the equitable powers of the courts to award attorneys' fees when overriding considerations of justice seemed to compel such a result." (citations and internal quotation marks omitted)).

**A.**

When "there is no effective manifestation of assent[, there is] no contract at all." *Restatement (Second) of Contracts § 163 cmt. a (1979).* Here, the district court found that the parties had not mutually assented to the terms of the form contract. Without mutual assent, the parties' written contract was therefore void. *See Restatement (Second) of Contracts § 7 cmt. a (1981)* (defining void contract as "[a] promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor" and explaining that "such a promise is not a contract [**9] at all.").

Consistent with this understanding that a void contract is "not a contract at all," in applying the American Rule federal courts have distinguished between contracts that are void as opposed to divisible or voidable. In a diversity case applying Indiana law, for example, the Seventh Circuit enforced an attorneys' fees provision in an employment contract in favor of the moving party, who had prevailed on her defense that the non-competition provision in the same contract was void as to her. *See* [*1082] *Osler Inst., Inc. v. Forde, 386 F.3d 816, 818 (7th Cir. 2004).* [3] Crucial to the Seventh Circuit's holding was the severability of the non-competition clause. *See id.* Because the non-competition clause was not the "essential purpose" of the contract, the remaining provisions, including that providing for attorneys' fees, survived. *Id. at 819.* In *Aetna Casualty and Surety Co. v. L.K. Comstock & Co., Inc., 684 F.2d 1267 (9th Cir. 1982)*, we invalidated an indemnity agreement that was prohibited under Nevada law. *See id. at 1272.* We enforced an attorneys' fees provision in the parties' contract, however, because enforcing that provision would "not result in an indirect payment of damages [**10] to the employee," the result that Nevada law condemned. *Id. at 1272 n.9; see also Oral Roberts Univ. v. Anderson, 11 F. Supp. 2d 1336, 1339 (N.D. Okla. 1997)* (enforcing attorneys' fees provision in favor of party who prevailed by showing that option contract had expired). Analogously, the district court in *International Marble and Granite of Colorado, Inc. v. Congress Financial Corporation, 465 F. Supp. 2d 993 (C.D. Cal. 2006)*, held that a party who successfully repudiated a subsequent agreement, such that the terms of the first agreement controlled, could not bar the opposing party from enforcing the attorneys' fees provision in the earlier contract. *Id. at 1002, 1004.* [4]

> 3 Indiana adheres to the American Rule. *Id.*
> 4 *See also Johnson Enters. of Jacksonville v. FPL Group, Inc., 162 F.3d 1290, 1313 (11th Cir. 1998)* (holding that attorneys' fees provision did not constitute consideration when it "would impose a cost on JEJ only if JEJ breached another provision of the contract. Because JEJ had no obligations under the contract, it would be impossible for JEJ to be in breach . . . [and its] commitment to pay attorneys' fees is illusory"). The court ultimately awarded the opposing party [**11] attorneys' fees when the fees provision

from the void contract "was incorporated into [the parties'] subsequent contracts." *Id. at 1329 n.87.*

State courts have similarly distinguished between contracts that are void as opposed to divisible or voidable in deciding whether to enforce an attorneys' fees provision. In *Grease Monkey International, Inc. v. Godat, 916 S.W.2d 257 (Mo. Ct. App. 1995)*, for example, the Missouri Court of Appeals affirmed an attorneys' fees award pursuant to a provision from a divisible contract in favor of the party who prevailed by showing that a sales provision in the same contract was unenforceable. *See id. at 261-62.* First explaining that "[s]everable or divisible contracts are, in legal effect, independent agreements about different subjects though made at the same time," *id. at 261*, the court enforced the attorneys' fees agreement because the "sales agreement in no way depended upon the litigation clause . . . . [which] stated the prevailing party would be reimbursed in the event of 'any litigation' between the parties," *id. at 262.* In *Williams v. Coe, 417 So. 2d 426 (La. Ct. App. 1982)*, in contrast, the Louisiana Court of Appeal refused to enforce a contractual [**12] attorneys' fees [*1083] provision in a sales contract when the entire contract was null and void. *See id. at 433* ("[S]ince we have determined the contract became null and void, the contractual basis for the award of attorney fees ceased to exist." (citations omitted)).

The Nevada Supreme Court similarly distinguished between a void contract and a rescinded contract in *Mackintosh v. California Federal Savings and Loan Association, 113 Nev. 393, 935 P.2d 1154 (Nev. 1997)*, and enforced an attorneys' fees provision in favor of the party who prevailed by showing that the contract at issue was rescinded. *Id. at 1162* (citing *Katz v. Van Der Noord, 546 So. 2d 1047, 1049 (Fla. 1989))*. In *Katz*, the Florida Supreme Court likewise enforced an attorney fees' provision in a rescinded contract, holding that:

> the distinction between no contract at all and one that is unenforceable makes all the difference . . . . [because t]he legal fictions which accompany a judgment of rescission do not change the fact that a contract *did exist*. It would be unjust to preclude the prevailing party to the dispute over the contract which led to its rescission from recovering the very attorney's fees which were contemplated by the contract.

*546 So. 2d at 1049* [**13] (alteration omitted) (emphasis added); *see also Norwood v. Serv. Dist., Inc., 2000 MT 4,*

*297 Mont. 473, 994 P.2d 25, 36 (Mont. 2000)* (citing *Mackintosh, 935 P.2d at 1162)).*

The principle that emerges from our survey of federal and state case law is that, consistent with the American Rule, a party who prevails by demonstrating that a contract is entirely void, as opposed to divisible, voidable, or rescindable, cannot then seek the benefit of an attorneys' fees provision from that contract. Applying this principle here, we find no reason to create a new equitable exception to the American Rule so as to enforce the attorneys' fees clause from the written form contract that Golden Pisces and OneBeacon successfully argued was void for lack of mutual assent.

B.

Golden Pisces and OneBeacon unavailingly rely on a series of state cases that apply state reciprocity statutes so as to enforce attorneys' fees provisions, regardless of the underlying contract's validity. In *Hsu v. Abbara, 9 Cal. 4th 863, 39 Cal. Rptr. 2d 824, 891 P.2d 804 (Cal. 1995)*, for example, the California Supreme Court held that *California Civil Code section 1717* "appl[ies] in favor of the party prevailing on a contract claim whenever that party would have been liable under the contract [**14] for attorney fees had the other party prevailed." *Id. at 809.* The state court rejected Hsu's argument that Abbara, who had successfully defended by showing that no contract was formed, could not then claim the benefit of a fee provision from the void contract. The court noted that the legislative intent behind *section 1717* was to:

> establish mutuality of remedy where a contractual provision makes recovery of attorney's fees available for only one party, and to prevent oppressive use of one-sided attorney's fees provisions. The statute would fall short of this [legislative] goal of full mutuality of remedy if its benefits were denied to parties who defeat contract claims by proving that they were not parties to the alleged contract or that it was never formed.

*Id.* (citations and alterations omitted). In *Bartmess v. Bourassa, 196 Mont. 231, 639 P.2d 1147 (Mont. 1982)*, the Montana Supreme Court similarly interpreted the applicable Montana statute as providing a reciprocal right to attorney fees in any action on a contract. *Id. at 1148; see also Herzog Aluminum, Inc. v. Gen. Am. Window Corp., 39 Wn. App. 188, 692 P.2d 867, 872 (Wash. Ct. App. 1984)* (applying state reciprocity statute in favor of prevailing party who showed [**15] absence of enforceable contract).

495 F.3d 1078, *; 2007 U.S. App. LEXIS 17527, **;
2007 AMC 1982

We disagree with Golden Pisces and OneBeacon's assertion that this set of state court cases indicates a "common law rule of true reciprocity." The state courts were simply construing the legislative intent behind the state reciprocity statutes at issue. *See Hsu, 9 Cal. 4th 863, 39 Cal. Rptr. 2d 824, 891 P.2d 804 at 809.* No similar maritime reciprocity statute exists; moreover, other state courts have declined to interpret their reciprocity statutes as requiring enforcement of a fees provision from an unenforceable contract. *See, e.g., Care Med. Equip., Inc. v. Baldwin, 331 Ore. 413,* [*1084] *15 P.3d 561, 563 (Or. 2000)* (en banc) (denying attorneys' fees based on conclusion that state reciprocity statute required existence of valid contract); *Kunz v. Lobo Lodge, Inc., 133 Idaho 608, 990 P.2d 1219, 1223 (Id. Ct. App. 1999)* (holding that state reciprocity statute did not apply in favor of prevailing party who showed that contract was illegal); *Baxley Veneer & Clete Co. v. Maddox, 261 Ga. 309, 404 S.E.2d 554, 556 (Ga. 1991)* ("It would be inconsistent to allow an award of attorney fees under *OCGA § 13-6-11* in an action based on a contract that is unenforceable as a matter of law."); *Buckmaster v. Dent, 146 Ariz. 521, 707 P.2d 319, 321 (Ariz. 1985)* (holding [**16] that "there is no successful party within the meaning of *A.R.S. § 12-341.01* when a contract has been held to be void").

C.

We are also unpersuaded by Golden Pisces and OneBeacon's policy-based rationales in favor of their proffered rule. They argue first that one-sided fees provisions are inherently unfair to the party with weaker bargaining power. The attorneys' fees provision in the void contract at issue here, however, was not one-sided, providing instead that "[i]n any litigation to enforce or interpret this agreement, the losing party agrees to pay the prevailing party's reasonable attorney fees."

Golden Pisces and OneBeacon next assert that the doctrine of judicial estoppel, which "precludes a party from gaining an advantage" by taking contradictory positions at different stages of a judicial proceeding, *see Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996)*, requires the adoption of its reciprocity rule. To the contrary, this doctrine actually supports the opposite conclusion here: Golden Pisces and OneBeacon first argued to their advantage that the written contract was void for lack of mutual assent and now seek, again to their advantage, to enforce [**17] a term from that same contract.

IV.

We therefore conclude that the district court correctly interpreted the American Rule and that it did not abuse its discretion in denying Golden Pisces and OneBeacon's motion for attorneys' fees. Because Golden Pisces and OneBeacon cannot rely on the attorneys' fees provision from the same form contract that they successfully proved was void, the Rule does not authorize an attorneys' fees award in their favor. We also decline to announce a new equitable maritime exception to the Rule on the basis of "reciprocity." No maritime statute otherwise requires an attorneys' fees award in Golden Pisces and OneBeacon's favor; we therefore affirm the district court's order.

