IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEL MAR SEAFOODS INC.,

    Plaintiff,

v.

BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam*, and F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8 foot long fishing vessel, her engines, tackle, furniture apparel, etc., *in rem*, and DOES 1–10,

    Defendants.

No. C 07-02952 WHA

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL**

## INTRODUCTION

In this admiralty action, a fish processor lent money to owners of a fishing boat, secured by the vessel. They also had a separate joint venture in which the vessel had only an occasional and minor role and in which various other obligations arose. When they parted ways, the fish processor sued herein and obtained an *ex parte* seizure of the vessel, representing that the mortgage on the vessel was in arrears. It was not in arrears, however, due to a large payment made by the boat owners that counsel failed to disclose to the Court and that came to light only after the seizure. After a bench trial, this order now sorts out a tangle of competing claims.

## THE PARTIES

Plaintiff Del Mar Seafoods, Inc., is a fish processor and distributor of frozen fish out of Watsonville. Defendants Barry Cohen and his wife Christene Cohen own the fishing vessel

1  F/V POINT LOMA, the subject of this maritime action. At all relevant times, they were
2  married, though they recently separated. The Cohens operated a restaurant, fish market and fish
3  wholesale business in Avila Beach. Joe Cappuccio was and remains the president of Del Mar.
4  Joe Roggio was and remains its controller.



### THE NOTE AND MORTGAGE

The story began in 1999. Del Mar and Barry Cohen entered into an oral joint venture pursuant to which Del Mar was to supply the financial backing for a wholesale fish-marketing business in Avila Beach. Barry Cohen managed the joint venture. Each owned a half interest. The joint venture continued through at least September 30, 2004, with the wind-up taking a few weeks. For virtually all of the time, Mr. Cohen was entrusted to manage the venture and keep its books and records. The fish were purchased by the Avila Beach joint venture from more than a dozen vessels, and a myriad of different fishermen, including gill netters, salmon trollers, and hook-and-line fishermen. Barry Cohen was allowed to write checks to himself and for the benefit of the joint venture. He was also an employee of Del Mar from 1999 to 2006, and after the dissolution was stationed at Del Mar's home office in Watsonville. At all material times and separate from the joint venture, he and his family operated a retail restaurant and fish market in Avila Beach.

The F/V POINT LOMA was (and is) owned by the Cohens. It is a commercial fishing boat. Although the F/V POINT LOMA fished for the joint venture, it had the option to fish for other markets and to deliver fish wherever it wanted. As stated, the joint venture purchased

2

from a dozen vessels. The F/V POINT LOMA was only an occasional supplier to the joint venture. Contrary to the impression sometimes left by counsel, the boat had little to do with the joint venture.

Del Mar and Barry Cohen also discussed another possible joint venture to fish near Mexico. This would have directly employed the F/V POINT LOMA. Although preparations were made for this venture, Del Mar decided not to go ahead with it. In preparation, however, Del Mar had advanced funds to Barry Cohen for boat improvements for the F/V POINT LOMA. When the Mexico joint venture did not materialize, Del Mar asked Barry and Chris Cohen to execute a note and ship mortgage to secure the advances. This led to the promissory note and a mortgage on the F/V POINT LOMA, the mainstays of this action. The documents were executed on or about October 31, 2003. The amount of the promissory note was $215,000.

The parties dispute whether the actual amount of the advances preceding the note were more or less than $215,000. Both sides agree that the $215,000 amount of the note was an estimate of the amount that Del Mar had advanced, and this order finds that it was a reasonably close estimate. This order rejects the litigation efforts of both sides to vary the amount on the original note. This order finds that all amounts owed by the Cohens preceding the note were merged into and superseded by the $215,000 amount of the note. Neither side will be allowed to vary the amount of the note as of its execution on October 31, 2003.

The terms of the note and mortgage deserve attention. Both were drafted by Del Mar and signed by the Cohens without change. The note provided that monthly payments were to be made at the rate of $3,000 or fifteen percent of the gross landing receipts of each and every landing of seafood product made by the vessel, whichever was greater, commencing on January 15, 2004. With one minor exception discussed later, there is no proof any amounts were ever due over and above the $3,000 per month, *i.e.*, no proof of gross-landing receipts. The note stated an interest rate of seven percent per annum. It further stated that payments were to be applied first to interest and then to principal. Another provision stated that the holder of

the note (Del Mar) could "extend the time for making any installments provided for in this note *or accept any installment in advance*" (TX 7) (emphasis added).

