**COX, WOOTTON, GRIFFIN,
HANSEN & POULOS LLP**
Gregory W. Poulos (SBN 131428)
Max L. Kelley (SBN 205943)
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

**LAW OFFICES OF RICHARD P. WAGNER**
Richard P. Wagner (SBN 166792)
700 Oceangate, Suite 700
Long Beach, CA 90802
Telephone: (562) 216-2946
Facsimile: (562) 216-2960

Attorneys for Plaintiff
DEL MAR SEAFOODS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DEL MAR SEAFOODS, INC.,<br><br>    Plaintiff,<br><br>vs.<br><br>BARRY COHEN, CHRIS COHEN (aka CHRISTENE COHEN), *in personam* and F/V POINT LOMA, Official Number 515298, a 1968 steel-hulled, 126-gross ton, 70.8- foot long fishing vessel, her engines, tackle, furniture, apparel, etc., *in rem*, and Does 1-10,<br><br>    Defendants.<br><br>And Related Counterclaims | Case No.: CV 07-02952 WHA<br><br>**DECLARATION OF GREGORY W. POULOS IN OPPOSITION TO DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES AND COSTS**<br><br><br><br>Hon. William H. Alsup |

I, Gregory W. Poulos, hereby declare:

    1.    I am a Partner in the law firm of Cox, Wootton, Griffin, Hansen & Poulos, LLP. I been practicing law for nearly twenty-one years, and for most of that time I have specialized in handling cases that are governed by the maritime law of the United States,

the International Law of the Sea, and / or the maritime law of other nations. I am a recognized Proctor in Admiralty by the Maritime Law Association of the United States, a past Chair of the Pacific Admiralty Seminar, an advisor to the USF Maritime Law Journal and the current Vice-Chair of the International Bar Association Maritime and Transport Law Committee. I have published articles on various issues of concern to the maritime legal community, and I have spoken at both national and international conferences on maritime law topics.

    Throughout my twenty-one years of maritime practice I have handled cases that ran the spectrum from maritime personal injury to collisions, groundings, allisions, oil pollution and fishing rights and vessel arrests. I have handled well over a dozen maritime arrest cases, usually for the defense. The breadth of my experience in handling maritime cases can be understood from a review of the reported decisions on cases that I have handled including *Western Bulk Carriers v. United States*, 1999 AMC 2818 (E.D. Cal. 1999); *NYK Line v. Burlington N. & Santa Fe Ry. Co.*, 222 F.Supp.2d 1176 (C.D. Cal. 2002); *Davenport v. M/V New Horizon*, 2003 AMC 356 (N.D. Cal. 2002); *Port of Stockton v. Western Bulk Carriers KS*, 371 F.3d. 1119, 2004 AMC 1544 (2003); *Russo v. Blue Ocean Shipping*, 2003 AMC 2882 (N.D. Cal. Cal. 2003); *Vogt-Nem, Inc. v. M/V Tramper*, 263 F.Supp.2d 1226, 2003 AMC 21 (N.D. Cal. 2003); and *Deltak, L.L.C. v. Industrial Maritime Carries Worldwide*, 2004 AMC 1781 (N.D. Cal. 2004).

    3.    In addition to my practice in of maritime law in California, I have also been privileged to have clients assign me maritime related cases in other jurisdictions. I have been admitted to practice *pro hac vice* in the Federal Courts in Alaska, Oregon, Texas (both Southern and Eastern Districts) and the Southern District of New York. I am admitted to all of the Federal Districts in California, the Ninth Circuit and the United States Supreme Court.

    4.    In handling of this case I was assisted by our Associate, Max Lee Kelley. Mr. Kelley is a 1984 graduate from the California maritime academy and a 1998 graduate from Tulane University School of Law where he served as the Managing Editor for the

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL 415-438-4600
FAX 415-438-4601

DM/MarSeafoods/2504

-2-    Case No.: CV07-02952-WHA
DECLARATION OF GREGORY W. POULOS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES & COSTS

Tulane Maritime Law Journal. Between those years Mr. Kelley was a licensed officer in the US Merchant Marine, rising to the rank of Master of an 80,000 dead weight ton crude oil carrier. Mr. Kelley joined Cox, Wootton, Griffin, Hansen & Poulos, LLP as an Associate in 2002. As an Associate Mr. Kelley has participated in four trials and is considered a Senior Associate at the firm.