**AFFIRMED.**

LEXSEE 893 F.2D 54, 56

⚠
Caution
As of: Jun 11, 2008

## FORD SOSEBEE v. WILLIAM RATH, Appellant

### No. 88-3710

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*893 F.2d 54; 1990 U.S. App. LEXIS 325; 1990 AMC 1601*

**December 7, 1989, Argued**
**January 11, 1990, Filed**

**SUBSEQUENT HISTORY:**    [**1] As Amended
January 29, 1990.

**PRIOR HISTORY:**    On Appeal from the District
Court of the Virgin Islands, D.C. Civil No. 86-0019.

**COUNSEL:** Vincent A. Colianni, Esq., Judith A.
Turner, Esq., (argued), Hunter, Colianni, Cole & Turner,
Christiansted, St. Croix, U.S. Virgin Islands, attorney for
Appellant.

Joel H. Holt, Esq. (argued), Christiansted, St. Croix, U.S.
Virgin Islands, attorney for Appellee.

**JUDGES:** Gibbons, Chief Judge, Mansmann and
Nygaard, Circuit Judges.

**OPINION BY:** NYGAARD

**OPINION**

[*55] OPINION OF THE COURT

NYGAARD, Circuit Judge.

The issue in this case is whether an award of attor-
ney's fees pursuant to *V.I.Code Ann. tit. 5, § 541* is ap-
propriate in a case applying federal substantive admiralty
law. The district court awarded attorneys' fees to appel-
lee, holding that the case was tried on the territorial side
of the court. Our review of this question of law is ple-
nary. *See Dent v. Cunningham, 786 F.2d 173, 175 (3d
Cir. 1986).* We will reverse. [1]

1 Rath also contends that the district court erred
in calculating the attorneys' fees. Because we find
the award of attorneys' fees inappropriate in this
case, we need not consider this argument.

[**2] I.

Ford Sosebee, appellee, purchased a scuba diving
tour from William Rath, appellant, in St. Croix, Virgin
Islands. Sosebee was seriously injured while diving and
filed this action, alleging that Rath was negligent. Sose-
bee's initial complaint did not directly allege jurisdiction,
but contained factual averments sufficient to establish
diversity jurisdiction. In his amended complaint, Sosebee
invoked the jurisdiction of the district court pursuant to
*V.I.Code Ann. tit. 4, § 32*, which grants jurisdiction over
"all causes arising under the Constitution, treaties and
laws of the United States . . . [and] in all other causes in
the Virgin Islands." Sosebee's amended complaint also
alleged specifically that the "general maritime law of the
United States of America is applicable to this cause of
action."

At a pretrial conference, Rath first raised the ques-
tion of whether maritime law should properly be applied
in this case. Following the conference, both sides filed
memoranda of law on the question. Sosebee argued that
maritime law should apply and that his claim was in ad-
miralty. The district ruled that Sosebee's claim "does fall
in the maritime and admiralty jurisdiction. I think [**3]
there is a motion . . . [that] it is within the general juris-
diction of the Court. If that's the motion, that is denied."

The district court instructed the jury on the substan-
tive maritime law applicable to the case. The jury re-
turned a verdict in favor of Sosebee in the amount of

$200,000. This award was reduced to $100,000, because the jury also found Sosebee 50% negligent. [2]

> 2   Although admiralty law allows for pure comparative negligence, Virgin Islands law bars recovery if a plaintiff is more than 50% contributorily negligent. *See V.I.Code Ann. tit. 5, § 1451.*

Sosebee filed a motion for attorneys' fees and witness costs pursuant to *V.I.Code Ann. tit. 5, § 541*. [3] Rath argued that attorneys' [*56] fees were not available in an admiralty case. Notwithstanding the fact that it had earlier declared jurisdiction to be in admiralty, the district court determined that "the case was tried on the territorial side of this court and not as a federal case in admiralty." The district court awarded [**4] attorneys' fees in the amount of $46,000 to Sosebee. Rath appeals.

> 3   At the time, this statute provided in relevant part:
>
> *§ 541 Costs defined*
>
> (a) Costs which may be allowed in a civil action include:
>
> . . .
>
> (6) Attorney's fees as provided in subsection (b) of this section.
>
> (b) The measure and mode of compensation of attorneys shall be left to the agreement, expressed or implied, of the parties; but there shall be allowed to the prevailing party in the judgment such sums as the court in its discretion may fix by way of indemnity for his attorneys fees in maintaining the action or defenses thereto.
>
> *V.I.Code Ann. tit. 5, § 541* (1967).
>
> This section has since been amended to allow attorneys' fees in personal injury cases only if the court finds the complaint or defense frivolous. *V.I.Code Ann. tit. 5, § 541(b)* (Supp. 1988).

II.

As a preliminary matter, we note that both parties agree this case was tried as a territorial case applying federal substantive admiralty law, rather [**5] than as a case in admiralty. The distinction is more than academic since under the "saving to suitors" clause of *28 U.S.C. § 1333* [4] important rights are preserved when a plaintiff

does not specifically invoke admiralty jurisdiction. Chief among these is the right to a jury trial, *see Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 360, 7 L. Ed. 2d 798, 82 S. Ct. 780 (1962), Edynak v. Atlantic Shipping Inc., 562 F.2d 215, 221 n. 11 (3d Cir. 1977).* A plaintiff not specifically invoking admiralty jurisdiction may also seek to have state, or in this case, territorial, law applied to the extent that such law does not conflict with admiralty law. *See e.g. Floyd v. Lykes Bros. S.S. Co., Inc., 844 F.2d 1044, 1047 (3d Cir. 1988).* Thus, our first level of inquiry is to decide whether the applicable Virgin Islands statute directly conflicts with admiralty law. [5]

> 4   This statute vests original jurisdiction over admiralty cases in the district courts "saving to suitors in all cases all other remedies to which they are otherwise entitled." *28 U.S.C. § 1333(1).*

[**6]

> 5   To the extent that Sosebee argues that he is entitled to attorneys' fees simply because the district court was sitting as a court of original general jurisdiction, we find his argument wholly without merit. Although the "saving to suitors" clause allows a state or territorial court to decide a maritime case, federal maritime law determines the rights of the parties. *See e.g. Continental Casualty Co. v. Canadian Universal Ins. Co., 605 F.2d 1340, 1344 (5th Cir. 1979), cert. denied, 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1317 (1980).*

As a general matter, attorneys' fees are not available in admiralty cases unless the court determines in its equitable discretion that one party has acted in bad faith. *See e.g. F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 40 L. Ed. 2d 703, 94 S. Ct. 2157 (1974); Vaughan v. Atkinson, 369 U.S. 527, 530-1, 8 L. Ed. 2d 88, 82 S. Ct. 997 (1962).* Under the Virgin Islands statute, however, attorneys' fees may be awarded to prevailing parties by the district [**7] court in its discretion without finding that one party acted in bad faith. Thus a general award of attorneys' fees pursuant to a state statute which does not require a finding of bad faith directly conflicts with federal admiralty law. *Cf. Ocean Barge Transp. v. Hess Oil Virgin Islands Corp., 598 F. Supp. 45, 47 (D.V.I. 1984)* (Virgin Islands statute allowing attorneys' fees should not be applied in admiralty action), *aff'd without opinion, 760 F.2d 259 (3d Cir. 1985). Accord Templeman v. Chris Craft Corp., 770 F.2d 245, 250* (1st Cir.), *cert. denied, 474 U.S. 1021, 88 L. Ed. 2d 556, 106 S. Ct. 571 (1985)* (Puerto Rico statute allowing attorneys' fees should not be applied in admiralty action).

893 F.2d 54, *; 1990 U.S. App. LEXIS 325, **;
1990 AMC 1601

There is a strong interest in maintaining uniformity in maritime law. *See e.g.  Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409-10, 98 L. Ed. 143, 74 S. Ct. 202 (1953).* This interest would be undermined if the availability of attorneys' fees depended upon where the plaintiff filed **[*57]** suit. Therefore, where a case arises under the federal maritime law, as this case does, a local statute awarding attorneys' **[**8]** fees should not be applied. The award of attorneys' fees in this case was error and we will reverse.

LEXSEE 338 F.3D 394, 405



Positive
As of: Jun 11, 2008

## TEXAS A&M RESEARCH FOUNDATION, Plaintiff-Appellant-Cross-Appellee, VERSUS MAGNA TRANSPORTATION, INC., Defendant-Third Party Plaintiff-Appellee-Cross-Appellant, VERSUS ITALIA LINE, Third Party Defendant-Appellee-Cross-Appellant, NAVAHO SHIPPING AGENCY, INC., Third Party Defendant-Appellee.

### 02-40264

### UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

*338 F.3d 394; 2003 U.S. App. LEXIS 13775; 56 Fed. R. Serv. 3d (Callaghan) 1242;*
*2003 AMC 1839*

### July 9, 2003, Filed

**SUBSEQUENT HISTORY:**   Counsel Added, July 22, 2003.

**PRIOR HISTORY:**   [**1] Appeals from the United States District Court for the Southern District of Texas.

**DISPOSITION:**   Affirmed in part, reversed in part, and remanded.

**COUNSEL:** For TEXAS A & M RESEARCH FOUNDATION, Plaintiff - Appellant-Cross-Appellee: Thomas C. Fitzhugh, III, Fitzhugh & Elliott, James Corbin Van Arsdale, Houston, TX.

For MAGNA TRANSPORTATION INC, Defendant - Third Party Plaintff-Appellee-Cross-Appellant: Victor Raul Rodriguez, Houston, TX.

Fot ITALIA LINE, Third Party Defendant - Appellee-Cross-Appellant: William Andrew Durham, Justin William Renshaw, Eastham, Watson, Dale & Forney, Houston, TX.

For NAVAHO SHIPPING AGENCY INC, Third Party Defendant - Appellee: Frank E. Billings, Billings & Solomon, Houston, TX.

**JUDGES:** Before SMITH and BARKSDALE, Circuit Judges, and DUPLANTIER, ' District Judge.

\*   District Judge of the Eastern District of Louisiana, sitting by designation.

**OPINION BY:** JERRY E. SMITH

**OPINION**

[\*397] JERRY E. SMITH, Circuit Judge:

Plaintiff Texas A&M Research Foundation ("TAMRF") sued defendant Magna Transportation, Inc. ("Magna"), for damages suffered from the late delivery of specialized ocean research equipment. Magna, in turn, sought indemnification from third-party defendants Italia di Navigazione, S.p.A ("Italia"), and Navajo Shipping Agency, Inc. ("Navajo"). The district court held Magna, Italia, and Navajo jointly and severally liable to TAMRF but denied certain items of damages as unreasonable and unforeseeable. All but Navajo appeal.