The mortgage was on the F/V POINT LOMA (TX 8). It secured the promissory note and the principal amount of $215,000. Upon default, the mortgage authorized Del Mar to "declare the principal of said note and all accrued interests thereon" to be due. The mortgage further provided that it secured not only the note in question but also "all future advances made by the holder of said note to the mortgager." Neither of the instruments provided for interest on any subsequent advances. The ship mortgage was then recorded with the United States Coast Guard.

### SUBSEQUENT ADVANCES

Subsequently, personal advances were made to Mr. Cohen by Del Mar in the amount of $22,035.48. Such advances were clearly covered by the mortgage and secured by the mortgage. In addition, subsequent advances for improvements of the F/V POINT LOMA were made in the amount of $16,021.33. These also were clearly covered by and protected by the mortgage. Contrary to the defense, further paperwork was not required to add these amounts to the mortgage, for it already covered any future advances made by Del Mar to the Cohens.

All other debts in suit, however, were *not* "advances" within the meaning of the mortgage and thus were *not* secured by the mortgage. Specifically, while it is true that Mr. Cohen agreed to be responsible for certain amounts owed by his sons Michael and Leonard Cohen, these amounts were *not* "advances" *to Mr. Cohen*. Nor were the outlays made by Del Mar for its attorney's fees as a third party to certain litigation Mr. Cohen maintained against the harbor authority. Nor was the inventory taken by Mr. Cohen (with consent) an "advance." Regardless of the extent to which Mr. Cohen is responsible for these amounts, they were not "advances" within the meaning of the mortgage and thus were *un*secured obligations. To be sure, Del Mar claims that Mr. Cohen said to add these amounts "to his balance." Even if he said it, that did not translate to adding the amounts "against the boat." They are two different things. It is common for a debtor to have some secured and other unsecured debts, even to the same lender. This order finds that Mr. Cohen agreed to be

4

responsible for certain of these miscellaneous items but never agreed to treat them as an advance secured by the ship mortgage.

**PAYMENT HISTORY**

Returning to the note and mortgage, the parties' subsequent course of conduct is important, especially the payment history. Contrary to the terms of the note, regular payments were not made. Most were skipped. In December 2004, Mr. Cohen made a $5,000 payment. This was the first payment, even though the first payment had been due in January of 2004. No notice of default or complaint of any type, however, was made by Del Mar.

This nonpayment pattern continued until November 2005, when a large payment of $175,000 was made by the Cohens to Del Mar. This large payment is perhaps the single most central fact in the case. This large payment resulted from one or more conversations between Joe Cappuccio, president of Del Mar, and Mr. Cohen. Mr. Cappuccio stated that Del Mar's bank was uncomfortable with the sizeable note on his books. Mr. Cappuccio requested that Mr. Cohen borrow from a bank and pay down the note. The foregoing is not really controverted. Although it is contested, this order also finds that Mr. Roggio, the Del Mar controller, further told Mr. Cohen that if he would make a large pay-down on the note, Mr. Roggio would see to it that the note would be interest-free. To accommodate Del Mar and in light of the interest-free inducement, the Cohens took out a second mortgage on their home and used $175,000 of the loan proceeds to pay against the note.

Mr. Cohen delivered the check for $175,000 to Mr. Cappuccio. Mr. Cappuccio thanked him. Both sides agree that the conversation went something like this (Cohen at Tr. 455–56):

> Joe, I have the check that you asked for. And I handed him the check. And he said "thank you so much. I really appreciate this." And I said: "I will get you the rest as soon as I can, pay it off." And he said: "I'm not worried about it. I'm not concerned anymore. It's such a small amount now. It's good."

After the payment, the amount still owed was $35,000 (plus any other advances made to Mr. Cohen).

A key question is the effect of the $175,000 payment. This order finds that it constituted a prepayment of installment payments such that the Cohens paid in advance at least into 2009.

5

The $175,000 payment would cover 58 payments at the rate of $3,000 per month. This is an important finding, for it means that there was no default when this action was commenced and the vessel seized.

Specifically, the note called out that Del Mar could "accept any installment in advance." That is what Del Mar did. Certainly, there was no conversation or statement agreeing to any effect other than Del Mar's accepting installments in advance. It is true that the clause was followed by "all without affecting the liability of maker." All that meant was that the balance unpaid (here $35,000 plus any advances) would eventually have to be paid.