5. Cox, Wootton, Griffin, Hansen & Poulos, LLP is considered a small to medium sized firm with six Partners and six Associates. This is a fairly typical size to maritime firms today, particularly in California. Before joining my current Partnership I was a Partner at the firm of Lillick & Charles, LLP before it merged into the larger firm of Nixon Peabody, LLP. As a result of my experience as a Partner in my own maritime law firm coupled with my experience as a Partner at a much larger firm (ranging from 80 – 100 attorneys), and my prior work as an Associate at another venerable California maritime law firm, Graham & James, LLP, I have direct personal knowledge of the billing rates that are typically charged by firms in San Francisco for the type of legal work that was necessary in this case.

5. In the present case my hourly rate was, and remains, $350.00 per hour. The rate for my associates that performed work on this case, primarily Max Kelley, was $250.00 per hour. These rates are typical, if not slightly above average, for maritime related litigation in San Francisco and, indeed, throughout California.

6. I have reviewed the declarations of Mr. Martin Fineman and Mr. Gorder submitted in support of defendant's motion for attorneys' fees. I note that neither Mr. Fineman nor Mr. Gorder address the issue of the billing rates for *maritime* litigation or particularly for the type of work done in this case. Mr. Gorder for example discusses the billing rates for "fifty-two other large peer firms (151 or more attorneys firm-wide)" without either identifying those firms or explaining what work those firms do related to maritime litigation and the rates that those firms charge for maritime litigation. Based on my own experience as a Partner in a large law firm, I know that the billing rates charged by maritime Partners are typically far lower than those charged by colleagues practicing in other areas of

civil litigation. The maritime industry simply does not, and cannot typically afford to, pay the rates charged by commercial litigation partners in large firms.

7. Mr. Fineman's declaration also addresses only the question of hourly rates for a "litigation partner in a large law firm."

8. In addition, the Court should notice that the invoices submitted by the defendants in support of the fees motion shows that *none of the fees charged have ever been paid.* The fee agreement that has been produced states that fees are billed monthly and are required to be paid within 30 days. It is obvious therefore that there has been some modification of this fee agreement which has not yet been disclosed. In my experience as a Partner at both a large and a small firm, I can and do attest that it is *highly* unusual for a firm to allow more than $400,000 to accumulate in outstanding accounts receivables unless there is in fact a different fee agreement such as where a contingency fee has been agreed.

9. During the course of this litigation there were several attempts made by Del Mar to reach a settlement. The first effort occurred during the mediation held on November 15, 2007 before Mathew Vafadis, an experienced local maritime attorney and frequent maritime mediator under the federal court's mediation program. During that mediation Del Mar offered a "walk away" which would have forgiven all of the Cohens' debts in return for their dropping the wrongful arrest claim, and each party would have been responsible for their own legal fees and costs. This offer was later reiterated outside the mediation context in discussions that I had with Barry Cohen and James Walsh at the courthouse on January 3, 2008. I specifically told both Barry Cohen and his attorney James ("Bud") Walsh that they should not let the attorneys' fees be the driving force behind this lawsuit and renewed the "walk away" offer.

10. I have reviewed the legal bills submitted by the Cohens' counsel. The Cohens' counsel billed $77,928.50 through the mediation on November 15, 2007.

11. As the lead attorney for Del Mar, it was my decision to depose certain witnesses. Del Mar took the depositions of Barry Cohen, Chris Cohen, Michael Cohen, Leonard Cohen and David Cantrell. Of these depositions, the depositions of Chris, Michael

-4-   Case No.: CV07-02952-WHA
DECLARATION OF GREGORY W. POULOS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES & COSTS

and Leonard Cohen were all taken primarily because the Cohens disputed that they were responsible for the debts of Michael and Leonard. Through these depositions Del Mar obtained testimony from each witness that Barry Cohen had indeed agreed to be "responsible" for those debts and the timing for when he made those promises. This same subject matter was covered in the deposition of David Cantrell who was the Cohens' accountant. Had the Cohens admitted that they owed the sums which the Court found they "clearly" owed, I would not have directed these depositions to be taken.