I.

[\*398] TAMRF is a private, non-profit corporation that, under contract with the Joint Oceanographic Institute, Inc., conducts a research program known as the Ocean Drilling Program. TAMRF maintains a research vessel, the *Joides Resolution*, which conducts deep water drilling into the ocean floor in six annual, two-month-long cruises, or legs, that are planned [**2] at least eighteen months in advance by lengthy consultation and preparation. Once the research projects for a given leg

are approved and the scientists selected to conduct the experiments, special equipment must be assembled and shipped to a port where it can be loaded on the *Joides Resolution*. Each shipment is time sensitive, because port time is expensive and steals time from research.

A new hammer device specifically designed to penetrate the earth's crust was to be tested on Leg 179. The crew and equipment were to meet the vessel in Capetown, South Africa, in early April 1998. TAMRF selected Magna to arrange for the transport of the necessary equipment. Magna contacted Navajo, which had a direct contract to arrange booking for Italia, and obtained a rate for shipment on the *M/V Morelos*, Voyage 17. On February 3, 1998, Magna entered into a contract with TAMRF to arrange shipment of the cargo for arrival in Capetown by March 23, 1998. Magna had worked with TAMRF and was aware of the time-sensitive nature of the delivery.

Magna, in turn, contracted with Navajo for the carriage of TAMRF's cargo, which consisted of a flatrack and two containers. Navajo engaged Italia to carry [**3] TAMRF's cargo. The result of this string of contracts was an arrangement for TAMRF's equipment to be shipped on the *Morelos*, Voyage 17, which was scheduled to sail from Houston in late February 1998, and was estimated to arrive in Capetown on March 23.

On February 20, 1998, Navajo issued a bill of lading to Magna certifying that TAMRF's cargo had been loaded on the *Morelos*, Voyage 17; the *Morelos*, Voyage 17, departed Houston on the same day. On two separate occasions, Navajo confirmed that the cargo had sailed on the *Morelos*. When TAMRF's personnel flew to meet their cargo in Capetown, however, they were able to locate only the flatrack and not the two containers.

TAMRF's agent in Capetown informed Magna that the containers were missing, and Magna eventually contacted Italia, which replied that the containers were at sea aboard the *Morelos*, Voyage 18. The containers had not even been loaded until April 1998, after their scheduled arrival in Capetown. Before TAMRF's discovery that its cargo was missing, Italia had made no effort to inform any party that the cargo had not been shipped aboard Voyage 17.

After learning its containers were aboard Voyage 18, TAMRF [**4] requested that the containers be discharged in Miami, Florida, and then Valencia, Spain, but Italia refused to offload the containers. The *Morelos* continued on to La Speiza, Italy, where TAMRF's personnel met the cargo and placed the most essential equipment into a single container for air shipment to the island of Reunion. From there, TAMRF's personnel chartered a small freighter to carry the container and attempted a midsea rendezvous with the *Joides Resolution*.

Because of rough seas, the attempt failed, and none of the equipment was transferred to the research vessel.

II.

TAMRF sued Magna, alleging breach of contract and fraudulent misrepresentation. [*399] Magna brought in Navajo and Italia as third-party defendants pursuant to FED. R. CIV. P. 14(c). After a short bench trial, [1] the district court found the defendants jointly and severally liable, decided that TAMRF had failed to offer any evidence of damages, and invited a motion to reopen the record.

> 1 The court heard testimony from a single witness, after which it informed the parties that it would conduct the trial on written submissions. No party objected to this procedure, and we make no comment on its propriety.

[**5] After TAMRF made, and the district court granted, the motion to reopen, TAMRF submitted affidavit and documentary evidence of certain expenses it had incurred, allegedly as a result of defendants' conduct. The court considered the additional evidence and altered its judgment, awarding TAMRF damages of $ 49,057.97 [2] but disallowing various consequential damages because they were unforeseeable and thus unrecoverable.

> 2 The damages awarded included amounts spent to return various portions of the cargo to Houston and travel expenses for Pat Thompson, a TAMRF employee attempting to ensure proper delivery of the cargo.

All parties except Navajo appeal. [3] TAMRF appeals the denial of its consequential damages and the refusal to award attorneys' fees. Magna and Italia appeal the calculation of damages. Italia challenges the assessment of liability.

> 3 Navajo filed an answer but, without explanation, did not appear at trial.

[**6] III.

Italia contends that it is immune from liability and, in the alternative, that the district court erred as a matter of law in imposing joint and several liability. As an initial matter, however, we conclude the court improperly applied *rule 14(c)* in holding Italia and Navajo directly liable to TAMRF. Because the court abused its discretion in imposing such liability, we need not address Italia's other arguments with respect to this issue.

After being sued by TAMRF, Magna joined Italia and Navajo as third-party defendants. TAMRF took no steps to assert claims against the third-party defendants.

338 F.3d 394, *; 2003 U.S. App. LEXIS 13775, **;
56 Fed. R. Serv. 3d (Callaghan) 1242; 2003 AMC 1839

Yet, in its final order, the district court purported to realign the parties, allowing TAMRF to proceed directly against Navajo and Italia.

*Rule 14(c)* governs third-party practice in admiralty proceedings and, in some circumstances, allows a plaintiff to proceed directly against third-party defendants. The rule provides that "the defendant . . . may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the [defendant as third-party plaintiff]." Magna exercised that option, filing a third-party complaint seeking indemnification from Italia [**7] and Navajo.

The rule additionally states that "the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event . . . the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff." This clause is inapplicable here, however, because Magna's third-party complaint did not demand judgment against Navajo and Italia in favor of TAMRF. Instead, Magna sought indemnification from Italia and Navajo for any sums it was required to pay TAMRF.

Courts have taken a lenient approach in determining whether a third-party plaintiff has "demanded judgment" in favor of the plaintiff such that the plaintiff may then [*400] pursue its action directly against the third-party defendants.[4] This case, however, does not involve inapt phrasing in a complaint that was nonetheless intended to invoke the direct suit provision of *rule 14(c)*.

> 4 *See, e.g., Royal Ins. Co. v. Southwest Marine, 194 F.3d 1009, 1018 (9th Cir. 1999)* (holding that third-party complaint permitted original plaintiff to recover from third-party defendants where complaint explained the third-party defendants' direct liability to plaintiffs and repeatedly referred to *rule 14(c)*); *Riverway Co. v. Trumbull River Servs., Inc., 674 F.2d 1146, 1154 (7th Cir. 1982)* (where third-party complaint cited *rule 14(c)* and demanded that third-party appear and answer the complaint).

[**8] To the contrary, Magna's third-party complaint entirely fails to meet the substantive requirements of that provision. Nowhere does it request that Italia and Navajo be held liable directly to TAMRF; in the absence of such a request, there was no basis for TAMRF to recover directly from them under *rule 14(c)*. Consequently, the district court erred in finding Italia and Navajo directly liable to TAMRF, although they are potentially liable to Magna for any amounts expended in satisfaction of a judgment in favor of TAMRF.

**IV.**

In its initial findings of fact and conclusions of law, the district court concluded that, although TAMRF had established defendants' liability, it "inexplicably had provided no evidence to support a finding of damages . . . ."[5] Accordingly, the court invited TAMRF to move to reopen the record for submission of evidence on damages. TAMRF made, and the district court granted, such a motion seven days later. All damages awarded were based on the additional evidence submitted by TAMRF pursuant to that order.

> 5 TAMRF disputes the accuracy of this finding, contending that evidence of damages was provided by Richard McPherson, the only live witness heard from in the case. McPherson did testify as to damages, most or all of which were denied even after the record was supplemented.

[**9] We review for abuse of discretion the decision to reopen the record.[6] "The extent of the court's discretion to reopen the case and to consider [additional] materials depends, in the first instance, on the particular Federal Rule of Civil Procedure under which the motion arises." *Lavespere v. Niagra Mach. & Tool Works, 910 F.2d 167, 173.* A motion filed after judgment requesting that the court reconsider its decision in light of additional evidence constitutes either a motion to "alter or amend" under *FED. R. CIV. P. 59(e)* or a motion for "relief from judgment" under *FED. R. CIV. P. 60(b). See id.*

> 6 See *Ford v. Elsbury, 32 F.3d 931, 937-38 (5th Cir. 1994); Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 173 (5th Cir. 1990), abrogated on other grounds by Little v. Liquid Air. Corp., 37 F.3d 1069 (5th Cir. 1994)* (en banc)).

"Under which Rule the motion falls turns on the time at which the motion is [filed]. If the motion is [filed no later than] ten [**10] days of the rendition of judgment, the motion falls under *Rule 59(e)*; if it is [filed] after that time, it falls under *Rule 60(b).*" *Id.* Here, the motion was filed seven days after the entry of the initial order, so we treat it as a motion to alter or amend under *rule 59(e).*

"Because *Rule 59(e)* is not subject to the limitations of *Rule 60(b)*, the district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration arising under the former rule." *Id. at 174.* In exercising this broad discretion, the court should consider four primary factors: "(1) the reasons for the plaintiffs' default, (2) [*401] the importance of the evidence to the plaintiffs' case, (3) whether the evidence was available to plaintiffs [prior to the entry of

judgment], and (4) the likelihood that the defendants will suffer unfair prejudice if the case is reopened." *Ford, 32 F.3d at 937-38* (citing *Lavespere, 910 F.2d at 174*).

The first and third factors cut against granting the motion to reopen. TAMRF offers no substantial explanation for its failure to submit, before judgment, the documentary and affidavit evidence proffered **[**11]** after the record was reopened. Further, there is no allegation that this evidence was not freely available before entry of the initial judgment. Unlike a *rule 60(b)* motion, however, a *rule 59(e)* motion need not "make any particular showing of inadvertence or excusable neglect." [7] Therefore, even if these factors weigh against TAMRF's request to reopen, they are not determinative. *See Ford, 32 F.3d at 938.*

> 7    *Ford, 32 F.3d at 938*; see also *Lavespere, 910 F.2d at 174* ("To reopen a case under *Rule 59(e)* on the basis of evidentiary materials that were not timely submitted, the mover need not first show that her default was the result of mistake, inadvertence, surprise, or excusable neglect . . . .").