It is unreasonable for Del Mar to now contend that despite having made the large payment, the Cohens nonetheless had an ongoing $3,000/month obligation without respite to Del Mar, as well as monthly payments on the second mortgage they took out to finance the payment. Mr. Cappuccio had told Mr. Cohen that he wanted the Cohens to substitute a bank for Del Mar so that Del Mar would no longer be acting as their bank. No one could have reasonably intended that the Cohens would have two lenders to pay simultaneously. Moreover, upon receiving the large payment, Mr. Cappuccio said he was not worried about the small unpaid balance. Both sides agree he so stated. This supports the view that both sides felt the large payment was simply a massive prepayment of installments.

From that point until the end of 2006, moreover, no further payments were made and significantly, Del Mar never asked for payment. This course of dealing speaks volumes. Clearly, the overall trial record — including the specific terms of the note — requires that the large payment be deemed and was deemed by the parties to be an advance payment of installments.

The course-of-conduct evidence favors Mr. Cohen for the additional reason that for the vast majority of the time in question, Mr. Cohen was Del Mar's employee, joint venturer and Mr. Cappuccio's alleged good friend. It is also worth noting that in this industry, the caselaw reflects that funding arrangements between a fish-boat operator and a fish-processing company very often reflect one thing on paper and another thing in practice. *OT Africa Line Ltd. v.*

6

1  *First Class Shipping Corp.*, 124 F. Supp. 2d 817, 822 (S.D.N.Y. 2000) ("Under Admiralty law,
2  contractual obligations may be modified in practice by a course of dealing").

3       In all contracts, maritime contracts included, there is a covenant of good faith and fair
4  dealing. If Del Mar intended to treat the large payment as anything other than prepaid
5  installments (as called out by the note), Del Mar was obligated to so advise the Cohens,
6  especially if any other application method meant a default and endangered their means of
7  livelihood — the vessel. At no time did Del Mar or its attorneys do so. (This is not use of the
8  covenant as a stand-alone tort. It is use of the covenant as a consideration in construing the
9  course of dealing.)

10       Since the $175,000 was a prepayment, it follows that all of it should have been applied
11  to reduce the note rather than diverting some of it to settle unsecured obligations (such as the
12  Cohen sons' unpaid invoices). It is worth noting that even if Del Mar's allocation in its
13  much-litigated spreadsheet (in TX 37) had been proper, even then $144,000 was allocated to
14  the note. This would have translated into 48 advance monthly payments, meaning that all
15  installments were paid to at least February 2008, almost a year after the boat seizure occurred.
16  (Taking into account the other thirteen thousand in payment before suit, the paid-up period
17  would have been even later.)

18       In sum, the $175,000 prepayment paid all installments well into 2009.

19                                     **INTEREST**

20       Next is the question of interest. While the note expressly stated seven-percent interest
21  and while there are some contrary implications in the record, the preponderance of the evidence
22  favors Mr. Cohen's testimony that he and his wife took out the second mortgage on their home
23  and made the large payment to Del Mar after Mr. Roggio said he would see that the note would
24  be interest-free if the Cohens did so. *This is corroborated by the fact that no interest was ever*
25  *accrued on Del Mar's books and records for the note and no interest was ever requested, at*
26  *least until this litigation erupted.* Significantly as well, the November 2005 schedule given by
27  Del Mar to Barry Cohen showed no accrued interest (TX 37). Had interest been accruing and
28  had the payment been applied to interest first, the principal reduction would have been much

7

1  less than Del Mar showed on its schedule. The schedule prepared by Controller Roggio applied
2  nothing against any accrued interest and showed the principal as being reduced dollar for dollar.
3  Del Mar's idea that interest would have been sorted out and calculated at the end would have
4  been most impractical. This boils down to saying that as soon as the debt appeared dead on the
5  books, it would suddenly be resurrected by an infusion of interest, the amount unknown until
6  the math was somehow done, no amount of which had ever been on the books. Calculating and
7  accounting for interest in this way would have led to a maritime version of Zeno's Paradox and
8  at least advanced algebra.[1]