12. The deposition of Chris Cohen was required in this case because she was a debtor on the promissory note and mortgage and because the Cohens listed her as a witness with discoverable information in their Rule 26 disclosure. While they later sought to recant that designation, I could not in all professionalism tell my client not to take the deposition of Mrs. Cohen given the disclosure and her position in the case. Had the Cohens taken a consistent position that she had no knowledge, then I would have avoided taking her deposition. I must say, however, that Mrs. Cohen provided helpful testimony the Del Mar because she confirmed that the fishing vessel was losing money and that this helped limit the amount of damages that the Cohens recovered for loss of income while the vessel was under arrest. Had the Cohens not submitted inflated figures for lost profits, the deposition could also have been avoided.

13. The case did not involve any novel legal issues and the skill required for the case was not beyond that ordinarily at issue in maritime contract cases.

14. At various times throughout the case I was informed that Mr. Walsh was unavailable to work on the matter because he was involved in other litigation on behalf of other clients. It was my understanding, therefore, that this litigation did not preclude his working on other matters for other clients.

15. Apart from the efforts to have the vessel released from arrest between June and August, 2007, there were no particular time limitations imposed on this matter outside the normal parameters of litigation in the federal courts.

16. The amounts in controversy were Del Mar's claims for debts owed by the Cohens of approximately $138,000 plus interest and the Cohens' cross-complaint for lost fishing profits of roughly $68,000 and the loss of a fishing net valued at approximately $16,000.

17. There was no undesirability to taking the case for either party that I am aware of.

18. At the outset of this case, and up until the plaintiff's summary judgment motion and trial, the Cohens claimed damages of $146,250.78. This amount was comprised of $127,750.78 in lost fishing income for the two months that the vessel was under arrest, $16,000 in costs for the stolen fishing net, and $2,500 in the Cohens' alleged "estimated costs relating to the litigation."

19. Attached as Exhibit 1 to this Declaration is the Declaration filed by Edward Bull in the case of *Arispe v. Timmer, et. al*, Northern District of California, Case No. C03 4269 CRB (ARB). This declaration sets forth in hourly rates for maritime litigation and his experience.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated July 28, 2008 at San Francisco, California.

                                                         /s/
                                                      Gregory W. Poulos

COX, WOOTTON, GRIFFIN, HANSEN & POULOS LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL 415-438-4600
FAX 415-438-4601

DelMarSeafoods/2504

-6-  Case No.: CV07-02952-WHA
DECLARATION OF GREGORY W. POULOS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES & COSTS

# EXHIBIT 1

1 | BANNING MICKLOW BULL & LOPEZ LLP
Edward M. Bull, III, State Bar No. 141966
2 | Eugene A. Brodsky, State Bar No. 36691
Jennifer L. Fiore, State Bar No. 203618
3 | One Market, Steuart Tower, Suite 1440
San Francisco, California 94105
4 | Telephone:   (415) 399-9191
Facsimile:   (415) 399-9192
5 |
Attorneys for Plaintiff
6 | JOSEPH F. ARISPE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH F. ARISPE,<br><br>Plaintiff,<br><br>vs.<br><br>TOM TIMMER and ANN TIMMER, *in personam*, and F/V DONITA and F/V BOUNTIFUL, their engines, tackle, apparel, furniture, etc., *in rem*,<br><br>Defendants. | CASE NO.  C 03 4269 CRB (ARB)<br><br>**DECLARATION OF EDWARD M. BULL III IN SUPPORT OF PLAINTIFF'S PETITION FOR ATTORNEY FEES AND COSTS**<br>Date:  March 17, 2006<br>Time:  10:00 a.m.<br>Courtroom:  8<br>Judge:  Hon. Charles R. Breyer |

1.   I, Edward M. Bull III, declare:

2.   I am an attorney licensed to practice in all courts of the State of California and am admitted to practice before the United States District Courts for the Northern, Eastern, Central and Southern Districts of California.

3.   I am a partner of Banning Micklow Bull & Lopez LLP, attorneys for JOSEPH F. ARISPE, Plaintiff herein.

4.   I earned my juris doctor degree from the University of San Francisco School of Law in 1989 where I graduated *cum laude* and as a member of the University's McAuliffe Honor Society. In law school I founded and was the Editor-In-Chief of the *U.S.F. Maritime Law Journal*. During my final semester of law school I was a full-time judicial extern for the Honorable Edward Panelli, Associate Justice to the California Supreme Court. Prior to attending law school I obtained my

Bachelor of Arts degree from the University of California at Berkeley, graduating with honors from the history department.