The second and fourth factors, by contrast, weigh heavily in favor of TAMRF. Although the district court already had established defendants' liability, its judgment left TAMRF without any recovery. Evidence of damages was obviously of critical importance. In addition, **[**12]** the defendants did not suffer any unfair prejudice from the reopening. The affidavit and invoice testimony overlapped substantially with McPherson's testimony, to which the defendants did not object at trial; they were therefore already aware of most of the damages claimed. Further, the additional damages identified in the supplemental filings took the form of expenses actually incurred by TAMRF.

Defendants' position is that TAMRF's expenses are not recoverable as damages, but defendants never have argued that these expenses were not incurred. Essentially, defendants were not unfairly surprised by the evidence, which did not directly relate to their principal arguments against recovery. Consequently, defendants were not unfairly prejudiced by evidence of the expenses. Taken together, these factors establish that the district court did not abuse its discretion in inviting and granting the motion to reopen.

V.

As part of its submission on damages for the reopened trial record, TAMRF introduced McPherson's affidavit, which described in detail various expenses TAMRF had incurred purportedly in connection with the defendants' failure timely to deliver the cargo to Capetown. The six-page **[**13]** affidavit was accompanied by 329 pages of documents detailing TAMRF's expenses. The district court admitted it as a business record affidavit with respect to most of the documented charges; the court excluded, as speculative, that portion of the affidavit discussing damages for "lost ship time." Both parties challenge the treatment of the affidavit. We review evidentiary rulings for abuse of discretion. *Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 660 (5th Cir. 2002).*

A.

Italia and Magna contend that the invoices submitted with McPherson's affidavit are inadmissible under *FED. R. CIV. P. 37(c)(1)*, which provides that a party cannot offer, at trial, documents that have not been disclosed in accordance with *FED R. CIV. P. 26.* [8]   **[*402]** *Rule 37(c)(1)* provides that a party who fails to disclose such information "shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *FED. R. CIV. P. 37(c)(1).* We review for abuse of discretion a decision not to exclude documents under *rule 37. United States v. $ 9,041,598.68, 163 F.3d 238, 252 (5th Cir. 1998).*

> 8    Presumably, Magna contends that TAMRF should have disclosed the documents pursuant to *rule 26(a)(1)(B) or (C)*, which requires a party to disclose, respectively, documents relevant to disputed facts in the proceedings or documents on which damages computations are based.

**[**14]** In evaluating whether a violation of *rule 26* is harmless, and thus whether the district court was within its discretion in allowing the evidence to be used at trial, we look to four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose. *See id.*

Although TAMRF failed to explain its failure to disclose, the prejudice to the adverse parties was negligible, because the witness in support of whose testimony the invoices were offered had been designated properly as a witness before trial. Further, any prejudice was cured by the approximately one month during which Italia was allowed to examine and respond to the contested evidence. The district court did not abuse its discretion in admitting the documentary evidence supporting the affidavit.

B.

Magna contends the McPherson affidavit is hearsay not admissible under any exception. The district court, however, concluded that the affidavit was admissible as a

business record affidavit, which requires only that the affiant have "personal knowledge [**15] to testify as custodian of documents" and "personal knowledge as to some of the statements in the affidavit." *FSLIC v. Griffin, 935 F.2d 691, 702 (5th Cir. 1991).*

The affidavit states that part of McPherson's duties as vice-president of TAMRF included the management of all records and documents pertaining to the Ocean Drilling Program and that such records are kept under his custody and control. The district court also reasonably concluded that, as vice-president of the foundation, McPherson had personal knowledge as to some of the statements in the affidavit. [9] Italia's principal argument is that McPherson lacked personal knowledge of certain of the facts in the affidavit. This argument is meritless, because personal knowledge of all the contents of a business record affidavit is not required. *See id;* 4 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 803.02[7][d] (Lexis-Nexis 8th. ed. 2002). Consequently, the district court did not abuse its discretion in admitting the affidavit as a business record.

> 9 This conclusion is particularly appropriate in light of the fact that most of the statements in the affidavit relate to the payment of various expenses related to the program over which payment McPherson had final approval authority.

[**16] C.

The McPherson affidavit included, in its list of expenses, $ 132,239 related to lost ship time. This entry reflects the cost of chartering the *Joides Resolution* for the [*403] three days during which the hammer experiment was to have been performed, but during which no research was done because of defendants' failure to deliver the necessary equipment. The district court excluded that portion of the affidavit, concluding that it was inadmissible as improper or speculative lay opinion testimony.

"Under *[FED.R. EVID.] 701*, 'a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the [fact finder].'" [10] "In particular, the witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those facts." *Id.* Accordingly, *rule 701* does not preclude testimony by business owners or officers on matters that relate to their business affairs. [11] Indeed, an officer or employee of a corporation may testify to industry practices and pricing without qualifying as an expert. *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 (11th Cir. 2003).* [**17] McPherson's testimony, similarly, is based on

particularized knowledge based on his position as vice-president of the research foundation. [12]

> 10  *Miss. Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 373 (5th Cir. 2002)* (quoting *United States v. Riddle, 103 F.3d 423, 428 (5th Cir. 1997)).*
> 11  *Id.. at 373-74* (allowing corporation's director of risk management to testify to lost profits, and collecting cases from other circuits holding likewise); 3 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 701.03[7], at 701-20 through 701-21 & Supp. 2002 (Lexis-Nexis 8th ed. 2002).
> 12  Although *rule 701* was amended in 2000 to prohibit lay witnesses from offering opinions based on "scientific, technical or other specialized knowledge within the scope of *Rule 702* [expert evidence]," the court in *Tampa Bay Shipbuilding, 320 F.3d at 1222-23*, thoroughly reviewed the advisory committee notes accompanying the 2000 amendment and concluded that the amendment did not place any restrictions on the pre-amendment practice of allowing business owners or officers to testify based on particularized knowledge derived from their position.

[**18] In any event, the lost ship time charges set forth in the affidavit do not constitute opinion testimony of any kind. As with the other documented expenses, the amount established for lost ship time is an amount actually paid by TAMRF. The figure was not derived from McPherson's opinion as to the value of lost ship time, as the district court phrased it, but rather was established according to precise contractual terms.

Because the ruling rested on a misinterpretation of *rule 701*, the exclusion of the lost-ship-time portion of the affidavit was an abuse of discretion. [13] But, "[this court] will not reverse erroneous evidentiary rulings unless the aggrieved party can demonstrate 'substantial prejudice.'" *Viazis v. Am. Ass'n of Orthodontists, 314 F.3d 758, 767 (5th Cir. 2002), cert. denied, 155 L. Ed. 2d 1063, 123 S. Ct. 2078 (2003).* As we explain, TAMRF is not entitled to recover expenses related to the cessation of research activity aboard the *Joides Resolution* and thus was not prejudiced by the exclusion of this evidence.

> 13  *See United States v. Buck, 324 F.3d 786, 791 (5th Cir. 2003)* (noting that district court abuses discretion where decision to admit evidence is based on error of law).

[**19] VI.

338 F.3d 394, *; 2003 U.S. App. LEXIS 13775, **;
56 Fed. R. Serv. 3d (Callaghan) 1242; 2003 AMC 1839

In its supplemental order on damages, the district court denied recovery for two broad categories of expenses incurred by TAMRF: expenditures related to TAMRF's own attempts to deliver part of the delayed shipment to the Joides [*404] Resolution; [14] and costs incurred in reliance on defendants' commitment to deliver the cargo by the appointed date. [15] In its findings of fact, the district court acknowledged that TAMRF had incurred these expenses but held them to be unforeseeable and thus unrecoverable as consequential damages. TAMRF argues that the expenses were reasonable and necessary to salvage critical research.

> [14]    These expenditures include the $ 98,000 spent to airlift part of the cargo to Reunion Island and $ 38,962.90 to charter a vessel for the attempted mid-sea rendezvous with the *Joides Resolution.*
> [15]    TAMRF's reliance costs include items such as the $ 7,465.60 spent to outfit the *Joides Resolution* for the scientific experiments that could not be performed. TAMRF also spent $ 2,325 to feed and $ 24,796.16 to pay the crew intended to perform those experiments. The most significant reliance expenditure, however, was the roughly $ 140,000 spent to secure use of the *Joides Resolution* for the three days during which the hammer experiment was to have been performed.

[**20] We review *de novo* legal conclusions underlying an award of damages. *Harken Exploration Co. v. Sphere Drake Ins. PLC, 261 F.3d 466, 477 (5th Cir. 2001).* In the absence of legal error, the award of damages is a finding of fact reviewed for clear error. *Tyler v. Union Oil Co., 304 F.3d 379, 401 (5th Cir. 2002).* So, "if the district court's factual findings are plausible in light of the evidence presented, this court will not reverse its decision even if this court would have reached a different conclusion." [16]

> [16]    *Id.* (citing *Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 936 (5th Cir. 1996)).*

That TAMRF actually incurred the disputed expenses is uncontroverted; the only issue is whether it is entitled to recover them as consequential, or "special," damages, which are those unusual or indirect costs that, although caused by the defendant's conduct in a literal sense, are beyond what one would reasonably expect to be the ordinary consequences of a [**21] breach. [17] As a general rule, special damages are not recoverable in an action for breach of contract. *See id.* Instead, to recover special damages, a plaintiff must establish that the defendant "had notice of the special circumstances from which such damages would flow." [18] Accordingly, a carrier is liable for special damages caused by an unreason-

able and unnecessary delay in the transportation of goods only if it has notice of the special circumstances leading to those damages. [19]

> [17]    *See Contempo Metal Furniture Co. v. E. Tex. Motor Freight Lines, Inc., 661 F.2d 761, 765 (9th Cir. 1981)* ("Special damages are those that the carrier did not have reason to foresee as ordinary, natural consequences of a breach when the contract was made.").
> [18]    *Id.* (citing *Ill. Cent. Gulf R.R. v. S. Rock, Inc., 644 F.2d 1138, 1141 (5th Cir. May 1981)); see also Gardner v. Mid-Continent Grain Co., 168 F.2d 819, 822 (8th Cir. 1948)* ("It is the general rule that damages recoverable for delay in transportation must be such as might reasonably have been contemplated by the parties at the time the contract of carriage was made" (citation and internal quotation marks omitted)).