9       Although Mr. Cohen was an employee of Del Mar at various times, including
10 virtually all of the period after the joint venture dissolved, he was fired at the end of 2006.
11 Shortly thereafter, Controller Roggio left a telephone message for Mr. Cohen, asking him to pay
12 on the note. For the reasons already stated, however, no payments were due on the note given
13 the earlier, large prepayment. Del Mar had no right to demand payment at that time (although it
14 could have demanded payment of the *unsecured* items). Nonetheless, Mr. Cohen made a
15 $2,000 payment in January 2007, a $3,000 payment in February 2007 and another $3,000
16 payment in April 2007, bringing the total paid to $188,000. The Court has considered whether
17 these payments contradict the basic finding of this order that no amount was then due on the
18 note. There is no necessary inconsistency. Rather, the payments resulted from a specific
19 request from Controller Roggio and Cohen's effort to voluntarily further prepay yet more on
20 the note, even if not required to do so. The January 2007 payment included a note that stated
21 "With this payment, if your analysis was correct, the new balance should be $139,749.79. I will
22 try to send you at least $2,000/month, sometimes $3,000" (TX 40).

23      Del Mar's counsel argue that "one week after he made the $175,000 payment,
24 Mr. Cohen testified in the *Avila Beach* case that he did not know why he wasn't being charged

---

[1] None of plaintiff's own accounting documents showed any accrued interest. The Cohens were never asked to pay interest nor were they ever invoiced for any interest. Plaintiff kept no record of any accrued interest on its books. The only document showing accrued interest was prepared after-the-fact by plaintiff's counsel and submitted to the Court as an exhibit to the declaration of Joe Cappuccio in support of plaintiff's opposition to defendants' motion to vacate the order of arrest.

8

interest." Therefore, he could not have had any such agreement, it is argued. Actually, the testimony was different (Tr. 292):

> Question: Were you assessed interest under the terms of this promissory note?
>
> Answer: No.
>
> Question: Why not?
>
> Answer: I don't know.

The question asked was why Del Mar had not assessed interest, not why Del Mar was not then assessing interest. This is an important distinction, for it is entirely plausible that Mr. Cohen had no knowledge why Del Mar had historically not assessed interest. The question in the *Avila Beach* case was *not* focused on the period immediately before the deposition, despite counsel's spin. This order finds that the Cohens relied on the promise to eliminate interest in making the large prepayment and that Del Mar cannot now go back and renege on that promise. This course of conduct worked a modification to the express terms of the note.

\*            \*            \*

In sum, the payment history was as follows:

- January 15, 2004:            First payment due.
- December 22, 2004:    First payment made ($5,000).
- November 10, 2005:    $175,000 payment.
- All of 2006:               No payments.
- January 2007:            $2,000 payment.
- February 2007:           $3,000 payment.
- April 2007:              $3,000 payment.

### THE SEIZURE

Despite the payments in early 2007, and without notice or declaration of any kind, Del Mar filed this action on June 7, 2007, and obtained an *ex parte* seizure of the vessel. Significantly, Del Mar claimed that large amounts were due and owing, all secured by the mortgage. *In obtaining a writ of seizure, Del Mar counsel failed to disclose to the Court the large $175,000 payment, leaving the false impression that the Cohens were in hopeless default.*

9

In reliance upon the *ex parte* factual representations of counsel and Del Mar, the Court approved the writ. The F/V POINT LOMA was then arrested on June 8. This was later revoked when the truth came out — on defendants' motion — about the payment history. The seizure immobilized the F/V POINT LOMA for two months and one week. This damaged the Cohens' livelihood.

To pause over the misleading application for the writ of seizure, plaintiff Del Mar alleged that defendants had defaulted and had failed to make necessary payments under the promissory note. Del Mar neglected to say, however, that defendants had provided the $175,000 prepayment in November 2005. In light of the large prepayment, the following misleading statements were made to the Court by Del Mar and its counsel (emphasis added):

- According to the verified complaint, "[a]s of May 1, 2007, the total amount due and owing under the Agreement was $180,653.98, *no portion of which has been paid*" (Compl. ¶ 15). The allegation in the complaint was untrue; Barry Cohen *had* paid Del Mar $188,000.