5. Following employment as a Summer Associate in 1987 and upon graduating from law school I became employed as an associate at Hancock, Rothert & Bunshoft in San Francisco in 1989 with the firm's maritime and admiralty practice group. Thereafter, I left Hancock, Rothert & Bunshoft with the firm's admiralty practice group to start the San Francisco office of a New Orleans maritime and energy firm, Rice, Fowler, Kingsmill, Vance, Flint & Booth. Rice, Fowler is and was one of the leading admiralty and maritime firms in the United States with offices in New Orleans, Houston, San Francisco, Los Angeles, Miami and London, England. In 1994, the firm name was changed to Rice, Fowler, Booth & Banning. I became an equity partner in the Rice, Fowler, Booth & Banning firm in 1996.

6. During my 16 years of practice, I have specialized primarily in admiralty and maritime litigation. In that capacity my clients have included Underwriters at Lloyd's of London, Underwriters at the Institute of London Underwriters, the majority of the members of the International Shipowners Protection and Indemnity Association based in London, numerous U.S. Flag tanker and other blue water shipping operators, major oil companies (both in the shipping and offshore oil and gas production areas), marine construction companies, shipyards and commercial fishing interests. Beginning in the year 2000, several partners of the Booth Banning firm re-formed the law firm and began a practice dedicated almost exclusively to the representation of plaintiffs in personal injury, wrongful death, insurance and commercial litigation matters.

7. During my years practicing in the maritime area, I have been actively involved in various professional associations, including the Maritime Law Association of the United States, the Pacific Admiralty Seminar (the maritime law section of the Bar Association of San Francisco) and the Association for Transportation Law, Logistics and Policy. I have published articles in the area of maritime law, including the article *Seamen Status Revisited: A Practical Guide to Status Determination*, 6 U.S.F.Mar.L.J. 549 (1994), an article cited by the United States Supreme Court in *Chandris, Inc. v. Latsis*, 115 S.Ct. 2172 (1995). I served as Session Chairs for the Pacific Admiralty Seminar in 1994 (producing and moderating the section on marine environmental laws) and the year

2000 (producing and moderating the section on special admiralty remedies). Between the years of 2002 and 2004 I served as the Chair of the seminar's Steering Committee. I have been given an "AV" rating by Martindale-Hubbell. I am an adjunct professor of maritime law at U.S.F. School of Law. I am a member of the American Trial Lawyers Association, The Consumer Attorneys of California and the San Francisco Trial Lawyers Association.

8. Attached hereto as Exhibit "A" is a true and correct copy of the Brodsky, Baskin & Miller bill (the "Brodsky Bill") for professional services rendered and costs incurred in this matter prior to January 1, 2005. Attached hereto as Exhibit "B" is a true and correct copy of the Banning Micklow Bull & Lopez bill (the "Banning Bill") for professional services rendered and costs incurred in this matter from January 1, 2005 to the date of this filing. All of the time entries referenced on these bills were personally prepared or reviewed by me or the other responsible attorney or staff members and represent the actual time committed to the described tasks. Time estimates are rounded down where they exceed 1/10th of an hour and many day-to-day activities committed to the file are not captured. The case was at all times supervised and handled by an experienced maritime lawyer and every effort was made to do only the work needed to properly prepare the case. My current billing rate for hourly clients is $300- $350 per hour depending on the client in question. My lowest hourly billing rate on any file open in the firm is $300 an hour. As a long-time member of the California admiralty bar, I have developed personal knowledge of the rates charged for maritime work for hourly clients. I have not only consulted with numerous attorneys and clients to ensure the competitiveness of our firm's fee structure, but working as counsel in fee disputes and marine insurance coverage litigation and as a representative of excess underwriters, I have also developed a personal understanding of the rates charged by maritime lawyers in California and in San Francisco. Given this personal knowledge, I can attest that our firm's rates are representative of other attorneys in this market (for this type of work) and are therefore reasonable.

9. The bills were prepared in conformance with the customary billing practices we use for all clients. Because we represent clients both on a contingency basis and an hourly basis, we customarily keep time with our smallest time increment being one-tenth of an hour.