[**22]

> [19]    *See Alpine Ocean Seismic Survey, Inc. v. F.W. Myers & Co., 23 F.3d 946, 948 (5th Cir. 1994)* (holding carrier not liable for cost of replacing microorganisms killed as a result of late delivery, in part because it had no knowledge of the contents of containers and therefore could not have reasonably foreseen the need to collect replacements from the ocean floor); *see also Contempo, 661 F.2d at 765; Hector Martinez & Co. v. S. Pac. Transp. Co., 606 F.2d 106, 109 (5th Cir. 1979); Ill. Cent. R.R. v. Horace Turner Corp., 9 F.2d 6, 7 (5th Cir. 1925).*

The question is therefore whether Magna had reason to know that [*405] untimely delivery of the cargo would cause the special damages suffered by TAMRF. The district court implicitly held that Magna lacked knowledge of the special circumstances surrounding the shipment, concluding that neither the significant costs TAMRF incurred in its attempts to secure an alternative means of delivery nor those incurred in reliance on the agreed-on delivery date were "foreseeable." The foreseeability of [**23] damages is a fact question we review for clear error. [20]

> [20]    *Cf. Hector Martinez, 606 F.2d at 110; King v. Otasco, Inc., 861 F.2d 438, 444 (5th Cir. 1988).*

Judging from the findings of facts, Magna had sufficient notice of the special circumstances surrounding the cargo that it can be held liable for special damages resulting from TAMRF's attempts to secure an alternate means of delivering the cargo. The court found that "Magna was aware of the time-sensitive nature of the delivery of [the] equipment." In addition, Dana Hol-

comb, Magna's president, admitted knowing the purpose of the Ocean Drilling Project.

Further, Magna had worked with TAMRF on several time- and place-sensitive deliveries and was aware that, in this case, TAMRF had arranged alternate shipping dates to ensure timely delivery. Although a general awareness that harm could result from any untimely delivery does not justify an award of consequential damages, [21] Magna had actual notice of the importance to TAMRF [**24] of timely delivery. Therefore, the district court clearly erred in holding these expenses to be unforeseeable.

> 21   See Evra Corp. v. Swiss Bank Corp., 673 F.2d 951, 959 (holding that abstract knowledge that any untimely bank transfer could theoretically cause great harm was not sufficient to justify consequential damages).

The special damages resulting from TAMRF's reliance on its contract with Magna raise more difficult questions of foreseeability. The $ 7,465.60 TAMRF spent outfitting the Joides Resolution for the hammer experiment was foreseeable, even given Magna's limited knowledge of the particulars of the Ocean Drilling Project. Magna should reasonably have known that certain costs would be incurred in preparing for research dependent upon the cargo and that those expenditures would be wasted in the event Magna failed to deliver the shipment in time.

With respect to the remainder of the expenses sought to be recovered, however, the district court did not clearly err. Based on its superficial knowledge of the [**25] purposes and methods of the research project, Magna could not reasonably have expected that a failure to deliver TAMRF's cargo would render the Joides Resolution and its scientists incapable of performing any research for an extended period of time. Thus, all the preparation costs associated specifically with the task at hand are recoverable, but costs generally applicable to other, unspecified research are not. Cf. Alpine, 23 F.3d at 948.

VII.

Maritime disputes generally are governed by the "American Rule," pursuant to which each party bears its own costs. Galveston County Nav. Dist. v. Hopson Towing Co., 92 F.3d 353, 356 (5th Cir. 1996). Therefore, "absent statute or enforceable contract, litigants must pay their own attorneys' fees." Id. TAMRF contends, however, that it has identified a statute entitling it to fees-- TEX. CIV. PRAC. & REM. CODE § 38.001, which provides that a party seeking to recover for breach of an

[*406] oral or written contract "may recover reasonable attorney's fees."

In MTO Maritime Transp. Overseas, Inc. v. McLendon Forwarding Co., 837 F.2d 215, 219-220 (5th Cir. 1988), we rejected a similar challenge [**26] to the refusal to award fees under the precursor to § 38.001. Concluding that the statute was discretionary and that there had been no abuse of discretion, the MTO Maritime panel affirmed the denial of fees without deciding whether the state statute controlled. Since MTO Maritime was decided, however, Texas courts have concluded that "attorneys' fees under section 38.001 are mandatory." [22] Therefore, we must address the question reserved in MTO Maritime, 837 F.2d at 219, namely, "the applicability of state laws providing for attorney's fees in an admiralty contract dispute." The applicability of state law to a maritime contract dispute is a legal determination subject to de novo review.

> 22   Kona Tech. Corp. v. S. Pac. Transp. Co., 225 F.3d 595, 603 (5th Cir. 2000) (citing Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390, 40 Tex. Sup. Ct. J. 610 (Tex. 1997)).

Although the question is a matter of first impression in this circuit, two other circuits have directly addressed [**27] it. Citing the "strong interest in maintaining uniformity in maritime law," the Third Circuit has held that the various state statutes providing for attorney fees should not be applied in federal maritime disputes. [23]

> 23   Sosebee v. Rath, 893 F.2d 54, 56-57 (3d Cir. 1990); id. at 57 ("Where a case arises under the federal maritime law, as this case does, a local statute awarding attorneys' fees should not be applied.").

Similarly, the First Circuit has held that state law is inapplicable to the question of attorneys' fees in maritime contract disputes, noting that state law cannot apply where it conflicts with maritime law and concluding that the fee statute at issue contradicted the general rule of maritime law that "parties pay their own fees absent bad faith or oppressive litigation tactics." [24] We likewise conclude that the general rule of maritime law that parties bear their own costs, coupled with the need for uniformity in federal maritime law, precludes the application [**28] of state attorneys' fee statutes, such as § 38.001, to maritime contract disputes.

> 24   See Southworth Mach. Co. v. F/V Corey Pride, 994 F.2d 37, 41 (1st Cir. 1993); id. at 42 (holding that state law governing awards of attorney's fees will not be applied in a case involving a "standard contractual breach to which maritime law has always applied").

338 F.3d 394, *; 2003 U.S. App. LEXIS 13775, **;
56 Fed. R. Serv. 3d (Callaghan) 1242; 2003 AMC 1839

The judgment is REVERSED in part and AFFIRMED in part, and this matter is REMANDED for further proceedings consistent with this opinion. In addition to the initial award of $ 49,057.97, TAMRF is entitled to recover for amounts expended in connection with its attempt to deliver the cargo, specifically, $ 98,000.00 to airlift the cargo to Reunion Island and $ 38,962.90 to charter a vessel for the attempted rendezvous with the *Joides Resolution.* TAMRF is also entitled to the $ 7,465.60 incurred in outfitting its vessel for research dependent on the cargo. On remand, therefore, the district court shall enter judgment of $ 193,486.47 [**29] for TAMRF against Magna and then shall determine the extent to which Magna is entitled to indemnification from Italia and Navajo.

LEXSEE 907 F. SUPP. 397

⚠
Caution
As of: Jun 10, 2008

**GARAN, INC., individually and for the use and benefit of the INSURANCE COMPANY OF NORTH AMERICA, Plaintiffs, v. M/V AIVIK, her engines, tackle and furnishing, IN REM; and THE NORTH WEST COMPANY, INC., her owner, Defendants.**

**CASE NO. 93-2406-CIV-UUB**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

*907 F. Supp. 397; 1995 U.S. Dist. LEXIS 20214*

**June 23, 1995, Decided**
**June 23, 1995, FILED**

**SUBSEQUENT HISTORY:** [**1] Reported at: *907 F. Supp. 397 at 398.*

**COUNSEL:** For GARAN, INC., individually and for the use and benefit of the Insurance Company of North America, plaintiff: Gerard Joseph Sullivan, Jr., [COR LD NTC], Sullivan & Boyd, Jacksonville, FL.

For NORTH WEST COMPANY, INC., her owner, defendant: Vincent O'Brien, [COR LD NTC], Keller & Houck, Miami, FL.

**JUDGES:** Barry L. Garber, United States Magistrate Judge. Judge Ursula Ungaro-Benages

**OPINION BY:** Barry L. Garber

**OPINION**

[*398] *REPORT AND RECOMMENDATION*

This CAUSE comes before the Court pursuant to an Order of Reference entered on February 9, 1995 by the Honorable Ursula Ungaro-Benages, United States District Judge. (D.E. 86). The following Report and Recommendation is hereby submitted on Plaintiff Insurance Company of North America's ("INA") Motion to Strike Offer of Judgment. This action is within the Court's maritime and admiralty jurisdiction pursuant to *28 U.S.C. § 1333* and *Fed.R.Civ.P. 9(h).*

**BACKGROUND**

Defendant, The North West Company ("North West"), owns the vessel AIVIK, the master of which issued a bill of lading for carriage of Plaintiff's cargo to the United States from Costa Rica. During the course of transportation, a portion [**2] of the cargo was lost without explanation. On December 19, 1994, Defendant North West filed an offer of judgment pursuant to *Florida Statutes § 768.79* [1] in the amount of $ 500 to Plaintiff [*399] INA, the insurer of the cargo. Thereafter, INA moved to Strike Defendant's Offer of Judgment under which INA could be required to pay Defendant's attorneys' fees. INA argues that because the Florida Offer of Judgment statute is substantive in nature and conflicts with substantive admiralty law, it is prohibited in cases within the admiralty and maritime jurisdiction. (Pl.'s Mot. to Strike at 2-5.) Defendant, on the other hand, contends that the Florida statute does not conflict with federal admiralty law but only operates as a permissible supplement to the general maritime common law. (Def.'s Mot. in Supp. at 2-3.)

     1  *Florida Statutes § 768.79* reads, in pertinent part: In any civil action for damages filed in the courts of this state, if a defendant files an offer of judgment which is not accepted by the plaintiff within 30 days, the defendant shall be entitled to recover reasonable costs and attorney's fees incurred by him or on his behalf. . .from the date of

907 F. Supp. 397, *; 1995 U.S. Dist. LEXIS 20214, **

filing of the offer if the judgment is one of no liability or the judgment obtained by the defendant is at least 25 percent less than such offer.

[**3] Thus, the issue before the Court is whether Florida's statutory Offer of Judgment is applicable in an admiralty jurisdiction case when federal maritime common law does not provide for fee shifting under such circumstances and requires each side to pay its own attorneys' fees.