- The complaint also alleged: "Prior to, and as of, May 1, 2007, the COHENS repeatedly failed to make the proper monthly payments as required under the Note and Mortgage. As of the last payment on April 25, 2007, the COHENS were still in arrears on the required payments. Since April 25, 2007, the COHENS have not made any subsequent payments. As required under the Note and Mortgage. Consequently, under the terms of the Note and the Mortgage, the COHENS are in default under the terms of the Note and the Mortgage, and have been since at least May 1, 2007. Under the terms of the Note and the Mortgage, the total principal balance is $180,653.98" (Compl. ¶ 20–21).

- The *ex parte* application for arrest of the fishing vessel made similar misrepresentations: "As of May 1, 2007, the total amount due and owing under the Agreement was $180,653.98, *no portion of which has been paid*" (App. for Arrest at 3).

- In the *ex parte* application for arrest, plaintiff further asserted that the Cohens "have defaulted on their obligations to make payments under both the Note and the Mortgage" (App. for Arrest at 5).

No disclosure was made of the large prepayment. Taking the large prepayment into account, there was no default at all. This was true regardless of whether interest was added or not, for the record shows no more than $3,000 per month was ever due and that had been prepaid well into 2009.

10

This order specifically finds that these representations were misleading and were made in bad faith to mislead the Court. *Stevens v. F/V BONNIEDOON*, 655 F.2d 206, 209 (9th Cir. 1981). Del Mar may have relied on the advice of counsel in deciding to sue and to seize the vessel but that cannot excuse the false and misleading statements made by Del Mar and its counsel. The foregoing is sufficient to find bad faith. The Court, however, further finds that Mr. Cappuccio was of the belief at the time of the seizure that Mr. Cohen had embezzled money from the joint venture. He so stated in his deposition in this case. There is no proof whatsoever, however, of any such embezzlement. Although Mr. Cappuccio claimed at trial to be a close friend of Mr. Cohen, that was a charade for trial purposes. Mr. Cappuccio did not cover himself with candor as a witness. This order further finds that Del Mar had ill-will against Mr. Cohen and wanted to seize his boat and threaten his livelihood as a way to put him over a barrel and force him to make payments not actually due and owing under the note and mortgage. As a result, damages will be allowed on Mr. Cohen's counterclaim for wrongful seizure, as computed below.

Nor has plaintiff shown a bankruptcy or impairment of the Cohens' net current asset position, net worth, asset-liability ratio or earnings such that plaintiff was in danger of losing the debt within the meaning of Article II, Section 1(b) of the mortgage (TX 8). Nor did plaintiff have any reasonable belief in any such financial problem at the time of the seizure.

**THE UNSECURED DEBTS**

Returning to the unsecured items, there is no question that Mr. Cohen agreed to be responsible for certain additional items, even if they were not secured by the vessel. The reader should be aware that even if they *were* secured by the vessel, it would make no difference in the foregoing analysis. The reason is that the large prepayment cleared all installments well into 2009, regardless of how much was or was not secured by the mortgage. Put differently, no more than $3,000 a month was ever due, with a minor exception below, so that the large prepayment took care of all installments through 2009.

11

1    The same is true with respect to interest. Even assuming arguendo that interest was due
2 on the note, contrary to the above finding, the fact remains that payments were never due at more
3 than $3,000 per month. The paid-up period would still have run into 2009.

### THE RECEIVABLES

Mr. Cohen's two sons bought fish on credit from the joint venture. When they did not pay, Mr. Cohen agreed with Del Mar to be responsible for repayment. The amounts were $18,069.10 for Leonard and $13,920.40 for Michael. These amounts remain unpaid. These amounts did not carry interest. Mr. Cohen still owes these amounts to Del Mar.

When the joint venture was dissolved in 2004, Mr. Cohen took some of its inventory and agreed to pay for it. That amount was $10,383.24. He still owes this amount.

The Court has considered the possibility that only one-half of these assets should have been credited to Del Mar (with the other half credited to Mr. Cohen) when the joint venture dissolved. The evidence indicates, however, that the venture ended with a loss and Del Mar wound up funding the loss. Mr. Cohen was given a fifty-percent credit for his share and the receivables were then transferred to Del Mar. The assets in question were transferred to Del Mar. In other words, Mr. Cohen was credited for his half in the wind-up process. In this regard, TX 37 — the schedule of Cohen debts and payments prepared by Roggio — is again important. This was prepared well after the dissolution. If Mr. Cohen felt he was not responsible for the inventory or his sons' obligations, as shown on the schedule, he should have said so after he received the schedule. We must remember that he specifically asked for the schedule and was promptly given it. He can be excused for not objecting to the way the $175,000 payment had been allocated on the schedule, for he could not have been expected to clearly see why it might matter. But he should easily have known whether or not he was responsible for the inventory and his sons' obligations. He did not object. That silence is probative. He had managed the joint venture and had kept its books. He was in a position to know whether the receivables were correctly stated. The vague possibility that he said

something like "This does not look right" is too amorphous. He should have immediately seen the items and known instantly whether he had or had not agreed to them and their amounts.[2]