10. The Bill was edited by me to write off any time that may have been duplicated, time

that could be classified as education time or time that could be classified as administrative time in the same manner that we employ for our hourly clients. With respect to Mr. Arispe's bills, we assigned work to the least expensive person who was qualified and available to perform the task. The methodology we used to record time and expenses and to prepare and finalize the bills was the same methodology I used at Hancock and at Rice Fowler Booth & Banning as a billing partner. The only difference in the billing practices relating to this matter is that there was a tendency not to record all activities on the file which were not related to a specific task or project. Indeed, as mentioned above, a great deal of the routine day-to-day activity on the file (particularly related to routine phone calls, client interaction and interoffice activities) is not represented on the bills. My best estimate is that the bills represents approximately 75% to 80% of the time actually devoted to the file by members of the Brodsky and Banning firms.

11. The work performed by the Brodsky firm was also performed by attorneys with significant trial and maritime experience. Mr. Brodsky is a graduate of Columbia University School of Law, has been practicing maritime law in San Francisco since the late 1960's and is an adjunct professor of maritime law at Golden Gate University. Mr. Miller is a graduate of Hastings College Of The Law and has been practicing in the Bay Area for over 25 years. Ms. Fiore is also an experienced maritime lawyer who graduated from the University of San Francisco School of Law in 1999 after serving as the Editor in Chief of the U.S.F Maritime Law Journal. Ms. Fiore also co-taught maritime law with Mr. Brodsky as an adjunct professor at Golden Gate University. The rates charged by Mr. Brodsky, Mr. Miller and Ms. Fiore are all reasonable and reflect standard billing rates for maritime counsel with similar experience.

12. Plaintiff's complaint was filed on September 19, 2003. The complaint alleged causes of action for willful and arbitrary failure to pay maintenance and cure, Jones Act Negligence and Unseaworthiness. Between the time of the original filing of the Complaint and December 31, 2004, all of the work on this file was done by Brodsky Baskin & Miller. Since January 1, 2005, all the work on Mr. Arispe's case has been handled by Banning Micklow Bull & Lopez.

13. The time billed to this case broken down into three separate categories of work: (1) time relating to items which were exclusively connected to the maintenance and cure case (such as

4

writing maintenance and cure demand letters and opposing the motion for summary judgment on maintenance and cure), (2) activities exclusively related to the liability claims (essentially limited to working with Plaintiff's liability expert, Captain Stoller); and (3) areas which were inextricably intertwined with the maintenance and cure claim and the liability claims; the classic "overlap" area. This latter category amounted to the vast majority of the time dedicated to this case. These activities included, by way of example, proving seaman status (i.e., the nature and extent of Plaintiff's work, work assignments, vessel assignments, etc.), that Plaintiff was injured or became ill while in the service of the Defendants' vessels, medical causation and the damages potentially recoverable under both the liability and the maintenance and cure claims. This category also included taking the depositions of numerous factual witnesses, the preparation of most of the pretrial materials (jury instructions, special verdict form, etc.), the preparation of motions *in limine* and oppositions and the vast majority of the time spent during the trial of this matter.

14. Of the items in the "overlapping" or "inextricably intertwined" area, each of the general tasks or activities related both to the maintenance and cure related issues and the liability issues and cannot be segregated without applying artificial ratios or time reconstructions. The primary areas in question and their connection to the maintenance and cure issues are as follows:

| | |
|---|---|
| **Initial Case Evaluation** | Related to entire case, but initially focused on plaintiff's need for maintenance and cure and medical treatment. |
| **Crew Depositions** | Related, at least in part, to the circumstances of accident, work methods and plausibility of Plaintiff's "story" regarding his accidents. |
| **Obtaining and Reviewing Operational documents** | Most of these documents related to work methods, work practices, Plaintiff's assignment, and other activities relating to the prosecution and defense of maintenance and cure as well as liability issues. |