## DISCUSSION

This is a case of first impression in the context of admiralty and maritime jurisdiction. The Eleventh Circuit, however, has addressed the application of *Florida Statutes § 768.79* in diversity actions. *See Tanker Management Inc. v. Brunson, 918 F.2d 1524 (11th Cir. 1990)*, in which the argument that Rule 68 of the Federal Rules preempts the Florida Offer of Judgment statute was rejected under a reverse-*Erie* analysis. [2] There, the Court found that because no such conflict existed, the substantive policy of the state should be followed. [3] *Id. at 1528.*

> 2    A reverse-*Erie* analysis necessitates the determination of whether a state substantive law conflicts impermissibly with federal law pursuant to *Erie R. Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938)* and its progeny. Accordingly the extent to which a state law may be used is constrained by the reverse-*Erie* doctrine which requires that the substantive remedies afforded by the states conform to governing federal standards. *See Offshore Logistics, infra,* 447 U.S. at 221.

[**4]

> 3    Ultimately, however, attorneys fees were denied because the statute, at that time, did not apply to offers of judgments by defendants. The statute has subsequently been modified to include such offers.

Here, the determination of whether the Florida Offer of Judgment statute impermissibly conflicts with federal maritime law similarly requires a reverse-*Erie* analysis. *Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222-223, 91 L. Ed. 2d 174, 106 S. Ct. 2485 (1986).* A two-part test determines whether a state law may be used in conjunction with federal maritime law: (1) Does the state law conflict with substantive maritime law? and (2) Does the state law affect remedies peculiar to the maritime jurisdiction? *Id.* If the answer to either of these questions is in the affirmative, the state law must be struck down as conflicting with federal maritime law. *Id.*

The Florida Supreme Court has recognized that "a statutory requirement for the nonprevailing party to pay attorneys fees constitutes a new obligation or duty and is therefore substantive in nature." *Young v. Altenhaus,* [**5] *472 So. 2d 1152, 1154 (Fla. 1985).* Pursuant to the first prong of the *Offshore Logistics* analysis, a determination of whether this substantive Florida law conflicts with federal maritime law must be made.

Here, federal maritime law [4] provides that absent specific federal statutory authorization for an award of attorneys' fees, the prevailing party is generally not entitled to those fees. *Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724 (5th Cir. 1980).* [5] In *Noritake,* the Fifth Circuit noted that:

> [*400] Although Congress undoubtedly could have explicitly provided for the award of attorneys' fees to a party prevailing in a suit based upon COGSA [Carriage of Goods on Sea Act], no such statutory authorization appears in the Act. Nor is there any other federal statutory authorization for the award of attorneys' fees in this type of admiralty proceeding. Absent some statutory authorization, the prevailing party in an admiralty case is generally not entitled to an award for attorneys' fees. (citations omitted).

*Id. at 730.* [6]

> 4    The federal maritime common law is "an amalgam of tradition common-law rules, modifications of those rules, and newly created rules" drawn from both state and federal sources. *Brockington v. Certified Elec., 903 F.2d 1523, 1529 n.2 (11th Cir. 1990)* (citing *East River S.S. v. Transamerica Delaval, 476 U.S. 858, 865, 90 L. Ed. 2d 865, 106 S. Ct. 2295).*

[**6]

> 5    The decisions of the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that day, *shall be binding as precedent on all federal courts within the Eleventh Circuit,* for this court, the district courts, and the bankruptcy courts in the circuit. (emphasis added). *Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1209 (11th Cir. 1981).*
>
> 6    However, because plaintiff could not challenge on appeal the trial court's refusal to award attorneys' fees based on Texas law relating to

Case 3:07-cv-02952-WHA    Document 194    Filed 06/13/2008    Page 25 of 32

Page 3

907 F. Supp. 397, *; 1995 U.S. Dist. LEXIS 20214, **

cargo damage where such argument was not advanced at trial, the Fifth Circuit also affirmed the lower court's refusal to award such fees on that basis. *Noritake, 627 F.2d at 730-732.*

The Third Circuit similarly denied the award of attorneys' fees within the maritime context in *Sosebee v. Rath, 893 F.2d 54 (3d Cir. 1990).* There, plaintiff sought attorneys' fees pursuant to a Virgin Islands statute which awarded costs to the prevailing party. *Sosebee at 56.* In applying a reverse-*Erie* analysis, the Court determined that "a [**7] general award of attorneys' fees pursuant to a state statute which does not require a finding of bad faith directly conflicts with federal admiralty law." *Id.*

Here, Defendant attempts to distinguish *Sosebee* by arguing that *Florida Statutes § 768.79* contains a bad faith provision [7] providing for the disallowance of an award of costs and attorneys' fees upon such a finding. However, *section 768.79*, while providing that a Court may deny attorneys' fees when an offer of judgment is made in bad faith, does not *require* a finding of bad faith in order for the Court to award attorneys' fees. Rather, the offering party must merely meet the requirements of the statute namely, there must be a finding of no liability or the judgment must be at least 25 percent less than the offer. [8] The Florida statute conflicts with the American rule [9] set forth in federal common law, as the Florida substantive rule impermissibly imposes an additional obligation on the parties in direct conflict with long-standing federal maritime common law.

> [7] *Florida Statutes § 768.79's* bad faith provision reads: (7)(a) If a party is entitled to costs and fees pursuant to the provisions of this section, the court may, in its discretion, determine that an offer was not made in good faith. In such case, the court may disallow an award of costs and attorney's fees.

[**8]

> [8] See note 1, *supra.*
>
> [9] The American Rule provides that each side pays its own fees. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, 695 F.2d 893, 905 (5th Cir. 1983); see also Noritake, supra.*

While Defendant argues that courts have increasingly applied state law as a supplement to the federal maritime law, such applications are only valid when federal statutory or common law is silent on the issue. *See, e.g., Wilburn Boat Co. v. Fireman's Fund Insur. Co., 348 U.S. 310, 99 L. Ed. 337, 75 S. Ct. 368 (1955).* The federal law regarding the award of attorneys' fees in the maritime context is clear and directs each side to pay its own fees.

Defendant's reliance on *Royal Caribbean Corp. v. Modesto, 614 So. 2d 517 (Fla. 3d DCA 1992)* is unavailing because that case misconstrues the holding in *Vaughan v. Atkinson, 369 U.S. 527, 8 L. Ed. 2d 88, 82 S. Ct. 997 (1962). Vaughan* discusses an exception for a discretionary award of attorneys' fees in the maritime context but only when the nonprevailing party has acted in bad faith during the course of [**9] the litigation. *See Vaughan v. Atkinson, 369 U.S. at 530.*

Further, Defendants' reliance on *Steelmet, Inc. v. Caribe Towing Corp., 842 F.2d 1237 (11th Cir.1988)* (Steelmet II) and *Blasser Brothers, Inc. v. Northern Pan American Line, 628 F.2d 376 (5th Cir. 1980)* is misplaced. In both of those cases, attorneys' fees were awarded only in third party actions on insurance contracts between insured shippers and their insurers. There, the Courts had previously recognized the ability of [*401] states to regulate rights under insurance policies issued within their domain.

Moreover, a strong interest exists in maintaining uniformity in maritime law. In *Sosebee, supra,* the Third Circuit noted that this interest "would be undermined if the availability of attorneys' fees depended upon where the plaintiff filed suit." *Sosebee at 56-57.* Consequently, this Court believes that *Florida Statutes § 768.79* would frustrate the need for uniformity in the admiralty jurisdiction and is preempted by federal maritime common law.

## CONCLUSION AND RECOMMENDATION

After careful consideration and for the foregoing reasons, the undersigned hereby

RECOMMENDS that Plaintiff INA's Motion [**10] to Strike Defendant's Offer of Judgment be GRANTED.

The parties have ten (10) days to file written objections, if any, with the Honorable Ursula Ungaro-Benages, United States District Judge. *See* U.S.C. § 636 (1991). Failure to file objections timely shall bar the parties from challenging on appeal the findings contained herein. *LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958, 102 L. Ed. 2d 386, 109 S. Ct. 397.*

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida, this 23rd day of June, 1995.

Barry L. Garber

United States Magistrate Judge

LEXSEE 2006 U.S. DIST. LEXIS 30555



Analysis
As of: Jun 10, 2008

**NISSAN FIRE AND MARINE INSURANCE COMPANY LTD.; HITACHI DATA SYSTEMS CORP., Plaintiffs, v. BAX GLOBAL INC.;CATHAY PACIFIC AIRWAYS, LTD., Defendants.**

**No. C 02-2516 JSW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 30555*

**May 11, 2006, Decided
May 11, 2006, Filed**

**PRIOR HISTORY:** *Nissan Fire & Marine Ins. Co. v. Bax Global, Inc., 2005 U.S. Dist. LEXIS 31390 (N.D. Cal., Nov. 21, 2005)*

**COUNSEL:** [*1] For Nissan Fire and Marine Insurance Company Ltd., Hitachi Data Systems Corp., Plaintiffs: David M. Salentine, San Francisco, CA.

For Bax Global Inc, Defendant: Paul B. Arenas, Raelyn Mari Ohira, Law Offices of George W. Nowell, San Francisco, CA.

For Cathay Pacific Airways Ltd., Defendant: Jennifer J. Johnston, Evan K McNamara, Condon & Forsyth LLP, Los Angeles, CA.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This action came on for a bench trial which began on March 28, 2006 and lasted one court day. Plaintiffs The Nissan Fire and Marine Insurance Company, Ltd. ("Nissan") and Hitachi Data Systems Corp. ("Hitachi") (collectively, "Plaintiffs") appeared by their counsel,

David Salentine, and Defendant BAX Global, Inc. ("BAX") appeared by its counsel, Paul Arenas and Paul Nowell. Prior to trial, in lieu of having live witness, the parties stipulated to what the witnesses of each party would have testified. The Court, having considered the stipulated testimony and exhibits admitted into evidence, as well as the arguments of counsel, hereby makes the following findings of fact and conclusions of [*2] law pursuant to *Federal Rule of Civil Procedure 52(a)*.

**FINDINGS OF FACT**

Hitachi shipped 18 cartons of cargo on BAX air waybill No. CHG17066781 dated April 5, 2001 from Plainfield, Indiana to Hong Kong. (Stipulated Facts ("Stip. Fact"), No. 1; Ex. 1.) The cargo was shipped with no declared value. (Stip. Fact, No. 2.) Hitachi insured the cargo with Nissan. (*Id.*, No. 3.) Nissan compensated Hitachi $ 122,645.33 for the damage to the cargo. (*Id.*, No. 4.) The Nissan/Hitachi insurance policy had an insurance deductible of $ 10,000.00. (*Id.*, No. 5.)