### THE JOINT VENTURE ASSIGNMENT

The joint venture was dissolved in 2003. Due to the ongoing Cohen suit against the Avila Beach port authority, however, Del Mar wanted to distance itself as much as possible from the litigation. In addition to an earlier letter (TX 40), counsel for Mr. Cohen drafted and gave Del Mar a simple assignment in 2006 to sign (TX 47). This assignment was "made effective as of the 22nd day of October 2004." In other words, it was executed two years after the fact. This assignment purported to assign to Mr. Cohen Del Mar's entire interest in the joint venture, including all rights of recoveries. Both sides testified that they viewed this as a vehicle for insulating Del Mar from the ever-consuming Cohen litigation against the port.

Defense counsel have latched onto the assignment as a *nunc pro tunc* extinguishment of the obligation of Mr. Cohen to make good on the receivables. That is, at least under this theory, the receivables owned by the joint venture were retroactively assigned to Mr. Cohen, thus eliminating his obligation to Del Mar. This neat trick is theoretically plausible but most unconvincing on the actual record. In light of the clear-cut testimony from both sides as to the reason and intended effect of the assignment, however, no one could have been more surprised by this theory than Mr. Cohen himself, for it is at odds with his own intent in the matter. Many times, he said he would make good on his sons' obligations and the inventory, before and after the assignment. Both sides thought the assignment was simply a way to keep the enemy in the port litigation from drawing Del Mar in.

Our entire case has been awash in parol evidence at the insistence of both sides. Having used parol and course-of-conduct evidence to escape the interest clause, for example, the Cohens show little grace in opposing the same type of evidence when it works in the other

---

[2] The schedule (TX 37) that Mr. Roggio gave to Mr. Cohen contained headings for amounts relating to: Michael Cohen, Olde Port Inn, Inventory, Point Loma, and Barry. The Michael Cohen heading showed an amount of $13,920.40 and was for fish that he purchased from the Avila Beach Joint Venture and was taken from the accounting records of the Avila Beach Joint Venture. The Olde Port Inn heading showed an amount of $18,069.10 and was for invoices or sales made to Barry Cohen's other son, Leonard Cohen, for fish purchased from the Avila Beach Joint Venture.

13

1  direction. In accordance with the clear mutual intent and undertaking at the time, the assignment
2  did *not* affect Mr. Cohen's obligations with respect to the inventory and his sons. (For this
3  reason, it is unnecessary to reach the dependent issue of whether, as contended by the defense,
4  the joint venture was still alive (but in its death throes) on October 22, 2004, such that the
5  receivables were still owned by it rather than already transferred to Del Mar on that exact date.)

**DEL MAR'S ATTORNEY'S FEES IN THE PORT CASE**

7  Mr. Cohen agreed with Del Mar to repay it for attorney's fees incurred by Del Mar in
8  assisting Cohen in his lawsuit with the port. The lawsuit was not for the benefit of Del Mar.
9  It was solely to help Mr. Cohen. Del Mar was drawn into the discovery and trial of the case.
10 It needed a lawyer. When the legal bills mounted, Del Mar raised the issue with Mr. Cohen and
11 he agreed to reimburse Del Mar for any reasonable fees. The amount turned out to be
12 $21,308.52 (TX 38). Although Mr. Cohen now says he only thought the amount would turn out
13 to be $2,000 or so, that testimony was not credible. Mr. Cohen incurred well over a million
14 dollars in attorney's fees on his own ticket for the same suit. Given the way in which Del Mar
15 was drawn into the discovery battles, the fees in question were entirely reasonable. Mr. Cohen
16 owes this amount directly to Del Mar, although it is unsecured. This item is not derivative of the
17 joint venture but is anchored in a straightforward promise by Mr. Cohen to Del Mar.