| | |
|---|---|
| **Case Management and Reporting Activities** | Related to case overall. |
| **Settlement Conferences and Briefing** | Related to case overall. |
| **Medical Discovery, Depositions and Documents** | Related largely to maintenance and cure issues of medical causation, etiology, maximum cure, etc. |
| **Written Discovery** | Related to whole case, injuries, medical issues, timing, witness locations, etc. |
| **Stipulations Regarding Parties and Status** | Again, related to totality of covered claims, including maintenance and cure. |
| **Economic Damages Issues and Documentation (and Experts)** | Related to damages needed covered by all claims, including maintenance and cure. |
| **Plaintiff's Depositions** | Related to all issues covered during Plaintiff's multiple depositions. However, much of the examination related to medical and other maintenance and cure related issues. |
| **Hours Worked and Excessive Work Issues** | Directly related, at least in part, to medical causation and manifestation issues. |
| **Medical Causation Experts, Cumulative Trauma Issues, etc.** | All related, at least in part, to mechanism of injury and maintenance and cure. |
| **Damages Expert Whalen** | This testimony directly relating to the economic damages which potentially could have been recovered pursuant to the maintenance and cure claim. |
| **Carol Hyland and Mr. Yankowski** | Provided testimony regarding potential damages recoverable under all claims, including maintenance and cure claims. |
| **Pretrial Documents, Motions *in Limine*, Pretrial Conference Order and Jury Instructions** | All items covered of a large mix of procedural, case management, maintenance and cure, damages and medical and liability issues. Many of these items related directly to maintenance and cure and defenses thereto. |

| | |
|---|---|
| **Trial Exhibits (Plaintiff's and Defendants')** | Again, the trial exhibit preparation process was inextricably intertwined with all aspects of the case (see paragraph 18 below). |
| **Demonstrative Exhibits/Blow-ups** | Virtually all of the materials used at trial as far as demonstrative evidence related to, at least in part, the mechanism of injury during the fishing operations, and therefore were prepared for use on both the maintenance and liability aspects of the case |
| **Trial Preparation and Trial Work** | Virtually all of the trial preparation and trial work involved all aspects of the case. Plaintiff did endeavor to formulate a reliable estimate as to the amount of time spent on the liability issues where they were discreet in evidentiary presentation (relating almost exclusively to plaintiff's liability expert). The time for preparing and presenting Plaintiff's liability expert has been deducted from the bill. |

As can be seen from the above examples, the vast majority of the activities undertaken in this case fell into the "overlap" area between the maintenance and cure and Jones Act and unseaworthiness claims and would fall into the area described in the mixed fee cases (including the maintenance and cure cases) as the "inextricably intertwined" activities.

15. As can be seen from the attached Brodsky and Banning bills (Exhibits "A" & "B" hereto), only a small number of tasks were undertaken which related solely to the liability issues in this case; in most instances dealing with Plaintiff's liability expert. This is true even where best estimates have been made to deduct the time committed to the preparation and presentation of the trial testimony of Plaintiff's liability witness. Specifically, the total billings related exclusively to liability activities amounts to $4507.50. The level of costs and expenses dedicated to pure liability issues was $11,112.89.

16. One of the primary reasons that the maintenance and cure and related issues dominated this case was the tactical decision made by the Defendants to focus on the "willful misconduct" defense and attacking Plaintiff's credibility relating to the mechanism of his accident, the nature and extent of his medical injuries and his alleged failure to mitigate his maintenance and cure damages. Through the case, plaintiff had to respond to defenses to the maintenance and cure

claims, such as:

    a.    Mr. Arispe was not injured in October of 2003 while stacking crab pots in the gear yard or in the spring of 2003 while lifting gear on the BOUNTIFUL;

    b.    If injured while working for the Defendants, the injuries were mild and fully resolved;

    c.    All of Plaintiff medical problems were the result of daily life activities (like fly fishing) rather than crab fishing;

    d.    Mr. Arispe malingered or exaggerated his injuries;

    e.    Maintenance of $20.00 per day was adequate to provide room and board; and

    f.    No maintenance was owed for September 2003 to September 2004.

Obtaining the benefits that were paid before trial involved extensive letter writing, document submissions and discovery expeditions. The entire case involved special maritime substantive and procedural issues and required specialized maritime counsel. However, while some of these factors do support an upward enhancement in the loadstar rates sought, Plaintiff submits that the complexity involved in such cases (and this case) is typical in the firm's practice and already accounted for in the firms prevailing hourly rates.