The Cargo was received by BAX from Hitachi in Plainfield, Indiana. (*Id.*, No. 6.) Thereafter the cargo was trucked to BAX's facility near but not on the grounds of the Indianapolis International Airport and thereafter to Chicago O'Hare International Airport. (*Id.*, No. 7.) The cargo did not enter onto an airport premises until reaching Chicago O'Hare. The BAX facility at Chicago O'Hare is within the boundaries of that airport. (*Id.*)

Upon BAX's delivery of the cargo to Cathay Pacific at O'Hare, Cathay Pacific issued to BAX Cathay Pacific's air waybill no. 160-89992022 dated [*3] April 7, 2001. (*Id.*, No. 9.) The Cargo was then flown from Chicago to Hong Kong aboard Cathay's flight CX085. This flight has a scheduled stop at Anchorage, Alaska. (*Id.*, No. 10.)

One of the 18 pieces of cargo was discovered damaged upon arrival in Hong Kong. (*Id.*, No. 11.) The Court finds that the damage occurred within the boundaries of an airport or while engaged in international travel. [1] The weight of the damaged carton and contents was 481 kilograms. (Stip. Fact, No. 12.) The damaged package contained a "disk controller" unit. (*Id.*, No. 13.) The weight of a single Hitachi Data Systems 9960 is at most 1,062 kilograms when fully assembled. (*Id.*, No. 14.) The weight of two Hitachi Data Systems 9960 Disk Subsystems is at most 2,124 kilograms. (*Id.*, No. 15.)

> 1    This finding is based on upon the rebuttable presumption under Article 18(3) of the Warsaw Convention that the damage occurred during air transportation. *See Read-Rite Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190, 1194 (9th Cir. 1999).* BAX bears the burden of presenting evidence to rebut the presumption and demonstrate where the damage actually occurred. *See Washington Int'l Ins. Co. v. Distribution Specialists Inc., 1996 U.S. Dist. LEXIS 1263, 1996 WL 50232, *2 (S.D.N.Y. Feb. 8, 1996)*; *Royal Ins. Co. ofAmer. v. Air Express Int'l, 906 F. Supp. 218, 219-20 (S.D.N.Y. 1995).* The Court concludes that BAX did not provide sufficient, credible evidence to demonstrate that the damage occurred within the United States *before* the entering the boundaries of an airport.

[*4] The BAX air waybill states on the face: "It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted for carriage) SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF." (*Id.*, No. 16; Ex. 1.) The waybill contains no notations of bad order of the cargo. (Stip. Fact, No. 16.)

The BAX air waybill further states:

> 1. . . . and "Carrier" includes all air carriers that carry the goods hereunder or perform any other services related to such air carriage including [BAX]. For the purposes of this contact, [BAX] includes employees, agents, servants, or representatives of [BAX].

> 2. In tendering the shipment for carriage, the Shipper agrees to these TERMS AND CONDITIONS OF CONTRACT, and agrees that no employee, agent, . . . may modify or waive them. This [BAX] Air Waybill is NON-NEGOTIABLE, and has been prepared by or on behalf of the Shipper who, by accepting the Air Waybill, ratifies the correctness.

. . .

#### 5. LIMITATION OF LIABILITY

> A. (1) The Shipper acknowledges that is has been given an opportunity to make a declaration of the value of the goods in excess of U.S. $ 9.07 per pound (U. [*5] S. $ 20 per kilogram [or 17 Special Drawing Rights per kilogram when the Montreal Protocol No. 4 applies] and to pay applicable excess charges at the time of tender to [BAX] or the Carrier, and that the sum entered on the face of this Air Waybill as Shipper's Declared Value, if any, constitutes such special declaration of value.

. . .

> B. Except as the Convention may otherwise require, [BAX]'s liability for all proved damages is limited to U.S. $ 9.07 per pound (U.S. $ 20 per kilogram) [or 17 Special Drawing Rights per kilogram when Montreal Protocol No. 4 applies] or Shipper's Declared Value, whichever is greater. In cases of loss, damage or delay of part of the consignment, the weight to be taken into account in determining [BAX]'s limit of liability shall be only the weight of the package or packages concerned.

. . .

8. The agreed stopping places (which may be altered by Carrier in case of necessity) are those places, except the place of departure and the place of destination, set forth on the face hereof or shown in the Carrier's time tables as scheduled stopping places for the route. Carrier's timetables are hereby incorporated by reference.

. [*6] . .

10. It is agreed that no time is fixed for completion of carriage hereunder and that [BAX] may, without notice, substitute alternate carriers or air craft. [BAX] assumes no obligation to forward the goods by a specified carrier or over any particular route or routes or to make connection at any point according to any particular schedule, and [BAX] is hereby authorized to select, or deviate from, the route or routes of shipment notwithstanding the same may be stated on the face hereof.

. . .

15. ALL CHARGES ARE DUE AND PAYABLE UPON RECEIPT OF BAX GLOBAL'S INVOICE. Any payment which is past due shall be subject to an additional charge of 11/2% per month of the outstanding balance due or the maximum interest rate permitted by applicable law, whichever is less.

16. THE SHIPPER, CONSIGNEE, AND OWNER JOINTLY AND SEVERALLY AGREE TO PAY ALL LEGAL AND COLLECTION FEES INCURRED BY BAX GLOBAL IN SECURING PAYMENT FOR ALL CHARGES RELATED TO THE SHIPMENT OR ENFORCING ANY PORTION OF THIS CONTRACT.

. . .

19. To the extent that it is not governed by the Convention or by federal law, this contract will be construed pursuant to the laws of the State of California, [*7] United States of America.

(*Id.*, No. 17; Ex. 1.)

The damaged package was returned from Hong Kong to Chicago under BAX air waybill No. HEH106941 dated May 5, 2001. (Stip. Fact., No. 18., Ex. 11.) Plaintiffs had the damaged package trucked from Chicago to Hitachi's facility at Plainfield, Indiana. (Stip. Fact., No. 18.) Hitachi inspected and tested the damaged package at the Plainfield facility and determined that the piece could not be repaired at a cost less than the original invoiced price of $ 132,645.33. (Stip. Fact, No. 19; Ex. 2.) Hitachi had the damaged piece disposed of as scrap. (Stip. Fact., No. 19.) Hitachi located a replacement piece and had that piece built, configured, and tested at the Plainfield facility. Hitachi then shipped the replacement piece to Hong Kong. (*Id.*, No. 19.)

Defendant Cathay Pacific Airways, Ltd settled Plaintiffs' claim against it for $ 15,000.00. (*Id.*, No. 20.)

## CONCLUSIONS OF LAW

The Warsaw Convention is an international treaty governing the liability of air carriers engaging in international air travel. *See* Warsaw Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, art. [*8] 1, 49 Stat. 3000, T.S. No. 876 (1034), *reprinted in* note following *49 U.S.C. § 40105*. Based on the Court's conclusion that BAX failed to rebut the presumption that the damage occurred on the grounds of an airport or during air transportation, the Warsaw Convention applies to this case.

### A. Determining Which Version of the Warsaw Treaty Convention Applies.

The Warsaw Convention was modified by The Hague Protocol. *See* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371. The United States did not ratify The Hague Protocol before the Warsaw Convention was amended again by the Montreal Protocol No. 4. *See* Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw at 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145 U.N.T.S. 36. On September 28, 1998, the United States ratified the Montreal Protocol No. 4. The Montreal Protocol became effective as to the United States on March 4, 1999. *Id.* [*9] , 2145 U.N.T.S. at 44. Article XVII of Montreal Protocol No. 4 provides that ratification of Montreal Protocol No. 4 by a State that, such as the United States, was not yet a party to The Hague Protocol, "shall have the effect of accession to the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." 2145 U.N.T.S. at 44, art. XVII(2). [2]

2    "[I]n 2002, the Department of State acknowledged 'the difficult question of whether the United States, by reason of its adherence to Montreal Protocol No. 4 became a party to The Hague Protocol and therefore entered into treaty relations under The Hague Protocol with other countries party to that instrument (but not to Montreal Protocol No. 4).'" *Avero Belgium Ins. v. American Airlines, Inc., 423 F.3d 73, 83 (2d Cir. 2005)* (quoting Letter of Submittal by Secretary of Sate Colin L. Powell, June 15, 2002, S. Treaty Doc. 107-14, at ix. President Bush re-transmitted The Hague Protocol to the Senate for "advice and consent." *Id.* The Senate approve The Hague Protocol on July 31, 2003. President Bush ratified The Hague Protocol effective December 14, 2003. *See* U.S. Dep't of State, *Treaties in Force* 350 (2004).

[*10]    The parties dispute whether, at the time the air waybill was signed in April 2001, the United States was bound by the original Warsaw Convention, or the Warsaw Convention as amended by The Hague Protocol. [3] BAX contends that by ratifying the Montreal Protocol No. 4, the United States also acceded to The Hague Protocol. The Court must determine whether the United States, by ratifying the Montreal Protocol No. 4, consented to be bound by one treaty, namely the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975, or by two treaties: (1) the Warsaw Convention as amended at The Hague, 1955, and (2) the Montreal Protocol No. 4.

3    BAX argues that because Plaintiffs initially argued that the Warsaw Convention as amended by The Hague Protocol applied and the Court granted partial summary judgment on this basis, Plaintiffs should be judicially estopped from arguing now that the original Warsaw Convention applies. Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich, 530 U.S. 211, 217 n.8, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000).* "Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts." *Wagner v. Professional Engineers in California Government, 354 F.3d 1036, 1044 (9th Cir. 2004)* (internal quotations omitted). However, if the party was not successful in a prior proceeding, the "party's later inconsistent position introduces no risk of inconsistent court determinations . . . and thus poses little threat to judicial integrity." *New Hampshire v. Maine, 532*

*U.S. 742, 751, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)* (internal citation and quotations omitted). In this case, the Court initially granted Plaintiffs' motion for partial summary judgment, but upon BAX's motion for reconsideration, the Court vacated its order granting partial summary judgment. Thus, Plaintiffs were not successful on their motion for partial summary judgment. Accordingly, the doctrine of judicial estoppel is inapplicable.

[*11]    The best evidence of a treaty's purpose and the parties' intent is the language of the treaty. *United States v. Stuart, 489 U.S. 353, 372, 109 S. Ct. 1183, 103 L. Ed. 2d 388 (1989).* The Montreal Protocol No. 4 provides: "As between the Parties to this Protocol, the Warsaw Convention as amended at The Hague in 1955 and this Protocol shall be read and interpreted together as *one single instrument* and shall be known as the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." 2145 U.N.T.S. at 43, art. XV (emphasis added). The Montreal Protocol No. 4 further provides: "Ratification of this Protocol by any State which is not a Party to the Warsaw Convention or by any State which is not a Party to the Warsaw Convention as amended at The Hague, 1955, shall have the effect of accession to the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." *Id.* at 44, art. XVII(2).