18                          *        *        *

19 In sum, on the complaint, this order finds that the Cohens owe $63,681.26 on the
20 unsecured obligations, that this is due and owing now, and that they owe $65,066.81 on the
21 secured debt, none of which is now due. Both figures are subject to the offsets stated below.
22 There having been no default, relief with respect to the vessel is **DENIED**.

**THE COUNTERCLAIM**

24 For the reasons earlier stated, the Cohens were the victims of a bad-faith wrongful arrest
25 of the vessel and may recover the damages proximately caused thereby. This order finds that
26 the vessel was immobilized for two months and one week as a result of the wrongful seizure.
27 During this period, this order finds that the vessel would have made seven trips and netted
28 $4,200 per trip for a total of $29,400. The seven trips are based on the overall rate at which

1  trips occurred before and after the seizure, which was three per month (27 over nine months).
2  Also, the $5,000 paid to the excellent boat captain (Captain Kobak) to keep him able and ready
3  was a reasonable mitigation expenditure.[3] The amounts paid to the easy-to-replace crew,
4  however, were not and are not recoverable. The total recoverable is $34,400. This will be offset
5  against the amount owed against the mortgage, bringing the unpaid amount thereunder down to
6  $30,688.81.

7      In the course of proving his damages, Mr. Cohen submitted a schedule showing his
8  gross-landing receipts for the period before and after the seizure. These happen also to show
9  that in a few months the fifteen-percent clause required slightly more than $3,000 per month to
10 have been paid on the note. Specifically, the three trips in February 2007 grossed enough
11 combined to require $5,284.97. The two trips in March 2007 grossed enough to require
12 $4,070.49 and the three trips in May 2007 grossed enough to require $4,911.88. These are
13 the only instances in the record where the fifteen-percent clause would have exceeded the
14 $3,000 payment. The difference (over the $3,000) comes to $5,267.34. The large prepayment
15 was still ample to cover this amount but not quite as far into 2009 as previously stated.

### ATTORNEY'S FEES FOR THE INSTANT CASE

17     This seizure action was launched in bad faith, for the reasons stated above. Under the
18 admiralty power described in *Golden Pisces, Inc. v. Fred Wahl Marine Construction, Inc.*,
19 495 F.3d 1078, 1081 (9th Cir. 2007), this order holds that defendants are entitled to recover
20 all reasonable attorney's fees and expenses in defending against this case and in prosecuting
21 the counterclaim. As an independent basis, the note had an attorney's fees clause. Under the
22 California rule of reciprocity, defendants are entitled to their reasonable fees and expenses.
23 It is routine in collection actions in California to apply the rule of reciprocity. There is no
24 special reason to deviate from this rule here merely because the vessel was security for the note.
25 *Golden Pisces* refused to adopt a maritime rule of reciprocity in a case where the prevailing
26 party succeeded in proving that the contract was void. Here, however, both sides agree that the

---

[3] Mr. Cohen was a landlubber, not a sea captain. He hired others like Captain Kobak to go to sea and fish.

note has always been valid. The Cohens have prevailed. The award belongs to the Cohens and not to counsel, so the amount of any award shall first be offset against the secured debt and then against the unsecured, with any balance to be paid to the Cohens. A separate order shall explain the procedure to be used to determine the amount.

The reason for the offset is to prevent the unfairness to Del Mar of having to pay cash out without getting paid itself. The Court will use its equitable power, however, to allocate the offset first against the *secured* debt in light of Del Mar's bad-faith misuse of the secured interest and its misuse of the equitable power of the district court to seize the vessel. Moreover, the vast majority of this litigation has concerned the seizure, the note and mortgage, *i.e.*, the secured obligation, and their nexus to the damage award makes it appropriate to offset first against the note and mortgage.

## CONCLUSION

Although both sides submitted extensive findings of fact and conclusions of law in proposed form, this order has found its own way through a rather tortured controversy. It is unhelpful to try to rule on each and every proposed finding. Nonetheless, this order adopts as further findings all findings expressly agreed to by the other side. It is unnecessary to reach any other specific proposals. Counsel shall meet and confer on and submit a proposed form of judgment. Since the amount of attorney's fees will undoubtedly exceed the balance on the secured debt, the form of judgment should provide that the mortgage and note are discharged. Please submit the proposed form of judgment within **FOURTEEN CALENDAR DAYS**.

**IT IS SO ORDERED.**

Dated: June 19, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

16