    17.    In the present case, the raising of the above-referenced defenses expanded the amount of work that had to be carried out and the percentage of work ultimately attributable to the maintenance and cure claims. For example, virtually all of witnesses who were deposed and testified at trial provided testimony relating to the maintenance and cure claim. These included: (1) Plaintiff (on the nature of the injury and the accident, medical causation, mitigation efforts, willful misconduct issues and damages); (2) Alex Meeks (service issues, work methods and duties - i.e., medical causation, willful misconduct, etc.); (3) Dave Doering (service issues, work methods and duties - i.e., medical causation, willful misconduct, etc.); (4) Lance Duey (service issues, work methods and duties - i.e., medical causation, willful misconduct, etc.); (5) Victor Pomilia (service issues, work methods and duties - i.e., medical causation, willful misconduct, etc.); (6) Dave Coerbert (service issues, work methods and duties - i.e., medical causation, willful misconduct, etc.); (7) Tom Timmer (service issues, work methods and duties - i.e., medical causation, willful

8

misconduct, etc.); (8) Ann Timmer (service issues, work methods and duties - i.e., medical causation, willful misconduct, etc.); (9) Denise Arispe (willful misconduct, mitigation, medical causation, living expenses, benefit administration etc.); (10) Dr. Whalen (damages); (11) Thomas Sampson, M.D. (medical causation, maximum cure, willful misconduct and damages); (12) James Stark, M.D. (medical causation, maximum cure, willful misconduct and damages); (13) Dr. Daniel Farnum (medical causation, maximum cure, willful misconduct and damages); (14) Dr. Asa Stockton (medical causation, maximum cure, willful misconduct and damages); (15) Dr. Kevin Caldwell (medical causation, maximum cure, willful misconduct and damages); (16) Dr. Kenneth Miller (medical causation, maximum cure, willful misconduct and damages); (17) Dr. Frank Mainzer (medical causation); (18) Scott Fulmer (medical causation/work place environment); (19) Jim Rooning (maintenance and cure administration, willful misconduct , etc.); (20) Carol Hyland (damages); (21) Mr. Thomas Yankowski (damages), (22) Dr. Michael Earleywine (via report-marijuana use); and (23) Micheal Slade (via report-marijuana use). In contrast, only one witnesses did not testify regarding any maintenance and cure issues; namely Plaintiff's liability expert, Captain Mitchell Stoller.

18. Similarly, the vast majority of the documents sought and obtained during discovery and presented at trial as exhibits were either entirely related to maintenance and cure or were used for both maintenance and cure and non-maintenance and cure issues. These included, Exhibits 1, 2, 5-8, 10, 11, 13-15, 17, 19 & 20 [photograph, documents and objects relating to work methods and equipment], Exhibits 22-24 & 64 [are medical records], Exhibits 28, 29, 32 & 69 [are earning records], Exhibits 65 & 67 [marijuana reports] and Exhibits 33, 35 & 51 [maintenance and cure administration files]. Furthermore, the vast majority of the blow-ups used by counsel during trial (as well as other demonstrative exhibits) also related at least in part to the maintenance and cure related issues.

19. In order to establish what portion of fees should be included in this petition, I personally reviewed both the Brodsky and Banning Bills and calculated all time spent by any time keepers on items exclusively related to the liability issues in this case. All such items are highlighted on the bills for identification purposes. This was done for each individual timekeeper

9

1  and thereafter those totals were subtracted from the bill totals. The claim presented reflects the balance, less those purely liability related activities. The total petition amount is $ 219,865.00 in fees.

20.  I also went through all of the cost items on the bills and subtracted those cost items relating exclusively to the liability aspect of this case. I did not subtract those items which were undertaken entirely for the maintenance and cure case or those items which related to both the maintenance and cure and liability case activities. The cost deducted are also highlighted on the bills. The total remaining costs amount to $ 37,588.18.

21.  The Defendants settlement position in relation to this case was very aggressive and essentially forced the case to trial and significantly increased the fees and costs incurred. Ultimately, the Defendants' highest offer in this case was conveyed just weeks before trial in a settlement conference before Magistrate Judge Edward Chen and amounted to $20,000 (with an indication that the defendants "might" pay as much as $60,000 if Plaintiff would commit to accepting it). Judge Chen told Plaintiff's counsel that if Plaintiff was not prepared to make a demand for less than $100,000, there was no point in negotiating further. Defendants' position *vis-à-vis* the settlement of this case made a settlement essentially impossible (the amount of costs alone would have resulted in Plaintiff receiving essentially nothing through the settlement proposed) and therefore mandated a trial of this matter.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing statements are true and correct.

Executed this 27th day of January, 2006, at San Francisco, California.

        /s/ Edward M. Bull III
        Edward M. Bull III