The Second Circuit, in *Avero*, concluded these provisions demonstrated that by ratifying the Montreal Protocol No. 4, a State "consen[ted] to be bound by *one instrument* consisting of the combination of three related treaties." *Avero, 423 F.3d at 84* [*12] (emphasis added). In contrast, the district court in *G.D. Searle & Co. v. Federal Express Corp., 248 F. Supp. 2d 905, 908 (N.D. Cal. 2003),* considered the language in Article XVII(2) to be evidence of consent to accede to the Warsaw Convention as amended by The Hague Protocol, separate from the amendments to the Warsaw Convention by the Montreal Protocol No. 4. [4] The court in *G.D. Searle* did not consider the language in Article XV that the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975 shall be known as "one single instrument." This Court agrees with the Second Circuit's interpretation of the plain language of the Montreal Protocol No. 4, and thus, concludes that ratification of the Montreal Protocol No. 4 evinces an intent to be bound by a *single instrument* known as "the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." By ratifying the Montreal Protocol No. 4, the Court finds that the United States did not demonstrate an intent to be bound by the Warsaw Convention as amended at The Hague, 1955,

separate from the amendments made by the Montreal Protocol No. 4.

> 4    The Court in *G.D. Searle* also relied on a footnote in *Motorola, Inc. v. Federal Express Corp.*, in which the Ninth Circuit stated "The Hague Protocol did not enter into force for the United States until the Montreal Protocol No. 4 was ratified by the Senate on September 28, 1998 and became effective on March 4, 1999." *308 F.3d 995, 999 n.6 (9th Cir. 2002)*. However, in *Motorola*, the shipment at issue occurred before the United States ratified the Montreal Protocol No. 4, and thus the issue of whether by ratifying the Montreal Protocol No. 4 the United States also acceded to the Warsaw Convention as amended by The Hague Protocol was not before the court. *Id.*

[*13] Thus, as of the date of the shipment at issue in this case, the United States had not ratified or acceded to the Warsaw Convention as amended by The Hague Protocol. Accordingly, the Court will apply the original Warsaw Convention to this case.

## B. Weight Limitations on BAX's Liability.

"The [Warsaw] Convention creates a presumption of air carrier liability, but, in turn, substantially limits that liability." *Insurance Co. of North America v. Federal Express Corp., 189 F.3d 914, 917 (9th Cir. 1999)* (citing Warsaw Convention, arts. 18, 22(2).) If applicable, the Convention limits an air carrier's liability to $ 9.07 per pound. *Id.* However, to invoke the protection of this limited liability, a carrier must comply with the procedural and substantive provisions of the Warsaw Convention. *Id.*

Articles 8 and 9 of the Warsaw Convention govern the issuance of air waybills. Article 8 enumerates a list of seventeen "particulars" which an airway bill must contain, including "[t]he agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity." *See* Warsaw Convention, art. 8(a)-(q). If an air [*14] waybill fails to comply with the particulars set forth in Article 8, the air carrier is not entitled to the limitations on liability provided by the Convention. *See id.*, art. 9.

BAX relies on *Insurance Co. of North America* to argue that the waybill at issue here made clear that there were no "agreed stopping places," and thus, it was not required to list any stopping places. In *Insurance Co. of North America*, the waybill specifically disclaimed any agreement as to specific stopping places, stating: "You agree that this shipment may be carried via intermediate stopping places that we deem appropriate." *189 F.3d at*

*916-17*. Moreover, the FedEx Service Guide incorporated by reference into the waybill provided: "FedEx will determine the routing of all shipments. There are no agreed stopping places which are agreed to at the time of tender of the shipment. We reserve the right to divert any shipment in order to expedite its delivery. . . ." *Id. at 917 n.5*. The court found that the text of Article 8(c) only required the air waybill to contain "agreed stopping places" and "the air waybill made it perfectly clear that there were no agreed stopping [*15] places." *Id. at 918-19*. Accordingly, the court concluded that the carrier did not have any obligation to disclose an intermediate stop in order to retain the protection of the liability limitations. *Id. at 919*.

In contrast to *Insurance Co. of North America* in which the waybill expressly disclaimed any agreement as to stopping places, the waybill at issue here provides that the agreed stopping places are those shown on the face of the waybill or in the Carrier's time tables. (Ex. 1.) The waybill also provides that BAX is "authorized to select, or deviate from, the route or routes of shipment notwithstanding the same be stated on the face hereof." However, this disclaimer does not address stopping places, but rather, only addresses the routes. As the court noted in *Running Bear Farms, Inc. v. Expeditors International of Washington, Inc.*, 2001 WL 102515, *5 (S.D. Ohio 2001), "[u]nder the Warsaw Convention, "routing" and "stopping places" are distinct concepts addressed in separate subsections." Accordingly, the Court concludes that BAX was required to list the stopping places to maintain the protection of the liability limitations [*16] in the Warsaw Convention. Because the air waybill failed to name Chicago, Illinois as a stopping place, and it is undisputed that the cargo stopped in Chicago, BAX is not entitled to the Warsaw Convention's liability limitations.[5]

> 5    Because the Court concludes that BAX is not entitled to the Warsaw Convention's limitations on liability based on its failure list all stopping places, the Court need not address Plaintiffs' additional argument that the air waybill's failure to list the correct airport of departure deprives BAX of the liability limitations.

## C. Attorney Fees.

The Original Warsaw Convention does not address attorneys' fees. The air waybill provides for attorneys' fees only for BAX. (Ex. 1.) Plaintiffs argue that the Court should apply *California Civil Code § 1717* to convert the parties' attorneys' fees provision in the air waybill into one that is mutual.[6] Plaintiffs contends that Article 19 of the airway bill provides support for invoking this provision of the [*17] California Civil Code. Article

19 of the air waybill provides: "To the extent that it is *not* governed by the Convention or by federal law, this contract will be construed pursuant to the laws of the State of California." (Ex. 1 (emphasis added.)

> 6 *California Civil Code § 1717* provides in pertinent part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

Although the Warsaw Convention is silent with respect to attorneys fees, federal law provides that attorneys' fees may be awarded only if they are "authorized by contract, applicable statute, or other exceptional circumstances." *In re Bybee, 945 F.2d 309, 316 (9th Cir. 1991)* [*18] (internal quotations omitted). Here, the parties' agreement does not authorize attorneys' fees for *Plaintiffs*. Plaintiffs have not pointed to any statute or other exceptional circumstances warranting attorneys' fees. Rather, Plaintiffs solely rely on state law, *California Civil Code § 1717*, for their contention that they are entitled to attorneys' fees. However, because federal law addresses when attorneys' fees may be awarded, Plaintiffs' reliance on California law is misplaced. The Court concludes that *California Civil Code § 1717* may not be applied to convert the attorneys' fees provision to one that is mutual. Accordingly, Plaintiffs are not entitled to attorneys' fees.

**D. Prejudgment Interest**

The parties agree that this Court has discretion to award prejudgment interest, *see Motorola, Inc. v. Federal Express Corp., 308 F.3d 995, 1008 (9th Cir. 2002)*, and merely dispute what amount should be awarded.

Plaintiffs argue that the Court should award 18% compounded annually, based on clause 15 of the air waybill. The air waybill provides that BAX shall be paid 1 1/2% per month, or 18% per year, on any amount [*19] past due under the parties' contract, but does not address what prejudgment interest should be paid to Plaintiffs if the products being shipped are damaged. (Ex. 1.) Thus, the air waybill does not provide support for awarding Plaintiffs 18% prejudgment interest.

Plaintiffs argue in the alternative that neither the Warsaw Convention nor federal law address prejudgment interest, and thus, the Court should apply the rate of 10% per year set forth in *California Code of Civil Procedure § 3289.* BAX contends the amount should be 4%

compounded annually, based upon *28 U.S.C. § 1961.* Although *28 U.S.C. § 1961* sets forth the rate for post-judgment interest, courts have applied this amount to prejudgment interest. *See Western Pacific Fisheries v. Proprietors Ins. Co., 730 F.2d 1280, 1289 (9th Cir. 1984)* (in maritime case, concluding "measure of interest rates prescribed for post-judgment interest in *28 U.S.C. § 1961 (a)* is also appropriate for fixing the rate for pre-judgment interest in cases such as this, where prejudgment may be awarded . . ."); *see also Hollie v. Korean Air Lines Co. Ltd., 834 F. Supp. 65, 70 (S.D.N.Y 1993)* [*20] (applying rate set forth in *28 U.S.C. § 1961* to prejudgment interest in action arising under Warsaw Convention). The Court concludes that the appropriate rate of prejudgment interest is the rate set forth in *28 U.S.C. § 1961*, and thus, awards Plaintiffs prejudgment interest at the rate of 4% compounded annually.

**E. Calculation of Award.**

BAX contends that it is entitled to a set-off in the amount of the settlement paid by co-defendant, Cathay Pacific, to Plaintiffs, which was $ 15,000. Plaintiffs do not address whether it would appropriate to set-off the damages award. The Court agrees that BAX is entitled to a $ 15,000 set-off. *See Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1389 (9th Cir. 1987)*, modified on other grounds, 817 F.2d 609 (9th Cir. 1987).

Accordingly, the Court awards Plaintiffs $ 117,645.33 in damages. Including prejudgment interest at the rate of 4% compounded annually, the award amounts to $ 156,184.17 as of the date of this Order.

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of Plaintiffs and against BAX, and awards Plaintiffs damages and [*21] prejudgment interest in the amount of $ 156,184.17.

**IT IS SO ORDERED.**

Dated: May 11, 2006

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

**JUDGMENT**

This action came before the Court for trial, Judge Jeffrey S. White presiding. Pursuant to the Findings of Fact and Conclusions of Law entered on May 11, 2006, judgment is hereby entered against Defendant BAX Global, Inc. ("BAX") and in favor of Plaintiffs The Nissan Fire and Marine Insurance Company, Ltd. and Hitachi Data Systems Corp. ("Plaintiffs"). The Court

2006 U.S. Dist. LEXIS 30555, *

awards Plaintiffs damages and prejudgment interest in the amount of $ 156,184.17.

**IT IS SO ORDERED.**

Dated: May 11, 2006

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE